**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

DK ACQUISITION PARTNERS, L.P.,
KENSINGTON INTERNATIONAL LIMITED,
RUSHMORE CAPITAL-I, L.L.C., RUSHMORE
CAPITAL-II, L.L.C., and SPRINGFIELD
ASSOCIATES, LLC.,

                               Plaintiffs,

      v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, J.P. MORGAN SECURITIES,
INC., CITIGROUP INC., CITIBANK, N.A. and
CITIGROUP GLOBAL MARKETS, INC. f/k/a
Salomon Smith Barney,

                            Defendants.

-------------------------------------------------------------X

Case No. 08 Civ. 446 (LTS)

[Caption continued on following page]

```
---------------------------------------------------------X
AVENUE CAPITAL MANAGEMENT II, L.P.,          :
GRACIE CAPITAL, L.P., HALCYON FUND,          :
L.P., KING STREET CAPITAL, L.P.,             :
LONGACRE MASTER FUND, LTD., MAN MAC          :
3 LIMITED, ORE HILL FUND HUB LTD.,           :
MARATHON SPECIAL OPPORTUNITY                 :
MASTER FUND, LTD., RCG CARPATHIA             :
MASTER FUND, LTD., REDWOOD MASTER            :
FUND, LTD., SCOGGIN CAPITAL                   :
MANAGEMENT, L.P. II, SCOGGIN                  :
INTERNATIONAL FUND, LTD., SCOTTWOOD          :
CAPITAL MANAGEMENT, LLC, SPCP GROUP,         :     Case No. 08 Civ. 447 (LTS)
LLC, STRATEGIC VALUE CREDIT                  :
OPPORTUNITIES MASTER FUND, L.P.,             :
STRATEGIC VALUE MASTER FUND, LTD.,           :
and TRILOGY CAPITAL, LLC,                    :
                                             :
                              Plaintiffs,    :
                                             :
              v.                             :
                                             :
JPMORGAN CHASE & CO., JPMORGAN               :
CHASE BANK, J.P. MORGAN SECURITIES,          :
INC., CITIGROUP INC., CITIBANK, N.A., and    :
CITIGROUP GLOBAL MARKETS, INC. f/k/a         :
Salomon Smith Barney,                        :
                                             :
                              Defendants.    :
---------------------------------------------------------X
---------------------------------------------------------X
UNICREDITO ITALIANO SPA and BANK             :
POLSKA KASA OPIEKI SA                        :
                                             :
                              Plaintiffs,    :
                                             :
              v.                             :
                                             :
JPMORGAN CHASE BANK, J.P. MORGAN             :     Case No. 02 Civ. 5328 (LTS)
CHASE & CO., J.P. MORGAN SECURITIES,         :
INC., CITIBANK, N.A., CITIGROUP, INC. and    :
CITIGROUP GLOBAL MARKETS INC.                :
(FORMERLY SALOMON SMITH BARNEY              :
INC.)                                        :
                                             :
                              Defendants.    :
---------------------------------------------------------X
```

2

## SUPPLEMENTAL AFFIDAVIT OF DAVID J. WOLL

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK   )

        DAVID J. WOLL, Esq., being duly sworn, deposes and says:

1.      I am a member of the law firm of Simpson Thacher & Bartlett LLP, attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc. (collectively, "JPMorgan Chase"), in the above-captioned action.  I submit this affidavit in support of Defendants' Motion for Summary Judgment solely to place before the Court certain relevant documents.

2.      Attached hereto as Supplemental Exhibit 1 is a true and correct copy of the $1.25 billion, five-year revolving credit facility dated as of May 18, 2000.

3.      Attached hereto as Supplemental Exhibit 2 is a true and correct copy of the $1.75 billion, 364-day revolving credit facility dated as of May 14, 2001.

4.      Attached hereto as Supplemental Exhibit 3 is a true and correct copy of the $1.75 billion, 364-day revolving credit facility dated as of May 18, 2000.

5.      Attached hereto as Supplemental Exhibit 4 is a true and correct copy of the Information Memorandum for the $1.25 billion, five-year revolving credit facility dated April 25, 2000.

6.    Attached hereto as Supplemental Exhibit 5 is a true and correct copy of the Invitation to Offer for the $1.75 billion, 364-day revolving credit facility and the $500 million letter of credit facility dated April 20, 2001.

7.    Attached hereto as Supplemental Exhibit 6 is a true and correct copy of the $500 million letter of credit facility dated as of May 14, 2001.

8.    Attached hereto as Supplemental Exhibit 7 is a true and correct copy of the Notice of Borrowing for the $1.25 billion, five-year revolving credit facility that Enron sent to Citibank on October 25, 2001.

9.    Attached hereto as Supplemental Exhibit 8 is a true and correct copy of the Notice of Borrowing for the $1.75 billion, 364-day revolving credit facility that Enron sent to Citibank on October 25, 2001.

DAVID J. WOLL

Sworn to before me this
14th day of April 2008

Notary Public

STEVE M. METRO
Notary Public, State of New York
No. 01ME5029824
Qualified in Orange County
Commission Expires July 5, 2010

4

SUPPLEMENTAL EXHIBIT 1

**U.S. $1,250,000,000**

**LONG-TERM**
**REVOLVING CREDIT AGREEMENT**

**DATED AS OF**
**MAY 18, 2000**

**AMONG**

**ENRON CORP.,**
*AS BORROWER*

**AND**

**THE BANKS NAMED HEREIN,**
*AS BANKS*

**AND**

**CITIBANK, N.A.,**
*AS PAYING AGENT*

**AND**

**CITIBANK, N.A. AND THE CHASE MANHATTAN BANK**
*AS CO-ADMINISTRATIVE AGENTS*

*CO-LEAD ARRANGERS:*

*SALOMON SMITH BARNEY INC.*
*AND*
*CHASE SECURITIES INC.*

*SYNDICATION AGENT:*

*BARCLAY BANK PLC*

*DOCUMENTATION AGENT:*

*ABN AMRO BANK N.V.*

NICHJJ016951\004046
HOUSTON\1120252 3



DEPOSITION EXHIBIT
60015
12' 6' 04
TAMMEY M. PASTOR, R.P.R.

JPMUCI 0008438

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms ................................................ 1
SECTION 1.02.    Computation of Time Periods ...................................... 10
SECTION 1.03.    Accounting Terms ...................................................... 10
SECTION 1.04.    Miscellaneous ........................................................... 10
SECTION 1.05.    Ratings ....................................................................... 10

## ARTICLE II

### AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01.    The Advances ............................................................ 11
SECTION 2.02.    Making the Advances ................................................ 11
SECTION 2.03.    Fees ........................................................................... 12
SECTION 2.04.    Repayment ................................................................ 12
SECTION 2.05.    Interest ...................................................................... 12
SECTION 2.06.    Additional Interest on LIBOR Advances ................... 13
SECTION 2.07.    Interest Rate Determination and Protection ............... 13
SECTION 2.08.    Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings ... 14
SECTION 2.09.    Prepayments .............................................................. 15
SECTION 2.10.    Increased Costs; Capital Adequacy, Etc .................... 15
SECTION 2.11.    Illegality .................................................................... 16
SECTION 2.12.    Payments and Computations ...................................... 17
SECTION 2.13.    Taxes ........................................................................ 18
SECTION 2.14.    Sharing of Payments, Etc ......................................... 19
SECTION 2 15.    Ratable Reduction or Termination of the Commitments; Effect of
                 Termination ......................................................... 20
SECTION 2.16.    Replacement of Bank; Additional Right to Terminate Commitments ........ 20
SECTION 2.17.    Non-Ratable Reduction or Termination of Commitments ................. 21
SECTION 2.18.    Certificates of Banks ................................................ 22

## ARTICLE III

### CONDITIONS TO ADVANCES

SECTION 3.01.    Initial Condition Precedent ....................................... 22
SECTION 3.02    Additional Conditions Precedent to Each Advance ...................... 23

NICHJN016951\004046
HOUSTON\1202523

-i-

JPMUCI 0008439

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4 01.        Representations and Warranties of the Borrower . . . . . . . . . . . . . . . . . . . . . . 23

# ARTICLE V

## COVENANTS OF THE BORROWER

SECTION 5.01.        Affirmative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 5.02.        Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.        Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# ARTICLE VII

## THE PAYING AGENT

SECTION 7.01.        Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.02.        Paying Agent's Reliance, Etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.03.        Paying Agent and Its Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.04.        Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.05.        Certain Rights of the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.06.        Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.07.        Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.08.        Resignation by the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# ARTICLE VIII

## THE CO-ADMINISTRATIVE AGENTS

SECTION 8 01.        Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.02.        Co-Administrative Agents' Reliance, Etc . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.03.        Co-Administrative Agents and Their Affiliates . . . . . . . . . . . . . . . . . . . 34
SECTION 8.04.        Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.05.        Certain Rights of the Co-Administrative Agents . . . . . . . . . . . . . . . . . . 35
SECTION 8.06.        Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.07.        Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.08        Resignation by the Co-Administrative Agents . . . . . . . . . . . . . . . . . . . . 36

JPMUCI 0008440

# ARTICLE IX

## MISCELLANEOUS

| | | |
|---|---|---|
| SECTION 9.01. | Amendments, Etc | 37 |
| SECTION 9.02. | Notices, Etc | 37 |
| SECTION 9.03. | No Waiver; Remedies | 39 |
| SECTION 9.04. | Costs, Expenses and Indemnity | 39 |
| SECTION 9.05. | Right of Set-Off | 40 |
| SECTION 9.06. | Assignments and Participations | 40 |
| SECTION 9.07. | Governing Law; Entire Agreement | 43 |
| SECTION 9.08. | Interest | 43 |
| SECTION 9.09. | Confidentiality | 43 |
| SECTION 9.10. | Execution in Counterparts | 44 |
| SECTION 9.11. | Domicile of Loans | 44 |
| SECTION 9.12. | Binding Effect | 44 |
| SECTION 9.13. | Prior Credit Facilities | 44 |
| SECTION 9.14. | Return of Notes | 44 |

Schedule I  - Facility Fees and Applicable Margins
Schedule II - Applicable Lending Offices

Exhibit A  -  Form of Note
Exhibit B  -  Notice of Borrowing
Exhibit C  -  Opinion of Vinson & Elkins L.L.P., Counsel to Borrower
Exhibit D  -  Opinion of Executive Vice President and General Counsel of Borrower
Exhibit E  -  Opinion of Bracewell & Patterson, L.L.P., Counsel to the Paying Agent
Exhibit F  -  Form of Assignment and Acceptance

JPMUCI 0008441

# LONG-TERM
# REVOLVING CREDIT AGREEMENT

Dated as of May 18, 2000

ENRON CORP., an Oregon corporation, the lenders party hereto, Citibank, N. A. and The Chase Manhattan Bank, as Co-Administrative Agents hereunder, and Citibank, N.A., as Paying Agent hereunder, agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

"Advance" means an advance by a Bank to the Borrower pursuant to Article II (as divided or combined from time to time as contemplated in the definition herein of "Borrowing"), and refers to a Base Rate Advance or a LIBOR Advance (each of which shall be a "Type" of Advance).

"Affected Lender" has the meaning specified in Section 2.11.

"Agreement" means this Long-Term Revolving Credit Agreement, as same may be amended, extended, supplemented or modified from time to time in the future.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of a Base Rate Advance and such Bank's Eurodollar Lending Office in the case of a LIBOR Advance.

"Applicable Margin" means, for any Interest Period for any LIBOR Advance, the percentage per annum applicable to such LIBOR Advance, as shown in Schedule I and being based on the Rating Level, which for the purposes of determining the Applicable Margin for any Interest Period for any LIBOR Advance shall be the Rating Level in effect on the first day of such Interest Period.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Bank and an Eligible Assignee, and accepted by the Paying Agent, in substantially the form of Exhibit F.

"Bankruptcy Code" means Title 11 of the United States Code, as now or hereafter in effect, or any successor thereto.

"Banks" means the lenders listed on the signature pages hereof and each Eligible Assignee that becomes a Bank party hereto pursuant to Section 2.16 or Section 9.06(a), (b) and (d).

JPMUCI 0008442

"Base Rate" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time which rate per annum shall at all times be equal to the highest of:

(a)    the rate of interest announced publicly by Citibank in New York, New York, from time to time, as Citibank's base rate; and

(b)    the sum (adjusted to the nearest ¼ of 1% or, if there is no nearest ¼ of 1%, to the next higher ¼ of 1%) of (i) ½ of one percent per annum plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on the next succeeding Business Day) for the three-week period ending on the previous Friday by Citibank on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Citibank from three New York certificate of deposit dealers of recognized standing selected by Citibank, by (B) a percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Federal Reserve Board for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Citibank with respect to liabilities consisting of or including (among other liabilities) three-month Dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Citibank for determining the then current annual assessment payable by Citibank to the Federal Deposit Insurance Corporation (or any successor) for insuring Dollar deposits of Citibank in the United States; and

(c)    the sum of ½ of one percent per annum plus the Federal Funds Rate in effect from time to time.

"Base Rate Advance" means an Advance which bears interest as provided in Section 2.05(a).

"Borrower" means Enron Corp., an Oregon corporation, and any successor thereto pursuant to Section 5.02(d)(ii).

"Borrowing" means a borrowing hereunder consisting of Advances of the same Type made on the same day by the Banks and, in the case of LIBOR Advances, having the same Interest Period; provided that (a) all Base Rate Advances outstanding at any time shall thereafter be deemed to be one Borrowing, and (b) subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08 and 2.11, on the last day of an Interest Period for a Borrowing comprised of LIBOR Advances, such Borrowing may be divided ratably to form multiple Borrowings comprised of LIBOR Advances (with the result that each Bank's Advance as a part of each such multiple Borrowing is proportionately the same as its Advance as a part of such divided Borrowing) or combined with all or a ratable portion of the Base Rate Advances or all or a ratable portion of one or more other Borrowings, the Interest Period for which also ends on such day, to form a new Borrowing comprised of LIBOR Advances, such division or combination to be made by notice from the Borrower given to the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the proposed division or combination specifying the date of such division or combination (which shall be a Business Day) and all other relevant information (such as the Borrowings (or portions thereof) to be divided or combined, the respective amounts of the Borrowings resulting from any such division, the relevant Interest Periods, the amount of the Base Rate

JPMUCI 0008443

Advances or other Borrowings (or portions thereof) to be so combined and such other information as the Paying Agent may request), but except as provided in the proviso to Section 2.07(f) in no event shall any LIBOR Borrowing resulting from, or remaining after, any such division or combination be less than $25,000,000, and in all cases each Bank's Advances as a part of each such combined, resultant or remaining Borrowing shall be proportionately the same as its Advances as a part of the relevant Borrowings prior to such division or combination. Each Borrowing comprised of a Type of Advance shall be that "Type" of Borrowing.

"Business Day" means (a) any day of the year except Saturday, Sunday and any day on which banks are required or authorized to close in New York City or Houston, Texas and (b) if the applicable Business Day relates to any LIBOR Advances, any day which is a "Business Day" described in clause (a) and which is also a day for trading by and between banks in the London interbank Eurodollar market.

"Chase" means The Chase Manhattan Bank, a New York banking corporation.

"Citibank" means Citibank, N. A., a national banking association.

"Co-Administrative Agents" means, collectively, Citibank and Chase, each in its capacity as a Co-Administrative Agent pursuant to Article VIII, and such term shall include any successor to either such entity in such capacity pursuant to Section 8.08. If at any time only one Person is serving as a Co-Administrative Agent hereunder, such term shall mean such Person.

"Code" means the Internal Revenue Code of 1986 as amended from time to time, or any successor Federal tax code, and any reference to any statutory provision of the Code shall be deemed to be a reference to any successor provision or provisions.

"Commitment" has the meaning specified in Section 2.01.

"Consolidated" refers to the consolidation of the accounts of the Borrower and its Subsidiaries in accordance with GAAP.

"Consolidated Net Worth" means at any date the Consolidated stockholders' equity of the Borrower and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of the Borrower).

"Convert", "Conversion" and "Converted" each refers to a conversion of Advances or a Borrowing of one Type into Advances or a Borrowing of another Type, as the case may be, pursuant to Section 2.07, Section 2.08, Section 2.10(b) or Section 2.11.

"Debt" of any Person means, at any date, without duplication, its (a) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with GAAP, (b) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (c) guaranties of payment or collection of any obligations described in clauses (a) and (b) of other Persons, provided, that clauses (a) and (b) include, in the case of obligations of the Borrower or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; provided, further, that the liability of any Person as a general partner of a partnership for Debt of such partnership, if such partnership is not a Subsidiary of such Person, shall not constitute Debt.

JPMUCI 0008444

"Default" means an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" opposite its name on Schedule II hereto or in the Assignment and Acceptance pursuant to which it became a Bank or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Eligible Assignee" means (a) any Bank, and (b) with the consent of the Paying Agent and the Borrower (which consent will not be unreasonably withheld), any other commercial bank or financial institution not covered by clause (a) of this definition; provided, however, that neither the Borrower nor any Subsidiary of the Borrower shall be an Eligible Assignee.

"Enron Indenture" means that certain indenture dated as of November 1, 1985, between the Borrower (formerly InterNorth, Inc.) and Harris Trust and Savings Bank, as Trustee, as supplemented and amended by the First Supplemental Indenture dated as of December 1, 1995, the Supplemental Indenture, dated as of May 8, 1997, by and among Enron Corp., a Delaware corporation, the Borrower and Harris Trust and Savings Bank, as Trustee, the Third Supplemental Indenture, dated as of September 1, 1997, between the Borrower and Harris Trust and Savings Bank, as Trustee, and the Fourth Supplemental Indenture, dated as of August 17, 1999, between the Borrower and Harris Trust and Savings Bank, as Trustee, without giving effect to any further amendment or modification thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute of similar import, together with the regulations thereunder, as in effect from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a group of which the Borrower is a member and which is under common control within the meaning of the regulations under Section 414 of the Code.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board, as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Eurodollar Lending Office" opposite its name on Schedule II hereto or in the Assignment and Acceptance pursuant to which it became a Bank (or, if no such office is specified, its Domestic Lending Office) or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Events of Default" has the meaning specified in Section 6.01.

"FDIC" means the Federal Deposit Insurance Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal

JPMUCI 0008445

Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Paying Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any federal agency or authority of the United States from time to time succeeding to its function.

"GAAP" means United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements referred to in Section 4.01(d).

"Illegality Event" has the meaning specified in Section 2.11.

"Indemnified Parties" has the meaning specified in Section 9.04(c).

"Insufficiency" means, with respect to any Plan, the amount, if any, by which the present value of the accrued benefits under such Plan exceeds the fair market value of the assets of such Plan allocable to such benefits.

"Interest Period" means, with respect to each LIBOR Advance, in each case comprising part of the same Borrowing, the period commencing on the date of such Advance or the date of the Conversion of any Advance into (or the division or combination of any Borrowing resulting in) such an Advance and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months (or, as to any Interest Period, such other period as the Borrower and the Banks may agree to for such Interest Period), in each case as the Borrower may, upon notice received by the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the first day of such Interest Period (or, as to any Interest Period, at such other time as the Borrower and the Banks may agree to for such Interest Period), select; provided, however, that:

    (a)    Interest Periods commencing on the same date for Advances comprising part of the same Borrowing shall be of the same duration;

    (b)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

    (c)    any Interest Period which begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month in which such Interest Period would have ended if there were a numerically corresponding day in such calendar month; and

    (d)    no Interest Period may end after the Termination Date.

JPMUCI 0008446

"LIBO Rate" means, for any Interest Period for each LIBOR Advance comprising part of the same Borrowing, (a) the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period; (b) if for any reason the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page), the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of such Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page (or any successor page), the applicable rate shall be the arithmetic mean of all such rates; and (c) if the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor  page) and if no rate specified in clause (b) of this definition so appears on Reuters Screen LIBO page (or any successor page), the interest rate per annum (rounded upward to the nearest whole multiple of 1/16 of 1% per annum if such rate is not such a multiple) equal to the rate per annum at which deposits in Dollars are offered by the principal office of the Reference Bank in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to the amount of the LIBOR Advance of the Reference Bank comprising part of such Borrowing and for a period equal to such Interest Period. If the LIBO Rate is determined pursuant to clause (c) of this definition, such determination shall be made by the Paying Agent on the basis of the applicable rate furnished to and received by the Paying Agent from the Reference Bank two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.07.

"LIBOR Advance" means an Advance which bears interest as provided in Section 2.05(b).

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Advances.

"Loan Document" means this Agreement, each Note, each Notice of Borrowing and each other document or instrument executed and delivered in connection with this Agreement.

"Losses" has the meaning specified in Section 9.04(c).

"Majority Banks" means at any time Banks holding at least 51% of the then aggregate unpaid principal amount of the Notes held by Banks, or, if no such principal amount is then outstanding, Banks having at least 51% of the Commitments.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means an employee benefit plan, other than a Multiemployer Plan, subject to Title IV of ERISA to which the Borrower or any ERISA Affiliate, and more than one employer other than the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or any ERISA Affiliate made

JPMUCI 0008447

or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"Note" means a promissory note of the Borrower payable to the order of any Bank, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to such Bank resulting from the Advances owed to such Bank.

"Notice of Borrowing" has the meaning specified in Section 2.02.

"Other Taxes" has the meaning specified in Section 2.13(c).

"Paying Agent" means Citibank in its capacity as Paying Agent pursuant to Article VII and any successor in such capacity pursuant to Section 7.08.

"Payment Office" means the office of the Paying Agent located at 399 Park Avenue, New York, New York 10043 or such other office as the Paying Agent may designate by written notice to the other parties hereto.

"PBGC" means the Pension Benefit Guaranty Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, firm or other entity, or a government or any political subdivision or agency, department or instrumentality thereof.

"Plan" means an employee benefit plan (other than a Multiemployer Plan) which is (or, in the event that any such plan has been terminated within five years after a transaction described in Section 4069 of ERISA, was) maintained for employees of the Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Preferred Stock" means, as applied to any corporation, shares of such corporation which shall be entitled to preference or priority over any other shares of such corporation in respect of either the payment of dividends or the distribution of assets upon liquidation.

"Prescribed Forms" shall mean such duly executed form(s) or statement(s), and in such number of copies, which may, from time to time, be prescribed by law and which, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Bank providing the form(s) or statement(s), (b) the Code, or (c) any applicable rule or regulation under the Code, permit the Borrower to make payments hereunder for the account of such Bank free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Code or any such rule or regulation).

"Principal Subsidiary" means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which the Borrower has not guaranteed payment) equal to or greater than 5% of the Borrower's consolidated assets; provided that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date

JPMUCI 0008448

of determination) without regard to the consolidated assets test described above in this definition: Houston Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron North America Corp., and Enron Pipeline Company. For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recent quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of the Borrower shall be determined based on the most recent quarterly or annual consolidated financial statements of the Borrower available prior to such determination.

"Prior Credit Facilities" means (a) the Revolving Credit Agreement dated as of August 3, 1999, among the Borrower, the banks party thereto and Citibank, as agent for such banks, and (b) the Second Amended and Restated Revolving Credit Agreement, dated as of December 3, 1996, as amended to the date hereof, among the Borrower, the banks party thereto and Chase, as agent for such banks.

"Rating Level" means the applicable category of rating level contained in Schedule I which is based on the rating of the Borrower's senior unsecured long-term debt as classified by Moody's and/or Standard & Poor's and which shall be the highest (subject, however, to the first footnote on Schedule I) applicable Rating Level I, Rating Level II, Rating Level III, Rating Level IV or Rating Level V, as the case may be, as set forth in Schedule I.

"Redeemable" means, as applied to any Preferred Stock, any Preferred Stock which (a) the issuer undertakes to redeem at a fixed or determinable date or dates (other than pursuant to the exercise of an option to redeem by the issuer, if the failure to exercise such option would not materially adversely affect the business, consolidated financial position or consolidated results of operations of the issuer and its subsidiaries taken as a whole), whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer, or (b) is redeemable at the option of the holder.

"Reference Bank" means Citibank.

"Register" has the meaning specified in Section 9.06(c).

"Standard & Poor's" and "S&P" each means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. on the date hereof.

"Subordinated Debt" means, (a) the 8.25% Senior Subordinated Debentures due 2012 and the 6 3/4% Senior Subordinated Debentures due July 1, 2005 of the Borrower issued pursuant to the Indenture dated as of February 1, 1987 between the Borrower and NationsBank of Texas, N.A., as trustee, (b) the obligations of Borrower under the Loan Agreement dated as of November 15, 1993, between Borrower and Enron Capital L.L.C., (c) the obligations of Borrower under the Loan Agreement dated as of August 3, 1994, between Borrower and Enron Capital Resources, L.P., (d) the 7.75% Subordinated Debentures due 2016 of the Borrower issued pursuant to the Indenture dated as of November 21, 1996 between the Borrower and The Chase Manhattan Bank, Trustee, (e) the 7.75% Subordinated Debentures due 2016, Series II of the Borrower issued pursuant to the Indenture dated as of January 16, 1997 between the Borrower and The Chase Manhattan Bank, Trustee, (f) the Adjustable Rate Debentures, Series A, issued pursuant to the Indenture dated as of June 6, 1997, between the Borrower and The Chase Manhattan Bank, as Indenture Trustee, and (g) any Debt of the Borrower which is subordinate to any other obligations of the Borrower so long as (i) the terms of such Debt are (x) substantially similar to and no less favorable to the holders of Senior Indebtedness (as defined in the Indenture dated as of February 1, 1987 referenced in clause (a) of this definition) than the terms of such Senior Subordinated Debentures due 2012 of the Borrower (and

JPMUCI 0008449

the parties confirm that it is their intention that all principal of and interest on the Advances constitute "Senior Indebtedness" for the purposes thereof) or (y) consented to by the Majority Banks (which consent will not be unreasonably withheld), and (ii) no payments of principal shall be payable (whether by scheduled maturity, required prepayment, or otherwise, unless as a result of the acceleration of such Debt in accordance with the terms thereof) under such Debt prior to June 1, 2005.

"Subsidiary" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of the Borrower, unless such entity is a Consolidated Subsidiary of the Borrower, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with GAAP. Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of the Borrower.

"Taxes" has the meaning specified in Section 2.13(a).

"Termination Date" means May 18, 2005 or the earlier date of termination in whole of the Commitments pursuant to this Agreement.

"Termination Event" means (a) a "reportable event", as such term is described in Section 4043 of ERISA (other than a "reportable event" not subject to the provision for 30-day notice to the PBGC), or an event described in Section 4062(e) of ERISA, or (b) the withdrawal of the Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year in which it was a "substantial employer", as such term is defined in Section 4001(a)(2) of ERISA, or the incurrence of liability by the Borrower or any ERISA Affiliate under Section 4064 of ERISA upon the termination of a Multiple Employer Plan, or (c) the distribution of a notice of intent to terminate a Plan pursuant to Section 4041(a)(2) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (e) any other event or condition which might constitute termination grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Total Capitalization" means, at any time, the sum (without duplication) of (a) Total Senior Debt, (b) the total outstanding principal amount (or the book carrying amount of such Debt if issued at a discount) of Subordinated Debt of the Borrower and its Consolidated Subsidiaries, (c) Consolidated Net Worth less any amount thereof attributable to "minority interests" (as defined below), and (d) Redeemable Preferred Stock of the Borrower and its Consolidated Subsidiaries. For the purpose of this definition, "minority interests" means any investment or interest of the Borrower in any corporation, partnership or other entity to the extent that the total amount thereof owned by the Borrower (directly or indirectly) constitutes 50% or less of all outstanding interests or investments in such corporation, partnership or entity.

"Total Senior Debt" means, at any time, all Consolidated Debt of the Borrower and its Consolidated Subsidiaries other than Subordinated Debt.

JPMUCI 0008450

"Type" has the meaning specified in the definition of the term "Advance" (with respect to an Advance) and in the definition of the term "Borrowing" (with respect to a Borrowing).

"Withdrawal Liability" shall have the meaning given such term under Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.   Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Unless otherwise indicated, all references to a particular time are references to New York City time.

SECTION 1.03.   Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based on, GAAP; provided, however, the financial statements and reports required pursuant to Sections 5.01(a)(i) and (viii) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

SECTION 1.04.   Miscellaneous.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Schedule and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified.  The term "including" shall mean "including, without limitation,".

SECTION 1.05.   Ratings.  A rating, whether public or private, by Standard & Poor's or Moody's shall be deemed to be in effect on the date of announcement or publication by Standard & Poor's or Moody's, as the case may be, of such rating or, in the absence of such announcement or publication, on the effective date of such rating and will remain in effect until the date when any change in such rating is deemed to be in effect.  In the event any of the rating categories used by Moody's or Standard & Poor's is revised or designated differently (such as by changing letter designations to different letter designations or to numerical designations), then the references herein to such rating shall be changed to the revised or redesignated rating for which the standards are closest to, but not lower than, the standards at the date hereof for the rating which has been revised or redesignated. Long-term debt supported by a letter of credit, guaranty, insurance or other similar credit enhancement mechanism shall not be considered as senior unsecured long-term debt.

JPMUCI 0008451

## ARTICLE II

## AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01.    The Advances.    Each Bank severally agrees, on the terms and conditions hereinafter set forth, to make one or more Advances to the Borrower from time to time on any Business Day during the period from the date hereof until the Termination Date in an aggregate amount not to exceed at any time outstanding the amount set opposite such Bank's name on the signature pages hereof or, if such Bank has entered into any Assignment and Acceptance, set forth for such Bank in the Register maintained by the Paying Agent pursuant to Section 9.06(c), as such amount may be adjusted pursuant to Section 2.15, Section 2.16 or Section 2.17, or Section 6.01 (such Bank's "Commitment"); provided, that no Advance shall be required to be made, except as part of a Borrowing that is in an aggregate amount not less than (a) in the case of a Borrowing comprised of LIBOR Advances, $25,000,000 and (b) in the case of a Borrowing comprised of Base Rate Advances, $15,000,000, and each Borrowing shall consist of Advances of the same Type having (in the case of a Borrowing comprised of LIBOR Advances) the same Interest Period, made on the same day by the Banks ratably according to their respective Commitments.  Within the limits of each Bank's Commitment, the Borrower may borrow, prepay pursuant to Section 2.09 and reborrow under this Section 2.01.  Subject to the terms and conditions hereof, more than one Borrowing may be made on the same Business Day, including more than one LIBOR Borrowing (with the Advances comprising each LIBOR Borrowing made on such Business Day having a different Interest Period from the Advances comprising each other LIBOR Borrowing made on such Business Day).

SECTION 2.02.    Making the Advances.  (a) Each Borrowing shall be made on notice, given not later than 11:00 A.M. (x) in the case of a proposed Borrowing comprised of LIBOR Advances, at least three Business Days prior to the date of the proposed Borrowing (or, as to any proposed Borrowing comprised of LIBOR Advances, at such other time as the Borrower and the Banks may agree to for such proposed Borrowing) and (y) in the case of a proposed Borrowing comprised of Base Rate Advances, on the day of the proposed Borrowing, by the Borrower to the Paying Agent, which shall give to each Bank prompt notice thereof by telex or telecopy.  Each such notice of a Borrowing (a "Notice of Borrowing") shall be by telex or telecopy, confirmed immediately in writing, in substantially the form of Exhibit B hereto, specifying therein the requested (i) date of such Borrowing, (ii) Type of Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing comprised of LIBOR Advances, initial Interest Period for each such Advance, provided that the Borrower may not specify LIBOR Advances for any Borrowing if, after giving effect to such Borrowing, LIBOR Advances having more than four different Interest Periods shall be outstanding.  In the case of a proposed Borrowing comprised of LIBOR Advances, the Paying Agent shall promptly notify each Bank of the applicable interest rate under Section 2.05(b).  Each Bank shall, before 11:00 A.M. (2:00 P.M. in the case of a Borrowing comprised of Base Rate Advances) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Paying Agent at its Payment Office, in same day funds, such Bank's ratable portion of such Borrowing.  After the Paying Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Paying Agent will make such funds available to the Borrower at the Paying Agent's aforesaid address.

(b)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower.  In the case of any Borrowing which the related Notice of Borrowing specifies is to be comprised of LIBOR Advances, the Borrower shall indemnify each Bank against any loss, cost or expense incurred by such Bank as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including any loss (excluding loss of anticipated profits), cost

JPMUCI 0008452

or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund the Advance to be made by such Bank as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(c)     Unless the Paying Agent shall have received notice from a Bank prior to the date of any Borrowing that such Bank will not make available to the Paying Agent such Bank's ratable portion of such Borrowing, the Paying Agent may assume that such Bank has made such portion available to the Paying Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Paying Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Bank shall not have so made such ratable portion available to the Paying Agent, such Bank and the Borrower severally agree to repay to the Paying Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Paying Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to Advances comprising such Borrowing and (ii) in the case of such Bank, the Federal Funds Rate.  If such Bank shall repay to the Paying Agent such corresponding amount, such amount so repaid shall constitute such Bank's Advance as part of such Borrowing for purposes of this Agreement.

(d)     The failure of any Bank to make the Advance to be made by it as part of any Borrowing shall not relieve any other Bank of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Bank shall be responsible for the failure of any other Bank to make the Advance to be made by such other Bank on the date of any Borrowing.

SECTION 2.03.     Fees. (a) Facility Fee.  The Borrower agrees to pay to the Paying Agent for the account of each Bank a facility fee on the average daily amount of such Bank's Commitment, whether or not used, from the date hereof in the case of each Bank listed on the signature pages hereof and from the effective date specified in the Assignment and Acceptance pursuant to which it became a Bank in the case of each other Bank until the Termination Date.  The facility fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2000, and on the Termination Date.  The rate per annum of the facility fee for each calendar quarter shall be determined as provided in Schedule I based on the Rating Level in effect on the first day of such quarter.

(b)     Co-Administrative Agents' and Paying Agent's Fee.  The Borrower shall pay to each of the Co-Administrative Agents  and the Paying Agent such fees as may be separately agreed to by it and such Co-Administrative Agents or the Paying Agent, as the case may be.

SECTION 2.04.     Repayment.  The Borrower shall repay the unpaid principal amount of each Advance owed to each Bank in accordance with the Note to the order of such Bank.  All Advances shall be due and payable on the Termination Date or such earlier date such Advances are due and payable to such Bank pursuant to any other provision of this Agreement.

SECTION 2.05.     Interest.  The Borrower shall pay interest on the unpaid principal amount of each Advance owed to each Bank from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(a)     Base Rate Advances.  During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the Base Rate in effect from time to time, payable quarterly on the last day of each March, June, September and December during such periods and on the date such Base Rate Advance

JPMUCI 0008453

shall be Converted (in whole or in part), changed (in whole or in part) as a result of any division or combination of any Borrowing, or paid in full; provided that any amount of principal (other than principal of LIBOR Advances bearing interest pursuant to the proviso to Section 2.05(b)) which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the sum of 2% per annum plus the Base Rate in effect from time to time.

(b)    LIBOR Advances.  During such periods as such Advance is a LIBOR Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of the LIBO Rate for such Interest Period for such Advance plus the Applicable Margin per annum for such Interest Period, payable on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on the day which occurs during such Interest Period three months from the first day of such Interest Period; provided that any amount of principal of any LIBOR Advance which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the greater of (x) the sum of 2% per annum plus the Base Rate in effect from time to time and (y) the sum of 2% per annum plus the rate per annum required to be paid on such Advance immediately prior to the date on which such amount became due.

SECTION 2.06.    Additional Interest on LIBOR Advances.    If any Bank is required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to such Bank of agreeing to make or making, funding or maintaining LIBOR Advances, then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), unless such Bank withdraws its demand for such additional amounts pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a), pay to the Paying Agent for the account of such Bank additional amounts, as additional interest hereunder, sufficient to compensate such Bank for such increased cost.

SECTION 2.07.    Interest Rate Determination and Protection.  (a) If at any time the LIBO Rate is determined pursuant to clause (c) of the definition herein of LIBO Rate, the Reference Bank agrees to furnish to the Paying Agent timely information for the purpose of determining such LIBO Rate.  If at any time the Base Rate is determined pursuant to clause (a) or clause (b) of the definition herein of Base Rate and if Citibank is not the Paying Agent at such time, Citibank agrees to furnish to the Paying Agent timely information with respect to the determination of such Base Rate.  In cases other than specified in the first two sentences of this Section 2 07(a), the Paying Agent shall determine the applicable rate of interest.

(b)    The Paying Agent shall give prompt notice to the Borrower and the Banks of the applicable interest rate determined by the Paying Agent for purposes of Section 2.05(a) or (b), the applicable rate, if any, furnished by the Reference Bank pursuant to clause (c) of the definition herein of LIBO Rate for the purpose of determining the applicable interest rate under Section 2.05(b), and the applicable rate, if any, furnished by Citibank pursuant to the penultimate sentence of Section 2.07(a) with respect to the determination of the Base Rate for purposes of the applicable interest rate under Section 2.05(a).

(c)    If the Paying Agent is unable to obtain timely information for determining the LIBO Rate for any LIBOR Advances,

JPMUCI 0008454

(i)    the Paying Agent shall forthwith notify the Borrower and the Banks that the interest rate cannot be determined for such LIBOR Advances,

(ii)    each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(iii)    the obligation of the Banks to make, or to Convert Advances or Borrowings into, or make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(d)    If, with respect to any LIBOR Advances, the Majority Banks notify the Paying Agent that the applicable interest rate for any Interest Period for such Advances will not adequately reflect the cost to such Majority Banks of making, funding or maintaining their respective LIBOR Advances for such Interest Period, the Paying Agent shall forthwith so notify the Borrower and the Banks, whereupon

(i)    each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or, if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(ii)    the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(e)    If the Borrower shall fail to select the duration of any Interest Period for any LIBOR Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Paying Agent will forthwith so notify the Borrower and the Banks and such Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(f)    On the date on which the aggregate unpaid principal amount of Advances comprising any LIBOR Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $25,000,000, such Advances shall automatically Convert into Base Rate Advances, and on and after such date the right of the Borrower to Convert such Advances into LIBOR Advances shall terminate; provided, however, that if and so long as each such Advance shall be of the same Type and have an Interest Period ending on the same date as Advances comprising another Borrowing or other Borrowings, and the aggregate unpaid principal amount of all such Advances of all such Borrowings shall equal or exceed $25,000,000, the Borrower shall have the right to continue all such Advances as, or to Convert all such Advances into, Advances of such Type having an Interest Period ending on such date.

SECTION 2.08.    Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings. (a) The Borrower may on any Business Day, upon notice given to the Paying Agent not later than 11:00 A.M. (x) in the case of a proposed Conversion into a LIBOR Borrowing, on the third Business Day prior to the date of the proposed Conversion and (y) in the case of a proposed Conversion into a Base Rate Borrowing, on the date of the proposed Conversion and subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11, Convert all or any portion of a Borrowing of one Type into a Borrowing of another Type; provided, however, that any

JPMUCI 0008455


Conversion of any LIBOR Borrowing shall be made on, and only on, the last day of an Interest Period for such LIBOR Borrowing. Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Borrowing (or identified portion thereof) to be Converted and the Type into which it is to be Converted, and (iii) if such Conversion is into a LIBOR Borrowing, the duration of the Interest Period for each LIBOR Advance comprising such LIBOR Borrowing.

(b)     The Borrower may continue all or any portion of any LIBOR Borrowing as a LIBOR Borrowing for an additional Interest Period that complies with the requirements set forth in the definition herein of "Interest Period," by giving notice of such Interest Period as set forth in such definition, subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11.

(c)     All Borrowings, Conversions and continuations under this Agreement shall be effected in a manner that (i) treats all Banks ratably (including, for example, effecting Conversions of any portion of a Borrowing in a manner that results in each Bank retaining its same ratable percentage of both the Converted portion and the remaining portion not Converted), and (ii) in the case of LIBOR Borrowings, results in each LIBOR Borrowing (including, in the case of any Conversion of a portion of a LIBOR Borrowing, both the Converted portion and the remaining portion not Converted) being in an amount not less than $25,000,000; provided, that clause (ii) immediately above shall not limit the Borrower's rights under the proviso of Section 2.07(f). Upon Conversion of any Borrowing, or portion thereof, into a particular Type, all Advances comprising such Borrowing or portion thereof, as the case may be, will be deemed Converted into Advances of such Type.

SECTION 2.09.    Prepayments.  The Borrower may (a) in respect of LIBOR Advances, upon at least three Business Days' notice, and (b) in respect of Base Rate Advances, upon notice by 11:00 A.M. on the day of the proposed prepayment, to the Paying Agent stating the proposed date and aggregate principal amount of the prepayment and the Types of Advances to be prepaid, and in the case of LIBOR Advances, the specific Borrowing or Borrowings to be prepaid in whole or in part, and if such notice is given the Borrower shall, prepay the outstanding principal amounts of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid without premium or penalty; provided, however, that each partial prepayment shall be in an aggregate principal amount not less than $10,000,000, and provided further, that if the Borrower prepays any LIBOR Advance on any day other than the last day of an Interest Period therefor, the Borrower shall compensate the Banks pursuant to Section 9.04(b).

SECTION 2.10.    Increased Costs: Capital Adequacy, Etc.  (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to any Bank of agreeing to make or making, funding or maintaining LIBOR Advances (other than increased costs described in Section 2.06 or in Section 2.10 (c) below), then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank additional amounts sufficient to compensate such Bank for such increased cost unless such Bank shall have withdrawn its demand for additional compensation for such increased cost pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a).

JPMUCI 0008456

(b)    If the Borrower so notifies the Paying Agent within five Business Days after any Bank notifies the Borrower of any increased cost pursuant to the provisions of Section 2.10(a), the Borrower shall Convert all Advances of the Type affected by such increased cost of all Banks then outstanding into Advances of another Type in accordance with Section 2.08 and, additionally, reimburse such Bank for such increased cost in accordance with Section 2.10(a).

(c)    If any Bank shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of such Bank), has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder, such Bank shall have the right to give prompt written notice and demand for payment thereof to the Borrower with a copy to the Paying Agent (which notice and demand shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate such Bank for the increased cost to such Bank as a result of such increase in capital and shall certify that such costs are generally being charged by such Bank to other similarly situated borrowers under similar credit facilities), although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section 2.10(c), and subject to Section 2.16, the Borrower shall pay such additional amounts.

(d)    Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.10 or to eliminate the amount of any such increased cost which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(e)    No Bank shall be entitled to recover increased costs pursuant to Section 2.10, (a) incurred or accruing more than 90 days prior to the date on which such Bank sent to the Borrower a written notice and demand for payment as specified in this Section 2.10, or (b) to the extent that such increased costs have resulted from the failure of such Bank to have complied with Section 2.10(d).

SECTION 2.11.    Illegality.    Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any governmental authority, central bank or comparable agency shall assert that it is unlawful (such unlawfulness or such assertion of unlawfulness being an "Illegality Event"), for any Bank or its Eurodollar Lending Office (such a Bank being an "Affected Lender") to perform its obligations hereunder to make LIBOR Advances or to continue to fund or maintain LIBOR Advances hereunder, then, on notice thereof and demand therefor by such Bank to the Borrower through the Paying Agent, (a) the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the time set forth in the next succeeding sentence, and (b) the Borrower shall forthwith Convert all LIBOR Advances of all Banks then outstanding into Advances of another Type in accordance with Section 2.08.    The suspension of the obligation of the Banks to make LIBOR Advances or to continue to fund or maintain LIBOR Advances, as

JPMUCI 0008457

set forth in the preceding sentence, shall terminate upon the earliest to occur of the following: (i) the withdrawal by each Affected Lender of its notice and demand with respect to the Illegality Event referenced in this Section 2.11, (ii) the replacement by the Borrower of each Affected Lender pursuant to Section 2.16(a) hereof with an Eligible Assignee that is not an Affected Lender, and (iii) the termination by the Borrower of each Affected Lender pursuant to Section 2.16(b) hereof. If an Illegality Event has ceased to exist with respect to a Bank that has given notice and demand with respect to such Illegality Event pursuant to Section 2.11, such Bank shall promptly withdraw such notice and demand by giving written notice of withdrawal to the Paying Agent and the Borrower. Upon termination of such suspension pursuant to clause (i), (ii) or (iii) above, as applicable, the Paying Agent shall notify each Bank and the Co-Administrative Agents of such termination, and the Banks shall thereupon again be obligated to make LIBOR Advances and LIBOR Borrowings and to continue to fund, maintain, and Convert LIBOR Advances and LIBOR Borrowings in each case in accordance with and to the extent provided in this Agreement.

SECTION 2.12.    _Payments and Computations_.  (a) The Borrower shall make each payment under any Loan Document not later than 11:00 A.M. on the day when due in Dollars to the Paying Agent at its Payment Office in same day funds.  The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or facility fees ratably (other than amounts payable pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17 or 9.04) to the Banks (decreased, as to any Bank, for any taxes withheld in respect of such Bank as contemplated by Section 2.13(b)) for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.06(d), from and after the effective date specified in such Assignment and Acceptance, the Paying Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the Bank assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.  At the time of each payment of any principal of or interest on any Borrowing to the Paying Agent, the Borrower shall notify the Paying Agent of the Borrowing to which such payment shall apply.  In the absence of such notice the Paying Agent may specify the Borrowing to which such payment shall apply.

(b)    All computations of interest based on the Base Rate (except during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof) and of facility fees shall be made by the Paying Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the LIBO Rate, the Federal Funds Rate or, during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof, the Base Rate shall be made by the Paying Agent, and all computations of interest pursuant to Section 2.06 shall be made by a Bank, on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or facility fees are payable.  Each determination by the Paying Agent (or, in the case of Section 2.06, by a Bank) of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)    Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of _interest or facility fees, as the case_ may be; _provided_, _however_, if such extension would cause payment of interest on or principal of LIBOR Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

JPMUCI 0008458

(d)     Unless the Paying Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Banks hereunder that the Borrower will not make such payment in full, the Paying Agent may assume that the Borrower has made such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Borrower shall not have so made such payment in full to the Paying Agent, each Bank shall repay to the Paying Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Paying Agent, at the Federal Funds Rate.

SECTION 2.13.     Taxes.  (a) Any and all payments by the Borrower hereunder or under the Notes shall be made, in accordance with Section 2.12, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of each Bank and the Paying Agent, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) such Bank or Paying Agent (as the case may be) is organized or any political subdivision thereof and, in the case of each Bank, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction of such Bank's Applicable Lending Office or any political subdivision thereof and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof (or, with respect to any entity that becomes a Bank after the date hereof, on the date such entity becomes a Bank), to payments to be made to such Bank or the Paying Agent (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Note to any Bank or the Paying Agent, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.13) such Bank or the Paying Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     Notwithstanding anything to the contrary contained in this Agreement, each of the Borrower and the Paying Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of any Bank (without the payment by the Borrower of increased amounts to such Bank pursuant to clause (a) above) other than a Bank (i) which is a domestic corporation (as such term is defined in Section 7701 of the Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Borrower and the Paying Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Borrower shall so deduct or withhold any such taxes, it shall provide a statement to the Paying Agent and such Bank, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation which such Bank or the Paying Agent may reasonably request for assisting such Bank or the Paying Agent to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Bank is subject to tax.

(c)     In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder

NICHIJN016951\004046
HOUSTON\1120252.3

-18-

JPMUCI 0008459

or under the Notes or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Notes (hereinafter referred to as "Other Taxes").

(d)    The Borrower, to the fullest extent permitted by law, will indemnify each Bank and the Paying Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.13) paid by such Bank or the Paying Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of such Bank or Paying Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date such Bank or the Paying Agent (as the case may be) makes written demand therefor. No Bank nor the Paying Agent shall be indemnified for Taxes incurred or accrued more than 90 days prior to the date that such Bank or the Paying Agent notifies the Borrower thereof.

(e)    Within 30 days after the date of any payment of Taxes by or at the direction of the Borrower, the Borrower will furnish to the Paying Agent, at its address referred to in Section 9.02, (i) the original or a certified copy of a receipt evidencing payment thereof, if the relevant taxing authority provides a receipt, or (ii) if the relevant taxing authority does not provide a receipt, other reasonable evidence of the payment thereof. Should any Bank or the Paying Agent ever receive any refund, credit or deduction from any taxing authority to which such Bank or the Paying Agent would not be entitled but for the payment by the Borrower of Taxes as required by Section 2.13 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund, credit or deduction shall be made by such Bank or the Paying Agent in its sole discretion), such Bank or the Paying Agent, as the case may be, thereupon shall repay to the Borrower an amount with respect to such refund, credit or deduction equal to any net reduction in taxes actually obtained by such Bank or the Paying Agent, as the case may be, and determined by such Bank or the Paying Agent, as the case may be, to be attributable to such refund, credit or deduction.

(f)    Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any Taxes or Other Taxes or to eliminate the amount of any such additional amounts which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(g)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.13 shall survive the payment in full of principal and interest hereunder and under the Notes.

SECTION 2.14.    Sharing of Payments, Etc.    If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances made by it (other than pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17 or 9.04) in excess of its ratable share of payments on account of the Advances obtained by all the Banks, such Bank shall forthwith purchase from the other Banks such participations in the Advances made by them as shall be necessary to cause such purchasing Bank to share the excess payment ratably with each of them, provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, such purchase from each Bank shall be rescinded and such Bank shall repay to the purchasing Bank the purchase price to the extent of its ratable share (according to the proportion of (i) the amount of the participation purchased from such Bank as a result of such excess payment to (ii) the total amount of such excess payment) of such recovery

JPMUCI 0008460

together with an amount equal to such Bank's ratable share (according to the proportion of (i) the amount of such Bank's required repayment to (ii) the total amount so recovered from the purchasing Bank) of any interest or other amount paid or payable by the purchasing Bank in respect of the total amount so recovered. The Borrower agrees that any Bank so purchasing a participation from another Bank pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Bank were the direct creditor of the Borrower in the amount of such participation.

SECTION 2.15.    Ratable Reduction or Termination of the Commitments; Effect of Termination. The Borrower shall have the right, upon at least three Business Days' notice to the Paying Agent, to terminate in whole or reduce ratably in part the unused portions of the respective Commitments of the Banks (with the signature pages hereto deemed amended to reflect same), provided that each partial reduction shall be in the aggregate amount of at least $10,000,000.  Upon and at all times after any Commitment of any Bank is terminated pursuant to any provision of this Agreement, such Commitment shall be zero and such Bank shall have no further obligation to make any Advances.

SECTION 2.16.    Replacement of Bank; Additional Right to Terminate Commitments.  In the event that any Bank demands payment pursuant to Section 2.06, 2.10 or 2.13, or any Bank becomes an Affected Bank as set forth in Section 2.11, the Borrower shall have the right, within 45 days after the date of the giving by such Bank of any notice or demand required or otherwise permitted to be given pursuant to Section 2.06, 2.10, 2.11 or 2.13 and if no Event of Default or Default then exists, to either replace such Bank in accordance with the procedure set forth in Section 2.16(a) or terminate such Bank's Commitment in accordance with the procedure set forth in Section 2.16(b).

(a)    If the Borrower determines to replace a Bank pursuant to this Section 2.16, then the Borrower will have the right to replace such Bank with an Eligible Assignee in accordance with Section 9 06(a), (b) and (d) (including execution of an appropriate Assignment and Acceptance), provided that such Eligible Assignee (i) shall unconditionally offer in writing (with a copy to the Paying Agent) to purchase all of such Bank's rights hereunder and interest in the Advances owing to such Bank and the Note held by such Bank without recourse at the principal amount of such Note plus interest and accrued facility fees to the date of such purchase on a date therein specified, and (ii) shall execute and deliver to the Paying Agent an Assignment and Acceptance, as assignee, pursuant to which such Eligible Assignee becomes a party hereto with a Commitment equal to that of the Bank being replaced (plus, if such Eligible Assignee is already a Bank, the amount of its Commitment prior to such replacement); provided, further, that no Bank or other Person shall have any obligation to increase its Commitment or otherwise to replace, in whole or in part, any Bank. Upon satisfaction of the requirements set forth in the first sentence of this Section 2.16(a), acceptance of such offer to purchase by the Bank to be replaced, payment to such Bank of the purchase price in immediately available funds, and the payment by the Borrower of all requested costs accruing to the date of purchase which the Borrower is obligated to pay under Section 9.04 and all other amounts owed by the Borrower to such Bank (other than the principal of and interest on the Advances of such Bank and accrued facility fees to the date of such purchase that are purchased by such Eligible Assignee), such Eligible Assignee shall constitute a "Bank" hereunder with a Commitment as so specified and the Bank being so replaced shall no longer constitute a "Bank" hereunder and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of the Bank being so replaced shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder. If, however, (x) a Bank accepts such an offer and such Eligible Assignee fails to purchase such rights and interest on such specified date in accordance with the terms of such offer, the Borrower shall continue to be obligated to pay the increased costs and additional amounts due to such Bank pursuant to

JPMUCI 0008461

Sections 2.06, 2.10 and 2.13 (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement), or (y) the Bank proposed to be replaced fails to accept such purchase offer, the Borrower (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement) shall not be obligated to pay to such Bank such increased costs or additional amounts incurred or accrued from and after the date of such purchase offer, and neither the failure to purchase as set forth in clause (x) of this sentence nor the failure to accept a purchase offer as set forth in clause (y) of this sentence, shall affect any rights the Borrower may have to terminate such Bank's Commitment in accordance with Section 2.16(b).

(b)     In the event that the Borrower determines to terminate a Bank's Commitment pursuant to this Section 2.16, the Borrower shall have the right to terminate such Bank's Commitment and shall give notice to such Bank of the Borrower's election to terminate (a copy of such notice to be sent to the Paying Agent), and such termination shall become effective on the date specified in such notice (which shall be 15 days after the date of such notice, provided, that if the 15th day after the date of such notice is not a Business Day, the date specified in such notice shall be the first Business Day next succeeding such 15th day) unless such Bank withdraws its demand or notice for increased costs or additional amounts (if such a demand or notice is the basis for the proposed termination). On the date of the termination of the Commitment of any Bank pursuant to this Section 2.16(b), the Borrower shall pay all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility fees and amounts specified in such Bank's notice and demand (if any) delivered pursuant to Sections 2.06, 2.10 or 2.13, as the case may be, with respect to the period prior to such termination) and such Bank shall thereupon cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that such Bank's rights under Sections 2.06, 2.10, 2.13 and 9.04 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.17.     Non-Ratable Reduction or Termination of Commitments. The Borrower shall have the right, without the consent of any Bank, but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to reduce in part or to terminate in whole the Commitment of one or more Banks non-ratably, provided that (a) on the effective date of any such reduction or termination (i) if the Commitment of one or more Banks is being reduced in part (whether or not simultaneously the Commitment of any other Bank is being terminated in whole) and if any Advances are outstanding, the Borrower shall prepay all principal of and interest on all such Advances pursuant to Section 2.09, and if any Bank's Commitment is being terminated in whole, the Borrower shall also pay any other amounts payable to such Bank under its Note and this Agreement, including accrued facility fees and any other amounts owing to such Bank, (ii) no Default or Event of Default shall have occurred and be continuing, (iii) the senior unsecured long-term debt of the Borrower is rated BBB- or better by Standard & Poor's or Baa3 or better by Moody's, and (iv) if the Commitment of one or more Banks is being terminated in whole (and if no Commitments are simultaneously being reduced in part), the Borrower shall pay to each Bank whose Commitment is so terminated all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility fees and any other amounts owing to such Bank), (b) the aggregate amount of each non-ratable reduction shall be at least $5,000,000, and (c) the aggregate amount of all such non-ratable reductions and terminations of Commitments since the date of this Agreement shall not exceed $300,000,000. The Borrower shall give the Paying Agent three Business Days' notice of the Borrower's intention to reduce or terminate any Commitment pursuant to this Section 2.17. Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.17, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under

JPMUCI 0008462

Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.18.     Certificates of Banks.  Without limitation to the requirements of Section 2.10(c), any Bank demanding or giving notice of amounts due to such Bank under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Paying Agent) a certificate setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

## ARTICLE III

## CONDITIONS TO ADVANCES

SECTION 3.01.     Initial Condition Precedent.  The obligation of each Bank to make Advances pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial Advance the following, each dated on or before such day, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

(a)     The Notes to the order of the Banks, respectively.

(b)     Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower.

(c)     A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign each Loan Document to which it is a party and the other documents to be delivered hereunder.

(d)     A favorable opinion of Vinson & Elkins L.L.P., counsel for the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, substantially in the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)     A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, in substantially the form of Exhibit D hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(f)     A favorable opinion of Bracewell & Patterson, L.L.P., counsel for the Paying Agent, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Paying Agent, substantially in the form of Exhibit E hereto.

JPMUCI 0008463

(g)    A letter addressed to the Paying Agent, the Co-Administrative Agents and the Banks from the Borrower with respect to the Prior Credit Facilities stating to the effect that (i) all the "Commitments" (as defined in each of the Prior Credit Facilities) of the "Banks" (as defined in each of the Prior Credit Facilities) have been terminated, (ii) no "Advances" (as defined in each of the Prior Credit Facilities) are outstanding under the Prior Credit Facilities, and (iii) all fees and other amounts known by the Borrower to be payable under the Prior Credit Facilities have been paid in full.

SECTION 3.02.    Additional Conditions Precedent to Each Advance. The obligation of each Bank to make any Advance shall be subject to the additional conditions precedent that on the date of such Advance (a) the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)    The representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of such Advance (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to such Advance and the Borrowing of which such Advance is a part and to the application of the proceeds therefrom, as though made on and as of such date, and

(ii)    No event has occurred and is continuing, or would result from such Advance or the Borrowing of which such Advance is a part or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both;

and (b) the Paying Agent shall have received such other approvals, opinions or documents as any Bank through the Paying Agent may reasonably request. For avoidance of doubt, this Section 3.02 shall not apply to the Conversion, combination, division or continuation pursuant to this Agreement of Advances previously made.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of the Borrower. The Borrower represents and warrants as follows:

(a)    The Borrower and each Principal Subsidiary are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation. The Borrower and each Principal Subsidiary have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted. Each Subsidiary that is a Principal Subsidiary as of the date hereof (based on December 31, 1999 financial statements) is listed in that certain letter dated the date hereof from the Borrower to the Banks and the Paying Agent.

(b)    The execution, delivery and performance by the Borrower of each Loan Document to which it is or will be a party are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any

JPMUCI 0008464

provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

(c)     This Agreement and each Note are, and each other Loan Document to which the Borrower is or will be a party, when executed and delivered in accordance with this Agreement will be legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(d)     The audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 1999 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of March 31, 2000 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Borrower, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Borrower and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

(e)     Since December 31, 1999 through the date hereof, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries, considered as a whole.

(f)     Since December 31, 1999, except as disclosed in the Borrower's Form 10-K for the year ended December 31, 1999 or the Borrower's Form 10-Q for the quarter ended March 31, 2000, which were delivered to the Banks (or made available to each of the Banks either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com) prior to the date hereof, there is no action, suit or proceeding pending against the Borrower or any of its Subsidiaries, or to the knowledge of the Borrower threatened against the Borrower or any of its Subsidiaries, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole or which in any manner draws into question the validity of this Agreement or any other Loan Document to which the Borrower is or will be a party.

(g)     No Termination Event has occurred or is reasonably expected to occur with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists. Neither the Borrower nor any ERISA Affiliate has received any notification (or has knowledge of any reason to expect) that any Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, for which a Withdrawal Liability in excess of $100,000,000 exists.

JPMUCI 0008465

(h)    United States federal income tax returns of the Borrower and its Subsidiaries have been examined and closed through the fiscal year ended December 31, 1995. The Borrower and its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material domestic tax returns which to the knowledge of the Borrower are required to be filed by them and have paid or provided for the payment, before the same become delinquent, of all taxes due pursuant to such returns or pursuant to any assessment received by the Borrower or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of taxes are, in the opinion of the Borrower, adequate to the extent required by GAAP.

(i)    Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(j)    Each of the Borrower and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" or a "subsidiary company" of a "holding company", in each case as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.

(k)    Margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) does not constitute all or substantially all of the assets of the Borrower.

## ARTICLE V

## COVENANTS OF THE BORROWER

SECTION 5.01.    <u>Affirmative Covenants</u>. The Borrower covenants and agrees that so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will, unless the Majority Banks shall otherwise consent in writing:

(a)    Reporting Requirements. Furnish to each Bank:

(i)    by making available either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com, or otherwise transmitting to the Banks (1) promptly after the sending or filing thereof, a copy of each of the Borrower's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 75 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, a copy of the Borrower's report on Form 10-Q (or any comparable form) for such quarter, which report will include the Borrower's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 135 days after the end of each fiscal year of the Borrower, a copy of the Borrower's annual report which it sends to its public security holders, and a copy of the Borrower's report on Form 10-K (or any comparable form) for such year, which annual report will include the Borrower's annual audited consolidated financial statements as of the end of and for such year;

(ii)    simultaneously with the furnishing of each of the annual or quarterly reports referred to in clause (i) above, a certificate of the chief financial officer or the chief accounting officer of the Borrower in a form acceptable to the Paying Agent (x) setting forth in reasonable detail the calculations required to establish whether the Borrower was in compliance with the requirements

JPMUCI 0008466

of Section 5.02(b) on the date of the financial statements contained in such report, and (y) stating whether there exists on the date of such certificate any Event of Default or Default, and, if so, setting forth the details thereof and the action which the Borrower has taken and proposes to take with respect thereto;

(iii)     as soon as is possible and in any event within five days after a change in, or issuance of, any rating of any of the Borrower's senior unsecured long-term debt by Standard & Poor's or Moody's which causes a change in the applicable Rating Level, notice to the Paying Agent of such change;

(iv)     as soon as possible and in any event within five days after an executive officer of the Borrower having obtained knowledge thereof, notice of the occurrence of any Event of Default or any Default, in each case continuing on the date of such notice, and a statement of the chief financial officer of the Borrower setting forth details of such Event of Default or Default and the action which the Borrower has taken and proposes to take with respect thereto;

(v)     as soon as possible and in any event (a) within 30 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred and (b) within 10 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any other Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred or is reasonably expected to occur, a statement of the chief financial officer or chief accounting officer of the Borrower describing such Termination Event and the action, if any, which the Borrower or such ERISA Affiliate proposes to take with respect thereto;

(vi)     promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate, copies of each notice received by the Borrower or any ERISA Affiliate from the PBGC stating its intention to terminate any Plan for which an Insufficiency in excess of $100,000,000 exists or to have a trustee appointed to administer any Plan for which an Insufficiency in excess of $100,000,000 exists;

(vii)     promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate from the sponsor of a Multiemployer Plan, a copy of each notice received by the Borrower or any ERISA Affiliate indicating liability in excess of $100,000,000 incurred or expected to be incurred by the Borrower or any ERISA Affiliate in connection with (a) the imposition of a Withdrawal Liability by a Multiemployer Plan, (b) the determination that a Multiemployer Plan is, or is expected to be, in reorganization within the meaning of Title IV of ERISA, or (c) the termination of a Multiemployer Plan within the meaning of Title IV of ERISA; and

(viii)     such other information respecting the condition or operations, financial or otherwise, of the Borrower or any of its Subsidiaries as any Bank through the Paying Agent may from time to time reasonably request.

(b)     Compliance with Laws, Etc. Comply, and cause each of its Subsidiaries to comply, with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a material adverse effect on the Borrower and its Subsidiaries taken as a whole, such compliance to include, without limitation, compliance with environmental laws and the paying before the same become delinquent of all

JPMUCI 0008467

taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

(c)     Use of Proceeds.  Use the proceeds of the Advances only for general corporate purposes of the Borrower not in violation of Section 5.02(f).

(d)     Maintenance of Insurance.  Maintain, and cause each of the Principal Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary, provided, that self-insurance by the Borrower or any such Principal Subsidiary shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary self-insure.  The Borrower may maintain its Principal Subsidiaries' insurance on behalf of them.

(e)     Preservation of Corporate Existence. Etc.  Preserve and maintain, and cause each of the Principal Subsidiaries to preserve and maintain, its legal existence, rights (charter, if applicable, and statutory) and franchises; provided, however, that this Section 5.01(e) shall not apply to any transactions or matters permitted by Section 5.02(c) or (d) and shall not prevent the termination of existence, rights and franchises of any Principal Subsidiary pursuant to any merger or consolidation to which such Principal Subsidiary is a party or pursuant to lease, sale, transfer or other disposition of assets by a Principal Subsidiary, and provided, further, that the Borrower or any Principal Subsidiary shall not be required to preserve any right or franchise if the Borrower or such Principal Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower or such Principal Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Banks.

(f)     Visitation Rights.  At any reasonable time and from time to time, after reasonable notice, permit the Paying Agent or any of the Banks or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, the Borrower and any of its Principal Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Principal Subsidiaries with any of their respective officers or directors.

SECTION 5.02.     Negative Covenants.  So long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will not at any time, without the written consent of the Majority Banks:

(a)     Negative Pledge.  Fail to perform and observe any term, covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof). For the purposes of this Section 5.02(a), such Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein; provided, however, that solely for the purposes of this Section 5.02(a) the word "Securities" as used in the Enron Indenture shall mean the Notes, the word "Company" used therein shall mean the Borrower, the phrase "this Section 1007" used therein shall mean this Section 5.02(a), the word "Trustee" used therein shall mean the Paying Agent and the phrase "So long as any of the Securities are outstanding" used therein shall mean so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder.

JPMUCI 0008468

(b)    <u>Senior Debt to Capitalization</u>.  Have a ratio of (i) Total Senior Debt to, (ii) Total Capitalization greater than 65%.

(c)    <u>Disposition of Assets</u>.  Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

(d)    <u>Mergers, Etc</u>. Merge or consolidate with or into, any Person, unless (i) the Borrower is the survivor or (ii) the surviving Person, if not the Borrower, is organized under the laws of the United States or a state thereof and assumes all obligations of the Borrower under this Agreement, provided, that in each case immediately after giving effect to such proposed transaction, no Event of Default or Default would exist or result.

(e)    <u>Compliance with ERISA</u>.  (i) Terminate, or permit any ERISA Affiliate to terminate, any Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC, or (ii) permit circumstances which give rise to a Termination Event described in clause (b), (d) or (e) of the definition of Termination Event with respect to a Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC.

(f)    <u>Use of Proceeds</u>.  Use the proceeds of any Advance for any purpose other than for general corporate purposes of the Borrower; or use any such proceeds (i) in a manner which violates or results in a violation of any law or regulation, (ii) to purchase or carry any margin stock (as defined in Regulation U issued by the Federal Reserve Board) or to extend credit to others for that purpose or (iii) to make any investment in any Person if such investment is opposed by the board of directors, general partner or other governing body of such Person.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.    <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)    The Borrower shall fail to pay (i) any principal on any Note when due and payable or (ii) any interest on any Note for more than five days after such interest becomes due and payable or (iii) any facility fee set forth in Section 2.03 for more than 15 days after such fee becomes due and payable; or

(b)    Any representation or warranty made by the Borrower (or any of its officers) (including representations and warranties deemed made pursuant to Section 3.02) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)    The Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.02 or shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Borrower by the Paying Agent at the request of any Bank; or

JPMUCI 0008469

(d)     The Borrower or any of its Principal Subsidiaries shall (i) fail to pay any principal of or premium or interest on any Debt which is outstanding in the principal amount of at least $100,000,000 in the aggregate, of the Borrower or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) default in the observance or performance of any covenant or obligation contained in any agreement or instrument relating to any such Debt or permit or suffer any other event to occur or condition to exist under any agreement or instrument relating to any such Debt that in substance is customarily considered a default in loan documents (in each case, other than a failure to pay specified in clause (i) of this subsection (d)) and such default or other event or condition shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect thereof is to accelerate the maturity of such Debt or require such Debt to be prepaid prior to the stated maturity thereof; for the avoidance of doubt the parties acknowledge and agree that (A) the "other" events or conditions referred to in clause (ii) of this subsection (d) do not include (1) mandatory prepayments required on borrowing base or similar loans, (2) changes in law or judicial, executive or administrative interpretation, or the tax, accounting, regulatory or other treatment of the payments or transactions under or in connection with any such agreement or instrument or the failure or inability of any Person to achieve its desired tax, accounting or regulatory treatment in connection with such transactions, (3) increased costs or the failure or inability of any Person to limit costs in connection with such transactions, (4) the sale, other disposition or collection of any assets or collection of any insurance, condemnation or other proceeds, (5) the failure of any Person to achieve or maintain specified credit ratings published or issued by credit rating agencies, (6) fluctuations in interest rates, stock market prices, commodities or other prices or indexes, or (7) any other prepayment provision in such agreement or instrument that is of a type customarily included in loan documents if the prepayment is not required as a result of a failure to meet any financial test and (B) any payment required to be made under a guaranty of payment or collection described in clause (c) of the definition of Debt shall be due and payable at the time such payment is due and payable under the terms of such guaranty (taking into account any applicable grace period) and such payment shall be deemed not to have been accelerated or required to be prepaid prior to its stated maturity as a result of the obligation guaranteed having become due; or

(e)     The Borrower or any of its Principal Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower or any of its Principal Subsidiaries seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or the Borrower or any of its Principal Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (e); or

(f)     Any judgment, decree or order for the payment of money in excess of $100,000,000 shall be rendered against the Borrower or any of its Principal Subsidiaries and remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment, decree or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect; or

JPMUCI 0008470

(g)     Any Termination Event as defined in clause (b), (d) or (e) of the definition thereof with respect to a Plan shall have occurred and, 30 days after notice thereof shall have been given to the Borrower by the Paying Agent, (i) such Termination Event shall still exist and (ii) the sum (determined as of the date of occurrence of such Termination Event) of the liabilities to the PBGC resulting from all such Termination Events is equal to or greater than $150,000,000; or

(h)     The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount which, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date of such notification), exceeds $150,000,000 or requires payments exceeding $100,000,000 in any year; or

(i)     The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of the Borrower and its ERISA Affiliates to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the respective plan years which include the date hereof by an amount exceeding $100,000,000 in the aggregate;

then, and in any such event, the Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the obligation of each Bank to make Advances to be terminated, whereupon each such obligation and all of the Commitments shall forthwith terminate, and (ii) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the Notes, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Notes, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, notice of intent to accelerate or further notice of any kind, all of which are hereby expressly waived by the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, (a) the obligation of each Bank to make its Advances and all of the Commitments shall automatically be terminated and (b) the Notes, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

JPMUCI 0008471

# ARTICLE VII

## THE PAYING AGENT

**SECTION 7.01**    Authorization and Action. Each Bank hereby appoints and authorizes the Paying Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Paying Agent, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Notes), the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Paying Agent shall not be required to take any action which exposes the Paying Agent to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings. The Paying Agent agrees to give to each Bank prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement.

**SECTION 7.02.**    Paying Agent's Reliance, Etc. Neither the Paying Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct. The duties of the Paying Agent shall be mechanical and administrative in nature; the Paying Agent shall not have, by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Paying Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein. Without limitation of the generality of the foregoing, the Paying Agent: (i) may treat the payee of any Note as the holder thereof until the Paying Agent receives and accepts an Assignment and Acceptance entered into by the Bank that is the payee of such Note, as assignor, and an Eligible Assignee, as assignee, as provided in Section 9.06; (ii) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (v) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (vi) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

**SECTION 7.03.**    Paying Agent and Its Affiliates. With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also the Paying Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not the Paying Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank

JPMUCI 0008472

serving as the Paying Agent in its individual capacity. Any Bank serving as the Paying Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not the Paying Agent and without any duty to account therefor to the Banks.

SECTION 7.04.    Bank Credit Decision. Each Bank acknowledges that it has, independently and without reliance upon the Paying Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges that it will, independently and without reliance upon the Paying Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents. The Paying Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 7.05.    Certain Rights of the Paying Agent. If the Paying Agent shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Paying Agent shall be entitled to refrain from such act or taking such action unless and until the Paying Agent shall have received instructions from the Majority Banks; and it shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against the Paying Agent as a result of its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be. Furthermore, except for action expressly required of the Paying Agent hereunder, the Paying Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 7.06.    Holders. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

SECTION 7.07.    Indemnification. The Banks agree to indemnify the Paying Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Paying Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by the Paying Agent under the Loan Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE,

JPMUCI 0008473

LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PAYING AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT THE PAYING AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 7.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by the Paying Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that the Paying Agent is not reimbursed for such expenses by the Borrower.

SECTION 7.08.    Resignation by the Paying Agent.  (a) The Paying Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower and the Banks.  Such resignation shall take effect upon the appointment of a successor Paying Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Paying Agent which shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)    If a successor to a resigning Paying Agent shall not have been so appointed within such 15 Business Day period, the resigning Paying Agent, with the consent of the other Loan Documents (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Paying Agent who shall serve as Paying Agent until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

(d)    If no successor Paying Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Paying Agent, the resigning Paying Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Paying Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

(e)    After any Paying Agent's resignation hereunder as Paying Agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Paying Agent under this Agreement.

JPMUCI 0008474

# ARTICLE VIII

## THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01.    Authorization and Action.  Each Bank hereby appoints and authorizes the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Co-Administrative Agents, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement of their rights), the Co-Administrative Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Co-Administrative Agents shall not be required to take any action which exposes the Co-Administrative Agents (or either of them) to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings.  The Co-Administrative Agents agree to give to each Bank prompt notice of each notice given to them by the Borrower pursuant to the terms of this Agreement.

SECTION 8.02.    Co-Administrative Agents' Reliance, Etc.  Neither of the Co-Administrative Agents and none of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct.  The duties of the Co-Administrative Agents shall be mechanical and administrative in nature; the Co-Administrative Agents shall not have, by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Co-Administrative Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein.  Without limitation of the generality of the foregoing, the Co-Administrative Agents: (a) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) make no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith, (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (d) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (e) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 8.03.    Co-Administrative Agents and Their Affiliates.  With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also a Co-Administrative Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not a Co-Administrative Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as a Co-Administrative Agent in its individual capacity.  Any

JPMUCI 0008475

Bank serving as a Co-Administrative Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not a Co-Administrative Agent and without any duty to account therefor to the Banks.

SECTION 8.04.    Bank Credit Decision.  Each Bank acknowledges that it has, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Bank also acknowledges that it will, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents.  The Co-Administrative Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 8.05.    Certain Rights of the Co-Administrative Agents.  If the Co-Administrative Agents shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Co-Administrative Agents shall be entitled to refrain from such act or taking such action unless and until the Co-Administrative Agents shall have received instructions from the Majority Banks; and they shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against either Co-Administrative Agent as a result of its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be.  Furthermore, except for action expressly required of the Co-Administrative Agents hereunder, each Co-Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 8.06.    Holders.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

SECTION 8.07.    Indemnification.  The Banks agree to indemnify each Co-Administrative Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Co-Administrative Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by such Co-Administrative Agent under the Loan

JPMUCI 0008476

Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH CO-ADMINISTRATIVE AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT EACH CO-ADMINISTRATIVE AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 8.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse each Co-Administrative Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by such Co-Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that such Co-Administrative Agent is not reimbursed for such expenses by the Borrower.

SECTION 8.08.    Resignation by the Co-Administrative Agents.  (a) Each Co-Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower, the other Co-Administrative Agent and the Banks. Such resignation shall take effect upon the appointment of a successor Co-Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent which successor shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)    If a successor to a resigning Co-Administrative Agent shall not have been so appointed within such 15 Business Day period, the resigning Co-Administrative Agent, with the consent of the Borrower (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent who shall serve as a Co-Administrative Agent until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent as provided above.

(d)    If no successor Co-Administrative Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Co-Administrative Agent, the resigning Co-Administrative Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Co-Administrative Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent; provided, however, that if only one of the Co-Administrative Agents has given notice of resignation and the other Co-Administrative Agent is continuing to serve in such capacity, (i) the resigning Co-Administrative Agent's resignation shall become effective on such 20th Business Day, (ii) the Banks shall not perform the duties of the resigning Co-Administrative Agent, and (iii) the remaining Co-Administrative Agent alone shall have all rights and perform all duties ascribed to the Co-Administrative Agents hereunder and under any Loan Document until such time if any, as the Majority Banks appoint a successor Co-Administrative Agent for the resigning Co-Administrative Agent.

(e)    After any Co-Administrative Agent's resignation hereunder as Co-Administrative Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement.

JPMUCI 0008477

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01.    Amendments, Etc.  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall, unless in writing and signed by all the Banks, do any of the following: (a) waive any of the conditions specified in Article III, (b) increase the Commitment of any Bank or subject any Bank to any additional obligation, (c) forgive or reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (d) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (e) take any action which requires the signing of all the Banks pursuant to the terms of any Loan Document, (f) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Notes which shall be required for the Banks or any of them to take any action under any Loan Document or (g) amend this Section 9.01; and provided, further, that (x) no amendment, waiver or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under any Loan Document, and (y) no amendment, waiver or consent shall, unless in writing and signed by the Co-Administrative Agents in addition to the Banks required above to take such action, affect the rights or duties of the Co-Administrative Agents under the Loan Documents.

SECTION 9.02.    Notices, Etc.  All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied, or delivered, if to the Borrower, at its address or telecopier number set forth below:

> Enron Corp.
> 1400 Smith Street
> Houston, Texas  77002
> Attention:   Deputy Treasurer, Corporate Finance
> Telecopier No.: (713) 646-3422

if to any Bank, at its Domestic Lending Office; if to the Paying Agent, at its address or telecopier number set forth below:

> Citibank, N. A.
> 399 Park Avenue
> New York, New York  10043
> Attention:   Energy Department,
>              North American Banking Group
> Telecopier No.:  (212) 832-9857

NICHJ2016951\004046
HOUSTON\11202523

-37-

JPMUCI 0008478

with a copy to:

    Citicorp Securities, Inc.
    1200 Smith Street, Suite 2000
    Houston, Texas  77002
    Attention:  James F. Reilly, Jr.
           Managing Director
    Telecopier No.: (713) 654-2849

if to the Co-Administrative Agents at their respective addresses or telecopier numbers set forth below:

    Citibank, N. A.
    399 Park Avenue
    New York, New York  10043
    Attention:  Energy Department,
           North American Banking Group
    Telecopier No.:  (212) 832-9857

with a copy to:

    Citicorp Securities, Inc.
    1200 Smith Street, Suite 2000
    Houston, Texas  77002
    Attention:  James F. Reilly, Jr.
           Managing Director
    Telecopier No.: (713) 654-2849

    The Chase Manhattan Bank
    1 Chase Manhattan Plaza, 8th Floor
    New York, New York  10081
    Attention:  Lisa Pucciarelli
    Telecopier No.:    (212) 552-5777

or, as to the Borrower, the Paying Agent, or either Co-Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower, the Paying Agent and each Co-Administrative Agent.  All such notices and communications shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment, respectively; provided, however, that (i) notices and communications to the Paying Agent shall not be effective until received by the Paying Agent and (ii) telexed or telecopied notices received by any party after its normal business hours (or on a day other than a Business Day) shall be effective on the next Business Day.  The notices contemplated by the definitions of "Borrowing" and "Interest Period" and by Section 2.08 may be combined in one notice, if all required information is provided in the combined notice and the combined notice meets the requirements as to timeliness set forth in each definition and Section to which the combined notice pertains

JPMUCI 0008479

SECTION 9.03.    No Waiver; Remedies.    No failure on the part of any Bank, any Co-Administrative Agent or the Paying Agent to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.    Costs, Expenses and Indemnity. (a) The Borrower agrees to pay on demand, (i) all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification and amendment of the Loan Documents and the other documents to be delivered under the Loan Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of one law firm as counsel for the Paying Agent with respect to preparation, execution and delivery of the Loan Documents and the satisfaction of the matters referred to in Section 3.01, and (ii) all reasonable legal and other costs and expenses, if any, of the Paying Agent, each Co-Administrative Agent and each Bank in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents and the other documents to be delivered under the Loan Documents or incurred in connection with any workout, restructuring or bankruptcy.

(b)    If any payment or purchase of principal of, or Conversion of, any LIBOR Advance or LIBOR Borrowing is made other than on the last day of an Interest Period relating to such Advance, as a result of a payment, purchase or Conversion pursuant to Section 2.07(f), 2.08, 2.09, 2.10, 2.11, 2.13, 2.16 or 2.17 or acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, the Borrower shall, upon demand by any Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank any amounts required to compensate such Bank for any additional losses, costs and expenses (other than taxes, which are dealt with in Section 2.13) which it may reasonably incur as a result of such payment, purchase or Conversion, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund or maintain such Advance.

(c)    The Borrower agrees, to the fullest extent permitted by law, subject to the last two sentences of this Section 9.04(c), to indemnify and hold harmless the Paying Agent, each Co-Administrative Agent and each Bank and each of their respective directors, officers, employees and agents (collectively, "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and claims, damages, losses, liabilities and expenses relating to environmental matters, but excluding taxes, which are dealt with in Section 2.13) (collectively, "Losses") for which any of them may become liable or which may be incurred by or asserted against an Indemnified Party (other than by another Indemnified Party), in each case in connection with or arising out of or by reason of any investigation, litigation, or proceeding, whether or not such Indemnified Party is a party thereto, arising out of, related to or in connection with this Agreement or any other Loan Document or any transaction in which any proceeds of all or any part of the Advances are applied (EXPRESSLY INCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY). IT IS THE INTENT OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 9.04(c), BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE BORROWER SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY FOR, LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNIFIED PARTY HAS BECOME LIABLE TO A THIRD PARTY (THAT IS NOT ANOTHER INDEMNIFIED PARTY) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE

JPMUCI 0008480

PRECEDING SENTENCE, AND (B) SUCH INDEMNIFIED PARTY WOULD BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNIFIED PARTY SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(d)     Except as set forth in the next succeeding sentence, each of the Banks, each Co-Administrative Agent and the Paying Agent shall not be liable to the Borrower for amounts constituting punitive, treble or exemplary damages arising out of or in connection with any breach by such Bank, such Co-Administrative Agent or the Paying Agent of any of its obligations hereunder. If the Borrower becomes liable to a third party for amounts constituting punitive, treble or exemplary damages as a result of a breach of an obligation hereunder by a Bank, a Co-Administrative Agent or the Paying Agent, as the case may be, the Borrower shall be entitled to claim and recover (and does not waive its rights to claim and recover) such amounts from such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, to the extent such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, would be liable to the Borrower for such amounts but for the limitation set forth in the preceding sentence.

SECTION 9.05.     Right of Set-Off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Paying Agent to declare the Notes due and payable pursuant to the provisions of Section 6.01, each Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement and the Note held by such Bank, irrespective of whether or not such Bank shall have made any demand under this Agreement or such Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Borrower after any such set-off and application made by such Bank, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which such Bank may have.

SECTION 9.06.     Assignments and Participations.  (a)  Each Bank may, in accordance with applicable law, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement, (ii) except in the case of an assignment of all of a Bank's rights and obligations under this Agreement, the amount of the Commitment of the assigning Bank being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents), for acceptance by the Paying Agent and recording by the Paying Agent in the Register, an Assignment and Acceptance, together with any Note then held by such assigning Bank and any Note then held by such Assignee and a processing and recordation fee of $3,000.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Bank hereunder, (y) the Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case

JPMUCI 0008481

of an Assignment and Acceptance covering all of an assigning Bank's rights and obligations under this Agreement, such Bank shall cease to be a party hereto except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a party hereto), and (z) unless the Borrower in its sole discretion otherwise consents, no such assignee shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than the assigning Bank would have been entitled to receive with respect to the rights assigned to such assignee, except as a result of circumstances arising after the date of such assignment.

      (b)    By executing and delivering an Assignment and Acceptance, the Bank assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Bank makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (ii) such assigning Bank makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Co-Administrative Agents, the Paying Agent, such assigning Bank or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any of the other Loan Documents or any other instrument or document; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Paying Agent to take such action as Paying Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; (vii) such assignee appoints and authorizes each Co-Administrative Agent to take such action as Co-Administrative Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Co-Administrative Agents by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

      (c)    The Paying Agent shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and the principal amount of the Advances owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Paying Agent, the Co-Administrative Agents and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Bank at any reasonable time and from time to time upon reasonable prior notice.

      (d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Bank and an assignee representing that it is an Eligible Assignee, together with any Note then held by such assigning Bank and any Note then held by such assignee, the Paying Agent shall, if such Assignment and Acceptance has

JPMUCI 0008482

been completed and is in substantially the form of Exhibit F, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. Within five Business Days after its receipt of such notice, an authorized officer of the Borrower shall execute and deliver to the Paying Agent in exchange for the surrendered Notes a new Note payable to the order of such Eligible Assignee in an amount equal to its Commitment after giving effect to such Assignment and Acceptance and, if the assigning Bank has retained a Commitment hereunder, a new Note payable to the order of the assigning Bank in an amount equal to the Commitment retained by it hereunder (such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes, shall be dated the effective date of such Assignment and Acceptance, shall be properly completed and shall otherwise be in substantially the form of Exhibit A).

     (e)    Each Bank, in accordance with applicable law, may sell participations to one or more banks or other entities (other than the Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) such Bank's obligations under this Agreement (including its Commitment to the Borrower hereunder) shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of any such Notes for all purposes of this Agreement, (iv) the Borrower, the Paying Agent, the Co-Administrative Agents and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, (v) the terms of any such participation shall not restrict such Bank's ability to make any amendment or waiver of this Agreement or any Note or such Bank's ability to consent to any departure by the Borrower therefrom without the approval of the participant, except that the approval of the participant may be required to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, and (vi) unless the Borrower in its sole discretion otherwise consents, no such participant shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than such Bank would have been entitled to receive with respect to the rights assigned to such participant by such Bank except as a result of circumstances arising after the date of such participation to the extent that such circumstances affect other Banks and participants generally, and (vii) each participant that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall provide to the Paying Agent and the Borrower a U.S. Internal Revenue Service Form W-8BEN or W-8ECI, as appropriate, or any successor form prescribed by the U.S. Internal Revenue Service, duly completed and certifying that such participant is fully exempt from United States withholding taxes with respect to all payments to be made to such participant under such participation agreement, or other documents satisfactory to the Borrower and the Paying Agent indicating that all payments to be made to such participant under such participation agreement are fully exempt from such withholding taxes, and neither the Borrower nor the Paying Agent shall have any obligation to pay to any participant any taxes, penalties, interest or other expenses, costs and losses incurred or payable by the Borrower or the Paying Agent as a result of the failure of such participant to obtain such additional duly completed and signed copies of one or the other of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may be required under then-current United States law or regulations to avoid United States withholding taxes on payments in respect of all amounts to be received by such participant.

     (f)    Any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.06, disclose to the assignee or participant or proposed assignee or

JPMUCI 0008483

participant any information relating to the Borrower or any of its Affiliates furnished to such Bank by or on behalf of the Borrower or any of its Affiliates; provided, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to comply with Section 9.09.

(g)     Notwithstanding any other provision set forth in this Agreement, any Bank may at any time create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it and the Note held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Board.

SECTION 9.07.     Governing Law; Entire Agreement.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.  This Agreement, the Notes, the other Loan Documents and any fee letter pertaining hereto accepted by the Borrower constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 9.08.     Interest. It is the intention of the parties hereto that the Paying Agent, each Co-Administrative Agent and each Bank shall conform strictly to usury laws applicable to it, if any. Accordingly, if the transactions with the Paying Agent, any Co-Administrative Agent or any Bank contemplated hereby would be usurious under applicable law, if any, then, in that event, notwithstanding anything to the contrary in the Notes, this Agreement or any other agreement entered into in connection with this Agreement or the Notes, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, under the Notes, this Agreement or under any other agreement entered into in connection with this Agreement or the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law and any excess shall be cancelled automatically and, if theretofore paid, shall at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be applied on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower, and (b) in the event that the maturity of any Note or other obligation payable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, is accelerated or in the event of any permitted prepayment, then such consideration that constitutes interest under law applicable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, may never include more than the maximum amount allowed by such applicable law and excess interest, if any, to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, provided for in this Agreement or otherwise shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be credited by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower.

SECTION 9.09.     Confidentiality.  Each Bank agrees that it will use reasonable efforts not to disclose without the prior consent of the Borrower (other than to such Bank's affiliates in the ordinary course of business in connection with any Loan Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Bank if the disclosing Bank or the disclosing Bank's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to the Borrower or its Subsidiaries which is

JPMUCI 0008484

furnished pursuant to this Agreement or any other Loan Document and which is designated by the Borrower to the Banks in writing as confidential, provided that any Bank may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Bank or to the Federal Reserve Board or the FDIC or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Bank, and (e) to the prospective transferee in connection with any contemplated transfer of any of the Notes or any interest therein by such Bank, provided, that such prospective transferee executes an agreement with the Borrower containing provisions substantially identical to those contained in this Section.

SECTION 9.10.    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 9.11.    Domicile of Loans.  Each Bank may transfer and carry its loans at, to or for the account of any office, subsidiary or affiliate of such Bank provided that no Bank shall be relieved of its Commitment as a result thereof.

SECTION 9.12.    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, the Co-Administrative Agents and the Paying Agent and when the Paying Agent shall have, as to each Bank, either received a copy of a signature page hereof executed by such Bank or been notified by such Bank that such Bank has executed it and thereafter shall be binding upon and inure to the benefit of and be enforceable by the Borrower, the Paying Agent, the Co-Administrative Agents and each Bank and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Banks (other than an assignment effectuated by a merger or consolidation permitted by Section 5.02(d) to the surviving Person referred to therein).

SECTION 9.13.    Prior Credit Facilities  The undersigned agree and acknowledge that, except for provisions that expressly provide for their survival of termination, the Prior Credit Facilities are terminated and all Commitments thereunder (as defined in each of the Prior Credit Facilities) are terminated, and the undersigned waive any right to receive any notice of such termination.  With respect to each Prior Credit Facility, each Bank that was a party to such Prior Credit Facility agrees to return to the Borrower, with reasonable promptness, the Note (as defined in such Prior Credit Facility) delivered by the Borrower to the Bank under such Prior Credit Facility.

SECTION 9.14.    Return of Notes.  With respect to each Bank, upon the full and final payment by the Borrower to such Bank of all amounts due under the Note payable to the order of such Bank, and termination of the Commitment of such Bank, such Bank will, with reasonable promptness, return such Note to the Borrower.

JPMUCI 0008485

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

ENRON CORP.

By: _____
Name: Timothy A. DeSpain
Title: Deputy Treasurer

Signature Page for Enron Corp
Long-Term Revolving Credit Agreement

JPMUCI 0008486

PAYING AGENT:

CITIBANK, N. A.

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

By:_____
         Authorized Officer

CO-ADMINISTRATIVE AGENTS:

CITIBANK, N. A.

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

By:_____
         Authorized Officer

THE CHASE MANHATTAN BANK

By:_____
         Authorized Officer

Signature Page Enron Corp
Long-Term Revolving Credit Agreement

-46-

PAYING AGENT:

CITIBANK, N. A.

By:_____
            Authorized Officer


CO-ADMINISTRATIVE AGENTS:

CITIBANK, N. A.

By:_____
            Authorized Officer

THE CHASE MANHATTAN BANK

By:_____
            Authorized Officer

JPMUCI 0008488

BANKS:

| Commitment | |
|---|---|
| $33,333,333.43 | CITIBANK, N. A. |

By:_____
Authorized Officer

| $33,333,333.33 | THE CHASE MANHATTAN BANK |

By:_____
Authorized Officer

JPMUCI 0008489

Commitment

**BANKS:**

$33,333,333.43

CITIBANK, N. A.

By:_____
  Authorized Officer

$33,333,333.33

THE CHASE MANHATTAN BANK

By:_____
  Authorized Officer

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                -47-

$33,333,333.33

ABN AMRO BANK N.V.

By: _____
     Authorized Officer

PETER D. GAW
SENIOR VICE PRESIDENT
& MANAGING DIRECTOR

By: _____
     Authorized Officer

WILLIAM R. HALE
SENIOR VICE PRESIDENT
& MANAGING DIRECTOR

JPMUCI 0008491

$10,416,666.67                           ARAB BANK PLC

                                    By: _____
                                            Authorized Officer

JPMUCI 0008492

$10,416,666.67

ARAB BANKING CORPORATION (B.S.C.)

By: _____
          Authorized Officer

JPMUCI 0008493

$20,833,333.33

AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By _Ela M Waters_ , V P
Authorized Officer

JPMUCI 0008494

$20,833,333.33

BANCA COMMERCIALE ITALIANA-LOS ANGELES
FOREIGN BRANCH

By: _____
Authorized Officer    & Dougherty, VP

By: _____
Authorized Officer    J. Dickerhof, VP

JPMUCI 0008495

$27,083,333.33

BANCA DI ROMA, CHICAGO BRANCH

By: _____
    Authorized Officer    Aurora Pensa (97974)
                          Vice President

By: _____
    Authorized Officer    Claudio Perna (19690)
                          Sr. Vice President & Manager

$10,416,666.67

BANCA NAZIONALE DEL LAVORO S.p.A.

By: _____
Authorized Officer    LEONARDO VALENTINI
FIRST VICE PRESIDENT

By: _____
Authorized Officer

ROBERTO MANCONE
SENIOR LOAN OFFICER

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                    -54-

JPMUCI 0008497

$10,416.666.67

BANCA POPOLARE DI MILANO

By: _____

Title: FULVIO MONTANARI
FIRST VICE PRESIDENT

By: _____

Title: 597 - V. Repola
U P S COMPTROLLER

JPMUCI 0008498

$10,416,666.67

BANCO BILBAO VIZCAYA ARGENTARIA

By: _____
        Authorized Officer

**JOHN MARTINI**
**VICE PRESIDENT**
**CORPORATE BANKING**

**ALEJANDRO LORCA**
**VICE PRESIDENT**
**CORPORATE BANKING**

JPMUCI 0008499

$20,833,333.33

BANCO SANTANDER CENTRAL HISPANO S.A.,
NEW YORK BRANCH

By: _____
Authorized Officer

JAVIER Ardent
VP

G.K. Greathouse
SVP

JPMUCI 0008500

$27,083,333.33

BANK OF AMERICA, N.A.

By: _____
         Authorized Officer

James R. Allred
Managing Director

Signature Page Eaton Corp.
Long-Term Revolving Credit Agreement

-58-

JPMUCI 0008501

$10,416,666.67

BANK OF MONTREAL

By: _____

Authorized Officer

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                    -59-

JPMUCI 0008502

$20,833,333.33                    THE BANK OF NEW YORK

                                  By: _____
                                       Authorized Officer
                                       RAYMOND J. PALMER
                                       Vice President

JPMUCI 0008503

$27,083,333.33

THE BANK OF NOVA SCOTIA

By: _____
Authorized Officer

F.C.H. Ashby
Senior Manager Loan Operations

JPMUCI 0008504

$20,833,333.33

THE BANK OF TOKYO-MITSUBISHI, LTD.,
HOUSTON AGENCY

By: _____
            Authorized Officer
     **Michael Meiss**
     **VP & Manager**

JPMUCI 0008505

$20,833,333.33                    BANK ONE, NA

                                 By: _____
                                       Authorized Officer

JPMUCI 0008506

$20,833,333.33                    FLEET NATIONAL BANK

                                  By: _____
                                          Authorized Officer

                                      Michael M. Parker
                                      Managing Director

Signature Page Exxon Corp                    -64-
Long-Term Revolving Credit Agreement

JPMUCI 0008507

$27,083,333.33

BANKERS TRUST COMPANY

By:_____
          Authorized Officer

JPMUCI 0008508

$33.333.333 33

BARCLAYS BANK PLC

By: _____
Authorized Officer

JPMUCI 0008509

$20,833,333.33

BAYERISCHE HYPO-UND VEREINSBANK AG
NEW YORK BRANCH

By: _Edmund Santin_
Authorized Officer
ASSOCIATE DIRECTOR

_Steven Atwell_
Steven Atwell
Director

JPMUCI 0008510

$27,083,333.33

By: _____

Name:    Hereward Drummond

Title:   Senior Vice President

BAYERISCHE LANDESBANK GIROZENTRALE

By: _____

Name: :- Sean O'Sullivan

Title-   Vice President

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                    -68-

JPMUCI 0008511

$20,833,333.33

BBL INTERNATIONAL (U.K.) LIMITED

By: _____
Authorized Officer
MC Swanson
Authorised Signatory

By: _____
Authorized Officer
G R H Weller
Authorised Signatory

JPMUCI 0008512

$10,416.666.67

CHRISTIANIA BANK OG KREDITKASSE ASA

By: _____
Authorized Officer

By: _____
Authorized Officer

Signature Page Enron Corp
Long-Term Revolving Credit Agreement

-70-

$27,083.333 33

CIBC INC.

By: _____

Authorized Officer

JPMUCI 0008514

$27,083,333.33

COMMERZBANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By: _____
   Authorized Officer  Brian J. Campbell
                       Vice President

By: _____
   Authorized Officer  D. L. Ward, Jr.
                       Asst. Treasurer

JPMUCI 0008515

$10,416,666.67

CREDIT AGRICOLE INDOSUEZ

By: _____
              PATRICK COCQUEREL
    Authorized Officer FIRST VICE PRESIDENT, MANAGING DIRECTOR
             HEAD OF HOUSTON REPRESENTATIVE OFFICE

By: _____
    Authorized Officer
    Douglas A. Whidden
    Vice President
    Senior Relationship Manager

Signature Page Enron Corp
Long-Term Revolving Credit Agreement

-73-

JPMUCI 0008516

$27,083,333.33

CREDIT LYONNAIS NEW YORK BRANCH

By._____

Authorized Officer
Pascal Poupelle
President & Chief Operating Officer

-74-

JPMUCI 0008517

$27.083.333.33

CREDIT SUISSE FIRST BOSTON

By: _____

Authorized Officer

JAMES P MORAN
DIRECTOR

Robert N Finney
Managing Director

JPMUCI 0008518

$10,416,666.67

THE DAI-ICHI KANGYO BANK, LTD.

By: _____
    Authorized Officer

JPMUCI 0008519

$20.833.333.33

DG BANK DEUTSCHE
GENOSSENSCHAFTSBANK AG

By: _____     **RICHARD W. WILBERT**
    Authorized Officer             Vice President

By: _____     **CRAIG ANDERSON**
    Authorized Officer             Vice President

Signature Page Enron Corp
Long-Term Revolving Credit Agreement

-77-

JPMUCI 0008520

$27,083,333.33

DLJ CAPITAL FUNDING, INC.

By: _____
        Authorized Officer

**James L. Paradise**
**Senior Vice President**

JPMUCI 0008521

$27,083,333.33

DRESDNER BANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By: _____
       Authorized Officer         ALEC KUSHNIR
                                  ASSISTANT TREASURER

By: _____
       Authorized Officer

ROBERT PREMINGER
ASSISTANT VICE PRESIDENT

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                -79-

JPMUCI 0008522

$27.083 333.33

FIRST UNION NATIONAL BANK

By: _____
        Authorized Officer

JPMUCI 0008523

$20,833,333.33

THE FUJI BANK, LIMITED

By: _____
         Authorized Officer

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                          -81-

JPMUCI 0008524

$27,083,333.33

HSBC BANK USA

By: _____
        Authorized Officer

George Linhart #9429

JPMUCI 0008525

$20,833,333.33

THE INDUSTRIAL BANK OF JAPAN
TRUST COMPANY

By: _____
Authorized Officer – Ryusuke Aya
Senior Vice President
THE INDUSTRIAL BANK OF JAPAN, LIMITED, HOUSTON OFFICE
(Authorized Representative)

JPMUCI 0008526

$20,833,333.33

KBC BANK N.V.

By: _____ ROBERT SNAUFFER
          Authorized Officer    FIRST VICE PRESIDENT

By: _____
          Authorized Officer

RAYMOND F. MURRAY
FIRST VICE PRESIDENT

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                    -84-

JPMUCI 0008527

$10,416,666.67

MEESPIERSON N.V.

By: _____
Authorized Officer

JPMUCI 0008528

ENRON
$20,833,333.33

Merrill Lynch Bank USA

By: _____
Preston L. Jackson
President & C.E.O.

JPMUCI 0008529

$27,083,333.33

MORGAN GUARANTY TRUST COMPANY OF
NEW YORK

By: _Robert Bittermid_

Authorized Officer

JPMUCI 0008530

$10,416,666.67

NATEXIS BANQUE

Renaud J. d'Herbes
Senior Vice President
and Regional Manager

By:_____
Authorized Officer

By:_____
Authorized Officer

Daniel Payer
Assistant Vice President

Signature Page Enron Corp.
Long-Term Revolving Credit Agreement

-88-

JPMUCI 0008531

$27.083.333.33                              NATIONAL AUSTRALIA BANK LIMITED

                                           By ___Paul B Morrison___
                                                Authorized Officer
                                                Paul B. Morrison
                                                Vice President

JPMUCI 0008532

$27.083.333.33

NATIONAL WESTMINSTER BANK PLC,
NEW YORK BRANCH

By:_____
　　　　Authorized Officer

NATIONAL WESTMINSTER BANK PLC,
NASSAU BRANCH

By:_____
　　　　Authorized Officer

JPMUCI 0008533

$10,416,666.67

THE NORTHERN TRUST COMPANY

By _____
Authorized Officer
DAVID J. MITCHELL
VICE PRESIDENT

JPMUCI 0008534

$27,083.333.33

PARIBAS

By

Authorized Officer

**Brian M. Malone**
Director

Douglas R. Liftman
Director

-92-

JPMUCI 0008535

$27.083.333.33

ROYAL BANK OF CANADA

By: _____
Authorized Officer

DAVID A McCLUSKEY
MANAGER

$20,833,333.33                          SANPAOLO IMI S.p.A.

                                        By: _____
                                              Authorized Officer

                                        By: _____
                                              Authorized Officer

JPMUCI 0008537

$20,833,333.33

SOCIETE GENERALE

By: _____
Authorized Officer

JPMUCI 0008538

$10.416.666.67

STANDARD CHARTERED BANK

By _____
    Authorized Officer

    Jack Insinga
    Vice President

ANDREW YUNG
VICE/PRESIDENT

JPMUCI 0008539

$27,083,333.33

THE SUMITOMO BANK, LIMITED

By: _____
        Authorized Officer     Peter R. C. Knight
                               Senior Vice President

JPMUCI 0008540

$20,833,333.33

SUNTRUST BANK, ATLANTA

By: _____
        Authorized Officer

JPMUCI 0008541

$27,083,333.33

TORONTO DOMINION (TEXAS), INC.

By: _____
     Authorized Officer

**LYNN CHASIN**
**VICE PRESIDENT**

JPMUCI 0008542

$27,083,333.33

UBS AG, STAMFORD BRANCH

By: _____
    Authorized Officer
    Barbara McKinley
    Director
    Loan Portfolio Support, US

By: _____
    Authorized Officer

    RICHARD W FORTNEY
    EXECUTIVE DIRECTOR

Signature Page Enron Corp.
Long-Term Revolving Credit Agreement                    -100-

JPMUCI 0008543

$10,416,666.67

UNICREDITO ITALIANO SpA

By _____
Gianfranco Bisagni, First Vice President

By: _____
Saiyed A. Abbas, Vice President

Signature Page Enron Corp
Long-Term Revolving Credit Agreement

-101-

JPMUCI 0008544

$20,833,333.33

WACHOVIA BANK, N.A.

By: _____

Authorized Officer          Senior Vice President

JPMUCI 0008545

$27,083,333.33

WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By: _____
         Authorized Officer

CYNTHIA M. NIESEN
MANAGING DIRECTOR

By: _____
         Authorized Officer

THOMAS LEE
ASSOCIATE

Signature Page Enron Corp
Long-Term Revolving Credit Agreement                    -103-

JPMUCI 0008546

**SCHEDULE I**

## FACILITY FEES AND APPLICABLE MARGINS

| *RATING LEVELS | Rating Level Level I | Rating Level Level II | Rating Level Level III | Rating Level Level IV | Rating Level Level V |
|---|---|---|---|---|---|
| | If Borrower's senior unsecured long-term debt is rated A- or better by S&P or A3 or better by Moody's. | If Borrower's senior unsecured long-term debt is rated BBB+ by S&P or Baa1 by Moody's. | If Borrower's senior unsecured long-term debt is rated BBB by S&P or Baa2 by Moody's. | If Borrower's senior unsecured long-term debt is rated BBB- by S&P or Baa3 by Moody's. | If Borrower's senior unsecured long-term debt is rated BB+ or lower (or not rated) by S&P and Ba1 or lower (or not rated) by Moody's. |
| **Facility Fees (per annum) | 0.085% | 0.10% | 0.150% | 0.20% | 0.25% |
| ***Applicable Margin for LIBOR Advances (per annum): LIBO Rate plus | 0.315% | 0.35% | 0.50% | 0.675% | 1.00% |

* The relevant Rating Level is determined by the higher of S&P or Moody's rating. However, if one rating is two or more levels below the higher such rating, the Rating Level that is one level below the Rating Level otherwise applicable shall apply. For example, if S&P rates the Borrower's senior unsecured long-term debt A- and Moody's rates such debt Baa2, then Rating Level II would apply.

** For purposes of determining facility fees, the Rating Level for each calendar quarter shall be determined as of the first day of such quarter.

*** For purposes of determining Applicable Margin for LIBOR Advances, the Rating Level shall be determined as of the first day of the Interest Period for such Advance.

JPMUCI 0008547

SCHEDULE II

| Name of Bank | Domestic Lending Office | Eurodollar Lending Office |
|---|---|---|
| ABN AMRO Bank N.V | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention: Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy: (312) 992-5155 | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention: Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy: (312) 992-5155 |
| Arab Bank plc | Arab Bank plc - Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Justo Huapaya<br>Telephone: (212) 715-9713<br>Telecopy: (212) 593-4632 | Arab Bank plc - Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Justo Huapaya<br>Telephone: (212) 715-9713<br>Telecopy: (212) 593-4632 |
| Arab Banking Corporation<br>(B.S.C ) | Arab Banking Corporation (B.S.C.)<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-3299<br>Attention: Barbara Sanderson<br>Telephone: (212) 583-4752<br>Telecopy: (212) 583-0921/22 | Arab Banking Corporation (B.S.C.)<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-3299<br>Attention: Barbara Sanderson<br>Telephone: (212) 583-4752<br>Telecopy: (212) 583-0921/22 |
| Australia and New Zealand<br>Banking Group Limited | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention: Tessie Amante<br>Telephone: (212) 801-9744<br>Telecopy: (212) 801-9859 | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention: Tessie Amante<br>Telephone: (212) 801-9744<br>Telecopy: (212) 801-9859 |
| Banca Commerciale Italiana-<br>Los Angeles Foreign<br>Branch | Banca Commerciale Italiana-<br>Los Angeles Foreign Branch<br>One William Street<br>New York, NY 10004<br>Attention: Alex Papace<br>Telephone: (212) 607-3531<br>Telecopy: (212) 607-3897 | Banca Commerciale Italiana-<br>Los Angeles Foreign Branch<br>One William Street<br>New York, NY 10004<br>Attention: Alex Papace<br>Telephone: (212) 607-3531<br>Telecopy: (213) 607-3897 |
| Banca di Roma, Chicago<br>Branch | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention: Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy: (312) 726-3058 | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention: Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy: (312) 726-3058 |
| Banca Nazionale del<br>Lavoro S.p.A | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Robert Manlone<br>Telephone: (212) 314-0734<br>Telecopy: (212) 765-2978 | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Robert Manlone<br>Telephone: (212) 314-0734<br>Telecopy: (212) 765-2978 |

JPMUCI 0008548

| | | |
|---|---|---|
| Banca Popolare di Milano | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone: (212) 546-9429/9435<br>Telecopy: (212) 838-1077 | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone: (212) 546-9429/9435<br>Telecopy: (212) 838-1077 |
| Banco Bilbao Vizcaya Argentaria | Banco Bilbao Vizcaya Argentaria–<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Francisco Miguens<br>Telephone: (212) 728-1682<br>Telecopy: (212) 333-2926 | Banco Bilbao Vizcaya Argentaria–<br>Nassau Branch<br>c/o Banco Bilbao Vizcaya Argentaria–<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Francisco Miguens<br>Telephone: (212) 728-1682<br>Telecopy: (212) 333-2926 |
| Banco Santander Central Hispano S.A., New York Branch | Banco Santander Central Hispano S.A.,<br>New York Branch<br>45 East 53rd Street<br>New York, NY 10022<br>Attention: Rebecca Raines<br>Assistant Treasurer<br>Telephone: (212) 350-3642<br>Telecopy: (212) 350-3690 | Banco Santander Central Hispano S.A.,<br>New York Branch<br>45 East 53rd Street<br>New York, NY 10022<br>Attention: Rebecca Raines<br>Assistant Treasurer<br>Telephone: (212) 350-3642<br>Telecopy: (212) 350-3690 |
| Bank of America, N.A. | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376<br><br>with a copy to:<br><br>Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376<br><br><br><br>Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 |
| Bank of Montreal | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Bryan Nusky<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Bryan Nusky<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 |
| The Bank of New York | The Bank of New York<br>One Wall Street<br>Energy Division, 19th Floor<br>New York, NY 10286<br>Attention: Terri Foran<br>Telephone: (212) 635-7921<br>Telecopy: (212) 635-7926 | The Bank of New York<br>One Wall Street<br>Energy Division, 19th Floor<br>New York, NY 10286<br>Attention: Terri Foran<br>Telephone: (212) 635-7921<br>Telecopy: (212) 635-7926 |

JPMUCI 0008549

| | | |
|---|---|---|
| The Bank of Nova Scotia | The Bank of Nova Scotia<br>600 Peachtree St , NE, Ste. 2700<br>Atlanta, GA 30308<br>Attention: Donna Gardner<br>Telephone: (404) 877-1599<br>Telecopy: (404) 888-8998 | The Bank of Nova Scotia<br>600 Peachtree St NE, Ste 2700<br>Atlanta, GA 30308<br>Attention: Jeffrey Jones<br>Telephone: (404) 877-1549<br>Telecopy (404) 888-8998 |
| The Bank of Tokyo-Mitsubishi,<br>Ltd., Houston Agency | Bank of Tokyo-Mitsubishi, Ltd ,<br>Houston Agency<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Michael Meiss<br>Telephone: (713) 655-3815<br>Telecopy: (713) 655-3855 | Bank of Tokyo-Mitsubishi, Ltd.,<br>Houston Agency<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention Michael Meiss<br>Telephone: (713) 655-3815<br>Telecopy: (713) 655-3855 |
| Bank One, NA | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention Kenneth J. Fatur<br>Vice President<br>Telephone (312) 732-3117<br>Telecopy: (312) 732-3055 | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention Kenneth J. Fatur<br>Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 |
| Fleet National Bank | Fleet National Bank<br>100 Federal Street<br>Boston, MA 02110<br>Attention Leah Hardy<br>Telephone (617) 434-4633<br>Telecopy: (617) 454-9820 | Fleet National Bank<br>100 Federal Street<br>Boston, MA 02110<br>Attention Leah Hardy<br>Telephone (617) 434-4633<br>Telecopy: (617) 454-9820 |
| Bankers Trust Company | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy. (212) 250-7351 | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy: (212) 250-7351 |
| Barclays Bank PLC | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention. David Barton<br>Telephone (212) 412-3702<br>Telecopy: (212) 412-5308 | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention. David Barton<br>Telephone (212) 412-3702<br>Telecopy: (212) 412-5308 |
| Bayerische Hypo - und<br>Vereinsbank AG<br>New York Branch | Bayerische Hypo - und Vereinsbank AG<br>New York Branch<br>150 East 42nd Street<br>29th Floor<br>New York, NY 10017-4679<br>Attention Yoram Danker<br>Telephone (212) 672-5446<br>Telecopy. (212) 672-5530 | Bayerische Hypo - und Vereinsbank AG<br>New York Branch<br>150 East 42nd Street<br>29th Floor<br>New York, NY 10017-4679<br>Attention Yoram Danker<br>Telephone: (212) 672-5446<br>Telecopy. (212) 672-5530 |

-3-

JPMUCI 0008550

| | | |
|---|---|---|
| Bayerische Landesbank Girozentrale | Bayerische Landesbank Girozentrale 560 Lexington Avenue New York, NY 10022 Attention: Sean O'Sullivan/ Edward Santos Telephone: (212) 310-9913/ (212) 310-9962 Telecopy: (212) 310-9868 | Bayerische Landesbank Girozentrale 560 Lexington Avenue New York, NY 10022 Attention: Sean O'Sullivan/ Edward Santos Telephone: (212) 310-9913/ (212) 310-9962 Telecopy: (212) 310-9868 |
| BBL International (U.K.) Limited | BBL International (U.K.) Ltd. 6 Broadgate London EC2M 2AJ England Attention: Karen Bowman Telephone: 00-44-20-7392-5583 Telecopy: 00-44-20-7562-0210 Attention: Jeremy Hayes Telephone: 00-44-20-7392-5586 Telecopy: 00-44-20-7562-0210 Attention: Tessa Baptiste Telephone: 00-44-20-7392-5517 Telecopy: 00-44-20-7562-0210 | BBL International (U.K.) Ltd. 6 Broadgate London EC2M 2AJ England Attention: Karen Bowman Telephone: 00-44-20-7392-5583 Telecopy: 00-44-20-7562-0210 Attention: Jeremy Hayes Telephone: 00-44-20-7392-5586 Telecopy: 00-44-20-7562-0210 Attention: Tessa Baptiste Telephone: 00-44-20-7392-5517 Telecopy: 00-44-20-7562-0210 |
| The Chase Manhattan Bank | The Chase Manhattan Bank 1 Chase Manhattan Plaza, 8th Floor New York, NY 10081 Attention: Lisa Pucciarelli Telephone: (212) 552-7886 Telecopy: (212) 552-5777 with a copy to: Chase Bank of Texas, N.A. 600 Travis Houston, Texas 77002 Attention: Peter Licatzi Telephone: (713) 216-8869 Telecopy: (713) 216-4117 | The Chase Manhattan Bank 1 Chase Manhattan Plaza, 8th Floor New York, NY 10081 Attention: Lisa Pucciarelli Telephone: (212) 552-7886 Telecopy: (212) 552-5777 with a copy to: Chase Bank of Texas, N.A. 600 Travis Houston, Texas 77002 Attention: Peter Licatzi Telephone: (713) 216-8869 Telecopy: (713) 216-4117 |
| Christiania Bank og Kreditkasse ASA | Christiania Bank og Kreditkasse ASA 11 West 42nd Street, 7th Floor New York, NY 10036 Attention: Lucins Ong Telephone: (212) 827-4877 Telecopy: (212) 827-4888 | Christiania Bank og Kreditkasse ASA 11 West 42nd Street, 7th Floor New York, NY 10036 Attention: Lucine Ong Telephone: (212) 827-4877 Telecopy: (212) 827-4888 |
| CIBC Inc | CIBC Inc. 2727 Paces Ferry Road, Suite 1200 Atlanta, GA 30339 Attention: Anita Rounds Telephone: (770) 319-4828 Telecopy: (770) 319-4950 | CIBC Inc. 2727 Paces Ferry Road, Suite 1200 Atlanta, GA 30339 Attention: Anita Rounds Telephone: (770) 319-4828 Telecopy: (770) 319-4950 |

JPMUCI 0008551

| | | |
|---|---|---|
| Citibank, N.A. | Citibank, N.A.<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Sydney Chance<br>Telephone: (302) 894-6076<br>Telecopy: (302) 894-6120<br>Attention: Alvin Weissberger<br>Telephone: (302) 894-6043<br>Telecopy: (302) 894-6120 | Citibank, N.A.<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Mike Whitman<br>and Phil Green<br>Telephone: (302) 894-6021<br>Telecopy: (302) 894-6120 |
| | with a copy to: | with a copy to: |
| | Citicorp Securities, Inc.<br>1200 Smith Street, Suite 2000<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 | Citicorp Securities, Inc.<br>1200 Smith Street, Suite 200<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 |
| Commerzbank AG, New York<br>and Grand Cayman Branches | Commerzbank AG, New York and<br>Grand Cayman Branches<br>1230 Peachtree St., N.E., Suite 3500<br>Atlanta, GA 30309<br>Attention David Suttles<br>Telephone: (404) 888-6524<br>Telecopy: (404) 888-6539<br>Attention Lee Ward<br>Telephone: (404) 888-6526<br>Telecopy: (404) 888-6539 | Commerzbank AG, New York and<br>Grand Cayman Branches<br>1230 Peachtree St., N.E., Suite 3500<br>Atlanta, GA 30309<br>Attention: David Suttles<br>Telephone: (404) 888-6524<br>Telecopy: (404) 888-6539<br>Attention: Lee Ward<br>Telephone: (404) 888-6526<br>Telecopy: (404) 888-6539 |
| Credit Agricole Indosuez | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard<br>Telephone (312) 917-7554<br>Telecopy: (312) 372-4421 | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 |
| Credit Lyonnais New York<br>Branch | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 |
| Credit Suisse First Boston | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 |
| The Dai-Ichi Kangyo Bank, Ltd. | The Dai-Ichi Kangyo Bank, Ltd<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Katsuya Noto<br>        Assistant Vice President<br>Telephone: (212) 432-6627<br>Telecopy (212) 912-1879 | The Dai-Ichi Kangyo Bank, Ltd.<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Katsuya Noto<br>        Assistant Vice President<br>Telephone: (212) 432-6627<br>Telecopy: (212) 912-1879 |

-5-

JPMUCI 0008552

| | | |
|---|---|---|
| DG BANK Deutsche Genossenschaftsbank AG | DG BANK Deutsche Genossenschaftsbank AG<br>DG Bank Building<br>609 Fifth Avenue<br>New York, NY 10017-1021<br>Attention: Mark Connelly<br>Telephone: (212) 745-1560<br>Telecopy: (212) 745-1556 | DG BANK Deutsche Genossenschaftsbank AG<br>DG Bank Building<br>609 Fifth Avenue<br>New York, NY 10017-1021<br>Attention: Mark Connelly<br>Telephone: (212) 745-1560<br>Telecopy: (212) 745-1556 |
| DLJ Capital Funding, Inc | DLJ Capital Funding, Inc.<br>277 Park Avenue, 17th Floor<br>New York, NY 10172<br>Attention: Dana Klein<br>Telephone: (212) 892-7911<br>Telecopy: (212) 892-7542 | DLG Capital Funding, Inc.<br>277 Park Avenue, 17th Floor<br>New York, NY 10172<br>Attention: Dana Klein<br>Telephone: (212) 892-7911<br>Telecopy: (212) 892-7542 |
| Dresdner Bank AG, New York and Grand Cayman Branches | Dresdner Bank AG, New York Branch<br>75 Wall Street<br>New York, NY 10005-2889<br>Attention: Annabelle Librojo<br>Telephone: (212) 429-2269<br>Telecopy: (212) 429-2130 | Dresdner Bank AG, Grand Cayman Branch<br>75 Wall Street<br>New York, NY 10005-2889<br>Attention: Annabelle Librojo<br>Telephone: (212) 429-2269<br>Telecopy: (212) 429-2130 |
| First Union National Bank | First Union National Bank<br>301 South College Street<br>Charlotte, NC 28288<br>Attention: Debbie Blank<br>Telephone: (713) 346-2727<br>Telecopy (713) 650-6354 | First Union National Bank<br>301 South College Street<br>Charlotte, NC 28288<br>Attention: Debbie Blank<br>Telephone: (713) 346-2727<br>Telecopy: (713) 650-6354 |
| The Fuji Bank, Limited | The Fuji Bank, Limited<br>Two World Trade Center<br>New York, NY 10048<br>Attention: Tina Catapano<br>Telephone: (212) 898-2099<br>Telecopy: (212) 488-8216 | The Fuji Bank, Limited<br>Two World Trade Center<br>New York, NY 10048<br>Attention: Tina Catapano<br>Telephone: (212) 898-2099<br>Telecopy: (212) 488-8216 |
| HSBC Bank USA | HSBC Bank USA<br>1 HSBC Center<br>Buffalo, NY 14203<br>Attention: Donna Riley<br>Telephone: (716) 841-4178<br>Telecopy: (716) 841-1844 | HSBC Bank USA<br>1 HSBC Center<br>Buffalo, NY 14203<br>Attention: Donna Riley<br>Telephone: (716) 841-4178<br>Telecopy (716) 841-1844 |
| The Industrial Bank of Japan Trust Company | The Industrial Bank of Japan Trust Company<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attention: Andrew Encarnacion<br>Telephone: (212) 282-4065<br>Telecopy: (212) 282-4480 | The Industrial Bank of Japan Trust Company<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attention: Andrew Encarnacion<br>Telephone: (212) 282-4065<br>Telecopy: (212) 282-4480 |
| KBC Bank N.V. | KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone (212) 541-0653<br>Telecopy: (212) 956-5581 | KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone (212) 541-0653<br>Telecopy: (212) 956-5581 |

-6-

JPMUCI 0008553

| | | |
|---|---|---|
| MeesPierson N.V. | MeesPierson N.V.<br>Camomile Court<br>23 Camomile Street<br>London, England  EC3A 7PP<br>Attention:  Michael Davies, Manager<br>Telephone:  44-20-7444-8712<br>Telecopy:  44-20-7444-8810 | MeesPierson N.V.<br>Camomile Court<br>23 Camomile Street<br>London, England  EC3A 7PP<br>Attention:  Michael Davies, Manager<br>Telephone:  44-20-7444-8712<br>Telecopy:  44-20-7444-8810 |
| Merrill Lynch Bank USA | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT  84101<br>Attention:  Kevin Imlay<br>Telephone:  (801) 526-8310<br>Telecopy:  (801) 521-6466 | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT  84101<br>Attention:  Kevin Imlay<br>Telephone:  (801) 526-8310<br>Telecopy:  (801) 521-6466 |
| Morgan Guaranty Trust<br>Company of New York | Morgan Guaranty Trust Company of<br>New York<br>60 Wall Street, 3rd Floor<br>New York, NY  10260-0060<br>Attention:  Bob McMinn<br>Telephone:  (212) 648-0896<br>Telecopy:  (212) 648-5358<br>Attention:  Ed Wirth<br>Telephone:  (302) 634-4273<br>Telecopy:  (302) 634-1094 | Morgan Guaranty Trust Company of<br>New York<br>60 Wall Street, 3rd Floor<br>New York, NY  10260-0060<br>Attention:  Bob McMinn<br>Telephone:  (212) 648-0896<br>Telecopy:  (212) 648-5358<br>Attention:  Ed Wirth<br>Telephone:  (302) 634-4273<br>Telecopy:  (302) 634-1094 |
| NATEXIS Banque | NATEXIS Banque<br>333 Clay Street, Suite 4340<br>Houston, TX  77002<br>Attention:  Louis "Parker" Laville<br>Vice President<br>Telephone:  (713) 759-9401<br>Telecopy:  (713) 759-9908 | NATEXIS Banque<br>333 Clay Street, Suite 4340<br>Houston, TX  77002<br>Attention:  Louis "Parker" Laville<br>Vice President<br>Telephone:  (713) 759-9401<br>Telecopy:  (713) 759-9908 |
| National Australia Bank<br>Limited | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY  10166<br>Attention  Frank J. Campiglia<br>Telephone:  (212) 916-9595<br>Telecopy:  (212) 983-1969 | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY  10166<br>Attention:  Frank J. Campiglia<br>Telephone:  (212) 916-9595<br>Telecopy:  (212) 983-1969 |
| National Westminster Bank<br>PLC | National Westminster Bank PLC<br>65 East 55th Street<br>24th Floor<br>New York, NY  10022<br>Attention:  Settie Chinapen<br>Telephone:  (212) 401-1407<br>Telecopy:  (212) 401-1494 | National Westminster Bank PLC<br>65 East 55th Street<br>24th Floor<br>New York, NY  10022<br>Attention:  Settie Chinapen<br>Telephone:  (212) 401-1407<br>Telecopy:  (212) 401-1494 |
| The Northern Trust Company | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL  60675<br>Attention:  Linda Honda<br>Telephone:  (312) 444-3532<br>Telecopy:  (312) 630-1566 | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL  60675<br>Attention:  Linda Honda<br>Telephone:  (312) 444-3532<br>Telecopy:  (312) 630-1566 |

-7-

JPMUCI 0008554

| | | |
|---|---|---|
| Paribas | Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 | Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 |
| Royal Bank of Canada | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention: Assistant Manager,<br>   Loan Processing<br>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372 | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention: Assistant Manager,<br>   Loan Processing<br>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372 |
| SanPaolo IMI S.p.A | SanPaolo IMI S.p.A.<br>245 Park Avenue, 35th Floor<br>New York, NY 10067<br>Attention: Glen Binder, Vice President<br>Telephone: (212) 692-3016<br>Telecopy: (212) 599-5303 | SanPaolo IMI S.p.A.<br>245 Park Avenue, 35th Floor<br>New York, NY 10067<br>Attention: Glen Binder, Vice President<br>Telephone: (212) 692-3016<br>Telecopy: (212) 599-5303 |
| Societe Generale | Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Lis Guerra<br>Telephone: (214) 979-2769<br>Telecopy: (214) 979-1104 | Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Lis Guerra<br>Telephone: (214) 979-2769<br>Telecopy: (214) 979-1104 |
| Standard Chartered Bank | Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Insinga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780 | Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Insinga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780 |
| The Sumitomo Bank, Limited | The Sumitomo Bank, Limited<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537 | The Sumitomo Bank, Limited<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537 |
| SunTrust Bank, Atlanta | SunTrust Bank, Atlanta<br>25 Park Place, 24th Floor<br>Atlanta, GA 30303<br>Attention: John A. Fields, Jr.<br>   First Vice President<br>Telephone: (404) 724-3667<br>Telecopy: (404) 827-6270 | SunTrust Bank, Atlanta<br>25 Park Place, 24th Floor<br>Atlanta, GA 30303<br>Attention: John A. Fields, Jr.<br>   First Vice President<br>Telephone: (404) 724-3667<br>Telecopy: (404) 827-6270 |
| Toronto Dominion (Texas), Inc. | Toronto Dominion (Texas), Inc.<br>909 Fannin Street, 17th Floor<br>Houston, TX 77010<br>Attention: Lynn Chasin<br>Telephone: (713) 653-8234<br>Telecopy: (713) 951-9921 | Toronto Dominion (Texas), Inc.<br>909 Fannin Street, 17th Floor<br>Houston, TX 77010<br>Attention: Lynn Chasin<br>Telephone: (713) 653-8234<br>Telecopy: (713) 951-9921 |

-8-

JPMUCI 0008555

| UBS AG, Stamford Branch | UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Sailoz Sikka<br>Telephone: (203) 719-3072<br>Telecopy: (203) 719-3888 | UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Sailoz Sikka<br>Telephone: (203) 719-3072<br>Telecopy: (203) 719-3888 |
|---|---|---|
| UniCredito Italiano SpA | UniCredito Italiano SpA<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Angie Blanco<br>Telephone: (212) 546-9614<br>Telecopy: (212) 826-9675 | UniCredito Italiano SpA<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Angie Blanco<br>Telephone: (212) 546-9614<br>Telecopy: (212) 826-9675 |
| Wachovia Bank, N.A. | Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905 | Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905 |
| Westdeutsche Landesbank Girozentrale, New York Branch | Westdeutsche Landesbank Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention: Cheryl Wilson<br>Telephone: (212) 852-6152<br>Telecopy: (212) 302-7948 | Westdeutsche Landesbank Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention: Cheryl Wilson<br>Telephone: (212) 852-6152<br>Telecopy: (212) 302-7948 |

JPMUCI 0008556

EXHIBIT A

PROMISSORY NOTE

U.S. $_____                                                      Dated·_____

FOR VALUE RECEIVED, the undersigned, Enron Corp., an Oregon corporation (the "Borrower"), HEREBY PROMISES TO PAY to the order of _____ (the "Bank") for the account of its Applicable Lending Office (as defined in the Credit Agreement referred to below) on the Termination Date (as defined in the Credit Agreement referred to below), or on such earlier date payment is required to be made pursuant to such Credit Agreement, the principal sum of _____ U.S. dollars (U.S. $_____) or, if less, the aggregate unpaid principal amount of the Advances (as defined in the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement dated as of May 18, 2000 among the Borrower, the Bank, certain other lenders parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, as amended from time to time; such Long-Term Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement") owing to the Bank outstanding on such date.

The Borrower promises to pay interest on the unpaid principal amount of each Advance owing to the Bank from the date of such Advance until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

Both principal and interest are payable in lawful money of the United States of America to Citibank, N.A., as Paying Agent, at 399 Park Avenue, New York, New York 10043, in same day funds. Each Advance owed to the Bank by the Borrower pursuant to the Credit Agreement, and all payments made on account of principal thereof, shall be recorded by the Bank and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Promissory Note; provided that the failure of the Bank to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under the Credit Agreement.

This Promissory Note is one of the Notes referred to in, and is subject to and is entitled to the benefits of, the Credit Agreement. The Credit Agreement, among other things, (i) provides for the making of advances by the Bank to the Borrower from time to time in an aggregate amount not to exceed the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each Advance owing to the Bank being evidenced by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of New York.

ENRON CORP.

By:_____
Name _____
Title:_____

-2-

JPMUCI 0008558

ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Type of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|-------------------|-----------------|-------------------------------------|--------------------------|------------------|

-3-

JPMUCI 0008559

EXHIBIT B

NOTICE OF BORROWING
[Date]

Citibank, N. A., as Paying Agent
399 Park Avenue
New York, New York  10043

Attention:  Energy Department, North American Banking Group

Ladies and Gentlemen·

The undersigned, Enron Corp., refers to the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of May 18, 2000 (such Long-Term Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement:

(i)    The Business Day of the Proposed Borrowing is _____, ____.

(ii)    The Type of Advances comprising the Proposed Borrowing is [Base Rate Advances] [LIBOR Advances].

(iii)    The aggregate amount of the Proposed Borrowing is $_____.

·[(iv)    The initial Interest Period for each Advance made as part of the Proposed Borrowing is _____(months).]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(A)    the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both.

---

·    To be included for a Proposed Borrowing comprised of LIBOR Advances.

Very truly yours,

ENRON CORP.

By: _____
Name: _____
Title: _____

cc:    Citicorp Securities, Inc.
       1200 Smith Street, Suite 2000
       Houston, Texas 77002
       Attention: James F. Reilly, Jr.
                  Managing Director
       Telecopier No.: (713) 654-2849

-2-

JPMUCI 0008561

EXHIBIT C

[Opinion of Vinson & Elkins L.L.P.]

May 18, 2000

To each of the Banks parties to the Long-Term
Revolving Credit Agreement dated as of May 18,
2000, among Enron Corp., said Banks, Citibank, N.A.,
as Paying Agent, Citibank, N.A. and The Chase
Manhattan Bank, as Co-Administrative Agents and
to such Paying Agent and Co-Administrative Agents

     RE:   Enron Corp.

Ladies and Gentlemen:

     This opinion is furnished to you pursuant to Section 3.01(d) of the Long-Term Revolving Credit Agreement, dated as of May18, 2000 (the "Credit Agreement"), among Enron Corp. (the "Borrower"), the Banks parties thereto, Citibank, N.A., as Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents. Except as otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined.

     We have acted as counsel for the Borrower in connection with the preparation, execution, delivery and effectiveness of the Credit Agreement.

     In that connection, we have examined:

     (1)    The Credit Agreement and the Notes (other than any Note that may be executed and delivered after the date hereof); and

     (2)    The other documents furnished by the Borrower pursuant to the conditions precedent set forth in Section 3.01 of the Credit Agreement.

     In addition, we have (i) investigated such questions of law and (ii) relied on such certificates from officers and representatives of the Borrower and from public officials, as we have deemed necessary or appropriate for the purposes of this opinion.

     In rendering the opinions herein set forth, we have assumed (i) the due authorization, execution and delivery of each document referred to in clauses (1) and (2) of the third paragraph of this opinion by all parties to such documents and that each such document is valid, binding and enforceable (subject to limitations on enforceability of the types referred to in paragraphs (a) and (b) below) against the parties thereto other than the Borrower, (ii) the legal capacity of natural persons, (iii) the genuineness of all signatures, (iv) the authenticity of all documents submitted to us as originals, and (v) the conformity to original documents of all documents submitted to us as copies.

JPMUCI 0008562

Based upon the foregoing and upon such investigation as we have deemed necessary, we are of the following opinion:

      1.     No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required to be made or obtained by the Borrower for the execution, delivery and performance by the Borrower of each Loan Document.

      2.     The execution, delivery and performance by the Borrower of each Loan Document does not contravene any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or of Regulation U issued by the Federal Reserve Board.

      3.     Under the laws of the State of New York and the federal laws of the United States, the Credit Agreement and the Notes constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms.

      4.     A Texas court or a United States federal court applying Texas conflict-of-laws principles will give effect to the choice of New York law as the governing law of the Credit Agreement and the Notes and will apply New York law (other than New York procedural law) in any action to enforce the Credit Agreement and the Notes.

The opinions set forth above are subject to the following qualifications:

      (a)     Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally.

      (b)     Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, and also to the possible unavailability of specific performance or injunctive relief. Such principles of equity are of general application, and in applying such principles a court, among other things, might not allow a creditor to accelerate maturity of a debt upon the occurrence of a default deemed immaterial or might decline to order the Borrower to perform covenants. In addition, we express no opinion as to the enforceability of the following provisions to the extent same are contained in the Credit Agreement or the Notes: (i) provisions purporting to waive or not give effect to rights to notices, demands, legal defenses, or other rights or benefits that cannot be waived or rendered ineffective under applicable law; (ii) provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability to the extent that the same are inconsistent with public policy; (iii) provisions purporting to establish evidentiary standards for enforcement of the Loan Documents or providing that decisions by a party are conclusive or are based on such party's sole or absolute discretion; or (iv) provisions relating to rights of setoff.

      (c)     Our opinion in paragraph 2, with respect to Texas law, takes into account and is based on and qualified by our opinion in paragraph 4.

-2-

JPMUCI 0008563

(d)     In rendering our opinion in paragraph 3 above with respect to Notes delivered after the date hereof, we assume that such Notes will be issued, executed and delivered in accordance with the provisions of the Credit Agreement.

(e)     Our opinion in paragraph 4 above is based on the language of section 35.51 of the Texas Business and Commerce Code.

In rendering the opinions expressed in paragraphs 1, 2, and 3 above, we have relied upon the opinions stated in paragraphs 1, 2 (so far as such paragraph 2 relates to the corporate powers of, and due authorization of the Loan Documents by, the Borrower, and noncontravention of the Amended and Restated Articles of Incorporation, as amended, and Bylaws, as amended, of the Borrower), 4, and 5 of the opinion, dated today, of the Executive Vice President and General Counsel of the Borrower which is being delivered to you pursuant to Section 3.01(e) of the Credit Agreement.

We have not been called upon to, and accordingly do not, express any opinion as to the various state and federal laws regulating banks or the conduct of their business (except Regulation U issued by the Federal Reserve Board) that may relate to the Loan Documents or the transactions contemplated thereby.

This opinion is limited to the laws of the State of Texas and the State of New York, the Oregon Business Corporation Act and the federal law of the United States.

The opinions herein have been furnished at your request and are solely for your benefit and the benefit of your respective successors and your respective assignees and participants pursuant to the Credit Agreement, and the Paying Agent's special counsel, in connection with the subject transaction and may not be relied upon by any other person or by you or any other person in any other context without the prior written consent of the undersigned.

We are aware that Bracewell & Patterson, L.L.P. will rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

JPMUCI 0008564

EXHIBIT D

[Opinion of Executive Vice President and
General Counsel of the Borrower]

May 18, 2000

To each of the Banks parties to the Long-Term
Revolving Credit Agreement dated as of
May 18, 2000 among Enron Corp., said Banks,
Citibank, N.A., as Paying Agent, and Citibank, N.A.
and The Chase Manhattan Bank, as Co-Administrative
Agents, and to such Paying Agent and Co-Administrative
Agents

RE:    $1,250,000,000 Long-Term Revolving Credit Agreement of even date herewith
among Enron Corp., as Borrower, the Banks named therein, Citibank, N.A., as
Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-
Administrative Agents

Ladies and Gentlemen:

As Executive Vice President and General Counsel of Enron Corp., an Oregon corporation (the
"Borrower"), I am familiar with the Long-Term Revolving Credit Agreement (the "Credit Agreement") dated
as of May 18, 2000 among the Borrower, the Banks listed on the signature pages thereto, Citibank, N.A., as
Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents. In such
capacities, I am also familiar with the Amended and Restated Articles of Incorporation, as amended, and By-
laws, as amended, of the Borrower. This opinion is being furnished to you pursuant to Section 3.01(e) of the
Credit Agreement. Terms defined in the Credit Agreement and not otherwise defined herein are used herein
as therein defined.

Before rendering the opinion hereinafter set forth, I (or other attorneys with the Borrower's legal
department acting under my direction) have examined the Loan Documents, and have examined and relied
upon originals or photostatic or certified copies of such corporate records, certificates of officers of the
Borrower and of public officials, and such agreements, documents and instruments, and made such
investigations of law, as I or such other attorneys have deemed relevant and necessary as the basis for the
opinion hereinafter expressed. In such examination, I or such other attorneys assumed the genuineness of all
signatures (other than signatures of officers of the Borrower on the Loan Documents) and the authenticity
of all documents submitted to us as originals, and the conformity to original documents of all documents
submitted to us as photostatic or certified copies.

Upon the basis of the foregoing, I am of the opinion that:

1.    The Borrower is a corporation duly organized, validly existing and in good standing
under the laws of the State of Oregon, and has all corporate powers and all governmental licenses,
authorizations, consents and approvals required to carry on its business as now conducted, except to

JPMUCI 0008565

the extent failure to obtain such licenses, authorizations, consents or approvals would not materially adversely affect the Borrower and its Subsidiaries taken as a whole.

   2.     The execution, delivery and performance by the Borrower of each Loan Document is within the Borrower's corporate powers, has been duly authorized by all necessary corporate action on the part of the Borrower, and do not contravene, or constitute a default under, (a) the Amended and Restated Articles of Incorporation, as amended, or By-laws, as amended, of the Borrower, (b) any contractual or legal restriction contained in any material (meaning for the purposes of this opinion those creating a monetary liability of $100,000,000 or more) indenture, loan or credit agreement, receivables sale or financing agreement, lease financing agreement, capital lease, mortgage, security agreement, bond or note, or any guaranty of any of such obligations to which the Borrower is a party, or (c) any judgment, injunction, order or decree known to me binding upon the Borrower. The execution, delivery and performance by the Borrower of each of the Loan Documents will not result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any Subsidiary. The Credit Agreement and the Notes have been duly executed and delivered by the Borrower.

   3.     Except as disclosed in the Borrower's Form 10-K for the year ended December 31, 1999 or the Borrower's Form 10-Q for the quarter ended March 31, 2000, there is no action, suit or proceeding pending or, to my knowledge, threatened against the Borrower before any court or arbitrator or any governmental agency, in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole or which in any manner draws into question the validity of the Credit Agreement or any other Loan Document.

   4.     Neither the Borrower nor any Subsidiary is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

   5.     Each of the Borrower and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" under the Public Utility Holding Company Act of 1935, as amended, or pursuant to such Act or the rules and regulations promulgated thereunder or any order or interpretation of the Securities and Exchange Commission or its staff issued pursuant thereto.

The opinions set forth above are subject to the following qualifications:

   1.     In rendering the opinion expressed in paragraph 2 above, neither I nor any other attorney acting under my direction have made any examination of any accounting or financial matters related to certain of the covenants contained in certain documents to which the Borrower may be subject, and I express no opinion with respect thereto.

   2.     I am a member of the Bar of the State of Texas, and this opinion is limited in all respects to the laws of the State of Texas, the Oregon Business Corporation Act and Federal law.

   3.     In rendering the opinion expressed in paragraph 3 above, I (or the other attorneys acting under my direction) have only reviewed the files and records of the Borrower and the Subsidiaries, and we have consulted with such senior officers of the Borrower and the Subsidiaries as we have deemed necessary.

-2-

JPMUCI 0008566

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees pursuant to the Credit Agreement and the Paying Agent's special counsel and may not be relied upon in connection with any other transaction or by any other person, provided, however, that Vinson & Elkins L.L.P. may rely on certain provisions of this opinion to the extent stated in its opinion for the purposes of rendering its opinion pursuant to Section 3.01(d) of the Credit Agreement, and Bracewell & Patterson, L.L.P. may rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

-3-

JPMUCI 0008567

[FORM OF OPINION OF SPECIAL COUNSEL
TO THE PAYING AGENT]

May 18, 2000

To Citibank, N.A. and The Chase Manhattan Bank,
as Co-Administrative Agents, to Citibank, N.A., as Paying Agent,
and to each of the Banks party to the Credit
Agreement described below

Ladies and Gentlemen:

We have acted as special counsel to Citibank, N. A. in connection with the preparation, execution and delivery of the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of May 18, 2000 (the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), and each of you.  Capitalized terms defined in the Credit Agreement are used herein as therein defined.

In that connection, we have examined the following documents:

(1)     Counterparts of the Credit Agreement, executed by the Paying Agent and the Borrower, respectively.

(2)     The documents furnished by the Borrower pursuant to Section 3.01 of the Credit Agreement and listed on Annex A hereto, including the opinion of Messrs. Vinson & Elkins, L.L.P., counsel to the Borrower (the "Opinion of Borrower's Counsel") and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower (the "General Counsel Opinion").

In our examination of the documents referred to above, we have assumed the authenticity of all such documents submitted to us as originals, the genuineness of all signatures and the conformity to the originals of all such documents submitted to us as copies.  We have also assumed the accuracy of all matters set forth in the certificates referred to on Annex A hereto and assumed that each of the Borrower, the Banks, the Co-Administrative Agents and the Paying Agent has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the Credit Agreement, and that the Borrower has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the respective Notes and other Loan Documents contemplated to be executed by it.  We have also assumed that no Bank has requested that the opinion required by Section 3 01(d) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit C to the Credit Agreement or that the form of opinion of James V. Derrick, Jr. required by Section 3.01(e) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit D to the Credit Agreement.

Based upon the foregoing examination of documents and assumptions and upon such other investigation as we have deemed necessary, we are of the opinion that the Opinion of Borrower's Counsel, the General Counsel Opinion and the other documents referred to in item (2) above, are substantially responsive to the requirements of the Credit Agreement.

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees and may be relied upon only by such Persons in connection with the transactions contemplated by the Credit Agreement.

Very truly yours,

Bracewell & Patterson, L.L.P.

-2-

JPMUCI 0008569

ANNEX A

(1)     The 58 Promissory Notes dated May 18, 2000 of the Borrower payable to the order of each of the Banks.

(2)     The opinion of Vinson & Elkins L.L.P., counsel to the Borrower, substantially in the form of Exhibit C to the Credit Agreement and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower substantially in the form of Exhibit D to the Credit Agreement.

(3)     A certificate of an officer of the Borrower certifying copies of the resolutions of the Board of Directors of the Borrower referred to in Section 3.01(b) of the Credit Agreement and the certificate of an officer of the Borrower contemplated by Section 3.01(c) of the Credit Agreement.

-3-

JPMUCI 0008570

EXHIBIT F

ASSIGNMENT AND ACCEPTANCE

Dated _____, ____

Reference is made to the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of May 18, 2000 (such Long-Term Revolving Credit Agreement, as amended or otherwise modified from time to time, being herein referred to as the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), the Banks (as defined in the Credit Agreement), Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents, and Citibank, N.A., as Paying Agent. Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.    The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement.    After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of the Advances owing to the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iv) attaches the Note held by the Assignor and requests that the Paying Agent exchange such Note for a new Note payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance or new Notes payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance and the Assignor in an amount equal to the Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

3.    The Assignee attaches the Note (if any) held by it and (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents, the Assignor or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, any of

JPMUCI 0008571

the other Loan Documents or any other instrument or document; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Paying Agent and the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent and the Co-Administrative Agents by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof.

4.      Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents. The effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto.

5.      Upon such acceptance and recording by the Paying Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement and under the other Loan Documents.

6.      .  Upon such acceptance and recording by the Paying Agent, from and after the Effective Date, the Paying Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and facility fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

JPMUCI 0008572

**Schedule 1**
**to**
**Assignment and Acceptance**

<u>Section 1</u>.
    Percentage interest assigned:                             \_\_\_\_%

<u>Section 2</u>.
    Assignee's Commitment before giving effect to this
        Assignment and Acceptance:                    $_____
    Assignee's outstanding principal of Advances before
        giving effect to this Assignment and Acceptance        $_____

    Aggregate outstanding principal of Advances assigned to
        the Assignee under this Assignment and Acceptance:     $_____

    Assignee's Commitment after giving effect to this
        Assignment and Acceptance:                    $_____
    Assignee's outstanding principal of Advances after
        giving effect to this Assignment and Acceptance:       $_____

    Assignor's remaining Commitment after
        giving effect to this Assignment and Acceptance:       $_____
    Assignor's remaining outstanding principal of Advances
        after giving effect to this Assignment and Acceptance:    $_____

    Principal amount of Note payable to the Assignee:      $_____

    Principal amount of Note payable to the Assignor:      $_____

<u>Section 3</u>.
    Effective Date\*\*:                               _____, 20\_\_

                           [NAME OF ASSIGNOR], as Assignor

                           By: _____
                           Name: _____
                           Title: _____
                           Dated: _____, _____

---

    \*\*    This date should be no earlier than the date five Business Days after the delivery of this Assignment and Acceptance to the Paying Agent.

JPMUCI 0008573

[NAME OF ASSIGNEE], as Assignee

By: _____
Name: _____
Title: _____
Dated: _____, _____

Domestic Lending Office (and
    address for notices):

[Address]


Eurodollar Lending Office:

[Address]


[Approved this ___ day of _____,
_____

ENRON CORP.

By: _____
Name: _____
Title: _____]***

Accepted [and Approved]*** this ___ day of
_____, ____

[NAME OF PAYING AGENT], as
    Paying Agent


By: _____
Name: _____
Title: _____

_____

    ***Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Credit Agreement.


-2-

JPMUCI 0008574

SUPPLEMENTAL EXHIBIT 2

U.S. $1,750,000,000

364-DAY
REVOLVING CREDIT AGREEMENT

DATED AS OF
MAY 14, 2001

AMONG

ENRON CORP.,
*AS BORROWER*

AND

THE BANKS NAMED HEREIN,
*AS BANKS*

AND

CITIBANK, N.A.,
*AS PAYING AGENT*

AND

CITIBANK, N.A. AND THE CHASE MANHATTAN BANK
*AS CO-ADMINISTRATIVE AGENTS*

CO-LEAD ARRANGERS:

*SALOMON SMITH BARNEY INC.*
*AND*
*JP MORGAN , a Division of Chase Securities Inc.*

CO-SYNDICATION AGENTS:

*BARCLAYS BANK PLC*
*AND*
*THE ROYAL BANK OF SCOTLAND plc*

DOCUMENTATION AGENT:

*ABN AMRO BANK N.V.*

HOUSTON 1280475 11



DEPOSITION EXHIBIT
6C017
12 16 04
TAMMEY M. PASTOR, R.P.R.

JPMUCI 0003167

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms .................................................. 1
SECTION 1.02. Computation of Time Periods .......................................... 10
SECTION 1.03. Accounting Terms ..................................................... 10
SECTION 1.04. Miscellaneous ......................................................... 10

## ARTICLE II

### AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01. The Advances .......................................................... 10
SECTION 2.02. Making the Advances .................................................. 10
SECTION 2.03. Fees .................................................................. 11
SECTION 2.04. Repayment ............................................................ 12
SECTION 2.05. Interest .............................................................. 12
SECTION 2.06. Additional Interest on LIBOR Advances ................................ 12
SECTION 2.07. Interest Rate Determination and Protection ........................... 13
SECTION 2.08. Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings ........ 14
SECTION 2.09. Prepayments ........................................................... 14
SECTION 2.10. Increased Costs; Capital Adequacy, Etc ............................... 15
SECTION 2.11. Illegality ............................................................ 16
SECTION 2.12. Payments and Computations ............................................ 16
SECTION 2.13. Taxes ................................................................. 17
SECTION 2.14. Sharing of Payments, Etc. ............................................ 19
SECTION 2.15. Ratable Reduction or Termination of the Commitments; Effect of
                Termination ......................................................... 19
SECTION 2.16. Replacement of Bank; Additional Right to Terminate Commitments ............ 19
SECTION 2.17. Renewal of Commitments ............................................... 20
SECTION 2.18. Replacement of Commitments ........................................... 21
SECTION 2.19. Non-Ratable Reduction or Termination of Commitments ..................... 22
SECTION 2.20. Certificates of Banks ................................................ 22

## ARTICLE III

### CONDITIONS TO ADVANCES

SECTION 3.01. Initial Condition Precedent ........................................... 23
SECTION 3.02. Additional Conditions Precedent to Each Advance ....................... 24

JPMUCI 0003168

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties of the Borrower . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE V

COVENANTS OF THE BORROWER

SECTION 5.01. Affirmative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 5.02. Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE VI

EVENTS OF DEFAULT

SECTION 6.01. Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VII

THE PAYING AGENT

SECTION 7.01. Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.02. Paying Agent's Reliance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.03. Paying Agent and Its Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.04. Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.05. Certain Rights of the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.06. Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.07. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 7.08. Resignation by the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE VIII

THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01. Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.02. Co-Administrative Agents' Reliance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.03. Co-Administrative Agents and Their Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.04. Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.05. Certain Rights of the Co-Administrative Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.06. Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.07. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.08. Resignation by the Co-Administrative Agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

JPMUCI 0003169

# ARTICLE IX

## MISCELLANEOUS

SECTION 9.01. Amendments, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
SECTION 9.02. Notices, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
SECTION 9.03. No Waiver; Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
SECTION 9.04. Costs, Expenses and Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
SECTION 9.05. Right of Set-Off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
SECTION 9.06. Assignments and Participations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
SECTION 9.07. Governing Law; Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
SECTION 9.08. Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
SECTION 9.09. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
SECTION 9.10. Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 9.11. Domicile of Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 9.12. Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 9.13. Prior Credit Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 9.14. Return of Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Schedule I -    Applicable Lending Offices

Exhibit A  -    Form of Note
Exhibit B  -    Notice of Borrowing
Exhibit C  -    Opinion of Vinson & Elkins L.L.P., Counsel to Borrower
Exhibit D  -    Opinion of Executive Vice President and General Counsel of Borrower
Exhibit E  -    Opinion of Bracewell & Patterson, L.L.P., Counsel to the Paying Agent
Exhibit F  -    Form of Assignment and Acceptance
Exhibit G-1 -   New Bank Agreement
Exhibit G-2 -   Commitment Increase Agreement

HOUSTON 1280475 11

JPMUCI 0003170

# 364-DAY
## REVOLVING CREDIT AGREEMENT

### Dated as of May 14, 2001

ENRON CORP., an Oregon corporation, the lenders party hereto, Citibank, N. A. and The Chase Manhattan Bank, as Co-Administrative Agents hereunder, and Citibank, N.A., as Paying Agent hereunder, agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

"Advance" means an advance by a Bank to the Borrower pursuant to Article II (as divided or combined from time to time as contemplated in the definition herein of "Borrowing"), and refers to a Base Rate Advance or a LIBOR Advance (each of which shall be a "Type" of Advance).

"Affected Lender" has the meaning specified in Section 2.11.

"Agreement" means this 364-Day Revolving Credit Agreement, as same may be amended, extended, supplemented or modified from time to time in the future.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of a Base Rate Advance and such Bank's Eurodollar Lending Office in the case of a LIBOR Advance.

"Applicable Margin" means, for any Interest Period, a rate per annum equal to 0.35%.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Bank and an Eligible Assignee, and accepted by the Paying Agent, in substantially the form of Exhibit F.

"Bankruptcy Code" means Title 11 of the United States Code, as now or hereafter in effect, or any successor thereto.

"Banks" means the lenders listed on the signature pages hereof and each Eligible Assignee that becomes a Bank party hereto pursuant to Section 2.16, Section 2.18 or Section 9.06(a), (b) and (d).

"Base Rate" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time which rate per annum shall at all times be equal to the highest of:

(a)    the rate of interest announced publicly by Citibank in New York, New York, from time to time, as Citibank's base rate; and

JPMUCI 0003171

(b)    the sum (adjusted to the nearest ¼ of 1% or, if there is no nearest ¼ of 1%, to the next higher ¼ of 1%) of (i) ⅓ of one percent per annum plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on the next succeeding Business Day) for the three-week period ending on the previous Friday by Citibank on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Citibank from three New York certificate of deposit dealers of recognized standing selected by Citibank, by (B) a percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Federal Reserve Board for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Citibank with respect to liabilities consisting of or including (among other liabilities) three-month Dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Citibank for determining the then current annual assessment payable by Citibank to the Federal Deposit Insurance Corporation (or any successor) for insuring Dollar deposits of Citibank in the United States; and

(c)    the sum of ½ of one percent per annum plus the Federal Funds Rate in effect from time to time.

"Base Rate Advance" means an Advance which bears interest as provided in Section 2.05(a).

"Borrower" means Enron Corp., an Oregon corporation, and any successor thereto pursuant to Section 5.02(d)(ii).

"Borrowing" means a borrowing hereunder consisting of Advances of the same Type made on the same day by the Banks and, in the case of LIBOR Advances, having the same Interest Period; provided that (a) all Base Rate Advances outstanding at any time shall thereafter be deemed to be one Borrowing, and (b) subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08 and 2.11, on the last day of an Interest Period for a Borrowing comprised of LIBOR Advances, such Borrowing may be divided ratably to form multiple Borrowings comprised of LIBOR Advances (with the result that each Bank's Advance as a part of each such multiple Borrowing is proportionately the same as its Advance as a part of such divided Borrowing) or combined with all or a ratable portion of the Base Rate Advances or all or a ratable portion of one or more other Borrowings, the Interest Period for which also ends on such day, to form a new Borrowing comprised of LIBOR Advances, such division or combination to be made by notice from the Borrower given to the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the proposed division or combination specifying the date of such division or combination (which shall be a Business Day) and all other relevant information (such as the Borrowings or portions thereof to be divided or combined, the respective amounts of the Borrowings resulting from any such division, the relevant Interest Periods, the amount of the Base Rate Advances or other Borrowings or portions thereof to be so combined and such other information as the Paying Agent may request), but except as provided in the proviso to Section 2.07(f) in no event shall any LIBOR Borrowing resulting from, or remaining after, any such division or combination be less than $25,000,000, and in all cases each Bank's Advances as a part of each such combined, resultant or remaining Borrowing shall be proportionately the same as its Advances as a part of the relevant Borrowings prior to such division or combination. Each Borrowing comprised of a Type of Advance shall be that "Type" of Borrowing.

JPMUCI 0003172

"Business Day" means (a) any day of the year except Saturday, Sunday and any day on which banks are required or authorized to close in New York City or Houston, Texas and (b) if the applicable Business Day relates to any LIBOR Advances, any day which is a "Business Day" described in clause (a) and which is also a day for trading by and between banks in the London interbank Eurodollar market.

"Chase" means The Chase Manhattan Bank, a New York banking corporation.

"Citibank" means Citibank, N. A., a national banking association.

"Co-Administrative Agents" means, collectively, Citibank and Chase, each in its capacity as a Co-Administrative Agent pursuant to Article VIII, and such term shall include any successor to either such entity in such capacity pursuant to Section 8.08. If at any time only one Person is serving as a Co-Administrative Agent hereunder, such term shall mean such Person.

"Code" means the Internal Revenue Code of 1986 as amended from time to time, or any successor Federal tax code, and any reference to any statutory provision of the Code shall be deemed to be a reference to any successor provision or provisions.

"Commitment" has the meaning specified in Section 2.01.

"Commitment Increase Agreement" means an agreement entered into by a Bank, the Borrower and the Paying Agent substantially in the form of Exhibit G-2.

"Consolidated" refers to the consolidation of the accounts of the Borrower and its Subsidiaries in accordance with GAAP.

"Consolidated Net Worth" means at any date the Consolidated stockholders' equity of the Borrower and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of the Borrower).

"Convert", "Conversion" and "Converted" each refers to a conversion of Advances of a Borrowing of one Type into Advances or a Borrowing of another Type, as the case may be, pursuant to Section 2.07, Section 2.08, Section 2.10(b) or Section 2.11.

"Debt" of any Person means, at any date, without duplication, its (a) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with GAAP, (b) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (c) guaranties of payment or collection of any obligations described in clauses (a) and (b) of other Persons, provided, that clauses (a) and (b) include, in the case of obligations of the Borrower or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; provided, further, that the liability of any Person as a general partner of a partnership for Debt of such partnership, if such partnership is not a Subsidiary of such Person, shall not constitute Debt.

"Default" means an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Dollars" and "$" means lawful money of the United States of America.

JPMUCI 0003173

"Domestic Lending Office" means. with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Eligible Assignee" means (a) any Bank, and (b) with the consent of the Paying Agent and the Borrower (which consent will not be unreasonably withheld), any other commercial bank or financial institution not covered by clause (a) of this definition: provided, however, that neither the Borrower nor any Subsidiary of the Borrower shall be an Eligible Assignee.

"Enron Indenture" means that certain indenture dated as of November 1, 1985, between the Borrower (formerly InterNorth, Inc.) and Harris Trust and Savings Bank, as Trustee, as supplemented and amended by the First Supplemental Indenture dated as of December 1, 1995, the Supplemental Indenture, dated as of May 8. 1997. by and among Enron Corp. a Delaware corporation, the Borrower and Harris Trust and Savings Bank, as Trustee. the Third Supplemental Indenture, dated as of September 1, 1997, between the Borrower and Harris Trust and Savings Bank, as Trustee, and the Fourth Supplemental Indenture, dated as of August 17, 1999, between the Borrower and Harris Trust and Savings Bank, as Trustee, without giving effect to any further amendment or modification thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute of similar import, together with the regulations thereunder, as in effect from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a group of which the Borrower is a member and which is under common control within the meaning of the regulations under Section 414 of the Code.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board. as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Eurodollar Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank (or, if no such office is specified, its Domestic Lending Office) or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Events of Default" has the meaning specified in Section 6.01.

"Existing Commitments" has the meaning specified in Section 2.17 hereof.

"Existing Termination Date" has the meaning specified in Section 2.17 hereof.

"FDIC" means the Federal Deposit Insurance Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day. for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such

JPMUCI 0003174

rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Paying Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any federal agency or authority of the United States from time to time succeeding to its function.

"GAAP" means United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements referred to in Section 4.01(d).

"Illegality Event" has the meaning specified in Section 2.11.

"Indemnified Parties" has the meaning specified in Section 9.04(c).

"Insufficiency" means, with respect to any Plan, the amount, if any, by which the present value of the accrued benefits under such Plan exceeds the fair market value of the assets of such Plan allocable to such benefits.

"Interest Period" means, with respect to each LIBOR Advance, in each case comprising part of the same Borrowing, the period commencing on the date of such Advance or the date of the Conversion of any Advance into (or the division or combination of any Borrowing resulting in) such an Advance and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months (or, as to any Interest Period, such other period as the Borrower and the Banks may agree to for such Interest Period), in each case as the Borrower may, upon notice received by the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the first day of such Interest Period (or, as to any Interest Period, at such other time as the Borrower and the Banks may agree to for such Interest Period), select; provided, however, that:

(a)     Interest Periods commencing on the same date for Advances comprising part of the same Borrowing shall be of the same duration;

(b)     whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(c)     any Interest Period which begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month in which such Interest Period would have ended if there were a numerically corresponding day in such calendar month; and

(d)     no Interest Period may end after the Termination Date.

"LIBO Rate" means, for any Interest Period for each LIBOR Advance comprising part of the same Borrowing, (a) the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to

JPMUCI 0003175

the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period; (b) if for any reason the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page), the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of such Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page (or any successor page), the applicable rate shall be the arithmetic mean of all such rates; and (c) if the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page) and if no rate specified in clause (b) of this definition so appears on Reuters Screen LIBO page (or any successor page), the interest rate per annum (rounded upward to the nearest whole multiple of 1/16 of 1% per annum if such rate is not such a multiple) equal to the rate per annum at which deposits in Dollars are offered by the principal office of the Reference Bank in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to the amount of the LIBOR Advance of the Reference Bank comprising part of such Borrowing and for a period equal to such Interest Period. If the LIBO Rate is determined pursuant to clause (c) of this definition, such determination shall be made by the Paying Agent on the basis of the applicable rate furnished to and received by the Paying Agent from the Reference Bank two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.07.

"LIBOR Advance" means an Advance which bears interest as provided in Section 2.05(b).

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Advances.

"Loan Document" means this Agreement, each Note, each Notice of Borrowing and each other document or instrument executed and delivered in connection with this Agreement.

"Losses" has the meaning specified in Section 9.04(c).

"Majority Banks" means at any time Banks holding at least 51% of the then aggregate unpaid principal amount of the Notes held by Banks, or, if no such principal amount is then outstanding, Banks having at least 51% of the Commitments.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means an employee benefit plan, other than a Multiemployer Plan, subject to Title IV of ERISA to which the Borrower or any ERISA Affiliate, and more than one employer other than the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

JPMUCI 0003176

"New Bank Agreement" means an agreement entered into by a bank or other financial institution, the Borrower and the Paying Agent, substantially in the form of Exhibit G-1.

"Note" means a promissory note of the Borrower payable to the order of any Bank, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to such Bank resulting from the Advances owed to such Bank.

"Notice of Borrowing" has the meaning specified in Section 2.02.

"Other Taxes" has the meaning specified in Section 2.13(c).

"Paying Agent" means Citibank in its capacity as Paying Agent pursuant to Article VII and any successor in such capacity pursuant to Section 7.08.

"Payment Office" means the office of the Paying Agent located at 399 Park Avenue, New York, New York 10043 or such other office as the Paying Agent may designate by written notice to the other parties hereto.

"PBGC" means the Pension Benefit Guaranty Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, firm or other entity, or a government or any political subdivision or agency, department or instrumentality thereof.

"Plan" means an employee benefit plan (other than a Multiemployer Plan) which is (or, in the event that any such plan has been terminated within five years after a transaction described in Section 4069 of ERISA, was) maintained for employees of the Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Preferred Stock" means, as applied to any corporation, shares of such corporation which shall be entitled to preference or priority over any other shares of such corporation in respect of either the payment of dividends or the distribution of assets upon liquidation.

"Prescribed Forms" shall mean such duly executed form(s) or statement(s), and in such number of copies, which may, from time to time, be prescribed by law and which, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Bank providing the form(s) or statement(s), (b) the Code, or (c) any applicable rule or regulation under the Code, permit the Borrower to make payments hereunder for the account of such Bank free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Code or any such rule or regulation).

"Principal Subsidiary" means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which the Borrower has not guaranteed payment) equal to or greater than 5% of the Borrower's consolidated assets; provided that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date of determination) without regard to the consolidated assets test described above in this definition: Houston

JPMUCI 0003177

Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron North America Corp., and Enron Pipeline Company. For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recent quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of the Borrower shall be determined based on the most recent quarterly or annual consolidated financial statements of the Borrower available prior to such determination.

"Prior Credit Facility" means the Revolving Credit Agreement dated as of May 18, 2000, among the Borrower, the banks party thereto and Citibank and Chase, as agents for such banks.

"Redeemable" means, as applied to any Preferred Stock, any Preferred Stock which (a) the issuer undertakes to redeem at a fixed or determinable date or dates (other than pursuant to the exercise of an option to redeem by the issuer, if the failure to exercise such option would not materially adversely affect the business, consolidated financial position or consolidated results of operations of the issuer and its subsidiaries taken as a whole), whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer, or (b) is redeemable at the option of the holder.

"Reference Bank" means Citibank.

"Register" has the meaning specified in Section 9.06(c).

"Standard & Poor's" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. on the date hereof.

"Stated Termination Date" means, as to any Bank, May 13, 2002 or such later date, if any, as may be in effect as to such Bank pursuant to Section 2.17.

"Subordinated Debt" means, (a) the 8.25% Senior Subordinated Debentures due 2012 and the 6 3/4% Senior Subordinated Debentures due July 1, 2005 of the Borrower issued pursuant to the Indenture dated as of February 1, 1987 between the Borrower and NationsBank of Texas, N.A., as trustee, (b) the obligations of Borrower under the Loan Agreement dated as of November 15, 1993, between Borrower and Enron Capital L.L.C., (c) the obligations of Borrower under the Loan Agreement dated as of August 3, 1994, between Borrower and Enron Capital Resources, L.P., (d) the 7.75% Subordinated Debentures due 2016 of the Borrower issued pursuant to the Indenture dated as of November 21, 1996 between the Borrower and The Chase Manhattan Bank, Trustee, (e) the 7.75% Subordinated Debentures due 2016, Series II of the Borrower issued pursuant to the Indenture dated as of January 16, 1997 between the Borrower and The Chase Manhattan Bank, Trustee, (f) the Adjustable Rate Debentures, Series A issued pursuant to the Indenture dated as of June 6, 1997 between the Borrower and The Chase Manhattan Bank, as Indenture Trustee, and (g) any Debt of the Borrower which is subordinate to any other obligations of the Borrower so long as (i) the terms of such Debt are (x) substantially similar to and no less favorable to the holders of Senior Indebtedness (as defined in the Indenture dated as of February 1, 1987 referenced in clause (a) of this definition) than the terms of such Senior Subordinated Debentures due 2012 of the Borrower (and the parties confirm that it is their intention that all principal of and interest on the Advances constitute "Senior Indebtedness" for the purposes thereof) or (y) consented to by the Majority Banks (which consent will not be unreasonably withheld), and (ii) no payments of principal shall be payable (whether by scheduled maturity, required prepayment, or otherwise, unless as a result of the acceleration of such Debt in accordance with the terms thereof) under such Debt prior to June 1, 2005.

JPMUCI 0003178

"Subsidiary" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of the Borrower, unless such entity is a Consolidated Subsidiary of the Borrower, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with GAAP. Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of the Borrower.

"Taxes" has the meaning specified in Section 2.13(a).

"Terminating Bank" has the meaning specified in Section 2.17.

"Termination Date" means the earlier of (a) the Stated Termination Date (if the Stated Termination Date has been extended pursuant to Section 2.17, then the Stated Termination Date for purposes of this clause (a) will be the Stated Termination Date of the Bank or Banks that have the latest Stated Termination Date), and (b) the earlier date of termination in whole of the Commitments pursuant to this Agreement.

"Termination Event" means (a) a "reportable event", as such term is described in Section 4043 of ERISA (other than a "reportable event" not subject to the provision for 30-day notice to the PBGC), or an event described in Section 4062(e) of ERISA, or (b) the withdrawal of the Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year in which it was a "substantial employer", as such term is defined in Section 4001(a)(2) of ERISA, or the incurrence of liability by the Borrower or any ERISA Affiliate under Section 4064 of ERISA upon the termination of a Multiple Employer Plan, or (c) the distribution of a notice of intent to terminate a Plan pursuant to Section 4041(a)(2) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Total Capitalization" means, at any time, the sum (without duplication) of (a) Total Senior Debt, (b) the total outstanding principal amount (or the book carrying amount of such Debt if issued at a discount) of Subordinated Debt of the Borrower and its Consolidated Subsidiaries, (c) Consolidated Net Worth less any amount thereof attributable to "minority interests" (as defined below), and (d) Redeemable Preferred Stock of the Borrower and its Consolidated Subsidiaries. For the purpose of this definition, "minority interests" means any investment or interest of the Borrower in any corporation, partnership or other entity to the extent that the total amount thereof owned by the Borrower (directly or indirectly) constitutes 50% or less of all outstanding interests or investments in such corporation, partnership or entity.

"Total Senior Debt" means, at any time, all Consolidated Debt of the Borrower and its Consolidated Subsidiaries other than Subordinated Debt.

"Type" has the meaning specified in the definition of the term "Advance" (with respect to an Advance) and in the definition of the term "Borrowing" (with respect to a Borrowing).

JPMUCI 0003179

"Withdrawal Liability" shall have the meaning given such term under Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Computation of Time Periods. In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding". Unless otherwise indicated, all references to a particular time are references to New York City time.

SECTION 1.03. Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based on, GAAP; provided, however, the financial statements and reports required pursuant to Sections 5.01(a)(i) and (viii) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

SECTION 1.04. Miscellaneous. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article. Section, Schedule and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified. The term "including" shall mean "including, without limitation,".

ARTICLE II

AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01. The Advances. Each Bank severally agrees, on the terms and conditions hereinafter set forth, to make one or more Advances to the Borrower from time to time on any Business Day during the period from the date hereof until the Stated Termination Date for such Bank in an aggregate amount not to exceed at any time outstanding the amount set opposite such Bank's name on the signature pages hereof or, if such Bank has entered into any Assignment and Acceptance, New Bank Agreement or Commitment Increase Agreement, set forth for such Bank in the Register maintained by the Paying Agent pursuant to Section 9.06(c), as such amount may be adjusted pursuant to Section 2.15, Section 2.16, Section 2.17, Section 2.18, Section 2.19 or Section 6.01 (such Bank's "Commitment"); provided, that no Advance shall be required to be made, except as part of a Borrowing that is in an aggregate amount not less than (a) in the case of a Borrowing comprised of LIBOR Advances, $25,000,000 and (b) in the case of a Borrowing comprised of Base Rate Advances, $15,000,000, and each Borrowing shall consist of Advances of the same Type having (in the case of a Borrowing comprised of LIBOR Advances) the same Interest Period, made on the same day by the Banks ratably according to their respective Commitments. Within the limits of each Bank's Commitment, the Borrower may borrow, prepay pursuant to Section 2.09 and reborrow under this Section 2.01. Subject to the terms and conditions hereof, more than one Borrowing may be made on the same Business Day, including more than one LIBOR Borrowing (with the Advances comprising each LIBOR Borrowing made on such Business Day having a different Interest Period from the Advances comprising each other LIBOR Borrowing made on such Business Day).

SECTION 2.02. Making the Advances. (a) Each Borrowing shall be made on notice, given not later than 11:00 A.M. (x) in the case of a proposed Borrowing comprised of LIBOR Advances, at least three Business Days prior to the date of the proposed Borrowing (or, as to any proposed Borrowing comprised of LIBOR Advances, at such other time as the Borrower and the Banks may agree to for such proposed Borrowing) and (y) in the case of a proposed Borrowing comprised of Base Rate Advances, on the day of

-10-

JPMUCI 0003180

the proposed Borrowing, by the Borrower to the Paying Agent, which shall give to each Bank prompt notice thereof by telex or telecopy. Each such notice of a Borrowing (a "Notice of Borrowing") shall be by telex or telecopy, confirmed immediately in writing, in substantially the form of Exhibit B hereto, specifying therein the requested (i) date of such Borrowing, (ii) Type of Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing comprised of LIBOR Advances, initial Interest Period for each such Advance, provided that the Borrower may not specify LIBOR Advances for any Borrowing if, after giving effect to such Borrowing, LIBOR Advances having more than four different Interest Periods shall be outstanding. In the case of a proposed Borrowing comprised of LIBOR Advances, the Paying Agent shall promptly notify each Bank of the applicable interest rate under Section 2.05(b). Each Bank shall, before 11:00 A.M. (2:00 P.M. in the case of a Borrowing comprised of Base Rate Advances) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Paying Agent at its Payment Office, in same day funds, such Bank's ratable portion of such Borrowing. After the Paying Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Paying Agent will make such funds available to the Borrower at the Paying Agent's aforesaid address.

(b)     Each Notice of Borrowing shall be irrevocable and binding on the Borrower. In the case of any Borrowing which the related Notice of Borrowing specifies is to be comprised of LIBOR Advances, the Borrower shall indemnify each Bank against any loss, cost or expense incurred by such Bank as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund the Advance to be made by such Bank as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(c)     Unless the Paying Agent shall have received notice from a Bank prior to the date of any Borrowing that such Bank will not make available to the Paying Agent such Bank's ratable portion of such Borrowing, the Paying Agent may assume that such Bank has made such portion available to the Paying Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Paying Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Bank shall not have so made such ratable portion available to the Paying Agent, such Bank and the Borrower severally agree to repay to the Paying Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Paying Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to Advances comprising such Borrowing and (ii) in the case of such Bank, the Federal Funds Rate. If such Bank shall repay to the Paying Agent such corresponding amount, such amount so repaid shall constitute such Bank's Advance as part of such Borrowing for purposes of this Agreement.

(d)     The failure of any Bank to make the Advance to be made by it as part of any Borrowing shall not relieve any other Bank of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Bank shall be responsible for the failure of any other Bank to make the Advance to be made by such other Bank on the date of any Borrowing.

SECTION 2.03. Fees. (a) Facility Fee. The Borrower agrees to pay to the Paying Agent for the account of each Bank a facility fee on the average daily amount of such Bank's Commitment, whether or not used, from the date hereof in the case of each Bank listed on the signature pages hereof and from the effective date specified in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank in the case of each other Bank until the Stated Termination Date for such Bank at a rate per annum

JPMUCI 0003181

equal to 0.10%. The facility fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2001, and on the Termination Date, and, with respect to facility fees owed to any Terminating Bank, on the Stated Termination Date applicable to such Bank.

(b)    Utilization Fee.  The Borrower agrees to pay to the Paying Agent for the account of each Bank a utilization fee on the aggregate outstanding principal amount of all Advances owed to such Bank at a rate per annum equal to 0.10%. provided that such utilization fee shall accrue on such aggregate outstanding principal amount only during periods in which the aggregate outstanding principal amount of all Advances exceeds 33% of the aggregate Commitments then existing. The utilization fee is due quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2001, on the date the Advances are paid in full, on the Termination Date, and, with respect to utilization fees owed to any Terminating Bank, on the Stated Termination Date applicable to such Bank.

(c)    Co-Administrative Agents' and Paying Agent's Fee.  The Borrower shall pay to each of the Co-Administrative Agents  and the Paying Agent such fees as may be separately agreed to by it and such Co-Administrative Agents or the Paying Agent, as the case may be.

SECTION 2.04. Repayment.  The Borrower shall repay the unpaid principal amount of each Advance owed to each Bank in accordance with the Note to the order of such Bank. With respect to each Bank, all Advances owed to such Bank shall be due and payable on the Stated Termination Date applicable to such Bank or such earlier date such Advances are due and payable to such Bank pursuant to any other provision of this Agreement.

SECTION 2.05. Interest.  The Borrower shall pay interest on the unpaid principal amount of each Advance owed to each Bank from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(a)    Base Rate Advances.  During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the Base Rate in effect from time to time, payable quarterly on the last day of each March, June, September and December during such periods and on the date such Base Rate Advance shall be Converted (in whole or in part), changed (in whole or in part) as a result of any division or combination of any Borrowing, or paid in full; provided that any amount of principal (other than principal of LIBOR Advances bearing interest pursuant to the proviso to Section 2.05(b)) which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the sum of 2% per annum plus the Base Rate in effect from time to time.

(b)    LIBOR Advances.  During such periods as such Advance is a LIBOR Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of the LIBO Rate for such Interest Period for such Advance plus the Applicable Margin per annum for such Interest Period, payable on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on the day which occurs during such Interest Period three months from the first day of such Interest Period; provided that any amount of principal of any LIBOR Advance which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the greater of (x) the sum of 2% per annum plus the Base Rate in effect from time to time and (y) the sum of 2% per annum plus the rate per annum required to be paid on such Advance immediately prior to the date on which such amount became due.

JPMUCI 0003182

SECTION 2.06. Additional Interest on LIBOR Advances. If any Bank is required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to such Bank of agreeing to make or making, funding or maintaining LIBOR Advances, then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), unless such Bank withdraws its demand for such additional amounts pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a), pay to the Paying Agent for the account of such Bank additional amounts, as additional interest hereunder, sufficient to compensate such Bank for such increased cost.

SECTION 2.07. Interest Rate Determination and Protection. (a) If at any time the LIBO Rate is determined pursuant to clause (c) of the definition herein of LIBO Rate, the Reference Bank agrees to furnish to the Paying Agent timely information for the purpose of determining such LIBO Rate. If at any time the Base Rate is determined pursuant to clause (a) or clause (b) of the definition herein of Base Rate and if Citibank is not the Paying Agent at such time, Citibank agrees to furnish to the Paying Agent timely information with respect to the determination of such Base Rate. In cases other than specified in the first two sentences of this Section 2.07(a), the Paying Agent shall determine the applicable rate of interest.

(b)     The Paying Agent shall give prompt notice to the Borrower and the Banks of the applicable interest rate determined by the Paying Agent for purposes of Section 2.05(a) or (b), the applicable rate, if any, furnished by the Reference Bank pursuant to clause (c) of the definition herein of LIBO Rate for the purpose of determining the applicable interest rate under Section 2.05(b), and the applicable rate, if any, furnished by Citibank pursuant to the penultimate sentence of Section 2.07(a) with respect to the determination of the Base Rate for purposes of the applicable interest rate under Section 2.05(a).

(c)     If the Paying Agent is unable to obtain timely information for determining the LIBO Rate for any LIBOR Advances,

(i)     the Paying Agent shall forthwith notify the Borrower and the Banks that the interest rate cannot be determined for such LIBOR Advances,

(ii)     each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(iii)     the obligation of the Banks to make, or to Convert Advances or Borrowings into, or make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(d)     If, with respect to any LIBOR Advances, the Majority Banks notify the Paying Agent that the applicable interest rate for any Interest Period for such Advances will not adequately reflect the cost to such Majority Banks of making, funding or maintaining their respective LIBOR Advances for such Interest Period, the Paying Agent shall forthwith so notify the Borrower and the Banks, whereupon

(i)     each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or, if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

JPMUCI 0003183

(ii)    the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(e)    If the Borrower shall fail to select the duration of any Interest Period for any LIBOR Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Paying Agent will forthwith so notify the Borrower and the Banks and such Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

(f)    On the date on which the aggregate unpaid principal amount of Advances comprising any LIBOR Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $25,000,000, such Advances shall automatically Convert into Base Rate Advances, and on and after such date the right of the Borrower to Convert such Advances into LIBOR Advances shall terminate; provided, however, that if and so long as each such Advance shall be of the same Type and have an Interest Period ending on the same date as Advances comprising another Borrowing or other Borrowings, and the aggregate unpaid principal amount of all such Advances of all such Borrowings shall equal or exceed $25,000,000, the Borrower shall have the right to continue all such Advances as, or to Convert all such Advances into, Advances of such Type having an Interest Period ending on such date.

SECTION 2.08.  Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings. (a) The Borrower may on any Business Day, upon notice given to the Paying Agent not later than 11:00 A.M. (x) in the case of a proposed Conversion into a LIBOR Borrowing, on the third Business Day prior to the date of the proposed Conversion and (y) in the case of a proposed Conversion into a Base Rate Borrowing, on the date of the proposed Conversion and subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11, Convert all or any portion of a Borrowing of one Type into a Borrowing of another Type; provided, however, that any Conversion of any LIBOR Borrowing shall be made on, and only on, the last day of an Interest Period for such LIBOR Borrowing.  Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Borrowing (or identified portion thereof) to be Converted and the Type into which it is to be Converted, and (iii) if such Conversion is into a LIBOR Borrowing, the duration of the Interest Period for each LIBOR Advance comprising such LIBOR Borrowing.

(b)    The Borrower may continue all or any portion of any LIBOR Borrowing as a LIBOR Borrowing for an additional Interest Period that complies with the requirements set forth in the definition herein of "Interest Period," by giving notice of such Interest Period as set forth in such definition, subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11.

(c)    All Borrowings, Conversions and continuations under this Agreement shall be effected in a manner that (i) treats all Banks ratably (including, for example, effecting Conversions of any portion of a Borrowing in a manner that results in each Bank retaining its same ratable percentage of both the Converted portion and the remaining portion not Converted), and (ii) in the case of LIBOR Borrowings, results in each LIBOR Borrowing (including, in the case of any Conversion of a portion of a LIBOR Borrowing, both the Converted portion and the remaining portion not Converted) being in an amount not less than $25,000,000; provided, that clause (ii) immediately above shall not limit the Borrower's rights under the proviso of Section 2.07(f).  Upon Conversion of any Borrowing, or portion thereof, into a particular Type, all Advances comprising such Borrowing or portion thereof, as the case may be, will be deemed Converted into Advances of such Type.

JPMUCI 0003184

SECTION 2.09. Prepayments. The Borrower may (a) in respect of LIBOR Advances, upon at least three Business Days' notice, and (b) in respect of Base Rate Advances, upon notice by 11:00 A.M. on the day of the proposed prepayment, to the Paying Agent stating the proposed date and aggregate principal amount of the prepayment and the Types of Advances to be prepaid, and in the case of LIBOR Advances, the specific Borrowing or Borrowings to be prepaid in whole or in part, and if such notice is given the Borrower shall prepay the outstanding principal amounts of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid without premium or penalty; provided, however, that each partial prepayment shall be in an aggregate principal amount not less than $10,000,000, and provided further, that if the Borrower prepays any LIBOR Advance on any day other than the last day of an Interest Period therefor, the Borrower shall compensate the Banks pursuant to Section 9.04(b).

SECTION 2.10. Increased Costs; Capital Adequacy, Etc. (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to any Bank of agreeing to make or making, funding or maintaining LIBOR Advances (other than increased costs described in Section 2.06 or in Section 2.10(c) below), then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank additional amounts sufficient to compensate such Bank for such increased cost unless such Bank shall have withdrawn its demand for additional compensation for such increased cost pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a).

(b)      If the Borrower so notifies the Paying Agent within five Business Days after any Bank notifies the Borrower of any increased cost pursuant to the provisions of Section 2.10(a), the Borrower shall Convert all Advances of the Type affected by such increased cost of all Banks then outstanding into Advances of another Type in accordance with Section 2.08 and, additionally, reimburse such Bank for such increased cost in accordance with Section 2.10(a).

(c)      If any Bank shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of such Bank), has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder, such Bank shall have the right to give prompt written notice and demand for payment thereof to the Borrower with a copy to the Paying Agent (which notice and demand shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate such Bank for the increased cost to such Bank as a result of such increase in capital and shall certify that such costs are generally being charged by such Bank to other similarly situated borrowers under similar credit facilities) although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section 2.10(c), and subject to Section 2.16, the Borrower shall pay such additional amounts.

(d)      Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction

JPMUCI 0003185

of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.10 or to eliminate the amount of any such increased cost which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(e)     No Bank shall be entitled to recover increased costs pursuant to Section 2.10, (a) incurred or accruing more than 90 days prior to the date on which such Bank sent to the Borrower a written notice and demand for payment as specified in this Section 2.10, or (b) to the extent that such increased costs have resulted from the failure of such Bank to have complied with Section 2.10(d).

SECTION 2.11. Illegality.     Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any governmental authority, central bank or comparable agency shall assert that it is unlawful (such unlawfulness or such assertion of unlawfulness being an "Illegality Event"), for any Bank or its Eurodollar Lending Office (such a Bank being an "Affected Lender") to perform its obligations hereunder to make LIBOR Advances or to continue to fund or maintain LIBOR Advances hereunder, then, on notice thereof and demand therefor by such Bank to the Borrower through the Paying Agent, (a) the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the time set forth in the next succeeding sentence, and (b) the Borrower shall forthwith Convert all LIBOR Advances of all Banks then outstanding into Advances of another Type in accordance with Section 2.08. The suspension of the obligation of the Banks to make LIBOR Advances or to continue to fund or maintain LIBOR Advances, as set forth in the preceding sentence, shall terminate upon the earliest to occur of the following: (i) the withdrawal by each Affected Lender of its notice and demand with respect to the Illegality Event referenced in this Section 2.11, (ii) the replacement by the Borrower of each Affected Lender pursuant to Section 2.16(a) hereof with an Eligible Assignee that is not an Affected Lender and (iii) the termination by the Borrower of each Affected Lender pursuant to Section 2.16(b) hereof. If an Illegality Event has ceased to exist with respect to a Bank that has given notice and demand with respect to such Illegality Event pursuant to Section 2.11, such Bank shall promptly withdraw such notice and demand by giving written notice of withdrawal to the Paying Agent and the Borrower. Upon termination of such suspension pursuant to clause (i), (ii) or (iii) above, as applicable, the Paying Agent shall notify each Bank and the Co-Administrative Agents of such termination, and the Banks shall thereupon again be obligated to make LIBOR Advances and LIBOR Borrowings and to continue to fund, maintain and Convert LIBOR Advances and LIBOR Borrowings in each case in accordance with and to the extent provided in this Agreement.

SECTION 2.12. Payments and Computations. (a) The Borrower shall make each payment under any Loan Document not later than 11:00 A.M. on the day when due in Dollars to the Paying Agent at its Payment Office in same day funds. The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal, interest, facility fees or utilization fees ratably (other than amounts payable pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17, 2.19 or 9.04) to the Banks (decreased, as to any Bank, for any taxes withheld in respect of such Bank as contemplated by Section 2.13(b)) for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.06(d), from and after the effective date specified in such Assignment and Acceptance, the Paying Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the Bank assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments

JPMUCI 0003186

for periods prior to such effective date directly between themselves. At the time of each payment of any principal of or interest on any Borrowing to the Paying Agent, the Borrower shall notify the Paying Agent of the Borrowing to which such payment shall apply. In the absence of such notice the Paying Agent may specify the Borrowing to which such payment shall apply.

(b)    All computations of interest based on the Base Rate (except during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof) and of facility and utilization fees shall be made by the Paying Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the LIBO Rate, the Federal Funds Rate or, during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof, the Base Rate shall be made by the Paying Agent, and all computations of interest pursuant to Section 2.06 shall be made by a Bank, on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, facility fees or utilization fees are payable. Each determination by the Paying Agent (or, in the case of Section 2.06, by a Bank) of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)    Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest, facility fees or utilization fees, as the case may be; provided, however, if such extension would cause payment of interest on or principal of LIBOR Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)    Unless the Paying Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Banks hereunder that the Borrower will not make such payment in full, the Paying Agent may assume that the Borrower has made such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Borrower shall not have so made such payment in full to the Paying Agent, each Bank shall repay to the Paying Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Paying Agent, at the Federal Funds Rate.

SECTION 2.13. Taxes. (a) Any and all payments by the Borrower hereunder or under the Notes shall be made, in accordance with Section 2.12, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of each Bank and the Paying Agent, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) such Bank or Paying Agent (as the case may be) is organized or any political subdivision thereof and, in the case of each Bank, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction of such Bank's Applicable Lending Office or any political subdivision thereof and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof (or, with respect to any entity that becomes a Bank after the date hereof, on the date such entity becomes a Bank), to payments to be made to such Bank or the Paying Agent (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Note to any Bank or the Paying Agent, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums

-17-

JPMUCI 0003187

payable under this Section 2.13) such Bank or the Paying Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     Notwithstanding anything to the contrary contained in this Agreement, each of the Borrower and the Paying Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of any Bank (without the payment by the Borrower of increased amounts to such Bank pursuant to clause (a) above) other than a Bank (i) which is a domestic corporation (as such term is defined in Section 7701 of the Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Borrower and the Paying Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Borrower shall so deduct or withhold any such taxes, it shall provide a statement to the Paying Agent and such Bank, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation which such Bank or the Paying Agent may reasonably request for assisting such Bank or the Paying Agent to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Bank is subject to tax.

(c)     In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or under the Notes or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Notes (hereinafter referred to as "Other Taxes").

(d)     The Borrower, to the fullest extent permitted by law, will indemnify each Bank and the Paying Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.13) paid by such Bank or the Paying Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of such Bank or Paying Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date such Bank or the Paying Agent (as the case may be) makes written demand therefor. No Bank nor the Paying Agent shall be indemnified for Taxes incurred or accrued more than 90 days prior to the date that such Bank or the Paying Agent notifies the Borrower thereof.

(e)     Within 30 days after the date of any payment of Taxes by or at the direction of the Borrower, the Borrower will furnish to the Paying Agent, at its address referred to in Section 9.02, (i) the original or a certified copy of a receipt evidencing payment thereof, if the relevant taxing authority provides a receipt, or (ii) if the relevant taxing authority does not provide a receipt, other reasonable evidence of the payment thereof. Should any Bank or the Paying Agent ever receive any refund, credit or deduction from any taxing authority to which such Bank or the Paying Agent would not be entitled but for the payment by the Borrower of Taxes as required by Section 2.13 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund, credit or deduction shall be made by such Bank or the Paying Agent in its sole discretion), such Bank or the Paying Agent, as the case may be, thereupon shall repay to the Borrower an amount with respect to such refund, credit or deduction equal to any net reduction in taxes actually obtained by such Bank or the Paying Agent, as the case may be, and determined by such Bank or the Paying Agent, as the case may be, to be attributable to such refund, credit or deduction.

JPMUCI 0003188

(f)    Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any Taxes or Other Taxes or to eliminate the amount of any such additional amounts which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(g)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.13 shall survive the payment in full of principal and interest hereunder and under the Notes.

SECTION 2.14. Sharing of Payments, Etc. If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances made by it (other than pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17, 2.19 or 9.04) in excess of its ratable share of payments on account of the Advances obtained by all the Banks, such Bank shall forthwith purchase from the other Banks such participations in the Advances made by them as shall be necessary to cause such purchasing Bank to share the excess payment ratably with each of them, provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, such purchase from each Bank shall be rescinded and such Bank shall repay to the purchasing Bank the purchase price to the extent of its ratable share (according to the proportion of (i) the amount of the participation purchased from such Bank as a result of such excess payment to (ii) the total amount of such excess payment) of such recovery together with an amount equal to such Bank's ratable share (according to the proportion of (i) the amount of such Bank's required repayment to (ii) the total amount so recovered from the purchasing Bank) of any interest or other amount paid or payable by the purchasing Bank in respect of the total amount so recovered. The Borrower agrees that any Bank so purchasing a participation from another Bank pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Bank were the direct creditor of the Borrower in the amount of such participation.

SECTION 2.15. Ratable Reduction or Termination of the Commitments; Effect of Termination. The Borrower shall have the right, upon at least three Business Days' notice to the Paying Agent, to terminate in whole or reduce ratably in part the unused portions of the respective Commitments of the Banks (with the signature pages hereto deemed amended to reflect same), provided that each partial reduction shall be in the aggregate amount of at least $10,000,000. Upon and at all times after any Commitment of any Bank is terminated pursuant to any provision of this Agreement, such Commitment shall be zero and such Bank shall have no further obligation to make any Advances.

SECTION 2.16. Replacement of Bank; Additional Right to Terminate Commitments. In the event that any Bank demands payment pursuant to Section 2.06, 2.10 or 2.13, or any Bank becomes an Affected Bank as set forth in Section 2.11, the Borrower shall have the right, within 45 days after the date of the giving by such Bank of any notice or demand required or otherwise permitted to be given pursuant to Section 2.06, 2.10, 2.11 or 2.13 and if no Event of Default or Default then exists, to either replace such Bank in accordance with the procedure set forth in Section 2.16(a) or terminate such Bank's Commitment in accordance with the procedure set forth in Section 2.16(b).

(a)    If the Borrower determines to replace a Bank pursuant to this Section 2.16, then the Borrower will have the right to replace such Bank with an Eligible Assignee in accordance with Section 9.06(a), (b) and (d) (including execution of an appropriate Assignment and Acceptance); provided that such Eligible Assignee (i) shall unconditionally offer in writing (with a copy to the Paying Agent) to

JPMUCI 0003189

purchase all of such Bank's rights hereunder and interest in the Advances owing to such Bank and the Note held by such Bank without recourse at the principal amount of such Note plus interest and accrued facility and utilization fees to the date of such purchase on a date therein specified, and (ii) shall execute and deliver to the Paying Agent an Assignment and Acceptance, as assignee, pursuant to which such Eligible Assignee becomes a party hereto with a Commitment equal to that of the Bank being replaced (plus, if such Eligible Assignee is already a Bank, the amount of its Commitment prior to such replacement); provided, further, that no Bank or other Person shall have any obligation to increase its Commitment or otherwise to replace, in whole or in part, any Bank.  Upon satisfaction of the requirements set forth in the first sentence of this Section 2.16(a), acceptance of such offer to purchase by the Bank to be replaced, payment to such Bank of the purchase price in immediately available funds, and the payment by the Borrower of all requested costs accruing to the date of purchase which the Borrower is obligated to pay under Section 9.04 and all other amounts owed by the Borrower to such Bank (other than the principal of and interest on the Advances of such Bank and accrued facility and utilization fees to the date of such purchase that are purchased by such Eligible Assignee), such Eligible Assignee shall constitute a "Bank" hereunder with a Commitment as so specified and the Bank being so replaced shall no longer constitute a "Bank" hereunder and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of the Bank being so replaced shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.  If, however, (x) a Bank accepts such an offer and such Eligible Assignee fails to purchase such rights and interest on such specified date in accordance with the terms of such offer, the Borrower shall continue to be obligated to pay the increased costs and additional amounts due to such Bank pursuant to Sections 2.06, 2.10 and 2.13 (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement), or (y) the Bank proposed to be replaced fails to accept such purchase offer, the Borrower (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement) shall not be obligated to pay to such Bank such increased costs or additional amounts incurred or accrued from and after the date of such purchase offer, and neither the failure to purchase as set forth in clause (x) of this sentence nor the failure to accept a purchase offer as set forth in clause (y) of this sentence, shall affect any rights the Borrower may have to terminate such Bank's Commitment in accordance with Section 2.16(b).

(b)    In the event that the Borrower determines to terminate a Bank's Commitment pursuant to this Section 2.16, the Borrower shall have the right to terminate such Bank's Commitment and shall give notice to such Bank of the Borrower's election to terminate (a copy of such notice to be sent to the Paying Agent), and such termination shall become effective on the date specified in such notice (which shall be 15 days after the date of such notice, provided, that if the 15th day after the date of such notice is not a Business Day, the date specified in such notice shall be the first Business Day next succeeding such 15th day) unless such Bank withdraws its demand or notice for increased costs or additional amounts (if such a demand or notice is the basis for the proposed termination).  On the date of the termination of the Commitment of any Bank pursuant to this Section 2.16(b), the Borrower shall pay all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility and utilization fees and amounts specified in such Bank's notice and demand (if any) delivered pursuant to Sections 2.06, 2.10 or 2.13, as the case may be, with respect to the period prior to such termination) and such Bank shall thereupon cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that such Bank's rights under Sections 2.06, 2.10, 2.13 and 9.04 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.17. Renewal of Commitments.

JPMUCI 0003190

(a)    If no Event of Default has occurred and is continuing, the Borrower may request by notice to the Paying Agent and each Bank, given no earlier than 45 days prior to, and no later than 30 days prior to, any Stated Termination Date applicable on the date of such notice to all Banks ("Existing Termination Date"), that the Banks renew their respective Commitments for an additional 364 days. If a Bank agrees, in its sole and absolute discretion, to so renew its Commitment, it will give notice to the Paying Agent of its decision to do so no earlier than 30 days prior to, and no later than 20 days prior to, such Existing Termination Date. No later than 19 days prior to such Existing Termination Date (or the next Business Day, if the day 19 days prior to the Existing Termination Date is not a Business Day), the Paying Agent will notify the Borrower and each Bank of the Banks from which it has received such a notice agreeing to so renew ("Renewing Banks"). Any failure by a Bank to so notify the Paying Agent shall be deemed to be a decision by such Bank to not so renew its Commitment.

(b)    If all Banks elect to so renew their respective Commitments, the Stated Termination Date shall automatically become the date that is 364 days following the Existing Termination Date.

(c)    If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate at least 51% of, but less than 100% of, the Commitments of all of the Banks at such time ("Existing Commitments"), (i) effective as of the Existing Termination Date, except as to the Banks described in clause (ii) of this subsection (c), the Stated Termination Date shall automatically become the date that is 364 days following the Existing Termination Date as to each Renewing Bank, (ii) the Stated Termination Date shall remain unchanged as to each Bank that is not a Renewing Bank (each a "Terminating Bank"), (iii) each Terminating Bank's Commitment shall terminate on the Existing Termination Date, and (iv) the Borrower shall pay on the Existing Termination Date the outstanding Advances owed to each Terminating Bank and all other amounts owed to each Terminating Bank. If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate less than 51% of the Existing Commitments, none of the Commitments (including the Commitment of any Renewing Bank) will be extended and the Stated Termination Date shall remain unchanged.

(d)    If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate at least 51% of, but less than 100% of, the Existing Commitments, then the Borrower may request one or more Renewing Banks to increase their respective Commitments pursuant to Section 2.18 (but no Bank shall be obligated to do so), and may attempt to add one or more commercial banks or financial institutions to this Agreement pursuant to Section 2.18, but the aggregate amount of the Commitments of the Renewing Banks (after giving effect to any such increase) and such added commercial banks or financial institutions shall not exceed 100% of the Existing Commitments.

(e)    The Borrower may repeat the process contemplated by this Section 2.17 once each year (commencing in 2001) but the election by any Bank to become a Renewing Bank at any time shall not obligate such Bank to become a Renewing Bank at any other time, it being agreed that each election of any Bank to renew or not renew shall be made by such Bank in its sole and absolute discretion and that such discretion shall not be limited by any prior election to become a Renewing Bank.

SECTION 2.18. Replacement of Commitments. If at any time that the Paying Agent gives a notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the then Renewing Banks aggregate at least 51% but less than 100% of the then Existing Commitments, and if no Event of Default then exists, the Borrower shall have the right, without the consent of the Banks but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to replace the

JPMUCI 0003191

Commitments of the then Terminating Banks by adding to this Agreement one or more commercial banks or financial institutions that are Eligible Assignees (who shall, upon completion of the requirements stated in this Section 2.18, constitute Banks hereunder), or by allowing one or more Banks to increase their Commitments hereunder, provided that (a) the sum of such added Commitments plus such increases in Commitments shall not be greater than the Commitments of such Terminating Banks, so that in no event will the total aggregate amount of the Existing Commitments be increased (after giving effect to the contemporaneous termination of the Commitments of such Terminating Banks), (b) no Bank's Commitment shall be increased without the consent of such Bank, (c) no Person shall be added to this Agreement without its consent and (d) on the effective date of any such increase or addition, there shall be no Advances outstanding. The Borrower shall give the Paying Agent three Business Days' notice of the Borrower's intention to increase any Commitment or add a new commercial bank or financial institution pursuant to this Section 2.18. Such notice shall specify each new commercial bank or financial institution, if any, the changes in amounts of Commitments that will result, and such other information as is reasonably requested by the Paying Agent. Each new commercial bank or financial institution agreeing to be added to this Agreement, and each Bank agreeing to increase its Commitment, shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents) a New Bank Agreement or a Commitment Increase Agreement, substantially in the form of Exhibit G-1 or Exhibit G-2, as the case may be, pursuant to which it becomes a party hereto or increases its Commitment, as the case may be. In addition, an authorized officer of the Borrower shall execute and deliver a Note in the principal amount of the Commitment of each new commercial bank or financial institution, or a replacement Note in the principal amount of the increased Commitment of each Bank agreeing to increase its Commitment, as the case may be. Each such Note shall be dated the effective date of the pertinent New Bank Agreement or Commitment Increase Agreement, as the case may be, shall be properly completed, and shall otherwise be in substantially the form of Exhibit A. Each other document of the nature referred to in Section 3.01 shall be furnished to the Paying Agent in form and substance as may be reasonably required by it. Upon execution and delivery to the Paying Agent of such documents and execution by the Paying Agent of the relevant New Bank Agreement or Commitment Increase Agreement, as the case may be, such new commercial bank or financial institution shall constitute a "Bank" hereunder with a Commitment as specified therein, or such Bank's Commitment shall increase as specified therein, as the case may be.

SECTION 2.19. Non-Ratable Reduction or Termination of Commitments. The Borrower shall have the right, without the consent of any Bank, but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to reduce in part or to terminate in whole the Commitment of one or more Banks non-ratably, provided that (a) on the effective date of any such reduction or termination (i) if the Commitment of one or more Banks is being reduced in part (whether or not simultaneously the Commitment of any other Bank is being terminated in whole) and if any Advances are outstanding, the Borrower shall prepay all principal of and interest on all such Advances pursuant to Section 2.09, and if any Bank's Commitment is being terminated in whole, the Borrower shall also pay any other amounts payable to such Bank under its Note and this Agreement, including accrued facility and utilization fees and any other amounts owing to such Bank, (ii) no Default or Event of Default shall have occurred and be continuing, (iii) the senior unsecured long-term debt of the Borrower is rated BBB- or better by Standard & Poor's or Baa3 or better by Moody's, and (iv) if the Commitment of one or more Banks is being terminated in whole (and if no Commitments are simultaneously being reduced in part), the Borrower shall pay to each Bank whose Commitment is so terminated all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility and utilization fees and any other amounts owing to such Bank), (b) the aggregate amount of each non-ratable reduction shall be at least $5,000,000, and (c) the aggregate amount of all such non-ratable reductions and terminations of Commitments since the date of this Agreement shall not exceed $300,000,000. The Borrower shall give the Paying Agent three Business Days' notice of the Borrower's

JPMUCI 0003192

intention to reduce or terminate any Commitment pursuant to this Section 2.19. Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.19, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.20. Certificates of Banks. Without limitation to the requirements of Section 2.10(c), any Bank demanding or giving notice of amounts due to such Bank under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Paying Agent) a certificate setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

ARTICLE III

CONDITIONS TO ADVANCES

SECTION 3.01. Initial Condition Precedent. The obligation of each Bank to make Advances pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial Advance the following, each dated on or before such day, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

(a)    The Notes to the order of the Banks, respectively.

(b)    Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower.

(c)    A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign each Loan Document to which it is a party and the other documents to be delivered hereunder.

(d)    A favorable opinion of Vinson & Elkins L.L.P., counsel for the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, substantially in the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)    A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, in substantially the form of Exhibit D hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

JPMUCI 0003193

(f)    A favorable opinion of Bracewell & Patterson, L.L.P., counsel for the Paying Agent, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents at the express instruction of the Paying Agent, substantially in the form of Exhibit E hereto.

(g)    A letter addressed to the Paying Agent, the Co-Administrative Agents and the Banks from the Borrower with respect to the Prior Credit Facility stating to the effect that (i) all the "Commitments" (as defined in the Prior Credit Facility) of the "Banks" (as defined in the Prior Credit Facility) have been terminated, (ii) no "Advances" (as defined in the Prior Credit Facility) are outstanding under the Prior Credit Facility, and (iii) all fees and other amounts known by the Borrower to be payable under the Prior Credit Facility have been paid in full.

SECTION 3.02. Additional Conditions Precedent to Each Advance. The obligation of each Bank to make any Advance shall be subject to the additional conditions precedent that on the date of such Advance (a) the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)    The representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of such Advance (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to such Advance and the Borrowing of which such Advance is a part and to the application of the proceeds therefrom, as though made on and as of such date, and

(ii)    No event has occurred and is continuing, or would result from such Advance or the Borrowing of which such Advance is a part or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both;

and (b) the Paying Agent shall have received such other approvals, opinions or documents as any Bank through the Paying Agent may reasonably request. For avoidance of doubt, this Section 3.02 shall not apply to the Conversion, combination, division or continuation pursuant to this Agreement of Advances previously made.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties of the Borrower. The Borrower represents and warrants as follows:

(a)    The Borrower and each Principal Subsidiary are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation. The Borrower and each Principal Subsidiary have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted. Each Subsidiary that is a Principal Subsidiary as of the date hereof (based on December 31, 2000 financial statements) is listed in that certain letter dated the date hereof from the Borrower to the Banks and the Paying Agent

JPMUCI 0003194

(b)    The execution, delivery and performance by the Borrower of each Loan Document to which it is or will be a party are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries

(c)    This Agreement and each Note are, and each other Loan Document to which the Borrower is or will be a party, when executed and delivered in accordance with this Agreement will be legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(d)    The audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 2000 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of March 31, 2001 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Borrower, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Borrower and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

(e)    Since December 31, 2000 through the date hereof, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries, considered as a whole.

(f)    Since December 31, 2000, except as disclosed in the Borrower's Form 10-K for the year ended December 31, 2000 or the Borrower's Form 10-Q for the quarter ended March 31, 2001, which were delivered to the Banks (or made available to each of the Banks either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com) prior to the date hereof, there is no action, suit or proceeding pending against the Borrower or any of its Subsidiaries, or to the knowledge of the Borrower threatened against the Borrower or any of its Subsidiaries, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole or which in any manner draws into question the validity of this Agreement or any other Loan Document to which the Borrower is or will be a party.

(g)    No Termination Event has occurred or is reasonably expected to occur with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists. Neither the Borrower nor any ERISA Affiliate has received any notification (or has knowledge of any reason to expect) that any Multiemployer

JPMUCI 0003195

Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, for which a Withdrawal Liability in excess of $100,000,000 exists.

(h)     United States federal income tax returns of the Borrower and its Subsidiaries have been examined and closed through the fiscal year ended December 31, 1995. The Borrower and its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material domestic tax returns which to the knowledge of the Borrower are required to be filed by them and have paid or provided for the payment, before the same become delinquent, of all taxes due pursuant to such returns or pursuant to any assessment received by the Borrower or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of taxes are, in the opinion of the Borrower, adequate to the extent required by GAAP.

(i)     Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(j)     Each of the Borrower and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" or a "subsidiary company" of a "holding company", in each case as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.

(k)     Margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) does not constitute all or substantially all of the assets of the Borrower.

## ARTICLE V

## COVENANTS OF THE BORROWER

SECTION 5.01. Affirmative Covenants. The Borrower covenants and agrees that so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will, unless the Majority Banks shall otherwise consent in writing:

(a)     Reporting Requirements. Furnish to each Bank:

(i)     by making available either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com, or otherwise transmitting to the Banks (1) promptly after the sending or filing thereof, a copy of each of the Borrower's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 75 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, a copy of the Borrower's report on Form 10-Q (or any comparable form) for such quarter, which report will include the Borrower's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 135 days after the end of each fiscal year of the Borrower, a copy of the Borrower's annual report which it sends to its public security holders, and a copy of the Borrower's report on Form 10-K (or any comparable form) for such year, which annual report will include the Borrower's annual audited consolidated financial statements as of the end of and for such year;

(ii)     simultaneously with the furnishing of each of the annual or quarterly reports referred to in clause (i) above, a certificate of the chief financial officer or the chief accounting officer of the Borrower in a form acceptable to the Paying Agent (x) setting forth in reasonable detail the calculations required to

JPMUCI 0003196

establish whether the Borrower was in compliance with the requirements of Section 5.02(b) on the date of the financial statements contained in such report, and (y) stating whether there exists on the date of such certificate any Event of Default or Default, and, if so, setting forth the details thereof and the action which the Borrower has taken and proposes to take with respect thereto;

(iii)    as soon as is possible and in any event within five days after a downgrade of any rating of any of the Borrower's senior unsecured long-term debt by Standard & Poor's or Moody's, notice to the Paying Agent of such change;

(iv)    as soon as possible and in any event within five days after an executive officer of the Borrower having obtained knowledge thereof, notice of the occurrence of any Event of Default or any Default, in each case continuing on the date of such notice, and a statement of the chief financial officer of the Borrower setting forth details of such Event of Default or Default and the action which the Borrower has taken and proposes to take with respect thereto;

(v)    as soon as possible and in any event (a) within 30 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred and (b) within 10 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any other Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred or is reasonably expected to occur, a statement of the chief financial officer or chief accounting officer of the Borrower describing such Termination Event and the action, if any, which the Borrower or such ERISA Affiliate proposes to take with respect thereto;

(vi)    promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate, copies of each notice received by the Borrower or any ERISA Affiliate from the PBGC stating its intention to terminate any Plan for which an Insufficiency in excess of $100,000,000 exists or to have a trustee appointed to administer any Plan for which an Insufficiency in excess of $100,000,000 exists;

(vii)    promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate from the sponsor of a Multiemployer Plan, a copy of each notice received by the Borrower or any ERISA Affiliate indicating liability in excess of $100,000,000 incurred or expected to be incurred by the Borrower or any ERISA Affiliate in connection with (a) the imposition of a Withdrawal Liability by a Multiemployer Plan, (b) the determination that a Multiemployer Plan is, or is expected to be, in reorganization within the meaning of Title IV of ERISA, or (c) the termination of a Multiemployer Plan within the meaning of Title IV of ERISA; and

(viii)    such other information respecting the condition or operations, financial or otherwise, of the Borrower or any of its Subsidiaries as any Bank through the Paying Agent may from time to time reasonably request.

(b)    Compliance with Laws, Etc. Comply, and cause each of its Subsidiaries to comply, with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a material adverse effect on the Borrower and its Subsidiaries taken as a whole, such compliance to include, without limitation, compliance with environmental laws and the paying before the same become delinquent of all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

JPMUCI 0003197

(c)    <u>Use of Proceeds</u>.  Use the proceeds of the Advances only for general corporate purposes of the Borrower not in violation of Section 5.02(f).

(d)    <u>Maintenance of Insurance</u>.  Maintain, and cause each of the Principal Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary, <u>provided, that</u> self-insurance by the Borrower or any such Principal Subsidiary shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary self-insure.  The Borrower may maintain its Principal Subsidiaries' insurance on behalf of them.

(e)    <u>Preservation of Corporate Existence, Etc</u>.  Preserve and maintain, and cause each of the Principal Subsidiaries to preserve and maintain, its legal existence, rights (charter, if applicable, and statutory) and franchises; <u>provided, however</u>, that this Section 5.01(e) shall not apply to any transactions or matters permitted by Section 5.02(c) or (d) and shall not prevent the termination of existence, rights and franchises of any Principal Subsidiary pursuant to any merger or consolidation to which such Principal Subsidiary is a party or pursuant to lease, sale, transfer or other disposition of assets by a Principal Subsidiary, and <u>provided, further</u>, that the Borrower or any Principal Subsidiary shall not be required to preserve any right or franchise if the Borrower or such Principal Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower or such Principal Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Banks.

(f)    <u>Visitation Rights</u>.  At any reasonable time and from time to time, after reasonable notice, permit the Paying Agent or any of the Banks or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, the Borrower and any of its Principal Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Principal Subsidiaries with any of their respective officers or directors.

SECTION 5.02. <u>Negative Covenants</u>.  So long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will not at any time, without the written consent of the Majority Banks:

(a)    <u>Negative Pledge</u>.  Fail to perform and observe any term, covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof).  For the purposes of this Section 5.02(a), such Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein; <u>provided, however</u>, that solely for the purposes of this Section 5.02(a) the word "<u>Securities</u>" as used in the Enron Indenture shall mean the Notes, the word "<u>Company</u>" used therein shall mean the Borrower, the phrase "<u>this Section 1007</u>" used therein shall mean this Section 5.02(a), the word "<u>Trustee</u>" used therein shall mean the Paying Agent and the phrase "So long as any of the Securities are outstanding" used therein shall mean so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder.

(b)    <u>Senior Debt to Capitalization</u>.  Have a ratio of (i) Total Senior Debt to (ii) Total Capitalization greater than 65%.

(c)    <u>Disposition of Assets</u>.  Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

HOUSTON 1280475 11

-28-

JPMUCI 0003198

(d)     Mergers, Etc. Merge or consolidate with or into, any Person, unless (i) the Borrower is the survivor or (ii) the surviving Person, if not the Borrower, is organized under the laws of the United States or a state thereof and assumes all obligations of the Borrower under this Agreement, provided, that in each case immediately after giving effect to such proposed transaction, no Event of Default or Default would exist or result.

(e)     Compliance with ERISA. (i) Terminate, or permit any ERISA Affiliate to terminate, any Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC, or (ii) permit circumstances which give rise to a Termination Event described in clause (b), (d) or (e) of the definition of Termination Event with respect to a Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC.

(f)     Use of Proceeds. Use the proceeds of any Advance for any purpose other than for general corporate purposes of the Borrower; or use any such proceeds (i) in a manner which violates or results in a violation of any law or regulation, (ii) to purchase or carry any margin stock (as defined in Regulation U issued by the Federal Reserve Board) or to extend credit to others for that purpose or (iii) to make any investment in any Person if such investment is opposed by the board of directors, general partner or other governing body of such Person.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default. If any of the following events ("Events of Default") shall occur and be continuing:

(a)     The Borrower shall fail to pay (i) any principal on any Note when due and payable or (ii) any interest on any Note for more than five days after such interest becomes due and payable or (iii) any facility fee or utilization fee set forth in Section 2.03 for more than 15 days after such fee becomes due and payable; or

(b)     Any representation or warranty made by the Borrower (or any of its officers) (including representations and warranties deemed made pursuant to Section 3.02) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)     The Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.02 or shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Borrower by the Paying Agent at the request of any Bank; or

(d)     The Borrower or any of its Principal Subsidiaries shall (i) fail to pay any principal of or premium or interest on any Debt which is outstanding in the principal amount of at least $100,000,000 in the aggregate, of the Borrower or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) default in the observance or performance of any covenant or obligation

JPMUCI 0003199

contained in any agreement or instrument relating to any such Debt or permit or suffer any other event to occur or condition to exist under any agreement or instrument relating to any such Debt that in substance is customarily considered a default in loan documents (in each case, other than a failure to pay specified in clause (i) of this subsection (d)) and such default or other event or condition shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect thereof is to accelerate the maturity of such Debt or require such Debt to be prepaid prior to the stated maturity thereof; for the avoidance of doubt the parties acknowledge and agree that (A) the "other" events or conditions referred to in clause (ii) of this subsection (d) do not include (1) mandatory prepayments required on borrowing base or similar loans, (2) changes in law or judicial, executive or administrative interpretation, of the tax, accounting, regulatory or other treatment of the payments or transactions under or in connection with any such agreement or instrument or the failure or inability of any Person to achieve its desired tax, accounting or regulatory treatment in connection with such transactions, (3) increased costs or the failure or inability of any Person to limit costs in connection with such transactions, (4) the sale, other disposition or collection of any assets or collection of any insurance, condemnation or other proceeds, (5) the failure of any Person to achieve or maintain specified credit ratings published or issued by credit rating agencies, (6) fluctuations in interest rates, stock market prices, commodities or other prices or indexes, or (7) any other prepayment provision in such agreement or instrument that is of a type customarily included in loan documents if the prepayment is not required as a result of a failure to meet any financial test and (B) any payment required to be made under a guaranty of payment or collection described in clause (c) of the definition of Debt shall be due and payable at the time such payment is due and payable under the terms of such guaranty (taking into account any applicable grace period) and such payment shall be deemed not to have been accelerated or required to be prepaid prior to its stated maturity as a result of the obligation guaranteed having become due; or

(e)     The Borrower or any of its Principal Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower or any of its Principal Subsidiaries seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or the Borrower or any of its Principal Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (e); or

(f)     Any judgment, decree or order for the payment of money in excess of $100,000,000 shall be rendered against the Borrower or any of its Principal Subsidiaries and remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment, decree or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g)     Any Termination Event as defined in clause (b), (d) or (e) of the definition thereof with respect to a Plan shall have occurred, and 30 days after notice thereof shall have been given to the Borrower by the Paying Agent, (i) such Termination Event shall still exist and (ii) the sum (determined as of the date of occurrence of such Termination Event) of the liabilities to the PBGC resulting from all such Termination Events is equal to or greater than $150,000,000; or

(h)     The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount

JPMUCI 0003200

which, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date of such notification), exceeds $150,000,000 or requires payments exceeding $100,000,000 in any year; or

(i)    The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of the Borrower and its ERISA Affiliates to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the respective plan years which include the date hereof by an amount exceeding $100,000,000 in the aggregate;

then, and in any such event, the Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the obligation of each Bank to make Advances to be terminated, whereupon each such obligation and all of the Commitments shall forthwith terminate, and (ii) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the Notes, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Notes, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, notice of intent to accelerate or further notice of any kind, all of which are hereby expressly waived by the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, (a) the obligation of each Bank to make its Advances and all of the Commitments shall automatically be terminated and (b) the Notes, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE VII

## THE PAYING AGENT

SECTION 7.01. Authorization and Action.  Each Bank hereby appoints and authorizes the Paying Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Paying Agent, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Notes), the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Paying Agent shall not be required to take any action which exposes the Paying Agent to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings.  The Paying Agent agrees to give to each Bank prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement.

SECTION 7.02. Paying Agent's Reliance, Etc.  Neither the Paying Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct. The duties of the Paying Agent shall be mechanical and administrative in nature; the Paying Agent shall not have, by reason of this Agreement or any other Loan Document, a fiduciary relationship in respect of any

JPMUCI 0003201

Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Paying Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein. Without limitation of the generality of the foregoing, the Paying Agent: (i) may treat the payee of any Note as the holder thereof until the Paying Agent receives and accepts an Assignment and Acceptance entered into by the Bank that is the payee of such Note, as assignor, and an Eligible Assignee, as assignee, as provided in Section 9.06; (ii) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (v) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (vi) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 7.03. Paying Agent and Its Affiliates. With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also the Paying Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not the Paying Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as the Paying Agent in its individual capacity. Any Bank serving as the Paying Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not the Paying Agent and without any duty to account therefor to the Banks.

SECTION 7.04. Bank Credit Decision. Each Bank acknowledges that it has, independently and without reliance upon the Paying Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges that it will, independently and without reliance upon the Paying Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents. The Paying Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 7.05. Certain Rights of the Paying Agent. If the Paying Agent shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Paying Agent shall be entitled to refrain from such act or taking such action unless and until the Paying Agent shall have received instructions from the Majority Banks; and it shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against the Paying Agent as a result of

HOLSTON 1280475 11

-32-

its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be. Furthermore, except for action expressly required of the Paying Agent hereunder, the Paying Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 7.06. Holders. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

SECTION 7.07. Indemnification. The Banks agree to indemnify the Paying Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Paying Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by the Paying Agent under the Loan Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PAYING AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT THE PAYING AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 7.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by the Paying Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that the Paying Agent is not reimbursed for such expenses by the Borrower.

SECTION 7.08. Resignation by the Paying Agent. (a) The Paying Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower and the Banks. Such resignation shall take effect upon the appointment of a successor Paying Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)     Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Paying Agent which shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)     If a successor to a resigning Paying Agent shall not have been so appointed within such 15 Business Day period, the resigning Paying Agent, with the consent of the Borrower (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Paying Agent who shall serve as

JPMUCI 0003203

Paying Agent until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

(d)    If no successor Paying Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Paying Agent, the resigning Paying Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Paying Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

(e)    After any Paying Agent's resignation hereunder as Paying Agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Paying Agent under this Agreement.

## ARTICLE VIII

## THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01. Authorization and Action. Each Bank hereby appoints and authorizes the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Co-Administrative Agents, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement of their rights), the Co-Administrative Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Co-Administrative Agents shall not be required to take any action which exposes the Co-Administrative Agents (or either of them) to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings. The Co-Administrative Agents agree to give to each Bank prompt notice of each notice given to them by the Borrower pursuant to the terms of this Agreement.

SECTION 8.02. Co-Administrative Agents' Reliance, Etc. Neither of the Co-Administrative Agents and none of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct. The duties of the Co-Administrative Agents shall be mechanical and administrative in nature; the Co-Administrative Agents shall not have, by reason of this Agreement or any other Loan Document, a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Co-Administrative Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein. Without limitation of the generality of the foregoing, the Co-Administrative Agents: (a) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) make no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant

JPMUCI 0003204

hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (d) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (e) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 8.03. Co-Administrative Agents and Their Affiliates. With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also a Co-Administrative Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not a Co-Administrative Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as a Co-Administrative Agent in its individual capacity. Any Bank serving as a Co-Administrative Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not a Co-Administrative Agent and without any duty to account therefor to the Banks.

SECTION 8.04. Bank Credit Decision. Each Bank acknowledges that it has, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges that it will, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents. The Co-Administrative Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 8.05. Certain Rights of the Co-Administrative Agents. If the Co-Administrative Agents shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Co-Administrative Agents shall be entitled to refrain from such act or taking such action unless and until the Co-Administrative Agents shall have received instructions from the Majority Banks; and they shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against either Co-Administrative Agent as a result of its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be. Furthermore, except for action expressly required of the Co-Administrative Agents hereunder, each Co-Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 8.06. Holders. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

JPMUCI 0003205

SECTION 8.07. Indemnification. The Banks agree to indemnify each Co-Administrative Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Co-Administrative Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by such Co-Administrative Agent under the Loan Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH CO-ADMINISTRATIVE AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT EACH CO-ADMINISTRATIVE AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 8.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse each Co-Administrative Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by such Co-Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that such Co-Administrative Agent is not reimbursed for such expenses by the Borrower.

SECTION 8.08. Resignation by the Co-Administrative Agents. (a) Each Co-Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower, the other Co-Administrative Agent and the Banks. Such resignation shall take effect upon the appointment of a successor Co-Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent which successor shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)    If a successor to a resigning Co-Administrative Agent shall not have been so appointed within such 15 Business Day period, the resigning Co-Administrative Agent, with the consent of the Borrower (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent who shall serve as a Co-Administrative Agent until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent as provided above.

(d)    If no successor Co-Administrative Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Co-Administrative Agent, the resigning Co-Administrative Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Co-Administrative Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent; provided, however, that if only one of the Co-Administrative Agents has given notice of resignation and the other Co-Administrative Agent is continuing

JPMUCI 0003206

to serve in such capacity, (i) the resigning Co-Administrative Agent's resignation shall become effective on such 20th Business Day, (ii) the Banks shall not perform the duties of the resigning Co-Administrative Agent, and (iii) the remaining Co-Administrative Agent alone shall have all rights and perform all duties ascribed to the Co-Administrative Agents hereunder and under any Loan Document until such time if any, as the Majority Banks appoint a successor Co-Administrative Agent for the resigning Co-Administrative Agent.

(e)    After any Co-Administrative Agent's resignation hereunder as Co-Administrative Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement.

<h3 style="text-align:center">ARTICLE IX</h3>

<h3 style="text-align:center">MISCELLANEOUS</h3>

SECTION 9.01. Amendments. Etc.  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall, unless in writing and signed by all the Banks, do any of the following: (a) waive any of the conditions specified in Article III, (b) increase the Commitment of any Bank or subject any Bank to any additional obligation, (c) forgive or reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (d) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (e) take any action which requires the signing of all the Banks pursuant to the terms of any Loan Document, (f) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Notes which shall be required for the Banks or any of them to take any action under any Loan Document or (g) amend this Section 9.01; and provided, further, that (x) no amendment, waiver or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under any Loan Document, and (y) no amendment, waiver or consent shall, unless in writing and signed by the Co-Administrative Agents in addition to the Banks required above to take such action, affect the rights or duties of the Co-Administrative Agents under the Loan Documents.

SECTION 9.02. Notices. Etc.  All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied, or delivered, if to the Borrower, at its address or telecopier number set forth below:

> Enron Corp.
> 1400 Smith Street
> Houston, Texas  77002
> Attention:  Deputy Treasurer, Corporate Finance
> Telecopier No.: (713) 646-3422

if to any Bank, at its Domestic Lending Office; if to the Paying Agent, at its address or telecopier number set forth below:

JPMUCI 0003207

Citibank, N. A.
399 Park Avenue
New York, New York 10043
Attention:   Energy Department,
                      North American Banking Group
Telecopier No.: (212) 832-9857

with a copy to:

Citicorp Securities, Inc.
1200 Smith Street, Suite 2000
Houston, Texas 77002
Attention:   J. Christopher Lyons
                      Managing Director
Telecopier No.: (713) 654-2849

if to the Co-Administrative Agents at their respective addresses or telecopier numbers set forth below:

Citibank, N. A.
399 Park Avenue
New York, New York 10043
Attention:   Energy Department,
                      North American Banking Group
Telecopier No.: (212) 832-9857

with a copy to:

Citicorp Securities, Inc.
1200 Smith Street, Suite 2000
Houston, Texas 77002
Attention:   J. Christopher Lyons
                      Managing Director
Telecopier No.: (713) 654-2849

The Chase Manhattan Bank
1 Chase Manhattan Plaza, 8th Floor
New York, New York 10081
Attention:  Lisa Pucciarelli
Telecopier No.:     (212) 552-5777

or, as to the Borrower, the Paying Agent, or either Co-Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower, the Paying Agent and each Co-Administrative Agent. All such notices and communications shall be effective, if mailed, two Business Days after deposit in the mails: if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment, respectively; provided, however, that (i) notices and communications to the Paying Agent shall not be effective until

JPMUCI 0003208

received by the Paying Agent and (ii) telexed or telecopied notices received by any party after its normal business hours (or on a day other than a Business Day) shall be effective on the next Business Day. The notices contemplated by the definitions of "Borrowing" and "Interest Period" and by Section 2.08 may be combined in one notice, if all required information is provided in the combined notice and the combined notice meets the requirements as to timeliness set forth in each definition and Section to which the combined notice pertains.

SECTION 9.03. No Waiver, Remedies. No failure on the part of any Bank, any Co-Administrative Agent or the Paying Agent to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04. Costs, Expenses and Indemnity. (a) The Borrower agrees to pay on demand, (i) all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification and amendment of the Loan Documents and the other documents to be delivered under the Loan Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of one law firm as counsel for the Paying Agent with respect to preparation, execution and delivery of the Loan Documents and the satisfaction of the matters referred to in Section 3.01, and (ii) all reasonable legal and other costs and expenses, if any, of the Paying Agent, each Co-Administrative Agent and each Bank in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents and the other documents to be delivered under the Loan Documents or incurred in connection with any workout, restructuring or bankruptcy.

(b)     If any payment or purchase of principal of, or Conversion of, any LIBOR Advance or LIBOR Borrowing is made other than on the last day of an Interest Period relating to such Advance, as a result of a payment, purchase or Conversion pursuant to Section 2.07(f), 2.08, 2.09, 2.10, 2.11, 2.13, 2.16, 2.17 or 2.19 or acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, the Borrower shall, upon demand by any Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank any amounts required to compensate such Bank for any additional losses, costs or expenses (other than taxes, which are dealt with in Section 2.13) which it may reasonably incur as a result of such payment, purchase or Conversion, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund or maintain such Advance.

(c)     The Borrower agrees, to the fullest extent permitted by law, subject to the last two sentences of this Section 9.04(c), to indemnify and hold harmless the Paying Agent, each Co-Administrative Agent and each Bank and each of their respective directors, officers, employees and agents (collectively, "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and claims, damages, losses, liabilities and expenses relating to environmental matters, but excluding taxes, which are dealt with in Section 2.13) (collectively, "Losses") for which any of them may become liable or which may be incurred by or asserted against an Indemnified Party (other than by another Indemnified Party), in each case in connection with or arising out of or by reason of any investigation, litigation, or proceeding, whether or not such Indemnified Party is a party thereto, arising out of, related to or in connection with this Agreement or any other Loan Document or any transaction in which any proceeds of all or any part of the Advances are applied (EXPRESSLY INCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY). IT IS THE INTENT OF THE PARTIES

JPMUCI 0003209

HERETO THAT EACH INDEMNIFIED PARTY SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 9.04(C), BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE BORROWER SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY FOR, LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNIFIED PARTY HAS BECOME LIABLE TO A THIRD PARTY (THAT IS NOT ANOTHER INDEMNIFIED PARTY) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE PRECEDING SENTENCE, AND (B) SUCH INDEMNIFIED PARTY WOULD BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNIFIED PARTY SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(d)      Except as set forth in the next succeeding sentence, each of the Banks, each Co-Administrative Agent and the Paying Agent shall not be liable to the Borrower for amounts constituting punitive, treble or exemplary damages arising out of or in connection with any breach by such Bank, such Co-Administrative Agent or the Paying Agent of any of its obligations hereunder. If the Borrower becomes liable to a third party for amounts constituting punitive, treble or exemplary damages as a result of a breach of an obligation hereunder by a Bank, a Co-Administrative Agent or the Paying Agent, as the case may be, the Borrower shall be entitled to claim and recover (and does not waive its rights to claim and recover) such amounts from such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, to the extent such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, would be liable to the Borrower for such amounts but for the limitation set forth in the preceding sentence.

SECTION 9.05. Right of Set-Off. Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Paying Agent to declare the Notes due and payable pursuant to the provisions of Section 6.01, each Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement and the Note held by such Bank, irrespective of whether or not such Bank shall have made any demand under this Agreement or such Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Borrower after any such set-off and application made by such Bank, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which such Bank may have.

SECTION 9.06. Assignments and Participations. (a) Each Bank may, in accordance with applicable law, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement, (ii) except in the case of an assignment of all of a Bank's rights and obligations under this Agreement, the amount of the Commitment of the assigning Bank being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents), for acceptance by the Paying Agent and recording by the Paying Agent in the Register, an Assignment and Acceptance, together with any Note then held by such assigning Bank and any Note then held by such assignee and a processing and recordation fee of $3,000. Upon such execution, delivery, acceptance and recording, from and after the effective date

JPMUCI 0003210

specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Bank hereunder, (y) the Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an assigning Bank's rights and obligations under this Agreement, such Bank shall cease to be a party hereto except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a party hereto), and (z) unless the Borrower in its sole discretion otherwise consents, no such assignee shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than the assigning Bank would have been entitled to receive with respect to the rights assigned to such assignee, except as a result of circumstances arising after the date of such assignment.

(b)    By executing and delivering an Assignment and Acceptance, the Bank assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Bank makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (ii) such assigning Bank makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Co-Administrative Agents, the Paying Agent, such assigning Bank or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any of the other Loan Documents or any other instrument or document; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Paying Agent to take such action as Paying Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; (vii) such assignee appoints and authorizes each Co-Administrative Agent to take such action as Co-Administrative Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Co-Administrative Agents by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(c)    The Paying Agent shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance, New Bank Agreement and Commitment Increase Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and the principal amount of the Advances owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Paying Agent, the Co-Administrative Agents and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The

JPMUCI 0003211

Register shall be available for inspection by the Borrower or any Bank at any reasonable time and from time to time upon reasonable prior notice.

(d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Bank and an assignee representing that it is an Eligible Assignee, together with any Note then held by such assigning Bank and any Note then held by such assignee, the Paying Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit F, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower. Within five Business Days after its receipt of such notice, an authorized officer of the Borrower shall execute and deliver to the Paying Agent in exchange for the surrendered Notes a new Note payable to the order of such Eligible Assignee in an amount equal to its Commitment after giving effect to such Assignment and Acceptance and, if the assigning Bank has retained a Commitment hereunder, a new Note payable to the order of the assigning Bank in an amount equal to the Commitment retained by it hereunder (such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes, shall be dated the effective date of such Assignment and Acceptance, shall be properly completed and shall otherwise be in substantially the form of Exhibit A). The Paying Agent shall also record in the Register appropriate information from each New Bank Agreement and Commitment Increase Agreement executed by it.

(e)    Each Bank, in accordance with applicable law, may sell participations to one or more banks or other entities (other than the Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) such Bank's obligations under this Agreement (including its Commitment to the Borrower hereunder) shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of any such Notes for all purposes of this Agreement, (iv) the Borrower, the Paying Agent, the Co-Administrative Agents and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, (v) the terms of any such participation shall not restrict such Bank's ability to make any amendment or waiver of this Agreement or any Note or such Bank's ability to consent to any departure by the Borrower therefrom without the approval of the participant, except that the approval of the participant may be required to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, and (vi) unless the Borrower in its sole discretion otherwise consents, no such participant shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than such Bank would have been entitled to receive with respect to the rights assigned to such participant by such Bank except as a result of circumstances arising after the date of such participation to the extent that such circumstances affect other Banks and participants generally, and (vii) each participant that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall provide to the Paying Agent and the Borrower a U.S. Internal Revenue Service Form W-8BEN or W-8ECI, as appropriate, or any successor form prescribed by the U.S. Internal Revenue Service, duly completed and certifying that such participant is fully exempt from United States withholding taxes with respect to all payments to be made to such participant under such participation agreement, or other documents satisfactory to the Borrower and the Paying Agent indicating that all payments to be made to such participant under such participation agreement are fully exempt from such withholding taxes, and neither the Borrower nor the Paying Agent shall have any obligation to pay to any participant any taxes, penalties, interest or other expenses, costs and losses incurred or payable by the Borrower or the Paying Agent as a result of the failure of such participant to obtain such additional duly completed and signed copies of one

JPMUCI 0003212

or the other of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may be required under then-current United States law or regulations to avoid United States withholding taxes on payments in respect of all amounts to be received by such participant.

(f)    Any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.06, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower or any of its Affiliates furnished to such Bank by or on behalf of the Borrower or any of its Affiliates; provided, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to comply with Section 9.09.

(g)    Notwithstanding any other provision set forth in this Agreement, any Bank may at any time create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it and the Note held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Board.

SECTION 9.07. Governing Law; Entire Agreement. This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York. This Agreement, the Notes, the other Loan Documents and any fee letter pertaining hereto accepted by the Borrower constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 9.08. Interest. It is the intention of the parties hereto that the Paying Agent, each Co-Administrative Agent and each Bank shall conform strictly to usury laws applicable to it, if any. Accordingly, if the transactions with the Paying Agent, any Co-Administrative Agent or any Bank contemplated hereby would be usurious under applicable law, if any, then, in that event, notwithstanding anything to the contrary in the Notes, this Agreement or any other agreement entered into in connection with this Agreement or the Notes, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, under the Notes, this Agreement or under any other agreement entered into in connection with this Agreement or the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law and any excess shall be cancelled automatically and, if theretofore paid, shall at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be applied on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower, and (b) in the event that the maturity of any Note or other obligation payable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, is accelerated or in the event of any permitted prepayment, then such consideration that constitutes interest under law applicable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, may never include more than the maximum amount allowed by such applicable law and excess interest, if any, to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, provided for in this Agreement or otherwise shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be credited by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower.

JPMUCI 0003213

SECTION 9.09. Confidentiality. Each Bank agrees that it will use reasonable efforts not to disclose without the prior consent of the Borrower (other than to such Bank's affiliates in the ordinary course of business in connection with any Loan Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Bank if the disclosing Bank or the disclosing Bank's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to the Borrower or its Subsidiaries which is furnished pursuant to this Agreement or any other Loan Document and which is designated by the Borrower to the Banks in writing as confidential, provided that any Bank may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Bank or to the Federal Reserve Board or the FDIC or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Bank, and (e) to the prospective transferee in connection with any contemplated transfer of any of the Notes or any interest therein by such Bank, provided, that such prospective transferee executes an agreement with the Borrower containing provisions substantially identical to those contained in this Section.

SECTION 9.10. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 9.11. Domicile of Loans. Each Bank may transfer and carry its loans at, to or for the account of any office, subsidiary or affiliate of such Bank provided that no Bank shall be relieved of its Commitment as a result thereof.

SECTION 9.12. Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower, the Co-Administrative Agents and the Paying Agent and when the Paying Agent shall have, as to each Bank, either received a copy of a signature page hereof executed by such Bank or been notified by such Bank that such Bank has executed it and thereafter shall be binding upon and inure to the benefit of and be enforceable by the Borrower, the Paying Agent, the Co-Administrative Agents and each Bank and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Banks (other than an assignment effectuated by a merger or consolidation permitted by Section 5.02(d) to the surviving Person referred to therein).

SECTION 9.13. Prior Credit Facility. The undersigned agree and acknowledge that, except for provisions that expressly provide for their survival of termination and Sections 2.06, 2.10, 2.13 and 9.04 of the Prior Credit Facility, the Prior Credit Facility is terminated and all Commitments thereunder (as defined in the Prior Credit Facility) are terminated, and the undersigned waive any right to receive any notice of such termination. With respect to the Prior Credit Facility, each Bank that was a party to the Prior Credit Facility agrees to return to the Borrower, with reasonable promptness, the Note (as defined in the Prior Credit Facility) delivered by the Borrower to the Bank under the Prior Credit Facility.

SECTION 9.14. Return of Notes. With respect to each Bank, upon the full and final payment by the Borrower to such Bank of all amounts due under the Note payable to the order of such Bank, and termination of the Commitment of such Bank, such Bank agrees to, with reasonable promptness, return such Note to the Borrower.

JPMUCI 0003214

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

ENRON CORP.

By: _____

Name: Barry J. Schnapper

Title: Deputy Treasurer

JPMUCI 0003215

PAYING AGENT:

CITIBANK, N. A.

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

By:_____
            Authorized Officer

CO-ADMINISTRATIVE AGENT:

CITIBANK, N. A.

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

By:_____
            Authorized Officer

THE CHASE MANHATTAN BANK

By:_____
            Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement

-46-

JPMUCI 0003216

**PAYING AGENT:**

CITIBANK, N. A.

By:_____
          Authorized Officer


**CO-ADMINISTRATIVE AGENTS:**

CITIBANK, N. A.

By:_____
          Authorized Officer

THE CHASE MANHATTAN BANK

By:_____
          Authorized Officer

-48-

JPMUCI 0003217

May-15-01  07:46am  From-ABN AMRO                    +2120046367      T-706  P 03/03  F-633

| Commitment | BANKS: |
|---|---|
| $65,929,629.11 | ABN AMRO BANK N.V. |

By:_____
         Authorized Officer

By:_____
         Authorized Officer

$11,666,666.67          ARAB BANK PLC

By:_____
         Authorized Officer

$11,666,666.67          ARAB BANKING CORPORATION

By:_____
         Authorized Officer

$22,685,185.44          AUSTRALIA AND NEW ZEALAND BANKING
                        GROUP LIMITED

By:_____
         Authorized Officer

$38,888,888.89          BANCA DI ROMA, CHICAGO BRANCH

By:_____
         Authorized Officer

By:_____
         Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement          -47-

JPMUCI 0003218

Commitment                          BANKS:

$65,929,629.11                      ABN AMRO BANK N.V.

                                    By:_____
                                          Authorized Officer

                                    By:_____
                                          Authorized Officer

$11,666,666.67                      ARAB BANK PLC

                                    By:_____
                                          Authorized Officer

$11,666,666.67                      ARAB BANKING CORPORATION

                                    By:_____
                                          Authorized Officer

$22,685,185.44                      AUSTRALIA AND NEW ZEALAND BANKING
                                    GROUP LIMITED

                                    By:_____
                                          Authorized Officer

$38,888,888.89                      BANCA DI ROMA, CHICAGO BRANCH

                                    By:_____
                                          Authorized Officer

                                    By:_____
                                          Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement              -47-

JPMUCI 0003219

| Commitment | **BANKS:** |
|---|---|
| | |
| $65,929,629.11 | ABN AMRO BANK N.V. |

By:_____
   Authorized Officer

By:_____
   Authorized Officer

$11,666,666.67      ARAB BANK PLC

By:_____
   Authorized Officer

$11,666,666.67      ARAB BANKING CORPORATION

By: *WAHID B. BUGAIGHIS*
   Authorized Officer

$22,685,185.44      AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED

By:_____
   Authorized Officer

$38,888,888.89      BANCA DI ROMA, CHICAGO BRANCH

By:_____
   Authorized Officer

By:_____
   Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement         -47-

JPMUCI 0003220

| Commitment | BANKS: |
|---|---|
| $65,929,629.11 | ABN AMRO BANK N.V. |

By: _____
       Authorized Officer

By: _____
       Authorized Officer

| $11,666,666.67 | ARAB BANK PLC |

By: _____
       Authorized Officer

| $11,666,666.67 | ARAB BANKING CORPORATION |

By: _____
       Authorized Officer

$22,685,185.44    AUSTRALIA AND NEW ZEALAND BANKING
                  GROUP LIMITED

By: _____
       Authorized Officer    R. Scott McInnis
                  Head of Structured Finance &
                  Relationship Management-Americas

$38,888,888.89    BANCA DI ROMA, CHICAGO BRANCH

By: _____
       Authorized Officer

By: _____
       Authorized Officer

JPMUCI 0003221

| Commitment | BANKS: |
|---|---|

**$65,929,629.11**

ABN AMRO BANK N.V.

By:_____
　　Authorized Officer

By:_____
　　Authorized Officer

**$11,666,666.67**

ARAB BANK PLC

By:_____
　　Authorized Officer

**$11,666,666.67**

ARAB BANKING CORPORATION

By:_____
　　Authorized Officer

**$22,685,185.44**

AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED

By:_____
　　Authorized Officer

**$38,888,888.89**

BANCA DI ROMA, CHICAGO BRANCH

By:_____
　　Authorized Officer

By:_____
　　Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement

-47-

JPMUCI 0003222

$11,666,666.67

BANCA NAZIONALE DEL LAVORO S.p.A

By _____
Authorized Officer    ROBERTO MANCONE, VP

By _____
Authorized Officer    CARLO VECCHI, Sr.VP

$15,555,555.56

BANCA POPOLARE DI MILANO

. By _____
Authorized Officer

$11,666,666.67

BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

By _____
Authorized Officer

$38,888,888.89

BANK OF AMERICA N A

By _____
Authorized Officer

$11,666,666.67

BANK OF MONTREAL

By: _____
Authorized Officer

$38,888,888.89

THE BANK OF NEW YORK

By _____
Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement

-48-

JPMUCI 0003223

$11,666,666.67         BANCA NAZIONALE DEL LAVORO S.p.A.

By:_____
        Authorized Officer

By:_____
        Authorized Officer

$15,555,555.56         BANCA POPOLARE DI MILANO

By:_____
        Authorized Officer

$11,666,666.67         BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

By MANUEL SANCHEZ     Authorized Officer     JOHN MARTINI
SENIOR VICE PRESIDENT                 VICE PRESIDENT
& BRANCH MANAGER                   CORPORATE BANKING
GLOBAL CORPORATE BANKING

$38,888,888.89         BANK OF AMERICA N.A.

By:_____
        Authorized Officer

$11,666,666.67         BANK OF MONTREAL

By:_____
        Authorized Officer

$38,888,888.89         THE BANK OF NEW YORK

By:_____
        Authorized Officer

JPMUCI 0003224

$11,666,666.67                     BANCA NAZIONALE DEL LAVORO S.p.A.

                                   By:_____
                                          Authorized Officer

                                   By:_____
                                          Authorized Officer

$15,555,555.56                     BANCA POPOLARE DI MILANO

                                   By:_____
                                          Authorized Officer

$11,666,666.67                     BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

                                   By:_____
                                          Authorized Officer

$38,888,888.89                     BANK OF AMERICA N.A.

                                   By:_____
                                          Authorized Officer
                                                          Richard L. Stein
                                                          Vice President

$11,666,666.67                     BANK OF MONTREAL

                                   By:_____
                                          Authorized Officer

$38,888,888.89                     THE BANK OF NEW YORK

                                   By:_____
                                          Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement          -48-

JPMUCI 0003225

$11,666,666.67                          BANCA NAZIONALE DEL LAVORO S.p.A.

                                        By:_____
                                              Authorized Officer

                                        By:_____
                                              Authorized Officer

$15,555,555.56                          BANCA POPOLARE DI MILANO

                                        By:_____
                                              Authorized Officer

$11,666,666.67                          BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

                                        By:_____
                                              Authorized Officer

$38,888,888.89                          BANK OF AMERICA N.A.

                                        By:_____
                                              Authorized Officer

$11,666,666.67                          BANK OF MONTREAL

                                        By:_____
                                              Authorized Officer

$38,888,888.89                          THE BANK OF NEW YORK

                                        By:_____
                                              Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement              -48-

JPMUCI 0003226

$11,666,666.67         BANCA NAZIONALE DEL LAVORO S.p.A.

By: _____
              Authorized Officer

By: _____
              Authorized Officer

$15,555,555.56         BANCA POPOLARE DI MILANO

By: _____
              Authorized Officer

$11,666,666.67         BANCO BILBAO VIZCAYA ARGENTARIA. S.A.

By: _____
              Authorized Officer

$38,888,888.89         BANK OF AMERICA N.A.

By: _____
              Authorized Officer

$11,666,666.67         BANK OF MONTREAL

By: _____
              Authorized Officer

$38,888,888.89         THE BANK OF NEW YORK

By: _____
              Authorized Officer
              RAYMOND J. PALMER
              **Vice President**

JPMUCI 0003227

$38,888,888.89          THE BANK OF NOVA SCOTIA

By:_____
         Authorized Officer

F.C.H. ASHBY
SENIOR MANAGER LOAN OPERATIONS

$53,666,666.67          THE BANK OF TOKYO-MITSUBISHI, LTD.

By:_____
         Authorized Officer

$22,685,185.44          BANK ONE, NA

By:_____
         Authorized Officer

$53,666,666.67          BANKERS TRUST COMPANY

By:_____
         Authorized Officer

By:_____
         Authorized Officer

$65,929,629.11          BARCLAYS BANK PLC

By:_____
         Authorized Officer

$38,888,888.89          BAYERISCHE LANDESBANK GIROZENTRALE

By:_____
         Authorized Officer

JPMUCI 0003228

$38,886,888.89          THE BANK OF NOVA SCOTIA

                        By:_____
                            Authorized Officer

$53,666,666.67          THE BANK OF TOKYO-MITSUBISHI, LTD.

                        By:_____
                            Authorized Officer      K. GLASSCOCK
                                                    VP & Manager

$22,685,185.44          BANK ONE, NA

                        By:_____
                            Authorized Officer

$53,666,666.67          BANKERS TRUST COMPANY

                        By:_____
                            Authorized Officer

                        By:_____
                            Authorized Officer

$65,929,629.11          BARCLAYS BANK PLC

                        By:_____
                            Authorized Officer

$38,888,888.89          BAYERISCHE LANDESBANK GIROZENTRALE

                        By:_____
                            Authorized Officer

Signature Page Enron 5-m
364-Day Revolving Credit Agreement          -49-

JPMUCI 0003229

$38,888,888.89                THE BANK OF NOVA SCOTIA

                             By:_____
                                      Authorized Officer


$53,666,666.67                THE BANK OF TOKYO-MITSUBISHI, LTD.

                             By:_____
                                      Authorized Officer


$22,685,185.44                BANK ONE, NA (Main Office - Chicago)

                             By:_____
                                      Authorized Officer ; Daniel A. Davis
                                                           Vice President


$53,666,666.67                BANKERS TRUST COMPANY

                             By:_____
                                      Authorized Officer

                             By:_____
                                      Authorized Officer


$65,929,629.11                BARCLAYS BANK PLC

                             By:_____
                                      Authorized Officer


$38,888,888.89                BAYERISCHE LANDESBANK GIROZENTRALE

                             By:_____
                                      Authorized Officer

JPMUCI 0003230

$38,888,888.89                          THE BANK OF NOVA SCOTIA

                                        By:_____
                                             Authorized Officer


$53,666,666.67                          THE BANK OF TOKYO-MITSUBISHI, LTD.

                                        By:_____
                                             Authorized Officer


$22,685,185.44                          BANK ONE, NA

                                        By:_____
                                             Authorized Officer


$53,666,666.67                          BANKERS TRUST COMPANY

                                        By:_____
                                             Authorized Officer       Marcus M. Tarkington
                                                                            Director


$65,929,629.11                          BARCLAYS BANK PLC

                                        By:_____
                                             Authorized Officer


$38,888,888.89                          BAYERISCHE LANDESBANK GIROZENTRALE

                                        By:_____
                                             Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement              -49-


JPMUCI 0003231

$38,888,888.89                    THE BANK OF NOVA SCOTIA

                                  By:_____
                                          Authorized Officer


$53,666,666.67                    THE BANK OF TOKYO-MITSUBISHI, LTD.

                                  By:_____
                                          Authorized Officer


$22,685,185.44                    BANK ONE, NA

                                  By:_____
                                          Authorized Officer


$53,666,666.67                    BANKERS TRUST COMPANY

                                  By:_____
                                          Authorized Officer


                                  By:_____
                                          Authorized Officer


$65,929,629.11                    BARCLAYS BANK PLC

                                  By:_____
                                          Authorized Officer


$38,888,888.89                    BAYERISCHE LANDESBANK GIROZENTRALE

                                  By:_____
                                          Authorized Officer

JPMUCI 0003232

$38,888,888.89                          THE BANK OF NOVA SCOTIA

                                        By:_____
                                              Authorized Officer


$53,666,666.67                          THE BANK OF TOKYO-MITSUBISHI, LTD.

                                        By:_____
                                              Authorized Officer


$22,685,185.44                          BANK ONE, NA

                                        By:_____
                                              Authorized Officer


$53,666,666.67                          BANKERS TRUST COMPANY

                                        By:_____
                                              Authorized Officer


                                        By:_____
                                              Authorized Officer


$65,929,629.11                          BARCLAYS BANK PLC

                                        By:_____
                                              Authorized Officer


$38,888,888.89                          BAYERISCHE LANDESBANK GIROZENTRALE

By:_____             By:_____
Name:  Peter Obermann                   Name:   Sean O'Sullivan
Title: Senior Vice President            Title:  Vice President


Signature Page Enron Corp.                    -49-
364-Day Revolving Credit Agreement

JPMUCI 0003233

$38.888.888.89                          BBL INTERNATIONAL (U.K.) LIMITED

                                        By: _____
                                               Authorized Officer

                                        By: _____
                                               Authorized Officer


$38.888.888.89                          BEAR STEARNS CORPORATE LENDING INC.

                                        By: _____
                                               Authorized Officer


$38.888.888.89                          BNP PARIBAS

                                        By: _____
                                               Authorized Officer


$65.929.629.89                          THE CHASE MANHATTAN BANK

                                        By: _____
                                               Authorized Officer


$53.666.666.67                          CIBC INC.

                                        By: _____
                                               Authorized Officer


$65.929.629.11                          CITIBANK, N. A.

                                        By: _____
                                               Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement                    -50-

JPMUCI 0003234

<u>$38,888,888.89</u>                    BBL INTERNATIONAL (U.K.) LIMITED

By:_____
                                              Authorized Officer

By:_____
                                              Authorized Officer

<u>$38,888,888.89</u>                    BEAR STEARNS CORPORATE LENDING INC.

By:_____
                                              Authorized Officer

<u>$38,888,888.89</u>                    BNP PARIBAS

By:_____
                                              Authorized Officer

<u>$65,929,629.89</u>                    THE CHASE MANHATTAN BANK

By:_____
                                              Authorized Officer

<u>$53,666,666.67</u>                    CIBC INC.

By:_____
                                              Authorized Officer

<u>$65,929,629.11</u>                    CITIBANK, N. A.

By:_____
                                              Authorized Officer

JPMUCI 0003235

$38,888,888.89                    BBL INTERNATIONAL (U.K.) LIMITED

                                  By:_____
                                         Authorized Officer


                                  By:_____
                                         Authorized Officer


$38,888,888.89                    BEAR STEARNS CORPORATE LENDING INC.


                                  By:_____
                                         Authorized Officer


$38,888,888.89                    BNP PARIBAS

                                  By:                              Betsy Jooher
                                       Authorized Robinson         Betsy Jooher
                                       Vice President              Vice President

$65,929,629.89                    THE CHASE MANHATTAN BANK


                                  By:_____
                                         Authorized Officer


$53,666,666.67                    CIBC INC.


                                  By:_____
                                         Authorized Officer


$65,929,629.11                    CITIBANK, N. A.


                                  By:_____
                                         Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement              -50-


JPMUCI 0003236

By:_____
            Authorized Officer

By:_____
            Authorized Officer

$38,888,888.89           BEAR STEARNS CORPORATE LENDING INC.

By:_____
            Authorized Officer

$38,888,888.89           BNP PARIBAS

By:_____
            Authorized Officer

$65,929,629.89           THE CHASE MANHATTAN BANK

By:_____
            Authorized Officer

$53,666,666.67           CIBC INC.

By:_____
            Authorized Officer

$65,929,629.11           CITIBANK, N. A.

By:_____
            Authorized Officer

$19,444,444.44           CREDIT AGRICOLE INDOSUEZ

-52-

Signature Page Enron Corp
364-Day Revolving Credit Agreement

JPMUCI 0003237

$38.888.888.89                    BBL INTERNATIONAL (U.K.) LIMITED

                                  By:_____
                                          Authorized Officer


                                  By:_____
                                          Authorized Officer


$38.888.888.89                    BEAR STEARNS CORPORATE LENDING INC.

                                  By:_____
                                          Authorized Officer


$38.888.888.89                    BNP PARIBAS

                                  By:_____
                                          Authorized Officer


$65.929.629.89                    THE CHASE MANHATTAN BANK

                                  By:_____
                                          Authorized Officer


$53.666.666.67                    CIBC INC.

                                  By:_____
                                          Authorized Officer


$65.929.629.11                    CITIBANK, N. A.

                                  By:_____
                                          Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement              -50-

JPMUCI 0003238

$38,888,888.89     BBL INTERNATIONAL (U.K.) LIMITED

By:_____
    Authorized Officer

By:_____
    Authorized Officer

$38,888,888.89     BEAR STEARNS CORPORATE LENDING INC.

By:_____
    Authorized Officer

$38,888,888.89     BNP PARIBAS

By:_____
    Authorized Officer

$65,929,629.89     THE CHASE MANHATTAN BANK

By:_____
    Authorized Officer

$53,666,666.67     CIBC INC.

By:_____
    Authorized Officer

$65,929,629.11     CITIBANK, N. A.

            J. CHRISTOPHER LYONS
            ATTORNEY-IN-FACT
By:_____
    Authorized Officer

JPMUCI 0003239

$19,444,444.44                          CREDIT AGRICOLE INDOSUEZ

                                        By: _____
                                                    Authorized Officer

                                        By: _____
                                                    Authorized Officer


$53,666,666.67                          CREDIT LYONNAIS NEW YORK BRANCH

                                        By: _____
                                                    Authorized Officer


$53,666,666.67                          CREDIT SUISSE FIRST BOSTON

                                        By: _____
                                                    Authorized Officer


$19,444,444.44                          THE DAI-ICHI KANGYO BANK LTD,
                                        NEW YORK BRANCH

                                        By: _____
                                                    Authorized Officer


$22,685,185.44                          DG BANK DEUTSCHE
                                        GENOSSENSCHAFTSBANK AG

                                        By: _____
                                                    Authorized Officer

                                        By: _____
                                                    Authorized Officer

JPMUCI 0003240

$19,444,444.44                          CREDIT AGRICOLE INDOSUEZ

                                        By:_____
                                               Authorized Officer


                                        By:_____
                                               Authorized Officer


$53,666,666.67                          CREDIT LYONNAIS NEW YORK BRANCH

                                               Philippe Sauetry
                                               Executive Vice President
                                        By:_____
                                               Authorized Officer


$53,666,666.67                          CREDIT SUISSE FIRST BOSTON

                                        By:_____
                                               Authorized Officer


$19,444,444.44                          THE DAI-ICHI KANGYO BANK LTD.
                                        NEW YORK BRANCH

                                        By:_____
                                               Authorized Officer


$22,685,185.44                          DG BANK DEUTSCHE
                                        GENOSSENSCHAFTSBANK AG

                                        By:_____
                                               Authorized Officer


                                        By:_____
                                               Authorized Officer

JPMUCI 0003241

$19,444,444.44                    CREDIT AGRICOLE INDOSUEZ

                                  By:_____
                                        Authorized Officer


                                  By:_____
                                        Authorized Officer


$53,666,666.67                    CREDIT LYONNAIS NEW YORK BRANCH

                                  By:_____
                                        Authorized Officer


$53,666,666.67                    CREDIT SUISSE FIRST BOSTON

                                  By:_____
                                        Authorized Officer
                                        JAMES P. MORAN          LALITA ADVANI
                                        DIRECTOR          ASSISTANT VICE PRESIDENT

$19,444,444.44                    THE DAI-ICHI KANGYO BANK LTD.
                                  NEW YORK BRANCH

                                  By:_____
                                        Authorized Officer


$22,685,185.44                    DG BANK DEUTSCHE
                                  GENOSSENSCHAFTSBANK AG

                                  By:_____
                                        Authorized Officer


                                  By:_____
                                        Authorized Officer


Signature Page Enron Corp                    -51-
364-Day Revolving Credit Agreement

JPMUCI 0003242

$19,444,444.44                          CREDIT AGRICOLE INDOSUEZ

                                        By:_____
                                                Authorized Officer


                                        By:_____
                                                Authorized Officer


$53,666,666.67                          CREDIT LYONNAIS NEW YORK BRANCH

                                        By:_____
                                                Authorized Officer


$53,666,666.67                          CREDIT SUISSE FIRST BOSTON

                                        By:_____
                                                Authorized Officer


$19,444,444.44                          THE DAI-ICHI KANGYO BANK LTD.
                                        NEW YORK BRANCH

                                        By: _Boitran M. Tang_____
                                                Authorized Officer


$22,685,185.44                          DG BANK DEUTSCHE
                                        GENOSSENSCHAFTSBANK AG

                                        By:_____
                                                Authorized Officer


                                        By:_____
                                                Authorized Officer

JPMUCI 0003243

$19,444,444.44                    CREDIT AGRICOLE INDOSUEZ

                                  By:_____
                                       Authorized Officer


                                  By:_____
                                       Authorized Officer


$53,666,666.67                    CREDIT LYONNAIS NEW YORK BRANCH


                                  By:_____
                                       Authorized Officer


$53,666,666.67                    CREDIT SUISSE FIRST BOSTON


                                  By:_____
                                       Authorized Officer


$19,444,444.44                    THE DAI-ICHI KANGYO BANK LTD,
                                  NEW YORK BRANCH


                                  By:_____
                                       Authorized Officer


$22,685,185.44                    DG BANK DEUTSCHE
                                  GENOSSENSCHAFTSBANK AG


                                  By:_____
                                       Authorized Officer


                                  By:_____
                                       Authorized Officer

JPMUCI 0003244

$38,888,888.89

DRESDNER BANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By: _____
    Authorized Officer   *VP*

By: _____
    Authorized Officer   *AT*

$27,222,222.22

FIRST UNION NATIONAL BANK

By: _____
    Authorized Officer

$53,666,666.67

FLEET NATIONAL BANK

By: _____
    Authorized Officer

$19,444,444.44

THE FUJI BANK, LIMITED

By: _____
    Authorized Officer

$27,222,222.22

HSBC BANK USA

By: _____
    Authorized Officer

$19,444,444.44

THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By: _____
    Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement

-52-

JPMUCI 0003245

$38,888,888.89                        DRESDNER BANK AG, NEW YORK AND
                                      GRAND CAYMAN BRANCHES

                                      By:_____
                                             Authorized Officer


                                      By:_____
                                             Authorized Officer


$27,222,222.22                        FIRST UNION NATIONAL BANK

                                      By:_____
                                             Authorized Officer


$53,666,666.67                        FLEET NATIONAL BANK

                                      By:_____
                                             Authorized Officer


$19,444,444.44                        THE FUJI BANK, LIMITED

                                      By:_____
                                             Authorized Officer


$27,222,222.22                        HSBC BANK USA

                                      By:_____
                                             Authorized Officer


$19,444,444.44                        THE INDUSTRIAL BANK OF JAPAN TRUST
                                      COMPANY

                                      By:_____
                                             Authorized Officer

JPMUCI 0003246

$38.888.888.89

DRESDNER BANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By:_____
      Authorized Officer

By:_____
      Authorized Officer

$27.222.222.22

FIRST UNION NATIONAL BANK

By:_____
      Authorized Officer

$53.666.666.67

FLEET NATIONAL BANK

By: _J.u.H. Calabrese Bain_
      Authorized Officer
           J.C.A. Calabrese Bain
           Vice President

$19.444.444.44

THE FUJI BANK, LIMITED

By:_____
      Authorized Officer

$27.222.222.22

HSBC BANK USA

By:_____
      Authorized Officer

$19.444.444.44

THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By:_____
      Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement

-52-

JPMUCI 0003247

$38,888,888.89    DRESDNER BANK AG, NEW YORK AND
                  GRAND CAYMAN BRANCHES

                  By: _____
                              Authorized Officer

                  By: _____
                              Authorized Officer

$27,222,222.22    FIRST UNION NATIONAL BANK

                  By: _____
                              Authorized Officer

$53,666,666.67    FLEET NATIONAL BANK

                  By: _____
                              Authorized Officer

$19,444,444.44    THE FUJI BANK, LIMITED

                  By: _____
                              Authorized Officer

$27,222,222.22    HSBC BANK USA

                  By: _____
                              Authorized Officer

$19,444,444.44    THE INDUSTRIAL BANK OF JAPAN TRUST
                  COMPANY

                  By: _____
                              Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement                    -52-

<u>$38,888,888.89</u>                    DRESDNER BANK AG, NEW YORK AND
                                         GRAND CAYMAN BRANCHES

                                         By:_____
                                              Authorized Officer

                                         By:_____
                                              Authorized Officer


<u>$27,222,222.22</u>                    FIRST UNION NATIONAL BANK

                                         By:_____
                                              Authorized Officer


<u>$53,666,666.67</u>                    FLEET NATIONAL BANK

                                         By:_____
                                              Authorized Officer


<u>$19,444,444.44</u>                    THE FUJI BANK, LIMITED

                                         By:_____
                                              Authorized Officer


<u>$27,222,222.22</u>                    HSBC BANK USA

                                         By:_____
                                              Authorized Officer


<u>$19,444,444.44</u>                    THE INDUSTRIAL BANK OF JAPAN TRUST
                                         COMPANY

                                         By:_____
                                              Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement              -52-

JPMUCI 0003249

$38,888,888.89     DRESDNER BANK AG, NEW YORK AND
              GRAND CAYMAN BRANCHES

              By:_____
                  Authorized Officer

              By:_____
                  Authorized Officer

$27,222,222.22     FIRST UNION NATIONAL BANK

              By:_____
                  Authorized Officer

$53,666,666.67     FLEET NATIONAL BANK

              By:_____
                  Authorized Officer

$19,444,444.44     THE FUJI BANK, LIMITED

              By:_____
                  Authorized Officer

$27,222,222.22     HSBC BANK USA

              By:_____
                  Authorized Officer

$19,444,444.44     THE INDUSTRIAL BANK OF JAPAN TRUST
              COMPANY

              By: _____
                  Authorized Officer
           Michael N. Oakes, Senior Vice President
     The Industrial Bank of Japan, Limited, Houston Office
         (Authorized Representative)

Signature Page Enron Corp       -52-
364-Day Revolving Credit Agreement

JPMUCI 0003250

$22,685,185.44     INTESABci - NEW YORK BRANCH

By:_____
  Authorized Officer   **FRANK MAFFEI**
            **VICE PRESIDENT**

By:_____
  Authorized Officer
   *J. Carlani, VP*

$22,685,185.44     KBC BANK N.V.

By:_____
  Authorized Officer

By:_____
  Authorized Officer

$38,888,888.89     LEHMAN COMMERCIAL PAPER INC.

By:_____
  Authorized Officer

$22,685,185.44     MERRILL LYNCH BANK USA

By:_____
  Authorized Officer

$11,666,666.67     THE MITSUBISHI TRUST AND BANKING
              CORPORATION

By:_____
  Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement    -53-

JPMUCI 0003251

$22,685,185.44          INTESABci - NEW YORK BRANCH

By:_____
        Authorized Officer

By:_____
        Authorized Officer


$22,685,185.44          KBC BANK N.V.

By:_____    ROBERT SNAUFFER
        Authorized Officer                FIRST VICE PRESIDENT

                                         ERIC RASKIN
By:_____    ASSISTANT VICE PRESIDENT
        Authorized Officer


$38,888,888.89          LEHMAN COMMERCIAL PAPER INC.

By:_____
        Authorized Officer


$22,685,185.44          MERRILL LYNCH BANK USA

By:_____
        Authorized Officer


$11,666,666.67          THE MITSUBISHI TRUST AND BANKING
                        CORPORATION

By:_____
        Authorized Officer


Signature Page Enron Corp                    -53-
364-Day Revolving Credit Agreement

JPMUCI 0003252

$22,685,185.44     INTESABci - NEW YORK BRANCH

By:_____
   Authorized Officer

By:_____
   Authorized Officer

$22,685,185.44     KBC BANK N.V.

By:_____
   Authorized Officer

By:_____
   Authorized Officer

$38,888,888.89     LEHMAN COMMERCIAL PAPER INC.

By:_____
   Authorized Officer

$22,685,185.44     MERRILL LYNCH BANK USA

By:_____
   Authorized Officer

$11,666,666.67     THE MITSUBISHI TRUST AND BANKING
           CORPORATION

By:_____
   Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement   -53-

JPMUCI 0003253

$22,685,185.44                    INTESABci - NEW YORK BRANCH

By:_____
        Authorized Officer

By:_____
        Authorized Officer

$22,685,185.44                    KBC BANK N.V.

By:_____
        Authorized Officer

By:_____
        Authorized Officer

$38,888,888.89                    LEHMAN COMMERCIAL PAPER INC.

By:_____
        Authorized Officer

$22,685,185.44                    MERRILL LYNCH BANK USA

By:_____
        Authorized Officer

$11,666,666.67                    THE MITSUBISHI TRUST AND BANKING
                                  CORPORATION

By:_____
        Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement            -53-

JPMUCI 0003254

$22,685,185.44                          INTESABci - NEW YORK BRANCH

                                        By:_____
                                                    Authorized Officer

                                        By:_____
                                                    Authorized Officer

$22,685,185.44                          KBC BANK N.V.

                                        By:_____
                                                    Authorized Officer

                                        By:_____
                                                    Authorized Officer

$38,888,888.89                          LEHMAN COMMERCIAL PAPER INC.

                                        By:_____
                                                    Authorized Officer

$22,685,185.44                          MERRILL LYNCH BANK USA

                                        By:_____
                                                    Authorized Officer

$11,666,666.67                          THE MITSUBISHI TRUST AND BANKING
                                        CORPORATION

                                        By:_____
                                                    Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement              -53-

JPMUCI 0003255

$19,444,444.44                    NATEXIS BANQUES POPULAIRES

                                  By:_____
                                         Authorized Officer
                                  Louis P. Laville, III
                                  Vice President and
                                  Group Manager

                                  By:_____
                                         Authorized Officer
                                  Daniel Payer
                                  Vice President

$27,222,222.22                    NATIONAL AUSTRALIA BANK LIMITED

                                  By:_____
                                         Authorized Officer

$11,666,666.67                    THE NORTHERN TRUST COMPANY

                                  By:_____
                                         Authorized Officer

$53,666,666.67                    ROYAL BANK OF CANADA

                                  By:_____
                                         Authorized Officer

$65,929,629.11                    THE ROYAL BANK OF SCOTLAND PLC

                                  By:_____
                                         Authorized Officer

$38,888,888.89                    SOCIETE GENERALE

                                  By:_____
                                         Authorized Officer

Signature Page Enron Corp                        -54-
364-Day Revolving Credit Agreement

JPMUCI 0003256

$19,444,444.44

NATEXIS BANQUES POPULAIRES

By:_____
   Authorized Officer

By:_____
   Authorized Officer

$27,222,222.22

NATIONAL AUSTRALIA BANK LIMITED

By:_____
   Authorized Officer

        FRANK J. CAMPIGLIA
         VICE PRESIDENT

$11,666,666.67

THE NORTHERN TRUST COMPANY

By:_____
   Authorized Officer

$53,666,666.67

ROYAL BANK OF CANADA

By:_____
   Authorized Officer

$65,929,629.11

THE ROYAL BANK OF SCOTLAND PLC

By:_____
   Authorized Officer

$38,888,888.89

SOCIETE GENERALE

By:_____
   Authorized Officer

JPMUCI 0003257

$19,444,444.44    NATEXIS BANQUES POPULAIRES

By:_____
      Authorized Officer

By:_____
      Authorized Officer

$27,222,222.22    NATIONAL AUSTRALIA BANK LIMITED

By:_____
      Authorized Officer

$11,666,666.67    THE NORTHERN TRUST COMPANY

By:_____
      Authorized Officer

                  JOSEPH A. WEMHOFF
                  VICE PRESIDENT

$53,666,666.67    ROYAL BANK OF CANADA

By:_____
      Authorized Officer

$65,929,629.11    THE ROYAL BANK OF SCOTLAND plc

By:_____
      Authorized Officer

$38,888,888.89    SOCIETE GENERALE

By:_____
      Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                -54-

JPMUCI 0003258

$19,444,444.44                    NATEXIS BANQUES POPULAIRES

                                  By:_____
                                           Authorized Officer


                                  By:_____
                                           Authorized Officer


$27,222,222.22                    NATIONAL AUSTRALIA BANK LIMITED

                                  By:_____
                                           Authorized Officer


$11,666,666.67                    THE NORTHERN TRUST COMPANY

                                  By:_____
                                           Authorized Officer


$53,666,666.67                    ROYAL BANK OF CANADA

                                  By:_____
                                           Authorized Officer          DAVID A. McCLUSKEY
                                                                        MANAGER


$65,929,629.11                    THE ROYAL BANK OF SCOTLAND PLC

                                  By:_____
                                           Authorized Officer


$38,888,888.89                    SOCIETE GENERALE

                                  By:_____
                                           Authorized Officer

JPMUCI 0003259

$19,444,444.44     NATEXIS BANQUES POPULAIRES

By:_____
     Authorized Officer

By:_____
     Authorized Officer

$27,222,222.22     NATIONAL AUSTRALIA BANK LIMITED

By:_____
     Authorized Officer

$11,666,666.67     THE NORTHERN TRUST COMPANY

By:_____
     Authorized Officer

$53,666,666.67     ROYAL BANK OF CANADA

By:_____
     Authorized Officer

$65,929,629.11     THE ROYAL BANK OF SCOTLAND plc

By:_____
     Authorized Officer

$38,888,888.89     SOCIETE GENERALE

By:_____
     Authorized Officer

JPMUCI 0003260

$19,444,444.44                NATEXIS BANQUES POPULAIRES

                             By:_____
                                      Authorized Officer

                             By:_____
                                      Authorized Officer

$27,222,222.22                NATIONAL AUSTRALIA BANK LIMITED

                             By:_____
                                      Authorized Officer

$11,666,666.67                THE NORTHERN TRUST COMPANY

                             By:_____
                                      Authorized Officer

$53,666,666.67                ROYAL BANK OF CANADA

                             By:_____
                                      Authorized Officer

$65,929,629.11                THE ROYAL BANK OF SCOTLAND plc

                             By:_____
                                      Authorized Officer

$38,888,888.89                SOCIETE GENERALE

                             By:_____
                                      Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement           -54-

$11,666,666.67      STANDARD CHARTERED BANK

Jack Luziana
Vice President
By:_____
       Authorized Officer

ANDREW Y. NG
VICE PRESIDENT

$27,222,222.22      THE SUMITOMO BANK, LIMITED

By:_____
       Authorized Officer

$22,685,185.44      SUNTRUST BANK

By:_____
       Authorized Officer

$38,888,888.89      UBS AG, STAMFORD BRANCH

By:_____
       Authorized Officer

By:_____
       Authorized Officer

$11,666,666.67      UNICREDITO ITALIANO

By:_____
       Authorized Officer

$38,888,888.89      WACHOVIA BANK, N.A.

By:_____
       Authorized Officer

JPMUCI 0003262

$11,666,666.67                        STANDARD CHARTERED BANK

                                      By:_____
                                         Authorized Officer


$27,222,222.22                        SUMITOMO MITSUI BANKING CORPORATION

                                      By:_____
                                         Authorized Officer  Peter R.C. Knight
                                                             Senior Vice President


$22,685,185.44                        SUNTRUST BANK

                                      By:_____
                                         Authorized Officer


$38,888,888.89                        UBS AG, STAMFORD BRANCH

                                      By:_____
                                         Authorized Officer

                                      By:_____
                                         Authorized Officer


$11,666,666.67                        UNICREDITO ITALIANO

                                      By:_____
                                         Authorized Officer


$38,888,888.89                        WACHOVIA BANK, N.A.

                                      By:_____
                                         Authorized Officer


Signature Page Enron Corp                        -55-
364-Day Revolving Credit Agreement

JPMUCI 0003263

$11,666,666.67                          STANDARD CHARTERED BANK

                                        By:_____
                                              Authorized Officer


$27,222,222.22                          THE SUMITOMO BANK, LIMITED

                                        By:_____
                                              Authorized Officer


$22,685,185.44                          SUNTRUST BANK

                                        By:_____
                                              Authorized Officer


$38,888,888.89                          UBS AG, STAMFORD BRANCH

                                        By:_____
                                              Authorized Officer


                                        By:_____
                                              Authorized Officer


$11,666,666.67                          UNICREDITO ITALIANO

                                        By:_____
                                              Authorized Officer


$38,888,888.89                          WACHOVIA BANK, N.A.

                                        By:_____
                                              Authorized Officer


Signature Page Enron Corp
364-Day Revolving Credit Agreement              -55-

JPMUCI 0003264

$11,666,666.67 STANDARD CHARTERED BANK

By:_____
     Authorized Officer

$27,222,222.22 SUMITOMO MITSUI BANKING CORPORATION

By:_____
     Authorized Officer

$22,685,185.44 SUNTRUST BANK

By:_____
     Authorized Officer

$38,888,888.89 UBS AG, STAMFORD BRANCH

By:_____
     Authorized Officer

By:_____
     Authorized Officer

$11,666,666.67 UNICREDITO ITALIANO

By:_____
     Authorized Officer

$38,888,888.89 WACHOVIA BANK, N.A.

By:_____
     Authorized Officer

JPMUCI 0003265

$11,666,666.67     STANDARD CHARTERED BANK

By:_____
     Authorized Officer

$27,222,222.22     SUMITOMO MITSUI BANKING CORPORATION

By:_____
     Authorized Officer

$22,685,185.44     SUNTRUST BANK

By:_____
     Authorized Officer

$38,888,888.89     UBS AG, STAMFORD BRANCH

By:_____
     Authorized Officer

By:_____
     Authorized Officer

$11,666,666.67     UNICREDITO ITALIANO

By:_____
     Charles Michael  Saiyed A
     Vice President   Vice P

$38,888,888.89     WACHOVIA BANK, N.A.

By:_____
     Authorized Officer

$11,666,666.67

STANDARD CHARTERED BANK

By:_____
      Authorized Officer

$27,222,222.22

THE SUMITOMO BANK, LIMITED

By:_____
      Authorized Officer

$22,685,185.44

SUNTRUST BANK

By:_____
      Authorized Officer

$38,888,888.89

UBS AG, STAMFORD BRANCH

By:_____
      Authorized Officer

By:_____
      Authorized Officer

$11,666,666.67

UNICREDITO ITALIANO

By:_____
      Authorized Officer

$38,888,888.89

WACHOVIA BANK, N.A.

By:___John T. Seeds____
      Authorized Officer

Signature Page Enron Corp
364-Day Revolving Credit Agreement                -55-

JPMUCI 0003267

$53,666,666.67

WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By: _____
    Authorized Officer      Lisa Walker
                            Associate Director

By: _____
    Authorized Officer      Barry S. Wadler
                            Associate Director

JPMUCI 0003268

SCHEDULE I

## APPLICABLE LENDING OFFICES

| Name of Bank | Domestic Lending Office | Eurodollar Lending Office |
|---|---|---|
| ABN AMRO Bank N.V. | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy (312) 992-5155 | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention: Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy: (312) 992-5155 |
| Arab Bank Plc | Arab Bank Plc, Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention Justo Huapaya<br>Telephone (212) 715-9713<br>Telecopy (212) 593-4632 | Arab Bank Plc, Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Justo Huapaya<br>Telephone: (212) 715-9713<br>Telecopy: (212) 593-4632 |
| Arab Banking Corporation | Arab Banking Corporation<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-0003<br>Attention: R. Hassan, Loan Department<br>Telephone (212) 583-4770<br>Telecopy (212) 583-0932/0921 | Arab Banking Corporation (G.C.I.)<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-0003<br>Attention: R. Hassan, Loan Department<br>Telephone: (212) 583-4770<br>Telecopy: (212) 583-0932/21 |
| Australia and New Zealand Banking Group Limited | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention Tessie Amante<br>Telephone (212) 801-9744<br>Telecopy (212) 801-9859 | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention: Tessie Amante<br>Telephone: (212) 801-9744<br>Telecopy: (212) 801-9859 |
| Banca di Roma, Chicago Branch | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention Aurora Pensa<br>Telephone. (312) 704-2630<br>Telecopy (312) 726-3058 | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy. (312) 726-3058 |
| Banca Nazionale del Lavoro S p A | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention. Roberto Mancone<br>Telephone (212) 314-0734<br>Telecopy (212) 765-2978 | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Roberto Mancone<br>Telephone (212) 314-0734<br>Telecopy: (212) 765-2978 |
| Banca Popolare di Milano | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention Cheryl Raeffaele/Mark Walter<br>Telephone (212) 546-9429/9435<br>Telecopy (212) 838-1077 | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone: (212) 546-9429/9435<br>Telecopy: (212) 838-1077 |
| Banco Bilbao Vizcaya Argentaria, S A | Banco Bilbao Vizcaya Argentaria,<br>New York Branch | Banco Bilbao Vizcaya Argentaria,<br>Nassau Branch |

-57-

JPMUCI 0003269

|  |  |  |
|---|---|---|
|  | 1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Manuel Sanchez<br>Telephone: (212) 728-1511<br>Telecopy: (212) 333-2904 | c/o Banco Bilbao Vizcaya,<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Manuel Sanchez<br>Telephone: (212) 728-1511<br>Telecopy: (212) 333-2904 |
| Bank of America, N.A. | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376 | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376 |
|  | with a copy to: |  |
|  | Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 | Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 |
| Bank of Montreal | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Celyndia Williams<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Celyndia Williams<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 |
| The Bank of New York | The Bank of New York<br>One Wall Street<br>19th Floor<br>New York, NY 10286<br>Attention: Lisa Williams<br>Telephone: (212) 635-7535<br>Telecopy: (212) 635-7552 | The Bank of New York<br>One Wall Street<br>19th Floor<br>New York, NY 10286<br>Attention: Lisa Williams<br>Telephone: (212) 635-7535<br>Telecopy: (212) 635-7552 |
| The Bank of Nova Scotia | The Bank of Nova Scotia<br>600 Peachtree St., NE, Ste. 2700<br>Atlanta, GA 30308<br>Attention: Donna Gardner<br>Telephone: (404) 877-1599<br>Telecopy: (404) 888-8998 | The Bank of Nova Scotia<br>600 Peachtree St., NE, Ste. 2700<br>Atlanta, GA 30308<br>Attention: Jeffrey Jones<br>Telephone: (404) 877-1549<br>Telecopy: (404) 888-8998 |
| The Bank of Tokyo-Mitsubishi, Ltd. | The Bank of Tokyo-Mitsubishi, Ltd.<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Kelton Glasscock<br>Telephone: (713) 655-3805<br>Telecopy: (713) 658-0116 | The Bank of Tokyo-Mitsubishi, Ltd.<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Kelton Glasscock<br>Telephone: (713) 655-3805<br>Telecopy: (713) 658-0116 |
| Bank One, NA | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention: Kenneth J. Fatur<br>Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention: Kenneth J. Fatur<br>Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 |
| Bankers Trust Company | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006 | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006 |

JPMUCI 0003270

|  |  |  |
|---|---|---|
|  | Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy: (212) 250-7351 | Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy: (212) 250-7351 |
| Barclays Bank PLC | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention: David Barton<br>Telephone: (212) 412-3702<br>Telecopy: (212) 412-5308 | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention: David Barton<br>Telephone: (212) 412-3702<br>Telecopy: (212) 412-5308 |
| Bayerische Landesbank<br>Girozentrale | Bayerische Landesbank<br>Girozentrale<br>560 Lexington Avenue<br>New York, NY 10022<br>Attention: Sean O'Sullivan/<br>Edward Santos<br>Telephone: (212) 310-9913/<br>(212) 310-9962<br>Telecopy: (212) 310-9868 | Bayerische Landesbank<br>Girozentrale<br>560 Lexington Avenue<br>New York, NY 10022<br>Attention: Sean O'Sullivan/<br>Edward Santos<br>Telephone: (212) 310-9913/<br>(212) 310-9962<br>Telecopy: (212) 310-9868 |
| BBL International (U.K.)<br>Limited | BBL International (U.K.) Ltd.<br>6 Broadgate<br>London EC2M 2AJ<br>England<br>Attention: Karen Bowman<br>Telephone: 00-44-20-7392-5583<br>Telecopy: 00-44-20-7562-0210<br>Attention: Jeremy Hayes<br>Telephone: 00-44-20-7392-5586<br>Telecopy: 00-44-20-7562-0210<br>Attention: Tessa Baptiste<br>Telephone: 00-44-20-7392-5517<br>Telecopy: 00-44-20-7562-0210 | BBL International (U.K.) Ltd.<br>6 Broadgate<br>London EC2M 2AJ<br>England<br>Attention: Karen Bowman<br>Telephone: 00-44-20-7392-5583<br>Telecopy: 00-44-20-7562-0210<br>Attention: Jeremy Hayes<br>Telephone: 00-44-20-7392-5586<br>Telecopy: 00-44-20-7562-0210<br>Attention: Tessa Baptiste<br>Telephone: 00-44-20-7392-5517<br>Telecopy: 00-44-20-7562-0210 |
| Bear Stearns Corporate<br>Lending Inc | Bear, Stearns & Co. Inc.<br>245 Park Avenue<br>4th Floor<br>New York, NY 10167<br>Attention: Gloria Dombrowski<br>Telephone: (212) 272-6043<br>Telecopy: (212) 272-4844 | Bear, Stearns & Co. Inc.<br>245 Park Avenue<br>4th Floor<br>New York, NY 10067<br>Attention: Gloria Dombrowski<br>Telephone: (212) 272-6043<br>Telecopy: (212) 272-4844 |
| BNP Paribas | BNP Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 | BNP Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 |
| The Chase Manhattan Bank | The Chase Manhattan Bank<br>1 Chase Manhattan Plaza, 8th Floor<br>New York, NY 10081<br>Attention: Lisa Pucciarelli<br>Telephone: (212) 552-7886<br>Telecopy: (212) 552-5777<br><br>with a copy to:<br><br>Chase Bank of Texas, N.A.<br>600 Travis<br>Houston, Texas 77002<br>Attention: Peter Licalzi<br>Telephone: (713) 216-8869 | The Chase Manhattan Bank<br>1 Chase Manhattan Plaza, 8th Floor<br>New York, NY 10081<br>Attention: Lisa Pucciarelli<br>Telephone: (212) 552-7886<br>Telecopy: (212) 552-5777<br><br>with a copy to:<br><br>Chase Bank of Texas, N.A.<br>600 Travis<br>Houston, Texas 77002<br>Attention: Peter Licalzi<br>Telephone: (713) 216-8869 |

-59-

JPMUCI 0003271

|  | Telecopy: (713) 216-4117 | Telecopy: (713) 216-4117 |
|---|---|---|
| CIBC Inc. | CIBC Inc<br>2727 Paces Ferry Road, Suite 1200<br>Atlanta, GA 30339<br>Attention: Anita Rounds<br>Telephone: (770) 319-4828<br>Telecopy: (770) 319-4950 | CIBC Inc.<br>2727 Paces Ferry Road, Suite 1200<br>Atlanta, GA 30339<br>Attention: Anita Rounds<br>Telephone: (770) 319-4828<br>Telecopy: (770) 319-4950 |
| Citibank, N.A | Citibank, N.A<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Sydney Chance<br>Telephone: (302) 894-6076<br>Telecopy: (302) 894-6120<br>Attention: Alvin Weissberger<br>Telephone: (302) 894-6043<br>Telecopy: (302) 894-6120 | Citibank, N.A<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Mike Whitman<br>and Phil Green<br>Telephone: (302) 894-6021<br>Telecopy: (302) 894-6120 |
|  | with a copy to:<br>Citicorp Securities, Inc<br>1200 Smith Street, Suite 2000<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 | with a copy to:<br>Citicorp Securities, Inc<br>1200 Smith Street, Suite 200<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 |
| Credit Agricole Indosuez | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard/Trude Kreiling<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard/Trude Kreiling<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 |
| Credit Lyonnais New York Branch | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 |
| Credit Suisse First Boston | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 |
| The Dai-Ichi Kangyo Bank, Ltd. New York Branch | The Dai-Ichi Kangyo Bank, Ltd.<br>New York Branch<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Maureen Carson<br>Telephone: (212) 432-6658<br>Telecopy: (212) 912-1879 | The Dai-Ichi Kangyo Bank, Ltd.<br>New York Branch<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Maureen Carson<br>Telephone: (212) 432-6658<br>Telecopy: (212) 912-1879 |

JPMUCI 0003272

| | | |
|---|---|---|
| DG Bank Deutsche Genossenschaftsbank AG | DG Bank Deutsche Genossenschaftsbank AG DG Bank Building 609 Fifth Avenue New York, NY 10017-1021 Attention: Mark Connelly Telephone: (212) 745-1560 Telecopy: (212) 745-1556/50 | DG Bank Deutsche Genossenschaftsbank AG DG Bank Building 609 Fifth Avenue New York, NY 10017-1021 Attention: Mark Connelly Telephone: (212) 745-1560 Telecopy: (212) 745-1556/50 |
| Dresdner Bank AG, New York and Grand Cayman Branches | Dresdner Bank AG, New York Branch 75 Wall Street New York, NY 10005-2889 Attention: Howard Ramial Telephone: (212) 429-2281 Telecopy: (212) 429-2130 | Dresdner Bank AG, Grand Cayman Branch 75 Wall Street New York, NY 10005-2889 Attention: Howard Ramial Telephone: (212) 429-2281 Telecopy: (212) 429-2130 |
| First Union National Bank | First Union National Bank 301 South College Street Charlotte, NC 28288 Attention: Debbie Blank Telephone: (713) 346-2727 Telecopy: (713) 650-6354 | First Union National Bank 301 South College Street Charlotte, NC 28288 Attention: Debbie Blank Telephone: (713) 346-2727 Telecopy: (713) 650-6354 |
| Fleet National Bank | Fleet National Bank 100 Federal Street Boston, MA 02110 Attention: Jill A. Calabrese Telephone: (617) 434-9579 Telecopy: (617) 434-3652 | Fleet National Bank 100 Federal Street Boston, MA 02110 Attention: Jill A. Calabrese Telephone: (617) 434-9579 Telecopy: (617) 434-3652 |
| The Fuji Bank, Limited | The Fuji Bank, Limited Two World Trade Center New York, NY 10048 Attention: Tina Catapano Telephone: (212) 898-2099 Telecopy: (212) 488-8216 | The Fuji Bank, Limited Two World Trade Center New York, NY 10048 Attention: Tina Catapano Telephone: (212) 898-2099 Telecopy: (212) 488-8216 |
| HSBC Bank USA | HSBC Bank USA 1 HSBC Center Buffalo, NY 14203 Attention: Donna Riley Telephone: (716) 841-4178 Telecopy: (716) 841-1844 | HSBC Bank USA 1 HSBC Center Buffalo, NY 14203 Attention: Donna Riley Telephone: (716) 841-4178 Telecopy: (716) 841-1844 |
| The Industrial Bank of Japan Trust Company | The Industrial Bank of Japan Trust Company 1251 Avenue of the Americas New York, NY 10020 Attention: Andrew Encarnacion Telephone: (212) 282-4065 Telecopy: (212) 282-4480/4250 | The Industrial Bank of Japan Trust Company 1251 Avenue of the Americas New York, NY 10020 Attention: Andrew Encarnacion Telephone: (212) 282-4065 Telecopy: (212) 282-4480/4250 |
| IntesaBci - New York Branch | IntesaBci - New York Branch One William Street New York, NY 10004 Attention: Charles Dougherty Telephone: (212) 607-3656 Telecopy: (212) 809-2124 | IntesaBci - New York Branch One William Street New York, NY 10004 Attention: Charles Dougherty Telephone: (212) 607-3656 Telecopy: (212) 809-2124 |
| KBC Bank N.V | KBC Bank N.V. - New York Branch 125 West 55th Street | KBC Bank N.V., New York Branch 125 West 55th Street |

JPMUCI 0003273

|  | New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone: (212) 541-0653<br>Telecopy: (212) 956-5581 | New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone: (212) 541-0653<br>Telecopy: (212) 956-5581 |
|---|---|---|
| Lehman Commercial Paper Inc. | Lehman Commercial Paper Inc.<br>3 World Financial Center, 8th Floor<br>New York, NY 10285<br>Attention: Nancy Wong<br>Telephone (212) 526-6535<br>Telecopy (212)526-7365 | Lehman Commercial Paper Inc.<br>3 World Financial Center, 8th Floor<br>New York, NY 10285<br>Attention: Nancy Wong<br>Telephone: (212) 526-6535<br>Telecopy: (212)526-7365 |
| Merrill Lynch Bank USA | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT 84101<br>Attention Butch Alder<br>Telephone (801) 526-8324<br>Telecopy (801) 531-7470 | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT 84101<br>Attention: Butch Alder<br>Telephone: (801) 526-8324<br>Telecopy: (801) 531-7470 |
| The Mitsubishi Trust and Banking Corporation | The Mitsubishi Trust and<br>Banking Corporation<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Angela Bozorgmir<br>Telephone: (212) 891-8427<br>Telecopy: (212) 644-6825 | The Mitsubishi Trust and<br>Banking Corporation<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Angela Bozorgmir<br>Telephone: (212) 891-8427<br>Telecopy: (212) 644-6825 |
| NATEXIS Banques Populaires<br>Non U.S. (Foreign) Corporation | NATEXIS Banque Populaires<br>333 Clay Street, Suite 4340<br>Houston, TX 77002<br>Attention: Tanya McAllister<br>Account Administrator<br>Telephone (713) 759-9447<br>Telecopy: (713) 759-9908<br>Telecopy: (713) 759-9908 | NATEXIS Banque Populaires<br>333 Clay Street, Suite 4340<br>Houston, TX 77002<br>Attention: Tanya McAllister<br>Account Administrator<br>Telephone: (713) 759-9447 |
|  | with a copy to:<br><br>Natexis Banques Populaires<br>1252 Avenue of the Americas, 34th Floor<br>New York, NY 10020<br>Attention: Samantha Tang<br>Telecopy: (212) 872-5160 | with a copy to:<br><br>Natexis Banques Populaires<br>1252 Avenue of the Americas, 34th Floor<br>New York, NY 10020<br>Attention: Samantha Tang<br>Telecopy: (212) 872-5160 |
| National Australia Bank Limited | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY 10166<br>Attention Frank J. Campiglia<br>Telephone (212) 916-9595<br>Telecopy: (212) 983-1969 | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY 10166<br>Attention: Frank J. Campiglia<br>Telephone: (212) 916-9595<br>Telecopy: (212) 983-1969 |
| The Northern Trust Company | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL 60675<br>Attention Linda Honda<br>Telephone (312) 444-3532<br>Telecopy: (312) 630-1566 | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL 60675<br>Attention: Linda Honda<br>Telephone: (312) 444-3532<br>Telecopy: (312) 630-1566 |
| Royal Bank of Canada | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention Assistant Manager,<br>Loan Processing | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention: Assistant Manager,<br>Loan Processing |

JPMUCI 0003274

<table>
<tr><td></td><td>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372</td><td>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372</td></tr>
<tr><td>The Royal Bank of Scotland plc</td><td>The Royal Bank of Scotland plc<br>65 East 55th Street<br>24th Floor<br>New York, NY 10022<br>Attention: Sheila Shaw<br>Telephone: (212) 401-1406<br>Telecopy: (212) 401-1494</td><td>The Royal Bank of Scotland plc<br>65 East 55th Street<br>24th Floor<br>New York, NY 10022<br>Attention: Sheila Shaw<br>Telephone: (212) 401-1406<br>Telecopy: (212) 401-1494</td></tr>
<tr><td>Societe Generale</td><td>Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Aretha Velasquez<br>Telephone: (214) 979-2758<br>Telecopy: (214) 754-0171</td><td>Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Aretha Velasquez<br>Telephone: (214) 979-2758<br>Telecopy: (214) 754-0171</td></tr>
<tr><td>Standard Chartered Bank</td><td>Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Inianga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780</td><td>Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Inianga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780</td></tr>
<tr><td>Sumitomo Mitsui Banking Corporation</td><td>Sumitomo Mitsui Banking Corporation<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537</td><td>Sumitomo Mitsui Banking Corporation<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537</td></tr>
<tr><td>SunTrust Bank</td><td>SunTrust Bank<br>303 Peachtree Street, NE, 3rd Floor<br>Atlanta, GA 30308<br>Attention: Joe McCreery<br>Telephone: (404) 532-0274<br>Telecopy: (404) 827-6270</td><td>SunTrust Bank<br>303 Peachtree Street, NE, 3rd Floor<br>Atlanta, GA 30308<br>Attention: Joe McCreery<br>Telephone: (404) 532-0274<br>Telecopy: (404) 827-6270</td></tr>
<tr><td>UBS AG, Stamford Branch</td><td>UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Susan Brunner<br>Telephone: (203) 719-4181<br>Telecopy: (203) 719-4176</td><td>UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Susan Brunner<br>Telephone: (203) 719-4181<br>Telecopy: (203) 719-4176</td></tr>
<tr><td>UniCredito Italiano</td><td>UniCredito Italiano, New York Branch<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Gianfranco Bisagni<br>Telephone: (212) 546-9623<br>Telecopy: (212) 546-9665</td><td>UniCredito Italiano, New York Branch<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Gianfranco Bisagni<br>Telephone: (212) 546-9623<br>Telecopy: (212) 546-9665</td></tr>
<tr><td>Wachovia Bank, N.A.</td><td>Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905</td><td>Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905</td></tr>
<tr><td>Westdeutsche Landesbank Girozentrale, New York Branch</td><td>Westdeutsche Landesbank Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036</td><td>Westdeutsche Landesbank Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036</td></tr>
</table>

-63-

JPMUCI 0003275

Attention  Phillip Green
Telephone.  (212) 852-6113
Telecopy  (212) 302-7946

Attention: Phillip Green
Telephone: (212) 852-6113
Telecopy: (212) 302-7946

-64-

JPMUCI 0003276

EXHIBIT A

PROMISSORY NOTE

U.S. $_____                                              Dated·_____

     FOR VALUE RECEIVED, the undersigned, Enron Corp., an Oregon corporation (the "Borrower"), HEREBY PROMISES TO PAY to the order of _____ (the "Bank") for the account of its Applicable Lending Office (as defined in the Credit Agreement referred to below) on the Stated Termination Date (as defined in the Credit Agreement referred to below) applicable to such Bank, or on such earlier date payment is required to be made pursuant to such Credit Agreement, the principal sum of _____ U.S. dollars (U.S. $_____) or, if less, the aggregate unpaid principal amount of the Advances (as defined in the U.S. $1.750.000,000 364-Day Revolving Credit Agreement dated as of May 14, 2001 among the Borrower, the Bank, certain other lenders parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, as amended from time to time; such 364-Day Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement") owing to the Bank outstanding on such date.

     The Borrower promises to pay interest on the unpaid principal amount of each Advance owing to the Bank from the date of such Advance until such principal amount is paid in full, at such interest rates. and payable at such times, as are specified in the Credit Agreement.

     Both principal and interest are payable in lawful money of the United States of America to Citibank, N. A., as Paying Agent, at 399 Park Avenue, New York, New York 10043, in same day funds. Each Advance owed to the Bank by the Borrower pursuant to the Credit Agreement, and all payments made on account of principal thereof, shall be recorded by the Bank and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Promissory Note; provided that the failure of the Bank to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under the Credit Agreement.

     This Promissory Note is one of the Notes referred to in, and is subject to and is entitled to the benefits of, the Credit Agreement. The Credit Agreement, among other things, (i) provides for the making of advances by the Bank to the Borrower from time to time in an aggregate amount not to exceed the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each Advance owing to the Bank being evidenced by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

JPMUCI 0003277

This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of New York.

ENRON CORP.

By:_____
Name:_____
Title:_____

-66-

JPMUCI 0003278

## ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Type of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|-------------------|-----------------|-------------------------------------|--------------------------|------------------|

-67-

JPMUCI 0003279

NOTICE OF BORROWING
[Date]

Citibank, N. A., as Paying Agent
399 Park Avenue
New York, New York  10043

Attention:  Energy Department, North American Banking Group

Ladies and Gentlemen:

The undersigned, Enron Corp., refers to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (such 364-Day Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement:

(i)    The Business Day of the Proposed Borrowing is _____, ____.

(ii)    The Type of Advances comprising the Proposed Borrowing is [Base Rate Advances] [LIBOR Advances].

(iii)    The aggregate amount of the Proposed Borrowing is $_____.

[(iv)    The initial Interest Period for each Advance made as part of the Proposed Borrowing is _____ (months).]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(A)    the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date: and

---

To be included for a Proposed Borrowing comprised of LIBOR Advances.

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both.

Very truly yours,

ENRON CORP.

By: _____
Name: _____
Title: _____

cc:    Citicorp Securities, Inc.
       1200 Smith Street, Suite 2000
       Houston, Texas 77002
       Attention: James F. Reilly. Jr.
       Managing Director
       Telecopier No.: (713) 654-2849

-2-

JPMUCI 0003281

EXHIBIT C

[Opinion of Vinson & Elkins L.L.P.]

May 14, 2001

To each of the Banks parties to the 364-Day Revolving
Credit Agreement dated as of May 14, 2001,
among Enron Corp., said Banks, Citibank, N.A.,
as Paying Agent, Citibank. N.A. and The Chase
Manhattan Bank, as Co-Administrative Agents
and to such Paying Agent and Co-Administrative
Agents

      RE:   Enron Corp.

Ladies and Gentlemen:

      This opinion is furnished to you pursuant to Section 3.01(d) of the 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (the "Credit Agreement"), among Enron Corp. (the "Borrower"), the Banks parties thereto, Citibank, N.A., as Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents. Except as otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined.

      We have acted as counsel for the Borrower in connection with the preparation, execution, delivery and effectiveness of the Credit Agreement.

      In that connection, we have examined:

      (1)    The Credit Agreement and the Notes (other than any Note that may be executed and delivered after the date hereof); and

      (2)    The other documents furnished by the Borrower pursuant to the conditions precedent set forth in Section 3.01 of the Credit Agreement.

      In addition, we have (i) investigated such questions of law and (ii) relied on such certificates from officers and representatives of the Borrower and from public officials, as we have deemed necessary or appropriate for the purposes of this opinion.

      In rendering the opinions herein set forth, we have assumed (i) the due authorization, execution and delivery of each document referred to in clauses (1) and (2) of the third paragraph of this opinion by all parties to such documents and that each such document is valid, binding and enforceable (subject to limitations on enforceability of the types referred to in paragraphs (a) and (b) below) against the parties thereto other than the Borrower, (ii) the legal capacity of natural persons, (iii) the genuineness of all signatures, (iv) the authenticity of all documents submitted to us as originals, and (v) the conformity to original documents of all documents submitted to us as copies.

JPMUCI 0003282

Based upon the foregoing and upon such investigation as we have deemed necessary, we are of the following opinion:

1.    No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required to be made or obtained by the Borrower for the execution, delivery and performance by the Borrower of each Loan Document.

2.    The execution, delivery and performance by the Borrower of each Loan Document does not contravene any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or of Regulation U issued by the Federal Reserve Board.

3.    Under the laws of the State of New York and the federal laws of the United States, the Credit Agreement and the Notes constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms.

4.    A Texas court or a United States federal court applying Texas conflict-of-laws principles will give effect to the choice of New York law as the governing law of the Credit Agreement and the Notes and will apply New York law (other than New York procedural law) in any action to enforce the Credit Agreement and the Notes.

The opinions set forth above are subject to the following qualifications:

(a)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally.

(b)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, and also to the possible unavailability of specific performance or injunctive relief. Such principles of equity are of general application, and in applying such principles a court, among other things, might not allow a creditor to accelerate maturity of a debt upon the occurrence of a default deemed immaterial or might decline to order the Borrower to perform covenants. In addition, we express no opinion as to the enforceability of the following provisions to the extent same are contained in the Credit Agreement or the Notes: (i) provisions purporting to waive or not give effect to rights to notices, demands, legal defenses, or other rights or benefits that cannot be waived or rendered ineffective under applicable law; (ii) provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability to the extent that the same are inconsistent with public policy; (iii) provisions purporting to establish evidentiary standards for enforcement of the Loan Documents or providing that decisions by a party are conclusive or are based on such party's sole or absolute discretion; or (iv) provisions relating to rights of setoff.

(c)    Our opinion in paragraph 2, with respect to Texas law, takes into account and is based on and qualified by our opinion in paragraph 4.

(d)    In rendering our opinion in paragraph 3 above with respect to Notes delivered after the date hereof, we assume that such Notes will be issued, executed and delivered in accordance with the provisions of the Credit Agreement.

-2-

JPMUCI 0003283

(e)    Our opinion in paragraph 4 above is based on the language of section 35.51 of the Texas Business and Commerce Code.

In rendering the opinions expressed in paragraphs 1, 2, and 3 above, we have relied upon the opinions stated in paragraphs 1, 2 (so far as such paragraph 2 relates to the corporate powers of, and due authorization of the Loan Documents by, the Borrower, and noncontravention of the Amended and Restated Articles of Incorporation, as amended, and Bylaws, as amended, of the Borrower), 4, and 5 of the opinion, dated today, of the Executive Vice President and General Counsel of the Borrower which is being delivered to you pursuant to Section 3.01(e) of the Credit Agreement.

We have not been called upon to, and accordingly do not, express any opinion as to the various state and federal laws regulating banks or the conduct of their business (except Regulation U issued by the Federal Reserve Board) that may relate to the Loan Documents or the transactions contemplated thereby.

This opinion is limited to the laws of the State of Texas and the State of New York, the Oregon Business Corporation Act and the federal law of the United States.

The opinions herein have been furnished at your request and are solely for your benefit and the benefit of your respective successors and your respective assignees and participants pursuant to the Credit Agreement, and the Paying Agent's special counsel, in connection with the subject transaction and may not be relied upon by any other person or by you or any other person in any other context without the prior written consent of the undersigned.

We are aware that Bracewell & Patterson, L.L.P. will rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

-3-

JPMUCI 0003284

EXHIBIT D

[Opinion of Executive Vice President and
General Counsel of the Borrower]

May 14, 2001

To each of the Banks parties to the
364-Day Revolving Credit Agreement
dated as of May 14, 2001 among Enron
Corp., said Banks, Citibank, N.A., as
Paying Agent. and Citibank, N.A. and
The Chase Manhattan Bank, as Co-
Administrative Agents, and to such Paying
Agent and Co-Administrative Agents

      RE:    $1,750,000,000 364-Day Revolving Credit Agreement of even date herewith among
Enron Corp., as Borrower, the Banks named therein, Citibank, N.A., as Paying Agent, and Citibank,
N.A. and The Chase Manhattan Bank, as Co-Administrative Agents

Ladies and Gentlemen:

      As Executive Vice President and General Counsel of Enron Corp., an Oregon corporation (the
"Borrower"), I am familiar with the 364-Day Revolving Credit Agreement (the "Credit Agreement")
dated as of May 14, 2001 among the Borrower, the Banks listed on the signature pages thereto,
Citibank, N.A., as Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-
Administrative Agents. This opinion is being furnished to you pursuant to Section 3.01(e) of the Credit
Agreement. Terms defined in the Credit Agreement and not otherwise defined herein are used herein
as therein defined.

      Before rendering the opinion hereinafter set forth, I (or other attorneys with the Borrower's
legal department) examined the Loan Documents, and relied upon originals, photostatic or certified
copies of such agreements, documents, instruments, corporate records, and certificates of officers of the
Borrower as I (or such attorneys) deemed relevant and necessary as the basis for the opinions
hereinafter expressed. In such examination, I (or such attorneys) assumed the genuineness of all
signatures (other than signatures of officers of the Borrower on the Loan Documents), the authenticity
of all documents submitted to me (or such attorneys) as originals, and the conformity to original
documents of all documents submitted to me (or such attorneys) as photostatic or certified copies.

      Upon the basis of the foregoing, I am of the opinion that:

      1.      The Borrower is a corporation duly incorporated, validly existing and in good standing
under the laws of the State of Oregon, and has all corporate powers and all governmental licenses,
authorizations, consents and approvals required to carry on its business as now conducted, except to the
extent failure to obtain such licenses, authorizations, consents or approvals would not materially
adversely affect the Borrower and its Subsidiaries taken as a whole.

      2.      The execution, delivery and performance by the Borrower of each Loan Document is
within the Borrower's corporate powers. Each Loan Document has been duly authorized by all

necessary corporate action of the Borrower, and the Credit Agreement and the Notes have been duly executed and delivered by the Borrower.

3.     The execution, delivery and performance by the Borrower of each Loan Document, and the

consummation by the Borrower of the transactions evidenced thereby, have been duly authorized by all necessary corporate action of the Borrower and do not constitute a contravention or default by the Borrower under, (a) the Borrower's Amended and Restated Articles of Incorporation, as amended, or By-laws, as amended, (b) any contractual restriction contained in any material (meaning for the purposes of this opinion those creating a monetary liability of $100,000,000 or more) contract, agreement, indenture, mortgage, bond, note or any guaranty of any of such obligations, in each case known to me and to which the Borrower is subject, or (c) any judgment, injunction, order or decree known to me binding upon the Borrower.

4.     The execution, delivery and performance by the Borrower of the Loan Documents will not

result in the creation or imposition of any lien, security interest, or other charge or encumbrance on any asset of the Borrower, other than (a) pursuant to the Loan Documents or (b) those that would not materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of the Borrower and its subsidiaries taken as a whole, or (ii) the ability of the Borrower to perform its obligations under the Loan Documents.

5.     Except as disclosed in the Borrower's (i) Annual Report to Shareholders for the year ended

December 31, 2000, (ii) Annual Report on Form 10-K for the year ended December 31, 2000, and (iii) Quarterly Report on Form 10-Q for the period ended March 31, 2001, and (iv) definitive proxy statement with respect to its Annual Meeting of Stockholders held May 1, 2001, to my knowledge there is no action, suit or proceeding pending or threatened against the Borrower or any of its Subsidiaries before any court or arbitrator, or any governmental body, agency or official (a) with respect to the Loan Documents, or (b) in which there is a reasonable possibility of an adverse decision that could reasonably be expected to materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole, or (ii) the ability of the Borrower to perform its obligations under the Loan Documents.

6.     The Borrower is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7.     The Borrower is not subject to, or is exempt from, regulation as a "holding company" under

the Public Utility Holding Company Act of 1935, as amended, or pursuant to such Act or the rules and regulations promulgated thereunder or any order or interpretation of the Securities and Exchange Commission or its staff issued pursuant thereto.

The opinions set forth above are subject to the following qualifications:

A.     In rendering the opinion expressed in paragraph 3 above, neither I nor any other attorney in the Borrower's Legal Department has made any examination of any accounting or financial matters related to the covenants contained in certain documents to which the Borrower may be subject, and I express no opinion with respect thereto.

JPMUCI 0003286

B.  I am a member of the Bar of the State of Texas, and this opinion is limited in all respects to the laws of the State of Texas, the Oregon Business Corporation Act and Federal law.

C.  In rendering the opinion expressed in paragraph 5 above, I (or other attorneys in the Borrower's legal department) have only reviewed the files and records of the Borrower and its Subsidiaries, and have consulted with such senior officers of the Borrower and the Subsidiaries as I (or such attorneys) have deemed necessary.

D.  The opinions expressed herein are as of the date hereof only, and I assume no obligation to update or supplement such opinions to reflect any fact or circumstance that may hereafter come to my attention, or any changes in law that may hereafter occur or become effective.

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees pursuant to the Credit Agreement and the Paying Agent's special counsel and may not be relied upon in connection with any other transaction or by any other person; provided, however, that Vinson & Elkins L.L.P. may rely on certain provisions of this opinion to the extent stated in its opinion for the purposes of rendering its opinion pursuant to Section 3.01(d) of the Credit Agreement, and Bracewell & Patterson, L.L.P. may rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

-3-

[FORM OF OPINION OF SPECIAL COUNSEL
TO THE PAYING AGENT]

May 14, 2001

To Citibank, N.A. and The Chase Manhattan Bank,
as Co-Administrative Agents, to Citibank, N.A., as Paying Agent
and to each of the Banks party to the Credit
Agreement described below

Ladies and Gentlemen:

We have acted as special counsel to Citibank, N. A. in connection with the preparation, execution and delivery of the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), and each of you. Capitalized terms defined in the Credit Agreement are used herein as therein defined.

In that connection, we have examined the following documents:

(1)     Counterparts of the Credit Agreement, executed by the Paying Agent and the Borrower, respectively.

(2)     The documents furnished by the Borrower pursuant to Section 3.01 of the Credit Agreement and listed on Annex A hereto, including the opinion of Messrs. Vinson & Elkins, L.L.P., counsel to the Borrower (the "Opinion of Borrower's Counsel") and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower (the "General Counsel Opinion").

In our examination of the documents referred to above, we have assumed the authenticity of all such documents submitted to us as originals, the genuineness of all signatures and the conformity to the originals of all such documents submitted to us as copies. We have also assumed the accuracy of all matters set forth in the certificates referred to on Annex A hereto and assumed that each of the Borrower, the Banks, the Co-Administrative Agents, and the Paying Agent has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the Credit Agreement, and that the Borrower has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the respective Notes and other Loan Documents contemplated to be executed by it. We have also assumed that no Bank has requested that the opinion required by Section 3.01(d) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit C to the Credit Agreement or that the form of opinion of James V. Derrick, Jr. required by Section 3.01(e) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit D to the Credit Agreement.

JPMUCI 0003288

Based upon the foregoing examination of documents and assumptions and upon such other investigation as we have deemed necessary, we are of the opinion that the Opinion of Borrower's Counsel, the General Counsel Opinion and the other documents referred to in item (2) above, are substantially responsive to the requirements of the Credit Agreement.

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees and may be relied upon only by such Persons in connection with the transactions contemplated by the Credit Agreement.

Very truly yours,

Bracewell & Patterson, L.L.P.

-2-

ANNEX A

(1)    The 58 Promissory Notes dated May 14, 2001 of the Borrower payable to the order of each of the Banks.

(2)    The opinion of Vinson & Elkins L.L.P., counsel to the Borrower, substantially in the form of Exhibit C to the Credit Agreement and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower substantially in the form of Exhibit D to the Credit Agreement.

(3)    A certificate of an officer of the Borrower certifying copies of the resolutions of the Board of Directors of the Borrower referred to in Section 3.01(b) of the Credit Agreement and the certificate of an officer of the Borrower contemplated by Section 3.01(c) of the Credit Agreement.

-3-

JPMUCI 0003290

EXHIBIT F

ASSIGNMENT AND ACCEPTANCE

Dated _____, ____

Reference is made to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (such 364-Day Revolving Credit Agreement, as amended or otherwise modified from time to time, being herein referred to as the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), the Banks (as defined in the Credit Agreement), Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent. Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

      1.    The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement. After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of the Advances owing to the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

      2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iv) attaches the Note held by the Assignor and requests that the Paying Agent exchange such Note for a new Note payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance or new Notes payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance and the Assignor in an amount equal to the Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

      3.    The Assignee attaches the Note (if any) held by it and (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents, the Assignor or any other Bank and based on such documents and information

JPMUCI 0003291

as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, any of the other Loan Documents or any other instrument or document; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Paying Agent and the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent and the Co-Administrative Agents by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof.

4.      Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents. The effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto.

5.      Upon such acceptance and recording by the Paying Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement and under the other Loan Documents.

6.      Upon such acceptance and recording by the Paying Agent, from and after the Effective Date, the Paying Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and facility and utilization fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

-2-

JPMUCI 0003292

Schedule 1
to
Assignment and Acceptance

Section 1.
 Percentage interest assigned:       _____%

Section 2.
 Assignee's Commitment before giving effect to this
  Assignment and Acceptance:      $_____
 Assignee's outstanding principal of Advances before
  giving effect to this Assignment and Acceptance  $_____

 Aggregate outstanding principal of Advances assigned to
  the Assignee under this Assignment and Acceptance:  $_____

 Assignee's Commitment after giving effect to this
  Assignment and Acceptance:      $_____
 Assignee's outstanding principal of Advances after
  giving effect to this Assignment and Acceptance:  $_____

 Assignor's remaining Commitment after
  giving effect to this Assignment and Acceptance:  $_____
 Assignor's remaining outstanding principal of Advances
  after giving effect to this Assignment and Acceptance:  $_____

 Principal amount of Note payable to the Assignee:  $_____

 Principal amount of Note payable to the Assignor:  $_____

Section 3.
 Effective Date**:      ._____, 20__

      [NAME OF ASSIGNOR], as Assignor

      By: _____
      Name: _____
      Title: _____
      Dated: _____, _____

      [NAME OF ASSIGNEE], as Assignee

      By: _____
      Name: _____
      Title: _____

---

  **  This date should be no earlier than the date five Business Days after the delivery of this Assignment and Acceptance to the Paying Agent.

JPMUCI 0003293

Dated: _____, _____

Domestic Lending Office (and
    address for notices):

[Address]

Eurodoliar Lending Office:

[Address]

[Approved this ____ day of _____,
_____

ENRON CORP.

By: _____
Name: _____
Title: _____]***

Accepted [and Approved]*** this ___ day of
_____, _____

[NAME OF PAYING AGENT], as
    Paying Agent

By: _____
Name: _____
Title: _____

---

***Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Credit Agreement.

-2-

JPMUCI 0003294

EXHIBIT G-1

NEW BANK AGREEMENT

This New Bank Agreement dated as of _____, (this "Agreement") is by and among (i) Enron Corp., an Oregon corporation ("Borrower"), (ii) Citibank, N.A. in its capacity as Paying Agent under the U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 14, 2001 (as it may be amended or modified from time to time, the "Credit Agreement", capitalized terms that are defined in the Credit Agreement and not defined herein are used herein as therein defined) among the Borrower, the Co-Administrative Agents referred to therein, Citibank, N.A. in such capacity and the Banks party thereto, and (iii)_____("New Bank").

Preliminary Statements

1.      Pursuant to Section 2.18 of the Credit Agreement, the Borrower has the right, subject to the terms and conditions thereof, to add the Credit Agreement one or more banks or other financial institutions to replace the Commitments of Terminating Banks.

2.      The Borrower has given notice to the Paying Agent pursuant to Section 2.18 of the Credit Agreement of its intention to add the New Bank to the Credit Agreement as a Bank with a Commitment of $_____, and the Paying Agent is willing to consent thereto.

Accordingly, the parties hereto agree as follows:

        Section 1.  Addition of New Bank.  Pursuant to Section 2.18 of the Credit Agreement, the New Bank is hereby added to the Credit Agreement as a Bank with a Commitment of $_____ and a Stated Termination Date of _____ [date must be the same as the extended Stated Termination Date of the other Banks that are not Terminating Banks].  The New Bank specifies as its Domestic Lending Office and Eurodollar Lending Office the following:

        Domestic Lending      Address:
        Office:

                              Attention:
                              Telephone:
                              Telecopy:

        Eurodollar Lending    Address:
        Office:

                              Attention:
                              Telephone:
                              Telecopy:

        Section 2.  New Note.  The Borrower agrees to promptly execute and deliver to the New Bank a Note in the amount of its Commitment set forth in Section 1 above ("New Note").

        Section 3.  Consent.  The Paying Agent and the Borrower hereby consent to the addition of the New Bank effectuated hereby.

Section 4.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 5.  <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 6.  <u>Bank Credit Decision</u>.  The New Bank acknowledges that it has, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to agree to the various matters set forth herein.  The New Bank also acknowledges that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement.

Section 7.  <u>Representations and Warranties of the Borrower</u>.  The Borrower represents and warrants as follows:

(a)    The execution, delivery and performance by the Borrower of this Agreement and the New Note are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

(b)    This Agreement is a legal, valid and binding obligation of the Borrower and the New Note, when executed and delivered in accordance with this Agreement, will be a legal, valid and binding obligation of the Borrower, in each case enforceable against the Borrower in accordance with its respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(c)    After giving effect to this Agreement and any other New Bank Agreements and Commitment Increase Agreements, the Borrower will be in compliance with the limitation set forth in clause (a) of the proviso to the first sentence of Section 2.18 of the Credit Agreement.

(d)    No event has occurred and is continuing which constitutes an Event of Default.

(e)    No Advances are outstanding.

(f)    Attached hereto are resolutions duly adopted by the Board of Directors of the Borrower sufficient to authorize this Agreement and the New Note, and such resolutions are in full force and effect.

JPMUCI 0003296

Section 8. Default. Without limiting any other event that may constitute an Event of Default, in the event any representation or warranty of the Borrower set forth herein shall prove to have been incorrect in any material respect when made and such materiality is continuing, such event shall constitute an "Event of Default" under the Credit Agreement.

Section 9. Expenses. The Borrower agrees to pay on demand all costs and expenses of the Paying Agent in connection with the preparation, negotiation, execution and delivery of this Agreement and the New Note, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Paying Agent with respect thereto.

Section 10. Effectiveness. When, and only when, the Paying Agent shall have received counterparts of, or telecopied signature pages of, this Agreement executed by the Borrower, the Paying Agent and the New Bank, this Agreement shall become effective as of the date first written above. The Paying Agent shall provide a copy of this New Bank Agreement to the Co-Administrative Agents.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

ENRON CORP.

By: _____
Name: _____
Title: _____

PAYING AGENT:

CITIBANK, N.A., as Paying Agent

By: _____
Name: _____
Title: _____

NEW BANK:

By: _____
Name: _____
Title: _____

-3-

JPMUCI 0003297

EXHIBIT G-2

COMMITMENT INCREASE AGREEMENT

This Commitment Increase Agreement dated as of _____ (this "Agreement") is by and among (i) Enron Corp., an Oregon corporation ("Borrower"), (ii) Citibank, N.A. in its capacity as Paying Agent under the U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 14, 2001 (as it may be amended or modified from time to time, the "Credit Agreement", capitalized terms that are defined in the Credit Agreement and not defined herein are used herein as therein defined) among the Borrower, the Co-Administrative Agents referred to therein, Citibank, N.A. in such capacity and the Banks party thereto, and (iii) _____ ("Increasing Bank").

Preliminary Statements

1.      Pursuant to Section 2.18 of the Credit Agreement, the Borrower has the right, subject to the terms and conditions thereof, to agree with a Bank to increase that Bank's Commitment to replace the Commitments of Terminating Banks.

2.      The Borrower has given notice to the Paying Agent of its intention, pursuant to such Section 2.18 and with the consent of the Increasing Bank, to increase the Commitment of the Increasing Bank from $_____ to $_____, and the Paying Agent is willing to consent thereto.

Accordingly, the parties hereto agree as follows:

Section 1. Increase of Commitment. Pursuant to Section 2.18 of the Credit Agreement, the Commitment of the Increasing Bank is hereby increased from $_____ to $_____.

Section 2. New Note. The Borrower agrees to promptly execute and deliver to the Increasing Bank a Note in the amount of its increased Commitment set forth in Section 1 above (the "New Note"), and the Increasing Bank agrees to return to the Borrower, with reasonable promptness, the Note previously delivered to the Increasing Bank by the Borrower.

Section 3. Consent. The Paying Agent hereby consents to the increase in the Commitment of the Increasing Bank effectuated hereby.

Section 4. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 5. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 6. Bank Credit Decision. The Increasing Bank acknowledges that it has, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this

Agreement and to agree to the various matters set forth herein. The Increasing Bank also acknowledges that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement.

Section 7. Representations and Warranties of the Borrower. The Borrower represents and warrants as follows:

(a) The execution, delivery and performance by the Borrower of this Agreement and the New Note are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended. of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

(b) This Agreement is a legal, valid and binding obligation of the Borrower and the New Note, when executed and delivered in accordance with this Agreement, will be a legal, valid and binding obligation of the Borrower, in each case enforceable against the Borrower in accordance its respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(c) After giving effect to this Agreement and any other New Bank Agreements and Commitment Increase Agreements, the Borrower will be in compliance with the limitation set forth in clause (a) of the proviso to the first sentence of Section 2.18 of the Credit Agreement.

(d) No event has occurred and is continuing which constitutes an Event of Default.

(e) Attached hereto are resolutions duly adopted by the Board of Directors of the Borrower sufficient to authorize this Agreement and the New Note, and such resolutions are in full force and effect.

Section 8. Default. Without limiting any other event that may constitute an Event of Default, in the event any representation or warranty of the Borrower set forth herein shall prove to have been incorrect in any material respect when made, and such materiality is continuing, such event shall constitute an "Event of Default" under the Credit Agreement.

Section 9. Expenses. The Borrower agrees to pay on demand all costs and expenses of the Paying Agent in connection with the preparation, negotiation, execution and delivery of this Agreement and the New Note, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Paying Agent with respect thereto.

JPMUCI 0003299

Section 10. <u>Effectiveness</u>. When, and only when, the Paying Agent shall have received counterparts of, or telecopied signature pages of, this Agreement executed by the Borrower, the Paying Agent and the Increasing Bank, this Agreement shall become effective as of the date first written above. The Paying Agent shall provide a copy of this Commitment Increase Agreement to the Co-Administrative Agents.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

<u>BORROWER</u>:

ENRON CORP.

By: _____
Name: _____
Title: _____

<u>PAYING AGENT</u>:

CITIBANK, N.A., as Paying Agent

By: _____
Name: _____
Title: _____

<u>INCREASING BANK</u>:

_____

By: _____
Name: _____
Title: _____

-3-

JPMUCI 0003300

# SUPPLEMENTAL EXHIBIT 3

U.S. $1,750,000,000

364-DAY
REVOLVING CREDIT AGREEMENT

DATED AS OF
MAY 18, 2000

AMONG

ENRON CORP.,
*AS BORROWER*

AND

THE BANKS NAMED HEREIN,
*AS BANKS*

AND

CITIBANK, N.A.,
*AS PAYING AGENT*

AND

CITIBANK, N.A. AND THE CHASE MANHATTAN BANK
*AS CO-ADMINISTRATIVE AGENTS*

CO-LEAD ARRANGERS:

*SALOMON SMITH BARNEY INC.*
*AND*
*CHASE SECURITIES INC.*

SYNDICATION AGENT:

*BARCLAY BANK PLC*

DOCUMENTATION AGENT:

*ABN AMRO BANK N.V.*

NICHJJ7016951Y004046
HOUSTON\1122516.2

CONFIDENTIAL
CLH 002365

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
SECTION 1.02.    Computation of Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 1.03.    Accounting Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 1.04.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## ARTICLE II

### AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01.    The Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 2.02.    Making the Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 2.03.    Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
SECTION 2.04.    Repayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
SECTION 2.05.    Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
SECTION 2.06.    Additional Interest on LIBOR Advances . . . . . . . . . . . . . . . . . . . . . . . . 12
SECTION 2.07.    Interest Rate Determination and Protection . . . . . . . . . . . . . . . . . . . . . . 13
SECTION 2.08.    Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings . . . 14
SECTION 2.09.    Prepayments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
SECTION 2.10.    Increased Costs; Capital Adequacy, Etc . . . . . . . . . . . . . . . . . . . . . . . . 15
SECTION 2.11.    Illegality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SECTION 2.12.    Payments and Computations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SECTION 2.13.    Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
SECTION 2.14.    Sharing of Payments, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
SECTION 2.15.    Ratable Reduction or Termination of the Commitments; Effect of
                 Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
SECTION 2.16.    Replacement of Bank; Additional Right to Terminate Commitments . . . . . . . 19
SECTION 2.17.    Renewal of Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
SECTION 2.18.    Replacement of Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
SECTION 2.19.    Non-Ratable Reduction or Termination of Commitments . . . . . . . . . . . . . . 22
SECTION 2.20.    Certificates of Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## ARTICLE III

### CONDITIONS TO ADVANCES

SECTION 3.01.    Initial Condition Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
SECTION 3.02.    Additional Conditions Precedent to Each Advance . . . . . . . . . . . . . . . . . 24

CONFIDENTIAL
CLH 002366

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of the Borrower . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE V

COVENANTS OF THE BORROWER

SECTION 5.01.    Affirmative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 5.02.    Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARTICLE VI

EVENTS OF DEFAULT

SECTION 6.01.    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE VII

THE PAYING AGENT

SECTION 7.01.    Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.02.    Paying Agent's Reliance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
SECTION 7.03.    Paying Agent and Its Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.04.    Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.05.    Certain Rights of the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.06.    Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 7.07.    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 7.08.    Resignation by the Paying Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE VIII

THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01.    Authorization and Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.02.    Co-Administrative Agents' Reliance, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 8.03.    Co-Administrative Agents and Their Affiliates . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.04.    Bank Credit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.05.    Certain Rights of the Co-Administrative Agents . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.06.    Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.07.    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 8.08.    Resignation by the Co-Administrative Agents . . . . . . . . . . . . . . . . . . . . . . . . 36

CONFIDENTIAL
CLH 002367

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01.    Amendments, Etc. ................................................ 37
SECTION 9.02.    Notices, Etc. ................................................... 37
SECTION 9.03.    No Waiver; Remedies ............................................ 39
SECTION 9.04.    Costs, Expenses and Indemnity .................................. 39
SECTION 9.05.    Right of Set-Off .............................................. 40
SECTION 9.06.    Assignments and Participations ................................ 40
SECTION 9.07.    Governing Law; Entire Agreement ............................... 43
SECTION 9.08.    Interest ...................................................... 43
SECTION 9.09.    Confidentiality ............................................... 43
SECTION 9.10.    Execution in Counterparts ..................................... 44
SECTION 9.11.    Domicile of Loans ............................................. 44
SECTION 9.12.    Binding Effect ................................................ 44
SECTION 9.13.    Prior Credit Facilities ....................................... 44
SECTION 9.14.    Return of Notes ............................................... 44


Schedule I -    Applicable Lending Offices


Exhibit A    -    Form of Note
Exhibit B    -    Notice of Borrowing
Exhibit C    -    Opinion of Vinson & Elkins L.L.P., Counsel to Borrower
Exhibit D    -    Opinion of Executive Vice President and General Counsel of Borrower
Exhibit E    -    Opinion of Bracewell & Patterson, L.L.P., Counsel to the Paying Agent
Exhibit F    -    Form of Assignment and Acceptance
Exhibit G-1 -    New Bank Agreement
Exhibit G-2 -    Commitment Increase Agreement

CONFIDENTIAL
CLH 002368

## 364-DAY
### REVOLVING CREDIT AGREEMENT

Dated as of May 18, 2000

ENRON CORP., an Oregon corporation, the lenders party hereto, Citibank, N. A. and The Chase Manhattan Bank, as Co-Administrative Agents hereunder, and Citibank, N.A., as Paying Agent hereunder, agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined):

"Advance" means an advance by a Bank to the Borrower pursuant to Article II (as divided or combined from time to time as contemplated in the definition herein of "Borrowing"), and refers to a Base Rate Advance or a LIBOR Advance (each of which shall be a "Type" of Advance).

"Affected Lender" has the meaning specified in Section 2.11.

"Agreement" means this 364-Day Revolving Credit Agreement, as same may be amended, extended, supplemented or modified from time to time in the future.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of a Base Rate Advance and such Bank's Eurodollar Lending Office in the case of a LIBOR Advance.

"Applicable Margin" means, for any Interest Period, a rate per annum equal to 0.37%.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Bank and an Eligible Assignee, and accepted by the Paying Agent, in substantially the form of Exhibit F.

"Bankruptcy Code" means Title 11 of the United States Code, as now or hereafter in effect, or any successor thereto.

"Banks" means the lenders listed on the signature pages hereof and each Eligible Assignee that becomes a Bank party hereto pursuant to Section 2.16, Section 2.18 or Section 9.06(a), (b) and (d).

"Base Rate" means, for any period, a fluctuating interest rate per annum as shall be in effect from time to time which rate per annum shall at all times be equal to the highest of:

(a)    the rate of interest announced publicly by Citibank in New York, New York, from time to time, as Citibank's base rate; and

NJCHIJ016951N004046
HOUSTON\1122516.2

CONFIDENTIAL
CLH 002369

(b)    the sum (adjusted to the nearest ¼ of 1% or, if there is no nearest ¼ of 1%, to the next higher ¼ of 1%) of (i) ½ of one percent per annum plus (ii) the rate obtained by dividing (A) the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major United States money market banks, such three-week moving average (adjusted to the basis of a year of 360 days) being determined weekly on each Monday (or, if such day is not a Business Day, on the next succeeding Business Day) for the three-week period ending on the previous Friday by Citibank on the basis of such rates reported by certificate of deposit dealers to and published by the Federal Reserve Bank of New York or, if such publication shall be suspended or terminated, on the basis of quotations for such rates received by Citibank from three New York certificate of deposit dealers of recognized standing selected by Citibank, by (B) a percentage equal to 100% minus the average of the daily percentages specified during such three-week period by the Federal Reserve Board for determining the maximum reserve requirement (including, but not limited to, any emergency, supplemental or other marginal reserve requirement) for Citibank with respect to liabilities consisting of or including (among other liabilities) three-month Dollar non-personal time deposits in the United States, plus (iii) the average during such three-week period of the annual assessment rates estimated by Citibank for determining the then current annual assessment payable by Citibank to the Federal Deposit Insurance Corporation (or any successor) for insuring Dollar deposits of Citibank in the United States; and

(c)    the sum of ½ of one percent per annum plus the Federal Funds Rate in effect from time to time.

"Base Rate Advance" means an Advance which bears interest as provided in Section 2.05(a).

"Borrower" means Enron Corp., an Oregon corporation, and any successor thereto pursuant to Section 5.02(d)(ii).

"Borrowing" means a borrowing hereunder consisting of Advances of the same Type made on the same day by the Banks and, in the case of LIBOR Advances, having the same Interest Period; provided that (a) all Base Rate Advances outstanding at any time shall thereafter be deemed to be one Borrowing, and (b) subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08 and 2.11, on the last day of an Interest Period for a Borrowing comprised of LIBOR Advances, such Borrowing may be divided ratably to form multiple Borrowings comprised of LIBOR Advances (with the result that each Bank's Advance as a part of each such multiple Borrowing is proportionately the same as its Advance as a part of such divided Borrowing) or combined with all or a ratable portion of the Base Rate Advances or all or a ratable portion of one or more other Borrowings, the Interest Period for which also ends on such day, to form a new Borrowing comprised of LIBOR Advances, such division or combination to be made by notice from the Borrower given to the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the proposed division or combination specifying the date of such division or combination (which shall be a Business Day) and all other relevant information (such as the Borrowings or portions thereof to be divided or combined, the respective amounts of the Borrowings resulting from any such division, the relevant Interest Periods, the amount of the Base Rate Advances or other Borrowings or portions thereof to be so combined and such other information as the Paying Agent may request), but except as provided in the proviso to Section 2.07(f) in no event shall any LIBOR Borrowing resulting from, or remaining after, any such division or combination be less than $25,000,000, and in all cases each Bank's Advances as a part of each such combined, resultant or remaining Borrowing shall be proportionately the same as its Advances as a part of the relevant Borrowings prior to such division or combination. Each Borrowing comprised of a Type of Advance shall be that "Type" of Borrowing.

CONFIDENTIAL
CLH 002370

"Business Day" means (a) any day of the year except Saturday, Sunday and any day on which banks are required or authorized to close in New York City or Houston, Texas and (b) if the applicable Business Day relates to any LIBOR Advances, any day which is a "Business Day" described in clause (a) and which is also a day for trading by and between banks in the London interbank Eurodollar market.

"Chase" means The Chase Manhattan Bank, a New York banking corporation.

"Citibank" means Citibank, N. A., a national banking association.

"Co-Administrative Agents" means, collectively, Citibank and Chase, each in its capacity as a Co-Administrative Agent pursuant to Article VIII, and such term shall include any successor to either such entity in such capacity pursuant to Section 8.08. If at any time only one Person is serving as a Co-Administrative Agent hereunder, such term shall mean such Person.

"Code" means the Internal Revenue Code of 1986 as amended from time to time, or any successor Federal tax code, and any reference to any statutory provision of the Code shall be deemed to be a reference to any successor provision or provisions.

"Commitment" has the meaning specified in Section 2.01.

"Commitment Increase Agreement" means an agreement entered into by a Bank, the Borrower and the Paying Agent substantially in the form of Exhibit G-2.

"Consolidated" refers to the consolidation of the accounts of the Borrower and its Subsidiaries in accordance with GAAP.

"Consolidated Net Worth" means at any date the Consolidated stockholders' equity of the Borrower and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of the Borrower).

"Convert", "Conversion" and "Converted" each refers to a conversion of Advances or a Borrowing of one Type into Advances or a Borrowing of another Type, as the case may be, pursuant to Section 2.07, Section 2.08, Section 2.10(b) or Section 2.11.

"Debt" of any Person means, at any date, without duplication, its (a) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with GAAP, (b) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (c) guaranties of payment or collection of any obligations described in clauses (a) and (b) of other Persons, provided, that clauses (a) and (b) include, in the case of obligations of the Borrower or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; provided, further, that the liability of any Person as a general partner of a partnership for Debt of such partnership, if such partnership is not a Subsidiary of such Person, shall not constitute Debt.

"Default" means an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Dollars" and "$" means lawful money of the United States of America.

CONFIDENTIAL
CLH 002371

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Eligible Assignee" means (a) any Bank, and (b) with the consent of the Paying Agent and the Borrower (which consent will not be unreasonably withheld), any other commercial bank or financial institution not covered by clause (a) of this definition; provided, however, that neither the Borrower nor any Subsidiary of the Borrower shall be an Eligible Assignee.

"Enron Indenture" means that certain indenture dated as of November 1, 1985, between the Borrower (formerly InterNorth, Inc.) and Harris Trust and Savings Bank, as Trustee, as supplemented and amended by the First Supplemental Indenture dated as of December 1, 1995, the Supplemental Indenture, dated as of May 8, 1997, by and among Enron Corp. a Delaware corporation, the Borrower and Harris Trust and Savings Bank, as Trustee, the Third Supplemental Indenture, dated as of September 1, 1997, between the Borrower and Harris Trust and Savings Bank, as Trustee, and the Fourth Supplemental Indenture, dated as of August 17, 1999, between the Borrower and Harris Trust and Savings Bank, as Trustee, without giving effect to any further amendment or modification thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute of similar import, together with the regulations thereunder, as in effect from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a group of which the Borrower is a member and which is under common control within the meaning of the regulations under Section 414 of the Code.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board, as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Eurodollar Lending Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank (or, if no such office is specified, its Domestic Lending Office) or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Paying Agent.

"Events of Default" has the meaning specified in Section 6.01.

"Existing Commitments" has the meaning specified in Section 2.17 hereof.

"Existing Termination Date" has the meaning specified in Section 2.17 hereof.

"FDIC" means the Federal Deposit Insurance Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such

CONFIDENTIAL
CLH 002372

rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Paying Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any federal agency or authority of the United States from time to time succeeding to its function.

"GAAP" means United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements referred to in Section 4.01(d).

"Illegality Event" has the meaning specified in Section 2.11.

"Indemnified Parties" has the meaning specified in Section 9.04(c).

"Insufficiency" means, with respect to any Plan, the amount, if any, by which the present value of the accrued benefits under such Plan exceeds the fair market value of the assets of such Plan allocable to such benefits.

"Interest Period" means, with respect to each LIBOR Advance, in each case comprising part of the same Borrowing, the period commencing on the date of such Advance or the date of the Conversion of any Advance into (or the division or combination of any Borrowing resulting in) such an Advance and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one, two, three or six months (or, as to any Interest Period, such other period as the Borrower and the Banks may agree to for such Interest Period), in each case as the Borrower may, upon notice received by the Paying Agent not later than 11:00 A.M. on the third Business Day prior to the first day of such Interest Period (or, as to any Interest Period, at such other time as the Borrower and the Banks may agree to for such Interest Period), select; provided, however, that:

(a)      Interest Periods commencing on the same date for Advances comprising part of the same Borrowing shall be of the same duration;

(b)      whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(c)      any Interest Period which begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month in which such Interest Period would have ended if there were a numerically corresponding day in such calendar month; and

(d)      no Interest Period may end after the Termination Date.

"LIBO Rate" means, for any Interest Period for each LIBOR Advance comprising part of the same Borrowing, (a) the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to

CONFIDENTIAL
CLH 002373

the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period; (b) if for any reason the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page), the rate per annum (rounded upward, if not an integral multiple of 1/100 of 1%, to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 a.m. (London time) two business days before the first day of such Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page (or any successor page), the applicable rate shall be the arithmetic mean of all such rates; and (c) if the rate specified in clause (a) of this definition does not so appear on Telerate Page 3750 (or any successor page) and if no rate specified in clause (b) of this definition so appears on Reuters Screen LIBO page (or any successor page), the interest rate per annum (rounded upward to the nearest whole multiple of 1/16 of 1% per annum if such rate is not such a multiple) equal to the rate per annum at which deposits in Dollars are offered by the principal office of the Reference Bank in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such Interest Period in an amount substantially equal to the amount of the LIBOR Advance of the Reference Bank comprising part of such Borrowing and for a period equal to such Interest Period. If the LIBO Rate is determined pursuant to clause (c) of this definition, such determination shall be made by the Paying Agent on the basis of the applicable rate furnished to and received by the Paying Agent from the Reference Bank two Business Days before the first day of such Interest Period, subject, however, to the provisions of Section 2.07.

"LIBOR Advance" means an Advance which bears interest as provided in Section 2.05(b).

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Advances.

"Loan Document" means this Agreement, each Note, each Notice of Borrowing and each other document or instrument executed and delivered in connection with this Agreement.

"Losses" has the meaning specified in Section 9.04(c).

"Majority Banks" means at any time Banks holding at least 51% of the then aggregate unpaid principal amount of the Notes held by Banks, or, if no such principal amount is then outstanding, Banks having at least 51% of the Commitments.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means an employee benefit plan, other than a Multiemployer Plan, subject to Title IV of ERISA to which the Borrower or any ERISA Affiliate, and more than one employer other than the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

CONFIDENTIAL
CLH 002374

"New Bank Agreement" means an agreement entered into by a bank or other financial institution, the Borrower and the Paying Agent, substantially in the form of Exhibit G-1.

"Note" means a promissory note of the Borrower payable to the order of any Bank, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to such Bank resulting from the Advances owed to such Bank.

"Notice of Borrowing" has the meaning specified in Section 2.02.

"Other Taxes" has the meaning specified in Section 2.13(c).

"Paying Agent" means Citibank in its capacity as Paying Agent pursuant to Article VII and any successor in such capacity pursuant to Section 7.08.

"Payment Office" means the office of the Paying Agent located at 399 Park Avenue, New York, New York 10043 or such other office as the Paying Agent may designate by written notice to the other parties hereto.

"PBGC" means the Pension Benefit Guaranty Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, firm or other entity, or a government or any political subdivision or agency, department or instrumentality thereof.

"Plan" means an employee benefit plan (other than a Multiemployer Plan) which is (or, in the event that any such plan has been terminated within five years after a transaction described in Section 4069 of ERISA, was) maintained for employees of the Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Preferred Stock" means, as applied to any corporation, shares of such corporation which shall be entitled to preference or priority over any other shares of such corporation in respect of either the payment of dividends or the distribution of assets upon liquidation.

"Prescribed Forms" shall mean such duly executed form(s) or statement(s), and in such number of copies, which may, from time to time, be prescribed by law and which, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Bank providing the form(s) or statement(s), (b) the Code, or (c) any applicable rule or regulation under the Code, permit the Borrower to make payments hereunder for the account of such Bank free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Code or any such rule or regulation).

"Principal Subsidiary" means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which the Borrower has not guaranteed payment) equal to or greater than 5% of the Borrower's consolidated assets; provided that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date of determination) without regard to the consolidated assets test described above in this definition: Houston

CONFIDENTIAL
CLH 002375

Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron North America Corp., and Enron Pipeline Company. For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recent quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of the Borrower shall be determined based on the most recent quarterly or annual consolidated financial statements of the Borrower available prior to such determination.

"Prior Credit Facilities" means (a) the Revolving Credit Agreement dated as of August 3, 1999, among the Borrower, the banks party thereto and Citibank, as agent for such banks, and (b) the Second Amended and Restated Revolving Credit Agreement dated as of December 3, 1996, as amended to the date hereof, among the Borrower, the banks party thereto and Chase, as agent for such banks.

"Redeemable" means, as applied to any Preferred Stock, any Preferred Stock which (a) the issuer undertakes to redeem at a fixed or determinable date or dates (other than pursuant to the exercise of an option to redeem by the issuer, if the failure to exercise such option would not materially adversely affect the business, consolidated financial position or consolidated results of operations of the issuer and its subsidiaries taken as a whole), whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer, or (b) is redeemable at the option of the holder.

"Reference Bank" means Citibank.

"Register" has the meaning specified in Section 9.06(c).

"Standard & Poor's" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. on the date hereof.

"Stated Termination Date" means, as to any Bank, May 16, 2001 or such later date, if any, as may be in effect as to such Bank pursuant to Section 2.17.

"Subordinated Debt" means, (a) the 8.25% Senior Subordinated Debentures due 2012 and the 6 3/4% Senior Subordinated Debentures due July 1, 2005 of the Borrower issued pursuant to the Indenture dated as of February 1, 1987 between the Borrower and NationsBank of Texas, N.A., as trustee, (b) the obligations of Borrower under the Loan Agreement dated as of November 15, 1993, between Borrower and Enron Capital L.L.C., (c) the obligations of Borrower under the Loan Agreement dated as of August 3, 1994, between Borrower and Enron Capital Resources, L.P., (d) the 7.75% Subordinated Debentures due 2016 of the Borrower issued pursuant to the Indenture dated as of November 21, 1996 between the Borrower and The Chase Manhattan Bank, Trustee, (e) the 7.75% Subordinated Debentures due 2016, Series II of the Borrower issued pursuant to the Indenture dated as of January 16, 1997 between the Borrower and The Chase Manhattan Bank, Trustee, (f) the Adjustable Rate Debentures, Series A issued pursuant to the Indenture dated as of June 6, 1997 between the Borrower and The Chase Manhattan Bank, as Indenture Trustee, and (g) any Debt of the Borrower which is subordinate to any other obligations of the Borrower so long as (i) the terms of such Debt are (x) substantially similar to and no less favorable to the holders of Senior Indebtedness (as defined in the Indenture dated as of February 1, 1987 referenced in clause (a) of this definition ) than the terms of such Senior Subordinated Debentures due 2012 of the Borrower (and the parties confirm that it is their intention that all principal of and interest on the Advances constitute "Senior Indebtedness" for the purposes thereof) or (y) consented to by the Majority Banks (which consent will not be unreasonably withheld), and (ii) no payments of principal shall be payable (whether by scheduled maturity, required prepayment, or otherwise, unless as a result of the acceleration of such Debt in accordance with the terms thereof) under such Debt prior to June 1, 2005.

CONFIDENTIAL
CLH 002376

"Subsidiary" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of the Borrower, unless such entity is a Consolidated Subsidiary of the Borrower, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with GAAP. Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of the Borrower.

"Taxes" has the meaning specified in Section 2.13(a).

"Terminating Bank" has the meaning specified in Section 2.17.

"Termination Date" means the earlier of (a) the Stated Termination Date (if the Stated Termination Date has been extended pursuant to Section 2.17, then the Stated Termination Date for purposes of this clause (a) will be the Stated Termination Date of the Bank or Banks that have the latest Stated Termination Date), and (b) the earlier date of termination in whole of the Commitments pursuant to this Agreement.

"Termination Event" means (a) a "reportable event", as such term is described in Section 4043 of ERISA (other than a "reportable event" not subject to the provision for 30-day notice to the PBGC), or an event described in Section 4062(e) of ERISA, or (b) the withdrawal of the Borrower or any ERISA Affiliate from a Multiple Employer Plan during a plan year in which it was a "substantial employer", as such term is defined in Section 4001(a)(2) of ERISA, or the incurrence of liability by the Borrower or any ERISA Affiliate under Section 4064 of ERISA upon the termination of a Multiple Employer Plan, or (c) the distribution of a notice of intent to terminate a Plan pursuant to Section 4041(a)(2) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Total Capitalization" means, at any time, the sum (without duplication) of (a) Total Senior Debt, (b) the total outstanding principal amount (or the book carrying amount of such Debt if issued at a discount) of Subordinated Debt of the Borrower and its Consolidated Subsidiaries, (c) Consolidated Net Worth less any amount thereof attributable to "minority interests" (as defined below), and (d) Redeemable Preferred Stock of the Borrower and its Consolidated Subsidiaries. For the purpose of this definition, "minority interests" means any investment or interest of the Borrower in any corporation, partnership or other entity to the extent that the total amount thereof owned by the Borrower (directly or indirectly) constitutes 50% or less of all outstanding interests or investments in such corporation, partnership or entity.

"Total Senior Debt" means, at any time, all Consolidated Debt of the Borrower and its Consolidated Subsidiaries other than Subordinated Debt.

"Type" has the meaning specified in the definition of the term "Advance" (with respect to an Advance) and in the definition of the term "Borrowing" (with respect to a Borrowing).

CONFIDENTIAL
CLH 002377

"Withdrawal Liability" shall have the meaning given such term under Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Unless otherwise indicated, all references to a particular time are references to New York City time.

SECTION 1.03.    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based on, GAAP; provided, however, the financial statements and reports required pursuant to Sections 5.01(a)(i) and (viii) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

SECTION 1.04.    Miscellaneous.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Schedule and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified.  The term "including" shall mean "including, without limitation,".

## ARTICLE II

## AMOUNT AND TERMS OF THE ADVANCES

SECTION 2.01.    The Advances.  Each Bank severally agrees, on the terms and conditions hereinafter set forth, to make one or more Advances to the Borrower from time to time on any Business Day during the period from the date hereof until the Stated Termination Date for such Bank in an aggregate amount not to exceed at any time outstanding the amount set opposite such Bank's name on the signature pages hereof or, if such Bank has entered into any Assignment and Acceptance, New Bank Agreement or Commitment Increase Agreement, set forth for such Bank in the Register maintained by the Paying Agent pursuant to Section 9.06(c), as such amount may be adjusted pursuant to Section 2.15, Section 2.16, Section 2.17, Section 2.18, Section 2.19 or Section 6.01 (such Bank's "Commitment"); provided, that no Advance shall be required to be made, except as part of a Borrowing that is in an aggregate amount not less than (a) in the case of a Borrowing comprised of LIBOR Advances, $25,000,000 and (b) in the case of a Borrowing comprised of Base Rate Advances, $15,000,000, and each Borrowing shall consist of Advances of the same Type having (in the case of a Borrowing comprised of LIBOR Advances) the same Interest Period, made on the same day by the Banks ratably according to their respective Commitments.  Within the limits of each Bank's Commitment, the Borrower may borrow, prepay pursuant to Section 2.09 and reborrow under this Section 2.01.  Subject to the terms and conditions hereof, more than one Borrowing may be made on the same Business Day, including more than one LIBOR Borrowing (with the Advances comprising each LIBOR Borrowing made on such Business Day having a different Interest Period from the Advances comprising each other LIBOR Borrowing made on such Business Day).

SECTION 2.02.    Making the Advances.  (a) Each Borrowing shall be made on notice, given not later than 11:00 A.M. (x) in the case of a proposed Borrowing comprised of LIBOR Advances, at least three Business Days prior to the date of the proposed Borrowing (or, as to any proposed Borrowing comprised of LIBOR Advances, at such other time as the Borrower and the Banks may agree to for such proposed Borrowing) and (y) in the case of a proposed Borrowing comprised of Base Rate Advances, on the day of

CONFIDENTIAL
CLH 002376

the proposed Borrowing, by the Borrower to the Paying Agent, which shall give to each Bank prompt notice thereof by telex or telecopy. Each such notice of a Borrowing (a "Notice of Borrowing") shall be by telex or telecopy, confirmed immediately in writing, in substantially the form of Exhibit B hereto, specifying therein the requested (i) date of such Borrowing, (ii) Type of Advances comprising such Borrowing, (iii) aggregate amount of such Borrowing, and (iv) in the case of a Borrowing comprised of LIBOR Advances, initial Interest Period for each such Advance, provided that the Borrower may not specify LIBOR Advances for any Borrowing if, after giving effect to such Borrowing, LIBOR Advances having more than four different Interest Periods shall be outstanding. In the case of a proposed Borrowing comprised of LIBOR Advances, the Paying Agent shall promptly notify each Bank of the applicable interest rate under Section 2.05(b). Each Bank shall, before 11:00 A.M. (2:00 P.M. in the case of a Borrowing comprised of Base Rate Advances) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Paying Agent at its Payment Office, in same day funds, such Bank's ratable portion of such Borrowing. After the Paying Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Paying Agent will make such funds available to the Borrower at the Paying Agent's aforesaid address.

(b)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower. In the case of any Borrowing which the related Notice of Borrowing specifies is to be comprised of LIBOR Advances, the Borrower shall indemnify each Bank against any loss, cost or expense incurred by such Bank as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund the Advance to be made by such Bank as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(c)    Unless the Paying Agent shall have received notice from a Bank prior to the date of any Borrowing that such Bank will not make available to the Paying Agent such Bank's ratable portion of such Borrowing, the Paying Agent may assume that such Bank has made such portion available to the Paying Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Paying Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Bank shall not have so made such ratable portion available to the Paying Agent, such Bank and the Borrower severally agree to repay to the Paying Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Paying Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to Advances comprising such Borrowing and (ii) in the case of such Bank, the Federal Funds Rate. If such Bank shall repay to the Paying Agent such corresponding amount, such amount so repaid shall constitute such Bank's Advance as part of such Borrowing for purposes of this Agreement.

(d)    The failure of any Bank to make the Advance to be made by it as part of any Borrowing shall not relieve any other Bank of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Bank shall be responsible for the failure of any other Bank to make the Advance to be made by such other Bank on the date of any Borrowing.

SECTION 2.03.    Fees. (a) Facility Fee. The Borrower agrees to pay to the Paying Agent for the account of each Bank a facility fee on the average daily amount of such Bank's Commitment, whether or not used, from the date hereof in the case of each Bank listed on the signature pages hereof and from the effective date specified in the Assignment and Acceptance or New Bank Agreement pursuant to which it became a Bank in the case of each other Bank until the Stated Termination Date for such Bank at a rate per annum

CONFIDENTIAL
CLH 002379

equal to 0.08%. The facility fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2000, and on the Termination Date, and, with respect to facility fees owed to any Terminating Bank, on the Stated Termination Date applicable to such Bank.

(b)    Co-Administrative Agents' and Paying Agent's Fee. The Borrower shall pay to each of the Co-Administrative Agents and the Paying Agent such fees as may be separately agreed to by it and such Co-Administrative Agents or the Paying Agent, as the case may be.

SECTION 2.04.   Repayment. The Borrower shall repay the unpaid principal amount of each Advance owed to each Bank in accordance with the Note to the order of such Bank. With respect to each Bank, all Advances owed to such Bank shall be due and payable on the Stated Termination Date applicable to such Bank or such earlier date such Advances are due and payable to such Bank pursuant to any other provision of this Agreement.

SECTION 2.05.   Interest. The Borrower shall pay interest on the unpaid principal amount of each Advance owed to each Bank from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(a)    Base Rate Advances. During such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the Base Rate in effect from time to time, payable quarterly on the last day of each March, June, September and December during such periods and on the date such Base Rate Advance shall be Converted (in whole or in part), changed (in whole or in part) as a result of any division or combination of any Borrowing, or paid in full; provided that any amount of principal (other than principal of LIBOR Advances bearing interest pursuant to the proviso to Section 2.05(b)) which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the sum of 2% per annum plus the Base Rate in effect from time to time.

(b)    LIBOR Advances. During such periods as such Advance is a LIBOR Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of the LIBO Rate for such Interest Period for such Advance plus the Applicable Margin per annum for such Interest Period, payable on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on the day which occurs during such Interest Period three months from the first day of such Interest Period; provided that any amount of principal of any LIBOR Advance which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the greater of (x) the sum of 2% per annum plus the Base Rate in effect from time to time and (y) the sum of 2% per annum plus the rate per annum required to be paid on such Advance immediately prior to the date on which such amount became due.

SECTION 2.06.   Additional Interest on LIBOR Advances. If any Bank is required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, and if as a result thereof there is an increase in the cost to such Bank of agreeing to make or making, funding or maintaining LIBOR Advances, then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), unless such Bank withdraws its demand for such additional amounts pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a), pay to the Paying Agent for the account of such Bank additional amounts, as additional interest hereunder, sufficient to compensate such Bank for such increased cost.

CONFIDENTIAL
CLH 002380

SECTION 2.07.    Interest Rate Determination and Protection.  (a) If at any time the LIBO Rate is determined pursuant to clause (c) of the definition herein of LIBO Rate, the Reference Bank agrees to furnish to the Paying Agent timely information for the purpose of determining such LIBO Rate.  If at any time the Base Rate is determined pursuant to clause (a) or clause (b) of the definition herein of Base Rate and if Citibank is not the Paying Agent at such time, Citibank agrees to furnish to the Paying Agent timely information with respect to the determination of such Base Rate.  In cases other than specified in the first two sentences of this Section 2.07(a), the Paying Agent shall determine the applicable rate of interest.

(b)     The Paying Agent shall give prompt notice to the Borrower and the Banks of the applicable interest rate determined by the Paying Agent for purposes of Section 2.05(a) or (b), the applicable rate, if any, furnished by the Reference Bank pursuant to clause (c) of the definition herein of LIBO Rate for the purpose of determining the applicable interest rate under Section 2.05(b), and the applicable rate, if any, furnished by Citibank pursuant to the penultimate sentence of Section 2.07(a) with respect to the determination of the Base Rate for purposes of the applicable interest rate under Section 2.05(a).

(c)     If the Paying Agent is unable to obtain timely information for determining the LIBO Rate for any LIBOR Advances,

(i)     the Paying Agent shall forthwith notify the Borrower and the Banks that the interest rate cannot be determined for such LIBOR Advances,

(ii)     each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(iii)     the obligation of the Banks to make, or to Convert Advances or Borrowings into, or make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(d)     If, with respect to any LIBOR Advances, the Majority Banks notify the Paying Agent that the applicable interest rate for any Interest Period for such Advances will not adequately reflect the cost to such Majority Banks of making, funding or maintaining their respective LIBOR Advances for such Interest Period, the Paying Agent shall forthwith so notify the Borrower and the Banks, whereupon

(i)     each such Advance will automatically, on the last day of the then existing Interest Period therefor, Convert into a Base Rate Advance (or, if such Advance is then a Base Rate Advance, will continue as a Base Rate Advance), and

(ii)     the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the Paying Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist.

(e)     If the Borrower shall fail to select the duration of any Interest Period for any LIBOR Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Paying Agent will forthwith so notify the Borrower and the Banks and such Advances will automatically, on the last day of the then existing Interest Period therefor, Convert into Base Rate Advances.

CONFIDENTIAL
CLH 002381

(f)     On the date on which the aggregate unpaid principal amount of Advances comprising any LIBOR Borrowing shall be reduced, by payment or prepayment or otherwise, to less than $25,000,000, such Advances shall automatically Convert into Base Rate Advances, and on and after such date the right of the Borrower to Convert such Advances into LIBOR Advances shall terminate; provided, however, that if and so long as each such Advance shall be of the same Type and have an Interest Period ending on the same date as Advances comprising another Borrowing or other Borrowings, and the aggregate unpaid principal amount of all such Advances of all such Borrowings shall equal or exceed $25,000,000, the Borrower shall have the right to continue all such Advances as, or to Convert all such Advances into, Advances of such Type having an Interest Period ending on such date.

SECTION 2.08.     Voluntary Conversion of Borrowings; Continuation of LIBOR Borrowings.
(a) The Borrower may on any Business Day, upon notice given to the Paying Agent not later than 11:00 A.M. (x) in the case of a proposed Conversion into a LIBOR Borrowing, on the third Business Day prior to the date of the proposed Conversion and (y) in the case of a proposed Conversion into a Base Rate Borrowing, on the date of the proposed Conversion and subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11, Convert all or any portion of a Borrowing of one Type into a Borrowing of another Type; provided, however, that any Conversion of any LIBOR Borrowing shall be made on, and only on, the last day of an Interest Period for such LIBOR Borrowing. Each such notice of a Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Borrowing (or identified portion thereof) to be Converted and the Type into which it is to be Converted, and (iii) if such Conversion is into a LIBOR Borrowing, the duration of the Interest Period for each LIBOR Advance comprising such LIBOR Borrowing.

(b)     The Borrower may continue all or any portion of any LIBOR Borrowing as a LIBOR Borrowing for an additional Interest Period that complies with the requirements set forth in the definition herein of "Interest Period," by giving notice of such Interest Period as set forth in such definition, subject to the limitations in Section 2.02(a) as to the number of permitted Interest Periods and subject to the provisions of Sections 2.07, 2.08(c) and 2.11.

(c)     All Borrowings, Conversions and continuations under this Agreement shall be effected in a manner that (i) treats all Banks ratably (including, for example, effecting Conversions of any portion of a Borrowing in a manner that results in each Bank retaining its same ratable percentage of both the Converted portion and the remaining portion not Converted), and (ii) in the case of LIBOR Borrowings, results in each LIBOR Borrowing (including, in the case of any Conversion of a portion of a LIBOR Borrowing, both the Converted portion and the remaining portion not Converted) being in an amount not less than $25,000,000; provided, that clause (ii) immediately above shall not limit the Borrower's rights under the proviso of Section 2.07(f). Upon Conversion of any Borrowing, or portion thereof, into a particular Type, all Advances comprising such Borrowing or portion thereof, as the case may be, will be deemed Converted into Advances of such Type.

SECTION 2.09.     Prepayments.  The Borrower may (a) in respect of LIBOR Advances, upon at least three Business Days' notice, and (b) in respect of Base Rate Advances, upon notice by 11:00 A.M. on the day of the proposed prepayment, to the Paying Agent stating the proposed date and aggregate principal amount of the prepayment and the Types of Advances to be prepaid, and in the case of LIBOR Advances, the specific Borrowing or Borrowings to be prepaid in whole or in part, and if such notice is given the Borrower shall, prepay the outstanding principal amounts of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the principal amount prepaid without premium or penalty; provided, however, that each partial prepayment shall be in an aggregate principal amount not less than $10,000,000, and provided further, that if the Borrower

CONFIDENTIAL
CLH 002382

prepays any LIBOR Advance on any day other than the last day of an Interest Period therefor, the Borrower shall compensate the Banks pursuant to Section 9.04(b).

SECTION 2.10.    Increased Costs; Capital Adequacy, Etc.  (a) If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), there shall be any increase in the cost to any Bank of agreeing to make or making, funding or maintaining LIBOR Advances (other than increased costs described in Section 2.06 or in Section 2.10 (c) below), then the Borrower shall from time to time, upon demand by such Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank additional amounts sufficient to compensate such Bank for such increased cost unless such Bank shall have withdrawn its demand for additional compensation for such increased cost pursuant to Section 2.16(b) or the Borrower is not obligated to pay such amounts pursuant to Section 2.16(a).

(b)    If the Borrower so notifies the Paying Agent within five Business Days after any Bank notifies the Borrower of any increased cost pursuant to the provisions of Section 2.10(a), the Borrower shall Convert all Advances of the Type affected by such increased cost of all Banks then outstanding into Advances of another Type in accordance with Section 2.08 and, additionally, reimburse such Bank for such increased cost in accordance with Section 2.10(a).

(c)    If any Bank shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency (except to the extent such request or directive arises as a result of the individual creditworthiness of such Bank), has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder, such Bank shall have the right to give prompt written notice and demand for payment thereof to the Borrower with a copy to the Paying Agent (which notice and demand shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate such Bank for the increased cost to such Bank as a result of such increase in capital and shall certify that such costs are generally being charged by such Bank to other similarly situated borrowers under similar credit facilities) although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Borrower's obligations to pay additional amounts pursuant to Section 2.10(c), and subject to Section 2.16, the Borrower shall pay such additional amounts.

(d)    Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.10 or to eliminate the amount of any such increased cost which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(e)    No Bank shall be entitled to recover increased costs pursuant to Section 2.10, (a) incurred or accruing more than 90 days prior to the date on which such Bank sent to the Borrower a written notice and

CONFIDENTIAL
CLH 002383

demand for payment as specified in this Section 2.10, or (b) to the extent that such increased costs have resulted from the failure of such Bank to have complied with Section 2.10(d).

SECTION 2.11.  Illegality.  Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any governmental authority, central bank or comparable agency shall assert that it is unlawful (such unlawfulness or such assertion of unlawfulness being an "Illegality Event"), for any Bank or its Eurodollar Lending Office (such a Bank being an "Affected Lender") to perform its obligations hereunder to make LIBOR Advances or to continue to fund or maintain LIBOR Advances hereunder, then, on notice thereof and demand therefor by such Bank to the Borrower through the Paying Agent, (a) the obligation of the Banks to make, or to Convert Advances or Borrowings into, or to make divisions or combinations of Borrowings resulting in, LIBOR Advances or LIBOR Borrowings shall be suspended until the time set forth in the next succeeding sentence, and (b) the Borrower shall forthwith Convert all LIBOR Advances of all Banks then outstanding into Advances of another Type in accordance with Section 2.08.  The suspension of the obligation of the Banks to make LIBOR Advances or to continue to fund or maintain LIBOR Advances, as set forth in the preceding sentence, shall terminate upon the earliest to occur of the following: (i) the withdrawal by each Affected Lender of its notice and demand with respect to the Illegality Event referenced in this Section 2.11, (ii) the replacement by the Borrower of each Affected Lender pursuant to Section 2.16(a) hereof with an Eligible Assignee that is not an Affected Lender and (iii) the termination by the Borrower of each Affected Lender pursuant to Section 2.16(b) hereof.  If an Illegality Event has ceased to exist with respect to a Bank that has given notice and demand with respect to such Illegality Event pursuant to Section 2.11, such Bank shall promptly withdraw such notice and demand by giving written notice of withdrawal to the Paying Agent and the Borrower.  Upon termination of such suspension pursuant to clause (i), (ii) or (iii) above, as applicable, the Paying Agent shall notify each Bank and the Co-Administrative Agents of such termination, and the Banks shall thereupon again be obligated to make LIBOR Advances and LIBOR Borrowings and to continue to fund, maintain and Convert LIBOR Advances and LIBOR Borrowings in each case in accordance with and to the extent provided in this Agreement.

SECTION 2.12.  Payments and Computations.  (a) The Borrower shall make each payment under any Loan Document not later than 11:00 A.M. on the day when due in Dollars to the Paying Agent at its Payment Office in same day funds.  The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or facility fees ratably (other than amounts payable pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17, 2.19 or 9.04) to the Banks (decreased, as to any Bank, for any taxes withheld in respect of such Bank as contemplated by Section 2.13(b)) for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.06(d), from and after the effective date specified in such Assignment and Acceptance, the Paying Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the Bank assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.  At the time of each payment of any principal of or interest on any Borrowing to the Paying Agent, the Borrower shall notify the Paying Agent of the Borrowing to which such payment shall apply.  In the absence of such notice the Paying Agent may specify the Borrowing to which such payment shall apply.

(b)     All computations of interest based on the Base Rate (except during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof) and of facility fees shall be made by the Paying Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest

CONFIDENTIAL
CLH 002384

based on the LIBO Rate, the Federal Funds Rate or, during such times as the Base Rate is determined pursuant to clause (c) of the definition thereof, the Base Rate shall be made by the Paying Agent, and all computations of interest pursuant to Section 2.06 shall be made by a Bank, on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or facility fees are payable. Each determination by the Paying Agent (or, in the case of Section 2.06, by a Bank) of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)    Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or facility fees, as the case may be; provided, however, if such extension would cause payment of interest on or principal of LIBOR Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)    Unless the Paying Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Banks hereunder that the Borrower will not make such payment in full, the Paying Agent may assume that the Borrower has made such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such due date an amount equal to the amount then due such Bank. If and to the extent the Borrower shall not have so made such payment in full to the Paying Agent, each Bank shall repay to the Paying Agent forthwith on demand such amount distributed to such Bank together with interest thereon, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Paying Agent, at the Federal Funds Rate.

SECTION 2.13.    Taxes. (a) Any and all payments by the Borrower hereunder or under the Notes shall be made, in accordance with Section 2.12, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of each Bank and the Paying Agent, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) such Bank or Paying Agent (as the case may be) is organized or any political subdivision thereof and, in the case of each Bank, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction of such Bank's Applicable Lending Office or any political subdivision thereof and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof (or, with respect to any entity that becomes a Bank after the date hereof, on the date such entity becomes a Bank), to payments to be made to such Bank or the Paying Agent (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Note to any Bank or the Paying Agent, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.13) such Bank or the Paying Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Notwithstanding anything to the contrary contained in this Agreement, each of the Borrower and the Paying Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts

CONFIDENTIAL
CLH 002385

payable hereunder for the account of any Bank (without the payment by the Borrower of increased amounts to such Bank pursuant to clause (a) above) other than a Bank (i) which is a domestic corporation (as such term is defined in Section 7701 of the Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Borrower and the Paying Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Borrower shall so deduct or withhold any such taxes, it shall provide a statement to the Paying Agent and such Bank, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation which such Bank or the Paying Agent may reasonably request for assisting such Bank or the Paying Agent to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Bank is subject to tax.

(c)     In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or under the Notes or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Notes (hereinafter referred to as "Other Taxes").

(d)     The Borrower, to the fullest extent permitted by law, will indemnify each Bank and the Paying Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.13) paid by such Bank or the Paying Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of such Bank or Paying Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be made within 30 days from the date such Bank or the Paying Agent (as the case may be) makes written demand therefor.  No Bank nor the Paying Agent shall be indemnified for Taxes incurred or accrued more than 90 days prior to the date that such Bank or the Paying Agent notifies the Borrower thereof.

(e)     Within 30 days after the date of any payment of Taxes by or at the direction of the Borrower, the Borrower will furnish to the Paying Agent, at its address referred to in Section 9.02, (i) the original or a certified copy of a receipt evidencing payment thereof, if the relevant taxing authority provides a receipt, or (ii) if the relevant taxing authority does not provide a receipt, other reasonable evidence of the payment thereof.  Should any Bank or the Paying Agent ever receive any refund, credit or deduction from any taxing authority to which such Bank or the Paying Agent would not be entitled but for the payment by the Borrower of Taxes as required by Section 2.13 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund, credit or deduction shall be made by such Bank or the Paying Agent in its sole discretion), such Bank or the Paying Agent, as the case may be, thereupon shall repay to the Borrower an amount with respect to such refund, credit or deduction equal to any net reduction in taxes actually obtained by such Bank or the Paying Agent, as the case may be, and determined by such Bank or the Paying Agent, as the case may be, to be attributable to such refund, credit or deduction.

(f)     Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Applicable Lending Office or change the jurisdiction of its Applicable Lending Office, as the case may be, so as to avoid the imposition of any Taxes or Other Taxes or to eliminate the amount of any such additional amounts which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Applicable Lending Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

CONFIDENTIAL
CLH 002386

(g)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.13 shall survive the payment in full of principal and interest hereunder and under the Notes.

SECTION 2.14.     Sharing of Payments, Etc.  If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances made by it (other than pursuant to Section 2.06, 2.10, 2.13, 2.16, 2.17, 2.19 or 9.04) in excess of its ratable share of payments on account of the Advances obtained by all the Banks, such Bank shall forthwith purchase from the other Banks such participations in the Advances made by them as shall be necessary to cause such purchasing Bank to share the excess payment ratably with each of them, provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, such purchase from each Bank shall be rescinded and such Bank shall repay to the purchasing Bank the purchase price to the extent of its ratable share (according to the proportion of (i) the amount of the participation purchased from such Bank as a result of such excess payment to (ii) the total amount of such excess payment) of such recovery together with an amount equal to such Bank's ratable share (according to the proportion of (i) the amount of such Bank's required repayment to (ii) the total amount so recovered from the purchasing Bank) of any interest or other amount paid or payable by the purchasing Bank in respect of the total amount so recovered. The Borrower agrees that any Bank so purchasing a participation from another Bank pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Bank were the direct creditor of the Borrower in the amount of such participation.

SECTION 2.15.     Ratable Reduction or Termination of the Commitments; Effect of Termination. The Borrower shall have the right, upon at least three Business Days' notice to the Paying Agent, to terminate in whole or reduce ratably in part the unused portions of the respective Commitments of the Banks (with the signature pages hereto deemed amended to reflect same), provided that each partial reduction shall be in the aggregate amount of at least $10,000,000.  Upon and at all times after any Commitment of any Bank is terminated pursuant to any provision of this Agreement, such Commitment shall be zero and such Bank shall have no further obligation to make any Advances.

SECTION 2.16.     Replacement of Bank; Additional Right to Terminate Commitments.  In the event that any Bank demands payment pursuant to Section 2.06, 2.10 or 2.13, or any Bank becomes an Affected Bank as set forth in Section 2.11, the Borrower shall have the right, within 45 days after the date of the giving by such Bank of any notice or demand required or otherwise permitted to be given pursuant to Section 2.06, 2.10, 2.11 or 2.13 and if no Event of Default or Default then exists, to either replace such Bank in accordance with the procedure set forth in Section 2.16(a) or terminate such Bank's Commitment in accordance with the procedure set forth in Section 2.16(b).

(a)     If the Borrower determines to replace a Bank pursuant to this Section 2.16, then the Borrower will have the right to replace such Bank with an Eligible Assignee in accordance with Section 9.06(a), (b) and (d) (including execution of an appropriate Assignment and Acceptance); provided that such Eligible Assignee (i) shall unconditionally offer in writing (with a copy to the Paying Agent) to purchase all of such Bank's rights hereunder and interest in the Advances owing to such Bank and the Note held by such Bank without recourse at the principal amount of such Note plus interest and accrued facility fees to the date of such purchase on a date therein specified, and (ii) shall execute and deliver to the Paying Agent an Assignment and Acceptance, as assignee, pursuant to which such Eligible Assignee becomes a party hereto with a Commitment equal to that of the Bank being replaced (plus, if such Eligible Assignee is already a Bank, the amount of its Commitment prior to such replacement); provided, further, that no Bank or other Person shall have any obligation to increase its Commitment or otherwise to replace, in whole or

CONFIDENTIAL
CLH 002387

in part, any Bank. Upon satisfaction of the requirements set forth in the first sentence of this Section 2.16(a), acceptance of such offer to purchase by the Bank to be replaced, payment to such Bank of the purchase price in immediately available funds, and the payment by the Borrower of all requested costs accruing to the date of purchase which the Borrower is obligated to pay under Section 9.04 and all other amounts owed by the Borrower to such Bank (other than the principal of and interest on the Advances of such Bank and accrued facility fees to the date of such purchase that are purchased by such Eligible Assignee), such Eligible Assignee shall constitute a "Bank" hereunder with a Commitment as so specified and the Bank being so replaced shall no longer constitute a "Bank" hereunder and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of the Bank being so replaced shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder. If, however, (x) a Bank accepts such an offer and such Eligible Assignee fails to purchase such rights and interest on such specified date in accordance with the terms of such offer, the Borrower shall continue to be obligated to pay the increased costs and additional amounts due to such Bank pursuant to Sections 2.06, 2.10 and 2.13 (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement), or (y) the Bank proposed to be replaced fails to accept such purchase offer, the Borrower (if a demand or notice for payment of increased costs or additional amounts pursuant to any of such Sections is the basis of the proposed replacement) shall not be obligated to pay to such Bank such increased costs or additional amounts incurred or accrued from and after the date of such purchase offer, and neither the failure to purchase as set forth in clause (x) of this sentence nor the failure to accept a purchase offer as set forth in clause (y) of this sentence, shall affect any rights the Borrower may have to terminate such Bank's Commitment in accordance with Section 2.16(b).

(b)     In the event that the Borrower determines to terminate a Bank's Commitment pursuant to this Section 2.16, the Borrower shall have the right to terminate such Bank's Commitment and shall give notice to such Bank of the Borrower's election to terminate (a copy of such notice to be sent to the Paying Agent), and such termination shall become effective on the date specified in such notice (which shall be 15 days after the date of such notice, provided, that if the 15th day after the date of such notice is not a Business Day, the date specified in such notice shall be the first Business Day next succeeding such 15th day) unless such Bank withdraws its demand or notice for increased costs or additional amounts (if such a demand or notice is the basis for the proposed termination). On the date of the termination of the Commitment of any Bank pursuant to this Section 2.16(b), the Borrower shall pay all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility fees and amounts specified in such Bank's notice and demand (if any) delivered pursuant to Sections 2.06, 2.10 or 2.13, as the case may be, with respect to the period prior to such termination) and such Bank shall thereupon cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that such Bank's rights under Sections 2.06, 2.10, 2.13 and 9.04 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.17.     Renewal of Commitments.

(a)     If no Event of Default has occurred and is continuing, the Borrower may request by notice to the Paying Agent and each Bank, given no earlier than 45 days prior to, and no later than 30 days prior to, any Stated Termination Date applicable on the date of such notice to all Banks ("Existing Termination Date"), that the Banks renew their respective Commitments for an additional 364 days. If a Bank agrees, in its sole and absolute discretion, to so renew its Commitment, it will give notice to the Paying Agent of its decision to do so no earlier than 30 days prior to, and no later than 20 days prior to, such Existing Termination Date. No later than 19 days prior to such Existing Termination Date (or the next Business Day, if the day 19 days prior to the Existing Termination Date is not a Business Day), the Paying Agent will notify

CONFIDENTIAL
CLH 002388

the Borrower and each Bank of the Banks from which it has received such a notice agreeing to so renew ("Renewing Banks"). Any failure by a Bank to so notify the Paying Agent shall be deemed to be a decision by such Bank to not so renew its Commitment.

(b)　　If all Banks elect to so renew their respective Commitments, the Stated Termination Date shall automatically become the date that is 364 days following the Existing Termination Date.

(c)　　If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate at least 51% of, but less than 100% of, the Commitments of all of the Banks at such time ("Existing Commitments"), (i) effective as of the Existing Termination Date, except as to the Banks described in clause (ii) of this subsection (c), the Stated Termination Date shall automatically become the date that is 364 days following the Existing Termination Date as to each Renewing Bank, (ii) the Stated Termination Date shall remain unchanged as to each Bank that is not a Renewing Bank (each a "Terminating Bank"), (iii) each Terminating Bank's Commitment shall terminate on the Existing Termination Date, and (iv) the Borrower shall pay on the Existing Termination Date the outstanding Advances owed to each Terminating Bank and all other amounts owed to each Terminating Bank. If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate less than 51% of the Existing Commitments, none of the Commitments (including the Commitment of any Renewing Bank) will be extended and the Stated Termination Date shall remain unchanged.

(d)　　If, at the time the Paying Agent gives the notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the Renewing Banks aggregate at least 51% of, but less than 100% of, the Existing Commitments, then the Borrower may request one or more Renewing Banks to increase their respective Commitments pursuant to Section 2.18 (but no Bank shall be obligated to do so), and may attempt to add one or more commercial banks or financial institutions to this Agreement pursuant to Section 2.18, but the aggregate amount of the Commitments of the Renewing Banks (after giving effect to any such increase) and such added commercial banks or financial institutions shall not exceed 100% of the Existing Commitments.

(e)　　The Borrower may repeat the process contemplated by this Section 2.17 once each year (commencing in 2001) but the election by any Bank to become a Renewing Bank at any time shall not obligate such Bank to become a Renewing Bank at any other time, it being agreed that each election of any Bank to renew or not renew shall be made by such Bank in its sole and absolute discretion and that such discretion shall not be limited by any prior election to become a Renewing Bank.

SECTION 2.18.　　Replacement of Commitments.　If at any time that the Paying Agent gives a notice contemplated by Section 2.17(a) to the Borrower and the Banks, the Commitments of the then Renewing Banks aggregate at least 51% but less than 100% of the then Existing Commitments, and if no Event of Default then exists, the Borrower shall have the right, without the consent of the Banks but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to replace the Commitments of the then Terminating Banks by adding to this Agreement one or more commercial banks or financial institutions that are Eligible Assignees (who shall, upon completion of the requirements stated in this Section 2.18, constitute Banks hereunder), or by allowing one or more Banks to increase their Commitments hereunder, provided that (a) the sum of such added Commitments plus such increases in Commitments shall not be greater than the Commitments of such Terminating Banks, so that in no event will the total aggregate amount of the Existing Commitments be increased (after giving effect to the contemporaneous termination of the Commitments of such Terminating Banks), (b) no Bank's Commitment shall be increased without the consent of such Bank, (c) no Person shall be added to this Agreement without

CONFIDENTIAL
CLH 002389

its consent and (d) on the effective date of any such increase or addition, there shall be no Advances outstanding. The Borrower shall give the Paying Agent three Business Days' notice of the Borrower's intention to increase any Commitment or add a new commercial bank or financial institution pursuant to this Section 2.18. Such notice shall specify each new commercial bank or financial institution, if any, the changes in amounts of Commitments that will result, and such other information as is reasonably requested by the Paying Agent. Each new commercial bank or financial institution agreeing to be added to this Agreement, and each Bank agreeing to increase its Commitment, shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents) a New Bank Agreement or a Commitment Increase Agreement, substantially in the form of Exhibit G-1 or Exhibit G-2, as the case may be, pursuant to which it becomes a party hereto or increases its Commitment, as the case may be. In addition, an authorized officer of the Borrower shall execute and deliver a Note in the principal amount of the Commitment of each new commercial bank or financial institution, or a replacement Note in the principal amount of the increased Commitment of each Bank agreeing to increase its Commitment, as the case may be. Each such Note shall be dated the effective date of the pertinent New Bank Agreement or Commitment Increase Agreement, as the case may be, shall be properly completed, and shall otherwise be in substantially the form of Exhibit A. Each other document of the nature referred to in Section 3.01 shall be furnished to the Paying Agent in form and substance as may be reasonably required by it. Upon execution and delivery to the Paying Agent of such documents and execution by the Paying Agent of the relevant New Bank Agreement or Commitment Increase Agreement, as the case may be, such new commercial bank or financial institution shall constitute a "Bank" hereunder with a Commitment as specified therein, or such Bank's Commitment shall increase as specified therein, as the case may be.

SECTION 2.19.  Non-Ratable Reduction or Termination of Commitments. The Borrower shall have the right, without the consent of any Bank, but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to reduce in part or to terminate in whole the Commitment of one or more Banks non-ratably, provided that (a) on the effective date of any such reduction or termination (i) if the Commitment of one or more Banks is being reduced in part (whether or not simultaneously the Commitment of any other Bank is being terminated in whole) and if any Advances are outstanding, the Borrower shall prepay all principal of and interest on all such Advances pursuant to Section 2.09, and if any Bank's Commitment is being terminated in whole, the Borrower shall also pay any other amounts payable to such Bank under its Note and this Agreement, including accrued facility fees and any other amounts owing to such Bank, (ii) no Default or Event of Default shall have occurred and be continuing, (iii) the senior unsecured long-term debt of the Borrower is rated BBB- or better by Standard & Poor's or Baa3 or better by Moody's, and (iv) if the Commitment of one or more Banks is being terminated in whole (and if no Commitments are simultaneously being reduced in part), the Borrower shall pay to each Bank whose Commitment is so terminated all amounts owed by the Borrower to such Bank under this Agreement and under the Note payable to such Bank (including principal of and interest on the Advances owed to such Bank, accrued facility fees and any other amounts owing to such Bank), (b) the aggregate amount of each non-ratable reduction shall be at least $5,000,000, and (c) the aggregate amount of all such non-ratable reductions and terminations of Commitments since the date of this Agreement shall not exceed $300,000,000. The Borrower shall give the Paying Agent three Business Days' notice of the Borrower's intention to reduce or terminate any Commitment pursuant to this Section 2.19. Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.19, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under Sections 2.06, 2.10, 2.13 and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.20.  Certificates of Banks. Without limitation to the requirements of Section 2.10(c), any Bank demanding or giving notice of amounts due to such Bank under this Article II shall, as part of each

CONFIDENTIAL
CLH 002390

demand or notice for payment required under this Article II, deliver to the Borrower (with a copy to the Paying Agent) a certificate setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

## ARTICLE III

## CONDITIONS TO ADVANCES

SECTION 3.01.   <u>Initial Condition Precedent</u>.   The obligation of each Bank to make Advances pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial Advance the following, each dated on or before such day, in form and substance satisfactory to each Co-Administrative Agent (copies of which shall have been provided to the Co-Administrative Agents):

(a)   The Notes to the order of the Banks, respectively.

(b)   Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, each Note and each Notice of Borrowing, and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Loan Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Borrower.

(c)   A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures of the officers of the Borrower authorized to sign each Loan Document to which it is a party and the other documents to be delivered hereunder.

(d)   A favorable opinion of Vinson & Elkins L.L.P., counsel for the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, substantially in the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)   A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents, at the express instruction of the Borrower, in substantially the form of Exhibit D hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(f)   A favorable opinion of Bracewell & Patterson, L.L.P., counsel for the Paying Agent, to be delivered to, and for the benefit of, the Banks, the Paying Agent and the Co-Administrative Agents at the express instruction of the Paying Agent, substantially in the form of Exhibit E hereto.

(g)   A letter addressed to the Paying Agent, the Co-Administrative Agents and the Banks from the Borrower with respect to the Prior Credit Facilities stating to the effect that (i) all the "Commitments" (as defined in each of the Prior Credit Facilities) of the "Banks" (as defined in each of the Prior Credit Facilities) have been terminated, (ii) no "Advances" (as defined in each of the Prior Credit Facilities) are outstanding under the Prior Credit Facilities, and (iii) all fees and other amounts known by the Borrower to be payable under the Prior Credit Facilities have been paid in full.

CONFIDENTIAL
CLH 002391

SECTION 3.02.     Additional Conditions Precedent to Each Advance. The obligation of each Bank to make any Advance shall be subject to the additional conditions precedent that on the date of such Advance (a) the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)     The representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of such Advance (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to such Advance and the Borrowing of which such Advance is a part and to the application of the proceeds therefrom, as though made on and as of such date, and

(ii)     No event has occurred and is continuing, or would result from such Advance or the Borrowing of which such Advance is a part or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both;

and (b) the Paying Agent shall have received such other approvals, opinions or documents as any Bank through the Paying Agent may reasonably request. For avoidance of doubt, this Section 3.02 shall not apply to the Conversion, combination, division or continuation pursuant to this Agreement of Advances previously made.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.     Representations and Warranties of the Borrower. The Borrower represents and warrants as follows:

(a)     The Borrower and each Principal Subsidiary are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation. The Borrower and each Principal Subsidiary have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted. Each Subsidiary that is a Principal Subsidiary as of the date hereof (based on December 31, 1999 financial statements) is listed in that certain letter dated the date hereof from the Borrower to the Banks and the Paying Agent.

(b)     The execution, delivery and performance by the Borrower of each Loan Document to which it is or will be a party are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

CONFIDENTIAL
CLH 002392

(c)     This Agreement and each Note are, and each other Loan Document to which the Borrower is or will be a party, when executed and delivered in accordance with this Agreement will be legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(d)     The audited consolidated balance sheet of the Borrower and its Subsidiaries as of December 31, 1999 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of March 31, 2000 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Borrower, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Borrower and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

(e)     Since December 31, 1999 through the date hereof, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries, considered as a whole.

(f)     Since December 31, 1999, except as disclosed in the Borrower's Form 10-K for the year ended December 31, 1999 or the Borrower's Form 10-Q for the quarter ended March 31, 2000, which were delivered to the Banks (or made available to each of the Banks either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com) prior to the date hereof, there is no action, suit or proceeding pending against the Borrower or any of its Subsidiaries, or to the knowledge of the Borrower threatened against the Borrower or any of its Subsidiaries, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole or which in any manner draws into question the validity of this Agreement or any other Loan Document to which the Borrower is or will be a party.

(g)     No Termination Event has occurred or is reasonably expected to occur with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists.  Neither the Borrower nor any ERISA Affiliate has received any notification (or has knowledge of any reason to expect) that any Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, for which a Withdrawal Liability in excess of $100,000,000 exists.

(h)     United States federal income tax returns of the Borrower and its Subsidiaries have been examined and closed through the fiscal year ended December 31, 1995.  The Borrower and its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material domestic tax returns which to the knowledge of the Borrower are required to be filed by them and have paid or provided for the payment, before the same become delinquent, of all taxes due pursuant to such returns or pursuant to any assessment received by the Borrower or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of taxes are, in the opinion of the Borrower, adequate to the extent required by GAAP.

CONFIDENTIAL
CLH 002393

(i)    Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(j)    Each of the Borrower and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" or a "subsidiary company" of a "holding company", in each case as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.

(k)    Margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) does not constitute all or substantially all of the assets of the Borrower.

<div align="center">

ARTICLE V

COVENANTS OF THE BORROWER

</div>

SECTION 5.01.    *Affirmative Covenants.* The Borrower covenants and agrees that so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will, unless the Majority Banks shall otherwise consent in writing:

(a)    Reporting Requirements. Furnish to each Bank:

(i)    by making available either on "EDGAR" or Borrower's home page on the World Wide Web at www.enron.com, or otherwise transmitting to the Banks (1) promptly after the sending or filing thereof, a copy of each of the Borrower's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 75 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, a copy of the Borrower's report on Form 10-Q (or any comparable form) for such quarter, which report will include the Borrower's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 135 days after the end of each fiscal year of the Borrower, a copy of the Borrower's annual report which it sends to its public security holders, and a copy of the Borrower's report on Form 10-K (or any comparable form) for such year, which annual report will include the Borrower's annual audited consolidated financial statements as of the end of and for such year;

(ii)    simultaneously with the furnishing of each of the annual or quarterly reports referred to in clause (i) above, a certificate of the chief financial officer or the chief accounting officer of the Borrower in a form acceptable to the Paying Agent (x) setting forth in reasonable detail the calculations required to establish whether the Borrower was in compliance with the requirements of Section 5.02(b) on the date of the financial statements contained in such report, and (y) stating whether there exists on the date of such certificate any Event of Default or Default, and, if so, setting forth the details thereof and the action which the Borrower has taken and proposes to take with respect thereto;

(iii)    as soon as is possible and in any event within five days after a downgrade of any rating of any of the Borrower's senior unsecured long-term debt by Standard & Poor's or Moody's, notice to the Paying Agent of such change;

(iv)    as soon as possible and in any event within five days after an executive officer of the Borrower having obtained knowledge thereof, notice of the occurrence of any Event of Default or any Default, in each case continuing on the date of such notice, and a statement of the chief financial officer of

CONFIDENTIAL
CLH 002394

the Borrower setting forth details of such Event of Default or Default and the action which the Borrower has taken and proposes to take with respect thereto;

(v)      as soon as possible and in any event (a) within 30 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred and (b) within 10 Business Days after the Borrower or any ERISA Affiliate knows or has reason to know that any other Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred or is reasonably expected to occur, a statement of the chief financial officer or chief accounting officer of the Borrower describing such Termination Event and the action, if any, which the Borrower or such ERISA Affiliate proposes to take with respect thereto;

(vi)      promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate, copies of each notice received by the Borrower or any ERISA Affiliate from the PBGC stating its intention to terminate any Plan for which an Insufficiency in excess of $100,000,000 exists or to have a trustee appointed to administer any Plan for which an Insufficiency in excess of $100,000,000 exists;

(vii)      promptly and in any event within five Business Days after receipt thereof by the Borrower or any ERISA Affiliate from the sponsor of a Multiemployer Plan, a copy of each notice received by the Borrower or any ERISA Affiliate indicating liability in excess of $100,000,000 incurred or expected to be incurred by the Borrower or any ERISA Affiliate in connection with (a) the imposition of a Withdrawal Liability by a Multiemployer Plan, (b) the determination that a Multiemployer Plan is, or is expected to be, in reorganization within the meaning of Title IV of ERISA, or (c) the termination of a Multiemployer Plan within the meaning of Title IV of ERISA; and

(viii)      such other information respecting the condition or operations, financial or otherwise, of the Borrower or any of its Subsidiaries as any Bank through the Paying Agent may from time to time reasonably request.

(b)      Compliance with Laws, Etc.  Comply, and cause each of its Subsidiaries to comply, with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a material adverse effect on the Borrower and its Subsidiaries taken as a whole, such compliance to include, without limitation, compliance with environmental laws and the paying before the same become delinquent of all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

(c)      Use of Proceeds.  Use the proceeds of the Advances only for general corporate purposes of the Borrower not in violation of Section 5.02(f).

(d)      Maintenance of Insurance.  Maintain, and cause each of the Principal Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary, provided, that self-insurance by the Borrower or any such Principal Subsidiary shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as the Borrower or such Principal Subsidiary self-insure.  The Borrower may maintain its Principal Subsidiaries' insurance on behalf of them.

CONFIDENTIAL
CLH 002395

(e)  _Preservation of Corporate Existence, Etc._  Preserve and maintain, and cause each of the Principal Subsidiaries to preserve and maintain, its legal existence, rights (charter, if applicable, and statutory) and franchises; _provided, however,_ that this Section 5.01(e) shall not apply to any transactions or matters permitted by Section 5.02(c) or (d) and shall not prevent the termination of existence, rights and franchises of any Principal Subsidiary pursuant to any merger or consolidation to which such Principal Subsidiary is a party or pursuant to lease, sale, transfer or other disposition of assets by a Principal Subsidiary, and _provided, further,_ that the Borrower or any Principal Subsidiary shall not be required to preserve any right or franchise if the Borrower or such Principal Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower or such Principal Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Banks.

(f)  _Visitation Rights._  At any reasonable time and from time to time, after reasonable notice, permit the Paying Agent or any of the Banks or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, the Borrower and any of its Principal Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Principal Subsidiaries with any of their respective officers or directors.

SECTION 5.02.  _Negative Covenants._  So long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder, the Borrower will not at any time, without the written consent of the Majority Banks:

(a)  _Negative Pledge._  Fail to perform and observe any term, covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof). For the purposes of this Section 5.02(a), such Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein; _provided, however,_ that solely for the purposes of this Section 5.02(a) the word "_Securities_" as used in the Enron Indenture shall mean the Notes, the word "_Company_" used therein shall mean the Borrower, the phrase "_this Section 1007_" used therein shall mean this Section 5.02(a), the word "_Trustee_" used therein shall mean the Paying Agent and the phrase "So long as any of the Securities are outstanding" used therein shall mean so long as any Note shall remain unpaid or any Bank shall have any Commitment hereunder.

(b)  _Senior Debt to Capitalization._  Have a ratio of (i) Total Senior Debt to (ii) Total Capitalization greater than 65%.

(c)  _Disposition of Assets._  Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

(d)  _Mergers, Etc._  Merge or consolidate with or into, any Person, unless (i) the Borrower is the survivor or (ii) the surviving Person, if not the Borrower, is organized under the laws of the United States or a state thereof and assumes all obligations of the Borrower under this Agreement, _provided, that_ in each case immediately after giving effect to such proposed transaction, no Event of Default or Default would exist or result.

(e)  _Compliance with ERISA._  (i) Terminate, or permit any ERISA Affiliate to terminate, any Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC, or (ii) permit circumstances which give rise to a Termination Event described in clause (b), (d) or

(e) of the definition of Termination Event with respect to a Plan so as to result in any liability in excess of $100,000,000 of the Borrower or any ERISA Affiliate to the PBGC.

(f)     <u>Use of Proceeds</u>. Use the proceeds of any Advance for any purpose other than for general corporate purposes of the Borrower, or use any such proceeds (i) in a manner which violates or results in a violation of any law or regulation, (ii) to purchase or carry any margin stock (as defined in Regulation U issued by the Federal Reserve Board) or to extend credit to others for that purpose or (iii) to make any investment in any Person if such investment is opposed by the board of directors, general partner or other governing body of such Person.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01.     <u>Events of Default</u>. If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)     The Borrower shall fail to pay (i) any principal on any Note when due and payable or (ii) any interest on any Note for more than five days after such interest becomes due and payable or (iii) any facility fee set forth in Section 2.03 for more than 15 days after such fee becomes due and payable; or

(b)     Any representation or warranty made by the Borrower (or any of its officers) (including representations and warranties deemed made pursuant to Section 3.02) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)     The Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.02 or shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Borrower by the Paying Agent at the request of any Bank; or

(d)     The Borrower or any of its Principal Subsidiaries shall (i) fail to pay any principal of or premium or interest on any Debt which is outstanding in the principal amount of at least $100,000,000 in the aggregate, of the Borrower or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) default in the observance or performance of any covenant or obligation contained in any agreement or instrument relating to any such Debt or permit or suffer any other event to occur or condition to exist under any agreement or instrument relating to any such Debt that in substance is customarily considered a default in loan documents (in each case, other than a failure to pay specified in clause (i) of this subsection (d)) and such default or other event or condition shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect thereof is to accelerate the maturity of such Debt or require such Debt to be prepaid prior to the stated maturity thereof; for the avoidance of doubt the parties acknowledge and agree that (A) the "other" events or conditions referred to in clause (ii) of this subsection (d) do not include (1) mandatory prepayments required on borrowing base or similar loans, (2) changes in law or judicial, executive or administrative interpretation, or the tax, accounting, regulatory or other treatment of the payments or transactions under or in connection with any

CONFIDENTIAL
CLH 002397

such agreement or instrument or the failure or inability of any Person to achieve its desired tax, accounting or regulatory treatment in connection with such transactions, (3) increased costs or the failure or inability of any Person to limit costs in connection with such transactions, (4) the sale, other disposition or collection of any assets or collection of any insurance, condemnation or other proceeds, (5) the failure of any Person to achieve or maintain specified credit ratings published or issued by credit rating agencies, (6) fluctuations in interest rates, stock market prices, commodities or other prices or indexes, or (7) any other prepayment provision in such agreement or instrument that is of a type customarily included in loan documents if the prepayment is not required as a result of a failure to meet any financial test and (B) any payment required to be made under a guaranty of payment or collection described in clause (c) of the definition of Debt shall be due and payable at the time such payment is due and payable under the terms of such guaranty (taking into account any applicable grace period) and such payment shall be deemed not to have been accelerated or required to be prepaid prior to its stated maturity as a result of the obligation guaranteed having become due; or

(e)     The Borrower or any of its Principal Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower or any of its Principal Subsidiaries seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or the Borrower or any of its Principal Subsidiaries shall take any corporate action to authorize any of the actions set forth above in this subsection (e); or

(f)     Any judgment, decree or order for the payment of money in excess of $100,000,000 shall be rendered against the Borrower or any of its Principal Subsidiaries and remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment, decree or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(g)     Any Termination Event as defined in clause (b), (d) or (e) of the definition thereof with respect to a Plan shall have occurred and, 30 days after notice thereof shall have been given to the Borrower by the Paying Agent, (i) such Termination Event shall still exist and (ii) the sum (determined as of the date of occurrence of such Termination Event) of the liabilities to the PBGC resulting from all such Termination Events is equal to or greater than $150,000,000; or

(h)     The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount which, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date of such notification), exceeds $150,000,000 or requires payments exceeding $100,000,000 in any year; or

(i)     The Borrower or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of the Borrower and its ERISA Affiliates to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such

CONFIDENTIAL
CLH 002398

Multiemployer Plans for the respective plan years which include the date hereof by an amount exceeding $100,000,000 in the aggregate;

then, and in any such event, the Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the obligation of each Bank to make Advances to be terminated, whereupon each such obligation and all of the Commitments shall forthwith terminate, and (ii) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the Notes, all interest thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Notes, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, notice of intent to accelerate or further notice of any kind, all of which are hereby expressly waived by the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, (a) the obligation of each Bank to make its Advances and all of the Commitments shall automatically be terminated and (b) the Notes, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

## ARTICLE VII

## THE PAYING AGENT

SECTION 7.01.    Authorization and Action.  Each Bank hereby appoints and authorizes the Paying Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Paying Agent, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Notes), the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Paying Agent shall not be required to take any action which exposes the Paying Agent to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings.  The Paying Agent agrees to give to each Bank prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement.

SECTION 7.02.    Paying Agent's Reliance, Etc.  Neither the Paying Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct. The duties of the Paying Agent shall be mechanical and administrative in nature; the Paying Agent shall not have, by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Paying Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein.  Without limitation of the generality of the foregoing, the Paying Agent: (i) may treat the payee of any Note as the holder thereof until the Paying Agent receives and accepts an Assignment and Acceptance entered into by the Bank that is the payee of such Note, as assignor, and an Eligible Assignee, as assignee, as provided in Section 9.06; (ii) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranty or

NICHU701695I\004046
HOUSTON\1122516.2

-31-

CONFIDENTIAL
CLH 002399

representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (v) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (vi) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 7.03.    Paying Agent and Its Affiliates.  With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also the Paying Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not the Paying Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as the Paying Agent in its individual capacity.  Any Bank serving as the Paying Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not the Paying Agent and without any duty to account therefor to the Banks.

SECTION 7.04.    Bank Credit Decision.  Each Bank acknowledges that it has, independently and without reliance upon the Paying Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Bank also acknowledges that it will, independently and without reliance upon the Paying Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents.  The Paying Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 7.05.    Certain Rights of the Paying Agent.  If the Paying Agent shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Paying Agent shall be entitled to refrain from such act or taking such action unless and until the Paying Agent shall have received instructions from the Majority Banks; and it shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against the Paying Agent as a result of its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be.  Furthermore, except for action expressly required of the Paying Agent hereunder, the Paying Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 7.06.    Holders.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and

CONFIDENTIAL
CLH 002400

binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

SECTION 7.07.    Indemnification.  The Banks agree to indemnify the Paying Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Paying Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by the Paying Agent under the Loan Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PAYING AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT THE PAYING AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 7.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.  Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by the Paying Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that the Paying Agent is not reimbursed for such expenses by the Borrower.

SECTION 7.08.    Resignation by the Paying Agent.  (a) The Paying Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower and the Banks.  Such resignation shall take effect upon the appointment of a successor Paying Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Paying Agent which shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)    If a successor to a resigning Paying Agent shall not have been so appointed within such 15 Business Day period, the resigning Paying Agent, with the consent of the Borrower (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Paying Agent who shall serve as Paying Agent until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

(d)    If no successor Paying Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Paying Agent, the resigning Paying Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Paying Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Paying Agent as provided above.

CONFIDENTIAL
CLH 002401

(e)    After any Paying Agent's resignation hereunder as Paying Agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Paying Agent under this Agreement.

## ARTICLE VIII

## THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01.    Authorization and Action.  Each Bank hereby appoints and authorizes the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Co-Administrative Agents, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement of their rights), the Co-Administrative Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks, and such instructions shall be binding upon all Banks and all holders of Notes; provided, however, that the Co-Administrative Agents shall not be required to take any action which exposes the Co-Administrative Agents (or either of them) to personal liability or which is contrary to any Loan Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings.  The Co-Administrative Agents agree to give to each Bank prompt notice of each notice given to them by the Borrower pursuant to the terms of this Agreement.

SECTION 8.02.    Co-Administrative Agents' Reliance, Etc.  Neither of the Co-Administrative Agents and none of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Loan Document, except for its or their own gross negligence or willful misconduct.  The duties of the Co-Administrative Agents shall be mechanical and administrative in nature; the Co-Administrative Agents shall not have, by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Co-Administrative Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein.  Without limitation of the generality of the foregoing, the Co-Administrative Agents: (a) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) make no warranty or representation to any Bank and shall not be responsible to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower; (d) shall not be responsible to any Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (e) shall incur no liability under or in respect of any Loan Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

CONFIDENTIAL
CLH 002402

SECTION 8.03.    Co-Administrative Agents and Their Affiliates. With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also a Co-Administrative Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not a Co-Administrative Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as a Co-Administrative Agent in its individual capacity. Any Bank serving as a Co-Administrative Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not a Co-Administrative Agent and without any duty to account therefor to the Banks.

SECTION 8.04.    Bank Credit Decision. Each Bank acknowledges that it has, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges that it will, independently and without reliance upon either Co-Administrative Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents. The Co-Administrative Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

SECTION 8.05.    Certain Rights of the Co-Administrative Agents. If the Co-Administrative Agents shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, the Co-Administrative Agents shall be entitled to refrain from such act or taking such action unless and until the Co-Administrative Agents shall have received instructions from the Majority Banks; and they shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Bank nor the holder of any Note shall have any right of action whatsoever against either Co-Administrative Agent as a result of its acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be. Furthermore, except for action expressly required of the Co-Administrative Agents hereunder, each Co-Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 8.06.    Holders. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

SECTION 8.07.    Indemnification. The Banks agree to indemnify each Co-Administrative Agent (to the extent not reimbursed by the Borrower), ratably according to the respective principal amounts of the Notes then held by each of them (or if no principal of the Notes is at the time outstanding or if any principal of the Notes is held by any Person which is not a Bank, ratably according to the respective amounts of their Commitments then existing, or, if no such principal amounts are then outstanding (or if any principal of the Notes is held by any Person which is not a Bank) and no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from

CONFIDENTIAL
CLH 002403

and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Co-Administrative Agent in any way relating to or arising out of any of the Loan Documents or any action taken or omitted by such Co-Administrative Agent under the Loan Documents (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH CO-ADMINISTRATIVE AGENT). IT IS THE INTENT OF THE PARTIES HERETO THAT EACH CO-ADMINISTRATIVE AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 8.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse each Co-Administrative Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by such Co-Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Loan Documents, or any of them, to the extent that such Co-Administrative Agent is not reimbursed for such expenses by the Borrower.

SECTION 8.08. Resignation by the Co-Administrative Agents. (a) Each Co-Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving 15 Business Days' prior written notice to the Borrower, the other Co-Administrative Agent and the Banks. Such resignation shall take effect upon the appointment of a successor Co-Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)  Upon any such notice of resignation, the Majority Banks shall have the right to appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent which successor shall be a commercial bank or trust company reasonably acceptable to the Borrower.

(c)  If a successor to a resigning Co-Administrative Agent shall not have been so appointed within such 15 Business Day period, the resigning Co-Administrative Agent, with the consent of the Borrower (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent who shall serve as a Co-Administrative Agent until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent as provided above.

(d)  If no successor Co-Administrative Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Co-Administrative Agent, the resigning Co-Administrative Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Co-Administrative Agent hereunder and under any other Loan Document until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent; provided, however, that if only one of the Co-Administrative Agents has given notice of resignation and the other Co-Administrative Agent is continuing to serve in such capacity, (i) the resigning Co-Administrative Agent's resignation shall become effective on such 20th Business Day, (ii) the Banks shall not perform the duties of the resigning Co-Administrative Agent, and (iii) the remaining Co-Administrative Agent alone shall have all rights and perform all duties ascribed to the Co-Administrative Agents hereunder and under any Loan Document until such time if any, as the Majority Banks appoint a successor Co-Administrative Agent for the resigning Co-Administrative Agent.

CONFIDENTIAL
CLH 002404

(e)    After any Co-Administrative Agent's resignation hereunder as Co-Administrative Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement.

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01.    Amendments, Etc.  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall, unless in writing and signed by all the Banks, do any of the following: (a) waive any of the conditions specified in Article III, (b) increase the Commitment of any Bank or subject any Bank to any additional obligation, (c) forgive or reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (d) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, (e) take any action which requires the signing of all the Banks pursuant to the terms of any Loan Document, (f) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Notes which shall be required for the Banks or any of them to take any action under any Loan Document or (g) amend this Section 9.01; and provided, further, that (x) no amendment, waiver or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under any Loan Document, and (y) no amendment, waiver or consent shall, unless in writing and signed by the Co-Administrative Agents in addition to the Banks required above to take such action, affect the rights or duties of the Co-Administrative Agents under the Loan Documents.

SECTION 9.02.    Notices, Etc. All notices and other communications provided for hereunder shall be in writing (including telecopier communication) and mailed, telecopied, or delivered, if to the Borrower, at its address or telecopier number set forth below:

> Enron Corp.
> 1400 Smith Street
> Houston, Texas 77002
> Attention:   Deputy Treasurer, Corporate Finance
> Telecopier No.: (713) 646-3422

if to any Bank, at its Domestic Lending Office; if to the Paying Agent, at its address or telecopier number set forth below:

> Citibank, N. A.
> 399 Park Avenue
> New York, New York 10043
> Attention:   Energy Department,
>              North American Banking Group
> Telecopier No.: (212) 832-9857

CONFIDENTIAL
CLH 002405

with a copy to:

    Citicorp Securities, Inc.
    1200 Smith Street, Suite 2000
    Houston, Texas 77002
    Attention:  James F. Reilly, Jr.
              Managing Director
    Telecopier No.: (713) 654-2849

if to the Co-Administrative Agents at their respective addresses or telecopier numbers set forth below:

    Citibank, N. A.
    399 Park Avenue
    New York, New York  10043
    Attention:   Energy Department,
              North American Banking Group
    Telecopier No.: (212) 832-9857

with a copy to:

    Citicorp Securities, Inc.
    1200 Smith Street, Suite 2000
    Houston, Texas 77002
    Attention:  James F. Reilly, Jr.
              Managing Director
    Telecopier No.: (713) 654-2849

    The Chase Manhattan Bank
    1 Chase Manhattan Plaza, 8th Floor
    New York, New York  10081
    Attention:  Lisa Pucciarelli
    Telecopier No.:     (212) 552-5777

or, as to the Borrower, the Paying Agent, or either Co-Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower, the Paying Agent and each Co-Administrative Agent.  All such notices and communications shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by telecopier, when received by the receiving telecopier equipment, respectively; provided, however, that (i) notices and communications to the Paying Agent shall not be effective until received by the Paying Agent and (ii) telexed or telecopied notices received by any party after its normal business hours (or on a day other than a Business Day) shall be effective on the next Business Day.  The notices contemplated by the definitions of "Borrowing" and "Interest Period" and by Section 2.08 may be combined in one notice, if all required information is provided in the combined notice and the combined notice meets the requirements as to timeliness set forth in each definition and Section to which the combined notice pertains.

CONFIDENTIAL
CLH 002406

SECTION 9.03.    No Waiver; Remedies.    No failure on the part of any Bank, any Co-Administrative Agent or the Paying Agent to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.    Costs, Expenses and Indemnity.    (a) The Borrower agrees to pay on demand, (i) all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification and amendment of the Loan Documents and the other documents to be delivered under the Loan Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of one law firm as counsel for the Paying Agent with respect to preparation, execution and delivery of the Loan Documents and the satisfaction of the matters referred to in Section 3.01, and (ii) all reasonable legal and other costs and expenses, if any, of the Paying Agent, each Co-Administrative Agent and each Bank in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents and the other documents to be delivered under the Loan Documents or incurred in connection with any workout, restructuring or bankruptcy.

(b)    If any payment or purchase of principal of, or Conversion of, any LIBOR Advance or LIBOR Borrowing is made other than on the last day of an Interest Period relating to such Advance, as a result of a payment, purchase or Conversion pursuant to Section 2.07(f), 2.08, 2.09, 2.10, 2.11, 2.13, 2.16, 2.17 or 2.19 or acceleration of the maturity of the Notes pursuant to Section 6.01 or for any other reason, the Borrower shall, upon demand by any Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank any amounts required to compensate such Bank for any additional losses, costs or expenses (other than taxes, which are dealt with in Section 2.13) which it may reasonably incur as a result of such payment, purchase or Conversion, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund or maintain such Advance.

(c)    The Borrower agrees, to the fullest extent permitted by law, subject to the last two sentences of this Section 9.04(c), to indemnify and hold harmless the Paying Agent, each Co-Administrative Agent and each Bank and each of their respective directors, officers, employees and agents (collectively, "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and claims, damages, losses, liabilities and expenses relating to environmental matters, but excluding taxes, which are dealt with in Section 2.13) (collectively, "Losses") for which any of them may become liable or which may be incurred by or asserted against an Indemnified Party (other than by another Indemnified Party), in each case in connection with or arising out of or by reason of any investigation, litigation, or proceeding, whether or not such Indemnified Party is a party thereto, arising out of, related to or in connection with this Agreement or any other Loan Document or any transaction in which any proceeds of all or any part of the Advances are applied (EXPRESSLY INCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY).  IT IS THE INTENT OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 9.04(C), BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE BORROWER SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY FOR,  LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNIFIED PARTY HAS BECOME LIABLE TO A THIRD PARTY (THAT IS NOT ANOTHER INDEMNIFIED PARTY) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE PRECEDING SENTENCE, AND (B) SUCH INDEMNIFIED PARTY WOULD BE ENTITLED TO INDEMNIFICATION UNDER

CONFIDENTIAL
CLH 002407

THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNIFIED PARTY SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(d)    Except as set forth in the next succeeding sentence, each of the Banks, each Co-Administrative Agent and the Paying Agent shall not be liable to the Borrower for amounts constituting punitive, treble or exemplary damages arising out of or in connection with any breach by such Bank, such Co-Administrative Agent or the Paying Agent of any of its obligations hereunder. If the Borrower becomes liable to a third party for amounts constituting punitive, treble or exemplary damages as a result of a breach of an obligation hereunder by a Bank, a Co-Administrative Agent or the Paying Agent, as the case may be, the Borrower shall be entitled to claim and recover (and does not waive its rights to claim and recover) such amounts from such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, to the extent such Bank, such Co-Administrative Agent or the Paying Agent, as the case may be, would be liable to the Borrower for such amounts but for the limitation set forth in the preceding sentence.

SECTION 9.05.    Right of Set-Off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Paying Agent to declare the Notes due and payable pursuant to the provisions of Section 6.01, each Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement and the Note held by such Bank, irrespective of whether or not such Bank shall have made any demand under this Agreement or such Note and although such obligations may be unmatured. Each Bank agrees promptly to notify the Borrower after any such set-off and application made by such Bank, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which such Bank may have.

SECTION 9.06.    Assignments and Participations.  (a)  Each Bank may, in accordance with applicable law, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement, (ii) except in the case of an assignment of all of a Bank's rights and obligations under this Agreement, the amount of the Commitment of the assigning Bank being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Paying Agent (with a copy to be provided to the Co-Administrative Agents), for acceptance by the Paying Agent and recording by the Paying Agent in the Register, an Assignment and Acceptance, together with any Note then held by such assigning Bank and any Note then held by such assignee and a processing and recordation fee of $3,000.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Bank hereunder, (y) the Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an assigning Bank's rights and obligations under this Agreement, such Bank shall cease to be a party hereto except that the rights under Sections 2.06, 2.10, 2.13

CONFIDENTIAL
CLH 002408

and 9.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a party hereto), and (z) unless the Borrower in its sole discretion otherwise consents, no such assignee shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than the assigning Bank would have been entitled to receive with respect to the rights assigned to such assignee, except as a result of circumstances arising after the date of such assignment.

(b)    By executing and delivering an Assignment and Acceptance, the Bank assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Bank makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (ii) such assigning Bank makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Co-Administrative Agents, the Paying Agent, such assigning Bank or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any of the other Loan Documents or any other instrument or document; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Paying Agent to take such action as Paying Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; (vii) such assignee appoints and authorizes each Co-Administrative Agent to take such action as Co-Administrative Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Co-Administrative Agents by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(c)    The Paying Agent shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Acceptance, New Bank Agreement and Commitment Increase Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and the principal amount of the Advances owing to, each Bank from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Paying Agent, the Co-Administrative Agents and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Bank at any reasonable time and from time to time upon reasonable prior notice.

(d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Bank and an assignee representing that it is an Eligible Assignee, together with any Note then held by such assigning Bank and any Note then held by such assignee, the Paying Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit F, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the

CONFIDENTIAL
CLH 002409

Borrower. Within five Business Days after its receipt of such notice, an authorized officer of the Borrower shall execute and deliver to the Paying Agent in exchange for the surrendered Notes a new Note payable to the order of such Eligible Assignee in an amount equal to its Commitment after giving effect to such Assignment and Acceptance and, if the assigning Bank has retained a Commitment hereunder, a new Note payable to the order of the assigning Bank in an amount equal to the Commitment retained by it hereunder (such new Notes shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Notes, shall be dated the effective date of such Assignment and Acceptance, and shall be properly completed and shall otherwise be in substantially the form of Exhibit A). The Paying Agent shall also record in the Register appropriate information from each New Bank Agreement and Commitment Increase Agreement executed by it.

(e)     Each Bank, in accordance with applicable law, may sell participations to one or more banks or other entities (other than the Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Advances owing to it and the Note held by it); provided, however, that (i) such Bank's obligations under this Agreement (including its Commitment to the Borrower hereunder) shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Bank shall remain the holder of any such Notes for all purposes of this Agreement, (iv) the Borrower, the Paying Agent, the Co-Administrative Agents and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, (v) the terms of any such participation shall not restrict such Bank's ability to make any amendment or waiver of this Agreement or any Note or such Bank's ability to consent to any departure by the Borrower therefrom without the approval of the participant, except that the approval of the participant may be required to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, and (vi) unless the Borrower in its sole discretion otherwise consents, no such participant shall be entitled to receive any greater payment pursuant to Sections 2.06, 2.10 and 2.13 than such Bank would have been entitled to receive with respect to the rights assigned to such participant by such Bank except as a result of circumstances arising after the date of such participation to the extent that such circumstances affect other Banks and participants generally, and (vii) each participant that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall provide to the Paying Agent and the Borrower a U.S. Internal Revenue Service Form W-8BEN or W-8ECI, as appropriate, or any successor form prescribed by the U.S. Internal Revenue Service, duly completed and certifying that such participant is fully exempt from United States withholding taxes with respect to all payments to be made to such participant under such participation agreement, or other documents satisfactory to the Borrower and the Paying Agent indicating that all payments to be made to such participant under such participation agreement are fully exempt from such withholding taxes, and neither the Borrower nor the Paying Agent shall have any obligation to pay to any participant any taxes, penalties, interest or other expenses, costs and losses incurred or payable by the Borrower or the Paying Agent as a result of the failure of such participant to obtain such additional duly completed and signed copies of one or the other of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may be required under then-current United States law or regulations to avoid United States withholding taxes on payments in respect of all amounts to be received by such participant.

(f)     Any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.06, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower or any of its Affiliates furnished to such Bank by or on

CONFIDENTIAL
CLH 002410

behalf of the Borrower or any of its Affiliates; provided, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to comply with Section 9.09.

(g)     Notwithstanding any other provision set forth in this Agreement, any Bank may at any time create a security interest in all or any portion of its rights under this Agreement (including the Advances owing to it and the Note held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Board.

SECTION 9.07.     Governing Law; Entire Agreement.  This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.  This Agreement, the Notes, the other Loan Documents and any fee letter pertaining hereto accepted by the Borrower constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 9.08.     Interest.  It is the intention of the parties hereto that the Paying Agent, each Co-Administrative Agent and each Bank shall conform strictly to usury laws applicable to it, if any. Accordingly, if the transactions with the Paying Agent, any Co-Administrative Agent or any Bank contemplated hereby would be usurious under applicable law, if any, then, in that event, notwithstanding anything to the contrary in the Notes, this Agreement or any other agreement entered into in connection with this Agreement or the Notes, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, under the Notes, this Agreement or under any other agreement entered into in connection with this Agreement or the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law and any excess shall be cancelled automatically and, if theretofore paid, shall at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be applied on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower, and (b) in the event that the maturity of any Note or other obligation payable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, is accelerated or in the event of any permitted prepayment, then such consideration that constitutes interest under law applicable to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, may never include more than the maximum amount allowed by such applicable law and excess interest, if any, to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, provided for in this Agreement or otherwise shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, be credited by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, on the principal amount of the obligations owed to the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, by the Borrower or refunded by the Paying Agent, such Co-Administrative Agent or such Bank, as the case may be, to the Borrower.

SECTION 9.09.     Confidentiality.  Each Bank agrees that it will use reasonable efforts not to disclose without the prior consent of the Borrower (other than to such Bank's affiliates in the ordinary course of business in connection with any Loan Document, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Bank if the disclosing Bank or the disclosing Bank's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to the Borrower or its Subsidiaries which is furnished pursuant to this Agreement or any other Loan Document and which is designated by the Borrower to the Banks in writing as confidential, provided that any Bank may disclose any such information (a) as has

CONFIDENTIAL
CLH 002411

become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Bank or to the Federal Reserve Board or the FDIC or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Bank, and (e) to the prospective transferee in connection with any contemplated transfer of any of the Notes or any interest therein by such Bank, provided, that such prospective transferee executes an agreement with the Borrower containing provisions substantially identical to those contained in this Section.

SECTION 9.10.     Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 9.11.     Domicile of Loans.  Each Bank may transfer and carry its loans at, to or for the account of any office, subsidiary or affiliate of such Bank provided that no Bank shall be relieved of its Commitment as a result thereof.

SECTION 9.12.     Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, the Co-Administrative Agents and the Paying Agent and when the Paying Agent shall have, as to each Bank, either received a copy of a signature page hereof executed by such Bank or been notified by such Bank that such Bank has executed it and thereafter shall be binding upon and inure to the benefit of and be enforceable by the Borrower, the Paying Agent, the Co-Administrative Agents and each Bank and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Banks (other than an assignment effectuated by a merger or consolidation permitted by Section 5.02(d) to the surviving Person referred to therein).

SECTION 9.13.     Prior Credit Facilities.  The undersigned agree and acknowledge that, except for provisions that expressly provide for their survival of termination, the Prior Credit Facilities are terminated and all Commitments thereunder (as defined in each of the Prior Credit Facilities) are terminated, and the undersigned waive any right to receive any notice of such termination.  With respect to each Prior Credit Facility, each Bank that was a party to such Prior Credit Facility agrees to return to the Borrower, with reasonable promptness, the Note (as defined in such Prior Credit Facility) delivered by the Borrower to the Bank under such Prior Credit Facility.

SECTION 9.14.     Return of Notes.  With respect to each Bank, upon the full and final payment by the Borrower to such Bank of all amounts due under the Note payable to the order of such Bank, and termination of the Commitment of such Bank, such Bank will, with reasonable promptness, return such Note to the Borrower.

CONFIDENTIAL
CLH 002412

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

ENRON CORP.

By: _____

Name:  Timothy A. DeSpain

Title:  Deputy Treasurer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

CONFIDENTIAL
CLH 002413

PAYING AGENT:

CITIBANK, N. A.

By:_____
      Authorized Officer

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

CO-ADMINISTRATIVE AGENTS:

CITIBANK, N. A.

By:_____
      Authorized Officer

J. CHRISTOPHER LYONS

ATTORNEY-IN-FACT

THE CHASE MANHATTAN BANK

By:_____
      Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-46-

CONFIDENTIAL
CLH 002414

PAYING AGENT:

CITIBANK, N. A.

By:_____
        Authorized Officer

CO-ADMINISTRATIVE AGENTS:

CITIBANK, N. A.

By:_____
        Authorized Officer

THE CHASE MANHATTAN BANK

By:_____
        Authorized Officer

CONFIDENTIAL
CLH 002415

Commitment

**BANKS:**

$44,666,666.66

CITIBANK, N. A.

J. CHRISTOPHER LYONS
ATTORNEY-IN-FACT

By:_____
         Authorized Officer

$46,666,666.64

THE CHASE MANHATTAN BANK

By:_____
         Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-47-

CONFIDENTIAL
CLH 002416

<u>Commitment</u>

<u>BANKS:</u>

$44,666,666.66

CITIBANK, N. A.

By:_____
　　　Authorized Officer

$46,666,666.64

THE CHASE MANHATTAN BANK

By:_____
　　　Authorized Officer

CONFIDENTIAL
CLH 002417

$46,666,666.64                          ABN AMRO BANK N.V.

                                        By: _____  PETER D. GAW
                                            Authorized Officer          SENIOR VICE PRESIDENT
                                                                        & MANAGING DIRECTOR

                                        By: _____
                                            Authorized Officer
                                                                        WILLIAM R. HALE
                                                                        SENIOR VICE PRESIDENT
                                                                        & MANAGING DIRECTOR

CONFIDENTIAL
CLH 002418

$14,583,333.33

ARAB BANK PLC

By: _____
        Authorized Officer

CONFIDENTIAL
CLH 002419

$14,583,333.33

ARAB BANKING CORPORATION (B.S.C.)

By: _____
Authorized Officer

CONFIDENTIAL
CLH 002420

$29,166,666.67

AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By: _Eli~ M Waters , VP_
         Authorized Officer

-51-

CONFIDENTIAL
CLH 002421

$29,166,666.67

BANCA COMMERCIALE ITALIANA-LOS ANGELES
FOREIGN BRANCH

By: _____
    Authorized Officer      C. Dougherty, VP

By: _____
    Authorized Officer      J. Dickerhof, VP

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-52-

**CONFIDENTIAL
CLH 002422**

$37,916,666.67

BANCA DI ROMA, CHICAGO BRANCH

By: _____
     Authorized Officer
                           Aurora Pensa (97974)
                           Vice President

By: _____
     Authorized Officer Claudio Perna (19690)
                        Sr. Vice President & Manager

CONFIDENTIAL
CLH 002423

$14,583,333.33

BANCA NAZIONALE DEL LAVORO S.p.A.

By:_____
       Authorized Officer          LEONARDO VALENTINI
                                   FIRST VICE PRESIDENT

By:_____
       Authorized Officer

                        ROBERTO MANCONE
                        SENIOR LOAN OFFICER

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                    -54-

CONFIDENTIAL
CLH 002424

$14,583,333.33

BANCA POPOLARE DI MILANO

By: _____
FULVIO MONTANARI
Title: FIRST VICE PRESIDENT

By: _____
597 - V. Repola
Title: _____
UP § COMPTROLLER

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                    -55-

CONFIDENTIAL
CLH 002425

$14,583,333.33

BANCO BILBAO VIZCAYA ARGENTARIA

By: _____
    Authorized Officer

    JOHN MARTINI
    VICE PRESIDENT
    CORPORATE BANKING

    ALEJANDRO LORCA
    VICE PRESIDENT
    CORPORATE BANKING

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-56-

CONFIDENTIAL
CLH 002426

$29,166,666.67

BANCO SANTANDER CENTRAL HISPANO S.A.,
NEW YORK BRANCH

By: _____
Authorized Officer

JAVIER L-BERT          EX Greathouse
VP                        SVP

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-57-

CONFIDENTIAL
CLH 002427

$37,916,666.67

BANK OF AMERICA, N.A.

By: _____
Authorized Officer

James R. Allred
Managing Director

CONFIDENTIAL
CLH 002428

$14,583,333.33

BANK OF MONTREAL

By: _____
        Authorized Officer

CONFIDENTIAL
CLH 002429

$29,166,666.67

THE BANK OF NEW YORK

By: _____
     Authorized Officer

RAYMOND J. PALMER
Vice President

CONFIDENTIAL
CLH 002430

$37,916,666.67

THE BANK OF NOVA SCOTIA

By: _____
Authorized Officer

F.C.S. Ashby
Senior Manager Loan Operations

Signature Page Enron Corp.
364-Day Revolving Credit Agreement
                                        -61-

CONFIDENTIAL
CLH 002431

$29,166,666.67

THE BANK OF TOKYO-MITSUBISHI, LTD.,
HOUSTON AGENCY

By _____
Authorized Officer
**Michael Meiss**
**VP & Manager**

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                    -62-

CONFIDENTIAL
CLH 002432

$29,166,666.67

BANK ONE, NA

By: _____
       Authorized Officer

CONFIDENTIAL
CLH 002433

$29,166,666.67

FLEET NATIONAL BANK

By: _____
Authorized Officer

Michael M. Parker
Managing Director

CONFIDENTIAL
CLH 002434

$37,916,666.67

BANKERS TRUST COMPANY

By: _____
    Authorized Officer

CONFIDENTIAL
CLH 002435

$46,666,666.64

BARCLAYS BANK PLC

By: _____
       Authorized Officer

CONFIDENTIAL
CLH 002436

$29,166,666.67

BAYERISCHE HYPO-UND VEREINSBANK AG
NEW YORK BRANCH

By: _Edward Smits_
Authorized Officer
Associate Director

Steven Atwell
Director

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-67-

CONFIDENTIAL
CLH 002437

$37,916,666.67

By:
Name:     Hereward Drummond
Title:    Senior Vice President

BAYERISCHE LANDESBANK GIROZENTRALE

By:
Name:     Sean O'Sullivan
Title:    Vice President

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-68-

CONFIDENTIAL
CLH 002438

$29,166,666.67

BBL INTERNATIONAL (U.K.) LIMITED

By: _____
        Authorized Officer
        M-C Swinnen
        Authorized Signatory

By: _____
        Authorized Officer
        C. R. M. Weller
        Authorized Signatory

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                    -69-

CONFIDENTIAL
CLH 002439

$14,583,333.33

CHRISTIANIA BANK OG KREDITKASSE ASA

By:_____
        Authorized Officer

By:_____
        Authorized Officer

CONFIDENTIAL
CLH 002440

$37,916,666.67

CIBC INC.

By: _____
Authorized Officer

CONFIDENTIAL
CLH 002441

$37,916,666.67

COMMERZBANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By: _____
Authorized Officer  Brian J. Campbell
                      Vice President

By: _____
Authorized Officer  D. L. Ward, Jr.
                      Asst. Treasurer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-72-

CONFIDENTIAL
CLH 002442

$14,583,333.33

CREDIT AGRICOLE INDOSUEZ

By: _____
Authorized Officer PATRICK COURQUEREL
FIRST VICE PRESIDENT, MANAGING DIRECTOR
HEAD OF HOUSTON REPRESENTATIVE OFFICE

By: _____
Authorized Officer
Douglas A. Whiddon
Vice President
Senior Relationship Manager

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-73-

CONFIDENTIAL
CLH 002443

MAY 17 '00 15:12 FR CREDIT LYONNAIS-HOUS 713 751 0307 TO SPEC INDUSTRIES  P.03/03

$37,916,666.67

CREDIT LYONNAIS NEW YORK BRANCH

By: _____
    Authorized Officer
    Pascal Poupelle
    President & Chief Operating Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-74-

CONFIDENTIAL
CLH 002444

** TOTAL PAGE.03 **

$37,916,666.67

CREDIT SUISSE FIRST BOSTON

By: _____

Authorized Officer

JAMES P. MORAN
DIRECTOR

Robert N. Finney
Managing Director

CONFIDENTIAL
CLH 002445

$14,583,333.33

THE DAI-ICHI KANGYO BANK, LTD.

By: _____
Authorized Officer

CONFIDENTIAL
CLH 002446

$29,166,666.67

DG BANK DEUTSCHE
GENOSSENSCHAFTSBANK AG

By: _____    RICHARD W. WILBERT
    Authorized Officer    Vice President

By: _____    CRAIG ANDERSON
    Authorized Officer    Vice President

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-77-

CONFIDENTIAL
CLH 002447

$37,916,666.67

DLJ CAPITAL FUNDING, INC.

By:

Authorized Officer

**James L. Paradise**
**Senior Vice President**

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-78-

CONFIDENTIAL
CLH 002448

$37,916,666.67

DRESDNER BANK AG, NEW YORK AND
GRAND CAYMAN BRANCHES

By: _____
Authorized Officer          **ALEC KUSHNIR**
                            **ASSISTANT TREASURER**

By: _____
Authorized Officer

**ROBERT PREMINGER**
**ASSISTANT VICE PRESIDENT**

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                    -79-

CONFIDENTIAL
CLH 002449

$37,916,666.67

FIRST UNION NATIONAL BANK

By: _____
          Authorized Officer

CONFIDENTIAL
CLH 002450

$29,166,666.67

THE FUJI BANK, LIMITED

By: _____
        Authorized Officer

CONFIDENTIAL
CLH 002451

$37,916,666.67

HSBC BANK, USA

By: _____
        Authorized Officer

George Linhart #9429

CONFIDENTIAL
CLH 002452

$29,166,666.67

THE INDUSTRIAL BANK OF JAPAN
TRUST COMPANY

By: _____
Authorized Officer – Ryusuke Aya
Senior Vice President
THE INDUSTRIAL BANK OF JAPAN, LIMITED, HOUSTON OFFICE
(Authorized Representative)

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-83-

CONFIDENTIAL
CLH 002453

$29,166,666.67

KBC BANK N.V.

By: _____  ROBERT SNAUFFER
Authorized Officer              FIRST VICE PRESIDENT

By: _____
Authorized Officer

RAYMOND F. MURRAY
FIRST VICE PRESIDENT

Signature Page Enron Corp.
364-Day Revolving Credit Agreement                -84-

CONFIDENTIAL
CLH 002454

$14,583,333.33

MEESPIERSON N.V.

By: _____
       Authorized Officer

CONFIDENTIAL
CLH 002455

ENRON
$29,166,666.67

Merrill Lynch Bank USA

By: _____

Preston L. Jackson
President & C.E.O.

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-86-

CONFIDENTIAL
CLH 002456

$37,916,666.67

MORGAN GUARANTY TRUST COMPANY OF
NEW YORK

By: _____
       Authorized Officer

CONFIDENTIAL
CLH 002457

$14,583,333.33

NATEXIS BANQUE  Renaud J. d'Herbes
                Senior Vice President
                and Regional Manager

By:_____
        Authorized Officer


By:_____
        Authorized Officer


            Daniel Payer
        Assistant Vice President

CONFIDENTIAL
CLH 002458

$37,916,666.67

NATIONAL AUSTRALIA BANK LIMITED

By: _____
        Authorized Officer

Paul R. Morrison
Vice President

CONFIDENTIAL
CLH 002459

$37,916,666.67

NATIONAL WESTMINSTER BANK PLC,
NEW YORK BRANCH

By: _____
          Authorized Officer

NATIONAL WESTMINSTER BANK PLC,
NASSAU BRANCH

By: _____
          Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-90-

CONFIDENTIAL
CLH 002460

$14,583,333.33

THE NORTHERN TRUST COMPANY

By: _____
         Authorized Officer

DAVID J. MITCHELL
VICE PRESIDENT

CONFIDENTIAL
CLH 002461

$37,916,666.67

PARIBAS

By

Authorized Officer

**Brian M. Malone**
**Director**

Douglas R. Liftman
Director

**CONFIDENTIAL**
**CLH 002462**

$37,916,666.67

ROYAL BANK OF CANADA

By: _David McCluskey_

Authorized Officer

DAVID A. McCLUSKEY
MANAGER

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-93-

CONFIDENTIAL
CLH 002463

$29,166,666.67

SANPAOLO IMI S.p.A.

By: _____
     Authorized Officer

By: _____
     Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-94-

CONFIDENTIAL
CLH 002464

$29,166,666.67

SOCIETE GENERALE

By: _____
Authorized Officer

CONFIDENTIAL
CLH 002465

$14,583,333.33

STANDARD CHARTERED BANK

By: _____
Authorized Officer
Jack Insinga
Vice President

ANDREW Y. NG
VICE PRESIDENT

CONFIDENTIAL
CLH 002466

$37,916,666.67

THE SUMITOMO BANK, LIMITED

By: _____
    Authorized Officer        Peter R. C. Knight
                              Senior Vice President

CONFIDENTIAL
CLH 002467

$29,166,666.67

SUNTRUST BANK, ATLANTA

By: _____

Authorized Officer

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-98-

CONFIDENTIAL
CLH 002468

$37,916,666.67

TORONTO DOMINION (TEXAS), INC.

By: _____
Authorized Officer

LYNN CHASIN
VICE PRESIDENT

CONFIDENTIAL
CLH 002469

$37,916,666.67

UBS AG, STAMFORD BRANCH

By: _____
Dorothy McKinley
Authorized Officer
Director
Loan Portfolio Support US

By: _____
Authorized Officer

RICHARD W. FORTNEY
EXECUTIVE DIRECTOR

CONFIDENTIAL
CLH 002470

$14,583,333.33

UNICREDITO ITALIANO SpA

By: _____
Gianfranco Bisagni, First Vice President


By: _____
Saiyed A. Abbas, Vice President

Signature Page Enron Corp.
364-Day Revolving Credit Agreement

-101-

CONFIDENTIAL
CLH 002471

$29,166,666.67

WACHOVIA BANK, N.A.

By: _John T. Feeder_
     Authorized Officer    _Senior Vice President_

CONFIDENTIAL
CLH 002472

$37,916,666.67

WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By: _____
    Authorized Officer

CYNTHIA M. NIESEN
MANAGING DIRECTOR

By: _____
    Authorized Officer

THOMAS LEE
ASSOCIATE

CONFIDENTIAL
CLH 002473

SCHEDULE I

APPLICABLE LENDING OFFICES

| Name of Bank | Domestic Lending Office | Eurodollar Lending Office |
|---|---|---|
| ABN AMRO Bank N.V. | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention: Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy: (312) 992-5155 | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention: Loan Administration<br>Telephone: (312) 992-5150<br>Telecopy: (312) 992-5155 |
| Arab Bank plc | Arab Bank plc - Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Justo Huapaya<br>Telephone: (212) 715-9713<br>Telecopy: (212) 593-4632 | Arab Bank plc - Grand Cayman Branch<br>520 Madison Avenue<br>New York, NY 10022<br>Attention: Justo Huapaya<br>Telephone: (212) 715-9713<br>Telecopy: (212) 593-4632 |
| Arab Banking Corporation (B.S.C.) | Arab Banking Corporation (B.S.C.)<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-3299<br>Attention: Barbara Sanderson<br>Telephone: (212) 583-4752<br>Telecopy: (212) 583-0921/22 | Arab Banking Corporation (B.S.C.)<br>277 Park Avenue, 32nd Floor<br>New York, NY 10172-3299<br>Attention: Barbara Sanderson<br>Telephone: (212) 583-4752<br>Telecopy: (212) 583-0921/22 |
| Australia and New Zealand Banking Group Limited | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention: Tessie Amante<br>Telephone: (212) 801-9744<br>Telecopy: (212) 801-9859 | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention: Tessie Amante<br>Telephone: (212) 801-9744<br>Telecopy: (212) 801-9859 |
| Banca Commerciale Italiana- Los Angeles Foreign Branch | Banca Commerciale Italiana-<br>Los Angeles Foreign Branch<br>One William Street<br>New York, NY 10004<br>Attention: Alex Papace<br>Telephone: (212) 607-3531<br>Telecopy: (212) 607-3897 | Banca Commerciale Italiana-<br>Los Angeles Foreign Branch<br>One William Street<br>New York, NY 10004<br>Attention: Alex Papace<br>Telephone: (212) 607-3531<br>Telecopy: (213) 607-3897 |
| Banca di Roma, Chicago Branch | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention: Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy: (312) 726-3058 | Banca di Roma, Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention: Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy: (312) 726-3058 |
| Banca Nazionale del Lavoro S.p.A. | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Robert Manlone<br>Telephone: (212) 314-0734<br>Telecopy: (212) 765-2978 | Banca Nazionale del Lavoro S.p.A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Robert Manlone<br>Telephone: (212) 314-0734<br>Telecopy: (212) 765-2978 |
| Banca Popolare di Milano | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone: (212) 546-9429/9435<br>Telecopy: (212) 838-1077 | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone: (212) 546-9429/9435<br>Telecopy: (212) 838-1077 |

CONFIDENTIAL
CLH 002474

| Banco Bilbao Vizcaya Argentaria | Banco Bilbao Vizcaya Argentaria–<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Francisco Miguens<br>Telephone: (212) 728-1682<br>Telecopy: (212) 333-2926 | Banco Bilbao Vizcaya Argentaria–<br>Nassau Branch<br>c/o Banco Bilbao Vizcaya Argentaria–<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Francisco Miguens<br>Telephone: (212) 728-1682<br>Telecopy: (212) 333-2926 |
| Banco Santander Central Hispano S.A., New York Branch | Banco Santander Central Hispano S.A.,<br>New York Branch<br>45 East 53rd Street<br>New York, NY 10022<br>Attention: Rebecca Raines<br>Assistant Treasurer<br>Telephone: (212) 350-3642<br>Telecopy: (212) 350-3690 | Banco Santander Central Hispano S.A.,<br>New York Branch<br>45 East 53rd Street<br>New York, NY 10022<br>Attention: Rebecca Raines<br>Assistant Treasurer<br>Telephone: (212) 350-3642<br>Telecopy: (212) 350-3690 |
| Bank of America, N.A. | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376<br><br>with a copy to:<br><br>Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 | Bank of America, N.A.<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention: Terri Smith<br>Telephone: (214) 209-2141<br>Telecopy: (214) 290-8376<br><br><br><br>Bank of America, N.A.<br>1850 Gateway Blvd., 45th Floor<br>Concord, CA 94520<br>Attention: Camille Gibby<br>Telephone: (510) 675-7759<br>Telecopy: (510) 675-7531 |
| Bank of Montreal | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Bryan Nusky<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Brian Nusky<br>Telephone: (312) 750-4312<br>Telecopy: (312) 750-6061 |
| The Bank of New York | The Bank of New York<br>One Wall Street<br>Energy Division, 19th Floor<br>New York, NY 10286<br>Attention: Terri Foran<br>Telephone: (212) 635-7921<br>Telecopy: (212) 635-7926 | The Bank of New York<br>One Wall Street<br>Energy Division, 19th Floor<br>New York, NY 10286<br>Attention: Terri Foran<br>Telephone: (212) 635-7921<br>Telecopy: (212) 635-7926 |
| The Bank of Nova Scotia | The Bank of Nova Scotia<br>600 Peachtree St., NE, Ste. 2700<br>Atlanta, GA 30308<br>Attention: Donna Gardner<br>Telephone: (404) 877-1599<br>Telecopy: (404) 888-8998 | The Bank of Nova Scotia<br>600 Peachtree St., NE, Ste. 2700<br>Atlanta, GA 30308<br>Attention: Jefrey Jones<br>Telephone: (404) 877-1549<br>Telecopy: (404) 888-8998 |
| The Bank of Tokyo-Mitsubishi, Ltd., Houston Agency | Bank of Tokyo-Mitsubishi, Ltd.,<br>Houston Agency<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Michael Meiss<br>Telephone: (713) 655-3815<br>Telecopy: (713) 655-3855 | Bank of Tokyo-Mitsubishi, Ltd.,<br>Houston Agency<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Michael Meiss<br>Telephone: (713) 655-3815<br>Telecopy: (713) 655-3855 |

-2-

CONFIDENTIAL<br>CLH 002475

| | | |
|---|---|---|
| Bank One, NA | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention: Kenneth J. Fatur<br>Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention: Kenneth J. Fatur<br>Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 |
| Fleet National Bank | Fleet National Bank<br>100 Federal Street<br>Boston, MA 02110<br>Attention: Leah Hardy<br>Telephone: (617) 434-4633<br>Telecopy: (617) 454-9820 | Fleet National Bank<br>100 Federal Street<br>Boston, MA 02110<br>Attention: Leah Hardy<br>Telephone: (617) 434-4633<br>Telecopy: (617) 454-9820 |
| Bankers Trust Company | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy: (212) 250-7351 | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Jim Cullen<br>Telephone: (212) 250-7343<br>Telecopy: (212) 250-7351 |
| Barclays Bank PLC | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention: David Barton<br>Telephone: (212) 412-3702<br>Telecopy: (212) 412-5308 | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention: David Barton<br>Telephone: (212) 412-3702<br>Telecopy: (212) 412-5308 |
| Bayerische Hypo - und<br>Vereinsbank AG<br>New York Branch | Bayerische Hypo - und Vereinsbank AG<br>New York Branch<br>150 East 42nd Street<br>29th Floor<br>New York, NY 10017-4679<br>Attention: Yoram Danker<br>Telephone: (212) 672-5446<br>Telecopy: (212) 672-5530 | Bayerische Hypo - und Vereinsbank AG<br>New York Branch<br>150 East 42nd Street<br>29th Floor<br>New York, NY 10017-4679<br>Attention: Yoram Danker<br>Telephone: (212) 672-5446<br>Telecopy: (212) 672-5530 |
| Bayerische Landesbank<br>Girozentrale | Bayerische Landesbank<br>Girozentrale<br>560 Lexington Avenue<br>New York, NY 10022<br>Attention: Sean O'Sullivan/<br>Edward Santos<br>Telephone: (212) 310-9913/<br>(212) 310-9962<br>Telecopy: (212) 310-9868 | Bayerische Landesbank<br>Girozentrale<br>560 Lexington Avenue<br>New York, NY 10022<br>Attention: Sean O'Sullivan/<br>Edward Santos<br>Telephone: (212) 310-9913/<br>(212) 310-9962<br>Telecopy: (212) 310-9868 |
| BBL International (U.K.)<br>Limited | BBL International (U.K.) Ltd.<br>6 Broadgate<br>London EC2M 2AJ<br>England<br>Attention: Karen Bowman<br>Telephone: 00-44-20-7392-5583<br>Telecopy: 00-44-20-7562-0210<br>Attention: Jeremy Hayes<br>Telephone: 00-44-20-7392-5586<br>Telecopy: 00-44-20-7562-0210<br>Attention: Tessa Baptiste<br>Telephone: 00-44-20-7392-5517<br>Telecopy: 00-44-20-7562-0210 | BBL International (U.K.) Ltd.<br>6 Broadgate<br>London EC2M 2AJ<br>England<br>Attention: Karen Bowman<br>Telephone: 00-44-20-7392-5583<br>Telecopy: 00-44-20-7562-0210<br>Attention: Jeremy Hayes<br>Telephone: 00-44-20-7392-5586<br>Telecopy: 00-44-20-7562-0210<br>Attention: Tessa Baptiste<br>Telephone: 00-44-20-7392-5517<br>Telecopy: 00-44-20-7562-0210 |

-3-

CONFIDENTIAL<br>CLH 002476

| | | |
|---|---|---|
| The Chase Manhattan Bank | The Chase Manhattan Bank<br>1 Chase Manhattan Plaza, 8th Floor<br>New York, NY 10081<br>Attention: Lisa Pucciarelli<br>Telephone: (212) 552-7886<br>Telecopy: (212) 552-5777<br><br>with a copy to:<br><br>Chase Bank of Texas, N.A.<br>600 Travis<br>Houston, Texas 77002<br>Attention: Peter Licalzi<br>Telephone: (713) 216-8869<br>Telecopy: (713) 216-4117 | The Chase Manhattan Bank<br>1 Chase Manhattan Plaza, 8th Floor<br>New York, NY 10081<br>Attention: Lisa Pucciarelli<br>Telephone: (212) 552-7886<br>Telecopy: (212) 552-5777<br><br>with a copy to:<br><br>Chase Bank of Texas, N.A.<br>600 Travis<br>Houston, Texas 77002<br>Attention: Peter Licalzi<br>Telephone: (713) 216-8869<br>Telecopy: (713) 216-4117 |
| Christiania Bank og<br>Kreditkasse ASA | Christiania Bank og Kreditkasse ASA<br>11 West 42nd Street, 7th Floor<br>New York, NY 10036<br>Attention: Lucina Ong<br>Telephone: (212) 827-4877<br>Telecopy: (212) 827-4888 | Christiania Bank og Kreditkasse ASA<br>11 West 42nd Street, 7th Floor<br>New York, NY 10036<br>Attention: Lucine Ong<br>Telephone: (212) 827-4877<br>Telecopy: (212) 827-4888 |
| CIBC Inc. | CIBC Inc.<br>2727 Paces Ferry Road, Suite 1200<br>Atlanta, GA 30339<br>Attention: Anita Rounds<br>Telephone: (770) 319-4828<br>Telecopy: (770) 319-4950 | CIBC Inc.<br>2727 Paces Ferry Road, Suite 1200<br>Atlanta, GA 30339<br>Attention: Anita Rounds<br>Telephone: (770) 319-4828<br>Telecopy: (770) 319-4950 |
| Citibank, N.A. | Citibank, N.A.<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Sydney Chance<br>Telephone: (302) 894-6076<br>Telecopy: (302) 894-6120<br>Attention: Alvin Weissberger<br>Telephone: (302) 894-6043<br>Telecopy: (302) 894-6120<br><br>with a copy to:<br><br>Citicorp Securities, Inc.<br>1200 Smith Street, Suite 2000<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 | Citibank, N.A.<br>1 Penn's Way<br>New Castle, DE 19720<br>Attention: Mike Whitman<br>and Phil Green<br>Telephone: (302) 894-6021<br>Telecopy: (302) 894-6120<br><br><br><br><br><br>with a copy to:<br><br>Citicorp Securities, Inc.<br>1200 Smith Street, Suite 200<br>Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 |
| Commerzbank AG, New York<br>and Grand Cayman Branches | Commerzbank AG, New York and<br>Grand Cayman Branches<br>1230 Peachtree St., N.E., Suite 3500<br>Atlanta, GA 30309<br>Attention: David Suttles<br>Telephone: (404) 888-6524<br>Telecopy: (404) 888-6539<br>Attention: Lee Ward<br>Telephone: (404) 888-6526<br>Telecopy: (404) 888-6539 | Commerzbank AG, New York and<br>Grand Cayman Branches<br>1230 Peachtree St., N.E., Suite 3500<br>Atlanta, GA 30309<br>Attention: David Suttles<br>Telephone: (404) 888-6524<br>Telecopy: (404) 888-6539<br>Attention: Lee Ward<br>Telephone: (404) 888-6526<br>Telecopy: (404) 888-6539 |

-4-

CONFIDENTIAL
CLH 002477

| Credit Agricole Indosuez | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 |
|---|---|---|
| Credit Lyonnais New York Branch | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone: (713) 753-8723<br>Telecopy: (713) 759-9766 |
| Credit Suisse First Boston | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention: Jenaro Sarasola<br>Telephone: (212) 322-1384<br>Telecopy: (212) 335-0593/0576 |
| The Dai-Ichi Kangyo Bank, Ltd. | The Dai-Ichi Kangyo Bank, Ltd.<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Katsuya Noto<br>            Assistant Vice President<br>Telephone: (212) 432-6627<br>Telecopy: (212) 912-1879 | The Dai-Ichi Kangyo Bank, Ltd.<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Katsuya Noto<br>            Assistant Vice President<br>Telephone: (212) 432-6627<br>Telecopy: (212) 912-1879 |
| DG BANK Deutsche Genossenschaftsbank AG | DG BANK Deutsche<br>Genossenschaftsbank AG<br>DG Bank Building<br>609 Fifth Avenue<br>New York, NY 10017-1021<br>Attention: Mark Connelly<br>Telephone: (212) 745-1560<br>Telecopy: (212) 745-1556 | DG BANK Deutsche<br>Genossenschaftsbank AG<br>DG Bank Building<br>609 Fifth Avenue<br>New York, NY 10017-1021<br>Attention: Mark Connelly<br>Telephone: (212) 745-1560<br>Telecopy: (212) 745-1556 |
| DLJ Capital Funding, Inc. | DLJ Capital Funding, Inc.<br>277 Park Avenue, 17th Floor<br>New York, NY 10172<br>Attention: Dana Klein<br>Telephone: (212) 892-7911<br>Telecopy: (212) 892-7542 | DLJ Capital Funding, Inc.<br>277 Park Avenue, 17th Floor<br>New York, NY 10172<br>Attention: Dana Klein<br>Telephone: (212) 892-7911<br>Telecopy: (212) 892-7542 |
| Dresdner Bank AG, New York and Grand Cayman Branches | Dresdner Bank AG, New York Branch<br>75 Wall Street<br>New York, NY 10005-2889<br>Attention: Annabelle Librojo<br>Telephone: (212) 429-2269<br>Telecopy: (212) 429-2130 | Dresdner Bank AG, Grand Cayman Branch<br>75 Wall Street<br>New York, NY 10005-2889<br>Attention: Annabelle Librojo<br>Telephone: (212) 429-2269<br>Telecopy: (212) 429-2130 |
| First Union National Bank | First Union National Bank<br>301 South College Street<br>Charlotte, NC 28288<br>Attention: Debbie Blank<br>Telephone: (713) 346-2727<br>Telecopy: (713) 650-6354 | First Union National Bank<br>301 South College Street<br>Charlotte, NC 28288<br>Attention: Debbie Blank<br>Telephone: (713) 346-2727<br>Telecopy: (713) 650-6354 |

CONFIDENTIAL
CLH 002478

| The Fuji Bank, Limited | The Fuji Bank, Limited<br>Two World Trade Center<br>New York, NY 10048<br>Attention: Tina Catapano<br>Telephone: (212) 898-2099<br>Telecopy: (212) 488-8216 | The Fuji Bank, Limited<br>Two World Trade Center<br>New York, NY 10048<br>Attention: Tina Catapano<br>Telephone: (212) 898-2099<br>Telecopy: (212) 488-8216 |
|---|---|---|
| HSBC Bank USA | HSBC Bank USA<br>1 HSBC Center<br>Buffalo, NY 14203<br>Attention: Donna Riley<br>Telephone: (716) 841-4178<br>Telecopy: (716) 841-1844 | HSBC Bank USA<br>1 HSBC Center<br>Buffalo, NY 14203<br>Attention: Donna Riley<br>Telephone: (716) 841-4178<br>Telecopy: (716) 841-1844 |
| The Industrial Bank of Japan Trust Company | The Industrial Bank of Japan Trust Company<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attention: Andrew Encarnacion<br>Telephone: (212) 282-4065<br>Telecopy: (212) 282-4480 | The Industrial Bank of Japan Trust Company<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attention: Andrew Encarnacion<br>Telephone: (212) 282-4065<br>Telecopy: (212) 282-4480 |
| KBC Bank N.V. | KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone: (212) 541-0653<br>Telecopy: (212) 956-5581 | KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone: (212) 541-0653<br>Telecopy: (212) 956-5581 |
| MeesPierson N.V. | MeesPierson N.V.<br>Camomile Court<br>23 Camomile Street<br>London, England EC3A 7PP<br>Attention: Michael Davies, Manager<br>Telephone: 44-20-7444-8712<br>Telecopy: 44-20-7444-8810 | MeesPierson N.V.<br>Camomile Court<br>23 Camomile Street<br>London, England EC3A 7PP<br>Attention: Michael Davies, Manager<br>Telephone: 44-20-7444-8712<br>Telecopy: 44-20-7444-8810 |
| Merrill Lynch Bank USA | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT 84101<br>Attention: Kevin Imlay<br>Telephone: (801) 526-8310<br>Telecopy: (801) 521-6466 | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT 84101<br>Attention: Kevin Imlay<br>Telephone: (801) 526-8310<br>Telecopy: (801) 521-6466 |
| Morgan Guaranty Trust Company of New York | Morgan Guaranty Trust Company of New York<br>60 Wall Street, 3rd Floor<br>New York, NY 10260-0060<br>Attention: Bob McMinn<br>Telephone: (212) 648-0896<br>Telecopy: (212) 648-5358<br>Attention: Ed Wirth<br>Telephone: (302) 634-4273<br>Telecopy: (302) 634-1094 | Morgan Guaranty Trust Company of New York<br>60 Wall Street, 3rd Floor<br>New York, NY 10260-0060<br>Attention: Bob McMinn<br>Telephone: (212) 648-0896<br>Telecopy: (212) 648-5358<br>Attention: Ed Wirth<br>Telephone: (302) 634-4273<br>Telecopy: (302) 634-1094 |
| NATEXIS Banque | NATEXIS Banque<br>333 Clay Street, Suite 4340<br>Houston, TX 77002<br>Attention: Louis "Parker" Laville<br>Vice President<br>Telephone: (713) 759-9401<br>Telecopy: (713) 759-9908 | NATEXIS Banque<br>333 Clay Street, Suite 4340<br>Houston, TX 77002<br>Attention: Louis "Parker" Laville<br>Vice President<br>Telephone: (713) 759-9401<br>Telecopy: (713) 759-9908 |

CONFIDENTIAL
CLH 002479

| | | |
|---|---|---|
| National Australia Bank Limited | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY 10166<br>Attention: Frank J. Campiglia<br>Telephone: (212) 916-9595<br>Telecopy: (212) 983-1969 | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY 10166<br>Attention: Frank J. Campiglia<br>Telephone: (212) 916-9595<br>Telecopy: (212) 983-1969 |
| National Westminster Bank PLC | National Westminster Bank PLC<br>65 East 55th Street<br>24th Floor<br>New York, NY 10022<br>Attention: Settie Chinapen<br>Telephone: (212) 401-1407<br>Telecopy: (212) 401-1494 | National Westminster Bank PLC<br>65 East 55th Street<br>24th Floor<br>New York, NY 10022<br>Attention: Settie Chinapen<br>Telephone: (212) 401-1407<br>Telecopy: (212) 401-1494 |
| The Northern Trust Company | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL 60675<br>Attention: Linda Honda<br>Telephone: (312) 444-3532<br>Telecopy: (312) 630-1566 | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL 60675<br>Attention: Linda Honda<br>Telephone: (312) 444-3532<br>Telecopy: (312) 630-1566 |
| Paribas | Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 | Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX 77002<br>Attention: Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 |
| Royal Bank of Canada | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention: Assistant Manager,<br>Loan Processing<br>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372 | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention: Assistant Manager,<br>Loan Processing<br>Telephone: (212) 428-6321<br>Telecopy: (212) 428-2372 |
| SanPaolo IMI S.p.A. | SanPaolo IMI S.p.A.<br>245 Park Avenue, 35th Floor<br>New York, NY 10067<br>Attention: Glen Binder, Vice President<br>Telephone: (212) 692-3016<br>Telecopy: (212) 599-5303 | SanPaolo IMI S.p.A.<br>245 Park Avenue, 35th Floor<br>New York, NY 10067<br>Attention: Glen Binder, Vice President<br>Telephone: (212) 692-3016<br>Telecopy: (212) 599-5303 |
| Societe Generale | Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Lia Guerra<br>Telephone: (214) 979-2769<br>Telecopy: (214) 979-1104 | Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention: Lia Guerra<br>Telephone: (214) 979-2769<br>Telecopy: (214) 979-1104 |
| Standard Chartered Bank | Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Insinga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780 | Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention: Jack Insinga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy: (212) 667-0780 |
| The Sumitomo Bank, Limited | The Sumitomo Bank, Limited<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537 | The Sumitomo Bank, Limited<br>277 Park Avenue<br>New York, NY 10172<br>Attention: Jessica Cueto<br>Telephone: (212) 224-4132<br>Telecopy: (212) 224-4537 |

-7-

CONFIDENTIAL<br>CLH 002480

| | | |
|---|---|---|
| SunTrust Bank, Atlanta | SunTrust Bank, Atlanta<br>25 Park Place, 24th Floor<br>Atlanta, GA 30303<br>Attention: John A. Fields, Jr.<br>First Vice President<br>Telephone: (404) 724-3667<br>Telecopy: (404) 827-6270 | SunTrust Bank, Atlanta<br>25 Park Place, 24th Floor<br>Atlanta, GA 30303<br>Attention: John A. Fields, Jr.<br>First Vice President<br>Telephone: (404) 724-3667<br>Telecopy: (404) 827-6270 |
| Toronto Dominion (Texas), Inc. | Toronto Dominion (Texas), Inc.<br>909 Fannin Street, 17th Floor<br>Houston, TX 77010<br>Attention: Lynn Chasin<br>Telephone: (713) 653-8234<br>Telecopy: (713) 951-9921 | Toronto Dominion (Texas), Inc.<br>909 Fannin Street, 17th Floor<br>Houston, TX 77010<br>Attention: Lynn Chasin<br>Telephone: (713) 653-8234<br>Telecopy: (713) 951-9921 |
| UBS AG, Stamford Branch | UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Sailoz Sikka<br>Telephone: (203) 719-3072<br>Telecopy: (203) 719-3888 | UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention: Sailoz Sikka<br>Telephone: (203) 719-3072<br>Telecopy: (203) 719-3888 |
| UniCredito Italiano SpA | UniCredito Italiano SpA<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Angie Blanco<br>Telephone: (212) 546-9614<br>Telecopy: (212) 826-9675 | UniCredito Italiano SpA<br>375 Park Avenue<br>New York, NY 10152<br>Attention: Angie Blanco<br>Telephone: (212) 546-9614<br>Telecopy: (212) 826-9675 |
| Wachovia Bank, N.A. | Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905 | Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T. Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905 |
| Westdeutsche Landesbank<br>Girozentrale, New York<br>Branch | Westdeutsche Landesbank<br>Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention: Cheryl Wilson<br>Telephone: (212) 852-6152<br>Telecopy: (212) 302-7948 | Westdeutsche Landesbank<br>Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention: Cheryl Wilson<br>Telephone: (212) 852-6152<br>Telecopy: (212) 302-7948 |

-8-

CONFIDENTIAL
CLH 002481

EXHIBIT A

PROMISSORY NOTE

U.S. $_____                                                    Dated:_____

FOR VALUE RECEIVED, the undersigned, Enron Corp., an Oregon corporation (the "Borrower"), HEREBY PROMISES TO PAY to the order of _____ (the "Bank") for the account of its Applicable Lending Office (as defined in the Credit Agreement referred to below) on the Stated Termination Date (as defined in the Credit Agreement referred to below) applicable to such Bank, or on such earlier date payment is required to be made pursuant to such Credit Agreement, the principal sum of _____ U.S. dollars (U.S. $_____) or, if less, the aggregate unpaid principal amount of the Advances (as defined in the U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 18, 2000 among the Borrower, the Bank, certain other lenders parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, as amended from time to time; such 364-Day Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement") owing to the Bank outstanding on such date.

The Borrower promises to pay interest on the unpaid principal amount of each Advance owing to the Bank from the date of such Advance until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

Both principal and interest are payable in lawful money of the United States of America to Citibank, N.A. as Paying Agent at 399 Park Avenue, New York, New York 10043 in same day funds



This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of New York.

ENRON CORP.

By:_____

Name:_____

Title:_____

-2-

CONFIDENTIAL
CLH 002483

ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Type of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|------|------|------|------|------|
| | | | | | |

-3-

CONFIDENTIAL
CLH 002484

**EXHIBIT B**

NOTICE OF BORROWING
[Date]

Citibank, N. A., as Paying Agent
399 Park Avenue
New York, New York 10043

Attention: Energy Department, North American Banking Group

Ladies and Gentlemen:

The undersigned, Enron Corp., refers to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 18, 2000 (such 364-Day Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement", the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement:

(i)    The Business Day of the Proposed Borrowing is _____, _____.

(ii)    The Type of Advances comprising the Proposed Borrowing is [Base Rate Advances] [LIBOR Advances].

(iii)    The aggregate amount of the Proposed Borrowing is $_____.

*[(iv)    The initial Interest Period for each Advance made as part of the Proposed Borrowing is _____ (months).]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(A)    the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

---

*    To be included for a Proposed Borrowing comprised of LIBOR Advances.

CONFIDENTIAL
CLH 002485

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both.

Very truly yours,

ENRON CORP.

By: _____
Name: _____
Title: _____

cc:    Citicorp Securities, Inc.
       1200 Smith Street, Suite 2000
       Houston, Texas 77002
       Attention: James F. Reilly, Jr.
                  Managing Director
       Telecopier No.: (713) 654-2849

-2-

CONFIDENTIAL
CLH 002486

<div align="right"><u>EXHIBIT C</u></div>

<div align="center">[Opinion of Vinson & Elkins L.L.P.]</div>

<div align="center">May 18, 2000</div>

To each of the Banks parties to the 364-Day Revolving
Credit Agreement dated as of May 18, 2000,
among Enron Corp., said Banks, Citibank, N.A.,
as Paying Agent, Citibank, N.A. and The Chase
Manhattan Bank, as Co-Administrative Agents
and to such Paying Agent and Co-Administrative
Agents

RE:     Enron Corp.

Ladies and Gentlemen:

This opinion is furnished to you pursuant to Section 3.01(d) of the 364-Day Revolving Credit Agreement, dated as of May 18, 2000 (the "Credit Agreement"), among Enron Corp. (the "Borrower"), the Banks parties thereto, Citibank, N.A., as Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents.  Except as otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined.

We have acted as counsel for the Borrower in connection with the preparation, execution, delivery and effectiveness of the Credit Agreement.

In that connection, we have examined:

(1)     The Credit Agreement and the Notes (other than any Note that may be executed and delivered after the date hereof); and

(2)     The other documents furnished by the Borrower pursuant to the conditions precedent set forth in Section 3.01 of the Credit Agreement.

In addition, we have (i) investigated such questions of law and (ii) relied on such certificates from officers and representatives of the Borrower and from public officials, as we have deemed necessary or appropriate for the purposes of this opinion.

In rendering the opinions herein set forth, we have assumed (i) the due authorization, execution and delivery of each document referred to in clauses (1) and (2) of the third paragraph of this opinion by all parties to such documents and that each such document is valid, binding and enforceable (subject to limitations on enforceability of the types referred to in paragraphs (a) and (b) below) against the parties thereto other than the Borrower, (ii) the legal capacity of natural persons, (iii) the genuineness of all signatures, (iv) the authenticity of all documents submitted to us as originals, and (v) the conformity to original documents of all documents submitted to us as copies.

<div align="right">**CONFIDENTIAL**<br>**CLH 002487**</div>

Based upon the foregoing and upon such investigation as we have deemed necessary, we are of the following opinion:

1.    No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required to be made or obtained by the Borrower for the execution, delivery and performance by the Borrower of each Loan Document.

2.    The execution, delivery and performance by the Borrower of each Loan Document does not contravene any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or of Regulation U issued by the Federal Reserve Board.

3.    Under the laws of the State of New York and the federal laws of the United States, the Credit Agreement and the Notes constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms.

4.    A Texas court or a United States federal court applying Texas conflict-of-laws principles will give effect to the choice of New York law as the governing law of the Credit Agreement and the Notes and will apply New York law (other than New York procedural law) in any action to enforce the Credit Agreement and the Notes.

The opinions set forth above are subject to the following qualifications:

(a)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally.

(b)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, and also to the possible unavailability of specific performance or injunctive relief. Such principles of equity are of general application, and in applying such principles a court, among other things, might not allow a creditor to accelerate maturity of a debt upon the occurrence of a default deemed immaterial or might decline to order the Borrower to perform covenants. In addition, we express no opinion as to the enforceability of the following provisions to the extent same are contained in the Credit Agreement or the Notes: (i) provisions purporting to waive or not give effect to rights to notices, demands, legal defenses, or other rights or benefits that cannot be waived or rendered ineffective under applicable law; (ii) provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability to the extent that the same are inconsistent with public policy; (iii) provisions purporting to establish evidentiary standards for enforcement of the Loan Documents or providing that decisions by a party are conclusive or are based on such party's sole or absolute discretion; or (iv) provisions relating to rights of setoff.

(c)    Our opinion in paragraph 2, with respect to Texas law, takes into account and is based on and qualified by our opinion in paragraph 4.

(d)    In rendering our opinion in paragraph 3 above with respect to Notes delivered after the date hereof, we assume that such Notes will be issued, executed and delivered in accordance with the provisions of the Credit Agreement.

(e)    Our opinion in paragraph 4 above is based on the language of section 35.51 of the Texas Business and Commerce Code.

-2-

CONFIDENTIAL
CLH 002488

In rendering the opinions expressed in paragraphs 1, 2, and 3 above, we have relied upon the opinions stated in paragraphs 1, 2 (so far as such paragraph 2 relates to the corporate powers of, and due authorization of the Loan Documents by, the Borrower, and noncontravention of the Amended and Restated Articles of Incorporation, as amended, and Bylaws, as amended, of the Borrower), 4, and 5 of the opinion, dated today, of the Executive Vice President and General Counsel of the Borrower which is being delivered to you pursuant to Section 3.01(e) of the Credit Agreement.

We have not been called upon to, and accordingly do not, express any opinion as to the various state and federal laws regulating banks or the conduct of their business (except Regulation U issued by the Federal Reserve Board) that may relate to the Loan Documents or the transactions contemplated thereby.

This opinion is limited to the laws of the State of Texas and the State of New York, the Oregon Business Corporation Act and the federal law of the United States.

The opinions herein have been furnished at your request and are solely for your benefit and the benefit of your respective successors and your respective assignees and participants pursuant to the Credit Agreement, and the Paying Agent's special counsel, in connection with the subject transaction and may not be relied upon by any other person or by you or any other person in any other context without the prior written consent of the undersigned.

We are aware that Bracewell & Patterson, L.L.P. will rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

-3-

CONFIDENTIAL
CLH 002489

<u>EXHIBIT D</u>

[Opinion of Executive Vice President and
General Counsel of the Borrower]

May 18, 2000

To each of the Banks parties to the
364-Day Revolving Credit Agreement
dated as of May 18, 2000 among Enron
Corp., said Banks, Citibank, N.A., as
Paying Agent, and Citibank, N.A. and
The Chase Manhattan Bank, as Co-
Administrative Agents, and to such Paying
Agent and Co-Administrative Agents

RE:   $1,750,000,000 364-Day Revolving Credit Agreement of even date herewith among Enron
Corp., as Borrower, the Banks named therein, Citibank, N.A., as Paying Agent, and Citibank, N.A. and The
Chase Manhattan Bank, as Co-Administrative Agents

Ladies and Gentlemen:

As Executive Vice President and General Counsel of Enron Corp., an Oregon corporation (the
"<u>Borrower</u>"), I am familiar with the 364-Day Revolving Credit Agreement (the "<u>Credit Agreement</u>") dated
as of May 18, 2000 among the Borrower, the Banks listed on the signature pages thereto, Citibank, N.A., as
Paying Agent, and Citibank, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents. In such
capacities, I am also familiar with the Amended and Restated Articles of Incorporation, as amended, and By-
laws, as amended, of the Borrower. This opinion is being furnished to you pursuant to Section 3.01(e) of the
Credit Agreement. Terms defined in the Credit Agreement and not otherwise defined herein are used herein
as therein defined.

Before rendering the opinion hereinafter set forth, I (or other attorneys with the Borrower's legal
department acting under my direction) have examined the Loan Documents, and have examined and relied
upon originals or photostatic or certified copies of such corporate records, certificates of officers of the
Borrower and of public officials, and such agreements, documents and instruments, and made such
investigations of law, as I or such other attorneys have deemed relevant and necessary as the basis for the
opinion hereinafter expressed. In such examination, I or such other attorneys assumed the genuineness of
all signatures (other than signatures of officers of the Borrower on the Loan Documents) and the authenticity
of all documents submitted to us as originals, and the conformity to original documents of all documents
submitted to us as photostatic or certified copies.

Upon the basis of the foregoing, I am of the opinion that:

1.     The Borrower is a corporation duly organized, validly existing and in good standing under
the laws of the State of Oregon, and has all corporate powers and all governmental licenses, authorizations,
consents and approvals required to carry on its business as now conducted, except to the extent failure to
obtain such licenses, authorizations, consents or approvals would not materially adversely affect the
Borrower and its Subsidiaries taken as a whole.

CONFIDENTIAL
CLH 002490

2.      The execution, delivery and performance by the Borrower of each Loan Document is within the Borrower's corporate powers, has been duly authorized by all necessary corporate action on the part of the Borrower, and do not contravene, or constitute a default under, (a) the Amended and Restated Articles of Incorporation, as amended, or By-laws, as amended, of the Borrower, (b) any contractual or legal restriction contained in any material (meaning for the purposes of this opinion those creating a monetary liability of $100,000,000 or more) indenture, loan or credit agreement, receivables sale or financing agreement, lease financing agreement, capital lease, mortgage, security agreement, bond or note, or any guaranty of any of such obligations to which the Borrower is a party, or (c) any judgment, injunction, order or decree known to me binding upon the Borrower.  The execution, delivery and performance by the Borrower of each of the Loan Documents will not result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any Subsidiary.  The Credit Agreement and the Notes have been duly executed and delivered by the Borrower.

3.      Except as disclosed in the Borrower's Form 10-K for the year ended December 31, 1999 or the Borrower's Form 10-Q for the quarter ended March 31, 2000, there is no action, suit or proceeding pending or, to my knowledge, threatened against the Borrower before any court or arbitrator or any governmental agency, in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Borrower and its Subsidiaries taken as a whole or which in any manner draws into question the validity of the Credit Agreement or any other Loan Document.

4.      Neither the Borrower nor any Subsidiary is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5.      Each of the Borrower and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" under the Public Utility Holding Company Act of 1935, as amended, or pursuant to such Act or the rules and regulations promulgated thereunder or any order or interpretation of the Securities and Exchange Commission or its staff issued pursuant thereto.

The opinions set forth above are subject to the following qualifications:

1.      In rendering the opinion expressed in paragraph 2 above, neither I nor any other attorney acting under my direction have made any examination of any accounting or financial matters related to certain of the covenants contained in certain documents to which the Borrower may be subject, and I express no opinion with respect thereto.

2.      I am a member of the Bar of the State of Texas, and this opinion is limited in all respects to the laws of the State of Texas, the Oregon Business Corporation Act and Federal law.

3.      In rendering the opinion expressed in paragraph 3 above, I (or the other attorneys acting under my direction) have only reviewed the files and records of the Borrower and the Subsidiaries, and we have consulted with such senior officers of the Borrower and the Subsidiaries as we have deemed necessary.

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees pursuant to the Credit Agreement and the Paying Agent's special counsel and may not be relied upon in connection with any other transaction or by any other person; provided, however, that Vinson & Elkins L.L.P. may rely on certain provisions of this opinion to the extent stated in its opinion for the purposes of rendering its opinion pursuant to Section 3.01(d)

-2-

CONFIDENTIAL
CLH 002491

of the Credit Agreement, and Bracewell & Patterson, L.L.P. may rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(f) of the Credit Agreement.

Very truly yours,

-3-

CONFIDENTIAL
CLH 002492

[FORM OF OPINION OF SPECIAL COUNSEL
TO THE PAYING AGENT]

May 18, 2000

To Citibank, N.A. and The Chase Manhattan Bank,
as Co-Administrative Agents, to Citibank, N.A., as Paying Agent
and to each of the Banks party to the Credit
Agreement described below

Ladies and Gentlemen:

We have acted as special counsel to Citibank, N. A. in connection with the preparation, execution and delivery of the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 18, 2000 (the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), and each of you. Capitalized terms defined in the Credit Agreement are used herein as therein defined.

In that connection, we have examined the following documents:

(1)    Counterparts of the Credit Agreement, executed by the Paying Agent and the Borrower, respectively.

(2)    The documents furnished by the Borrower pursuant to Section 3.01 of the Credit Agreement and listed on Annex A hereto, including the opinion of Messrs. Vinson & Elkins, L.L.P., counsel to the Borrower (the "Opinion of Borrower's Counsel") and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower (the "General Counsel Opinion").

In our examination of the documents referred to above, we have assumed the authenticity of all such documents submitted to us as originals, the genuineness of all signatures and the conformity to the originals of all such documents submitted to us as copies. We have also assumed the accuracy of all matters set forth in the certificates referred to on Annex A hereto and assumed that each of the Borrower, the Banks, the Co-Administrative Agents, and the Paying Agent has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the Credit Agreement, and that the Borrower has duly executed and delivered, with all necessary power and authority (corporate and otherwise), the respective Notes and other Loan Documents contemplated to be executed by it. We have also assumed that no Bank has requested that the opinion required by Section 3.01(d) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit C to the Credit Agreement or that the form of opinion of James V. Derrick, Jr. required by Section 3.01(e) of the Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit D to the Credit Agreement.

Based upon the foregoing examination of documents and assumptions and upon such other investigation as we have deemed necessary, we are of the opinion that the Opinion of Borrower's Counsel, the General

CONFIDENTIAL
CLH 002493

Counsel Opinion and the other documents referred to in item (2) above, are substantially responsive to the requirements of the Credit Agreement.

This opinion is solely for the benefit of the Banks, the Paying Agent, the Co-Administrative Agents, their respective successors, assigns, participants and other transferees and may be relied upon only by such Persons in connection with the transactions contemplated by the Credit Agreement.

Very truly yours,

Bracewell & Patterson, L.L.P.

-2-

CONFIDENTIAL
CLH 002494

ANNEX A

(1)    The 58 Promissory Notes dated May 18, 2000 of the Borrower payable to the order of each of the Banks.

(2)    The opinion of Vinson & Elkins L.L.P., counsel to the Borrower, substantially in the form of Exhibit C to the Credit Agreement and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Borrower substantially in the form of Exhibit D to the Credit Agreement.

(3)    A certificate of an officer of the Borrower certifying copies of the resolutions of the Board of Directors of the Borrower referred to in Section 3.01(b) of the Credit Agreement and the certificate of an officer of the Borrower contemplated by Section 3.01(c) of the Credit Agreement.

CONFIDENTIAL
CLH 002495

EXHIBIT F

ASSIGNMENT AND ACCEPTANCE

Dated _____, ____

Reference is made to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 18, 2000 (such 364-Day Revolving Credit Agreement, as amended or otherwise modified from time to time, being herein referred to as the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), the Banks (as defined in the Credit Agreement), Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent. Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.     The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement.  After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of the Advances owing to the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

2.     The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iv) attaches the Note held by the Assignor and requests that the Paying Agent exchange such Note for a new Note payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance or new Notes payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance and the Assignor in an amount equal to the Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

3.     The Assignee attaches the Note (if any) held by it and (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents, the Assignor or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, any of

CONFIDENTIAL
CLH 002496

the other Loan Documents or any other instrument or document; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Paying Agent and the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent and the Co-Administrative Agents by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof.

4.       Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents. The effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto.

5.       Upon such acceptance and recording by the Paying Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement and under the other Loan Documents.

6.       Upon such acceptance and recording by the Paying Agent, from and after the Effective Date, the Paying Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and facility fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.       This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.       This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

-2-

CONFIDENTIAL
CLH 002497

Schedule 1
to
Assignment and Acceptance

Section 1.
    Percentage interest assigned:                           ____%

Section 2.
    Assignee's Commitment before giving effect to this
        Assignment and Acceptance:                 $_____
    Assignee's outstanding principal of Advances before
        giving effect to this Assignment and Acceptance     $_____

    Aggregate outstanding principal of Advances assigned to
        the Assignee under this Assignment and Acceptance:     $_____

    Assignee's Commitment after giving effect to this
        Assignment and Acceptance:                 $_____
    Assignee's outstanding principal of Advances after
        giving effect to this Assignment and Acceptance:     $_____

    Assignor's remaining Commitment after
        giving effect to this Assignment and Acceptance:     $_____
    Assignor's remaining outstanding principal of Advances
        after giving effect to this Assignment and Acceptance:     $_____

    Principal amount of Note payable to the Assignee:     $_____

    Principal amount of Note payable to the Assignor:     $_____

Section 3.
    Effective Date**:                           _____, 20__

                    [NAME OF ASSIGNOR], as Assignor

                    By: _____
                    Name: _____
                    Title: _____
                    Dated: _____, _____

---

  **   This date should be no earlier than the date five Business Days after the delivery of
this Assignment and Acceptance to the Paying Agent.

CONFIDENTIAL
CLH 002498

[NAME OF ASSIGNEE], as Assignee

By: _____
Name: _____
Title: _____
Dated: _____, _____

Domestic Lending Office (and
      address for notices):

[Address]

Eurodollar Lending Office:

[Address]

[Approved this ___ day of _____,

_____

ENRON CORP.

By: _____
Name: _____
Title: _____]***

Accepted [and Approved]*** this ___ day of
_____, _____

[NAME OF PAYING AGENT], as
      Paying Agent

By: _____
Name: _____
Title: _____

_____

***Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Credit Agreement.

-2-

CONFIDENTIAL
CLH 002499

EXHIBIT G-1

NEW BANK AGREEMENT

This New Bank Agreement dated as of _____, (this "Agreement") is by and among (i) Enron Corp., an Oregon corporation ("Borrower"), (ii) Citibank, N.A. in its capacity as Paying Agent under the U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 18, 2000 (as it may be amended or modified from time to time, the "Credit Agreement", capitalized terms that are defined in the Credit Agreement and not defined herein are used herein as therein defined) among the Borrower, the Co-Administrative Agents referred to therein, Citibank, N.A. in such capacity and the Banks party thereto, and (iii) _____ ("New Bank").

Preliminary Statements

1.      Pursuant to Section 2.18 of the Credit Agreement, the Borrower has the right, subject to the terms and conditions thereof, to add the Credit Agreement one or more banks or other financial institutions to replace the Commitments of Terminating Banks.

2.      The Borrower has given notice to the Paying Agent pursuant to Section 2.18 of the Credit Agreement of its intention to add the New Bank to the Credit Agreement as a Bank with a Commitment of $_____, and the Paying Agent is willing to consent thereto.

Accordingly, the parties hereto agree as follows:

Section 1. Addition of New Bank. Pursuant to Section 2.18 of the Credit Agreement, the New Bank is hereby added to the Credit Agreement as a Bank with a Commitment of $_____. The New Bank specifies as its Domestic Lending Office and Eurodollar Lending Office the following:

Domestic Lending      Address:
Office:

                     Attention:
                     Telephone:
                     Telecopy:

Eurodollar Lending   Address:
Office:

                     Attention:
                     Telephone:
                     Telecopy:

Section 2. New Note. The Borrower agrees to promptly execute and deliver to the New Bank a Note in the amount of its Commitment set forth in Section 1 above ("New Note").

Section 3. Consent. The Paying Agent and the Borrower hereby consent to the addition of the New Bank effectuated hereby.

Section 4. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

CONFIDENTIAL
CLH 002500

Section 5.  Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 6.  Bank Credit Decision.  The New Bank acknowledges that it has, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to agree to the various matters set forth herein.  The New Bank also acknowledges that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement.

Section 7.  Representations and Warranties of the Borrower.  The Borrower represents and warrants as follows:

(a)     The execution, delivery and performance by the Borrower of this Agreement and the New Note are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

(b)     This Agreement is a legal, valid and binding obligation of the Borrower and the New Note, when executed and delivered in accordance with this Agreement, will be a legal, valid and binding obligation of the Borrower, in each case enforceable against the Borrower in accordance with its respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(c)     After giving effect to this Agreement and any other New Bank Agreements and Commitment Increase Agreements, the Borrower will be in compliance with the limitation set forth in clause (a) of the proviso to the first sentence of Section 2.18 of the Credit Agreement.

(d)     No event has occurred and is continuing which constitutes an Event of Default.

(e)     No Advances are outstanding.

(f)     Attached hereto are resolutions duly adopted by the Board of Directors of the Borrower sufficient to authorize this Agreement and the New Note, and such resolutions are in full force and effect.

Section 8.  Default.  Without limiting any other event that may constitute an Event of Default, in the event any representation or warranty of the Borrower set forth herein shall prove to have been incorrect in

-2-

CONFIDENTIAL
CLH 002501

any material respect when made and such materiality is continuing, such event shall constitute an "Event of Default" under the Credit Agreement.

Section 9. Expenses. The Borrower agrees to pay on demand all costs and expenses of the Paying Agent in connection with the preparation, negotiation, execution and delivery of this Agreement and the New Note, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Paying Agent with respect thereto.

Section 10. Effectiveness. When, and only when, the Paying Agent shall have received counterparts of, or telecopied signature pages of, this Agreement executed by the Borrower, the Paying Agent and the New Bank, this Agreement shall become effective as of the date first written above. The Paying Agent shall provide a copy of this New Bank Agreement to the Co-Administrative Agents.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

ENRON CORP.


By: _____
Name: _____
Title: _____


PAYING AGENT:

CITIBANK, N.A., as Paying Agent


By: _____
Name: _____
Title: _____


NEW BANK:


By: _____
Name: _____
Title: _____

-3-

CONFIDENTIAL
CLH 002502

EXHIBIT G-2

COMMITMENT INCREASE AGREEMENT

This Commitment Increase Agreement dated as of May 18, 2000 (this "Agreement") is by and among (i) Enron Corp., an Oregon corporation ("Borrower"), (ii) Citibank, N.A. in its capacity as Paying Agent under the U.S. $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 18, 2000 (as it may be amended or modified from time to time, the "Credit Agreement", capitalized terms that are defined in the Credit Agreement and not defined herein are used herein as therein defined) among the Borrower, the Co-Administrative Agents referred to therein, Citibank, N.A. in such capacity and the Banks party thereto, and (iii) _____ ("Increasing Bank").

Preliminary Statements

1.    Pursuant to Section 2.18 of the Credit Agreement, the Borrower has the right, subject to the terms and conditions thereof, to agree with a Bank to increase that Bank's Commitment to replace the Commitments of Terminating Banks.

2.    The Borrower has given notice to the Paying Agent of its intention, pursuant to such Section 2.18 and with the consent of the Increasing Bank, to increase the Commitment of the Increasing Bank from $__ ____ to $_____; and the Paying Agent is willing to consent thereto.

Accordingly, the parties hereto agree as follows:

Section 1.  Increase of Commitment.  Pursuant to Section 2.18 of the Credit Agreement, the Commitment of the Increasing Bank is hereby increased from $_____ to $_____.

Section 2.  New Note.  The Borrower agrees to promptly execute and deliver to the Increasing Bank a Note in the amount of its increased Commitment set forth in Section 1 above (the "New Note"), and the Increasing Bank agrees to return to the Borrower, with reasonable promptness, the Note previously delivered to the Increasing Bank by the Borrower.

Section 3.  Consent.  The Paying Agent hereby consents to the increase in the Commitment of the Increasing Bank effectuated hereby.

Section 4.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

Section 5.  Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 6.  Bank Credit Decision.  The Increasing Bank acknowledges that it has, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to agree to the various matters set forth herein. The Increasing Bank also acknowledges that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents or any other Bank and based on such

CONFIDENTIAL
CLH 002503

documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement.

Section 7. Representations and Warranties of the Borrower. The Borrower represents and warrants as follows:

(a)     The execution, delivery and performance by the Borrower of this Agreement and the New Note are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action of the Borrower, require, in respect of the Borrower, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Borrower or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended,  or by-laws, as amended,  of the Borrower or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Borrower or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Borrower or any of its Subsidiaries.

(b)     This Agreement is a legal, valid and binding obligation of the Borrower and the New Note, when executed and delivered in accordance with this Agreement, will be a legal, valid and binding obligation of the Borrower, in each case enforceable against the Borrower in accordance its respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(c)     After giving effect to this Agreement and any other New Bank Agreements and Commitment Increase Agreements, the Borrower will be in compliance with the limitation set forth in clause (a) of the proviso to the first sentence of Section 2.18 of the Credit Agreement.

(d)     No event has occurred and is continuing which constitutes an Event of Default.

(e)     Attached hereto are resolutions duly adopted by the Board of Directors of the Borrower sufficient to authorize this Agreement and the New Note, and such resolutions are in full force and effect.

Section 8. Default. Without limiting any other event that may constitute an Event of Default, in the event any representation or warranty of the Borrower set forth herein shall prove to have been incorrect in any material respect when made, and such materiality is continuing, such event shall constitute an "Event of Default" under the Credit Agreement.

Section 9. Expenses. The Borrower agrees to pay on demand all costs and expenses of the Paying Agent in connection with the preparation, negotiation, execution and delivery of this Agreement and the New Note, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Paying Agent with respect thereto.

Section 10. Effectiveness. When, and only when, the Paying Agent shall have received counterparts of, or telecopied signature pages of, this Agreement executed by the Borrower, the Paying Agent and the Increasing Bank, this Agreement shall become effective as of the date first written above.  The Paying Agent shall provide a copy of this Commitment Increase Agreement to the Co-Administrative Agents.

CONFIDENTIAL
CLH 002504

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

ENRON CORP.

By: _____
Name: _____
Title: _____

PAYING AGENT:

CITIBANK, N.A., as Paying Agent

By: _____
Name: _____
Title: _____

INCREASING BANK:

_____

By: _____
Name: _____
Title: _____

-3-

CONFIDENTIAL
CLH 002505

SUPPLEMENTAL EXHIBIT 4

*Confidential*

*Information Memorandum*

# $1,750,000,000
# 364-Day Revolving Credit Facility
# $1,250,000,000
# 5-Year Revolving Credit Facility



**Salomon Smith Barney Inc.**
*Co-Lead Arranger &*
*Co-Book Manager*

**Chase Securities Inc.**
*Co-Lead Arranger &*
*Co-Book Manager*

**ABN AMRO Bank**
*Documentation Agent*

**Barclays Capital**
*Syndication Agent*

**April 25, 2000**



   

JPMNBY102046749

TABLE OF CONTENTS:

- EXECUTIVE SUMMARY

- SUMMARY OF TERMS AND CONDITIONS

- SYNDICATION CALENDAR

- CONTACT LIST

- FORMS OF RESPONSE

- ACKNOWLEDGEMENT LETTER

- DISCLAIMER

EXHIBITS:

- 1999 ENRON CORP. ANNUAL REPORT

- 2000 ENRON CORP. FIRST QUARTER EARNINGS RELEASE

- EQUITY RESEARCH REPORTS

  — J.P. MORGAN SECURITIES INC.

  — DONALDSON, LUFKIN, & JENRETTE

  — SIMMONS & COMPANY INTERNATIONAL

- MOODY'S INVESTORS SERVICE RATINGS UPGRADE

- PRESS RELEASES

- CREDIT AGREEMENT FOR ENRON CORP. $1,750,000,000 SENIOR UNSECURED REVOLVING CREDIT FACILITY

- CREDIT AGREEMENT FOR ENRON CORP. $1,250,000,000 SENIOR UNSECURED REVOLVING CREDIT FACILITY

CITIBANK⊕
SALOMON SMITH BARNEY
Members of citigroup

 CHASE

JPMNBY102046750

● EXECUTIVE SUMMARY

TRANSACTION SUMMARY

---

### $1,750,000,000 364-DAY REVOLVING CREDIT FACILITY

| | |
|---|---|
| **Facility:** | Senior unsecured revolving credit facility. |
| **Amount:** | $1,750,000,000. |
| **Maturity:** | 364-Days from closing. |
| **Purpose:** | General corporate purposes including commercial paper backstop. |
| **Facility Fee:** | 8.0 basis points per annum. |
| **LIBOR Margin:** | 37.0 basis points per annum. |
| **Drawn Cost:** | LIBOR + 45.0 basis points per annum. |
| **Pricing Grid:** | No. |

---

### $1,250,000,000 5-YEAR REVOLVING CREDIT FACILITY

| | |
|---|---|
| **Facility:** | Senior unsecured revolving credit facility. |
| **Amount:** | $1,250,000,000. |
| **Maturity:** | 5-Years from closing. |
| **Purpose:** | General corporate purposes including commercial paper backstop. |
| **Facility Fee:** | 10.0 basis points per annum. |
| **LIBOR Margin:** | 35.0 basis points per annum. |
| **Drawn Cost:** | LIBOR + 45.0 basis points per annum. |
| **Pricing Grid:** | Yes. (See Summary of Terms and Conditions) |

---

CITIBANK●
SALOMON SMITH BARNEY
Members of citigroup



## THE FACILITIES:

Enron Corp. ("Enron" or the "Company") has engaged Salomon Smith Barney, Inc. and Chase Securities, Inc., as Co-Arrangers and Co-Administrative Agents, to provide two senior unsecured revolving credit facilities (the "Facilities") aggregating $3.0 billion. The Facilities consist of (i) a $1.25 billion 5-year facility (the "Long-Term Facility"); and (ii) a $1.75 billion 364-day facility (the "Short-Term Facility"). Commitments to the Facilities will be allocated on a pro-rata basis.

The Facilities will replace Enron's current $1.0 billion 5-year senior unsecured revolver (established in 1996) and $1.5 billion 364-day senior unsecured revolver (established in 1999). ABN AMRO Bank and Barclays Capital in their roles as Documentation and Syndication Agents, respectively, together with Citibank, N.A. and The Chase Manhattan Bank, have each committed $125 million to the Facilities on a pro rata basis.

The Facilities will be used for general corporate purposes, including the backstopping of Enron's commercial paper program. Enron management views the liquidity provided by its commercial paper program as a vital component not only to future growth initiatives, but also to the Company's continued recognition as one of the world's largest integrated energy companies. The $500 million increase in aggregate commitments accompanying this offering is precipitated by Enron's consistent pattern of growth in its asset base, revenues, and earnings over the past five years.

The Short-Term Facility is priced at 8.0 basis points per annum Facility Fee and a Drawn Cost of LIBOR plus 45.0 basis points per annum. Pricing of the Long-Term Facility will be based upon the higher of Enron's senior unsecured debt ratings at Standard and Poor's and Moody's. Based upon the Company's current ratings of BBB+ / Baa1 the Long-Term Facility will incur a Facility Fee of 10.0 basis points per annum and a Drawn Cost of LIBOR plus 45.0 basis points per annum.

## THE COMPANY 

Headquartered in Houston, Texas, Enron is one of the world's largest integrated energy companies with approximately $33.4 billion in assets, $40.1 billion in revenues, and funds flow from operations of $2.2 billion in 1999. Reported earnings of $957 million (excluding non-recurring items) for 1999 marked an increase of approximately 37% over the prior year. The Company currently ranks 18th in Fortune magazine's top 500 companies, based upon total revenues for 1999. Fortune magazine also recognized Enron as the Most Innovative Company of 1999, marking the fourth consecutive year for the Company to receive such recognition. Operations at Enron are organized into four operating segments: Transportation and Distribution, Wholesale Energy Operations and Services, Retail Energy Services, and Broadband Services.

For a detailed description of each business segment please see the Company's 1999 Annual Report provided with this Information Memorandum.





JPMNBY102046752

*GROWTH TREND:*

In recent years, operational success has translated into growth in the Company's balance sheet and income statement. Total assets and revenue for 1995 were $13.2 billion and $9.2 billion, respectively. By comparison, total assets were $33.4 billion at year-end 1999, while revenues aggregated $40.1 billion. Paralleling this growth in the asset base and revenue stream is the Company's equity market capitalization, which currently stands at approximately $51.1 billion, representing more than a five-fold appreciation since 1995.

# Financial Trends
## (In Millions of US$)





JPMNBY102046753

*CREDIT RATINGS:*

Moody's Investor Services recently upgraded Enron's senior unsecured debt to Baa1. A summary of Enron's ratings is shown below:

## Current Ratings

| Rating Agency | Senior Unsecured | Commercial Paper | Outlook |
|---|---|---|---|
| Duff & Phelps | BBB+ | D-2 | |
| Fitch IBCA | BBB+ | F2 | Stable |
| Moody's | Baa1 | P-2 | Stable |
| R and I (Japan) | A- | n/a | Stable |
| Standard & Poor's | BBB+ | A-2 | Stable |

*FINANCIAL SUMMARY:*

Provided below is a financial summary on Enron's recent financial performance and summary credit statistics.

| FINANCIAL SUMMARY [1] | | | | |
|---|---|---|---|---|
| Fiscal Year ended December 31, ($ in Millions) | 1999 | 1998 | 1997 | 1996 |
| Revenues | $40,112 | $31,260 | $20,273 | $13,289 |
| Funds Flow from Operations | 2,228 | 1,873 | 870 | 706 |
| Total Debt | 8,152 | 7,357 | 6,254 | 3,349 |
| Book Equity | 9,570 | 7,048 | 5,618 | 3,723 |
| Total Lease and Interest Expense | 834 | 741 | 583 | 426 |
| CapEx | 2,363 | 1,905 | 1,392 | 864 |
| Funds Flow Interest Coverage | 3.67x | 3.53x | 2.49x | 2.66x |
| B/S Debt/Funds Flow from Operations | 3.66x | 3.93x | 7.19x | 4.74x |
| B/S Debt/Total B/S Capital | 38.5% | 41.9% | 44.6% | 39.8% |
| [1] Funds Flow from Operations are adjusted for certain items. For detailed information see Enron's Annual report for the related year. | | | | |

*Additional Information about Enron is available through www.enron.com*





JPMNBY102046754

● **SUMMARY OF TERMS AND CONDITIONS**

## Enron Corp.
### Summary of Terms and Conditions

| | |
|---|---|
| **Borrower:** | Enron Corp. (the "Borrower"). |
| **Facilities:** | Two unsecured revolving credit facilities (the "Facilities") aggregating $3 billion, consisting of a $1.25 billion 5-year facility (the "Long-Term Facility") and a $1.75 billion 364-day facility (the "Short-Term Facility"). The Short-Term Facility may be extended, at the request of the Borrower, for additional periods of 364 days each; <u>provided</u> that (i) the Borrower shall have provided notice of such extension no earlier than 45 days and no later than 30 days prior to the existing termination date and (ii) the majority of the Lenders in the Short-Term Facility shall have consented to such extension. In connection with any such extension of the Short-Term Facility, the commitment of any Lender that does not consent to such extension shall be terminated on the existing termination date and its loans repaid, and the Borrower shall have the right to provide, at its option, additional Lenders to assume the commitments of any Lender not so consenting. |
| **Co-Arrangers:** | Salomon Smith Barney Inc. and Chase Securities Inc. |
| **Co-Administrative Agents:** | Citibank, N.A. and The Chase Manhattan Bank. |
| **Syndication Agent:** | Barclays Capital. |
| **Documentation Agent:** | ABN AMRO Bank. |
| **Paying Agent:** | Citibank, N.A. |
| **Lenders:** | Citibank, N.A., The Chase Manhattan Bank and other Lenders acceptable to the Borrower and the Co-Administrative Agents. |
| **Use of Proceeds:** | General corporate purposes. |
| **Maturity Dates:** | Long-Term Facility: May 15, 2005. Short-Term Facility: May 15, 2001. |
| **Closing Date:** | May 16, 2000. |
| **Interest Rates and Fees:** | At the Borrower's option, Advances will be available to it at the rates and for the Interest Periods set forth below: |

**CITIBANK**
**SALOMON SMITH BARNEY**
Members of citygroup

 **CHASE**

JPMNBY102046755

(a)    *Base Rate Option:* Base Rate.

The Base Rate is a fluctuating rate per annum equal at all times to the highest of: (i) Citibank's publicly announced "base rate", (ii) ½ of 1% per annum above the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major U.S. money center banks, adjusted for reserve requirements and FDIC assessment rates, and (iii) ½ of 1% per annum above the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers.

(b)    *Eurodollar Rate Option:* LIBOR plus the Applicable Margin.

LIBOR is the rate per annum (rounded upward to the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period. If for any reason such rate is not available, LIBOR shall be the rate per annum (rounded upward to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page as the London interbank offered rate for deposits in dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page, the applicable rate shall be the arithmetic mean of all such rates. If neither the Telerate Page 3750 nor the Reuters Screen LIBO page rate is available, then LIBOR shall be the rate per annum at which dollar deposits are offered by the principal office of Citibank in London to prime banks in the London interbank market at 11:00 A.M. (London time) two business days before the first day of the relevant Interest Period and with a maturity equal to such Interest Period. The Borrower may select Interest Periods of 1, 2, 3 or 6 months for LIBOR Advances. The Borrower will reimburse each Lender, upon demand, for the cost of reserve requirements actually incurred.

The Applicable Margin for LIBOR Advances and the facility fee for the Long-Term Facility will be based on the ratings by Moody's and S&P of the senior unsecured long-term debt of the Borrower as specified in the pricing grid attached hereto as Schedule I. The Applicable Margin for LIBOR Advances and the facility fee for the Short-Term Facility are set forth on Schedule I.

CITIBANK

SALOMON SMITH BARNEY
Members of citigroup



Past due principal will bear interest at the higher of (i) 2% per annum above the Base Rate and (ii) 2% per annum above the rate required to be paid on such principal immediately before it became due.

**Interest Payments:**  Interest on Base Rate Advances will be payable quarterly in arrears. Interest on LIBOR Advances will be payable at the end of the relevant Interest Period, and if the Interest Period is more than three months, interest will also be paid quarterly. Interest will be computed on a 365/366-day basis for Base Rate Advances and on a 360-day basis for LIBOR Advances.

**Borrowings:**  Borrowings shall be in minimum principal amounts of $25,000,000 for LIBOR Advances and $15,000,000 for Base Rate Advances. All Advances under a Facility will be made by the Lenders ratably in proportion to their respective Commitments in that Facility. Borrowings will be available on same day notice (by 11:00 a.m. New York City time) for Base Rate Advances and three business days' notice for Eurodollar Rate Advances.

**Optional Commitment Reduction:**  The Borrower will have the right to permanently reduce, in whole or in part, the unused portion of either Facility, provided that each partial reduction shall be in an amount of at least $10,000,000. Such Commitment reductions shall be applied ratably to all Lenders in the Facility reduced. Additionally, the Borrower will have the right to reduce in part or to terminate in whole the Commitments of one or more Lenders non-ratably, subject to certain restrictions to be set forth in the definitive loan documentation.

**Optional Prepayments:**  Advances may be prepaid in an amount of at least $10,000,000 on same day notice for Base Rate Advances and three business days notice for LIBOR Advances. The Borrower will bear all losses and costs (but not lost profits) related to prepayment of LIBOR Advances prior to the last day of the relevant Interest Period.

**Conditions Precedent to Initial Advance:**  Customary for financings of this nature, including the execution and delivery of the following, in form and substance satisfactory to the Co-Administrative Agents, for each Facility:  (i) notes payable to each Lender and credit agreement; (ii) certificates with respect to resolutions, charter, by-laws, incumbency and signatures and certified copies of all other relevant documents evidencing any necessary corporate action and governmental approvals; (iii) favorable legal opinions from counsel for the Borrower; (iv) favorable legal opinion from counsel for the Paying Agent and (v) evidence satisfactory to the Paying Agent of termination of the $1,000,000,000 Second Amended and Restated Revolving Credit Agreement dated as of December 3, 1996 among Enron Corp., the

**CITIBANK**
SALOMON SMITH BARNEY
Members of citigroup



JPMNBY102046757

banks party thereto and The Chase Manhattan Bank, as Administrative Agent for such banks and the $1,500,000,000 Revolving Credit Agreement dated as of August 3, 1999 among Enron Corp., the banks party thereto and Citibank, N.A., as Administrative Agent for such banks.

**Conditions Precedent to All Advances:**

Customary for financings of this nature, including the following:

1)  All representations and warranties are correct on and as of the date of the borrowing before and after giving effect to such borrowing and to the application of the proceeds therefrom (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), as though made on and as of such date.

2)  No event or condition exists or would result from such borrowing which constitutes an event of default or would constitute an event of default but for the requirement that notice be give or time elapse or both.

3)  The Paying Agent shall have received such other approvals, opinions or documents as any Lender through the Paying Agent may reasonably request.

**Representations and Warranties:**

Usual and customary for transactions of this nature, including but not limited to: (i) confirmation of corporate status and authority of the Borrower and Principal Subsidiaries, (ii) documentation and performance duly authorized and do not contravene laws, corporate documents, judgments, orders or material (creating a liability of $100,000,000 or more) agreements, (iii) documentation legal, valid, binding and enforceable, (iv) financial statements, (v) since December 31, 1999 to the date of the Facilities, no material adverse change in the consolidated financial position, consolidated results of operations or business of the Borrower and its subsidiaries as a whole, (vi) no litigation having a material adverse effect, (vii) ERISA, (viii) taxes, and (ix) status under Investment Company Act and Public Utility Holding Company Act. Generally, a subsidiary will be a "Principal Subsidiary" if it has consolidated assets (less any debt that is not guaranteed by the Borrower) equal to or greater than 5% of the Borrower's consolidated assets.

**Covenants:**

Usual and customary for transactions of this nature including: (i) periodic financial statements (which may be available at the Borrower's home page on the world wide web at www.enron.com or by "EDGAR"), certificates of compliance with financial covenant, notice of default, certain ERISA information and other information

CITIBANK◯|
|SALOMON SMITH BARNEY
Members of citigroup†



JPMNBY102046758

reasonably requested from time to time, (ii) compliance with laws, (iii) use of proceeds, (iv) maintenance of existence (subject to a permitted merger or consolidation pursuant to clause (x) below), (v) insurance, (vi) visitation rights, (vii) negative pledge similar to the Borrower's November 1, 1985 Indenture, (viii) maintenance of ratio of total senior debt to total capitalization not to exceed 65%, (ix) no sale, lease, transfer or other disposition of all or substantially all of the Borrower's assets, (x) no merger or consolidation by the Borrower unless (a) no default exists or results and the Borrower is survivor, or surviving person (if not the Borrower) assumes all obligations of the Borrower under the Facilities, and (xi) ERISA.

**Events of Default:**    Customary events of default for transactions of this nature, including: (i) failure to pay principal when due or interest after 5-day grace period or facility fee after 15-day grace period, (ii) representations and warranties materially untrue when made and materiality is continuing, (iii) failure to comply with affirmative covenants if not cured within 30 days after written notice, (iv) failure to comply with negative covenants, (v) cross default for nonpayment when due after applicable grace period, or acceleration, of Debt of the Borrower or a Principal Subsidiary for borrowed money greater than $100,000,000, (vi) bankruptcy or insolvency of the Borrower or a Principal Subsidiary, (vii) any unsatisfied judgment against the Borrower or a Principal Subsidiary for payment of money greater than $100,000,000 unless enforcement stayed by appeal or otherwise, or (viii) occurrence of certain circumstances respecting ERISA plans.

**Transfers and**
**Participations:**    Lenders permitted to assign Commitments and loans under a Facility, in whole or part, to another Lender in such Facility, and, with the permission of the Co-Administrative Agents and the Borrower, to a person that is not a Lender. A $3,000 fee for each assignment will be paid to the Paying Agent by the assignee. Lenders may sell participations in either Facility provided that the assigning Lender retains all voting rights (except as specified in the definitive loan documentation) and all obligations under such Facility.

**Other:**    Separate loan documentation will be executed for each of the two Facilities. The documentation will include customary agency language, and Majority Lenders for a Facility will be defined as those holding at least 51% of the Commitments under such Facility. The loan documentation will contain customary provisions regarding taxes, illegality, increased costs and capital adequacy, subject to certain limitations, including (i) a 90 day limit on retroactive claims, and (ii) the right of the Borrower to replace or terminate a Lender for which it becomes illegal to make LIBOR Advances or that asserts a claim for additional costs (including

**CITIBANK○|**
**|SALOMONSMITHBARNEY**
Members of citigroup



additional interest on LIBOR) or if a tax gross-up will be payable with respect to such Lender.

**Expenses; Indemnity:** All reasonable expenses incurred (i) by the Paying Agent in connection with the preparation, execution, delivery, modification, amendment and administration of the loan documentation (including reasonable fees and expenses of one law firm as counsel to the Paying Agent) or (ii) by the Paying Agent, either Co-Administrative Agent or any Lender in connection with the enforcement of the loan documentation (including reasonable legal expenses), are for the Borrower's account. To the fullest extent permitted by law, the Borrower will indemnify and hold harmless the Paying Agent, each Co-Administrative Agent, each Lender and each of their respective officers, directors, employees and agents (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) that may be incurred by or asserted against any Indemnified Party (other than by the Paying Agent, either Co-Administrative Agent or another Lender or any of their respective successors and assigns), in each case arising out of or in connection with or by reason of any investigation, litigation or proceeding arising out of, related to or in connection with the loan documentation or any transaction in which any proceeds of either Facility are applied, excluding any claim, damage, loss, liability or expense attributable to such Indemnified Party's gross negligence or willful misconduct. The Borrower and the Lenders will waive, to the fullest extent under applicable law, any right to claim exemplary or punitive damages.

**Governing Law:** New York.

**Counsel to the Paying Agent:** Bracewell & Patterson, L.L.P.

CITIBANK●
SALOMON SMITH BARNEY
Members of citigroup



●CHASE

JPMNBY102046760

## SCHEDULE I

## FACILITY FEES AND APPLICABLE MARGINS

### Short-Term Facility

Facility Fee:        0.08%
(per annum)

Applicable Margin
for LIBOR Advances: 0.37%

### Long-Term Facility

| *RATING LEVELS | Rating Level Level I  If Borrower's senior unsecured long-term debt is rated A- or better by S&P or A3 or better by Moody's. | Rating Level Level II  If Borrower's senior unsecured long-term debt is rated BBB+ by S&P or Baa1 by Moody's. | Rating Level Level III  If Borrower's senior unsecured long-term debt is rated BBB by S&P or Baa2 by Moody's. | Rating Level Level IV  If Borrower's senior unsecured long-term debt is rated BBB- by S&P or Baa3 by Moody's. | Rating Level Level V  If Borrower's senior unsecured long-term debt is rated BB+ or lower (or not rated) by S&P and Ba1 or lower (or not rated) by Moody's. |
|---|---|---|---|---|---|
| **Facility Fees (per annum): | 0.085% | 0.10% | 0.150% | 0.20% | 0.25% |
| ***Applicable Margin for LIBOR Advances (per annum):  LIBO Rate plus | 0.315% | 0.35% | 0.50% | 0.675% | 1.0% |

\*      The relevant Rating Level is determined by the higher of S&P or Moody's rating.  However, if one rating is two or more levels below the higher such rating, the Rating Level that is one level below the Rating Level otherwise applicable shall apply.  For example, if S&P rates the Borrower's senior unsecured long-term debt A- and Moody's rates such debt Baa2, then Rating Level II would apply.

\*\*     For purposes of determining facility fees, the Rating Level for each calendar quarter shall be determined as of the first day of such quarter.

\*\*\*    For purposes of determining Applicable Margin for LIBOR Advances, the Rating Level shall be determined as of the first day of the Interest Period for such Advances.





JPMNBY102046761

● SYNDICATION CALENDAR

| APRIL | | | | | | 2000 |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

| MAY | | | | | | 2000 |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

| Date | Event |
|---|---|
| April 21, 2000 | Invitation to Offer, Confidentiality Agreement and EnronDirectFinance Registration Agreement distributed to Prospective Lenders. |
| April 24, 2000 | Lenders return completed and signed Confidentiality Agreement and EnronDirectFinance Agreement via facsimile. |
| April 25, 2000 | Information Memorandum available on Website. Website Password and URL Address distributed to Prospective Lenders. |
| May 8, 2000 | Commitment Letters and Administrative Details Reply Form due by 5:00 P.M. New York time. |
| May 11, 2000 | Allocation of Commitments. |
| May 12, 2000 | Comments on draft documents due by 5:00 P.M. New York time. |
| May 16, 2000 | Execution of Closing Documentation and Closing. |





● **CONTACT LIST**

|  | Telephone | Fax |
|---|---|---|
| **_Enron Corp._** | | |
| **1400 Smith Street**<br>**Houston, TX 77002** | | |
| Global Finance<br>Don Herrick<br>Director<br>Donald.W.Herrick@enron.com | (713) 853-1943 | (713) 646-3422 |
| Kelly Boots<br>Vice President<br>Kboots@enron.com | (713) 853-1603 | (713) 646-3422 |
| Trevor Randolph<br>Associate<br>Trevor.Randolph@enron.com | (713) 345-7751 | (713) 646-3422 |
| Sarah Heineman<br>Senior Specialist<br>Sarah.Heineman@enron.com | (713) 345-7208 | (713) 646-3422 |
| Jimmy Simien<br>Senior Specialist<br>Jimmy.Simien@enron.com | (713) 345-7752 | (713) 646-3422 |
| Technical Support for<br>EnronDirectFinance website<br>Email: webmaster@enrondirectfinance.com | (713) 853-9438 | (713) 646-8576 |
| **_Salomon Smith Barney Inc._** | | |
| **Global Loans – Structuring**<br>**390 Greenwich Street**<br>**New York, NY 10013** | | |
| Steven Victorin<br>Managing Director | (212) 723-6921 | (212) 723-8548 |
| Wajeeh Faheem<br>Vice President | (212) 723-6769 | (212) 723-8548 |
| Debbie W. Tay<br>Analyst | (212) 723-6544 | (212) 723-8548 |

CITIBANK◉|
|SALOMON SMITH BARNEY
Members of citigroup↑

 CHASE

JPMNBY102046763

|  | **Telephone** | **Fax** |
|---|---|---|
| **Global Loans – Structuring**<br>**1200 Smith Street, 20th Floor**<br>**Houston, TX 77002** | | |
| Chris Lyons<br>Director | (713) 654-2862 | (713) 654-2849 |
| **Global Loans – Distribution**<br>**390 Greenwich Street**<br>**New York, NY 10013** | | |
| Jeffrey Ferrell<br>Vice President | (212) 723-6609 | (212) 723-8541 |
| Julie Biemel Cooper<br>Vice President | (212) 723-6970 | (212) 723-8541 |
| Chuck Ferrando<br>Associate | (212) 723-6624 | (212) 723-8541 |
| **Global Energy and Mining**<br>**1200 Smith Street, 20th Floor**<br>**Houston, TX 77002** | | |
| Jim Reilly<br>Managing Director | (713) 654-2820 | (713) 654-2849 |
| Steve Baillie<br>Vice President | (713) 654-2887 | (713) 654-2849 |
| ***Chase Securities Inc.*** | | |
| **Global Syndicated Finance**<br>**270 Park Avenue, 5th Floor**<br>**New York, NY 10017** | | |
| Structuring<br>Christopher Teague<br>Managing Director | (212) 270-2727 | (212) 270-1063 |
| Sean Obranski<br>Vice President | (212) 270-4346 | (212) 270-1063 |
| Jalima McNally<br>Associate | (212) 270-9360 | (212) 270-1063 |

CITIBANK
| SALOMONSMITHBARNEY
Members of citigroup



|  | Telephone | Fax |
|---|---|---|
| Barbara Wong<br>Analyst | (212) 270-6339 | (212) 270-1063 |
| **Distribution**<br>Claire O'Connor<br>Managing Director | (212) 270-4345 | (212) 270-1063 |
| Cynnie Ogden<br>Managing Director | (212) 270-4345 | (212) 270-1063 |
| MaryAnn Riley<br>Managing Director | (212) 270-4345 | (212) 270-1063 |
| Benjamin Thompson<br>Vice President | (212) 270-4345 | (212) 270-1063 |

**_Chase Securities Inc. - Houston_**

**Global Oil and Gas**
707 Travis, 7th Floor
Houston, TX 77002

| Richard S. Walker<br>Managing Director | (713) 216-8850 | (713) 216-8882 |
|---|---|---|
| Robert W. Traband<br>Vice President | (713) 216-1081 | (713) 216-8882 |

**_Salomon Smith Barney Inc._**

**Loan Administration – Citibank, N.A.**
Two Penns Way, Suite 200
New Castle, Delaware 19720

| Janet Wallace<br>Loan Administrator | (302) 894-6029 | (302) 894-6120 |
|---|---|---|

**_Bracewell & Patterson_**

**South Tower Pennzoil Place**
**711 Louisiana, Suite 2900**
**Houston, TX 77002-2781**

| Bill Hayes<br>Partner | (713) 221-1333 | (713) 221-1212 |
|---|---|---|

CITIBANK○
SALOMON SMITH BARNEY
Members of citigroup



JPMNBY102046765

● **FORMS OF RESPONSE**

*[BANK LETTERHEAD]*

[Date], 2000

To: Salomon Smith Barney Inc.              Chase Securities Inc.
    390 Greenwich Street, First Floor          270 Park Avenue, Fifth Floor
    New York, NY 10013                    New York, NY 10017
    · Attention:     Mario Murillo             Attention:      Barbara Wong
       Tel: (212) 723-6561   Fax: (212) 723-8539     Tel: (212) 270-6339   Fax: (212) 270-1063

Re: $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility and $1,250,000,000
    5-Year Senior Unsecured Revolving Credit Facility for Enron Corp. (together, the
    "Facilities")

Dear Ladies and Gentlemen:

_____ (the "Bank") is pleased to confirm its commitment to provide a portion of the above referenced Facilities to the maximum aggregate amount of US $_____ (the "Commitment").

The Bank acknowledges that it has, independently and without reliance upon Salomon Smith Barney Inc. and Chase Securities Inc. (the "Co-Lead Arrangers"), or any of their affiliates, or any other bank, and based on the financial statements of Enron Corp. and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this commitment.

The Bank also acknowledges that entering into the Facilities is subject to satisfactory documentation substantially on the terms and conditions set forth in the Summary of Terms and Conditions. The Co-Lead Arrangers and the Company shall have no liability or responsibility to the Bank if such Facilities are not entered into.

JPMNBY102046766

The Bank understands and agrees that the proposed Offered Commitment Amount is subject to acceptance by Enron Corp. and the Co-Lead Arrangers, that the Commitment may be reduced by Enron Corp. and the Co-Lead Arrangers, and that the Co-Lead Arrangers will notify the Bank of the amount of the Bank's accepted commitment ("Allocated Commitment") by May 11, 2000, which shall be set forth on the copy of this letter returned to the undersigned.

Very truly yours,

[Print Name of Bank]

By:_____

Title:_____

Allocated Commitment: $_____

Accepted:        By:    _____

                 Title:    _____

                 Institution:    _____

JPMNBY102046767

| ENRON CORP. |
|---|

LEGAL NAME OF YOUR INSTITUTION TO APPEAR IN DOCUMENTATION:

| GENERAL INFORMATION |
|---|

DOMESTIC LENDING OFFICE:

Institution Name: _____
Street Address: _____
City/State/Zip: _____
Attention: _____
Telephone #: _____
Fax #: _____

EURODOLLAR LENDING OFFICE:

Institution Name: _____
Street Address: _____
City/State/Zip: _____
Attention: _____
Telephone #: _____
Fax #: _____

TAX WITHHOLDING:

Non-Resident Alien: _____ yes* _____ no          (*Form 4224 Enclosed)
Tax ID Number: _____

Attn.: Bank Loan Syndications

JPMNBY102046768

**ENRON CORP.**

**CONTACT
LIST**

**BUSINESS/CREDIT MATTERS:**

Primary Contact:
Street Address:
City/State/Zip:
Telephone #:
Fax #:

Back-Up Contact:
Street Address:
City/State/Zip:
Telephone #:
Fax #:

**ADMINISTRATIVE/OPERATIONS MATTERS:**

Contact(s):
Street Address:
City/State/Zip:
Telephone #:
Fax #:

**COMPETITIVE BID LOAN NOTIFICATION:**

Contact Name:
Street Address:
City/State/Zip:
Telephone #:
Fax #:

JPMNBY102046769

**ENRON CORP.**

**ROUTING INSTRUCTIONS**

PAYMENTS:

| | |
|---|---|
| Credit Bank: | _____ |
| City, State: | _____ |
| ABA # of | _____ |
| Credit Bank: | _____ |
| Name of Account: | _____ |
| Account #: | _____ |
| Benef. Acct. Name: | _____ |
| Benef Acct. # | _____ |
| Ref.: | _____ |
| Attention: | _____ |

MAILINGS:

Please specify who should receive financial information:

| | |
|---|---|
| Name: | _____ |
| Street Address: | _____ |
| City/State/Zip: | _____ |

**PAYING AGENT INFORMATION**

*Bank Loan Syndications - Agent Contact:*
| | |
|---|---|
| Name: | Janet Wallace |
| Tel: | (302) 894-6029 |
| Fax: | (302) 894-6120 |

<u>Initial Funding Standards</u>

LIBOR - Funds 2 days after rates are set.

<u>Agent Wire Instructions</u>

Citibank, N.A.
ABA # 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
Account Name: NAIB Agency Medium Term Finance
Reference: Enron Corp.
Account # 36852248

<u>Agent Notices Address</u>

Janet Wallace
Citibank, N.A.
Two Penns Way, Suite 200
New Castle, Delaware 19720

JPMNBY102046770

## ACKNOWLEDGEMENT LETTER

April 25, 2000

Mr. William W. Brown
Deputy Treasurer
Enron Corp.
1400 Smith Street
Houston, TX 77002

Re:    $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility and $1,250,000,000 5-Year Senior Unsecured Revolving Credit Facility for Enron Corp. (together, the "Facilities")

Ladies and Gentlemen:

You have reviewed the Information Memorandum with respect to the Facilities.

By signing and returning a copy of this letter, you acknowledge and confirm that: (i) the Information Memorandum is based upon information furnished by you to us for inclusion therein; (ii) neither Salomon Smith Barney Inc. and Chase Securities Inc. (as "Co-Lead Arrangers"), nor any of their affiliates or their respective officers, directors, employees, agents, advisors and representatives shall have any liability for the accuracy, completeness or use of information provided by you for use in the Information Memorandum, other than for loss of Co-Leads Arrangers anticipated profits, breach of Contract by either Co-Lead Arranger and willful or gross negligence of the respective Co-Lead Arrangers; (iii) you represent and warrant that, other than projections, all information provided by you and contained in the Information Memorandum, together with the information contained in your public filings, when furnished, is complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which they were made, and the projections provided by you in connection with the Facilities have been prepared in good faith based upon reasonable assumptions; and (iv) you authorize us to deliver copies of the Information Memorandum only to those institutions listed on Exhibit A hereto to whom we propose participation in the Facilities.

Very truly yours,

SALOMON SMITH BARNEY INC.

By: Steven R. Victorin
    Attorney-in-Fact

CHASE SECURITIES INC.

By: Sean Odranski
    Vice President

CITIBANK○|
    |SALOMONSMITHBARNEY
        Members of citigroup℠

 CHASE

JPMNBY102046771

ACCEPTED AND AGREED
As of the date hereof:

ENRON CORP.

By: William W. Brown
Deputy Treasurer





JPMNBY102046772

## DISCLAIMER

The information contained in this Information Memorandum has been supplied by or on behalf of Enron Corp. (the "Company"). Neither Salomon Smith Barney Inc. and Chase Securities Inc. (as "Co-Lead Arrangers") nor any of their affiliates has independently verified such information and the same is being provided by the Co-Lead Arrangers for informational purposes only. The Co-Lead Arrangers do not make any representation or warranty as to the accuracy or completeness of such information and does not assume any undertaking to supplement such information as further information becomes available or in light of changing circumstances. The Co-Lead Arrangers shall not have any liability for any representations or warranties (express or implied) contained in, or any omissions from, the Information Memorandum or any other written or oral communication transmitted to the recipient in the course of its evaluation of the proposed financing or otherwise.

The information contained herein has been prepared to assist interested parties in making their own evaluation of the proposed financing for the Company and for no other purpose. The information does not purport to be all-inclusive or to contain all information that a prospective lender may desire. It is understood that each recipient of this Information Memorandum will perform its own independent investigation and analysis of the proposed financing and the creditworthiness of the Company, based on such information as it deems relevant and without reliance on Co-Lead Arrangers. The information contained herein is not a substitute for the recipient's independent investigation and analysis.





JPMNBY102046773

## DISCLAIMER

The information contained in this Information Memorandum has been supplied by or on behalf of Enron Corp. (the "Company"). Neither Salomon Smith Barney Inc. and Chase Securities Inc. (as "Co-Lead Arrangers") nor any of their affiliates has independently verified such information and the same is being provided by the Co-Lead Arrangers for informational purposes only. The Co-Lead Arrangers do not make any representation or warranty as to the accuracy or completeness of such information and does not assume any undertaking to supplement such information as further information becomes available or in light of changing circumstances. The Co-Lead Arrangers shall not have any liability for any representations or warranties (express or implied) contained in, or any omissions from, the Information Memorandum or any other written or oral communication transmitted to the recipient in the course of its evaluation of the proposed financing or otherwise.

The information contained herein has been prepared to assist interested parties in making their own evaluation of the proposed financing for the Company and for no other purpose. The information does not purport to be all-inclusive or to contain all information that a prospective lender may desire. It is understood that each recipient of this Information Memorandum will perform its own independent investigation and analysis of the proposed financing and the creditworthiness of the Company, based on such information as it deems relevant and without reliance on Co-Lead Arrangers. The information contained herein is not a substitute for the recipient's independent investigation and analysis.





JPMNBY102046774

SUPPLEMENTAL EXHIBIT 5

## INVITATION TO OFFER

| | |
|---|---|
| **Memorandum To:** | Prospective Lenders |
| **From:** | JP Morgan, a division of Chase Securities Inc. and Salomon Smith Barney Inc. (together, the "Co-Lead Arrangers") |
| **Date:** | April 20, 2001 |
| **Re:** | $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility (the "364-Day Facility") and $500,000,000 Letter of Credit Facility (the "LC Facility") for Enron Corp. (together, the "Facilities") |

On behalf of Enron Corp. ("Enron" or the "Company"), the Co-Lead Arrangers are pleased to extend an invitation to your institution to participate in both the $1,750,000,000 364-Day Facility and the $500,000,000 LC Facility. The 364-Day Facility will replace the Company's existing $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility and the LC Facility is a new facility. The terms and conditions of the 364-Day Facility will be substantially the same as the existing facility.

By separate letter dated April 13, 2001 to Citibank, N.A. and each of the Banks party to the existing $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility, the Company requested an extension of such facility, in order to preserve the utilization of such facility pending its replacement.

We have provided a Confidential Information Memorandum describing the transaction, including a Summary of Terms and Conditions, a sample form of Commitment Letter, and an Administrative Details Reply Form which can be accessed via the Enron Deal Bench website. Your institution will receive the URL address and a confidential password to the Deal Bench website.

Final commitments will be accepted until May 7, 2001 at 5:00 p.m. New York City time. The Chase Manhattan Bank ("Chase") and Citibank, N.A. ("Citibank") (together, as "Co-Administrative Agents"), have initially committed $100 million each to the Facilities.

Commitments will be allocated pro rata between the Facilities. Lenders will be paid 3.0 basis points on their allocation in the 364-Day Facility and 7.0 basis points on their allocation in the LC Facility at closing.

The Company and/or the Co-Lead Arrangers will contact each bank regarding the desired level of commitment.

DEPOSITION EXHIBIT
60 048
ERIC J. PINZ

I

JPMNBY102043628

Your commitment should follow the format shown in Chapter 3, "Forms of Response". In addition, please complete the Administrative Details Reply Form included therein. Please send by facsimile and forward by overnight mail both the Commitment Letter and the Administrative Details Reply Form to:

Mario Murillo, Trader Liaison
Salomon Smith Barney Inc.
390 Greenwich Street, First Floor
New York, NY 10013
Tel: (212) 723-6561 / Fax (212) 723-8539

Additionally, please send by facsimile the Administrative Details Reply form to:

Donna McGroarty
JP Morgan, a division of Chase Securities Inc.
707 Travis, 8th Floor North
Houston, TX 77002
Tel: (713) 216-3617 / Fax (713) 216-4583

And, also by facsimile, the Commitment Letter to:

Roxanne Powell
JP Morgan, a division of Chase Securities Inc.
707 Travis, 8th Floor North
Houston, TX 77002
Tel: (713) 216-3510 / Fax (713) 216-4583

Final allocations will be determined by the Company and the Co-Lead Arrangers no later than May 8, 2001 or such other date selected by the Company and the Co-Lead Arrangers.

Pleased be advised that your commitment represents a commitment from your institution and does not in any way include a commitment or other arrangement from any other non-affiliated institution. Lastly, please acknowledge and agree that no secondary selling or offers to purchase will occur until such time as the Agents declare the preliminary syndication to be complete. Additionally, any such permitted secondary distribution or conversations will be subject to the same Confidentiality Agreement set forth in the Confidential Information Memorandum.

For further information, please contact the representatives of the Company and the Co-Lead Arrangers listed on the enclosed Contact List.

The Company and the Co-Lead Arrangers look forward to your response and to working with you on this transaction.

Thank you.

ii

JPMNBY102043629

## TABLE OF CONTENTS

Invitation To Offer................................................................................................i
Acknowledgement Letter.....................................................................................iv
Confidentiality Agreement....................................................................................v
Disclaimer............................................................................................................vii
Syndication Calendar...........................................................................................viii
Contact List..........................................................................................................ix

1.   EXECUTIVE SUMMARY.................................................................................1
     A.   FACILITY DESCRIPTIONS......................................................................1
     B.   ENRON CORP.......................................................................................2

2.   SUMMARY OF TERMS AND CONDITIONS ......................................................6

3.   FORMS OF RESPONSE................................................................................3

JPMNBY102043630

## ACKNOWLEDGEMENT LETTER

April 20, 2001

Mr. Tim DeSpain
Deputy Treasurer
Enron Corp.
1400 Smith Street
Houston, TX 77002

Re: $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility and $500,000,000
Letter of Credit Facility for Enron Corp. (together, the "Facilities")

Ladies and Gentlemen:

You have reviewed the Confidential Information Memorandum with respect to the above-captioned Facilities.

By signing and returning a copy of this letter, you acknowledge and confirm that: (i) the Confidential Information Memorandum is based upon information furnished by you to us for inclusion therein; (ii) neither JP Morgan, a division of Chase Securities Inc., and Salomon Smith Barney Inc. (as "Co-Lead Arrangers"), nor any of their affiliates or their respective officers, directors, employees, agents, advisors and representatives shall have any liability for the accuracy, completeness or use of the Confidential Information Memorandum; (iii) you represent and warrant that to your knowledge all information contained in the Confidential Information Memorandum, together with the information contained in your public filings, as updated from time to time, is complete and correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which they were made; and (iv) you authorize us to deliver copies of the Confidential Information Memorandum to those institutions to whom we propose participation in the Facilities.

Very truly yours,

JP MORGAN, A DIVISION OF CHASE                SALOMON SMITH BARNEY INC.
SECURITIES INC.


ACCEPTED AND AGREED
As of the date hereof:

ENRON CORP.

_____
By: Tim DeSpain
    Deputy Treasurer

iv

JPMNBY102043631

## CONFIDENTIALITY AGREEMENT

| | |
|---|---|
| **Memorandum To:** | Prospective Lenders |
| **From:** | JP Morgan, a division of Chase Securities Inc. and Salomon Smith Barney Inc. (together, the "Co-Lead Arrangers") |
| **Date:** | April 20, 2001 |
| **Subject:** | $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility (the "364-Day Facility") and $500,000,000 Letter of Credit Facility (the "LC Facility") for Enron Corp. (together, the "Facilities") |

In connection with your possible interest in becoming a lender in the Facilities for Enron Corp. (the "Company"), you are receiving certain information which is non-public, confidential or proprietary in nature. That information and any other information concerning the Company or the Facilities furnished to you by the Company or the Co-Lead Arrangers in connection with the Facilities (at any time on, before or after the date of this Agreement), together with analyses, compilations or other materials prepared by you or your directors, officers, employees, agents, auditors, attorneys, consultants or advisors (collectively, "Representatives") which contain or otherwise reflect such information or your review of or interest in the Facilities is hereinafter referred to as the "Information." In consideration of your receipt of the Information, you agree that:

1.  You will not, without the prior written consent of the Company, use, either directly or indirectly, any of the Information except in concert with the Company or the Co-Lead Arrangers and in connection with the proposed Facilities.

2.  You agree to reveal the Information only to your Representatives who need to know the Information for the purpose of evaluating the Facilities, who are informed by you of the confidential nature of the Information, and who agree to be bound by the terms and conditions of this Agreement. You agree to be responsible for any breach of this Agreement by any of your Representatives and to indemnify and hold the Company, the Co-Lead Arrangers, and their Representatives harmless from and against any and all liabilities, claims, causes of action, costs and expenses (including attorney fees and expenses) arising out of the breach of this Agreement by you or your Representatives.

3.  Without the Company's prior written consent, you shall not disclose to any person (except as otherwise expressly permitted herein) the fact that the Information has been made available, that discussions are taking place between the Company and the Co-Lead Arrangers or other financial institutions concerning the Facilities, or any of the terms, conditions or other facts with respect thereto (including the status thereof), or that the Facilities have been consummated.

4.  This Agreement shall be inoperative as to any portion of the Information that (i) is or becomes generally available to the public on a nonconfidential basis through no fault or action by you or your Representatives, or (ii) is or becomes available to you on a nonconfidential basis from a source other than the Company or the Co-Lead Arrangers or their representatives, which source, to the best of your knowledge, is not prohibited

v

JPMNBY102043632

from disclosing such Information to you by a contractual, legal or fiduciary obligation to the Company or the Co-Lead Arrangers.

5. You may disclose the Information at the request of any regulatory or supervisory authority having jurisdiction over you, provided that you request confidential treatment of such Information to the extent permitted by law.

6. In the event that you or anyone to whom you transmit the Information pursuant to this Agreement becomes legally compelled to disclose any of the Information or the existence of the Facilities, you shall provide the Co-Lead Arrangers with notice of such event promptly upon your obtaining knowledge thereof (provided that you are not otherwise prohibited by law from giving such notice) so that the Co-Lead Arrangers may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, you shall furnish only that portion of the Information that is legally required and shall disclose the Information in a manner reasonably designed to preserve its confidential nature.

7. In the event that discussions with you concerning the Facilities are discontinued or your participation in the Facilities is otherwise terminated, you shall redeliver to the Co-Lead Arrangers the copies of the Information that were furnished to you by or on behalf of the Company and represent to the Company that you have destroyed all other copies thereof. All of your obligations hereunder and all of the Co-Lead Arrangers' rights and remedies hereunder shall survive any return or destruction of the Information.

8. You acknowledge that disclosure of the Information in violation of the terms of this Agreement could have serious consequences, and agree that, in the event of any breach by you or your Representatives of this Agreement, the Company and the Co-Lead Arrangers will be entitled to equitable relief (including injunction and specific performance) in addition to all other remedies available to it at law or in equity. The Company is an intended third party beneficiary of this Agreement.

If you are not prepared to accept the Confidential Information Memorandum on this basis, you will return the Confidential Information Memorandum to the Co-Lead Arrangers or the Company immediately. Your acceptance of the Confidential Information Memorandum will constitute your agreement to be bound by this Agreement.

**SALOMON SMITH BARNEY INC.**

**JP MORGAN, A DIVISION OF CHASE SECURITIES INC.**

vi

## DISCLAIMER

The information contained in this Confidential Information Memorandum has been supplied by or on behalf of Enron Corp. (the "Company"). Neither JP Morgan, a division of Chase Securities Inc., nor Salomon Smith Barney Inc. (the "Co-Lead Arrangers") nor any of their affiliates has independently verified such information and the same is being provided by the Co-Lead Arrangers for informational purposes only. Co-Lead Arrangers do not make any representation or warranty as to the accuracy or completeness of such information and do not assume any undertaking to supplement such information as further information becomes available or in light of changing circumstances. Co-Lead Arrangers shall not have any liability for any representations or warranties (express or implied) contained in, or any omissions from, the Confidential Information Memorandum or any other written or oral communication transmitted to the recipient in the course of its evaluation of the proposed financing or otherwise.

The information contained herein has been prepared to assist interested parties in making their own evaluation of the proposed financing for the Company and for no other purpose. The information does not purport to be all-inclusive or to contain all information that a prospective lender may desire. It is understood that each recipient of this Confidential Information Memorandum will perform its own independent investigation and analysis of the proposed financing and the creditworthiness of the Company, based on such information as it deems relevant and without reliance on Co-Lead Arrangers. The information contained herein is not a substitute for the recipient's independent investigation and analysis.

JPMNBY102043634

## SYNDICATION CALENDAR

| APRIL | | | | | | 2001 |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | ▓ | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

| MAY | | | | | | 2001 |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | ▓▓ | ▓▓ | ▓ | 10 | ▓ | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| Date | Event |
|---|---|
| April 20, 2001 | Information distributed to Prospective Lenders. |
| May 7, 2001 | Commitment Letters and Administrative Details Reply Form due by 5:00 P.M. New York time. |
| May 8, 2001 | Allocation of Commitments. |
| May 9, 2001 | Comments on draft documents due by 5:00 P.M. New York time. |
| May 11, 2001 | Execution of Closing Documentation. |
| May 11, 2001 | Closing. |

vii

JPMNBY102043635

## CONTACT LIST

|  | Telephone | Fax |
|---|---|---|
| ***Enron Corp.*** | | |
| Global Finance<br>1400 Smith Street<br>Houston, TX 77002 | | |
| James Richardson<br>Director<br>James.Richardson@enron.com | (713) 345-7283 | (713) 646-3422 |
| Sarah Wesner Soong<br>Manager<br>Sarah.Wesner@enron.com | (713) 853-5261 | (713) 646-3422 |
| Joel Ephross<br>Senior Counsel<br>Joel.Ephross@enron.com | (713) 345-4998 | (713) 853-9252 |
| Kelly Boots<br>Vice President<br>Kboots@enron.com | (713) 853-1603 | (713) 646-3422 |
| Sarah Heinemen<br>Manager<br>Sarah.Heinemen@enron.com | (713) 345-7208 | (713) 646-3422 |
| Jimmy Simien<br>Senior Specialist<br>Jimmy.Simien@enron.com | (713) 345-7752 | (713) 646-3422 |
| Enron Deal Bench Technical Support<br>Webmaster@DealBench.com | (713) 853-9438 | (713) 646-8576 |
| ***JP Morgan*** | | |
| Global Syndicated Finance – Structuring<br>270 Park Avenue, 5th Floor<br>New York, NY 10017 | | |
| Christopher Teague<br>Managing Director | (212) 270-2727 | (212) 270-1063 |

JPMNBY102043636

|  | **Telephone** | **Fax** |
|---|---|---|
| 707 Travis, 8th Floor<br>Houston, TX 77002 |  |  |
| George Serice<br>Vice President | (713) 216-8079 | (713) 216-4583 |
| Roxanne Powell<br>Associate | (713) 216-3510 | (713) 216-4583 |
| Global Syndicated Finance - Distribution<br>Cynnie Ogden<br>Managing Director | (212) 270-4345 | (212) 270-1063 |
| Global Power<br>707 Travis, 7th Floor<br>Houston, TX 77002 |  |  |
| Richard S. Walker<br>Managing Director | (713) 216-8850 | (713) 216-8882 |
| Robert W. Traband<br>Vice President | (713) 216-1081 | (713) 216-8882 |

**Salomon Smith Barney Inc.**

| Global Loans – Structuring<br>1200 Smith Street, 20th Floor<br>Houston, TX 77002 |  |  |
|---|---|---|
| Chris Lyons<br>Director | (713) 654-2862 | (713) 654-2849 |
| David Lawrence<br>Associate | (713) 654-3505 | (713) 654-2849 |
| Global Loans – Distribution<br>390 Greenwich Street<br>New York, NY 10013 |  |  |
| Jeffrey Ferrell<br>Vice President | (212) 723-6609 | (212) 723-8541 |

x

JPMNBY102043637

| | Telephone | Fax |
|---|---|---|
| *Citibank, N.A.* | | |
| Global Energy and Mining<br>1200 Smith Street, 20th Floor<br>Houston, TX 77002 | | |
| Shirley Elliott<br>Analyst | (713) 654-2868 | (713) 654-2849 |
| Loan Administration<br>Two Penns Way, Suite 200<br>New Castle, Delaware 19720 | | |
| Janet Wallace<br>Loan Administrator | (302) 894-6029 | (302) 894-6120 |
| *Borrower's Counsel*<br>*Vinson & Elkins L.L.P.*<br>1001 Fannin<br>Houston, TX 77002 | | |
| David Keyes<br>Dkeyes@velaw.com | (713) 758-2418 | (713) 615-5043 |
| Emily Alderden<br>ealderden@velaw.com | (713) 758-4420 | (713) 615-5665 |
| *Arranger's Counsel*<br>*Bracewell & Patterson, L.L.P.*<br>South Tower Pennzoil Place<br>711 Louisiana, Suite 2900<br>Houston, TX 77002-2781 | | |
| Bill Hayes<br>Partner | (713) 221-1333 | (713) 221-1212 |

xi

JPMNBY102043638

# 1. EXECUTIVE SUMMARY

## A. FACILITY DESCRIPTIONS

### $1,750,000,000 364-DAY SENIOR UNSECURED REVOLVING CREDIT FACILITY

| | |
|---|---|
| **Facility:** | Senior unsecured revolving credit facility |
| **Amount:** | $1,750,000,000 |
| **Maturity:** | 364-Days from closing |
| **Purpose:** | General corporate purposes including commercial paper backstop |
| **Upfront Fee:** | 3.0 basis points |
| **Facility Fee:** | 10.0 basis points per annum |
| **LIBOR Margin:** | 35.0 basis points per annum |
| **Drawn Cost:** | LIBOR + 45.0 basis points per annum |
| **Utilization Fee:** | 10.0 basis points per annum for usage >33% |
| **Fully Drawn Cost:** | LIBOR + 55.0 basis points per annum |
| **Pricing Grid:** | No |

### $500,000,000 364-DAY + 1 YEAR COMMITTED LETTER OF CREDIT FACILITY

| | |
|---|---|
| **Facility:** | Committed letter of credit facility |
| **Amount:** | $500,000,000 |
| **Maturity:** | 364-Day + 1-Year L/C Facility |
| **Purpose:** | Issuance of Standby and Performance LCs |
| **Upfront Fees:** | 7.0 basis points |
| **Facility Fee:** | 10.0 basis points |
| **Issuance Cost:** | Standby 52.5 basis points/Performance 30.0 basis points |
| **Pricing Grid:** | No |

JPMNBY102043639

## B. ENRON CORP.

Enron is an Oregon corporation headquartered in Houston, Texas, providing products and services related to natural gas, electricity and communications to wholesale and retail customers. Enron's operations are conducted through its subsidiaries and affiliates, which are principally engaged in:

   ς  The marketing of natural gas, electricity and other commodities and related risk management and finance services worldwide;

   ς  The development, construction and operations of power plants, pipelines and other energy related assets worldwide;

   ς  The delivery and management of energy commodities and capabilities to end-use retail customers in the industrial and commercial business sectors;

   ς  The development of an intelligent network platform to provide bandwidth management services and to deliver high bandwidth applications; and

   ς  The generation and transmission of electricity to markets in the northwestern United States.

The following chart outlines Enron's reportable business segments:



### Wholesale Services

Enron's wholesale services businesses operate worldwide in developed and deregulated markets such as North America and Europe, as well as developing or newly deregulating markets, including South America, India and Japan. Enron builds its wholesale businesses through the creation of networks involving asset ownership, contractual access to third-party assets and market-making activities. Wholesale services can be categorized into two business lines: (a) Commodity Sales and Services and (b) Assets and Investments.

### Commodity Sales and Services

Enron provides commodity delivery and predictable pricing to its customers through forward contracts. This market making activity includes the purchase, sale, marketing and delivery of natural gas, electricity, liquids and other commodities, as well as the management of Enron's own portfolio of contracts. Enron's market making activity is facilitated through a network of

JPMNBY102043640

capabilities including asset ownership. Accordingly, certain assets involved in the delivery of these services are included in this business (such as intrastate natural gas pipelines, power plants and gas storage facilities.)

**Assets and Investments**
Enron makes investments in various energy-related assets as a part of its network strategy either by purchasing the asset from a third party or developing and constructing the asset. Additionally, Enron invests in debt and equity securities of energy and certain communications-related businesses.

**Retail Energy Services**
Enron Energy Services provides energy expertise and capabilities to end-use retail customers in the industrial and commercial business sectors to manage their energy requirements and reduce their total energy costs. Enron Energy Services sells or manages the delivery of natural gas, electricity, and other commodities to industrial and commercial customers located throughout the United States and the United Kingdom. Enron Energy Services also provides outsourcing solutions to customers for full energy management. This integrated product includes the management of commodity delivery, energy information and energy assets, and price risk management activities, as well as investments in related assets. Enron is focused on bringing substantial savings to customers by achieving energy cost reductions and realizing economies of scale in service and equipment purchases.

**Broadband Services**
Enron's broadband services business provides customers with a single source for broadband services. In implementing its broadband strategy, Enron is constructing the Enron Intelligent Network (the "EIN"), a nationwide fiber optic network that consists of both fiber deployed by Enron and acquired capacity on networks not owned by Enron. The EIN, managed by Enron's Broadband Operating System software, provides a bandwidth-on-demand platform allowing the delivery of high-bandwidth media-rich content such as video streaming, high capacity data transport and video conferencing. In addition, Enron is extending its market-making and risk management intermediation business to help customers manage unexpected fluctuations in the price, supply and demand of bandwidth. Enron also makes investments in companies with related technologies and with potential for capital appreciation.

**Transportation and Distribution**
Enron's transportation and distribution business is comprised of its North American interstate natural gas transportation systems and its electricity transmission and distribution operations in Oregon.

**Financial Performance**
On January 22, 2001, Enron announced earnings results for the year ended December 31, 2000. For 2000, Enron generated after-tax earnings of $1.12 per diluted share, compared to $1.10 for 1999. Enron's total net income was $979 million in 2000 and $893 million in 1999. Revenues were $101 billion in 2000 and $40 billion in 1999.

JPMNBY102043641

## Financial Trends
### (In Millions of US$)









JPMNBY102043642

**Credit Ratings:**

Moody's Investor Services ("Moody's") recently upgraded Enron's senior unsecured debt to Baa1 (Please see Exhibit B). Standard & Poor's ("S&P") rates Enron's senior unsecured debt BBB+. Enron commercial paper is rated A-2 / P-2 by S&P and Moody's, respectively.

### CURRENT RATINGS

| Rating Agency | Long Term | Commercial Paper | Outlook |
|---|---|---|---|
| Fitch IBCA | BBB+ | F-2 | Stable |
| Moody's | Baa1 | P2 | Stable |
| R and I (Japan) | A- | n/a | Stable |
| Standard & Poor's | BBB+ | A2 | Stable |

**Financial Summary:**

Provided below is a financial summary on Enron's recent financial performance and summary credit statistics.

| FINANCIAL SUMMARY | | | | |
|---|---|---|---|---|
| Fiscal Year ended Dec. 31, ($ in Millions) | 2000 | 1999 | 1998 | 1997 |
| Revenues | $100,789 | $40,112 | $31,260 | $20,273 |
| EBITDA | 3,337 | *1,672 | 2,409 | 1,165 |
| Total Debt | 10,229 | 8,152 | 7,357 | 6,254 |
| Book Equity | 11,470 | 9,570 | 7,048 | 5,618 |
| Interest Expense | 838 | 656 | 550 | 401 |
| CapEx | 2,381 | 2,363 | 1,905 | 1,413 |
| EBITDA/Interest Expense | 3.98x | 4.37x | 4.38x | 2.91x |
| Total Debt/EBITDA | 3.07x | 2.85x | 3.05x | 5.37x |
| Total Debt/Book Cap | 47.1% | 46.0% | 51.1% | 52.7% |

*Includes $441 million charge for "Impairment of long-lived assets"*

Additional Information about Enron is available through www.enron.com.

JPMNBY102043643

## 2. SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| Borrower: | Enron Corp. (the "Borrower"). |
| Facilities: | Two unsecured revolving credit facilities (the "Facilities") aggregating $2.25 billion, consisting of a $500 million letter of credit facility (the "L/C Facility") and a $1.75 billion 364-day facility (the "Short-Term Facility"). The Short-Term Facility will be available only for borrowings and the L/C Facility will be available only for letters of credit. Letters of credit may be issued during the first 364 days of the L/C Facility, with the expiry of each letter of credit being no later than one year from the date of issuance. The Short-Term Facility may be extended, at the request of the Borrower, for additional periods of 364 days each; provided that (i) the Borrower shall have provided notice of such extension no earlier than 45 days and no later than 30 days prior to the existing termination date and (ii) the majority of the Lenders in the Short-Term Facility shall have consented to such extension. In connection with any such extension of the Short-Term Facility, the commitment of any Lender that does not consent to such extension shall be terminated on the existing termination date and its loans repaid, and the Borrower shall have the right to provide, at its option, additional Lenders to assume the commitments of any Lender not so consenting. |
| Co-Arrangers: | Salomon Smith Barney Inc. and JP Morgan, a division of Chase Securities Inc. |
| Co-Administrative Agents: | Citibank, N.A. and The Chase Manhattan Bank. |
| Paying Agent: | Citibank, N.A. |
| Issuing Bank: | The Chase Manhattan Bank |
| Lenders: | Citibank, N.A., The Chase Manhattan Bank and other Lenders acceptable to the Borrower and the Co-Administrative Agents. |
| Use of Facilities: | General corporate purposes. |
| Maturity Dates: | L/C Facility: May 14, 2003.<br>Short-Term Facility: May 14, 2002. |

-6-

JPMNBY102043644

Closing Date:  May 15, 2001.

Interest Rates
and Fees:

At the Borrower's option, Advances will be available to it under the Short-Term Facility at the rates and for the Interest Periods set forth below:

(a)  Base Rate Option:  Base Rate.

The Base Rate is a fluctuating rate per annum equal at all times to the highest of: (i) Citibank's publicly announced "base rate", (ii) 2 of 1% per annum above the latest three-week moving average of secondary market morning offering rates in the United States for three-month certificates of deposit of major U.S. money center banks, adjusted for reserve requirements and FDIC assessment rates, and (iii) 2 of 1% per annum above the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers ("Fed Funds Rate").

(b)  Eurodollar Rate Option:  LIBOR plus the Applicable Margin.

LIBOR is the rate per annum (rounded upward to the nearest 1/100 of 1% per annum) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period. If for any reason such rate is not available, LIBOR shall be the rate per annum (rounded upward to the nearest 1/100 of 1% per annum) appearing on Reuters Screen LIBO page as the London interbank offered rate for deposits in dollars at approximately 11:00 a.m. (London time) two business days before the first day of the relevant Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO page, the applicable rate shall be the arithmetic mean of all such rates. If neither the Telerate Page 3750 nor the Reuters Screen LIBO page rate is available, then LIBOR shall be the rate per annum at which dollar deposits are offered by the principal office of Citibank in London to prime banks in the London interbank market at 11:00 A.M.

-7-

(London time) two business days before the first day of the relevant Interest Period and with a maturity equal to such Interest Period. The Borrower may select Interest Periods of 1, 2, 3 or 6 months for LIBOR Advances. The Borrower will reimburse each Lender, upon demand, for the cost of reserve requirements actually incurred.

The fronting fee, the letter of credit fees and the facility fee for the L/C Facility and the Applicable Margin for LIBOR Advances, the utilization fee and the facility fee for the Short-Term Facility are set forth on Schedule I. Drawings under letters of credit will be due five business days after paid by the Issuing Bank and until paid will bear interest at the higher of (i) 2 of 1% per annum above the Fed Funds Rate and (ii) the Issuing Bank's prime rate.

Past due principal will bear interest at the higher of (i) 2% per annum above the Base Rate and (ii) 2% per annum above the rate required to be paid on such principal immediately before it became due.

**Interest Payments:**  Interest on Base Rate Advances will be payable quarterly in arrears. Interest on LIBOR Advances will be payable at the end of the relevant Interest Period, and if the Interest Period is more than three months, interest will also be paid quarterly. Interest will be computed on a 365/366-day basis for Base Rate Advances and on a 360-day basis for LIBOR Advances.

**Borrowings:**  Borrowings shall be in minimum principal amounts of $25,000,000 for LIBOR Advances and $15,000,000 for Base Rate Advances. All Advances under the Short-Term Facility will be made by the Lenders ratably in proportion to their respective Commitments in that Facility. Borrowings will be available on same day notice (by 11:00 a.m. New York City time) for Base Rate Advances and three business days' notice for Eurodollar Rate Advances.

**Letters of Credit:**  Each letter of credit shall be in U.S. dollars in a minimum amount of $1,000,000 and will be available on five business days' notice or such shorter period as may be acceptable to the Issuing Bank. Each lender will participate in each letter of credit ratably in proportion to its Commitment in the L/C Facility.

JPMNBY102043646

| | |
|---|---|
| **Optional Commitment Reduction:** | The Borrower will have the right to permanently reduce, in whole or in part, the unused portion of either Facility, provided that each partial reduction shall be in an amount of at least $10,000,000. Such Commitment reductions shall be applied ratably to all Lenders in the Facility reduced. Additionally, the Borrower will have the right to reduce in part or to terminate in whole the Commitments of one or more Lenders non-ratably, subject to certain restrictions to be set forth in the definitive loan documentation. |
| **Optional Prepayments:** | Advances may be prepaid in an amount of at least $10,000,000 on same day notice for Base Rate Advances and three business days notice for LIBOR Advances. The Borrower will bear all losses and costs (but not lost profits) related to prepayment of LIBOR Advances prior to the last day of the relevant Interest Period. |
| **Conditions Precedent to Initial Credit:** | Customary for financings of this nature, including the execution and delivery of the following, in form and substance satisfactory to the Co-Administrative Agents, for each Facility:  (i) in the case of the Short-Term Facility only, notes payable to each Lender and credit agreement; (ii) certificates with respect to resolutions, charter, by-laws, incumbency and signatures and certified copies of all other relevant documents evidencing any necessary corporate action and governmental approvals; (iii) favorable legal opinions from counsel for the Borrower; (iv) favorable legal opinion from counsel for the Paying Agent and (v) evidence satisfactory to the Paying Agent of termination of the $1,750,000,000 364-day Revolving Credit Agreement dated as of May 18, 2000 among Enron Corp., the banks party thereto and Citibank, N.A., as paying agent. |
| **Conditions Precedent to All Credits:** | Customary for financings of this nature, including the following: |

- All representations and warranties are correct on and as of the date of the credit before and after giving effect to such credit and to the application of the proceeds therefrom, or use of the letter of credit, as the case may be  (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain

-9-

correct as of such earlier date), as though made on and as of such date.

- No event or condition exists or would result from such borrowing which constitutes an event of default or would constitute an event of default but for the requirement that notice be give or time elapse or both.

- The Paying Agent or the Issuing Bank, as the case may be, shall have received such other approvals, opinions or documents as any Lender through the Paying Agent or the Issuing Bank, as the case may be, may reasonably request.

**Representations and Warranties:** Usual and customary for transactions of this nature, including but not limited to: (i) confirmation of corporate status and authority of the Borrower and Principal Subsidiaries, (ii) documentation and performance duly authorized and do not contravene laws, corporate documents, judgments, orders or material (creating a liability of $100,000,000 or more) agreements, (iii) documentation legal, valid, binding and enforceable, (iv) financial statements, (v) since December 31, 2000 to the date of the Facilities, no material adverse change in the consolidated financial position, consolidated results of operations or business of the Borrower and its subsidiaries as a whole, (vi) no litigation having a material adverse effect, (vii) ERISA, (viii) taxes, and (ix) status under Investment Company Act and Public Utility Holding Company Act. Generally, a subsidiary will be a "Principal Subsidiary" if it has consolidated assets (less any debt that is not guaranteed by the Borrower) equal to or greater than 5% of the Borrower's consolidated assets.

**Covenants** Usual and customary for transactions of this nature including: (i) periodic financial statements (which may be available at the Borrower's home page on the world wide web at www.enron.com or by "EDGAR"), certificates of compliance with financial covenant, notice of default, certain ERISA information and other information reasonably requested from time to time, (ii) compliance with laws, (iii) use of proceeds, (iv) maintenance of existence (subject to a permitted merger or consolidation pursuant to clause (x) below), (v) insurance, (vi) visitation rights, (vii) negative pledge similar to the Borrower's November 1, 1985 Indenture, (viii) maintenance of ratio of total senior debt to total capitalization not to exceed 65%,

JPMNBY102043648

(ix) no sale, lease, transfer or other disposition of all or substantially all of the Borrower's assets, (x) no merger or consolidation by the Borrower unless (a) no default exists or results and the Borrower is survivor, or surviving person (if not the Borrower) assumes all obligations of the Borrower under the Facilities, and (xi) ERISA.

**Events of Default:**  Customary events of default for transactions of this nature, including: (i) failure to pay principal or letter of credit reimbursement when due or interest after 5-day grace period or facility fee after 15-day grace period, (ii) representations and warranties materially untrue when made and materiality is continuing, (iii) failure to comply with affirmative covenants if not cured within 30 days after written notice, (iv) failure to comply with negative covenants, (v) cross default for nonpayment when due after applicable grace period, or acceleration, of Debt of the Borrower or a Principal Subsidiary for borrowed money greater than $100,000,000, (vi) bankruptcy or insolvency of the Borrower or a Principal Subsidiary, (vii) any unsatisfied judgment against the Borrower or a Principal Subsidiary for payment of money greater than $100,000,000 unless enforcement stayed by appeal or otherwise, or (viii) occurrence of certain circumstances respecting ERISA plans.

**Transfers and Participations:**  Lenders permitted to assign Commitments and loans (or letter of credit participations) under a Facility, in whole or part, to another Lender in such Facility, and, with the permission of the Co-Administrative Agents and the Borrower, to a person that is not a Lender. A $3,000 fee for each assignment will be paid to the Paying Agent or the Issuing Bank, as the case may be, by the assignee. Lenders may sell participations in either Facility provided that the assigning Lender retains all voting rights (except as specified in the definitive loan documentation) and all obligations under such Facility.

**Other:**  Separate loan documentation will be executed for each of the two Facilities. The documentation will include customary agency language, and Majority Lenders for a Facility will be defined as those holding at least 51% of the Commitments under such Facility. The loan documentation will contain customary provisions regarding taxes, illegality, increased costs and capital adequacy, subject to certain limitations, including (i) a 90 day limit on retroactive claims, and (ii) the right of the Borrower to replace or terminate a Lender for which it becomes illegal to make LIBOR

-11-

JPMNBY102043649

|  |  |
|---|---|
|  | Advances or that asserts a claim for additional costs (including additional interest on LIBOR) or if a tax gross-up will be payable with respect to such Lender. The L/C Facility documentation will contain customary letter of credit provisions to be negotiated, including protection of the Issuing Bank and standards for review of drawings. |
| Expenses; Indemnity: | All reasonable expenses incurred (i) by the Paying Agent in connection with the preparation, execution, delivery, modification, amendment and administration of the loan documentation (including reasonable fees and expenses of one law firm as counsel to the Paying Agent) or (ii) by the Paying Agent, either Co-Administrative Agent, the Issuing Bank or any Lender in connection with the enforcement of the loan documentation (including reasonable legal expenses), are for the Borrower=s account. To the fullest extent permitted by law, the Borrower will indemnify and hold harmless the Paying Agent, each Co-Administrative Agent, the Issuing Bank, each Lender and each of their respective officers, directors, employees and agents (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees and expenses of counsel) that may be incurred by or asserted against any Indemnified Party (other than by the Paying Agent, either Co-Administrative Agent, the Issuing Bank or another Lender or any of their respective successors and assigns), in each case arising out of or in connection with or by reason of any investigation, litigation or proceeding arising out of, related to or in connection with the loan documentation or any transaction in which any proceeds are applied or letter of credit is used, excluding any claim, damage, loss, liability or expense attributable to such Indemnified Party's gross negligence or willful misconduct. The Borrower and the Lenders will waive, to the fullest extent under applicable law, any right to claim exemplary or punitive damages. |
| Governing Law: | New York. |
| Counsel to the Paying Agent: | Bracewell & Patterson, L.L.P. |

-12-

JPMNBY102043650

## SCHEDULE I

### FACILITY FEES AND APPLICABLE MARGINS

#### Short-Term Facility

| | |
|---|---|
| Facility Fee: | 0.10% per annum |
| Applicable Margin for LIBOR Advances: | 0.35% per annum |
| Utilization Fee: | 0.10% per annum on all outstanding amounts when the outstanding amounts exceed 33% of the then existing commitments |

#### L/C Facility

| | |
|---|---|
| Facility Fee: | 0.10% per annum |
| Fronting Fee: | 0.125% of face amount of each letter of credit for the account of the Issuing Bank only |
| Financial letter of credit fee: | 0.525% per annum |
| Performance letter of credit fee: | 0.30% per annum |

-13-

JPMNBY102043651

## 3. FORMS OF RESPONSE

*[BANK LETTERHEAD]*

April 20, 2001

To:  Salomon Smith Barney Inc.
    390 Greenwich Street, First Floor
    New York, NY 10013
    Attention:  Mario Murillo
           Fax:  (212) 723-8539

    JP Morgan, a division of Chase Securities Inc.
    707 Travis, 8th Floor North
    Houston, TX 77002
    Attention:  Roxanne Powell
           Fax:  (713) 216-4583

Re: $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility (the "364-Day Facility") and $500,000,000 Letter of Credit Facility (the "LC Facility") for Enron Corp. (together, the "Facilities")

Dear Ladies and Gentlemen:

_____ (the "Bank") is pleased to commit pro rata to the above referenced Facilities.  In the aggregate, our proposed offered commitment amount (the "Offered Commitment Amount") is US $_____.

The Bank acknowledges that it has, independently and without reliance upon JP Morgan, a division of Chase Securities Inc., and Salomon Smith Barney Inc. (the "Co-Lead Arrangers"), or any of their affiliates, or any other bank, and based on the financial statements of Enron Corp. and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this commitment.

The Bank also acknowledges that entering into the Facilities is subject to satisfactory documentation substantially on the terms and conditions set forth in the Confidential Information Memorandum dated April 20, 2001.  The Co-Lead Arrangers shall have no liability or responsibility to the Bank if such Facilities are not entered into.

The Bank understands and agrees that (i) the proposed Offered Commitment Amount is subject to acceptance by Enron Corp. and the Co-Lead Arrangers, that the Commitment may be reduced by Enron Corp. and the Co-Lead Arrangers, and that the Co-Lead Arrangers will notify the Bank of the amount of the Bank's accepted commitment ("Allocated Commitment") by May 8, 2001 and (ii) that upon the closing of the 364-Day Facility, Enron Corp.'s $1,750,000,000 364-Day Senior Unsecured Revolving Credit Facility dated May 18, 2000 (as extended) with Citibank, N.A., and the banks party thereto shall be terminated and that the Bank's commitment under such facility, if any, shall be cancelled.

Very truly yours,

[Print Name of Bank]

By:_____
Title:_____

JPMNBY102043652

| ENRON CORP. |
| --- |

**LEGAL NAME OF YOUR INSTITUTION TO APPEAR IN DOCUMENTATION:**

| GENERAL INFORMATION |
| --- |

**DOMESTIC LENDING OFFICE:**

Institution Name: _____
Street Address: _____
City/State/Zip: _____
Attention: _____
Telephone #: _____
Fax #: _____

**EURODOLLAR LENDING OFFICE:**

Institution Name: _____
Street Address: _____
City/State/Zip: _____
Attention: _____
Telephone #: _____
Fax #: _____

**TAX WITHHOLDING:**

Non-Resident Alien: ____ yes*    ____ no         (*Form 4224 Enclosed)
Tax ID Number: _____

Attn.: Bank Loan Syndications

JPMNBY102043653

CHAPTER 3                                                    ENRON CORP.
FORMS OF RESPONSE                        ADMINISTRATIVE DETAILS REPLY FORM

| ENRON CORP. |
| --- |

| CONTACT LIST |
| --- |

**BUSINESS/CREDIT MATTERS:**

Primary Contact: _____
Street Address: _____
City/State/Zip: _____
Telephone #: _____
Fax #: _____

Back-Up Contact: _____
Street Address: _____
City/State/Zip: _____
Telephone #: _____
Fax #: _____

**ADMINISTRATIVE/OPERATIONS MATTERS:**

Contact(s): _____
Street Address: _____
City/State/Zip: _____
Telephone #: _____
Fax #: _____

**COMPETITIVE BID LOAN NOTIFICATION:**

Contact Name: _____
Street Address: _____
City/State/Zip: _____
Telephone #: _____
Fax #: _____

**ENRON CORP.**

**ROUTING
INSTRUCTIONS**

PAYMENTS:

Credit Bank:
City, State:
ABA # of
Credit Bank:
Name of Account:
Account #:
Benef. Acct. Name:
Benef Acct. #
Ref.:
Attention:

MAILINGS:

Please specify who should receive financial information:

Name:
Street Address:
City/State/Zip:

**ADMINISTRATIVE AGENT
INFORMATION**

*Bank Loan Syndications – Agent Contact:*
Name:       Janet Wallace – Citibank, N.A.
Tel:         (302) 894-6029
Fax         (302) 894-6120

Initial Funding Standards

LIBOR – Fund 2 days after rates are set.

Agent Wire Instructions
Citibank, N.A.
ABA # 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
Account Name:  NAIB Agency Medium Term Finance
Reference:  Enron Corp.
Account # 36852248

Agent Notices Address
Janet Wallace
Citibank, N.A.
Two Penns Way, Suite 200
New Castle, Delaware 19720

JPMNBY102043655

SUPPLEMENTAL EXHIBIT 6

U.S. $500,000,000

LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT

DATED AS OF

MAY 14, 2001

AMONG

ENRON CORP.,
*AS THE COMPANY*

AND

THE BANKS NAMED HEREIN,
*AS BANKS*

AND

THE CHASE MANHATTAN BANK AND CITIBANK, N.A.,
*AS CO-ADMINISTRATIVE AGENTS*

THE CHASE MANHATTAN BANK,
*AS PAYING AGENT*

AND

THE CHASE MANHATTAN BANK,
*AS ISSUING BANK*

*CO-LEAD ARRANGERS*
JP MORGAN, A DIVISION OF CHASE SECURITIES AND SALOMON SMITH BARNEY INC.

528066



DEPOSITION EXHIBIT
65074

ERIC J. FINZ

JPMUCI 0003470

JPMUCI 0003471

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS.................................................1
SECTION 1 01    Certain Defined Terms. .................................................1
SECTION 1.02    Computation of Time Periods ................................................8
SECTION 1.03    Accounting Terms .................................................9
SECTION 1.04    Miscellaneous .................................................9

ARTICLE II LETTERS OF CREDIT .................................................9
SECTION 2.01    Letter of Credit Request.................................................9
SECTION 2.02    Letters of Credit.................................................9
SECTION 2.03    Letter of Credit Participation .................................................10
SECTION 2.04    LC Disbursement and Repayment.................................................11
SECTION 2.05    Obligation to Pay LC Obligations, Issuing Bank.................................................12
SECTION 2.06    Fees .................................................13
SECTION 2.07    Interest.................................................13
SECTION 2.08    Interest Rate Determination .................................................14
SECTION 2.09    Increased Costs, Capital Adequacy, Etc................................................14
SECTION 2.10    Payments and Computations .................................................15
SECTION 2.11    Taxes .................................................16
SECTION 2.12    Sharing of Payments, Etc.................................................17
SECTION 2.13    Ratable Reduction or Termination of the Commitments, Effect of Termination. .................................................18
SECTION 2 14    Replacement of Bank, Additional Right to Terminate Commitments .................................................18
SECTION 2 15    Non-Ratable Reduction or Termination of Commitments.................................................19
SECTION 2 16    Certificates of Banks .................................................19
SECTION 2 17    Replacement of Issuing Bank .................................................20
SECTION 2 18    Cash Collateral Account.................................................20

ARTICLE III CONDITIONS TO ISSUANCE OF LETTERS OF CREDIT .................................................22
SECTION 3 01    Initial Condition Precedent.................................................22
SECTION 3.02    Additional Conditions Precedent to Issuance of Each Letter of Credit .................................................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES .................................................23
SECTION 4.01    Representations and Warranties of the Company .................................................23

ARTICLE V COVENANTS OF THE COMPANY .................................................25
SECTION 5.01    Affirmative Covenants.................................................25
SECTION 5.02    Negative Covenants.................................................27

ARTICLE VI EVENTS OF DEFAULT.................................................28
SECTION 6.01    Events of Default .................................................28

ARTICLE VII THE PAYING AGENT.................................................30
SECTION 7.01    Authorization and Action .................................................30
SECTION 7.02    Paying Agent's Reliance, Etc .................................................30
SECTION 7.03    Paying Agent and Its Affiliates.................................................31
SECTION 7.04    Bank Credit Decision .................................................31
SECTION 7.05    Holders .................................................31
SECTION 7.06    Certain Rights of the Paying Agent. .................................................31
SECTION 7 07    Indemnification .................................................32
SECTION 7 08    Resignation of the Paying Agent .................................................3.

ARTICLE VIII THE CO-ADMINISTRATIVE AGENTS.................................................33

528066    i

JPMUCI 0003472

SECTION 8.01    Authorization and Action ............................................................... 33
SECTION 8.02    Co-Administrative Agents' Reliance, Etc.... .... .... ... .... .......  .. 33
SECTION 8.03    Co-Administrative Agents and Their Affiliates.............................. 34
SECTION 8.04    Bank Credit Decision........ ... .... .... ... .... ....     ... ... .. 34
SECTION 8.05    Certain Rights of the Co-Administrative Agents ............................ 34
SECTION 8.06    Holders . ..   ..     ...    .    .      ...  ..       . ...... 34
SECTION 8.07    Indemnification ...... .... ..... .   .      .    .    ..... ... 35
SECTION 8.08    Resignation by the Co-Administrative Agents ................................ 35

ARTICLE IX THE ISSUING BANK................................    ...........  ...   ...    ...  ... 36
SECTION 9.01    Indemnification  .......... .....  ..      ...   .    ... ............ 36

ARTICLE X MISCELLANEOUS.. ..............    .. ..................  ...    ........  ....     ...   .. 36
SECTION 10.01    Amendments, Etc. ................................................................. 36
SECTION 10.02    Notices, Etc    ...    ... ................ .... ... ....... .... .... ... ... .. 37
SECTION 10.03    No Waiver; Remedies........... .... ...............   ... ... ... 39
SECTION 10.04    Costs, Expenses and Indemnity ... ....... .... ... .......... 39
SECTION 10.05    Right of Set-Off.... .... ....... ....... ... ..... .....   ... .. .. 40
SECTION 10.06    Assignments and Participations ........   ...  ............ ...... 40
SECTION 10.07    Governing Law; Entire Agreement... ... ...... ... ..... .. ... 43
SECTION 10.08    Interest.... ................................... .... .... ....... ... 43
SECTION 10.09    Confidentiality ...   ...      .     ........... ....  ... .......... 43
SECTION 10.10    Execution in Counterparts   .    ..  .. ..... ...... ... ....... 44
SECTION 10.11    Binding Effect   ...     ...                .     ..        .. 44

Schedule I -    Funding Offices and Initial Commitments

Exhibit A-1    Letter of Credit Issuance Request
Exhibit A-2    Letter of Credit Amendment Request
Exhibit B    -    Opinion of Vinson & Elkins L.L.P., Counsel to the Company
Exhibit C    -    Opinion of Executive Vice President and General Counsel of the Company
Exhibit D    -    Opinion of Bracewell & Patterson, L.L.P., Counsel to the Paying Agent
Exhibit E    -    Form of Assignment and Acceptance

528066    ii

JPMUCI 0003473

## LETTER OF CREDIT AND REIMBURSEMENT AGREEMENT

### Dated as of May 14, 2001

ENRON CORP., an Oregon corporation, the financial institutions party hereto, The Chase Manhattan Bank and Citibank, N A , as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank hereunder, agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1 01 Certain Defined Terms   As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms defined)

"Agreement" means this Letter of Credit and Reimbursement Agreement, as same may be amended, extended, supplemented or modified from time to time in the future

"Assignment and Acceptance" means an assignment and acceptance entered into by a Bank and an Eligible Assignee, containing the approval of the Issuing Bank and such other approvals as are required by clause (b) of the definition of "Eligible Assignee" and accepted by the Paying Agent, in substantially the form of Exhibit E

"Bankruptcy Code" means Title 11 of the United States Code, as now or hereafter in effect, or any successor thereto

"Banks" means the financial institutions listed on the signature pages hereof and each Eligible Assignee that becomes a Bank party hereto pursuant to Section 2 14 or Section 10.06(a), (b) and (d)   The financial institution that is the Issuing Bank is also a "Bank", but the term "Issuing Bank" shall not include the Issuing Bank in its capacity as one of the Banks having a Pro Rata Percentage of the Commitments, nor shall the term "Bank" or "Banks" include the Issuing Bank in its capacity as Issuing Bank hereunder   Accordingly, Chase (or any successor Issuing Bank) will act in the separate capacities of being an "Issuing Bank" and a "Bank".

"Base Rate" means, for any day, the higher of (a) the Prime Rate for such day and (b) the Federal Funds Rate for such day plus 1/2 of 1% per annum.  Each change in any interest rate provided for herein based on the Base Rate resulting from a change in the Base Rate shall take effect at the time of such change in the Base Rate.

"Business Day" means any day of the year except Saturday, Sunday and any day on which banks are required or authorized to close in New York City or Houston, Texas.

"Cash Collateral Account" means an account that may, with the consent, or shall at the request, of the Majority Banks pursuant to Section 2.18 or Section 6.01 be established and maintained by the Paying Agent hereto, into which the Company shall pay the amounts necessary to secure certain obligations set forth in Section 2.18(a), over which the Paying Agent shall have sole dominion and control and upon such terms as may be satisfactory to the Paying Agent, and subject to the terms of this Agreement, provided, that from time to time at the request of the Company, to the extent provided in Section 2.18, the Paying Agent will invest the available proceeds from such Cash Collateral Account in Permitted Investments, and provided further, that the Paying Agent may liquidate such Permitted

528066

JPMUCI 0003474

Investments at any time when necessary to pay the obligations secured by the Cash Collateral Account as set forth in Section 2.18

"Chase" means The Chase Manhattan Bank, a New York banking corporation

"Citibank" means Citibank, N.A., a national banking association.

"Co-Administrative Agents" means, collectively, Chase and Citibank, each in its capacity as a Co-Administrative Agent pursuant to Article VIII, and such term shall include any successor to either such entity in such capacity pursuant to Section 8.08. If at any time only one Person is serving as a Co-Administrative Agent hereunder, such term shall mean such Person.

"Code" means the Internal Revenue Code of 1986 as amended from time to time, or any successor Federal tax code, and any reference to any statutory provision of the Code shall be deemed to be a reference to any successor provision or provisions.

"Commitment" means, for each Bank, the amount set forth opposite its name in Schedule I (or, if such Bank has entered into any Assignment and Acceptance Agreement, set forth for such Bank in the Register maintained by the Paying Agent pursuant to Section 10.06(c)), as such amount may be adjusted pursuant to Section 2.13, 2.14, 2.15 or Section 6.01 (subject to Sections 2.03 (a) and (b)).

"Company" means Enron Corp., an Oregon corporation, and any successor thereto pursuant to Section 5.02(d)(ii)

"Consolidated" refers to the consolidation of the accounts of the Company and its Subsidiaries in accordance with GAAP

"Consolidated Net Worth" means at any date the Consolidated stockholders' equity of the Company and its Consolidated Subsidiaries (excluding any Redeemable Preferred Stock of the Company)

"Debt" of any Person means, at any date, without duplication, its (a) obligations for the repayment of money borrowed which are or should be shown on a balance sheet as debt in accordance with GAAP, (b) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (c) guaranties of payment or collection of any obligations described in clauses (a) and (b) of other Persons, provided, that clauses (a) and (b) include, in the case of obligations of the Company or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; provided, further, that the liability of any Person as a general partner of a partnership for Debt of such partnership, if such partnership is not a Subsidiary of such Person, shall not constitute Debt.

"Default" means an event which, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Dollars" and "$" means lawful money of the United States of America.

"Duff & Phelps" means Duff & Phelps Credit Rating Co.

"Eligible Assignee" means, with the consent of the Issuing Bank, (a) any Bank and (b) with the additional consents of the Paying Agent (if the Bank acting as such is not the Issuing Bank) and the Company (which additional consents will not be unreasonably withheld), any other commercial bank

JPMUCI 0003475

or financial institution not covered by clause (a) of this definition; provided, however, that neither the Company nor any Subsidiary of the Company shall be an Eligible Assignee.

"Enron Indenture" means that certain indenture dated as of November 1, 1985, between the Company (formerly InterNorth, Inc.) and Harris Trust and Savings Bank, as Trustee, as supplemented and amended by the First Supplemental Indenture dated as of December 1, 1995, the Supplemental Indenture, dated as of May 8, 1997, by and among Enron Corp. a Delaware corporation, the Company and Harris Trust and Savings Bank, as Trustee, the Third Supplemental Indenture, dated as of September 1, 1997, between the Company and Harris Trust and Savings Bank, as Trustee, and the Fourth Supplemental Indenture, dated as of August 17, 1999, between the Company and Harris Trust and Savings Bank, as Trustee, without giving effect to any further amendment or modification thereof

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute of similar import, together with the regulations thereunder, as in effect from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a group of which the Company is a member and which is under common control within the meaning of the regulations under Section 414 of the Code.

"Events of Default" has the meaning specified in Section 6.01.

"Expiration Date" means, at any time for any Letter of Credit, the earlier of (1) the date of cancellation or termination of such Letter of Credit, or (2) the later of (i) its stated expiry date as in effect at such time, (ii) if any event referred to in clause (A) of this definition has occurred and is continuing in respect of such Letter of Credit, the date on which the Issuing Bank shall receive an opinion from its counsel to the effect that a final and nonappealable judgment or order has been rendered or issued either terminating the order, injunction or other process or decree restraining the Issuing Bank from paying under such Letter of Credit or permanently enjoining the Issuing Bank from paying under such Letter of Credit, and (iii) if any event referred to in clause (B) of this definition shall occur in respect of such Letter of Credit, the date on which the Issuing Bank shall receive an opinion from its counsel to the effect that the Issuing Bank has no further liability under such Letter of Credit. (A): This clause (A) shall apply for the purpose of this definition if the Issuing Bank shall have been served with or otherwise be subjected to a court order, injunction or other process or decree restraining or seeking to restrain the Issuing Bank from paying any amount under any Letter of Credit and either (a) there has been a drawing under such Letter of Credit which the Issuing Bank would otherwise be obligated to pay or (b) the stated expiry date of such Letter of Credit has occurred, but the right of the beneficiary or transferee to draw on the Letter of Credit has been extended past such date in connection with the pendency of the related court action or proceeding. (B): This clause (B) shall apply for the purpose of this definition if the beneficiary or transferee of a Letter of Credit shall have made a demand, on or prior to the stated expiry date of any Letter of Credit, to the effect that the stated expiry date be extended or that the value of such Letter of Credit be held for the account of the beneficiary or transferee, in either case under circumstances in which the Issuing Bank may incur liability or loss if the Issuing Bank does not comply with such demand and either (a) the Company shall have failed to authorize the Issuing Bank to extend the stated expiry date within three Business Days after the Issuing Bank shall have notified the Company of such demand or (b) the Issuing Bank shall in its sole discretion decline to extend such stated expiry date.

"Facility Documents" means this Agreement and each other document or instrument executed and delivered in connection with this Agreement; provided, that the term "Facility Documents" does not include the Letters of Credit.

528066

3

JPMUCI 0003476

"FDIC" means the Federal Deposit Insurance Corporation, or any federal agency or authority of the United States from time to time succeeding to its function

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Paying Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System. or any federal agency or authority of the United States from time to time succeeding to its function

"Fees" shall have the meaning set forth in Section 2 06.

"Final LC Issuance Date" means May 13, 2002

"Final Maturity Date" means May 13, 2003

"Financial Letter of Credit" means a Letter of Credit that is not a Performance Letter of Credit

"Funding Office" means. with respect to any Bank, the office of such Bank specified as its "Funding Office" opposite its name on Schedule I hereto or in the Assignment and Acceptance Agreement pursuant to which it became a Bank or such other office of such Bank as such Bank may from time to time specify to the Company and the Paying Agent

"GAAP" means United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements referred to in Section 4 01(d).

"Indemnified Parties" has the meaning specified in Section 10.04(b).

"Insufficiency" means, with respect to any Plan, the amount, if any, by which the present value of the accrued benefits under such Plan exceeds the fair market value of the assets of such Plan allocable to such benefits.

"Issuing Bank" means Chase, in its capacity as the financial institution that issues or may issue any Letter of Credit under this Agreement, or any successor Issuing Bank pursuant to Section 2.17

"LC Disbursement" means a payment made by the Issuing Bank under a Letter of Credit

"LC Disbursement Exposure" means, with respect to any Bank at any time, such Bank's Pro Rata Percentage of (a) the maximum aggregate undrawn amount of all outstanding Letters of Credit at such time (after giving effect to any step up provision or other mechanism for increases, if any, to any Letter of Credit that do not require the further consent of the Issuing Bank and assuming compliance with all conditions to drawing) plus (b) the aggregate amount of all unpaid LC Reimbursement Obligations at such time.

"LC Interest Obligation" means. with respect to each Letter of Credit, the obligation of the Company to pay accrued interest on the LC Reimbursement Obligation pursuant to Section 2.07

JPMUCI 0003477

"LC Obligation" means, with respect to each Letter of Credit, the sum of the LC Reimbursement Obligation and the LC Interest Obligation.

"LC Reimbursement Obligation" means, with respect to each Letter of Credit for which an LC Disbursement has been made, the obligation of the Company to reimburse to the Issuing Bank the amount of each LC Disbursement under such Letter of Credit pursuant to Sections 2.04(b) and 2.05.

"Letter of Credit" shall have the meaning set forth in Section 2.02.

"Letter of Credit Request" shall have the meaning set forth in Section 2.01.

"Losses" has the meaning specified in Section 10.04(b)

"Majority Banks" means at any time Banks having at least 51% of the Pro Rata Percentages.

"Moody's" means Moody's Investors Service, Inc

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Company or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions

"Multiple Employer Plan" means an employee benefit plan, other than a Multiemployer Plan, subject to Title IV of ERISA to which the Company or any ERISA Affiliate, and more than one employer other than the Company or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Company or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan

"Other Taxes" has the meaning specified in Section 2.11(c).

"Paying Agent" means Chase, in its capacity as the Paying Agent pursuant to Article VII, and such term shall include any successor to such entity in such capacity pursuant to Section 7.08.

"Payment Office" means the office of the Paying Agent located at 1 Chase Manhattan Plaza, New York, New York, 10081 or such other office as the Paying Agent may designate by written notice to the other parties hereto.

"PBGC" means the Pension Benefit Guaranty Corporation, or any federal agency or authority of the United States from time to time succeeding to its function.

"Performance Letter of Credit" means a Letter of Credit carrying a credit risk conversion factor of 50% or less under the capital adequacy guidelines promulgated pursuant to the 1988 Capital Accord of the Basel Committee on Banking Supervision.

"Permitted Investment" shall have the meaning set forth in Section 2.18(e).

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, firm or other entity, or a government or any political subdivision or agency, department or instrumentality thereof.

JPMUCI 0003478

"<u>Plan</u>" means an employee benefit plan (other than a Multiemployer Plan) which is (or, in the event that any such plan has been terminated within five years after a transaction described in Section 4069 of ERISA, was) maintained for employees of the Company or any ERISA Affiliate and covered by Title IV of ERISA.

"<u>Preferred Stock</u>" means, as applied to any corporation, shares of such corporation which shall be entitled to preference or priority over any other shares of such corporation in respect of either the payment of dividends or the distribution of assets upon liquidation.

"<u>Prescribed Forms</u>" shall mean such duly executed form(s) or statement(s), and in such number of copies, which may, from time to time, be prescribed by law and which, pursuant to applicable provisions of (a) an income tax treaty between the United States and the country of residence of the Bank or the Issuing Bank, as the case may be, providing the form(s) or statement(s), (b) the Code, or (c) any applicable rule or regulation under the Code, permit the Company to make payments hereunder for the account of such Bank or Issuing Bank, as the case may be, free of deduction or withholding of income or similar taxes (except for any deduction or withholding of income or similar taxes as a result of any change in or in the interpretation of any such treaty, the Code or any such rule or regulation).

"<u>Prime Rate</u>" means the rate of interest from time to time announced publicly by Chase at the Principal Office as its prime commercial lending rate. Such rate is set by Chase as a general reference rate of interest, taking into account such factors as Chase may deem appropriate, it being understood that many of Chase's commercial or other loans are priced in relationship to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that Chase may make various commercial or other loans at rates of interest having no relationship to such rate.

"<u>Principal Office</u>" means the principal office of Chase, presently located at 270 Park Avenue, New York, New York, 10017 or such other location as designated by Chase from time to time.

"<u>Principal Subsidiary</u>" means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which the Company has not guaranteed payment) equal to or greater than 5% of the Company's consolidated assets; provided that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date of determination) without regard to the consolidated assets test described above in this definition: Houston Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron North America Corp., and Enron Pipeline Company. For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recent quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of the Company shall be determined based on the most recent quarterly or annual consolidated financial statements of the Company available prior to such determination.

"<u>Pro Rata Percentage</u>" means, with respect to any Bank, a fraction (expressed as a percentage), (i) the numerator of which shall be the amount of such Bank's Commitment and the denominator of which shall be the aggregate amount of all the Commitments of the Banks, or (ii) if no Commitments are then existing, the numerator of which shall be the amount of such Bank's Commitment immediately prior to the termination of the Commitments and the denominator of which shall be the aggregate amount of all Commitments existing immediately prior to the termination thereof.

"<u>Redeemable</u>" means, as applied to any Preferred Stock, any Preferred Stock which (a) the issuer undertakes to redeem at a fixed or determinable date or dates (other than pursuant to the exercise of an option to redeem by the issuer if the failure to exercise such option would not materially

JPMUCI 0003479

adversely affect the business, consolidated financial position or consolidated results of operations of the issuer and its subsidiaries taken as a whole), whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer, or (b) is redeemable at the option of the holder

"Register" has the meaning specified in Section 10 06(c)

"Reimbursement Date" means, with respect to any LC Disbursement, the earlier to occur of:

(a)     the latest to occur of (i) the fifth Business Day following such LC Disbursement, (ii) the Business Day on which the Company receives notice of such LC Disbursement, provided that the Company receives notice of such LC Disbursement before 10 00 a.m. New York City time on such date, or (iii) the Business Day following the date on which the Company receives notice of such LC Disbursement, provided the Company receives notice of such LC Disbursement at or after 10:00 a.m. New York City time on such date, or

(b)     the Final Maturity Date.

"Standard & Poor's" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. on the date hereof

"Subordinated Debt" means, (a) the 8.25% Senior Subordinated Debentures due 2012 and the 6 3/4% Senior Subordinated Debentures due July 1, 2005 of the Company issued pursuant to the Indenture dated as of February 1, 1987 between the Company and NationsBank of Texas, N.A., as trustee, (b) the obligations of the Company under the Loan Agreement dated as of November 15, 1993, between the Company and Enron Capital L L C., (c) the obligations of the Company under the Loan Agreement dated as of August 3, 1994, between the Company and Enron Capital Resources, L.P., (d) the 7 75% Subordinated Debentures due 2016 of the Company issued pursuant to the Indenture dated as of November 21, 1996 between the Company and The Chase Manhattan Bank, Trustee, (e) the 7.75% Subordinated Debentures due 2016, Series II of the Company issued pursuant to the Indenture dated as of January 16, 1997 between the Company and The Chase Manhattan Bank, Trustee, (f) the Adjustable Rate Debentures, Series A issued pursuant to the Indenture dated as of June 6, 1997 between the Company and The Chase Manhattan Bank, as Indenture Trustee, and (g) any Debt of the Company which is subordinate to any other obligations of the Company so long as (i) the terms of such Debt are (x) substantially similar to and no less favorable to the holders of Senior Indebtedness (as defined in the Indenture dated as of February 1, 1987 referenced in clause (a) of this definition) than the terms of such Senior Subordinated Debentures due 2012 of the Company or (y) consented to by the Majority Banks (which consent will not be unreasonably withheld), and (ii) no payments of principal shall be payable (whether by scheduled maturity, required prepayment, or otherwise, unless as a result of the acceleration of such Debt in accordance with the terms thereof) under such Debt prior to June 1, 2005.

"Subsidiary" of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of the Company, unless such entity is a Consolidated Subsidiary of the Company, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with

528066                                                       7

JPMUCI 0003480

GAAP   Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of the Company.

"Taxes" has the meaning specified in Section 2.11(a)

"Termination Event" means (a) a "reportable event", as such term is described in Section 4043 of ERISA (other than a "reportable event" not subject to the provision for 30-day notice to the PBGC), or an event described in Section 4062(e) of ERISA, or (b) the withdrawal of the Company or any ERISA Affiliate from a Multiple Employer Plan during a plan year in which it was a "substantial employer", as such term is defined in Section 4001(a)(2) of ERISA, or the incurrence of liability by the Company or any ERISA Affiliate under Section 4064 of ERISA upon the termination of a Multiple Employer Plan, or (c) the distribution of a notice of intent to terminate a Plan pursuant to Section 4041(a)(2) of ERISA or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings to terminate a Plan by the PBGC under Section 4042 of ERISA, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Total Capitalization" means, at any time, the sum (without duplication) of (a) Total Senior Debt, (b) the total outstanding principal amount (or the book carrying amount of such Debt if issued at a discount) of Subordinated Debt of the Company and its Consolidated Subsidiaries, (c) Consolidated Net Worth less any amount thereof attributable to "minority interests" (as defined below), and (d) Redeemable Preferred Stock of the Company and its Consolidated Subsidiaries  For the purpose of this definition, "minority interests" means any investment or interest of the Company in any corporation, partnership or other entity to the extent that the total amount thereof owned by the Company (directly or indirectly) constitutes 50% or less of all outstanding interests or investments in such corporation, partnership or entity

"Total Commitments" shall mean at any time the sum of all Commitments of all Banks

"Total LC Disbursement Exposure" shall mean at any time the sum of all LC Disbursement Exposures at such time of all Banks.

"Total Senior Debt" means, at any time, all Consolidated Debt of the Company and its Consolidated Subsidiaries other than Subordinated Debt.

"UCP 500" means the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, and any amendment to, or successor of, such publication.

"Undrawn LC Amount" means, at any time, the maximum aggregate amount of all undrawn portions of Letters of Credit outstanding at such time (after giving effect to any step up provision or other mechanism for increases, if any, that do not require the further consent of the Issuing Bank and assuming compliance with all conditions to drawing).

"Withdrawal Liability" shall have the meaning given such term under Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02   Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Unless otherwise indicated, all references to a particular time are references to New York City time.

JPMUCI 0003481

SECTION 1.03  Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with, and certificates of compliance with financial covenants shall be based on, GAAP; provided, however, the financial statements and reports required pursuant to Sections 5.01(a)(i) and (viii) shall be prepared in accordance with generally accepted accounting principles consistently applied except to the extent stated therein.

SECTION 1.04  Miscellaneous.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Article, Section, Schedule and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified.  The term "including" shall mean "including, without limitation,".

## ARTICLE II

## LETTERS OF CREDIT

SECTION 2.01  Letter of Credit Request.  Subject to the terms and conditions set forth herein, the Company may request for its own account (a) the issuance of a Letter of Credit by delivering a "Letter of Credit Issuance Request" in the form attached as Exhibit A-1 properly completed, or (b) the amendment of an outstanding Letter of Credit (including an amendment that extends the term of a Letter of Credit), by delivering a "Letter of Credit Amendment Request" in the form attached as Exhibit A-2 properly completed (each of the Letter of Credit Issuance Requests and the Letter of Credit Amendment Requests, a "Letter of Credit Request") to the Issuing Bank (with a copy to the Paying Agent, if the Bank acting as such is different from the Issuing Bank) at any time and from time to time from the date of this Agreement until the Final LC Issuance Date (subject to the provisions of Section 2.02(c) below) by facsimile transmission; provided, that (i) the Company shall deliver such Letter of Credit Request on at least the second Business Day prior to the requested issuance or amendment date for such Letter of Credit to be issued or amended, or such shorter time period as agreed by the Issuing Bank, and (ii) each Letter of Credit shall comply with Section 2.02 (including amount and expiration date).  If so requested by the Issuing Bank, the Company shall also submit such other certificates, documents and other papers and information as the Issuing Bank may reasonably request.

SECTION 2.02  Letters of Credit

(a)    Subject to the terms and conditions set forth herein (including in Section 3.02), the Issuing Bank agrees that it will, following its receipt of a Letter of Credit Request prepared in accordance with the terms and conditions of this Agreement, together with any certificates, documents and other papers and information the Issuing Bank may reasonably request, issue for the account of the Company one or more Financial Letters of Credit or Performance Letters of Credit (each, as amended from time to time in accordance herewith, a "Letter of Credit").  Each Letter of Credit will be denominated in Dollars, will be issued in a minimum amount of $10,000,000, will be extended for the general corporate purposes of the Company, and shall be in such form as may be approved from time to time by the Issuing Bank and the Company.  As further described in Section 2.02(c), the Total LC Disbursement Exposure shall not exceed at any time the lesser of (i) $500,000,000 and (ii) the Total Commitments.  The Issuing Bank will notify the Banks and the Paying Agent (if the Bank acting as such is not the Issuing Bank) promptly by facsimile transmission following the issuance or amendment by the Issuing Bank of a Letter of Credit, and such notice shall specify if such issuance or amendment pertains to a Financial Letter of Credit or a Performance Letter of Credit.  If requested by a Bank, the Issuing Bank shall provide such Bank with copies of any such issuance or amendment.

528066

9

JPMUCI 0003482

(b)　　　Pursuant to the provisions of Section 2.02(a), and subject to the terms and conditions set forth herein, the Issuing Bank shall issue each Letter of Credit from time to time from the date of this Agreement until the Final LC Issuance Date. Each Letter of Credit shall expire at or prior to the close of business of the Issuing Bank on the earlier of (i) the date one year after the issuance of such Letter of Credit, or (ii) five Business Days before the Final Maturity Date; provided, that a Letter of Credit may provide that the expiration date shall be automatically extended for a period ending not later than the earlier of (A) the date that is one year from the previously stated expiration date, or (B) five Business Days before the Final Maturity Date, unless at least 60 days prior to any expiration date the Issuing Bank has given notice to the beneficiary and the Company that it elects not to extend the Letter of Credit for such additional period.

(c)　　　Subject to the terms and conditions set forth herein, a Letter of Credit shall be issued or amended only if (and upon issuance or amendment of each Letter of Credit, the Company shall be deemed to represent and warrant that), after giving effect to such issuance or amendment the Total LC Disbursement Exposure shall not exceed the Total Commitments.

(d)　　　As requested by the Company in each Letter of Credit Request, each Letter of Credit will be governed by the UCP 500 and, to the extent not inconsistent with the UCP 500, the laws of the State of New York (and in the event that the provisions of the UCP 500 conflict with the laws of the State of New York, then to the extent permitted by law, the provisions of the UCP 500 shall control), provided that any Letter of Credit may be governed by such other law, convention or practice, or such exceptions, as the Company may request in the related Letter of Credit Request, subject to the approval of the Issuing Bank.

SECTION 2.03　Letter of Credit Participation.

(a)　　　By the issuance of a Letter of Credit (or an amendment to a Letter of Credit) and without any further action on the part of the Issuing Bank, the Paying Agent or any of the Banks, the Issuing Bank hereby grants to each Bank, and each Bank hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Bank's Pro Rata Percentage of the LC Obligation attributable thereto. In consideration and in furtherance of the foregoing, each Bank hereby absolutely and unconditionally agrees to pay to the Issuing Bank such Bank's Pro Rata Percentage of each LC Obligation which has not been reimbursed to the Issuing Bank by the Company as provided in Section 2.04 and any reimbursement payment required to be refunded to the Company for any reason.

(b)　　　Each Bank acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.03 in respect of Letters of Credit issued or amended while such Bank remains a party to this Agreement is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment of any Letter of Credit or the occurrence and continuation of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(c)　　　The Company hereby agrees to each purchase of a participation pursuant to this Section 2.03. Upon any purchase by a Bank from the Issuing Bank of a participation pursuant to this Section 2.03, the Issuing Bank represents and warrants to such other Bank that the Issuing Bank is the legal and beneficial owner of such interest being sold by it, free and clear of any liens, but makes no other representation or warranty. The Issuing Bank shall have no responsibility or liability to any other Bank with respect to any LC Obligation or any such participation, and no Bank shall have recourse against the Issuing Bank with respect to any LC Obligation or any such participation, except that the Issuing Bank shall pay to the Paying Agent for the account of each Bank that purchases a participation pursuant to this Section 2.03 such Bank's ratable share of the payments, if any, actually received by the Issuing Bank

JPMUCI 0003483

pursuant to such LC Obligations with respect to the Letter of Credit in which such participation was purchased.

SECTION 2.04  LC Disbursement and Repayment

(a)     In the event that the Issuing Bank receives notice that a draw request or demand has been made under a Letter of Credit, the Issuing Bank will promptly notify the Company by telephone, confirmed promptly by facsimile transmission, of such drawing or demand.  The Issuing Bank shall timely examine all such documents purporting to represent a demand for payment under a Letter of Credit, and promptly notify the Company and Paying Agent (if the Bank acting as such is not the Issuing Bank) by telephone (confirmed by facsimile transmission) on or before 11:00 a.m. New York City time one Business Day prior to the day on which the Issuing Bank will make an LC Disbursement to the Letter of Credit beneficiary, provided if the terms of the Letter of Credit do not afford the Issuing Bank reasonable opportunity to provide the notice referred to in this sentence by the time stated, the Issuing Bank shall provide such notice as soon as practicable after such time.  Any failure to give or delay in giving such notices shall not relieve the Company of its LC Obligations.

(b)     The Company shall pay the Issuing Bank each LC Obligation on or before the Reimbursement Date with respect thereto pursuant to the payment provisions set forth in Section 2 10.  If the Company fails to make any such payment on or before the relevant Reimbursement Date, the Paying Agent shall notify each Bank of the applicable LC Obligation, the payment then due from the Company in respect thereof and such Bank's Pro Rata Percentage thereof.  Following receipt of such notice and by the time specified in Section 2.04(c), each Bank shall pay to the Paying Agent such Bank's Pro Rata Percentage of such LC Obligation as set forth in Section 2 04(c) below, and the Paying Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Banks.  Promptly following receipt by the Paying Agent of any payment from the Company pursuant to this Section 2 04, the Paying Agent shall distribute such payment to the Issuing Bank or, to the extent that the Banks have made payment pursuant to this Section 2.04(b) to reimburse the Issuing Bank, then to such Banks and the Issuing Bank as their interests may appear.

(c)     In the event that a Bank is required to pay its Pro Rata Percentage of an LC Obligation pursuant to the provisions of Section 2.04(b), and (i) the Bank receives such notice from the Paying Agent before 1:00 p.m New York City time on the Reimbursement Date, such Bank shall make available by 2:00 p m. New York City time on the Reimbursement Date, in same day funds, such Bank's corresponding Pro Rata Percentage of the LC Obligation for the account of its Funding Office to the Paying Agent at its Payment Office; or (ii) the Bank receives such notice from the Paying Agent after 1:00 p.m New York City time on the Reimbursement Date, such Bank shall make available by 12 00 noon New York City time, on the Business Day immediately following the Reimbursement Date, such Bank's corresponding Pro Rata Percentage of the LC Obligation for the account of its Funding Office to the Paying Agent at its Payment Office.  If and to the extent that any Bank shall not have made the amount required by this Section 2.04 available to the Paying Agent when required, such Bank additionally agrees to pay to the Paying Agent for the account of the Issuing Bank forthwith on demand interest on such amount, for each day during the period from the date such amount is due by such Bank until the date such amount is paid to the Paying Agent for the account of the Issuing Bank, at a rate per annum equal to the Federal Funds Rate.

(d)     The Paying Agent may assume that such Bank has made such portion available to the Paying Agent pursuant to the provisions of Section 2.04(c), and the Paying Agent may, in reliance upon such assumption, make available to the Issuing Bank the funds for the LC Obligation in a corresponding amount  If and to the extent that such Bank shall not have so made such amount available to the Paying Agent  such Bank and the Company severally agree to repay to the Paying Agent forthwith

5260bo                                    11

on demand such corresponding amount together with interest thereon, for each day from the Reimbursement Date until the date such amount is repaid to the Paying Agent, at (i) in the case of the Company, the interest rate applicable to past-due LC Obligations as set forth in Section 2.07, and (ii) in the case of such Bank, the Federal Funds Rate. If such Bank shall repay to the Paying Agent such corresponding amount, the amount so repaid shall constitute such Bank's Pro Rata Percentage of the LC Obligation in respect thereof. The failure of any Bank to pay its Pro Rata Percentage of an LC Obligation shall not relieve any other Bank of its obligation, if any, hereunder to make its payment pursuant to the provisions of Section 2.04(c), but no Bank shall be responsible for the failure of any other Bank to timely pay its Pro Rata Percentage of an LC Obligation.

SECTION 2.05  Obligation to Pay LC Obligations, Issuing Bank.

(a)    The Company's obligation to pay LC Obligations shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not strictly comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.05, constitute a legal or equitable discharge of, or provide a right of setoff against, the Company's obligations hereunder, other than a defense based on the gross negligence or willful misconduct of the Issuing Bank as determined by a court of competent jurisdiction. The Issuing Bank shall not be considered the drafter of, and will not be responsible for the effectiveness or suitability of, any Letter of Credit for the Company's commercial purpose, irrespective of whether the Issuing Bank provided assistance in preparing the text of such Letter of Credit.

(b)    Except as set forth in Section 2.05(c) and the other provisions of this Agreement, the Facility Documents, and the Letters of Credit, and except as mandated by applicable law, the Issuing Bank, the Banks, the Paying Agent and the Co-Administrative Agents shall not have any liability or responsibility by reason of or in connection with (i) the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder, (ii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), (iii) any error in interpretation of technical terms, (iv) the performance of any transaction which underlies any Letter of Credit, (v) any act or omission of any Person other than the Issuing Bank, (vi) loss or destruction of any draft, demand, or document in transit or in the possession of others, (vii) lack of knowledge of any particular trade usage (other than standard United States and Western European banking usage as used in the normal course of business), (viii) the genuineness, falsification or effect of any document which appears on due examination to be regular on its face, or (ix) any consequence arising from causes beyond the control of the Issuing Bank. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(c)    The parties hereto expressly agree that the foregoing provisions of this Section 2.05 shall not be construed to excuse the Issuing Bank from liability to the Company to the extent of any direct damages (as opposed to punitive and consequential damages, claims in respect of which are hereby

528066                                    12

JPMUCI 0003485

waived by the Company to the extent permitted by applicable law) suffered by the Company that are caused by the Issuing Bank's failure to exercise reasonable care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall, to the extent permitted by applicable law, be deemed to have exercised reasonable care in each determination.

SECTION 2.06  Fees.  The Company agrees to pay to each of the Co-Administrative Agents and the Paying Agent such fees as are set forth in a separate fee agreement. In addition, the Company agrees to pay the fees listed in this Section 2.06 (collectively, the "Fees"). The Company may pay to the Paying Agent each type of Fee separately or, at the Company's option, in a single payment of all Fees that are due on the same date, together with appropriate instructions to the Paying Agent identifying the Fees.

(a)     Facility Fee  The Company agrees to pay to the Paying Agent for the account of each Bank a facility fee on the average daily amount of such Bank's Commitment, whether or not used, from the date hereof in the case of each Bank listed on the signature pages hereof, and from the effective date specified in the Assignment and Acceptance pursuant to which it became a Bank in the case of each other Bank, until the Final LC Issuance Date at a rate per annum equal to 0.10%. The facility fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2001, and on the Final LC Issuance Date.

(b)     Fronting Fee  The Company agrees to pay to the Issuing Bank, for the sole account of the Issuing Bank, a fronting fee computed on the average daily Undrawn LC Amount at a rate of 0.125% per annum, provided, that if any Letter of Credit remains outstanding for less than 30 days, it shall be deemed to be outstanding for 30 days for the purpose of computing this fee. The fronting fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2001, and on the Final Maturity Date.

(c)     Letter of Credit Fee  The Company agrees to pay to the Paying Agent for the account of each Bank a letter of credit fee on the average daily amount of such Bank's LC Disbursement Exposure at a rate per annum equal to (i) 0.30% on that portion of the Bank's LC Disbursement Exposure made up of Performance Letters of Credit, and (ii) 0.525% on that portion of the Bank's LC Disbursement Exposure made up of Financial Letters of Credit. The letter of credit fee is payable quarterly in arrears on the last day of each March, June, September and December, commencing June 30, 2001, on the Final Maturity Date and on demand after the Final Maturity Date. If for any reason a Bank fails to pay for its Pro Rata Percentage of any LC Obligations as required herein, the letter of credit fee otherwise payable to such Bank in respect of such LC Obligations shall be payable by the Company through the Paying Agent instead to the Issuing Bank.

(d)     Expiration Date for Fee Purposes.  For the purpose of computing letter of credit fees pursuant to Section 2.06(c), Letters of Credit shall be deemed to be outstanding in their respective Undrawn LC Amounts through their respective Expiration Dates.

SECTION 2.07  Interest.  The Company shall pay interest on the amount of any LC Reimbursement Obligation from the date of the LC Disbursement up to but not including the Reimbursement Date, at a rate per annum equal at all times to the Base Rate in effect from time to time; provided that, any LC Reimbursement Obligation which is not paid by the Company by the Reimbursement Date shall bear past-due interest, from the Reimbursement Date up to but not including the date such amount is paid in full, payable on demand, at a rate per annum equal at all times to 2% per annum plus the Base Rate in effect from time to time.

JPMUCI 0003486

SECTION 2.08  Interest Rate Determination.  The Paying Agent shall upon request of the Company, the Issuing Bank or any Bank, give prompt notice to such requesting party of the applicable Base Rate determined by the Paying Agent.  If at any time the Base Rate is determined pursuant to clause (a) of the definition herein of Base Rate and if Chase is not the Paying Agent at such time, Chase agrees to furnish to the Paying Agent, in each case upon the Paying Agent's request, timely information with respect to the determination of such Base Rate.  The Paying Agent shall determine the applicable rate of interest hereunder.

SECTION 2.09  Increased Costs, Capital Adequacy, Etc.

(a)    If any Bank or the Issuing Bank shall have determined that, after the date hereof, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Bank (or its Funding Office) or the Issuing Bank with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has the effect of increasing the amount of capital required or expected to be maintained as a result of its Commitment hereunder or its obligation to issue or amend Letters of Credit (except, in the case of any such increase incurred by a Bank, to the extent such increase arises as a result of the individual creditworthiness of such Bank), such Bank or the Issuing Bank, as the case may be, shall have the right to give prompt written notice and demand for payment thereof to the Company with a copy to the Paying Agent (which notice and demand shall show in reasonable detail the calculation of such additional amounts as shall be required to compensate such Bank or the Issuing Bank, as the case may be, for the increased cost to such Bank or the Issuing Bank, as the case may be, as a result of such increase in capital and shall certify that such costs are generally being charged by such Bank or the Issuing Bank, as the case may be, to other similarly situated companies under similar credit facilities) although the failure to give any such notice shall not, unless such notice fails to set forth the information required above, release or diminish any of the Company's obligations to pay additional amounts pursuant to this Section 2.09, and subject to Section 2.14, the Company shall pay such additional amounts.

(b)    Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Funding Office or change the jurisdiction of its Funding Office, as the case may be, so as to avoid the imposition of any increased costs under this Section 2.09 or to eliminate the amount of any such increased cost which may thereafter accrue, provided that no such selection or change of the jurisdiction for its Funding Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(c)    If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof or (ii) the compliance with any guideline or request from any governmental authority, central bank or comparable agency (whether or not having the force of law), such governmental authority, central bank or comparable agency (A) imposes or modifies or deems applicable any reserve, special deposit or similar requirements against a Letter of Credit issued by the Issuing Bank or a Bank's participation in a Letter of Credit, or (B) imposes on any Bank or the Issuing Bank some condition regarding this Agreement that increases the cost to such Bank or the Issuing Bank of issuing or maintaining any Letter of Credit (other than increased costs described in Section 2.09(a)), then the Company shall from time to time, upon demand by the Issuing Bank or such Bank (with a copy of such demand to the Paying Agent), pay to the Paying Agent for the account of such Bank or the Issuing Bank additional amounts sufficient to compensate such Bank or the Issuing Bank for such increased cost unless such Bank or the Issuing Bank shall have withdrawn its demand for additional compensation for such

S280-A                                   14

JPMUCI 0003487

increased cost pursuant to Section 2.14(b) or the Company is not obligated to pay such amounts pursuant to Section 2.14(a).

(d)    Neither any Bank nor the Issuing Bank shall be entitled to recover increased costs pursuant to this Section 2.09, (a) incurred or accruing more than 90 days prior to the date on which such Bank or the Issuing Bank, as the case may be, sent to the Company a written notice and demand for payment as specified in this Section 2.09, or (b) to the extent that such increased costs have resulted from the failure of such Bank or the Issuing Bank, as the case may be, to have complied with Section 2.09(b).

SECTION 2.10  Payments and Computations.

(a)    The Company shall make each payment under any Facility Document not later than 3:00 p.m. on the day when due in Dollars to the Paying Agent at its Payment Office in same day funds.  The Paying Agent will promptly thereafter cause to be distributed like funds relating to the payment of such amounts to the Issuing Bank or the Banks, as applicable (such amount to be paid ratably as to the Banks, other than amounts payable pursuant to Section 2.09, 2.11, 2.14, 2.15 or 10.04 and decreased, as to any Bank or the Issuing Bank, as the case may be, for any taxes withheld in respect of such Bank or the Issuing Bank, as the case may be, as contemplated by Section 2.11(b)) for the account of the Issuing Bank or such Bank's Funding Office, to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 10.06(d), from and after the effective date specified in such Assignment and Acceptance, the Paying Agent shall make all payments hereunder in respect of the interest assigned thereby to the Bank assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.  At the time of the Company's payment of an LC Obligation to the Paying Agent, the Company shall notify the Paying Agent of the LC Obligation to which such payment shall apply.  In the absence of such notice the Paying Agent may specify the LC Obligation to which such payment shall apply.

(b)    All computations of interest based on clause (a) of the definition of the Base Rate and of facility fees pursuant to Section 2.06(a) shall be made by the Paying Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Federal Funds Rate and of all other Fees and, during such times as the Base Rate is determined pursuant to clause (b) of the definition thereof, the Base Rate shall be made by the Paying Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day).  Each determination by the Paying Agent of an interest rate or Fees hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)    Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or Fees, as the case may be.

(d)    Unless the Paying Agent shall have received notice from the Company that the Company will not make a payment due pursuant this Agreement in full prior to the date on which such payment is due hereunder, the Paying Agent may assume that the Company has made such payment in full to the Paying Agent on such date and the Paying Agent may, in reliance upon such assumption, cause to be distributed to the Issuing Bank or a Bank (as applicable) on such due date an amount equal to the amount then due the Issuing Bank or such Bank.  If and to the extent the Company shall not have so made such payment in full to the Paying Agent, the Issuing Bank or such Bank shall repay to the Paying Agent forthwith on demand such amount distributed to the Issuing Bank or such Bank together with interest

52#066                                        15

JPMUCI 0003488

thereon, for each day from the date such amount is distributed to the Issuing Bank or such Bank until the date the Issuing Bank or such Bank repays such amount to the Paying Agent, at the Federal Funds Rate.

SECTION 2.11  Taxes

(a)    Any and all payments by the Company hereunder shall be made, in accordance with Section 2.10, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto, excluding, in the case of each Bank, the Issuing Bank and the Paying Agent, (1) taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which (or by a jurisdiction under the laws of a political subdivision of which) such Bank, the Issuing Bank or the Paying Agent (as the case may be) is organized or any political subdivision thereof and, in the case of each Bank, the Issuing Bank and the Paying Agent, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction of such Bank's Funding Office or of the Issuing Bank or the Paying Agent (as the case may be) or any political subdivision thereof and (2) any taxes imposed by the United States of America by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable, on the date hereof (or, with respect to any entity that becomes a Bank or the Issuing Bank or Paying Agent after the date hereof, on the date such entity becomes a Bank or the Issuing Bank or Paying Agent), to payments to be made to such Bank or the Issuing Bank or the Paying Agent (all such non-excluded taxes, levies, imposts, deductions, charges, fees, duties, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Company shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to any Bank, the Issuing Bank or the Paying Agent, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.11) such Bank, the Issuing Bank or the Paying Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Company shall make such deductions and (iii) the Company shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Notwithstanding anything to the contrary contained in this Agreement, each of the Company and the Paying Agent shall be entitled, to the extent it is required to do so by law, to deduct or withhold income or other similar taxes imposed by the United States of America from interest, fees or other amounts payable hereunder for the account of any Bank or the Issuing Bank or the Paying Agent (without the payment by the Company of increased amounts to such Bank or the Issuing Bank or the Paying Agent pursuant to clause (a) above) other than a Bank, Issuing Bank or Paying Agent (i) which is a domestic corporation (as such term is defined in Section 7701 of the Code) for federal income tax purposes or (ii) which has the Prescribed Forms on file with the Company and the Paying Agent for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, provided that if the Company shall so deduct or withhold any such taxes, it shall provide a statement to the Paying Agent and such Bank or the Issuing Bank, as the case may be, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation which such Bank or the Paying Agent or the Issuing Bank, as the case may be, may reasonably request for assisting such Bank or the Paying Agent or the Issuing Bank to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Bank, the Paying Agent or the Issuing Bank is subject to tax.

(c)    In addition, the Company agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or the Letters of Credit (hereinafter referred to as "Other Taxes").

528066                                              16

(d)     The Company, to the fullest extent permitted by law, will indemnify each Bank, the Issuing Bank and the Paying Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.11) paid by such Bank, the Issuing Bank or the Paying Agent (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto except as a result of the gross negligence or willful misconduct of such Bank, the Issuing Bank or the Paying Agent, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date such Bank, the Issuing Bank or the Paying Agent (as the case may be) makes written demand therefor. No Bank, nor the Issuing Bank nor the Paying Agent shall be indemnified for Taxes incurred or accrued more than 90 days prior to the date that such Bank, the Issuing Bank or the Paying Agent notifies the Company thereof.

(e)     Within 30 days after the date of any payment of Taxes by or at the direction of the Company, the Company will furnish to the Paying Agent, at its address referred to in Section 10.02, (i) the original or a certified copy of a receipt evidencing payment thereof, if the relevant taxing authority provides a receipt, or (ii) if the relevant taxing authority does not provide a receipt, other reasonable evidence of the payment thereof. Should any Bank, the Issuing Bank or the Paying Agent ever receive any refund, credit or deduction from any taxing authority to which such Bank, the Issuing Bank or the Paying Agent would not be entitled but for the payment by the Company of Taxes as required by Section 2.11 (it being understood that the decision as to whether or not to claim, and if claimed, as to the amount of any such refund, credit or deduction shall be made by such Bank, the Issuing Bank or the Paying Agent in its sole discretion), such Bank, the Issuing Bank or the Paying Agent, as the case may be, thereupon shall repay to the Company an amount with respect to such refund, credit or deduction equal to any net reduction in taxes actually obtained by such Bank, the Issuing Bank or the Paying Agent, as the case may be, and determined by such Bank, the Issuing Bank or the Paying Agent, as the case may be, to be attributable to such refund, credit or deduction.

(f)     Each Bank shall use its best efforts (consistent with its internal policies and legal and regulatory restrictions) to select a jurisdiction for its Funding Office or change the jurisdiction of its Funding Office, as the case may be, so as to avoid the imposition of any Taxes or Other Taxes or to eliminate the amount of any such additional amounts which may thereafter accrue; provided that no such selection or change of the jurisdiction for its Funding Office shall be made if, in the reasonable judgment of such Bank, such selection or change would be disadvantageous to such Bank.

(g)     Without prejudice to the survival of any other agreement of the Company hereunder, the agreements and obligations of the Company and the Banks contained in this Section 2.11 shall survive the payment in full of all LC Obligations hereunder.

(h)     Each Bank shall make its payments for the account of the Issuing Bank to acquire such Bank's Pro Rata Percentage of LC Obligations free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, fees, duties or withholdings, and all liabilities with respect thereto.

SECTION 2.12 Sharing of Payments, Etc.  If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of its participation in a Letter of Credit (other than pursuant to Section 2.09, 2.11, 2.14, 2.15 or 10.04) in excess of its ratable share of payments on account of the participations in such Letter of Credit obtained by all the Banks, such Bank shall forthwith purchase from the other Banks such participations in such Letter of Credit purchased by them as shall be necessary to cause such purchasing Bank to share the excess payment ratably with each of them, provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, such purchase from each Bank shall be rescinded and

528566                                      17

JPMUCI 0003490

such Bank shall repay to the purchasing Bank the purchase price to the extent of its ratable share (according to the proportion of (i) the amount of the participation purchased from such Bank as a result of such excess payment to (ii) the total amount of such excess payment) of such recovery together with an amount equal to such Bank's ratable share (according to the proportion of (A) the amount of such Bank's required repayment to (B) the total amount so recovered from the purchasing Bank) of any interest or other amount paid or payable by the purchasing Bank in respect of the total amount so recovered. The Company agrees that any Bank so purchasing a participation from another Bank pursuant to this Section 2.12 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Bank were the direct creditor of the Company in the amount of such participation.

SECTION 2.13  Ratable Reduction or Termination of the Commitments; Effect of Termination  Subject to the last sentence of this Section 2.13, the Company shall have the right, upon at least three Business Days' notice to the Paying Agent, to terminate in whole or reduce ratably in part the unused portions of the respective Commitments of the Banks; provided that each partial reduction shall be in the aggregate amount of at least $10,000,000. Upon and at all times after any Commitment of any Bank is terminated pursuant to any provision of this Agreement, such Commitment shall be zero. In no event shall the Company terminate or reduce the Total Commitments if, after giving effect to such termination or reduction, the Total LC Disbursement Exposure would exceed the Total Commitments or any Bank's LC Disbursement Exposure would exceed such Bank's Commitment.

SECTION 2.14  Replacement of Bank, Additional Right to Terminate Commitment  In the event that any Bank demands payment pursuant to Section 2.09 or 2.11, the Company shall have the right, within 45 days after the date of the giving by such Bank of any notice or demand required or otherwise permitted to be given pursuant to Section 2.09 or 2.11 and if no Event of Default or Default then exists, to either replace such Bank in accordance with the procedure set forth in Section 2.14(a) or terminate such Bank's Commitment in accordance with the procedure set forth in Section 2.14(b).

(a)     If the Company determines to replace a Bank pursuant to this Section 2.14, then the Company will have the right to replace such Bank with an Eligible Assignee in accordance with Section 10.06(a), (b) and (d) (including execution of an appropriate Assignment and Acceptance), provided that such Eligible Assignee (i) shall unconditionally offer in writing (with a copy to the Paying Agent) to purchase at par all of such Bank's rights hereunder and interest in (A) the Letters of Credit outstanding and (B) LC Obligations without recourse plus (C) accrued Fees to the date of such purchase on a date therein specified, and (ii) shall execute and deliver to the Paying Agent an Assignment and Acceptance, as assignee, pursuant to which such Eligible Assignee becomes a party hereto with a Commitment equal to that of the Bank being replaced (plus, if such Eligible Assignee is already a Bank, the amount of its Commitment prior to such replacement), thereby assuming the obligations of such Bank to participate in Letters of Credit pursuant to Section 2.03 and to pay its Pro Rata Percentage of LC Obligations pursuant to Section 2.04; provided, further, that no Bank or other Person shall have any obligation to increase its Commitment or otherwise to replace, in whole or in part, any Bank. Upon satisfaction of the requirements set forth in the first sentence of this Section 2.14(a), acceptance of such offer to purchase by the Bank to be replaced, payment to such Bank of the purchase price in immediately available funds, and the payment by the Company of all requested costs accruing to the date of purchase which the Company is obligated to pay under Section 10.04 and all other amounts owed by the Company to such Bank (other than the LC Obligations and accrued Fees to the date of such purchase that are purchased by such Eligible Assignee), such Eligible Assignee shall constitute a "Bank" hereunder with a Commitment as so specified and the Bank being so replaced shall no longer constitute a "Bank" hereunder and its Commitment shall be deemed terminated, except that the rights under Sections 2.09, 2.11 and 10.04 of the Bank being so replaced shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder. If, however, (x) a Bank

JPMUCI 0003491

accepts such an offer and such Eligible Assignee fails to purchase such rights and interest on such specified date in accordance with the terms of such offer, the Company shall continue to be obligated to pay the increased costs and additional amounts due to such Bank pursuant to Sections 2.09 and 2.11, or (y) the Bank proposed to be replaced fails to accept such purchase offer, the Company shall not be obligated to pay to such Bank such increased costs or additional amounts incurred or accrued from and after the date of such purchase offer, and neither the failure to purchase as set forth in clause (x) of this sentence nor the failure to accept a purchase offer as set forth in clause (y) of this sentence, shall affect any rights the Company may have to terminate such Bank's Commitment in accordance with Section 2.14(b).

(b)    In the event that the Company determines to terminate a Bank's Commitment pursuant to this Section 2.14, and, on the effective date of such termination, both (a) no Letters of Credit are currently outstanding and (b) the Company has paid all outstanding LC Obligations, then the Company shall have the right to terminate such Bank's Commitment and shall give notice to such Bank of the Company's election to terminate (a copy of such notice to be sent to the Paying Agent), and such termination shall become effective on the date specified in such notice (which shall be 15 days after the date of such notice, provided, that if the 15th day after the date of such notice is not a Business Day, the date specified in such notice shall be the first Business Day next succeeding such 15th day) unless such Bank withdraws its demand or notice for increased costs or additional amounts. On the date of the termination of the Commitment of any Bank pursuant to this Section 2.14(b), the Company shall pay all amounts owed by the Company to such Bank under this Agreement (including accrued Fees and amounts specified in such Bank's notice and demand delivered pursuant to Sections 2.09 or 2.11, as the case may be, with respect to the period prior to such termination), and such Bank shall thereupon cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that such Bank's rights under Sections 2.09, 2.11 and 10.04 shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder

SECTION 2.15  Non-Ratable Reduction or Termination of Commitments  The Company shall have the right, without the consent of any Bank, but subject to the approval of the Paying Agent (which consent shall not be unreasonably withheld), to reduce in part or to terminate in whole the Commitment of one or more Banks non-ratably, provided that (a) on the effective date of any such reduction or termination (i) no Letters of Credit are currently outstanding, (ii) the Company has paid all outstanding LC Obligations, (iii) no Default or Event of Default shall have occurred and be continuing, (iv) the senior unsecured long-term debt of the Company is rated BBB- or better by Standard & Poor's or Baa3 or better by Moody's, and (v) if the Commitment of one or more Banks is being terminated in whole (and if no Commitments are simultaneously being reduced in part), the Company shall pay to each Bank whose Commitment is so terminated all amounts (including accrued Fees) owed by the Company to such Bank under this Agreement, (b) the aggregate amount of each non-ratable reduction shall be at least $5,000,000, and (c) the aggregate amount of all such non-ratable reductions and terminations of Commitments since the date of this Agreement shall not exceed $100,000,000. The Company shall give the Paying Agent three Business Days' notice of the Company's intention to reduce or terminate any Commitment pursuant to this Section 2.15  Upon the termination of a Bank's Commitment in whole in accordance with the provisions of this Section 2.15, such Bank shall cease to be a "Bank" hereunder for all purposes and its Commitment shall be deemed terminated, except that the rights under Sections 2.09, 2.11 and 10.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a "Bank" hereunder.

SECTION 2.16  Certificates of Banks  Without limitation to the requirements of Section 2.09(a), any Bank or the Issuing Bank demanding or giving notice of amounts due to such Bank or the Issuing Bank, as the case may be, under this Article II shall, as part of each demand or notice for payment required under this Article II, deliver to the Company (with a copy to the Paying Agent) a certificate

528066

19

setting forth in reasonable detail the amount and basis of the increased costs or additional amounts payable to such Bank or the Issuing Bank hereunder and such certificate shall be conclusive and binding on the Company in the absence of manifest error.

SECTION 2.17  Replacement of Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Company, the Paying Agent, the replaced Issuing Bank and the successor Issuing Bank, which successor Issuing Bank must be a financial institution that is a Bank.  The Paying Agent shall notify the Banks of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Company shall pay any Fees which have become payable for the account of the replaced Issuing Bank pursuant to Section 2.06, and the Paying Agent shall allocate between the replaced and successor Issuing Banks the quarterly fronting fee payments under Section 2.06(b) when and as received from the Company for the account of the Issuing Bank.  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional, or any amendment to, Letters of Credit.

SECTION 2.18  Cash Collateral Account.

(a)  If at any time any Event of Default occurs and is continuing, the Paying Agent may with the consent, or shall at the request, of the Majority Banks make demand upon the Company to, and within five Business Days after such demand the Company shall, pay an amount equal to the Undrawn LC Amount to the Paying Agent, in Dollars in same day funds for deposit to the Cash Collateral Account, to secure the obligations of the Company hereunder to the Issuing Bank and the Banks.  Additionally, if at any time the Company has commenced any action or proceeding seeking to enjoin or preclude the payment or drawing with respect to any Letter of Credit and such action or proceeding is not concluded on or prior to the Final Maturity Date, the Paying Agent may with the consent, or shall at the request, of the Majority Banks make demand upon the Company to, and within five Business Days after such demand the Company shall, pay an amount equal to the Undrawn LC Amount to the Paying Agent, in Dollars in same day funds for deposit to the Cash Collateral Account, to secure the obligations of the Company hereunder to the Issuing Bank and the Banks in respect of each Letter of Credit.

(b)  In the event that no Event of Default is continuing, the Company may direct the Paying Agent from time to time to invest the funds in the Cash Collateral Account in one or more of the Permitted Investments, and the Paying Agent shall promptly invest such funds in such Permitted Investments.  In the event, however, that the Company does not so direct the Paying Agent, or if an Event of Default is continuing, the Paying Agent may invest the funds in the Cash Collateral Account in any Permitted Investments as may be selected by the Paying Agent in the Paying Agent's sole discretion.  In no event shall the Paying Agent be liable for the selection, performance or investment risk of any Permitted Investments, whether or not the funds in the Cash Collateral Account invested in Permitted Investments lose value or if other Permitted Investments generate a higher rate of return than the Permitted Investments selected by the Paying Agent or the Company, as applicable.  The Company shall execute such financing statements, notices and other documents, and take such other actions, as may be reasonably requested by the Paying Agent from time to time to establish and maintain at all times a perfected, first priority security interest in the Cash Collateral Account, all cash and investments therein and all proceeds thereof in favor of the Paying Agent, for the benefit of the Issuing Bank and the Banks, to secure the obligations referred to in this Section 2.18.

528066                                      20

(c)     If at any time the Paying Agent determines that funds held in the Cash Collateral Account are subject to any right or claim of any Person other than the Paying Agent and the Banks, or that the total amount of such funds is less than the Undrawn LC Amount, then the Company will, forthwith upon demand by the Paying Agent, pay to the Paying Agent, as additional funds to be deposited and held in the Cash Collateral Account, an amount equal to the excess of (i) the Undrawn LC Amount, minus (ii) the total amount of funds, if any, then held in the Cash Collateral Account that the Paying Agent determines to be free and clear of any such right and claim. The Company may request information from the Paying Agent regarding the funds and Permitted Investments in the Cash Collateral Account.  If a greater amount of funds is being held in the Cash Collateral Account than is required pursuant to this Section 2.18, then the Company may request that the Paying Agent return to the Company, and the Paying Agent shall promptly return (but without prejudice to the right to require additional deposits pursuant to this Section 2.18), an amount equal to (A) the total amount of funds then held in the Cash Collateral Account, minus (B) the Undrawn LC Amount.

(d)     At any time while an Event of Default is continuing, the Paying Agent may apply funds then held in the Cash Collateral Account to the full or partial payment of any LC Obligation secured by the Cash Collateral Account.  If at any time no Event of Default is continuing, the Paying Agent shall, upon request of the Company, return all amounts in the Cash Collateral Account to the Company (except to the extent that Section 2.18(a) is applicable and requires a continued Cash Collateral Account); provided, that the Paying Agent shall not be precluded from requiring and maintaining a Cash Collateral Account in the future pursuant to the provisions of this Agreement.

(e)     For purposes of this Agreement, "Permitted Investment" means any of the following investments:

(i)  Direct general obligations of, or obligations fully and unconditionally guaranteed as to the timely payment of principal and interest by, the United States or any agency or instrumentality thereof having maturities of not more than six months from the date of acquisition, but excluding any of such securities whose terms do not provide for payment of a fixed dollar amount upon maturity or call for redemption;

(ii) Certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months, overnight bank deposits and other short-term deposit instruments, in each case with any domestic commercial bank having capital and surplus in excess of $500,000,000 and having a rating of at least "A2" (or the equivalent thereof) by Moody's, at least "A" (or the equivalent thereof) by Standard & Poor's and at least "A" (or the equivalent thereof) by Duff & Phelps;

(iii) Repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (i) and (ii) above entered into with any financial institution meeting the qualifications specified in clause (ii) above;

(iv) Commercial paper (having original maturities of not more than 180 days) of any person rated "P-1" (or the equivalent thereof) or better by Moody's and "A-1" (or the equivalent thereof) or better by Standard & Poor's and, if then rated by Duff & Phelps, "A-1" (or the equivalent thereof) or better by Duff & Phelps;

(v) Money market mutual or similar funds having assets in excess of $100,000,000, at least 95% of the assets of which are comprised of assets specified in clauses (i) through (iv) above; or

JPMUCI 0003494

(vi) Any other short-term, marketable investment-grade security or obligation requested by the Company and acceptable to the Paying Agent in its sole discretion.

(f)    At the Company's option at any time while no Letter of Credit shall remain outstanding except by virtue of clauses (A) or (B) of the definition of "Expiration Date" and all LC Obligations have been paid and no Bank has any Commitment hereunder, the Company may provide the Cash Collateral Account described in this Section 2.18 in the Undrawn LC Amount of all Letters of Credit for so long as they (or any portion thereof) are deemed outstanding solely by virtue of such clauses (A) and (B). In such event, and for so long as such Cash Collateral Account is maintained as herein required, the applicable Letters of Credit shall no longer be deemed outstanding for the purposes of Article V, Section 2.06(a) and Section 2.06(b) hereof, but shall be deemed outstanding for purposes of Section 2.06(c) and for all other purposes hereof.

## ARTICLE III

## CONDITIONS TO ISSUANCE OF LETTERS OF CREDIT

SECTION 3.01 Initial Condition Precedent.  The obligation of the Issuing Bank to issue the initial Letter of Credit pursuant to the terms and conditions of this Agreement is subject to the condition precedent that the Paying Agent shall have received on or before the day of the initial issuance by the Issuing Bank of a Letter of Credit the following, each dated on or before such day, in form and substance satisfactory to the Issuing Bank and each Co-Administrative Agent (copies of which shall have been provided to the Issuing Bank and the Co-Administrative Agents):

(a)    Certified copies of the resolutions of the Board of Directors of the Company approving this Agreement and of all other documents, in each case evidencing any necessary corporate action and governmental approvals, if any, with respect to each such Facility Document and certified copies of the amended and restated articles of incorporation, as amended, and bylaws, as amended, of the Company

(b)    A certificate of the Secretary, Deputy Corporate Secretary or an Assistant Secretary of the Company certifying the names and true signatures of the officers of the Company authorized to sign each Facility Document to which it is a party and the other documents to be delivered hereunder.

(c)    A favorable opinion of Vinson & Elkins L.L.P., counsel for the Company, to be delivered to, and for the benefit of, the Banks, the Co-Administrative Agents, the Paying Agent and the Issuing Bank, at the express instruction of the Company, substantially in the form of Exhibit B hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(d)    A favorable opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Company, to be delivered to, and for the benefit of, Banks, the Co-Administrative Agents, the Paying Agent and the Issuing Bank, at the express instruction of the Company, in substantially the form of Exhibit C hereto and as to such other matters as any Bank through the Co-Administrative Agents may reasonably request.

(e)    A favorable opinion of Bracewell & Patterson, L.L.P., counsel for the Issuing Bank, to be delivered to, and for the benefit of, Banks, the Co-Administrative Agents, the Paying Agent and the Issuing Bank at the express instruction of the Issuing Bank, substantially in the form of Exhibit D hereto

JPMUCI 0003495

SECTION 3.02  Additional Conditions Precedent to Issuance of Each Letter of Credit.  The obligation of the Issuing Bank to issue or amend any Letter of Credit shall be subject to the additional conditions precedent that on the date of such issuance or amendment, as the case may be, (a) the following statements shall be true (and the giving of the applicable Letter of Credit Request shall constitute a representation and warranty by the Company that on the date of such issuance or amendment, as the case may be, such statements are true):

(i)  The representations and warranties contained in Section 4.01 of this Agreement are correct on and as of the date of issuance or amendment, as the case may be, of such Letter of Credit (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the issuance or amendment, as the case may be, of such Letter of Credit and to the application of the proceeds therefrom, as though made on and as of such date, and

(ii)  No event has occurred and is continuing, or would result from such issuance or amendment, as the case may be, of such Letter of Credit which constitutes a Default, an Event of Default or both;

and (b) the Issuing Bank and the Paying Agent shall have received such other approvals, opinions or documents as either of them or any Bank through the Paying Agent may reasonably request

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01  Representations and Warranties of the Company.  The Company represents and warrants as follows

(a)  The Company and each Principal Subsidiary are duly organized or validly formed, validly existing and (if applicable) in good standing in each case under the laws of its jurisdiction of incorporation or formation.  The Company and each Principal Subsidiary have all requisite powers and all material governmental licenses, authorizations, consents and approvals required in each case to carry on its business as now conducted  Each Subsidiary that is a Principal Subsidiary as of the date hereof (based on December 31, 2000 financial statements) is listed in that certain letter dated the date hereof from the Company to the Banks, the Issuing Bank and the Paying Agent.

(b)  The execution, delivery and performance by the Company of each Facility Document to which it is or will be a party are within the Company's corporate powers, have been duly authorized by all necessary corporate action of the Company, require, in respect of the Company, no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Company or Regulation U issued by the Federal Reserve Board or the amended and restated articles of incorporation, as amended, or by-laws, as amended, of the Company or any judgment, injunction, order, decree or material ("material" for the purposes of this representation meaning creating a liability of $100,000,000 or more) agreement binding upon the Company or result in the creation or imposition of any lien, security interest or other charge or encumbrance on any asset of the Company or any of its Subsidiaries.

(c)  This Agreement is, and each other Facility Document to which the Company is or will be a party, when executed and delivered in accordance with this Agreement will be, legal, valid and

528066                                            23

JPMUCI 0003496

binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity

(d)     The audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2000 and the related audited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the fiscal year then ended and the unaudited consolidated balance sheet of the Company and its Subsidiaries as of March 31, 2001 and the related unaudited consolidated statements of income, cash flows and changes in stockholders' equity accounts for the three months then ended, certified by the chief financial or accounting officer of the Company, copies of which have been delivered to each of the Banks, fairly present, in conformity with GAAP except as otherwise expressly noted therein, the consolidated financial position of the Company and its Subsidiaries as of such dates and their consolidated results of operations and changes in financial position for such fiscal periods, subject (in the case of the unaudited balance sheet and statements) to changes resulting from audit and normal year-end adjustments.

(e)     Since December 31, 2000 through the date hereof, there has been no material adverse change in the business, consolidated financial position or consolidated results of operations of the Company and its Subsidiaries, considered as a whole.

(f)     Since December 31, 2000, except as disclosed in the Company's Form 10-K for the year ended December 31, 2000 or the Company's Form 10-Q for the quarter ended March 31, 2001, which were delivered to the Banks (or made available to each of the Banks either on "EDGAR" or the Company's home page on the World Wide Web at www.enron.com) prior to the date hereof, there is no action, suit or proceeding pending against the Company or any of its Subsidiaries, or to the knowledge of the Company threatened against the Company or any of its Subsidiaries, before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, consolidated financial position or consolidated results of operations of the Company and its Subsidiaries taken as a whole or which in any manner draws into question the validity of this Agreement or any other Facility Document to which the Company is or will be a party.

(g)     No Termination Event has occurred or is reasonably expected to occur with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists. Neither the Company nor any ERISA Affiliate has received any notification (or has knowledge of any reason to expect) that any Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, for which a Withdrawal Liability in excess of $100,000,000 exists.

(h)     United States federal income tax returns of the Company and its Subsidiaries have been examined and closed through the fiscal year ended December 31, 1995. The Company and its Subsidiaries have filed or caused to be filed all United States federal income tax returns and all other material domestic tax returns which to the knowledge of the Company are required to be filed by them and have paid or provided for the payment, before the same become delinquent, of all taxes due pursuant to such returns or pursuant to any assessment received by the Company or any Subsidiary, other than those taxes contested in good faith by appropriate proceedings. The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of taxes are, in the opinion of the Company, adequate to the extent required by GAAP.

(i)     Neither the Company nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

528066                                     24

JPMUCI 0003497

(j)     Each of the Company and the Principal Subsidiaries is not subject to, or is exempt from, regulation as a "holding company" or a "subsidiary company" of a "holding company", in each case as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.

(k)     Margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) does not constitute all or substantially all of the assets of the Company

## ARTICLE V

## COVENANTS OF THE COMPANY

SECTION 5.01     Affirmative Covenants  The Company covenants and agrees that so long as any Letter of Credit shall remain outstanding, any LC Obligation shall remain unpaid or any Bank shall have any Commitment hereunder, the Company will, unless the Majority Banks shall otherwise consent in writing

(a)     Reporting Requirements.  Furnish to each Bank:

(i)  by making available either on "EDGAR" or the Company's home page on the World Wide Web at www.enron.com, or otherwise transmitting to the Banks (1) promptly after the sending or filing thereof, a copy of each of the Company's reports on Form 8-K (or any comparable form), (2) promptly after the filing or sending thereof, and in any event within 75 days after the end of each of the first three fiscal quarters of each fiscal year of the Company, a copy of the Company's report on Form 10-Q (or any comparable form) for such quarter, which report will include the Company's quarterly unaudited consolidated financial statements as of the end of and for such quarter, and (3) promptly after the filing or sending thereof, and in any event within 135 days after the end of each fiscal year of the Company, a copy of the Company's annual report which it sends to its public security holders, and a copy of the Company's report on Form 10-K (or any comparable form) for such year, which annual report will include the Company's annual audited consolidated financial statements as of the end of and for such year;

(ii)  simultaneously with the furnishing of each of the annual or quarterly reports referred to in clause (i) above, a certificate of the chief financial officer or the chief accounting officer of the Company in a form acceptable to the Paying Agent (x) setting forth in reasonable detail the calculations required to establish whether the Company was in compliance with the requirements of Section 5.02(b) on the date of the financial statements contained in such report, and (y) stating whether there exists on the date of such certificate any Event of Default or Default, and, if so, setting forth the details thereof and the action which the Company has taken and proposes to take with respect thereto;

(iii) as soon as is possible and in any event within five Business Days after a downgrade of any rating of any of the Company's senior unsecured long-term debt by Standard & Poor's or Moody's, notice to the Paying Agent of such change;

(iv) as soon as possible and in any event within five days after an executive officer of the Company having obtained knowledge thereof, notice of the occurrence of any Event of Default or any Default, in each case continuing on the date of such notice, and a statement of the chief financial officer of the Company setting forth details of such Event of Default or Default and the action which the Company has taken and proposes to take with respect thereto;

JPMUCI 0003498

(v) as soon as possible and in any event (a) within 30 Business Days after the Company or any ERISA Affiliate knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred and (b) within 10 Business Days after the Company or any ERISA Affiliate knows or has reason to know that any other Termination Event with respect to any Plan for which an Insufficiency in excess of $100,000,000 exists, has occurred or is reasonably expected to occur, a statement of the chief financial officer or chief accounting officer of the Company describing such Termination Event and the action, if any, which the Company or such ERISA Affiliate proposes to take with respect thereto;

(vi) promptly and in any event within five Business Days after receipt thereof by the Company or any ERISA Affiliate, copies of each notice received by the Company or any ERISA Affiliate from the PBGC stating its intention to terminate any Plan for which an Insufficiency in excess of $100,000,000 exists or to have a trustee appointed to administer any Plan for which an Insufficiency in excess of $100,000,000 exists;

(vii) promptly and in any event within five Business Days after receipt thereof by the Company or any ERISA Affiliate from the sponsor of a Multiemployer Plan, a copy of each notice received by the Company or any ERISA Affiliate indicating liability in excess of $100,000,000 incurred or expected to be incurred by the Company or any ERISA Affiliate in connection with (a) the imposition of a Withdrawal Liability by a Multiemployer Plan, (b) the determination that a Multiemployer Plan is, or is expected to be, in reorganization within the meaning of Title IV of ERISA, or (c) the termination of a Multiemployer Plan within the meaning of Title IV of ERISA, and

(viii) such other information respecting the condition or operations, financial or otherwise, of the Company or any of its Subsidiaries as any Bank through the Paying Agent may from time to time reasonably request

(b) _Compliance with Laws, Etc._ Comply, and cause each of its Subsidiaries to comply, with all applicable laws, rules, regulations and orders to the extent noncompliance therewith would have a material adverse effect on the Company and its Subsidiaries taken as a whole, such compliance to include, without limitation, compliance with environmental laws and the paying before the same become delinquent of all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith.

(c) _Use of Proceeds._ Request the issuance of a Letter of Credit only for general corporate purposes of the Company, not in violation of Section 5.02(f).

(d) _Maintenance of Insurance._ Maintain, and cause each of the Principal Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties as the Company or such Principal Subsidiary, provided, that self-insurance by the Company or any such Principal Subsidiary shall not be deemed a violation of this covenant to the extent that companies engaged in similar businesses and owning similar properties as the Company or such Principal Subsidiary self-insure. The Company may maintain its Principal Subsidiaries' insurance on behalf of them.

(e) _Preservation of Corporate Existence, Etc._ Preserve and maintain, and cause each of the Principal Subsidiaries to preserve and maintain, its legal existence, rights (charter, if applicable, and

JPMUCI 0003499

statutory) and franchises; provided, however, that this Section 5.01(e) shall not apply to any transactions or matters permitted by Section 5.02(c) or (d) and shall not prevent the termination of existence, rights and franchises of any Principal Subsidiary pursuant to any merger or consolidation to which such Principal Subsidiary is a party or pursuant to any lease, sale, transfer or other disposition of assets by a Principal Subsidiary, and provided, further, that the Company or any Principal Subsidiary shall not be required to preserve any right or franchise if the Company or such Principal Subsidiary shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company or such Principal Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to the Banks.

(f)    Visitation Rights. At any reasonable time and from time to time, after reasonable notice, permit the Paying Agent or any of the Banks or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, the Company and any of its Principal Subsidiaries, and to discuss the affairs, finances and accounts of the Company and any of its Principal Subsidiaries with any of their respective officers or directors.

SECTION 5.02 Negative Covenants. So long as any Letter of Credit shall remain outstanding, any LC Obligation shall remain unpaid or any Bank shall have any Commitment hereunder, the Company will not at any time, without the written consent of the Majority Banks:

(a)    Negative Pledge. Fail to perform and observe any term, covenant or agreement contained in Section 1007 of the Enron Indenture (as modified for purposes hereof as set forth in the proviso to the next sentence hereof). For the purposes of this Section 5.02(a), such Section 1007, and the definitions of all terms defined in the Enron Indenture and used in or otherwise applicable to such Section 1007, are hereby incorporated in this Agreement by reference as if such provisions and definitions were set forth in full herein, provided, however, that solely for the purposes of this Section 5.02(a) the word "Securities" as used in the Enron Indenture shall mean the LC Obligations, the phrase "this Section 1007" used therein shall mean this Section 5.02(a), the word "Trustee" used therein shall mean the Paying Agent and the phrase "So long as any of the Securities are outstanding" used therein shall mean so long as any Bank shall have any Commitment hereunder, any Letter of Credit is outstanding or any LC Obligation remains unpaid.

(b)    Senior Debt to Capitalization. Have a ratio of (i) Total Senior Debt to (ii) Total Capitalization greater than 65%.

(c)    Disposition of Assets. Lease, sell, transfer or otherwise dispose of, voluntarily or involuntarily, all or substantially all of its assets.

(d)    Mergers, Etc. Merge or consolidate with or into, any Person, unless (i) the Company is the survivor or (ii) the surviving Person, if not the Company, is organized under the laws of the United States or a state thereof and assumes all obligations of the Company under this Agreement, provided, that in each case immediately after giving effect to such proposed transaction, no Event of Default or Default would exist or result.

(e)    Compliance with ERISA. (i) Terminate, or permit any ERISA Affiliate to terminate, any Plan so as to result in any liability in excess of $100,000,000 of the Company or any ERISA Affiliate to the PBGC, or (ii) permit circumstances which give rise to a Termination Event described in clause (b), (d) or (e) of the definition of Termination Event with respect to a Plan so as to result in any liability in excess of $100,000,000 of the Company or any ERISA Affiliate to the PBGC

JPMUCI 0003500

(f) <u>Use of Proceeds</u>. Use any Letter of Credit or the proceeds of any Letter of Credit for any purpose other than for general corporate purposes of the Company, or use any Letter of Credit or such proceeds (i) in a manner which violates or results in a violation of any law or regulation, (ii) to purchase or carry any margin stock (as defined in Regulation U issued by the Federal Reserve Board) or to extend credit to others for that purpose or (iii) to make any investment in any Person if such investment is opposed by the board of directors, general partner or other governing body of such Person

## ARTICLE VI

### EVENTS OF DEFAULT

SECTION 6.01  <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)     The Company shall fail to (i) pay an LC Reimbursement Obligation on or before the applicable Reimbursement Date, or (ii) pay an LC Interest Obligation for more than five days after such LC Interest Obligation becomes due and payable or (iii) pay any fee set forth in Section 2.06 for more than 15 days after such fee becomes due and payable; or

(b)     Any representation or warranty made by the Company (or any of its officers) (including representations and warranties deemed made pursuant to Section 3.02) in connection with any Facility Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing; or

(c)     The Company shall fail to perform or observe any term, covenant or agreement contained in Section 5.02 or shall fail to perform or observe any other term, covenant or agreement contained in any Facility Document on its part to be performed or observed if, in the case of such other term, covenant or agreement, such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Company by the Paying Agent at the request of any Bank; or

(d)     The Company or any of its Principal Subsidiaries shall (i) fail to pay any principal of or premium or interest on any Debt which is outstanding in the principal amount of at least $100,000,000 in the aggregate, of the Company or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) default in the observance or performance of any covenant or obligation contained in any agreement or instrument relating to any such Debt or permit or suffer any other event to occur or condition to exist under any agreement or instrument relating to any such Debt that in substance is customarily considered a default in loan documents (in each case, other than a failure to pay specified in clause (i) of this subsection (d)) and such default or other event or condition shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect thereof is to accelerate the maturity of such Debt or require such Debt to be prepaid prior to the stated maturity thereof; for the avoidance of doubt the parties acknowledge and agree that (A) the "other" events or conditions referred to in clause (ii) of this subsection (d) do not include (1) mandatory prepayments required on borrowing base or similar loans, (2) changes in law or judicial, executive or administrative interpretation, or the tax, accounting, regulatory or other treatment of the payments or transactions under or in connection with any such agreement or instrument or the failure or inability of any Person to achieve its desired tax, accounting or regulatory treatment in connection with such transactions, (3) increased costs or the failure or inability of any Person to limit costs in connection with such transactions, (4) the sale, other disposition or collection of any assets or collection of any insurance, condemnation or other proceeds, (5) the failure of any Person to achieve or maintain specified

JPMUCI 0003501

credit ratings published or issued by credit rating agencies, (6) fluctuations in interest rates, stock market prices, commodities or other prices or indexes, or (7) any other prepayment provision in such agreement or instrument that is of a type customarily included in loan documents if the prepayment is not required as a result of a failure to meet any financial test and (B) any payment required to be made under a guaranty of payment or collection described in clause (c) of the definition of Debt shall be due and payable at the time such payment is due and payable under the terms of such guaranty (taking into account any applicable grace period) and such payment shall be deemed not to have been accelerated or required to be prepaid prior to its stated maturity as a result of the obligation guaranteed having become due; or

(e)     The Company or any of its Principal Subsidiaries shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against the Company or any of its Principal Subsidiaries seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), shall remain undismissed or unstayed for a period of 60 days; or the Company or any of its Principal Subsidiaries shall take any action to authorize any of the actions set forth above in this subsection (e), or

(f)     Any judgment, decree or order for the payment of money in excess of $100,000,000 shall be rendered against the Company or any of its Principal Subsidiaries and remains unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment, decree or order or (ii) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect, or

(g)     Any Termination Event as defined in clause (b), (d) or (e) of the definition thereof with respect to a Plan shall have occurred and, 30 days after notice thereof shall have been given to the Company by the Paying Agent, (i) such Termination Event shall still exist and (ii) the sum (determined as of the date of occurrence of such Termination Event) of the liabilities to the PBGC resulting from all such Termination Events is equal to or greater than $150,000,000; or

(h)     The Company or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount which, when aggregated with all other amounts required to be paid to Multiemployer Plans in connection with Withdrawal Liabilities (determined as of the date of such notification), exceeds $150,000,000 or requires payments exceeding $100,000,000 in any year; or

(i)     The Company or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, if as a result of such reorganization or termination the aggregate annual contributions of the Company and its ERISA Affiliates to all Multiemployer Plans which are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the respective plan years which include the date hereof by an amount exceeding $100,000,000 in the aggregate;

then, and in any such event, the Paying Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Company and the Issuing Bank (if the Bank acting as such is not the Paying Agent), declare the obligation of the Issuing Bank to issue or amend Letters of Credit to be

528066                                         29

JPMUCI 0003502

terminated, whereupon such obligation and all of the Commitments shall forthwith terminate, except for obligations to the Issuing Bank in respect of then outstanding Letters of Credit and LC Obligations, and (ii) shall at the request, or may with the consent, of the Majority Banks, by notice to the Company, declare all LC Obligations and all Fees and other amounts payable under this Agreement to be forthwith due and payable, whereupon the LC Obligations and all Fees and other amounts shall become and be forthwith due and payable, without presentment, demand, protest, notice of intent to accelerate or further notice of any kind, all of which are hereby expressly waived by the Company, and (iii) shall at the request, or may with the consent, of the Majority Banks take the actions set forth in the first sentence of Section 2.18(a) (regarding the establishment of a Cash Collateral Account for the Undrawn LC Amount); provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Company under the Bankruptcy Code, (A) the obligations of the Issuing Bank to issue or amend Letters of Credit and all of the Commitments shall automatically be terminated, except for obligations to the Issuing Bank in respect of then outstanding Letters of Credit and LC Obligations, and (B) the LC Obligations and all Fees and other amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Company.

## ARTICLE VII

## THE PAYING AGENT

SECTION 7.01  Authorization and Action  Each of the Banks and the Issuing Bank hereby appoints and authorizes the Paying Agent to take such action as agent on its behalf and to exercise such powers under the Facility Documents as are delegated to the Paying Agent, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto  As to any matters not expressly provided for by the Facility Documents, the Paying Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks and, if its rights or obligations as Issuing Bank are affected, the Issuing Bank, and such instructions shall be binding upon all Banks and the Issuing Bank. provided, however, that the Paying Agent shall not be required to take any action which exposes the Paying Agent to personal liability or which is contrary to any Facility Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings. The Paying Agent agrees to give to each Bank prompt notice of each notice given to it by the Company pursuant to the terms of this Agreement.

SECTION 7.02  Paying Agent's Reliance, Etc.  Neither the Paying Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Facility Document, except for its or their own gross negligence or willful misconduct.  The duties of the Paying Agent shall be mechanical and administrative in nature; the Paying Agent shall not have, by reason of this Agreement or any other Facility Document, a fiduciary relationship in respect of any Bank or the Issuing Bank; and nothing in this Agreement or any other Facility Document, expressed or implied, is intended or shall be so construed as to impose upon the Paying Agent any obligations in respect of this Agreement or any other Facility Document except as expressly set forth herein.  Without limitation of the generality of the foregoing, the Paying Agent: (i) may treat each Bank listed on the signature pages hereof as the holder of all LC Obligations funded by such Bank until the Paying Agent receives and accepts an Assignment and Acceptance entered into by the Bank that is the payee of such LC Obligations, as assignor, and an Eligible Assignee, as assignee, as provided in Section 10.06, (ii) may consult with legal counsel (including counsel for the Company), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranty or representation to any Bank or the Issuing Bank and shall not be responsible to any Bank or the Issuing Bank for any statements, warranties or representations (whether

JPMUCI 0003503

written or oral) made in or in connection with any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Company or to inspect the property (including the books and records) of the Company; (v) shall not be responsible to any Bank or the Issuing Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith, and (vi) shall incur no liability under or in respect of any Facility Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by facsimile, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 7.03  Paying Agent and Its Affiliates.  With respect to its Commitment and the LC Obligations funded by it, each Bank which is also the Paying Agent or the Issuing Bank shall have the same rights and powers under the Facility Documents as any other Bank and may exercise the same as though it were not the Paying Agent or the Issuing Bank. and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as the Paying Agent or the Issuing Bank in its individual capacity  Any Bank serving as the Paying Agent or the Issuing Bank and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Company, any of the Subsidiaries and any Person who may do business with or own securities of the Company or any Subsidiary, all as if such Bank were not the Paying Agent or the Issuing Bank and without any duty to account therefor to the Banks

SECTION 7.04  Bank Credit Decision  Each of the Banks and the Issuing Bank acknowledges that it has independently and without reliance upon the Paying Agent. the Issuing Bank or any other Bank (except that the Issuing Bank relies on the Commitments and other obligations of the Banks hereunder) and based on the financial statements referred to in Section 4 01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement  Each of the Banks and the Issuing Bank (except that the Issuing Bank relies on the Commitments and other obligations of the Banks hereunder) also acknowledges that it will, independently and without reliance upon the Paying Agent, the Issuing Bank or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Facility Documents and the Letters of Credit  The Paying Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the Issuing Bank with any credit or other information with respect thereto, whether coming into its possession before the issuance of a Letter of Credit or at any time or times thereafter.

SECTION 7.05  Holders.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent is the holder of any LC Obligations shall be conclusive and binding on any subsequent holder, transferee or assignee, as the case may be, of such LC Obligations or any obligations issued in exchange therefor; provided, that the request, authority or consent of the Issuing Bank does not constitute the request, authority or consent of the Banks, nor vice versa.

SECTION 7.06  Certain Rights of the Paying Agent.  If the Paying Agent shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Facility Document, the Paying Agent shall be entitled to refrain from such act or taking such action unless and until the Paying Agent shall have received instructions from the Majority Banks and, if its rights or obligations as Issuing Bank are affected, the Issuing Bank. and it shall not incur liability to any Person by reason of so refraining. Without limiting the

JPMUCI 0003504

foregoing, no Bank shall have any right of action whatsoever against the Paying Agent as a result of its acting or refraining from acting hereunder or under any other Facility Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be, and (if its rights or obligations as Issuing Bank are affected) the Issuing Bank. Furthermore, except for action expressly required of the Paying Agent hereunder, the Paying Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 7.07  Indemnification.  The Banks agree to indemnify the Paying Agent (to the extent not reimbursed by the Company), ratably according to the Pro Rata Percentages then held by each of them (or if no Pro Rata Percentages are at the time existing, ratably according to the respective amounts of their Commitments then existing, or, if no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Paying Agent in any way relating to or arising out of any of the Facility Documents or the Letters of Credit or any action taken or omitted by the Paying Agent under the Facility Documents or the Letters of Credit (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF THE PAYING AGENT, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PAYING AGENT).  IT IS THE INTENT OF THE PARTIES HERETO THAT THE PAYING AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 7.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse the Paying Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by the Paying Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Facility Documents or the Letters of Credit, or any of them, to the extent that the Paying Agent is not reimbursed for such expenses by the Company.

SECTION 7.08  Resignation by the Paying Agent.

(a)     The Paying Agent may resign from the performance of all its functions and duties hereunder and under the other Facility Documents at any time by giving 15 Business Days' prior written notice to the Company, the Issuing Bank (if the Bank acting as such is not also the Paying Agent) and the Banks. Such resignation shall take effect upon the appointment of a successor Paying Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)     Upon any such notice of resignation, the Majority Banks and the Issuing Bank, acting together, shall have the right to appoint a successor Paying Agent which shall be a commercial bank or trust company reasonably acceptable to the Company.

(c)     If a successor to a resigning Paying Agent shall not have been so appointed within such 15 Business Day period, the resigning Paying Agent, with the consent of the Company (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Paying Agent who shall serve as Paying Agent until such time, if any, as the Majority Banks and the Issuing Bank appoint a successor Paying Agent as provided above.

JPMUCI 0003505

(d)    If no successor Paying Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such notice of resignation was given by the resigning Paying Agent, the resigning Paying Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Paying Agent hereunder and under any other Facility Document until such time, if any, as the Majority Banks and the Issuing Bank appoint a successor Paying Agent as provided above.

(e)    After any Paying Agent's resignation hereunder as Paying Agent, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Paying Agent under this Agreement.

## ARTICLE VIII

## THE CO-ADMINISTRATIVE AGENTS

SECTION 8.01  Authorization and Action.  Each Bank and the Issuing Bank hereby appoints and authorizes the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers under the Facility Documents as are delegated to the Co-Administrative Agents, by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Facility Documents (including, without limitation, enforcement of their rights), the Co-Administrative Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Banks and, if its rights or obligations as Issuing Bank are affected, the Issuing Bank, and such instructions shall be binding upon all Banks and the Issuing Bank, provided, however, that the Co-Administrative Agents shall not be required to take any action which exposes the Co-Administrative Agents (or either of them) to personal liability or which is contrary to any Facility Document or applicable law and shall not be required to initiate or conduct any litigation or other proceedings.  The Co-Administrative Agents agree to give to each Bank prompt notice of each notice given to them by the Company pursuant to the terms of this Agreement.

SECTION 8.02  Co-Administrative Agents' Reliance, Etc.  Neither of the Co-Administrative Agents nor none of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with any Facility Document, except for its or their own gross negligence or willful misconduct.  The duties of the Co-Administrative Agents shall be mechanical and administrative in nature; the Co-Administrative Agents shall not have, by reason of this Agreement or any other Facility Document, a fiduciary relationship in respect of any Bank or the Issuing Bank; and nothing in this Agreement or any other Facility Document, expressed or implied, is intended or shall be so construed as to impose upon the Co-Administrative Agents any obligations in respect of this Agreement or any other Facility Document except as expressly set forth herein.  Without limitation of the generality of the foregoing, the Co-Administrative Agents: (i) may treat each Bank listed on the signature pages hereof as the holder of all LC Obligations funded by such Bank until the Paying Agent receives and accepts an Assignment and Acceptance entered into by the Bank that is the payee of such LC Obligations, as assignor, and an Eligible Assignee, as assignee, as provided in Section 10.06, (ii) may consult with legal counsel (including counsel for the Company), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) make no warranty or representation to any Bank or the Issuing Bank and shall not be responsible to any Bank or the Issuing Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Facility Document or any other instrument

JPMUCI 0003506

or document furnished pursuant hereto or in connection herewith on the part of the Company or to inspect the property (including the books and records) of the Company; (v) shall not be responsible to any Bank or the Issuing Bank for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith; and (vi) shall incur no liability under or in respect of any Facility Document, except for its own gross negligence or willful misconduct, by acting upon any notice, consent, certificate or other instrument or writing (which may be by facsimile, telegram, cable or telex) believed by it to be genuine and signed, given or sent by the proper party or parties.

SECTION 8.03  Co-Administrative Agents and Their Affiliates.   With respect to its Commitment, the Advances made by it and the LC Obligations funded by it, each Bank which is also a Co-Administrative Agent shall have the same rights and powers under the Facility Documents as any other Bank and may exercise the same as though it were not a Co-Administrative Agent; and the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as a Co-Administrative Agent in its individual capacity.  Any Bank serving as a Co-Administrative Agent or Issuing Bank and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Company, any of the Subsidiaries and any Person who may do business with or own securities of the Company or any Subsidiary, all as if such Bank were not a Co-Administrative Agent or Issuing Bank (as applicable) and without any duty to account therefor to the Banks.

SECTION 8.04  Bank Credit Decision.  Each of the Banks and the Issuing Bank acknowledges that it has, independently and without reliance upon either Co-Administrative Agent and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each of the Banks and the Issuing Bank also acknowledges that it will, independently and without reliance upon either Co-Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Facility Documents and the Letters of Credit.  The Co-Administrative Agents shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any LC Obligations with any credit or other information with respect thereto, whether coming into its possession before the issuance of a Letter of Credit or at any time or times thereafter.

SECTION 8.05  Certain Rights of the Co-Administrative Agents.  If the Co-Administrative Agents shall request instructions from the Majority Banks with respect to any act or action (including failure to act) in connection with this Agreement or any other Facility Document, the Co-Administrative Agents shall be entitled to refrain from such act or taking such action unless and until the Co-Administrative Agents shall have received instructions from the Majority Banks and, if its rights or obligations as Issuing Bank are affected, the Issuing Bank; and they shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Bank nor the holder of any LC Obligations shall have any right of action whatsoever against either Co-Administrative Agent as a result of its acting or refraining from acting hereunder or under any other Facility Document in accordance with the instructions of the Majority Banks or all of the Banks, as the case may be, and (if its rights and obligations as Issuing Bank are affected) the Issuing Bank.  Furthermore, except for action expressly required of the Co-Administrative Agents hereunder, each Co-Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be specifically indemnified to its satisfaction by the Banks against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

SECTION 8.06  Holders.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any LC Obligations shall be

JPMUCI 0003507

conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such LC Obligations or of any obligations issued in exchange therefore; provided, that the request, authority or consent of the Issuing Bank does not constitute the request, authority or consent of the Banks, nor vice versa.

SECTION 8.07 Indemnification  The Banks agree to indemnify each Co-Administrative Agent (to the extent not reimbursed by the Company), ratably according to the Pro Rata Percentages then held by each of them (or if no Pro Rata Percentages are at the time existing, ratably according to the respective amounts of their Commitments then existing, or, if no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Co-Administrative Agent in any way relating to or arising out of any of the Facility Documents or the Letters of Credit or any action taken or omitted by such Co-Administrative Agent under the Facility Documents or the Letters of Credit (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH CO-ADMINISTRATIVE AGENT, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH CO-ADMINISTRATIVE AGENT).  IT IS THE INTENT OF THE PARTIES HERETO THAT EACH CO-ADMINISTRATIVE AGENT SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 8.07, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE.  Without limitation of the foregoing, each Bank agrees to reimburse each Co-Administrative Agent promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by such Co-Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Facility Documents or the Letters of Credit, or any of them, to the extent that such Co-Administrative Agent is not reimbursed for such expenses by the Company

SECTION 8.08 Resignation by the Co-Administrative Agents.

(a)    Each Co-Administrative Agent may resign from the performance of all its functions and duties hereunder and under the other Facility Documents at any time by giving 15 Business Days' prior written notice to the Company, the other Co-Administrative Agent, the Issuing Bank and the Banks  Such resignation shall take effect upon the appointment of a successor Co-Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Majority Banks and the Issuing Bank shall have the right to appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent which successor shall be a commercial bank or trust company reasonably acceptable to the Company.

(c)    If a successor to a resigning Co-Administrative Agent shall not have been so appointed within such 15 Business Day period, the resigning Co-Administrative Agent, with the consent of the Company (which consent will not be unreasonably withheld), shall have the right to then appoint a successor Co-Administrative Agent to such resigning Co-Administrative Agent who shall serve as a Co-Administrative Agent until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent as provided above.

(d)    If no successor Co-Administrative Agent has been appointed pursuant to clause (b) or (c) above and shall have accepted such appointment by the 20th Business Day after the date such

JPMUCI 0003508

notice of resignation was given by the resigning Co-Administrative Agent, the resigning Co-Administrative Agent's resignation shall become effective and the Banks shall thereafter perform all the duties of the resigning Co-Administrative Agent hereunder and under any other Facility Document until such time, if any, as the Majority Banks appoint a successor Co-Administrative Agent; provided, however, that if only one of the Co-Administrative Agents has given notice of resignation and the other Co-Administrative Agent is continuing to serve in such capacity, (i) the resigning Co-Administrative Agent's resignation shall become effective on such 20th Business Day, (ii) the Banks shall not perform the duties of the resigning Co-Administrative Agent, and (iii) the remaining Co-Administrative Agent alone shall have all rights and perform all duties ascribed to the Co-Administrative Agents hereunder and under any Facility Document until such time if any, as the Majority Banks appoint a successor Co-Administrative Agent for the resigning Co-Administrative Agent.

(e)    After any Co-Administrative Agent's resignation hereunder as Co-Administrative Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement.

## ARTICLE IX

## THE ISSUING BANK

SECTION 9.01. Indemnification. The Banks agree to indemnify the Issuing Bank (to the extent not reimbursed by the Company), ratably according to the Pro Rata Percentages then held by each of them (or if no Pro Rata Percentages are at the time existing, ratably according to the respective amounts of their Commitments then existing, or, if no Commitments are then existing, ratably according to the respective amounts of the Commitments existing immediately prior to the termination thereof), from and against any and all claims, damages, losses, liabilities and expenses (including without limitation, reasonable fees and disbursements of counsel) of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Issuing Bank in any way relating to or arising out of any of the Facility Documents or the Letters of Credit or any action taken or omitted by the Issuing Bank under the Facility Documents or the Letters of Credit (EXPRESSLY INCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF THE ISSUING BANK, BUT EXCLUDING ANY SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE ISSUING BANK). IT IS THE INTENT OF THE PARTIES HERETO THAT THE ISSUING BANK SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 9.01, BE INDEMNIFIED FOR ITS OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. Without limitation of the foregoing, each Bank agrees to reimburse the Issuing Bank promptly upon demand for such Bank's ratable share of any reasonable out-of-pocket expenses (including reasonable counsel fees) incurred by the Issuing Bank in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, the Facility Documents or the Letters of Credit, or any of them, to the extent that the Issuing Bank is not reimbursed for such expenses by the Company.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01. Amendments, Etc. No amendment or waiver of any provision of any Facility Document, nor consent to any departure by the Company therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. provided, however,

S26080                                    36

JPMUCI 0003509

that no amendment, waiver or consent shall, unless in writing and signed by all the Banks, do any of the following: (a) waive any of the conditions specified in Article III, (b) increase the Commitment of any Bank or subject any Bank or the Issuing Bank to any additional obligation, (c) forgive or reduce the LC Obligations, Fees or other amounts payable hereunder, (d) postpone any date fixed for any payment of the LC Obligations or Fees or other amounts payable hereunder, (e) take any action which requires the signing of all the Banks pursuant to the terms of any Facility Document, (f) change the amount of the Pro Rata Percentages which shall be required for the Banks or any of them to take any action under any Facility Document or (g) amend this Section 10.01; and provided, further, that (x) no amendment, waiver or consent shall, unless in writing and signed by the Paying Agent in addition to the Banks required above to take such action, affect the rights or duties of the Paying Agent under any Facility Document, (y) no amendment, waiver or consent shall, unless in writing and signed by the Co-Administrative Agents in addition to the Banks required above to take such action, affect the rights or duties of the Co-Administrative Agents under the Facility Documents, and (z) no amendment, waiver or consent shall, unless in writing and signed by the Issuing Bank in addition to the Banks required above to take such action, affect the rights or duties of the Issuing Bank under the Facility Documents or (without limiting the generality of the foregoing) reduce the Total Commitments below the Total LC Disbursement Exposure, change the definition of an "Eligible Assignee", change any obligation of any Bank or the Paying Agent to the Issuing Bank or change any of Sections 2.01 through Section 2.05 or the definition of any term used therein. Notwithstanding the foregoing, amendments to a Letter of Credit shall require only the consent of the Issuing Bank and the Company (as well as the beneficiary or any other party to such Letter of Credit)

SECTION 10.02 Notices, Etc. All notices and other communications provided for hereunder shall be in writing (including facsimile transmission) and mailed, telecopied, or delivered, if to the Company, at its address or facsimile number set forth below:

Enron Corp.
1400 Smith Street
Houston, Texas 77002
Attention: Jesne Mata
Facsimile No.: (713) 646-2667

if to the Co-Administrative Agents at their respective addresses or facsimile numbers set forth below.

The Chase Manhattan Bank
1 Chase Manhattan Plaza, 8th Floor
New York, New York 10081
Attention: Lisa Pucciarelli
Facsimile No.: (212) 552-5777

Citibank, N.A.
399 Park Avenue
New York, New York 10043
Attention: Energy Department,
                North American Banking Group
Facsimile No.: (212) 832-9857

3280v6                                    37

JPMUCI 0003510

with a copy to.

Citicorp Securities, Inc.
1200 Smith Street, Suite 2000
Houston, Texas  77002
Attention:  James F. Reilly, Jr.
            Managing Director
Facsimile No..  (713) 654-2849

if to any Bank, at its Funding Office (or any alternative address for notice specified in Schedule 1 or in the Assignment and Acceptance pursuant to which it became a Bank); if to the Paying Agent, at its address or facsimile number set forth below.

The Chase Manhattan Bank
1 Chase Manhattan Plaza, 8th Floor
New York, New York  10081
Attention.  Lisa Pucciarelli
Facsimile No..  (212) 552-5777

    with a copy to:

Peter Licalzi
The Chase Manhattan Bank
600 Travis St., 20th Floor
Attention    Peter Licalzi
Facsimile No ·  (713) 216-4117

if to the Issuing Bank, at its address or facsimile number set forth below

The Chase Manhattan Bank
1 Chase Manhattan Plaza, 8th Floor
New York, New York  10081
Attention:  Lisa Pucciarelli
Facsimile No.:  (212) 552-5777

    with a copy to

Peter Licalzi
The Chase Manhattan Bank
600 Travis St., 20th Floor
Attention    Peter Licalzi
Facsimile No.:  (713) 216-4117

or, as to the Company, either Co-Administrative Agent, the Paying Agent or the Issuing Bank, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Company, each Co-Administrative Agent, the Paying Agent and the Issuing Bank.  All such notices and communications shall be effective, if mailed, two Business Days after deposit in the mails; if sent by overnight courier, one Business Day after delivery to the courier company; and if sent by facsimile transmission, when received by the receiving facsimile equipment, respectively; *provided, however,* that

528066                                    38

JPMUCI 0003511

(i) notices and communications to the Paying Agent shall not be effective until received by the Paying Agent and (ii) notices and communications to the Issuing Bank shall not be effective until received by the Issuing Bank and (iii) telexed or telecopied notices received by any party after its normal business hours (or on a day other than a Business Day) shall be effective on the next Business Day

SECTION 10.03 No Waiver; Remedies. No failure on the part of any Bank, either Co-Administrative Agent, the Paying Agent or the Issuing Bank to exercise, and no delay in exercising, any right under any Facility Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in the Facility Documents are cumulative and not exclusive of any remedies provided by law.

SECTION 10.04 Costs, Expenses and Indemnity.

(a)    The Company agrees to pay on demand, (i) all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification and amendment of the Facility Documents and the other documents to be delivered under the Facility Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of one law firm as counsel for the Paying Agent and the Issuing Bank with respect to preparation, execution and delivery of the Facility Documents and the satisfaction of the matters referred to in Section 3.01, and (ii) all reasonable legal and other costs and expenses, if any, of each Co-Administrative Agent, the Paying Agent, the Issuing Bank and each Bank in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of the Facility Documents and the other documents to be delivered under the Facility Documents or incurred in connection with any workout, restructuring or bankruptcy.

(b)    The Company agrees, to the fullest extent permitted by law, subject to the last two sentences of this Section 10.04(b), to indemnify and hold harmless each Co-Administrative Agent, the Paying Agent, the Issuing Bank and each Bank and each of their respective directors, officers, employees and agents (collectively, "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and claims, damages, losses, liabilities and expenses relating to environmental matters, but excluding taxes, which are dealt with in Section 2.11) (collectively, "Losses") for which any of them may become liable or which may be incurred by or asserted against an Indemnified Party (other than by another Indemnified Party), in each case in connection with or arising out of or by reason of (i) the issuance or performance under any Letter of Credit, (ii) the compliance with a completed Letter of Credit Request that the Company provides to the Issuing Bank by facsimile or similar means of electronic transmission allowed by Section 10.02 and that the Issuing Bank believes to be genuine, or (iii) any investigation, litigation, or proceeding, whether or not such Indemnified Party is a party thereto, arising out of, related to or in connection with this Agreement or any other Facility Document, any Letter of Credit or any transaction in which any proceeds of all or any part of the Letter of Credit are applied (EXPRESSLY INCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY, BUT EXCLUDING ANY SUCH LOSSES ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY AND, IN THE CASE OF THE ISSUING BANK, EXCLUDING ANY LOSSES ATTRIBUTABLE TO ITS FAILURE TO MEET THE STANDARDS REQUIRED OF IT PURSUANT TO SECTION 2.05). IT IS THE INTENT OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY SHALL, TO THE EXTENT PROVIDED IN THIS SECTION 10.04(B), BE INDEMNIFIED FOR THEIR OWN ORDINARY, SOLE OR CONTRIBUTORY NEGLIGENCE. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, EXCEPT AS SET FORTH IN THE NEXT SUCCEEDING SENTENCE, THE COMPANY SHALL NOT BE LIABLE FOR, AND SHALL NOT BE OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY FOR, LOSSES CONSTITUTING TREBLE, EXEMPLARY, OR PUNITIVE DAMAGES. IF (A) AN INDEMNIFIED PARTY HAS BECOME LIABLE TO A

JPMUCI 0003512

THIRD PARTY (THAT IS NOT ANOTHER INDEMNIFIED PARTY) FOR LOSSES CONSTITUTING DAMAGES SPECIFIED IN THE PRECEDING SENTENCE, AND (B) SUCH INDEMNIFIED PARTY WOULD BE ENTITLED TO INDEMNIFICATION UNDER THIS AGREEMENT BUT FOR THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE, THEN SUCH INDEMNIFIED PARTY SHALL NONETHELESS BE ENTITLED TO INDEMNIFICATION FOR SUCH LOSSES INCURRED TO SUCH THIRD PARTY.

(c)     Except as set forth in the next succeeding sentence, each of the Banks and each Co-Administrative Agent, the Paying Agent and the Issuing Bank shall not be liable to the Company for amounts constituting punitive, treble or exemplary damages arising out of or in connection with any breach by such Bank, such Co-Administrative Agent, the Paying Agent or the Issuing Bank of any of its obligations hereunder. If the Company becomes liable to a third party for amounts constituting punitive, treble or exemplary damages as a result of a breach of an obligation hereunder by a Bank, a Co-Administrative Agent, the Paying Agent or the Issuing Bank, as the case may be, the Company shall be entitled to claim and recover (and does not waive its rights to claim and recover) such amounts from such Bank, such Co-Administrative Agent, the Paying Agent or the Issuing Bank, as the case may be, to the extent such Bank, such Co-Administrative Agent, the Paying Agent or the Issuing Bank, as the case may be, would be liable to the Company for such amounts but for the limitation set forth in the preceding sentence.

SECTION 10.05 Right of Set-Off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6 01 to authorize the Paying Agent to declare the LC Obligations due and payable pursuant to the provisions of Section 6 01, each of the Banks and the Issuing Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Bank or the Issuing Bank, as the case may be, to or for the credit or the account of the Company against any and all of the obligations of the Company now or hereafter existing under this Agreement, irrespective of whether or not such Bank or the Issuing Bank shall have made any demand under this Agreement and although such obligations may be unmatured. Each of the Banks and the Issuing Bank agrees promptly to notify the Company after any such set-off and application made by such Bank or the Issuing Bank, as the case may be, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Bank and the Issuing Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which such Bank or the Issuing Bank may have.

SECTION 10.06 Assignments and Participations.

(a)     Each Bank may, in accordance with applicable law, assign to one or more banks or other entities all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and its Pro Rata Percentage of LC Obligations); provided, however, that (i) each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement, (ii) except in the case of an assignment of all of a Bank's rights and obligations under this Agreement, the amount of the Commitment of the assigning Bank being assigned pursuant to each such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Paying Agent (with a copy to each Co-Administrative Agent), for acceptance and recording by the Paying Agent in the Register, an Assignment and Acceptance and a processing and recordation fee of $3,000. Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance,

JPMUCI 0003513

have the rights and obligations of a Bank hereunder, (y) the Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an assigning Bank's rights and obligations under this Agreement, such Bank shall cease to be a party hereto except that the rights under Sections 2.09, 2.11 and 10.04 of such Bank shall continue with respect to events and occurrences occurring before or concurrently with its ceasing to be a party hereto), and (z) unless the Company in its sole discretion otherwise consents, no such assignee shall be entitled to receive any greater payment pursuant to Sections 2.09 and 2.11 than the assigning Bank would have been entitled to receive with respect to the rights assigned to such assignee, except as a result of circumstances arising after the date of such assignment.

(b)     By executing and delivering an Assignment and Acceptance, the Bank assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows  (i) other than as provided in such Assignment and Acceptance, such assigning Bank makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith; (ii) such assigning Bank makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or any other Person or the performance or observance by the Company or any other Person of any of its respective obligations under any Facility Document or any other instrument or document furnished pursuant hereto or in connection herewith, (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such assignee will, independently and without reliance upon the Co-Administrative Agents, the Paying Agent, the Issuing Bank, such assigning Bank or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any of the other Facility Documents or any other instrument or document, (v) such assignee confirms that it is an Eligible Assignee, (vi) such assignee appoints and authorizes the Paying Agent to take such action as Paying Agent on its behalf and to exercise such powers and discretion under the Facility Documents as are delegated to the Paying Agent by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; (vii) such assignee appoints and authorizes each Co-Administrative Agent to take such action as Co-Administrative Agent on its behalf and to exercise such powers and discretion under the Facility Documents as are delegated to the Co-Administrative Agents by the terms hereof or thereof, together with such powers and discretion as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Bank.

(c)     The Paying Agent shall maintain at its address referred to in Section 10.02 a copy of each Assignment and Acceptance Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Banks and the Commitment of, and the payments pursuant to the respective Pro Rata Percentage of LC Obligations owing to, each Bank from time to time (the "Register")  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Company, the Co-Administrative Agents, the Paying Agent, the Issuing Bank and the Banks may treat each Person whose name is recorded in the Register as a Bank hereunder for all purposes of this Agreement  The Register shall be available for inspection by the Company or any Bank at any reasonable time and from time to time upon reasonable prior notice

528066                                  41

JPMUCI 0003514

(d)    Upon its receipt of an Assignment and Acceptance executed by an assigning Bank and an assignee representing that it is an Eligible Assignee, the Paying Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit E, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Company.

(e)    Each Bank, in accordance with applicable law, may sell participations to one or more banks or other entities (other than the Company or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the LC Obligations and Fees owing to it); provided, however, that (i) such Bank's obligations under this Agreement (including its Commitment to the Company hereunder) shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Company, the Co-Administrative Agents, the Paying Agent, the Issuing Bank and the other Banks shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement, (iv) the terms of any such participation shall not restrict such Bank's ability to make any amendment or waiver of this Agreement or such Bank's ability to consent to any departure by the Company therefrom without the approval of the participant, except that the approval of the participant may be required to the extent that such amendment, waiver or consent would reduce the amount of LC Obligations or Fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of the LC Obligations or Fees or other amounts payable hereunder, in each case to the extent subject to such participation, and (v) unless the Company in its sole discretion otherwise consents, no such participant shall be entitled to receive any greater payment pursuant to Sections 2.09 and 2.11 than such Bank would have been entitled to receive with respect to the rights assigned to such participant by such Bank except as a result of circumstances arising after the date of such participation to the extent that such circumstances affect other Banks and participants generally, and (vi) each participant that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall provide to the Paying Agent and the Company a U.S. Internal Revenue Service Form W-8BEN or W-8ECI, as appropriate, or any successor form prescribed by the U.S. Internal Revenue Service, duly completed and certifying that such participant is fully exempt from United States withholding taxes with respect to all payments to be made to such participant under such participation agreement, or other documents satisfactory to the Company and the Paying Agent indicating that all payments to be made to such participant under such participation agreement are fully exempt from such withholding taxes, and neither the Company nor the Paying Agent shall have any obligation to pay to any participant any taxes, penalties, interest or other expenses, costs and losses incurred or payable by the Company or the Paying Agent as a result of the failure of such participant to obtain such additional duly completed and signed copies of one or the other of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may be required under then-current United States law or regulations to avoid United States withholding taxes on payments in respect of all amounts to be received by such participant.

(f)    Any Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.06, disclose to the assignee or participant or proposed assignee or participant any information relating to the Company or any of its Affiliates furnished to such Bank by or on behalf of the Company or any of its Affiliates, provided, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to comply with Section 10.09.

(g)    Notwithstanding any other provision set forth in this Agreement, any Bank may at any time create a security interest in all or any portion of its rights under this Agreement (including its Pro Rata Percentage of LC Obligations) in favor of any Federal Reserve Bank in accordance with any applicable regulation of the Federal Reserve Board.

528066                                        42

JPMUCI 0003515

SECTION 10.07 Governing Law, Entire Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  This Agreement and the other Facility Documents and any fee letter pertaining hereto accepted by the Company constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.08 Interest.  It is the intention of the parties hereto that each Co-Administrative Agent, the Paying Agent, the Issuing Bank and each Bank shall conform strictly to usury laws applicable to it, if any.  Accordingly, if the transactions with either Co-Administrative Agent, the Paying Agent, the Issuing Bank or any Bank contemplated hereby would be usurious under applicable law, if any, then, in that event, notwithstanding anything to the contrary in this Agreement or any other agreement entered into in connection with this Agreement, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received by such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, under this Agreement or under any other agreement entered into in connection with this Agreement shall under no circumstances exceed the maximum amount allowed by such applicable law and any excess shall be cancelled automatically and, if theretofore paid, shall at the option of such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, be applied on the amount of the obligations owed to such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, by the Company or refunded by such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, to the Company, and (b) in the event that any obligation payable to such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, is accelerated or in the event of any permitted prepayment, then such consideration that constitutes interest under law applicable to such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, may never include more than the maximum amount allowed by such applicable law and excess interest, if any, to such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, provided for in this Agreement or otherwise shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall, at the option of such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, be credited by such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, on the amount of the obligations owed to such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, by the Company or refunded by such Co-Administrative Agent, the Paying Agent, the Issuing Bank or such Bank, as the case may be, to the Company.

SECTION 10.09 Confidentiality.  Each of the Banks and the Issuing Bank agrees that it will use reasonable efforts not to disclose without the prior consent of the Company (other than to such Bank's or the Issuing Bank's affiliates in the ordinary course of business in connection with any Facility Document or Letter of Credit, the administration thereof or any transaction contemplated hereby, employees, auditors or counsel or to another Bank or the Issuing Bank if the disclosing Bank or Issuing Bank or the disclosing Bank's or Issuing Bank's holding or parent company in its sole discretion determines that any such party should have access to such information) any information with respect to the Company or its Subsidiaries which is furnished pursuant to this Agreement or any other Facility Document and which is designated by the Company to the Banks and the Issuing Bank in writing as confidential, provided that any Bank or the Issuing Bank may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Bank or the Issuing Bank or to the Federal Reserve Board or the FDIC or similar organizations (whether in the United States or elsewhere), (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Bank or the Issuing Bank, and (e) to the prospective transferee in connection with any

JPMUCI 0003516

contemplated transfer of any of the LC Obligations or Commitments or any interest therein by such Bank or the Issuing Bank, provided, that such prospective transferee executes an agreement with the Company containing provisions substantially identical to those contained in this Section 10.09.

SECTION 10.10 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 10.11 Binding Effect. This Agreement shall become effective when it shall have been executed by the Company, the Co-Administrative Agents, the Paying Agent and the Issuing Bank, and when the Paying Agent shall have, as to each Bank, either received a copy of a signature page hereof executed by such Bank or been notified by such Bank that such Bank has executed it and thereafter shall be binding upon and inure to the benefit of and be enforceable by the Company, the Co-Administrative Agents, the Paying Agent, the Issuing Bank and each Bank and their respective successors and assigns, except that the Company shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Banks and the Issuing Bank (other than an assignment effectuated by a merger or consolidation permitted by Section 5.02(d) to the surviving Person referred to therein). There are no third party beneficiaries to this Agreement other than the Indemnified Parties.

528066

44

JPMUCI 0003517

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

COMPANY:

ENRON CORP.

By: _____

Name: Barry J. Schnapper

Title: Deputy Treasurer

529066

[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003518

**CO-ADMINISTRATIVE AGENTS:**

THE CHASE MANHATTAN BANK

By:_____
        Authorized Officer  CHRISTOPHER LYONS

                            ATTORNEY-IN-FACT

CITIBANK, N.A.

By:_____
        Authorized Officer

**PAYING AGENT:**

THE CHASE MANHATTAN BANK

By_____
        Authorized Officer

**ISSUING BANK:**

THE CHASE MANHATTAN BANK

By_____
        Authorized Officer

528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

CO-ADMINISTRATIVE AGENTS:

THE CHASE MANHATTAN BANK

By: _____
                Authorized Officer

CITIBANK, N.A.

By: _____
                Authorized Officer

PAYING AGENT:

THE CHASE MANHATTAN BANK

By: _____
                Authorized Officer

ISSUING BANK:

THE CHASE MANHATTAN BANK

By: _____
                Authorized Officer

528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

**BANKS:**

THE CHASE MANHATTAN BANK

By: _____
            Authorized Officer

ABN AMRO BANK N.V.

By: _____
            Authorized Officer

By: _____
            Authorized Officer

ARAB BANK PLC

By: _____
            Authorized Officer

ARAB BANKING CORPORATION

By: _____
            Authorized Officer

AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By: _____
            Authorized Officer

528066            [Signature Page to Letter of Credit and Reimbursement Agreement]

May-15-01  07:48am  From-ABN AMRO                          +31284048307      T-708  P 02/03  F-833

BANKS:

THE CHASE MANHATTAN BANK

By:_____
        Authorized Officer


ABN AMRO BANK N.V.

By:_____
        Authorized Officer

By:_____
        Authorized Officer


ARAB BANK PLC

By:_____
        Authorized Officer


ARAB BANKING CORPORATION

By:_____
        Authorized Officer


AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By:_____
        Authorized Officer


S38066                  [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003522

**BANKS**

THE CHASE MANHATTAN BANK

By_____
                Authorized Officer


ABN AMRO BANK N V.

By _____
                Authorized Officer

By_____
                Authorized Officer


ARAB BANK PLC

By_____
                Authorized Officer


ARAB BANKING CORPORATION

By_____
                Authorized Officer


AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By_____
                Authorized Officer


[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003523

**BANKS:**

THE CHASE MANHATTAN BANK

By:_____
                Authorized Officer


ABN AMRO BANK N.V..

By:_____
                Authorized Officer

By:_____
                Authorized Officer


ARAB BANK PLC

By:_____
                Authorized Officer


ARAB BANKING CORPORATION

By: _WAHID O. BUGAIGHIS_____
                Authorized Officer


AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By:_____
                Authorized Officer


528066            [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003524

BANKS:

THE CHASE MANHATTAN BANK

By:_____
                Authorized Officer


ABN AMRO BANK N.V.

By:_____
                Authorized Officer


By:_____
                Authorized Officer


ARAB BANK PLC

By:_____
                Authorized Officer


ARAB BANKING CORPORATION

By:_____
                Authorized Officer


AUSTRALIA AND NEW ZEALAND BANKING
GROUP LIMITED

By:_____
                Authorized Officer

                R. Scott McInnis
            Head of Structured Finance &
        Relationship Management-Americas


528066              [Signature Page to Letter of Credit and Reimbursement Agreement]

BANCA DI ROMA, CHICAGO BRANCH

By _____
        Authorized Officer

By: _____
        Authorized Officer


BANCA NAZIONALE DEL LAVORO S.p.A.

By _____
        Authorized Officer

By _____
        Authorized Officer


BANCA POPOLARE DI MILANO

By _____
        Authorized Officer


BANCO BILBAO VIZCAYA ARGENTARIA, S.A

By _____
        Authorized Officer


BANK OF AMERICA N.A.

By: _____
        Authorized Officer


528066       [Signature Page to Letter of Credit and Reimbursement Agreement]

BANCA DI ROMA, CHICAGO BRANCH

By _____
        Authorized Officer

By: _____
        Authorized Officer

BANCA NAZIONALE DEL LAVORO S.p.A.

By: _____
        Authorized Officer   ROBERTO MANCONE, VP

By _____
        Authorized Officer   CARLO VECCHI, Sr.VP

BANCA POPOLARE DI MILANO

By _____
        Authorized Officer

BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

By: _____
        Authorized Officer

BANK OF AMERICA N.A

By: _____
        Authorized Officer

5380++          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003527

BANCA DI ROMA, CHICAGO BRANCH

By: _____
          Authorized Officer

By: _____
          Authorized Officer


BANCA NAZIONALE DEL LAVORO S.p.A.

By: _____
          Authorized Officer

By: _____
          Authorized Officer


BANCA POPOLARE DI MILANO

By: _____
          Authorized Officer
          ANTHONY FRANCO
          EXECUTIVE VICE PRESIDENT
          & GENERAL MANAGER

BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

By: _____
          Authorized Officer


BANK OF AMERICA N.A.

By: _____
          Authorized Officer


528066                    [Signature Page to Letter of Credit and Reimbursement Agreement]

BANCA DI ROMA, CHICAGO BRANCH

By _____
Authorized Officer

By _____
Authorized Officer

BANCA NAZIONALE DEL LAVORO S.p.A.

By _____
Authorized Officer

By _____
Authorized Officer

BANCA POPOLARE DI MILANO

By _____
Authorized Officer

BANCO BILBAO VIZCAYA ARGENTARIA, S A

By _____
MANUEL SANCHEZ Authorized Officer          JOHN MARTINI
SENIOR VICE PRESIDENT                       VICE PRESIDENT
& BRANCH MANAGER                            CORPORATE BANKING
"1 OBAL CORPORATE BANKING
BANK OF AMERICA N A

By: _____
Authorized Officer

5280n6          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003529

BANCA DI ROMA, CHICAGO BRANCH

By:_____
                Authorized Officer

By:_____
                Authorized Officer


BANCA NAZIONALE DEL LAVORO S.p.A.

By:_____
                Authorized Officer

By:_____
                Authorized Officer


BANCA POPOLARE DI MILANO

By:_____
                Authorized Officer


BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

By:_____
                Authorized Officer


BANK OF AMERICA N.A.

By:_____
                Authorized Officer
                                    Richard L. Starr
                                    Vice President


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003530

BANK OF MONTREAL

By:_____
　　　　　Authorized Officer


THE BANK OF NEW YORK

By:_____
　　　　　Authorized Officer


THE BANK OF NOVA SCOTIA

By:_____
　　　　　Authorized Officer


THE BANK OF TOKYO-MITSUBISHI, LTD.

By_____
　　　　　Authorized Officer


BANK ONE, NA

By:_____
　　　　　Authorized Officer


BANKERS TRUST COMPANY

By:_____
　　　　　Authorized Officer

By_____
　　　　　Authorized Officer


52801-6　　　　[Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003531

BANK OF MONTREAL

By _____
         Authorized Officer


THE BANK OF NEW YORK

By _____
         Authorized Officer     RAYMOND J. PALMER
                                    Vice President

THE BANK OF NOVA SCOTIA

By _____
         Authorized Officer


THE BANK OF TOKYO-MITSUBISHI, LTD

By _____
         Authorized Officer


BANK ONE, NA

By _____
         Authorized Officer


BANKERS TRUST COMPANY

By _____
         Authorized Officer

By _____
         Authorized Officer


S28046          [Signature Page to Letter of Credit and Reimbursement Agreement]

BANK OF MONTREAL

By:_____
          Authorized Officer

THE BANK OF NEW YORK

By:_____
          Authorized Officer

THE BANK OF NOVA SCOTIA

By:_____
          Authorized Officer F.C.H. ASHBY
          SENIOR MANAGER LOAN OPERATIONS

THE BANK OF TOKYO-MITSUBISHI, LTD.

By:_____
          Authorized Officer

BANK ONE, NA

By:_____
          Authorized Officer

BANKERS TRUST COMPANY

By:_____
          Authorized Officer

By:_____
          Authorized Officer

528066       [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003533

BANK OF MONTREAL

By _____
       Authorized Officer

THE BANK OF NEW YORK

By _____
       Authorized Officer

THE BANK OF NOVA SCOTIA

By _____
       Authorized Officer

THE BANK OF TOKYO-MITSUBISHI, LTD

By _____
    Authorized Officer   K. GLASSCOCK
                 VP & Manager

BANK ONE, NA

By _____
       Authorized Officer

BANKERS TRUST COMPANY

By _____
       Authorized Officer

By _____
       Authorized Officer

Signature Page to Letter of Credit and Reimbursement Agreement

BANK OF MONTREAL

By:_____
          Authorized Officer


THE BANK OF NEW YORK

By:_____
          Authorized Officer


THE BANK OF NOVA SCOTIA

By:_____
          Authorized Officer


THE BANK OF TOKYO-MITSUBISHI, LTD.

By:_____
          Authorized Officer


BANK ONE, NA (Main Office - Chicago)

By:_____
          Authorized Officer : Daniel A. Davis
                               Vice President


BANKERS TRUST COMPANY

By:_____
          Authorized Officer

By:_____
          Authorized Officer


528066        [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003535

BANK OF MONTREAL

By _____
        Authorized Officer


THE BANK OF NEW YORK

By _____
        Authorized Officer


THE BANK OF NOVA SCOTIA

By _____
        Authorized Officer


THE BANK OF TOKYO-MITSUBISHI, LTD

By _____
        Authorized Officer


BANK ONE, NA

By _____
        Authorized Officer


BANKERS TRUST COMPANY

By _____
        Authorized Officer   Marcus M. Tarkington
                                   Director

529066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003536

BARCLAYS BANK PLC

By: _____
                Authorized Officer


BAYERISCHE LANDESBANK GIROZENTRALE

By _____
                Authorized Officer


BBL INTERNATIONAL (U.K.) LIMITED

By _____
                Authorized Officer

By _____
                Authorized Officer


BEAR STEARNS CORPORATE LENDING INC.

By _____
                Authorized Officer


BNP PARIBAS

By _____
                Authorized Officer


CIBC INC.

By _____
                Authorized Officer


(Signature Page to Letter of Credit and Reimbursement Agreement)

JPMUCI 0003537

BARCLAYS BANK PLC

By:_____
        Authorized Officer

BAYERISCHE LANDESBANK GIROZENTRALE

By:_____
Name:    Sean O'Sullivan
Title:   Vice President

By:_____
Name:    Peter Obermann
Title:   Senior Vice President

BBL INTERNATIONAL (U.K.) LIMITED

By:_____
        Authorized Officer

By:_____
        Authorized Officer

BEAR STEARNS CORPORATE LENDING INC.

By:_____
        Authorized Officer

BNP PARIBAS

By:_____
        Authorized Officer

CIBC INC.

By:_____
        Authorized Officer

528066            [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003538

BARCLAYS BANK PLC

By: _____
        Authorized Officer


BAYERISCHE LANDESBANK GIROZENTRALE

By: _____
        Authorized Officer


BBL INTERNATIONAL (U.K.) LIMITED

By: _____
        Authorized Officer

By: _____
        Authorized Officer


BEAR STEARNS CORPORATE LENDING INC

By: _____
        Authorized Officer


BNP PARIBAS

By: _____
        Authorized Officer


CIBC INC.

By: _____
        Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003539

BARCLAYS BANK PLC

By_____
        Authorized Officer


BAYERISCHE LANDESBANK GIROZENTRALE

By_____
        Authorized Officer


BBL INTERNATIONAL (U K ) LIMITED

By_____
        Authorized Officer

By_____
        Authorized Officer


BEAR STEARNS CORPORATE LENDING INC

By_____
        Authorized Officer


BNP PARIBAS

By_____
        Authorized Officer


CIBC INC.

By_____
        Authorized Officer


5280n6          [Signature Page to Letter of Credit and Reimbursement Agreement]

BARCLAYS BANK PLC

By:_____
                Authorized Officer


BAYERISCHE LANDESBANK GIROZENTRALE

By:_____
                Authorized Officer


BBL INTERNATIONAL (U.K.) LIMITED

By:_____
                Authorized Officer

By:_____
                Authorized Officer


BEAR STEARNS CORPORATE LENDING INC.

By:_____
                Authorized Officer


BNP PARIBAS

By:_____        _____
                Authorized Officer
                Larry Robinson                Betsy Jocher
                Vice President                Vice President

CIBC INC.

By:_____
                Authorized Officer


528066        [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003541

BARCLAYS BANK PLC

By:_____
                Authorized Officer


BAYERISCHE LANDESBANK GIROZENTRALE

By:_____
                Authorized Officer


BBL INTERNATIONAL (U.K.) LIMITED

By:_____
                Authorized Officer

By:_____
                Authorized Officer


BEAR STEARNS CORPORATE LENDING INC.

By:_____
                Authorized Officer


BNP PARIBAS

By:_____
                Authorized Officer


CIBC INC.

By: _/s/ illegible signature/_____
                Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003542

CITIBANK, N.A.

> J. CHRISTOPHER LYONS
> ATTORNEY-IN-FACT

By:_____
    Authorized Officer


CREDIT AGRICOLE INDOSUEZ

By:_____
      Authorized Officer


By:_____
      Authorized Officer


CREDIT LYONNAIS NEW YORK BRANCH

By:_____
      Authorized Officer


CREDIT SUISSE FIRST BOSTON

By:_____
      Authorized Officer


THE DAI-ICHI KANGYO BANK, LTD.
NEW YORK BRANCH

By:_____
      Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003543

CITIBANK, N.A.

By:_____
          Authorized Officer

CREDIT AGRICOLE INDOSUEZ

By:_____
          Authorized Officer

By:_____
          Authorized Officer

CREDIT LYONNAIS NEW YORK BRANCH

By:_____
          Authorized Officer

CREDIT SUISSE FIRST BOSTON

By:_____
          Authorized Officer

THE DAI-ICHI KANGYO BANK, LTD.
NEW YORK BRANCH

By:_____
          Authorized Officer

528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003544

CITIBANK, N.A.

By:_____
            Authorized Officer


CREDIT AGRICOLE INDOSUEZ

By:_____
            Authorized Officer


By:_____
            Authorized Officer


CREDIT LYONNAIS NEW YORK BRANCH

By:_____
            Authorized Officer
            Executive Vice President


CREDIT SUISSE FIRST BOSTON

By:_____
            Authorized Officer


THE DAI-ICHI KANGYO BANK, LTD.
NEW YORK BRANCH

By:_____
            Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003545

CITIBANK, N.A.

By:_____
            Authorized Officer


CREDIT AGRICOLE INDOSUEZ

By:_____
            Authorized Officer


By:_____
            Authorized Officer


CREDIT LYONNAIS NEW YORK BRANCH

By:_____
            Authorized Officer


CREDIT SUISSE FIRST BOSTON

By:_____
            Authorized Officer
       JAMES P. MORAN              LALITA ADVANI
          DIRECTOR          ASSISTANT VICE PRESIDENT


THE DAI-ICHI KANGYO BANK, LTD.
NEW YORK BRANCH

By:_____
            Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003546

CITIBANK, N A

By _____
                    Authorized Officer


CREDIT AGRICOLE INDOSUEZ

By _____
                    Authorized Officer

By _____
                    Authorized Officer


CREDIT LYONNAIS NEW YORK BRANCH

By _____
                    Authorized Officer


CREDIT SUISSE FIRST BOSTON

By _____
                    Authorized Officer


THE DAI-ICHI KANGYO BANK, LTD.
NEW YORK BRANCH

By _____*Bertram M Tary*_____
                    Authorized Officer


528064          [Signature Page to Letter of Credit and Reimbursement Agreement]

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK
AG

By: _____
               Authorized Officer

By: _____
               Authorized Officer


DRESDNER BANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES

By: _____
               Authorized Officer

By: _____
               Authorized Officer


FIRST UNION NATIONAL BANK

By: _____
               Authorized Officer


FLEET NATIONAL BANK

By: _____
               Authorized Officer


THE FUJI BANK, LIMITED

By: _____
               Authorized Officer


[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003548

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK
AG

By_____
       Authorized Officer

By_____
       Authorized Officer

DRESDNER BANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES

By_____
       Authorized Officer

By_____
       Authorized Officer

FIRST UNION NATIONAL BANK

By_____
       Authorized Officer

FLEET NATIONAL BANK

By_____
       Authorized Officer

THE FUJI BANK, LIMITED

By_____
       Authorized Officer

529066      [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003549

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK
AG

By:_____
              Authorized Officer


By:_____
              Authorized Officer


DRESDNER BANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES

By:_____
              Authorized Officer


By:_____
              Authorized Officer


FIRST UNION NATIONAL BANK

By:_____
              Authorized Officer


FLEET NATIONAL BANK

By:_____
              Authorized Officer


THE FUJI BANK, LIMITED

By:_____
              Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK
AG

By _____
   Authorized Officer

By _____
   Authorized Officer


DRESDNER BANK, AG, NEW YORK AND GRAND
CAYMAN BRANCHES

By _____
   Authorized Officer

By _____
   Authorized Officer


FIRST UNION NATIONAL BANK

By _____
   Authorized Officer


FLEET NATIONAL BANK

By _Jill A. Cullen_____
   Authorized Officer

   Jill A. Cullen
   Vice President

THE FUJI BANK, LIMITED

By _____
   Authorized Officer

[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003551

DG BANK DEUTSCHE GENOSSENSCHAFTSBANK
AG

By:_____
        Authorized Officer

By:_____
        Authorized Officer


DRESDNER BANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES

By:_____
        Authorized Officer

By:_____
        Authorized Officer


FIRST UNION NATIONAL BANK

By:_____
        Authorized Officer


FLEET NATIONAL BANK

By:_____
        Authorized Officer


THE FUJI BANK, LIMITED

By:_____
        Authorized Officer


528066            [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003552

HSBC BANK USA

By _____
Authorized Officer        # 2429

THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By: _____
Authorized Officer

INTESABci – NEW YORK BRANCH

By: _____
Authorized Officer

By _____
Authorized Officer

KBC BANK N V

By: _____
Authorized Officer

By _____
Authorized Officer

LEHMAN COMMERCIAL PAPER INC

By _____
Authorized Officer

329266        [Signat... Pa;  ...ter of Credit and R...m.o q.m.nt Agreem.n.

HSBC BANK USA

By:_____
                    Authorized Officer


THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By: _____
                    Authorized Officer
        Michael W. Oakes, Senior Vice President
    The Industrial Bank of Japan, Limited, Houston Office
            (Authorized Representative)
INTESABci – NEW YORK BRANCH

By:_____
                    Authorized Officer


By:_____
                    Authorized Officer


KBC BANK N.V.

By:_____
                    Authorized Officer


By:_____
                    Authorized Officer


LEHMAN COMMERCIAL PAPER INC.

By:_____
                    Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003554

HSBC BANK USA

By_____
         Authorized Officer


THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By_____
         Authorized Officer


INTESABci NEW YORK BRANCH

By_____
         Authorized Officer          FRANK MAFFEI
                                      V CE PRESIDENT

By_____
         Authorized Officer
         J. Carlani, VP


KBC BANK N V

By_____
         Authorized Officer

By_____
         Authorized Officer


LEHMAN COMMERCIAL PAPER INC.

By:_____
         Authorized Officer


[Signature Page to Letter of Credit and Reimbursement Agreement]

HSBC BANK USA

By_____
                    Authorized Officer


THE INDUSTRIAL BANK OF JAPAN TRUST
COMPANY

By_____
                    Authorized Officer


INTESABci – NEW YORK BRANCH

By_____
                    Authorized Officer

By_____
                    Authorized Officer


KBC BANK N V

By ~~signature~~              **ROBERT SNAUFFER**
      Authorized Officer        **FIRST VICE PRESIDENT**

By ~~signature~~                   ERIC RASKIN
      Authorized Officer        ASSISTANT VICE PRESIDENT


LEHMAN COMMERCIAL PAPER INC

By_____
                    Authorized Officer


538066          [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003556



JPMUCI 0003557

MERRILL LYNCH BANK USA

By: _____
　　　　Authorized Officer


THE MITSUBISHI TRUST AND BANKING
CORPORATION

By: _____
　　　　Authorized Officer


NATEXIS BANQUES POPULAIRES

By: _____
　　　　Authorized Officer

By: _____
　　　　Authorized Officer


NATIONAL AUSTRALIA BANK LIMITED

By: _____
　　　　Authorized Officer


THE NORTHERN TRUST COMPANY

By: _____
　　　　Authorized Officer


ROYAL BANK OF CANADA

By: _____
　　　　Authorized Officer


528086　　　　[Signature Page to Letter of Credit and Reimbursement Agreement]



MERRILL LYNCH BANK USA

By _____
    Authorized Officer

THE MITSUBISHI TRUST AND BANKING
CORPORATION

By _____
    Authorized Officer

NATEXIS BANQUES POPULAIRES

By _____
    Authorized Officer

By _____
    Authorized Officer

NATIONAL AUSTRALIA BANK LIMITED

By _____
    Authorized Officer

THE NORTHERN TRUST COMPANY

By _____
    Authorized Officer

ROYAL BANK OF CANADA

By _____
    Authorized Officer

528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

MERRILL LYNCH BANK USA

By:_____
                Authorized Officer


THE MITSUBISHI TRUST AND BANKING
CORPORATION

By:_____
                Authorized Officer


NATEXIS BANQUES POPULAIRES

By:_____
                Authorized Officer



Louis P. Laville, III
Vice President and
Group Manager

By:_____
                Authorized Officer

Daniel Payer
Vice President


NATIONAL AUSTRALIA BANK LIMITED

By:_____
                Authorized Officer


THE NORTHERN TRUST COMPANY

By:_____
                Authorized Officer


ROYAL BANK OF CANADA

By:_____
                Authorized Officer

328066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003560

MERRILL LYNCH BANK USA

By_____
          Authorized Officer

THE MITSUBISHI TRUST AND BANKING
CORPORATION

By_____
          Authorized Officer

NATEXIS BANQUES POPULAIRES

By_____
          Authorized Officer

By_____
          Authorized Officer

NATIONAL AUSTRALIA BANK LIMITED

By_____
          Authorized Officer     FRANK J. CAMPIGLIA
                                   VICE PRESIDENT

THE NORTHERN TRUST COMPANY

By_____
          Authorized Officer

ROYAL BANK OF CANADA

By_____
          Authorized Officer

528066        [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003561

MAY-15-2001  13:02      NORTHERN TRUST                    13124443421   P.03/03

MERRILL LYNCH BANK USA

By:_____
                Authorized Officer


THE MITSUBISHI TRUST AND BANKING
CORPORATION

By:_____
                Authorized Officer


NATEXIS BANQUES POPULAIRES

By:_____
                Authorized Officer

By:_____
                Authorized Officer


NATIONAL AUSTRALIA BANK LIMITED

By:_____
                Authorized Officer


THE NORTHERN TRUST COMPANY

By:_____
                Authorized Officer
        JOSEPH A. WIEMHOFF
        VICE PRESIDENT

ROYAL BANK OF CANADA

By:_____
                Authorized Officer


538066          [Signature Page to Letter of Credit and Reimbursement Agreement]


                                        TOTAL  P.03

JPMUCI 0003562

MERRILL LYNCH BANK USA

By _____
          Authorized Officer


THE MITSUBISHI TRUST AND BANKING
CORPORATION

By _____
          Authorized Officer


NATEXIS BANQUES POPULAIRES

By _____
          Authorized Officer

By _____
          Authorized Officer


NATIONAL AUSTRALIA BANK LIMITED

By _____
          Authorized Officer


THE NORTHERN TRUST COMPANY

By _____
          Authorized Officer


ROYAL BANK OF CANADA

By _____
          Authorized Officer

528066         [Signature Page to Letter of Credit and Reimbursement Agreement]

THE ROYAL BANK OF SCOTLAND plc

By: _____
          Authorized Officer


SOCIETE GENERALE

By: _____
          Authorized Officer


STANDARD CHARTERED BANK

By _____
          Authorized Officer


SUMITOMO MITSUI BANKING CORPORATION

By _____
          Authorized Officer


SUNTRUST BANK

By: _____
          Authorized Officer


UBS AG, STAMFORD BRANCH

By: _____
          Authorized Officer


By: _____
          Authorized Officer


528066                    [Signature Page to Letter of Credit and Reimbursement Agreement]


JPMUCI 0003564

THE ROYAL BANK OF SCOTLAND PLC

By:_____
          Authorized Officer


SOCIETE GENERALE

By:_____
          Authorized Officer


STANDARD CHARTERED BANK

By:_____
          Authorized Officer


THE SUMITOMO BANK, LIMITED

By:_____
          Authorized Officer


SUNTRUST BANK

By:_____
          Authorized Officer


UBS AG, STAMFORD BRANCH

By:_____
          Authorized Officer

By:_____
          Authorized Officer


528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

THE ROYAL BANK OF SCOTLAND PLC

By: _____
          Authorized Officer

SOCIETE GENERALE

By: _____
          Authorized Officer

STANDARD CHARTERED BANK

By _____
    Jack Ireland
    Vi Authorized Officer
                    ANDREW Y NG
                    VICE PRESIDENT

THE SUMITOMO BANK, LIMITED

By _____
          Authorized Officer

SUNTRUST BANK

By: _____
          Authorized Officer

UBS AG, STAMFORD BRANCH

By: _____
          Authorized Officer

By: _____
          Authorized Officer

[Signature Page to Letter of Credit and Reimbursement Agreement]

THE ROYAL BANK OF SCOTLAND plc

By _____
           Authorized Officer


SOCIETE GENERALE

By: _____
           Authorized Officer


STANDARD CHARTERED BANK

By: _____
           Authorized Officer


SUMITOMO MITSUI BANKING CORPORATION

By: _____
           Authorized Officer  Peter R.C. Knight
                               Senior Vice President


SUNTRUST BANK

By: _____
           Authorized Officer


UBS AG, STAMFORD BRANCH

By: _____
           Authorized Officer

By: _____
           Authorized Officer

[Signature Page to Letter of Credit and Reimbursement Agreement]

THE ROYAL BANK OF SCOTLAND PLC

By: _____
        Authorized Officer

SOCIETE GENERALE

By: _____
        Authorized Officer

STANDARD CHARTERED BANK

By: _____
        Authorized Officer

THE SUMITOMO BANK. LIMITED

By: _____
        Authorized Officer

SUNTRUST BANK

By: _____
        Authorized Officer

UBS AG, STAMFORD BRANCH

By _____
        Authorized Officer

By: _____
        Authorized Officer

528066

[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003568

THE ROYAL BANK OF SCOTLAND PLC

By: _____
                Authorized Officer

SOCIETE GENERALE

By: _____
                Authorized Officer

STANDARD CHARTERED BANK

By: _____
                Authorized Officer

THE SUMITOMO BANK, LIMITED

By: _____
                Authorized Officer

SUNTRUST BANK

By: _____
                Authorized Officer

UBS AG, STAMFORD BRANCH

                                                    Lynne E Allarone
                                                    Associa. Director
                                                    Banny.  i.
By: _____        · · vi- ei ix
                Authorized Officer

By: _____
                Authorized Officer

528066

[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003569

UNICREDITO ITALIANO

By: _____
      Authorized Officer
      Charles Michael          Saiyed A. Abbas
      Vice President           Vice President

WACHOVIA BANK, N.A.

By: _____
      Authorized Officer


WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By: _____
      Authorized Officer


By: _____
      Authorized Officer

52R66

[Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003570

UNICREDITO ITALIANO

By:_____
            Authorized Officer


WACHOVIA BANK, N.A.

By:_____
            Authorized Officer


WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By:_____
            Authorized Officer

By:_____
            Authorized Officer

528066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003571

UNICREDITO ITALIANO

By _____
        Authorized Officer


WACHOVIA BANK, N.A.

By _____
        Authorized Officer


WESTDEUTSCHE LANDESBANK
GIROZENTRALE, NEW YORK BRANCH

By _____
        Authorized Officer          Lisa Walker
                                     Associate Director

By _____
        Authorized Officer          Barry B Wadler
                                     Associate Director


S2b066          [Signature Page to Letter of Credit and Reimbursement Agreement]

JPMUCI 0003572

## SCHEDULE I

### FUNDING OFFICES

| <u>Name of Bank</u> | <u>Funding Office</u> | <u>Initial Commitment</u> |
|---|---|---|
| ABN AMRO Bank N.V | ABN AMRO Bank N.V.<br>208 South LaSalle Street, Suite 1500<br>Chicago, IL 60604<br>Attention Loan Administration<br>Telephone. (312) 992-5150<br>Telecopy: (312) 992-5155 | $18,837,036.89 |
| Arab Bank Plc | Arab Bank Plc, Grand Cayman Branch<br>520 Madison Avenue<br>New York. NY 10022<br>Attention. Justo Huapaya<br>Telephone (212) 715-9713<br>Telecopy. (212) 593-4632 | $ 3,333,333.33 |
| Arab Banking Corporation | Arab Banking Corporation<br>277 Park Avenue. 32nd Floor<br>New York. NY 10172-0003<br>Attention R. Hassan. Loan Department<br>Telephone (212) 583-4770<br>Telecopy (212) 583-0932 0921 | $ 3,333,333.33 |
| Australia and New Zealand Banking<br>Group Limited | Australia and New Zealand<br>Banking Group Limited<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Attention. Tessie Amante<br>Telephone. (212) 801-9744<br>Telecopy (212) 801-9859 | $ 6,481,481.56 |
| Banca di Roma, Chicago Branch | Banca di Roma. Chicago Branch<br>225 West Washington Street<br>Suite 1200<br>Chicago, IL 60606<br>Attention· Aurora Pensa<br>Telephone: (312) 704-2630<br>Telecopy (312) 726-3058 | $11,111,111 11 |
| Banca Nazionale del Lavoro S p A | Banca Nazionale del Lavoro S p A.<br>25 West 51st Street<br>New York, NY 10019<br>Attention: Roberto Mancone<br>Telephone· (212) 314-0734<br>Telecopy. (212) 765-2978 | $ 3,333,333.33 |

Schedule I – Funding Offices, Page 1

JPMUCI 0003573

| | | |
|---|---|---|
| Banca Popolare di Milano | Banca Popolare di Milano<br>375 Park Avenue, 9th Floor<br>New York, NY 10152<br>Attention: Cheryl Raeffaele/Mark Walter<br>Telephone. (212) 546-9429 9435<br>Telecopy: (212) 838-1077 | $ 4,444,444.44 |
| Banco Bilbao Vizcaya Argentaria, S.A | Banco Bilbao Vizcaya Argentaria,<br>New York Branch<br>1345 Avenue of the Americas, 45th Floor<br>New York, NY 10105<br>Attention: Manuel Sanchez<br>Telephone· (212) 728-1511<br>Telecopy: (212) 333-2904· | $ 3,333,333.33 |
| Bank of America, N.A | Bank of America, N.A<br>901 Main Street<br>Dallas, TX 75202-3714<br>Attention· Terri Smith<br>Telephone  (214) 209-2141<br>Telecopy. (214) 290-8376<br><br>with a copy to<br><br>Bank of America. N A<br>1850 Gateway Blvd , 45th Floor<br>Concord, CA 94520<br>Attention  Camille Gibby<br>Telephone  (510) 675-7759<br>Telecopy. (510) 675-7531 | $11,111,111.11 |
| Bank of Montreal | Bank of Montreal<br>115 South LaSalle, 11th Floor<br>Chicago, IL 60603<br>Attention: Celyndia Williams<br>Telephone. (312) 750-4312<br>Telecopy. (312) 750-6061 | $ 3,333,333.33 |
| The Bank of New York | The Bank of New York<br>One Wall Street<br>19th Floor<br>New York, NY 10286<br>Attention. Lisa Williams<br>Telephone. (212) 635-7535<br>Telecopy. (212) 635-7552 | $11,111,111.11 |
| The Bank of Nova Scotia | The Bank of Nova Scotia<br>600 Peachtree St. NE, Ste 2700<br>Atlanta, GA 30308<br>Attention: Donna Gardner<br>Telephone: (404) 877-1599<br>Telecopy· (404) 888-8998 | $11,111,111.11 |

528066                          Schedule I– Funding Offices, Page 2

| | | |
|---|---|---|
| The Bank of Tokyo-Mitsubishi, Ltd. | The Bank of Tokyo-Mitsubishi, Ltd<br>1100 Louisiana Street, Suite 2800<br>Houston, TX 77002<br>Attention: Kelton Glasscock<br>Telephone (713) 655-3805<br>Telecopy: (713) 658-0116 | $15,333,333 33 |
| Bank One, NA | Bank One, NA<br>One First National Plaza<br>Chicago, IL 60670<br>Attention: Kenneth J Fatur, Vice President<br>Telephone: (312) 732-3117<br>Telecopy: (312) 732-3055 | $ 6,481,481.56 |
| Bankers Trust Company | Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Jim Cullen<br>Telephone (212) 250-7343<br>Telecopy (212) 250-7351 | $15,333,333.33 |
| Barclays Bank PLC | Barclays Bank PLC<br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention David Barton<br>Telephone (212) 412-3702<br>Telecopy (212) 412-5308 | $18,837,036 89 |
| Bayerische Landesbank Girozentrale | Bayerische Landesbank Girozentrale<br>560 Lexington Avenue<br>New York, NY 10022<br>Attention: Sean O'Sullivan/Edward Santos<br>Telephone: (212) 310-9913/ (212) 310-9962<br>Telecopy. (212) 310-9868 | $11,111,111 11 |
| BBL International (U.K.) Limited | BBL International (U.K.) Ltd<br>6 Broadgate<br>London EC2M 2AJ<br>England<br>Attention: Karen Bowman<br>Telephone: 00-44-20-7392-5583<br>Telecopy 00-44-20-7562-0210<br>Attention: Jeremy Hayes<br>Telephone 00-44-20-7392-5586<br>Telecopy. 00-44-20-7562-0210<br>Attention. Tessa Baptiste<br>Telephone: 00-44-20-7392-5517<br>Telecopy 00-44-20-7562-0210 | $11,111,111 11 |

528066                  Schedule I– Funding Offices, Page 3

| | | |
|---|---|---|
| Bear Stearns Corporate Lending Inc | Bear, Stearns & Co Inc<br>245 Park Avenue<br>4th Floor<br>New York, NY 10167<br>Attention  Gloria Dombrowski<br>Telephone: (212) 272-6043<br>Telecopy  (212) 272-4844 | $11,111,111 11 |
| BNP Paribas | BNP Paribas<br>1200 Smith Street, Suite 3100<br>Houston, TX  77002<br>Attention  Leah Evans-Hughes<br>Telephone: (713) 659-4811<br>Telecopy: (713) 659-5305 | $11,111,111.11 |
| The Chase Manhattan Bank | The Chase Manhattan Bank<br>1 Chase Manhattan Plaza, 8th Floor<br>New York, NY  10081<br>Attention  Lisa Pucciarelli<br>Telephone  (212) 552-7886<br>Telecopy.  (212) 552-5777<br><br>with a copy to<br><br>Chase Bank of Texas, N.A.<br>600 Travis<br>Houston, Texas 77002<br>Attention  Peter Licalzi<br>Telephone   (713) 216-8869<br>Telecopy  (713) 216-4117 | $18,837,037 11 |
| CIBC Inc | CIBC Inc.<br>2727 Paces Ferry Road, Suite 1200<br>Atlanta, GA  30339<br>Attention  Anita Rounds<br>Telephone: (770) 319-4828<br>Telecopy: (770) 319-4950 | $15,333,333.33 |
| Citibank, N.A. | Citibank, N.A.<br>1 Penn's Way<br>New Castle, DE  19720<br>Attention. Sydney Chance<br>Telephone  (302) 894-6076<br>Telecopy:  (302) 894-6120<br>Attention: Alvin Weissberger<br>Telephone. (302) 894-6043<br>Telecopy: (302) 894-6120<br><br>with a copy to:<br><br>Citicorp Securities, Inc.<br>1200 Smith Street, Suite 2000 | $18,837,036 89 |

528066                 Schedule I– Funding Offices, Page 4

JPMUCI 0003576

|  |  |  |
|---|---|---|
|  | Houston, TX 77002<br>Attention: J. Christopher Lyons<br>Telephone: (713) 654-2862<br>Telecopy: (713) 654-2849 |  |
| Credit Agricole Indosuez | Credit Agricole Indosuez<br>55 East Monroe, Suite 4700<br>Chicago, IL 60603<br>Attention: Theresa Howard/Trude Kreihng<br>Telephone: (312) 917-7554<br>Telecopy: (312) 372-4421 | $ 5,555,555.56 |
| Credit Lyonnais New York Branch | Credit Lyonnais New York Branch<br>c/o Credit Lyonnais Houston<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>Attention: Bernadette Archie<br>Telephone (713) 753-8723<br>Telecopy (713) 759-9766 | $15,333,333.33 |
| Credit Suisse First Boston | Credit Suisse First Boston<br>5 World Trade Center<br>New York, NY 10048<br>Attention Jenaro Sarasola<br>Telephone (212) 322-1384<br>Telecopy (212) 335-0593/0576 | $15,333,333.33 |
| The Dai-Ichi Kangyo Bank, Ltd New York Branch | The Dai-Ichi Kangyo Bank, Ltd<br>New York Branch<br>One World Trade Center, Suite 4911<br>New York, NY 10048<br>Attention: Maureen Carson<br>Telephone: (212) 432-6658<br>Telecopy: (212) 912-1879 | $ 5,555,555 56 |
| DG Bank Deutsche Genossenschaftsbank AG | DG Bank Deutsche Genossenschaftsbank AG<br>DG Bank Building<br>609 Fifth Avenue<br>New York, NY 10017-1021<br>Attention: Mark Connelly<br>Telephone: (212) 745-1560<br>Telecopy: (212) 745-1556/50 | $ 6,481,481.56 |
| Dresdner Bank AG, New York and Grand Cayman Branches | Dresdner Bank AG, New York Branch<br>75 Wall Street<br>New York, NY 10005-2889<br>Attention Howard Ramlal<br>Telephone. (212) 429-2281<br>Telecopy: (212) 429-2130 | $11,111,111 11 |

528066                        Schedule I– Funding Offices, Page 5

JPMUCI 0003577

| | | |
|---|---|---|
| First Union National Bank | First Union National Bank<br>301 South College Street<br>Charlotte, NC 28288<br>Attention  Debbie Blank<br>Telephone.  (713) 346-2727<br>Telecopy  (713) 650-6354 | $ 7,777,777 78 |
| Fleet National Bank | Fleet National Bank<br>100 Federal Street<br>Boston, MA  02110<br>Attention. Jill A. Calabrese<br>Telephone: (617) 434-9579<br>Telecopy: (617) 434-3652 | $15,333,333.33 |
| The Fuji Bank, Limited | The Fuji Bank, Limited<br>Two World Trade Center<br>New York, NY  10048<br>Attention  Tina Catapano<br>Telephone  (212) 898-2099<br>Telecopy  (212) 488-8216 | $ 5,555,555.56 |
| HBSC Bank USA | HBSC Bank USA<br>1 HSBC Center<br>Buffalo, NY 14203<br>Attention  Donna Riley<br>Telephone  (716) 841-4178<br>Telecopy  (716) 841-1844 | $ 7,777,777 78 |
| The Industrial Bank of Japan Trust Company | The  Industrial  Bank  of  Japan  Trust<br>Company<br>1251 Avenue of the Americas<br>New York, NY  10020<br>Attention:  Andrew Encarnacion<br>Telephone: (212) 282-4065<br>Telecopy  (212) 282-4480/4250 | $ 5,555,555.56 |
| IntesaBci – New York Branch | IntesaBci – New York Branch<br>One William Street<br>New York, NY  10004<br>Attention: Charles Dougherty<br>Telephone  (212) -607-3656<br>Telecopy  (212) 809-2124 | $ 6,481,481 56 |
| KBC Bank N.V. | KBC Bank N V., New York Branch<br>125 West 55th Street<br>New York, NY  10019<br>Attention: Charlene Cumberbatch<br>Loan Administration<br>Telephone: (212) 541-0653<br>Telecopy: (212) 956-5581 | $ 6,481,481 56 |

528066                              Schedule I– Funding Offices, Page 6

JPMUCI 0003578

| | | |
|---|---|---|
| Lehman Commercial Paper Inc | Lehman Commercial Paper Inc<br>3 World Financial Center, 8th Floor<br>New York, NY 10285<br>Attention: Nancy Wong<br>Telephone: (212) 526-6535<br>Telecopy: (212)526-7365 | $11,111,111.11 |
| Merrill Lynch Bank USA | Merrill Lynch Bank USA<br>15 West South Temple, Suite 300<br>Salt Lake City, UT 84101<br>Attention: Butch Alder<br>Telephone. (801) 526-8324<br>Telecopy: (801) 531-7470 | $ 6,481,481.56 |
| The Mitsubishi Trust and Banking Corporation | The Mitsubishi Trust and Banking Corporation<br>520 Madison Avenue<br>New York, NY 10022<br>Attention. Angela Bozorgmir<br>Telephone. (212) 891-8427<br>Telecopy. (212) 644-6825 | $3,333,333.33 |
| Natexis Banques Populaires Non U S (Foreign) Corporation | NATEXIS Banque Populaires<br>Non U.S. (Foreign) Corporation<br>333 Clay Street, Suite 4340<br>Houston, TX 77002    Houston, TX 77002<br>Attention   Tanya McAllister<br>Account Administrator<br>Telephone  (713) 759-9447<br>Telecopy. (713) 759-9908 | $ 5,555,555.56 |
| National Australia Bank Limited | National Australia Bank Limited<br>200 Park Avenue, Floor 34<br>New York, NY 10166<br>Attention. Frank J. Campagha<br>Telephone. (212) 916-9595<br>Telecopy  (212) 983-1969 | $ 7,777,777.78 |
| The Northern Trust Company | The Northern Trust Company<br>50 S. LaSalle Street<br>Chicago, IL  60675<br>Attention.  Linda Honda<br>Telephone. (312) 444-3532<br>Telecopy  (312) 630-1566 | $ 3,333,333.33 |
| Royal Bank of Canada | Royal Bank of Canada<br>One Liberty Plaza, 4th Floor<br>New York, NY 10006<br>Attention. Assistant Manager,<br>Loan Processing<br>Telephone (212) 428-6321 | $15,333,333.33 |

JPMUCI 0003579

Telecopy· (212) 428-2372

| | | |
|---|---|---|
| The Royal Bank of Scotland plc | The Royal Bank of Scotland Plc<br>65 East 55th Street<br>24th Floor<br>New York, NY 10022<br>Attention· Sheila Shaw<br>Telephone. (212) 401-1406<br>Telecopy. (212) 401-1494 | $18,837,036.89 |
| Societe Generale | Societe Generale<br>2001 Ross Avenue, Suite 4800<br>Dallas, TX 75201<br>Attention  Aretha Velasquez<br>Telephone· (214) 979-2758<br>Telecopy· (214) 754-0171 | $11,111,111.11 |
| Standard Chartered Bank | Standard Chartered Bank<br>7 World Trade Center<br>New York, NY 10048<br>Attention  Jack Insinga, Vice President<br>Telephone: (212) 667-0264<br>Telecopy  (212) 667-0780 | $ 3,333,333.33 |
| Sumitomo    Mitsui    Banking Corporation | Sumitomo Mitsui Banking Corporation<br>277 Park Avenue<br>New York, NY 10172<br>Attention  Jessica Cueto<br>Telephone  (212) 224-4132<br>Telecopy  (212) 224-4537 | $ 7,777,777 78 |
| SunTrust Bank | SunTrust Bank<br>303 Peachtree Street, NE, 3rd Floor<br>Atlanta, GA 30308<br>Attention  Joe McCreery<br>Telephone· (404) 532-0274<br>Telecopy: (404) 827-6270 | $ 6,481,481.56 |
| UBS AG, Stamford Branch | UBS AG, Stamford Branch<br>677 Washington Boulevard<br>Stamford, CT 06901<br>Attention  Susuan Brunner<br>Telephone  (203) 719-4181<br>Telecopy: (203) 719-4176 | $11,111,111.11 |
| UniCredito Italiano | UniCredito Italiano, New York Branch<br>375 Park Avenue<br>New York, NY 10152<br>Attention  Gianfranco Bisagni<br>Telephone: (212) 546-9623<br>Telecopy  (212) 546-9665 | $ 3,333,333.33 |

529066                          Schedule I– Funding Offices, Page 8

JPMUCI 0003580

| | | |
|---|---|---|
| Wachovia Bank, N.A | Wachovia Bank of Georgia, N.A.<br>191 Peachtree St., NE<br>Atlanta, GA 30303<br>Attention: John T Seeds<br>Telephone: (404) 332-5184<br>Telecopy: (404) 332-5905 | $11,111,111.11 |
| Westdeutsche          Landesbank<br>Girozentrale, New York Branch | Westdeutsche Landesbank<br>Girozentrale, New York Branch<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Attention: Phillip Green<br>Telephone: (212) 852-6113<br>Telecopy: (212) 302-7946 | $15,333,333.33 |

JPMUCI 0003581

EXHIBIT A-1

LETTER OF CREDIT ISSUANCE REQUEST
[Date]

To   The Chase Manhattan Bank (the "Issuing Bank")

Enron Corp. (the "Company") hereby requests that you issue a letter of credit (the "Letter of Credit") pursuant to the Letter of Credit and Reimbursement Agreement, dated as of May 14, 2001 (the "Letter of Credit Agreement"), among the Company, the financial institutions party thereto, The Chase Manhattan Bank and Citibank, N.A., as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank.  Any terms used and not defined herein but which are defined in the Letter of Credit Agreement shall have the same meanings herein.  The terms of the Letter of Credit are as follows

| For the Account of:<br><br>Enron Corp<br>1400 Smith Street<br>Houston, TX 77002 | On behalf of:<br><br>_____<br>_____<br>_____ |
|---|---|
| In favor of:<br><br>___<br><br>_____<br><br>___ | Amount:<br><br>_____<br><br>_____ |
| Deliver To:<br><br>☐ Company  ☐ Beneficiary<br><br>☐ See Special Instructions<br><br>Via: ☐ Overnight Mail  ☐ Courier<br><br>☐ Telex  Other_____ | Type of Letter of Credit:<br><br>☐ Financial<br><br>☐ Performance |
| Partial Drawings: ☐ Yes ☐ No | Effective Date:_____ |
| Transferable: ☐ Yes ☐ No | Expiry Date:_____ |
| Governed by<br>☐ UCP 500 and law of the State of New York<br>☐ Other_____ | Exceptions to Governing Rules, if any: |

528066                          Exhibit A-1, Page 1

JPMUCI 0003582

| *Any other governing provisions require Issuing Bank approval. | |
|---|---|

Form of Letter of Credit.

☐      Issue    in    the    attached    form        ☐      Other

Funds under the Letter of Credit shall be available as follows:

☐     By draft at sight at the issuer of the Letter of Credit at the address specified in the Letter of Credit and when accompanied by the following documentation.

      ☐    The original Letter of Credit and any amendments to it
      ☐    The signed statement of the beneficiary (in the form and with the content required by the Letter of Credit)
      ☐    Other·_____

Special Instructions:

_____

_____

_____

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the issuance of the Letter of Credit

A.     The representations and warranties contained in Section 4.01 of the Letter of Credit Agreement are correct on and as of the date of issuance of such Letter of Credit (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the issuance of such Letter of Credit and to the application of the proceeds therefrom, as though made on and as of such date, and

B     No event has occurred and is continuing, or would result from such issuance of such Letter of Credit which constitutes a Default, an Event of Default or both.

This Letter of Credit Issuance Request is executed by the Company on _____, 20___.

Enron Corp.

By._____
Name
Title

JPMUCI 0003583

<div align="right">EXHIBIT A-2</div>

## LETTER OF CREDIT AMENDMENT REQUEST
### [Date]

To:  The Chase Manhattan Bank (the "Issuing Bank")

Enron Corp (the "Company") hereby requests that you amend a letter of credit described below (the "Letter of Credit") pursuant to the Letter of Credit and Reimbursement Agreement, dated as of May 14, 2001 (the "Letter of Credit Agreement"), among the Company, the financial institutions party thereto, The Chase Manhattan Bank and Citibank, N.A., as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank. Any terms used and not defined herein but which are defined in the Letter of Credit Agreement shall have the same meanings herein. The description of the Letter of Credit is as follows.

1.    Identification                        Number                    (if                        any).

_____

2.    Original                                                                      Amount

_____

3.    Beneficiary

_____

The Letter of Credit shall be amended as follows

_____

_____

_____

_____

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the amendment of the Letter of Credit:

A.    The representations and warranties contained in Section 4.01 of the Letter of Credit Agreement are correct on and as of the date of amendment of such Letter of Credit (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the amendment of such Letter of Credit and to the application of the proceeds therefrom, as though made on and as of such date; and

B.    No event has occurred and is continuing, or would result from such amendment of such Letter of Credit which constitutes a Default, an Event of Default or both.

This Letter of Credit Amendment Request is executed by the Company on _____, 20____.

JPMUCI 0003584

Enron Corp

By._____
Name
Title

Exhibit A-2, Page 2

JPMUCI 0003585

[Opinion of Vinson & Elkins L.L.P.]

May 14, 2001

To each of the Banks parties to the Letter of Credit
and Reimbursement Agreement dated as of May 14, 2001,
among Enron Corp., said Banks, The Chase Manhattan Bank
and Citibank N.A., as Co-Administrative Agents,
The Chase Manhattan Bank, as Paying Agent,
and The Chase Manhattan Bank as Issuing Bank
and to such Co-Administrative Agents, Paying Agent
and Issuing Bank

      RE    Enron Corp.

Ladies and Gentlemen:

    This opinion is furnished to you pursuant to Section 3 01(c) of the $500,000,000 Letter of Credit and Reimbursement Agreement dated as of May 14, 2001 among Enron Corp (the "Company"), the financial institutions party thereto, The Chase Manhattan Bank and Citibank, N A., as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank, as amended from time to time (the "Letter of Credit Agreement") Except as otherwise defined herein, terms defined in the Letter of Credit Agreement are used herein as therein defined

    We have acted as counsel for the Company in connection with the preparation, execution, delivery and effectiveness of the Letter of Credit Agreement

    In that connection, we have examined:

    (1)    The Letter of Credit Agreement, and

    (2)    The other documents furnished by the Company pursuant to the conditions precedent set forth in Section 3.01 of the Letter of Credit Agreement

    In addition, we have (i) investigated such questions of law and (ii) relied on such certificates from officers and representatives of the Company and from public officials, as we have deemed necessary or appropriate for the purposes of this opinion

    In rendering the opinions herein set forth, we have assumed (i) the due authorization, execution and delivery of each document referred to in clauses (1) and (2) of the third paragraph of this opinion by all parties to such documents and that each such document is valid, binding and enforceable (subject to limitations on enforceability of the types referred to in paragraphs (a) and (b) below) against the parties thereto other than the Company, (ii) the legal capacity of natural persons, (iii) the genuineness of all signatures, (iv) the authenticity of all documents submitted to us as originals, and (v) the conformity to original documents of all documents submitted to us as copies

578066                Exhibit B, Page 1

Based upon the foregoing and upon such investigation as we have deemed necessary, we are of the following opinion

1.    No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required to be made or obtained by the Company for the execution, delivery and performance by the Company of each Facility Document

2.    The execution, delivery and performance by the Company of each Facility Document does not contravene any provision of law or regulation (including, without limitation, Regulation X issued by the Federal Reserve Board) applicable to the Company or of Regulation U issued by the Federal Reserve Board

3    Under the laws of the State of New York and the federal laws of the United States, the Letter of Credit Agreement constitutes the legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms

4    A Texas court or a United States federal court applying Texas conflict-of-laws principles will give effect to the choice of New York law as the governing law of the Letter of Credit Agreement and will apply New York law (other than New York procedural law) in any action to enforce the Letter of Credit Agreement

The opinions set forth above are subject to the following qualifications

(a)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of any applicable bankruptcy insolvency, reorganization, moratorium or similar law affecting creditors' rights generally

(b)    Our opinion in paragraph 3 above is subject, as to enforceability, to the effect of general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing, and also to the possible unavailability of specific performance or injunctive relief  Such principles of equity are of general application, and in applying such principles a court, among other things, might not allow a creditor to accelerate maturity of a debt upon the occurrence of a default deemed immaterial or might decline to order the Company to perform covenants  In addition, we express no opinion as to the enforceability of the following provisions to the extent same are contained in the Letter of Credit Agreement  (i) provisions purporting to waive or not give effect to rights to notices, demands, legal defenses, or other rights or benefits that cannot be waived or rendered ineffective under applicable law, (ii) provisions releasing, exculpating or exempting a party from, or requiring indemnification of a party for, liability to the extent that the same are inconsistent with public policy, (iii) provisions purporting to establish evidentiary standards for enforcement of the Facility Documents or providing that decisions by a party are conclusive or are based on such party's sole or absolute discretion, or (iv) provisions relating to rights of setoff.

(c)    Our opinion in paragraph 2, with respect to Texas law, takes into account and is based on and qualified by our opinion in paragraph 4.

(d)    Our opinion in paragraph 4 above is based on the language of section 35 51 of the Texas Business and Commerce Code

528066                    Exhibit B, Page 2

JPMUCI 0003587

In rendering the opinions expressed in paragraphs 1, 2, and 3 above, we have relied upon the opinions stated in paragraphs 1, 2 (so far as such paragraph 2 relates to the corporate powers of, and due authorization of the Facility Documents by, the Company, and noncontravention of the Amended and Restated Articles of Incorporation, as amended, and Bylaws, as amended, of the Company), 4, and 5 of the opinion, dated today, of the Executive Vice President and General Counsel of the Company which is being delivered to you pursuant to Section 3.01(d) of the Letter of Credit Agreement.

We have not been called upon to, and accordingly do not, express any opinion as to the various state and federal laws regulating banks or the conduct of their business (except Regulation U issued by the Federal Reserve Board) that may relate to the Facility Documents or the transactions contemplated thereby

This opinion is limited to the laws of the State of Texas and the State of New York, the Oregon Business Corporation Act and the federal law of the United States.

The opinions herein have been furnished at your request and are solely for your benefit and the benefit of your respective successors and your respective assignees and participants pursuant to the Letter of Credit Agreement, and the Issuing Bank's special counsel, in connection with the subject transaction and may not be relied upon by any other person or by you or any other person in any other context without the prior written consent of the undersigned

We are aware that Bracewell & Patterson, L.L.P. will rely upon this opinion in rendering its opinion furnished pursuant to Section 3.01(e) of the Letter of Credit Agreement.

Very truly yours.

528046                           Exhibit B, Page 3

JPMUCI 0003588

EXHIBIT C

[Opinion of Executive Vice President and
General Counsel of the Company]

May 14, 2001

To each of the Banks parties to the Letter of Credit
and Reimbursement Agreement dated as of May 14, 2001,
among Enron Corp., said Banks, The Chase Manhattan
Bank and Citibank, N.A., as Co-Administrative Agents,
The Chase Manhattan Bank, as Paying Agent,
and The Chase Manhattan Bank as Issuing Bank
and to such Co-Administrative Agents, Paying Agent
and Issuing Bank

RE      $500,000,000 Letter of Credit and Reimbursement Agreement of even date herewith among
Enron Corp (the "Company"), the Banks named therein, The Chase Manhattan Bank and Citibank, N.A.,
as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan
Bank, as Issuing Bank

Ladies and Gentlemen

        As Executive Vice President and General Counsel of Enron Corp , an Oregon corporation (the
"Company"), I am familiar with the Letter of Credit and Reimbursement Agreement (the "Letter of
Credit Agreement") dated as of May, 14, 2001 among the Company, the financial institutions party
thereto, The Chase Manhattan Bank and Citibank, N A , as Co-Administrative Agents, The Chase
Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank This opinion is
being furnished to you pursuant to Section 3.01(d) of the Letter of Credit Agreement  Terms defined in
the Letter of Credit Agreement and not otherwise defined herein are used herein as therein defined

        Before rendering the opinion hereinafter set forth, I (or other attorneys with the Company's legal
department) examined the Facility Documents, and relied upon originals, photostatic or certified copies
of such agreements, documents, instruments, corporate records, and certificates of officers of the
Company as I (or such attorneys) deemed relevant and necessary as the basis for the opinions hereinafter
expressed  In such examination, I (or such attorneys) assumed the genuineness of all signatures (other
than signatures of officers of the Company on the Facility Documents), the authenticity of all documents
submitted to me (or such attorneys) as originals, and the conformity to original documents of all
documents submitted to me (or such attorneys) as photostatic or certified copies

        Upon the basis of the foregoing, I am of the opinion that

        1       The Company is a corporation duly incorporated, validly existing and in good standing
under the laws of the State of Oregon, and has all corporate powers and all governmental licenses,
authorizations, consents and approvals required to carry on its business as now conducted, except to the
extent failure to obtain such licenses, authorizations, consents or approvals would not materially
adversely affect the Company and its Subsidiaries taken as a whole

        2       The execution, delivery and performance by the Company of each Facility Document is
within the Company's corporate powers  Each Facility Document has been duly authorized by all

528066                          Exhibit C, Page 1

JPMUCI 0003589

necessary corporate action of the Company, and the Letter of Credit Agreement has been duly executed and delivered by the Company

3    The execution, delivery and performance by the Company of each Facility Document, and the consummation by the Company of the transactions evidenced thereby, have been duly authorized by all necessary corporate action of the Company and do not constitute a contravention or default by the Company under (a) the Company's Amended and Restated Articles of Incorporation, as amended, or By-laws. as amended, (b) any contractual restriction contained in any material (meaning for the purposes of this opinion those creating a monetary liability of $100,000,000 or more) contract, agreement, indenture, mortgage, bond, note or any guaranty of any of such obligations, in each case known to me and to which the Company is subject, or (c) any judgment, injunction, order or decree known to me binding upon the Company

4    The execution, delivery and performance by the Company of the Facility Documents will not result in the creation or imposition of any lien, security interest, or other charge or encumbrance on any asset of the Company. other than (a) pursuant to the Facility Documents or (b) those that would not materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of the Company and its subsidiaries taken as a whole, or (ii) the ability of the Company to perform its obligations under the Facility Documents.

5    Except as disclosed in the Company's (i) Annual Report to Shareholders for the year ended December 31. 2000. (ii) Annual Report on Form 10-K for the year ended December 31. 2000. and (iii) Quarterly Report on Form 10-Q for the period ended March 31, 2001. and (iv) definitive proxy statement with respect to its Annual Meeting of Stockholders held May 1, 2001. to my knowledge there is no action. suit or proceeding pending or threatened against the Company or any of its Subsidiaries before any court or arbitrator. or any governm...tal body agency or official (a) with respect to the Facility Documents, or (b) in which there is a reasonable possibility of an adverse decision that could reasonably be expected to materially and adversely affect (i) the business, consolidated financial position or consolidated results of operations of the Company and its Subsidiaries taken as a whole, or (ii) the ability of the Company to perform its obligations under the Facility Documents.

6.    The Company is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7    The Company is not subject to, or is exempt from, regulation as a "holding company" under the Public Utility Holding Company Act of 1935, as amended, or pursuant to such Act or the rules and regulations promulgated thereunder or any order or interpretation of the Securities and Exchange Commission or its staff issued pursuant thereto

The opinions set forth above are subject to the following qualifications.

A    In rendering the opinion expressed in paragraph 3 above, neither I nor any other attorney in the Company's legal department has made any examination of any accounting or financial matters related to the covenants contained in certain documents to which the Company may be subject, and I express no opinion with respect thereto

B    I am a member of the Bar of the State of Texas, and this opinion is limited in all respects to the laws of the State of Texas, the Oregon Business Corporation Act and Federal law.

JPMUCI 0003590

C.    In rendering the opinion expressed in paragraph 5 above, I (or other attorneys in the Company's legal department) have only reviewed the files and records of the Company and its Subsidiaries, and have consulted with such senior officers of the Company and its Subsidiaries as I (or such attorneys) have deemed necessary

D    The opinions expressed herein are as of the date hereof only, and I assume no obligation to update or supplement such opinions to reflect any fact or circumstance that may hereafter come to my attention, or any changes in law that may hereafter occur or become effective

This opinion is solely for the benefit of the Banks, the Issuing Bank, the Co-Administrative Agents, the Paying Agent, their respective successors, assigns, participants and other transferees pursuant to the Letter of Credit Agreement and the Paying Agent's special counsel and may not be relied upon in connection with any other transaction or by any other person; provided, however, that Vinson & Elkins L.L.P. may rely on certain provisions of this opinion to the extent stated in its opinion for the purposes of rendering its opinion pursuant to Section 3.01(c) of the Letter of Credit Agreement, and Bracewell & Patterson, L.L.P. may rely upon this opinion in rendering its opinion furnished pursuant to Section 3 01(e) of the Letter of Credit Agreement

Very truly yours,

JPMUCI 0003591

EXHIBIT D

[FORM OF OPINION OF SPECIAL COUNSEL
TO THE PAYING AGENT]

May 14, 2001

To each of the Banks parties to the Letter of Credit
and Reimbursement Agreement dated as of May 14, 2001,
among Enron Corp., said Banks, The Chase Manhattan
Bank and Citibank, N.A., as Co-Administrative Agents,
The Chase Manhattan Bank, as Paying Agent,
and The Chase Manhattan Bank as Issuing Bank
and to such Co-Administrative Agents, Paying Agent
and Issuing Bank

Ladies and Gentlemen:

We have acted as special counsel to The Chase Manhattan Bank in connection with the preparation,
execution and delivery of the $500,000,000 Letter of Credit and Reimbursement Agreement, dated as of
May 14, 2001 (the "Letter of Credit Agreement"), among Enron Corp., an Oregon corporation (the
"Company"), the financial institutions party thereto, The Chase Manhattan Bank and Citibank, N.A., as
Co-Administrative Agents, The Chase Manhattan Bank as Paying Agent, and The Chase Manhattan
Bank as Issuing Bank. Capitalized terms defined in the Letter of Credit Agreement are used herein as
therein defined.

In that connection, we have examined the following documents:

(1)    Counterparts of the Letter of Credit Agreement, executed by the Issuing Bank and the
Company, respectively.

(2)    The documents furnished by the Company pursuant to Section 3.01 of the Letter of
Credit Agreement and listed on Annex A hereto, including the opinion of Messrs. Vinson & Elkins,
L.L.P., counsel to the Company (the "Opinion of Company's Counsel") and the opinion of James V.
Derrick, Jr., Executive Vice President and General Counsel of the Company (the "General Counsel
Opinion").

In our examination of the documents referred to above, we have assumed the authenticity of all such
documents submitted to us as originals, the genuineness of all signatures and the conformity to the
originals of all such documents submitted to us as copies. We have also assumed the accuracy of all
matters set forth in the certificates referred to on Annex A hereto and assumed that each of the Company,
the Banks, the Co-Administrative Agents, the Paying Agent, and the Issuing Bank has duly executed and
delivered, with all necessary power and authority (corporate and otherwise), the Letter of Credit
Agreement, and that the Company has duly executed and delivered, with all necessary power and
authority (corporate and otherwise), the other Facility Documents contemplated to be executed by it. We
have also assumed that no Bank has requested that the opinion required by Section 3.01(e) of the Letter
of Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit B to the
Letter of Credit Agreement or that the form of opinion of James V. Derrick, Jr. required by Section

JPMUCI 0003592

3.01(d) of the Letter of Credit Agreement contain any matter not contained in the form of opinion set forth as Exhibit C to the Letter of Credit Agreement.

Based upon the foregoing examination of documents and assumptions and upon such other investigation as we have deemed necessary, we are of the opinion that the Opinion of Company's Counsel, the General Counsel Opinion and the other documents referred to in item (2) above, are substantially responsive to the requirements of the Letter of Credit Agreement

This opinion is solely for the benefit of the Banks, the Issuing Bank, the Co-Administrative Agents, the Paying Agent, their respective successors, assigns, participants and other transferees and may be relied upon only by such Persons in connection with the transactions contemplated by the Letter of Credit Agreement

<div align="center">Very truly yours,</div>

<div align="center">Bracewell & Patterson. L.L.P</div>

528066                    Exhibit D, Page 2

JPMUCI 0003593

ANNEX A

(a)     The opinion of Vinson & Elkins L.L.P., counsel to the Company, substantially in the form of Exhibit B to the Letter of Credit Agreement and the opinion of James V. Derrick, Jr., Executive Vice President and General Counsel of the Company substantially in the form of Exhibit C to the Letter of Credit Agreement.

(b)     A certificate of an officer of the Company certifying copies of the resolutions of the Board of Directors of the Company referred to in Section 3.01(a) of the Letter of Credit Agreement and the certificate of an officer of the Company contemplated by Section 3.01(b) of the Letter of Credit Agreement.

JPMUCI 0003594

EXHIBIT E

## ASSIGNMENT AND ACCEPTANCE

Dated _____, ____

Reference is made to the U.S. $500,000,000 Letter of Credit and Reimbursement Agreement dated as of May 14, 2001 among Enron Corp (the "Company"), the financial institutions party hereto, The Chase Manhattan Bank and Citibank, N.A., as Co-Administrative Agents, The Chase Manhattan Bank, as Paying Agent, and The Chase Manhattan Bank, as Issuing Bank, as amended from time to time (the "Letter of Credit Agreement"). Terms defined in the Letter of Credit Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1      The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Letter of Credit Agreement and the Facility Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Letter of Credit Agreement. Without limiting the generality of the foregoing, the Assignee hereby assumes the obligations of the Assignor, to the extent of the percentage interest assigned hereby, to participate in Letters of Credit pursuant to Section 2.03 of the Letter of Credit Agreement and to pay its Pro Rata Percentage of LC Obligations pursuant to Section 2.04 of the Letter of Credit Agreement. After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of outstanding participations that have been paid for under the Letter of Credit Agreement held by the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

2      The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Letter of Credit Agreement, the Facility Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Letter of Credit Agreement, any of the Facility Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Company or any other Person or the performance or observance by the Company or any other Person of any of its respective obligations under the Letter of Credit Agreement, any of the Facility Documents or any other instrument or document furnished pursuant thereto or in connection therewith.

3      The Assignee (i) confirms that it has received a copy of the Letter of Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Letter of Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Co-Administrative Agents, the Paying Agent, the Issuing Bank, the Assignor or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Letter of Credit Agreement, any of the Facility Documents or any other instrument or document,

528066                              Exhibit E, Page 1

(iii) confirms that it is an Eligible Assignee, (iv) appoints and authorizes the Co-Administrative Agents and the Paying Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Facility Documents as are delegated to the Co-Administrative Agents and the Paying Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto, (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Letter of Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Funding Office (and address for notices) the office set forth beneath its name on the signature pages hereof.

4.     Following the execution of this Assignment and Acceptance by the Assignor and the Assignee and the approval hereof by the Issuing Bank, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents  In addition, the approvals of the Paying Agent and the Company shall be required when applicable pursuant to clause (b) of the definition of "Eligible Assignee".  Upon obtaining the necessary approvals as aforesaid, the effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto

5     Upon such acceptance by the Paying Agent and recording by the Paying Agent (and after obtaining required approvals referred to in paragraph 4 above), as of the Effective Date, (i) the Assignee shall be a party to the Letter of Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the Facility Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Letter of Credit Agreement and under the Facility Documents

6     Upon such acceptance by the Paying Agent and recording by Paying Agent (and after obtaining required approvals referred to in paragraph 4 above), from and after the Effective Date, the Paying Agent shall make all payments under the Letter of Credit Agreement and the Facility Documents in respect of the interest assigned hereby (including, without limitation, all payments of interest and letter of credit and facility fees with respect thereto) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Letter of Credit Agreement and the Facility Documents for periods prior to the Effective Date directly between themselves.

7     This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York

8     This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement  Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by facsimile shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

528066

Exhibit E, Page 2

JPMUCI 0003596

Schedule 1
to
Assignment and Acceptance

<u>Section 1</u>
    Percentage interest assigned·                           ____%

<u>Section 2</u>
    Assignee's Commitment before giving effect to this
    Assignment and Acceptance.                     $_____

    Assignee's Commitment after giving effect to this
    Assignment and Acceptance:                    $_____

    Assignor's remaining Commitment after
    giving effect to this Assignment and Acceptance·    $_____

    Assignee's outstanding paid participations before
    giving effect to this Assignment and Acceptance     $_____

    Aggregate outstanding paid participations assigned to
    the Assignee under this Assignment and Acceptance.   $_____

    Assignee's outstanding paid participations after
    giving effect to this Assignment and Acceptance:    $_____

    Assignor's remaining outstanding paid participations
    after giving effect to this Assignment and Acceptance  $_____

<u>Section 3</u>

    Effective Date**: _____, 20__

                  [NAME OF ASSIGNOR], as Assignor

                  By:_____
                  Name:_____
                  Title:_____
                  Dated_____

                  [NAME OF ASSIGNEE], as Assignee

                  By:_____
                   Name:_____
                   Title:_____
                   Dated:_____

_____

    **   This date should be no earlier than the date five Business Days after the delivery of this
Assignment and Acceptance to the Paying Agent.

JPMUCI 0003597

Funding Office (and address for notices)

[Address]

Approved this ___ day of _____.
_____

THE CHASE MANHATTAN BANK,
As Issuing Bank

By_____
Name_____
Title_____

[ENRON CORP.

By:
Name:
Title: _____]***

Accepted [and Approved]*** this ___ day of
_____.

THE CHASE MANHATTAN BANK,
As Paying Agent

By_____
Name_____
Title_____

_____
    ***Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Letter of Credit Agreement.

528066              Schedule I to Assignment and Acceptance, Page 2

# SUPPLEMENTAL EXHIBIT 7

## NOTICE OF BORROWING
October 25, 2001

Citibank, N.A., as Paying Agent
399 Park Avenue
New York, New York 10043

Attention:     Energy Department, North American Banking Group

Ladies and Gentlemen:

The undersigned, Enron Corp., refers to the U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of May 18, 2000 (such Long-Term Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement," the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement.

  (i)     The Business Day of the Proposed Borrowing is October 25, 2001.

  (ii)     The Type of Advances comprising the Proposed Borrowing is Base Rate Advances.

  (iii)    The aggregate amount of the Proposed Borrowing is $1,250,000,000.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

  (A)     the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date; and

DEPOSITION EXHIBIT
65099
ERIC J. PINZ

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both.

Very truly yours,

ENRON CORP.

By: _____

Name: _____

Title: _____

cc:    Citicorp Securities Inc.
       1200 Smith Street, Suite 2000
       Houston, Texas 77002
       Attention:  James F. Reilly, Jr.
                   Managing Director
       Telecopier No.: (713) 654-2849

JPMNBY200010759

October 25, 2001

Citibank, N.A.
399 Park Avenue
New York, New York 10043

    Attention:    Energy Department, North American Banking Group

    Re:    U.S. $1,250,000,000 Long-Term Revolving Credit Agreement, dated as of
        May 18, 2000

Ladies and Gentlemen:

    On October 17, 2001, Enron Corp. received a letter from the United States
Securities and Exchange Commission requesting information and documents concerning
certain transactions involving Mr. Andrew S. Fastow, the former Executive Vice
President and Chief Financial Officer of Enron Corp. (the "SEC Inquiry"). In addition to
the SEC Inquiry, Enron Corp. has received notice that it is a defendant in a number of
lawsuits (and anticipates receiving notice of other such lawsuits in the near future),
claiming relief under the Federal securities laws. Final determination of legal liability and
the resulting financial impact with respect to the SEC Inquiry and the other securities
litigation referred to herein is impossible to predict with any degree of certainty, and may
not be resolved for a number of years.

        Very truly yours,

        ENRON CORP.

        By:
        Name: Kenneth L. Lay
        Title: Chairman & CEO

cc:    Citicorp Securities Inc.
        1200 Smith Street, Suite 2000
        Houston, Texas 77002
        Attention: James P. Reilly, Jr.
            Managing Director
        Telecopier No.: (713) 654-2849

jr/agreements/letter to Citibank.doc

JPMNBY200010780

# ENRON CORP.

## <u>CERTIFICATE OF ASSISTANT SECRETARY</u>

The undersigned, Teresa A. Callahan, hereby certifies that she is a duly elected, qualified and acting Assistant Secretary of ENRON CORP., an Oregon corporation (the "Company"), and, as such, is authorized to execute and deliver this Certificate on behalf of the Company and hereby further certifies that:

Below appears the true and correct signature of the following officer, who has been duly elected to the offices following such officer's name and who holds such offices on the date hereof.

| <u>Name</u> | <u>Offices</u> | <u>Signature</u> |
|---|---|---|
| Kenneth L. Lay | Chairman and Chief Executive Officer | |

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the 25 day of October, 2001.

Teresa A. Callahan
Assistant Secretary

# SUPPLEMENTAL EXHIBIT 8

10/25/2001 09:30 FAX 713 853 9679     CHAIRMAN/CEO'S OFFICE     @002/005

**NOTICE OF BORROWING**
October 25, 2001



Citibank, N.A., as Paying Agent
399 Park Avenue
New York, New York 10043

Attention:     Energy Department, North American Banking Group

Ladies and Gentlemen:

The undersigned, Enron Corp., refers to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (such 364-Day Revolving Credit Agreement, as amended from time to time, being herein referred to as the "Credit Agreement," the terms defined therein being used herein as therein defined), among the undersigned, certain Banks parties thereto, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.02(a) of the Credit Agreement.

> (i)     The Business Day of the Proposed Borrowing is October 25, 2001.
>
> (ii)     The Type of Advances comprising the Proposed Borrowing is Base Rate Advances.
>
> (iii)     The aggregate amount of the Proposed Borrowing is $1,750,000,000.00.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

> (A)     the representations and warranties contained in Section 4.01 of the Credit Agreement are correct (other than those representations and warranties that expressly relate solely to a specific earlier date, which shall remain correct as of such earlier date), before and after giving effect to the Proposed Borrowing, and to the application of the proceeds therefrom, as though made on and as of such date; and

jc:\agreements\notice of borrowing (short-term)

DEPOSITION EXHIBIT
60 056
/ /
ERIC J. FINZ

CITINEWBY 00021237

TERM

10/25/2001 09:31 FAX 713 853 9678      CHAIRMAN/CEO'S OFFICE                    003/005

(B)    no event has occurred and is continuing, or would result from such Proposed Borrowing or from the application of the proceeds therefrom, which constitutes a Default, an Event of Default or both.

Very truly yours,

ENRON CORP.

By: _____

Name: _____

Title: _____

CITINEWBY 00021238

October 25, 2001

Citibank, N.A.
399 Park Avenue
New York, New York 10043

     Attention:     Energy Department, North American Banking Group

Ladies and Gentlemen:

     On October 17, 2001, Enron Corp. received a letter from the United States Securities and Exchange Commission requesting information and documents concerning certain transactions involving Mr. Andrew S. Fastow, the former Executive Vice President and Chief Financial Officer of Enron Corp. (the "SEC Inquiry"). In addition to the SEC Inquiry, Enron Corp. has received notice that it is a defendant in a number of lawsuits (and anticipates receiving notice of other such lawsuits in the near future), claiming relief under the Federal securities laws. Final determination of legal liability and the resulting financial impact with respect to the SEC Inquiry and the other securities litigation referred to herein is impossible to predict with any degree of certainty, and may not be resolved for a number of years.

Very truly yours,

ENRON CORP.

By: _____
Name:  Kenneth L. Lay
Title:  Chairman and CEO

cc:    Citicorp Securities Inc.
      1200 Smith Street, Suite 2000
      Houston, Texas 77002
      Attention:  James F. Reilly, Jr.
               Managing Director
      Telecopier No.: (713) 654-2849

*jc/agreements/letter to Citibank.doc*

CITINEWBY 00021239

10/25/2001 09:31 FAX 713 853 9879    CHAIRMAN/CEO'S OFFICE    ☑005/005

# ENRON CORP.

## CERTIFICATE OF ASSISTANT SECRETARY

The undersigned, Teresa A. Callahan, hereby certifies that she is a duly elected, qualified and acting Assistant Secretary of ENRON CORP., an Oregon corporation (the "Company"), and, as such, is authorized to execute and deliver this Certificate on behalf of the Company and hereby further certifies that:

Below appears the true and correct signature of the following officer, who has been duly elected to the offices following such officer's name and who holds such offices on the date hereof.

| Name | Offices | Signature |
|------|---------|-----------|
| Kenneth L. Lay | Chairman and Chief Executive Officer | |

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the 2 5th day of October, 2001.

Teresa A. Callahan
Assistant Secretary

CITINEWBY 00021240