Confidential – Filed Under Seal

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
DK ACQUISITION PARTNERS, L.P., et al.,             :
                                                   :
                                     Plaintiffs,   :
                                                   :
                                                   :
          v.                                       :     Civil Action No. 08 Civ. 0446 (LTS)
                                                   :
JPMORGAN CHASE & CO., et al..                      :
                                                   :
                                     Defendants.   :
----------------------------------------------------- X
------------------------------------------------------- X
AVENUE CAPITAL MANAGEMENT II, L.P., et  :
al.,                                               :
                                                   :
                                     Plaintiffs,   :     Civil Action No. 08 Civ. 0447 (LTS)
                                                   :
          v.                                       :
                                                   :
JPMORGAN CHASE & CO., et al.,                      :
                                                   :
                                     Defendants.   :
------------------------------------------------------- X
```

## AFFIDAVIT OF ALAN C. TURNER

### Part II of II (Exhibits 8-21)

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
*Attorneys For Defendants Citigroup Inc., Citibank N.A., and
Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney
Inc.)*

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., and J.P. Morgan
Securities Inc.*

# EXHIBIT 8

# DK ACQUISITION PARTNERS, L. P., et al.

## v.

# J. P. MORGAN CHASE & CO., et al.

## Expert Report of William C. Carey, CPA
## Clifton Gunderson LLP

### June 1, 2006

**DK ACQUISITION PARTNERS, L. P., et al.**
v.
**J. P. MORGAN CHASE & CO., et al.**

**Expert Report of William C. Carey, CPA**
**Clifton Gunderson LLP**

**June 1, 2006**

# Table of Contents

I.    Introduction .................................................................................................................1

II.   Background ...................................................................................................................3

    A.    The Credit Agreements ........................................................................................3

    B.    The Plaintiffs' Rights ...........................................................................................4

    C.    The Defendants' Alleged Knowledge and Actions.............................................4

III.  Summary of Opinions ..................................................................................................7

IV.   Tracing the Plaintiffs' Holdings to the Lenders..........................................................8

    A.    Information Relied Upon and the Method of Tracing.........................................8

    B.    The Plaintiffs' Current Holdings ......................................................................11

V.    At the Times the Credit Agreements Were Executed, Enron's Financial Statements
      and Credit Ratings Indicated That Enron Would Be Able to Repay the Lenders
      Under the Terms of the Credit Agreements. ..............................................................12

    A.    Information Relied Upon and Methods Used....................................................12

    B.    The Public Picture of Enron at the Time of the May 2000 Agreement ...........13

        1.    Enron appeared to carry low levels of debt ...............................................13

        2.    Enron's cash flows appeared substantial....................................................13

        3.    Profitability appeared sufficient, and particularly good in relation
                   to debt.........................................................................................................14

        4.    Enron continued to grow ............................................................................14

        5.    Investors' and analysts' perceptions of Enron were positive ...................14

    C.    The Public Picture of Enron at the Time of the May 2001 Agreement ...........15

        1.    Enron continued to report relatively low levels of debt ...........................15

        2.    Cash flows continued to appear substantial...............................................15

|  | 3. | Profitability continued to appear sufficient, particularly in relation to debt | 15 |

|  | 4. | Enron's growth accelerated compared to prior years | 16 |

|  | 5. | Analysts' reports remained positive | 16 |

VI. At the Time the Loans Were Funded, the Risks of the Loans Had Apparently Increased, But No Event of Default Was Apparent ........................ 17

VII. Enron's Financial Statements, Adjusted for the False Accounting of the Defendants' Transactions With Enron, Show That the Defendants' Transactions with Enron Significantly Impacted the Appearance of Enron's Financial Condition ........ 19

A. Information Relied Upon and Methods Used .................... 19

B. The Picture of Enron at the Time of the May 2000 Agreement, Given the Field Adjustments .................................................. 21

    1. Enron's 1999 balance sheet omitted over $4 billion of debt arranged by the Defendants ............................................ 21

    2. Enron's 1999 cash flow statement reported over $1 billion of loans as cash flow from operations ................................ 21

    3. Enron's credit rating was not aligned with its financial results adjusted for the Defendants' improper transactions with Enron ........... 22

C. The Picture of Enron at the Time of the May 2001 Agreement, Considering the GAAP Expert's Adjustments ...................... 23

    1. Enron's 2000 balance sheet omitted $5.74 billion of debt arranged by the Defendants ............................................ 23

    2. Enron's 2000 cash flows statement overstated funds from operations by $1.39 billion ........................................... 23

    3. Enron's credit rating was not aligned with its financial results adjusted for the Defendants' improper transactions with Enron ........... 23

D. The Picture of Enron as of the Draw Date .......................... 24

    1. Enron concealed over $7 billion of debt arranged by the Defendants ........................................................... 24

    2. Given the concealed debt and Enron's announcement of an equity write down, Enron was in violation of the senior debt to total capital covenant as of October 25, 2001 ................. 24

VIII. Enron Was Unable to Repay the Lenders Under the Terms of the Credit Agreements When the Loans Were Made ................................ 26

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

IX.    Calculation of Damages ..................................................................................................27

    A.    Out-of-Pocket Damages and Statutory Interest Are Approximately
$1.815 Billion. ............................................................................................................27

        1.    Mitigation .....................................................................................................28

        2.    The out-of-pocket method statutory interest calculation .........................28

    B.    Benefit-of-the-Bargain Damages and Statutory Interest Are Approximately
$1.923 Billion. ............................................................................................................29

        1.    The contract interest calculation................................................................30

        2.    The Facility Fee...........................................................................................31

        3.    Mitigation .....................................................................................................32

        4.    The benefit-of-the-bargain statutory interest calculation..........................33

X.    The Current Market Value of the Plaintiffs' Holdings as Potential Future Mitigation.............34

## Exhibits

1.    Plaintiffs' Holdings Transfer Summary
2.    Complex Tracing Diagrams
3.    Plaintiffs' Holdings by Funding Bank
4.    Plaintiffs' Holdings by Plaintiff, by Credit Agreement, and by Funding Bank
5.    Plaintiffs' Holdings by Plaintiff, by Credit Agreement, by Funding Bank, and by Principal ID
6.    Enron Financial Measures as Reported v. as Adjusted in Field Report
7.    Enron and Peer Group Credit Ratios
8.    Comparison of Enron's Ratios to Standard & Poor's Ratings Guidelines
9.    Damage Calculation Variables
10.    Damage Calculation Methodology Examples
11.    Out-of-Pocket Damages and Statutory Interest Calculation
12.    Out-of-Pocket Statutory Interest Calculation Overview
13.    Benefit-of-the-Bargain Damages and Statutory Interest Calculation
14.    Benefit-of-the-Bargain Damages Calculation Overview
15.    Base Rate Definitions
16.    Facility Fee Calculation Overview

DK ACQUISITION PARTNERS, L. P., et al.
v.
J. P. MORGAN CHASE & CO., et al.

Expert Report of William C. Carey, CPA
Clifton Gunderson LLP

June 1, 2006

# I.    Introduction

I am a partner of the firm Clifton Gunderson LLP ("Clifton Gunderson"). Clifton Gunderson was retained by the law firm Bartlit Beck Herman Palenchar & Scott LLP on behalf of the Plaintiffs in this matter. The Plaintiffs are:

- DK Acquisition Partners, L. P.;

- Kensington International Limited;

- Rushmore Capital-I, L. L. C.;

- Rushmore Capital-II, L. L. C.; and

- Springfield Associates, LLC; and collectively, "the Plaintiffs."

I have been asked by the Plaintiffs to produce this report and to testify as an expert. The opinions contained in this report are mine. I prepared this report with the assistance of Clifton Gunderson partners and staff who worked under my direction. Where my partners and staff have assisted in preparing analysis and other work papers, I use "we" or "our" to indicate that assistance.

Specifically, Clifton Gunderson was engaged to review certain aspects of the Plaintiffs' holdings of certain Enron debt instruments. This Enron debt was issued under two agreements, collectively referred to as the "Credit Agreements," and include:

- The $1.25 billion Long-Term Revolving Credit Agreement, dated May 18, 2000 (the "May 2000 Agreement");[1] and

- The $1.75 billion 364-Day Revolving Credit Agreement, dated May 14, 2001 (the "May 2001 Agreement").[2]

---

[1] Bates # JPMUCI 0008438–0008574.
[2] Bates # JPMUCI 0003167–0003300.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

More specifically, I am engaged to:

- Trace the Plaintiffs' holdings of Enron debt issued under the Credit Agreements to the banks that funded the loans (the "Funding Banks");

- Contrast Enron's apparent credit-worthiness—both at the times the Credit Agreements were entered into and at the time that the loans were funded—as shown by its reported financial statements with its credit-worthiness as shown by its financial statements, adjusted for the impact of the Defendants' allegedly improper transactions with Enron and as shown in the report of Mr. Lawrence Field (the "Field Report");

- Determine whether Enron was able to repay the Lenders[3] under the terms of the credit agreements when the loans were made;

- Calculate the damages due each Plaintiff stemming from Enron's default under the terms of the Credit Agreements using two damages methods:

  o Out-of-pocket damages; and

  o Benefit-of-the-bargain damages.

The purpose of this report is to set forth my opinions and their bases. Certain disclosures required by the discovery order in this case are produced separately. These include: my CV and lists of testimony and reports in other cases; certain other documents that we found through our independent research and that are referenced in the text of this report; and our billing records. Clifton Gunderson is compensated for our work on this case at our standard hourly rates, ranging from $100 to $350 an hour. Our fees are not dependent or contingent in any way upon my opinions or the outcome of the litigation.

The scope of my work is limited, and does not include an audit, examination, review, or compilation of financial statements as those terms are defined in standards promulgated by the American Institute of Certified Public Accountants, and accordingly I express no such opinion on the financial information or other information I received in the course of my work.

---

[3] The term "Lenders" is defined in the Complaint as the "Plaintiffs' predecessors-in-interest." Second Amended Complaint, ¶ 1.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

## II.    Background

### A.    The Credit Agreements

As an integral part of its commercial paper program, Enron used "backstop" revolving credit agreements. In 2000, Enron engaged Salomon Smith Barney, Inc., and Chase Securities, Inc. ("Chase"), to provide it with two senior unsecured revolving credit facilities (the Credit Agreements). Enron, Salomon Smith Barney, Inc., and Chase represented that the Credit Agreements were needed by Enron to replace existing revolving lines of credit and were to be used for "general corporate purposes, including the backstopping of Enron's commercial paper program."[4]

There are two Credit Agreements:

- A May 18, 2000, Long-Term Revolving Credit Agreement for $1.25 billion;[5] and

- A May 14, 2001, 364-Day Revolving Credit Agreement for $1.75 billion.[6]

The Credit Agreements were entered into by a syndicate of banks. The commitments entered into by the banks could be sold and rights and obligations assigned to third-parties (predecessor transfers[7]).

On October 25, 2001 (or the "Draw Date"[8]), Enron drew down the full amount of each Credit Agreement. Just over five weeks later Enron filed for Chapter 11 bankruptcy protection.[9] As a result, Enron defaulted on the debt related to the Credit Agreements without making payments to the Funding Banks or their successors-in-interest.[10]

Many of the Signatory Banks sold or assigned their obligations under the Credit Agreements, in whole or in part, to other financial institutions; and many of those other financial institutions subsequently sold or assigned the obligations to further financial institutions.

---

[4] April 25, 2000, Information Memorandum, Bates # CREDIT00234.

[5] Bates # JPMUCI 0008438–0008574.

[6] Bates # JPMUCI 0003167–0003300.

[7] E.g., the model Assignment and Acceptance form included as Exhibit F to the Credit Agreements, JPMUCI 00008571–8574 and JPMUCI 0003291–3294

[8] Also, the "Business Day of the Proposed Borrowing" in the Notice(s) of Borrowing, Bates # CITINEWBY 0006460–6464 and CITINEWBY 00006467–6471.

[9] On December 2, 2001. Form B1: Voluntary Chapter 11 Petition of Enron Corp. in the United States Bankruptcy Court for the Southern District of New York.

[10] Note that no principal payments were due until the Termination Dates as these were revolvers. Per the Credit Agreements, the first interest payments would have been due on December 31, 2001, the first end-of-quarter following the Draw Date (Bates # JPMUCI 00008453 and JPMUCI 00003182).

### B.    The Plaintiffs' Rights

As a result of their holdings, the Plaintiffs currently own the rights of the original Lenders in accordance with the Credit Agreements. I understand from counsel that the Plaintiffs' rights under the Credit Agreements are a matter of standard forms of assignments. I understand that the Plaintiffs "stand in the shoes" of their respective predecessor-in-interest Funding Banks. That is, the Plaintiffs, as current holders of certain of the outstanding defaulted debt, are entitled to all the rights of repayment that are detailed in the Credit Agreements. As a result, the Plaintiffs seek recovery of damages suffered because of Enron's default on the debt allegedly caused by the Defendants' actions.

### C.    The Defendants' Alleged Knowledge and Actions

The Plaintiffs' Complaint contains many extensively detailed allegations of actions the Defendants took or failed to take that resulted in injury to the Lenders' business and property and resulted in the Plaintiffs' claims. This section of the report is included to serve as context for the rest of my report and contains only a small portion of the allegations of the Complaint.

The Plaintiffs state in the Complaint, in part, that:

> Enron's October 25, 2001 borrowing was fraudulent. Enron and the Defendants knew—but the Lenders did not—that, for two distinct reasons, Enron was not entitled to borrow and the Lenders were not obligated to lend:
>
> > (a) First, the Credit Agreements required that certain of Enron's financial statements fairly present Enron's financial condition in conformity with Generally Accepted Accounting Principles ("GAAP"), and that upon borrowing Enron again represent that those financial statements fairly presented Enron's financial condition in conformity with GAAP. Enron and Defendants knew—but the Lenders did not—that those financial statements did not fairly present Enron's financial condition in conformity with GAAP, and that on October 25, 2001, Enron could not truthfully represent that those financial statements fairly presented Enron's financial condition in conformity with GAAP.
>
> > (b) Separately, the Credit Agreements required, as an initial condition precedent to any obligation to advance funds, that certain of Defendants receive and approve as to form and substance certified resolutions of the Enron Board of Directors approving each notice of borrowing under the Credit Agreements. Enron and Defendants knew—but the Lenders did not—that the Enron Board of Directors never passed any such resolutions.[11]

> Defendants knew that Enron committed fraud on the Lenders by entering into the Credit Agreements in May 2000 and May 2001, and that Enron was again committing fraud on the Lenders on or about October 25, 2001 by borrowing under the Credit Agreements. At all relevant times, Defendants knew that the Lenders were relying on false information concerning Enron's financial condition, including certain of Enron's financial statements. Defendants knew the information was false because Defendants helped Enron to manufacture it, working with Enron for years to

---

[11] The Second Amended Complaint, ¶ 4.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

misrepresent Enron's financial condition by structuring transactions designed to make Enron appear creditworthy when in fact it was not.[12]


Regarding the JPMC Defendants, the Plaintiffs state in the Complaint, in part, that:

> The JPMC Defendants knew that Enron's representations to the Lenders—that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were fairly presented in accordance with GAAP—were materially false because the JPMC Defendants *themselves* had structured numerous fraudulent transactions for Enron that the JPMC Defendants knew Enron did not fairly present on its financial statements in conformity with GAAP. Indeed, the JPMC Defendants had *designed* these transactions to enable Enron to understate its true GAAP debt and to overstate its true GAAP operating cash flow. Defendants JPMorgan Chase Bank and J.P. Morgan Securities designed these transactions to hide the fact that Enron was raising debt financing while simultaneously making it appear as if Enron were generating more cash flow from its business than Enron actually was generating.[13]

> Through the Mahonia transactions, the JPMC Defendants provided Enron with an aggregate of $3.717 billion in secret loans. At least $1.5 billion of these secret and fraudulent transactions remained on Enron's books as of the October 25, 2001 fraud. Because of these fraudulent transactions, the JPMC Defendants knew that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements violated GAAP, drastically understating Enron's true GAAP debt and overstating Enron's true GAAP operating cash flow.[14]

> The JPMC Defendants also knew that Enron's auditor, Arthur Andersen LLP ("Andersen"), did not understand the true nature of the Mahonia transactions. In fact, the JPMC Defendants actively assisted Enron in making misleading representations to Andersen so that Andersen would approve Enron's non-GAAP accounting for the transactions. For example, most of the fraudulent prepays that the JPMC Defendants structured for Enron involved Mahonia, a family of shell corporations located in the Channel Islands near England. Andersen believed that Mahonia was an independent entity but, in reality, Defendant JPMorgan Chase Bank had established and controlled Mahonia from its inception. Indeed, in a November 29, 2001 email summarizing the Enron/JPMC prepay transactions, a JPMorgan Chase Bank employee, Michael Sabloff, refers to "[w]e (Mahonia)," succinctly expressing the functional identity of JPMorgan Chase Bank and Mahonia.[15]


Regarding the Citigroup Defendants, the Plaintiffs state in the Complaint, in part, that:

> The Citigroup Defendants knew that Enron's representations to the Lenders—that Enron's December 31, 1999, March 31, 2000, December 31, 2000, and March 31, 2001 financial statements were fairly presented in accordance with GAAP—were materially false because the Citigroup Defendants *themselves* had structured numerous fraudulent transactions for Enron that the Citigroup Defendants knew Enron did not fairly present on its financial statements in conformity with GAAP. Indeed, the Citigroup Defendants had *designed* these transactions to enable Enron to understate its

---

[12] Ibid., ¶ 5.
[13] Ibid., ¶ 48. The emphasis is in the original.
[14] Ibid., ¶ 53.
[15] Ibid., ¶ 57.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

true GAAP debt and to overstate its true GAAP operating cash flow. Defendants Citibank and Salomon Smith Barney designed these transactions to hide the fact that Enron was raising debt financing while simultaneously making it appear as if Enron were generating more cash flow from its business than Enron actually was generating.[16]

The fraudulent transactions that the Citigroup Defendants structured for Enron were designed to meet Enron's need for cash and Enron's need to maintain an investment grade credit rating. Virtually all of the fraudulent transactions that the Citigroup Defendants structured for Enron were designed to hide the fact that Enron was raising debt financing while simultaneously making it appear as if Enron was generating more cash flow from its business than Enron actually was generating. Among the fraudulent transactions were prepay transactions with Enron between 1998 and 2001, totaling over $3.8 billion. The Citigroup Defendants also participated in other structured finance transactions with Enron—including Nighthawk, Rawhide, Nahanni, Bacchus and Sundance—which provided Enron almost $2 billion of financing. The Citigroup Defendants structured these fraudulently-reported transactions by which Enron borrowed approximately $5.9 billion without reporting the borrowed funds as debt. The Citigroup Defendants knew that Enron was reporting these transactions in violation of GAAP. For example, these transactions understated the debt on Enron's December 31, 2000 balance sheet by nearly $2 billion and overstated Enron's operating cash flow.[17]

In its prepay transactions, Citibank often used a special purpose entity called Delta. Delta was located in the Cayman Islands. Delta was intended to appear to be an independent entity but, in reality, was established and controlled by Citibank. Delta had no employees, no office, and no business operations independent of Citibank, and Citibank provided all of the legal advice, paperwork and financial support necessary for Delta to participate in the prepay transactions. Citibank took steps, however, to make Delta appear independent in order to help Enron deceive Andersen, Enron's outside auditor. For instance, when Andersen raised questions about the independence of Delta and requested certain representations from Delta as to Delta's independent status and that Delta was not just a Special Purpose Entity ("SPE"), Enron contacted Citibank (not Delta) with a copy of Andersen's letter, noting such confirmation was necessary if Enron was to achieve its deceptive accounting objectives. Eventually, Citibank caused Delta to deliver a letter to Andersen containing the requested representations. However, Citibank subsequently admitted that Delta was in fact an SPE.[18]

---

[16] Ibid., ¶ 79.  The emphasis is in the original.
[17] Ibid., ¶ 84.
[18] Ibid., ¶ 85.

# III.  Summary of Opinions

The Plaintiffs collectively own the rights to approximately $1.577 billion of Enron debt under the Credit Agreements.  This is comprised of approximately $636 million from the May 2000 Agreement and approximately $941 million from the May 2001 Agreement.  In addition, the Plaintiffs collectively own the rights to approximately $5.775 million of unpaid facility fees from the May 2000 Agreement and approximately $582,000 of unpaid facility fees from the May 2001 Agreement.

Enron appeared able to repay the Lenders under the term of the Credit Agreements at the times that the Credit Agreements were entered into and when the loans were funded.

At the time the loans were funded, the risks of the loans had apparently increased, but no event of default was apparent.

Enron's credit rating was not aligned with its financial results when its financial results are adjusted for the Defendants' improper transactions with Enron.  Further, given the debt that was concealed as a result of the Defendants' improper transactions with Enron, Enron was in violation of the senior-debt-to-capitalization ratio when it drew down the funds under the Credit Agreements.

The facts show that at the time the loans were made Enron was insolvent and could not have repaid the Lenders under the terms of the Credit Agreements.

I calculated the Plaintiffs' damages using two methods: the out-of-pocket method; and the benefit-of-the-bargain method.

- Using the out-of-pocket method, the Plaintiffs damages, net of the approximate amount of mitigation the owners of the debt have received from the Enron Chapter 11 estate, are approximately $1.320 billion.  Statutory interest to September 1, 2007—an approximated date of trial—is approximately $495 million.  Total damages and interest are approximately $1.815 billion.

- Using the benefit-of-the-bargain method, the Plaintiffs damages, including the Facility Fees in accordance with the Credit Agreements and net of the approximate amount of mitigation the owners of the debt have received from the Enron Chapter 11 estate, are approximately $1.526 billion.  Statutory interest to September 1, 2007—an approximated date of trial—is approximately $397 million.  Total damages and interest are approximately $1.923 billion.

The damages and interest amounts do not include further potential mitigation from the Enron Chapter 11 estate.  I understand that the current market value of this Enron debt, as shown by trades of Enron bonds on May 24, 2006, is approximately $0.32125/dollar of principal.  This may indicate that additional potential mitigation would eventually approximate $507 million in May 2006 dollars.

## IV.   Tracing the Plaintiffs' Holdings to the Lenders

### A.     Information Relied Upon and the Method of Tracing

We created a database to:

- Capture information that documents the Plaintiffs' current holdings of Enron debt borrowed under the Credit Agreements and the provenance of those holdings; and to

- Calculate damages using alternate models and assumptions.

We traced each separate principal amount acquired by each Plaintiff to the related supporting documents. I understand that the supporting documents for the Plaintiffs' holdings that I rely on are genuine and binding legal documents.

Certain individual commitment amounts (and related rights and obligations) under the Credit Agreements were subsequently broken up into smaller amounts and transferred one or multiple times through different financial institutions. These predecessor transfers, as they relate to the Plaintiffs' holdings, occurred both between the dates of the Credit Agreements and the Draw Date and between the Draw Date and the date of this report. For ease and consistency of reference I have categorized the different financial institutions as:

- "Signatory Banks" – The original banks that signed one or both of the Credit Agreements;

- "Funding Banks" – The banks that actually lent the money to Enron under the Credit Agreements on the Draw Date; and

- "Intermediary Banks" – The banks involved in predecessor transfers—in other words, banks or financial institutions that held any portion of the debt that any Plaintiff eventually acquired—at any point in time between the date of the relevant Credit Agreement and the date one of the Plaintiffs acquired the debt.

The majority, but not all, of the Funding Banks are Signatory Banks, and many of the Signatory Banks and Funding Banks are also Intermediary Banks.

I understand that the Plaintiffs "stand in the shoes" of the Funding Banks. As a result, we documented as basis for the Plaintiffs' current holdings the predecessor transfers of each principal amount back to the Funding Bank. The supporting documents that we rely on as support for the predecessor transfers include:

- The original Purchase and Sale Agreement and related Assignment and Acceptance Agreement entered into by a Plaintiff as the buyer of the rights and obligations associated with the principal amount acquired;

- A summary document included as an Annex to the Purchase and Sale Agreement that lists predecessor transfer agreements—transfer by transfer—back to the Signatory Bank;

- Predecessor Purchase and Sale Agreements and/or related Assignment and Acceptance Agreements that show the lineage of ownership by Intermediary Banks of the rights and obligations associated with the principal amount acquired; and

- The draw-down letters that support the request for transfer of funds from the Funding Banks to Enron under the respective Credit Agreements on the Draw Date.

We created and recorded unique principal identification ("Principal ID") numbers as a tracking device to identify each block of debt acquired by each Plaintiff. The use of Principal ID numbers allowed us to structure the database such that each unique block of debt held by the Plaintiffs can be more easily traced to the Funding Banks.

During our review of each agreement that supports the principal amounts held by each of the Plaintiffs, we recorded in the database for each principal amount:

- The principal amount of the Enron debt acquired and/or sold by the Plaintiff and the respective Credit Agreement;

- The name of the Funding Bank and the name of the Signatory Bank, if different;

- The Bates number of the letter, if available, from Citibank, N.A., as the Paying Agent, to the Funding Bank, requesting transfer of the committed funds; and

- The Bates number of the summary document of predecessor transfers, if applicable.

Generally, each predecessor transfer is supported by both a Purchase and Sale agreement and an Assignment and Acceptance agreement. We recorded certain information in the database from

those documents in reverse chronology sequence (i.e., from the purchase by the Plaintiff, back in time through Intermediary Banks, to the Funding Bank), including:

- From the Purchase and Sale Agreements:

  o The name of the Intermediary Bank from which the principal was acquired;

  o The dollar amount of principal transferred;

  o The Bates number of the page from which the dollar amount was taken;

  o The date of the Purchase and Sale Agreement, if applicable;

  o The Bates number of the Purchase and Sale Agreement from which the date was taken, if applicable;

  o The Bates number range of the entire Purchase and Sale Agreement, if applicable; and

  o Any comments or unique circumstances regarding the transfer.

- From the Assignment and Acceptance Agreements:

  o The dollar amount of principal assigned;

  o The Bates number of the page from which the dollar amount was taken;

  o The date of the Assignment and Acceptance Agreement, if applicable;

  o The Bates number of the Assignment and Acceptance Agreement from which the date was taken, if applicable;

  o The Bates number range of the entire Assignment and Acceptance Agreement, if applicable; and

  o Any comments or unique circumstances regarding the transfer.

We conducted multiple levels of review of the information reviewed and captured to support each of the Plaintiffs' holdings. To document this review process, we captured:

- The initials of the person on my staff who first examined the supporting documents and entered the relevant information into the database;

- The initials of the person who performed the initial review of the information entered into the database; and

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

- The initials of the person who performed a second and final review of the details of the holding.

Exhibit 1 is the transfer summary report included in our work papers that includes each principal amount held by the Plaintiffs and that shows each of the elements captured in the database, as described above. For certain transfers that were complex—e.g., principal that was traded back and forth among the Plaintiffs and divided in the process—we prepared a diagram to show the relationships among those principal amounts. Exhibit 2 is the complex tracing diagrams.

### B.    The Plaintiffs' Current Holdings

The aggregate amount of Enron debt collectively held by the Plaintiffs is **$1,577,309,727.** We used the database to show the Plaintiffs' holdings multiple ways, including:

- By Funding Bank in Exhibit 3;

- By Plaintiff, by Credit Agreement, and by Funding Bank in Exhibit 4; and

- By Plaintiff, by Credit Agreement, by Funding Bank, and by Principal ID in Exhibit 5.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

# V.    At the Times the Credit Agreements Were Executed, Enron's Financial Statements and Credit Ratings Indicated That Enron Would Be Able to Repay the Lenders Under the Terms of the Credit Agreements.

### A.    Information Relied Upon and Methods Used

I reviewed Enron's annual financial statements for 1999 and 2000, as well as their 10-Q filings for the periods ended March 31, 2000, and March 31, 2001.  I then compared Enron's annual results to other investment grade companies in its peer group.  For purposes of comparison, I used the "Natural Gas: Pipelines" Peer Group from Moody's January 2001 publication "Financial Ratio Medians for Global Investment Grade Corporates," which includes Enron and ten investment grade companies in the U.S. and Canada.[19]  I obtained and reviewed the annual public filings of those companies listed in the peer group for the years 1999 and 2000.[20]

Based on Enron's financial statements and those of the companies in its peer group, I then calculated certain financial ratios that I understand to be commonly relied-upon benchmarks for purposes of credit analysis.[21]

Finally, I reviewed Enron's credit ratings, as well as press releases and other publicly available information circulating at the time the Lenders entered into the Credit Agreements.  My analysis is covered below, and is further detailed in Exhibits 6 and 7 to this report.

- Exhibit 6 shows a summary of the reported financial statements of Enron, and shows those figures adjusted for the effects of the Defendants' improper transactions as set forth in the Field Report.

- Exhibit 7 compares and contrasts certain of Enron's financial ratios—both as reported and as adjusted in the Field Report—to those of its peer group.  The ratios in the text are also found in Exhibit 7.

---

[19] These companies include: The Coastal Corporation, The Columbia Energy Group, Consolidated Natural Gas Company, Duke Capital Corporation, El Paso Energy Corporation, Kinder Morgan Inc., National Fuel Gas Company, Reliant Energy Resources Corp., TransCanada Pipelines Limited, and The Williams Companies.  See Moody's January 2001 publication "Financial Ratio Medians for Global Investment Grade Corporates" at p. 72.  Bates # MDY 19348–19438.

[20] The annual filings for these companies for 1999 and 2000 are produced separately from this report.

[21] Based on my review of Moody's January 2001 publication "Financial Ratio Medians for Global Investment Grade Corporates" at p. 72, and Standard & Poor's 2002 publication "Corporate Ratings Criteria" at pp. 54–55.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

### B.    The Public Picture of Enron at the Time of the May 2000 Agreement

About the time the Lenders entered into the May 2000 Agreement, Enron's financial statements indicated solid fundamentals. Enron showed a low level of debt on its balance sheet relative to its peers, its statements of cash flows showed significant levels of cash funded by its operations, and Enron's profitability and growth appeared either above or in line with its peer group.

### 1.    Enron appeared to carry low levels of debt

Enron appeared under-leveraged relative to its peer group in early 2000, reporting very low levels of debt relative to its competitors. As of December 31, 1999, Enron's balance sheet showed total debt of $8.152 billion, and Enron's debt to capital ratio[22] stood at 43.3%. This ratio was at the low end of the range compared to its investment grade peers, whose debt to capital ratios ranged from 42.7% to 71.2%. Enron's total debt at March 31, 2000, grew to $10.172 billion; and its debt to capital ratio likewise rose to 48.4%,[23] low for its peer group. It appeared Enron could comfortably take on additional levels of debt.

### 2.    Enron's cash flows appeared substantial

Enron's cash flows statement shows that its lines of business were generating more than enough cash to service its debt. Enron reported $1.228 billion of cash flow from operations for 1999 and funds from operations[24] of $2.228 billion. Enron's funds from operations interest coverage[25] (a measure of a company's ability to generate sufficient cash earnings to meet its interest obligations) for 1999 was 4.40, among the best of its peer group, which reported ratios ranging from 2.06 to 5.46.

Enron's first quarter 2000 funds from operations dipped to negative $144 million from a negative $104 million a year earlier. The MD&A section of Enron's 10-Q explains this deficit being driven in part by net cash used to acquire additional merchant assets and investments due to increased working capital requirements. Enron's cash flows from operations for the quarter included a negative $517 million line item for net merchant asset additions and unrealized gains—a $382 million increase from the prior year—apparently indicating significant future cash flows from the performance of its merchant assets.[26]

---

[22] The debt to capital ratio measures the percentage of a company's capitalization (defined as total debt, equity, minority interest, company-obligated preferred stock (or "COPS"), and other mezzanine financing) that consists of debt or debt equivalents. I include COPS as a debt equivalent in the debt to capital ratio calculation.
[23] Enron's March 31, 2000, 10-Q indicates that with total debt of $10.172 billion, COPS of $1.099 billion, minority interests of $1.872 billion, and equity of $10.140 billion, total capitalization was $23.283 billion. See Exhibit 6.
[24] Funds from operations is calculated by backing the net changes in working capital out of cash flow from operations.
[25] Funds from operations interest coverage is calculated as the sum of funds flow from operations and gross interest expense, divided by gross interest expense.
[26] Enron March 31, 2000, Form 10-Q.

3. **Profitability appeared sufficient, and particularly good in relation to debt**

For 1999 Enron reported revenues of $40 billion, net income of $1 billion, and earnings before interest and taxes ("EBIT") of $2 billion. Enron's apparent return on capital[27] for the year was 9.2%, which falls in the middle of the range of Enron's peer group (1.5% to 16.2%). Enron's pretax interest coverage ratio[28] of 2.25 likewise fell in the middle of the range (0.13 to 4.12), and its operating margin[29] (3.1%) was among the lowest. Enron's earnings relative to debt, however, appeared good compared to the peer group. Enron's debt to EBITDA stood at 2.85, near the low end of the range (2.67 to 8.21), apparently showing that Enron had capacity for additional debt. For the first quarter of 2000, earnings apparently remained consistent with 1999 levels, with Enron reporting net income of $338 million and EBIT of $624 million.[30]

4. **Enron continued to grow**

Enron reported gross revenue of $40 billion for 1999, up 28% from the prior year.[31] This trend continued into the first quarter of 2000, as reported sales topped $13 billion, a 72% increase from first quarter 1999.[32]

5. **Investors' and analysts' perceptions of Enron were positive**

Anchored by its continued apparently strong financial results, Enron maintained investment grade ratings from both Moody's (Baa1, upgraded from Baa2 in March)[33] and Standard & Poor's (BBB+)[34] in 2000. Further, Enron enjoyed the support of equity analysts who continued to recommend Enron's stock, pushing the stock price targets ever higher.[35]

---

[27] Return on capital is calculated as the sum of pretax income and interest expense, divided by the average of the beginning and ending total capitalization for the period.

[28] Pretax interest coverage ratio is calculated as the sum of pretax income and gross interest expense less equity income, divided by gross interest expense.

[29] Operating margin is calculated by dividing income from operations (excluding non-recurring items such as merger expenses, settlements, and other infrequent items) by total revenues.

[30] Enron March 31, 2000, 10-Q. See Exhibit 6.

[31] Enron December 31, 1999, 10-K reports total revenue for the year ended December 31, 1999, as $40.112 billion and for the year ended December 31, 1998, as $31.260 billion.

[32] Enron March 31, 2000, 10-Q reports total revenue for the three months ended March 31, 2000, as $13.145 billion and for the three months ended March 31, 1999, as $7.632 billion.

[33] Moody's research report on Enron Corporation, March 23 2000, Bates # ANARPT 009042.

[34] March 17, 2005, Deposition of Ron Barone, Standard & Poor's, at 982:13–18. Barone's testimony confirms Enron maintained a BBB+ issuer rating from Standard & Poor's from approximately December 1995 until November 1, 2001.

[35] E.g., a May 4, 2000, Goldman Sachs Equity Research Report, "You ain't seen nothin' yet," set a $100, 12-month price target for Enron's stock, which was then trading at $69.69 (Bates # ANARPT 003561).

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

## C.    The Public Picture of Enron at the Time of the May 2001 Agreement

As of May 2001, Enron's financial statements continued to portray solid fundamentals. Enron continued to show low levels of debt on its balance sheet, its cash flow statement showed substantial cash from operations, and its statement of operations indicated continued profitability and significant growth over the prior year.

### 1.    Enron continued to report relatively low levels of debt

Enron's balance sheet at December 31, 2000, showed total debt of $10.229 billion, and its resulting debt to capital ratio stood at 44.5%. Enron continued to appear under-leveraged in comparison to its peer group. The range of debt to capital ratios for the peer group was from 47.5% to 67.0%. This indicated that Enron was capable of carrying additional debt.

At March 31, 2001, Enron's balance sheet showed total debt of $11.922 billion, and its debt to capital ratio had moved slightly to 47.6%,[36] still well below the majority of its peer group.

### 2.    Cash flows continued to appear substantial

In its 2000 10-K Enron reported record cash flow from operations of $4.78 billion, and funds from operations were reported to be $3.01 billion. Enron's funds from operations interest coverage increased to 4.59, near the top of the range among its peer group (2.29 to 5.08), making it appear that Enron was generating more than enough cash from its day-to-day operations to continue to grow, meet its obligations, and support additional debt.

Enron's first quarter 2001 cash flows statement showed funds from operations of $135 million, which, while not along the same trajectory as Enron's $3.01 billion funds from operations for the year 2000, was still an improvement over the first quarter of 2000.

### 3.    Profitability continued to appear sufficient, particularly in relation to debt

For 2000 Enron reported net income of $979 million and EBIT of $2.482 billion. Much like 1999, Enron's reported earnings did not stand out from its peer group:

- Return on capital for the year was 9.8% (the peer group ranged from 7.3% to 15.1%);

- Pretax interest coverage ratio of 2.58 fell in the middle of the range of the peer group (1.82 to 3.86); and

---

[36] Enron's March 31, 2001, 10-Q indicates that with total debt of $11.922 billion, COPS of $904 million, minority interests of $2.418 billion, and equity of $11.727 billion, Enron's total capitalization was $26.971 billion. See Exhibit 6.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

- Operating margin, down to 1.9% of revenues, was at the bottom of the range of the peer group (1.5% to 20.7%).

However, Enron's reported earnings relative to debt continued to be good, with a low debt to EBITDA ratio of 3.07 compared to the range of its peer group (2.51 to 4.95). The low debt to EBITDA suggested Enron had sufficient earnings to further leverage its business.

Enron continued to grow earnings in the first quarter of 2001, posting net income of $406 million (a 20% increase from first quarter 2000) and EBIT of $795 million (a 27% increase).[37]

### 4.    Enron's growth accelerated compared to prior years

Enron's financial statements showed substantial growth in 2000, with over $100 billion in sales, a 151% jump from 1999. Funds from operations were also up 35% over the prior year. Enron's apparent growth continued into first quarter 2001, with sales reported at $50.129 billion, a 281% increase over first quarter 2000.[38]

### 5.    Analysts' reports remained positive

Enron continued to maintain investment grade ratings from both Moody's (Baa1)[39] and Standard & Poor's (BBB+).[40] Enron's stock continued to receive strong recommendations from stock analysts projecting significant appreciation, and its stock price, although down, appeared to be weathering the storm of a down market.[41]

---

[37] Enron's March 31, 2001, 10-Q; net income in first quarter 2000 was $338 million, and EBIT was reported at $624 million. See Exhibit 6.

[38] Enron March 31, 2001, 10-Q; sales for first quarter 2000 were reported as $13.145 billion. See Exhibit 6.

[39] Moody's Global Credit Research Report, April 2001, Bates # ERN 0011460.

[40] March 17, 2005, Deposition of Ron Barone, Standard & Poor's, at 982:13–18. Barone's testimony confirms Enron maintained a BBB+ issuer rating from Standard & Poor's from approximately December 1995 until November 1, 2001.

[41] For example, an April 17, 2001, Salomon Smith Barney report (Bates # ANARPT 0078733–34) targeted Enron's stock at $100 for the 12–18 month range. The stock was trading at $59.44 the prior day. According to the article "Is Enron Overpriced?" by B. McLean, *Fortune Magazine*, March 5, 2001, Enron was rated a buy by 13 of Enron's 18 analysts.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

## VI.   At the Time the Loans Were Funded, the Risks of the Loans Had Apparently Increased, But No Event of Default Was Apparent

By the time Enron issued Notices of Borrowing to the lenders on October 25, 2001, there was concern among the lender banks regarding Enron's condition.[42]  In the months leading up to the funding, a number of events happened.

- On August 14, CEO Jeffrey Skilling unexpectedly resigned.[43]

- On October 16, Enron announced third quarter earnings, and revealed:

  o   A $1.2 billion charge to equity;

  o   A $1 billion "non-recurring earnings charge" related to a write down of its investment in Azurix Corp., a restructuring charge to Enron's broadband business, and "Losses associated with certain investments."[44]

- Also on October 16, Moody's announced Enron's long-term debt obligations were on review for a possible downgrade.[45]

- On October 22, the SEC announced an informal investigation into Enron's related party transactions.[46]

- On October 24, Enron announced CFO Andrew Fastow was placed on a leave of absence.[47]

There was an apparent deterioration of the credit quality of the Credit Agreements, but nothing appeared that would have relieved the Lenders from their obligations under the Credit Agreements. Nothing appeared that could have indicated that Enron was in default under the Credit Agreements, and nothing appeared that could have indicated that Enron was in default of the 65% senior debt to total capitalization requirement.  Enron maintained the appearance of keeping its promises

---

[42] See deposition testimony of the Lenders, e.g.: the June 6 deposition of Elizabeth Hunter, Societe Generale, at 98:23–99:13 and 116:8–23; the January 28, 2005, deposition of John McGhee, Bank of Tokyo Mitsubishi, at 151:8–25; and the December 2, 2004, deposition of Raymond Palmer, Bank of New York, at 126:22–128:15.
[43] CSFB Equity Research Report, "CEO Skilling Resigns; Chmn Lay Back as CEO & Pres, No Other 'Shoes to Drop'," August 15, 2001.
[44] Enron Press Release, "Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share," October 16, 2001.
[45] Moody's Rating Action, "Moody's Places All Long Term Debt Obligations of Enron Corp on Review for Downgrade," J. Diaz and S. Moore, October 16, 2001.
[46] "SEC Seeks Information on Enron Dealings with Partnerships Recently Run by Fastow," R. Smith and J. Emshwiller, Wall Street Journal, October 23, 2001.
[47] Associated Press, "Enron Corp. Ousts Its CFO," P. Easton, October 24, 2001.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

contained in the Credit Agreements, and as a result the Lenders were constrained by that false appearance to fund the loans.[48]

The Credit Agreements define certain Events of Default under which the Lenders would have been able to terminate their obligations to fund.[49] Enron was apparently in default of the Credit Agreements under at least two definitions at October 25, 2001:

- Enron had knowingly and materially misstated its historical financial statements,[50] thus violating paragraph 6.01(b) of the Credit Agreements;[51]

- Enron's senior debt to total capitalization ratio was at least 66.4%, thus violating the negative covenant in paragraph 5.02(b) of the Credit Agreements.[52]

The violations of the debt covenants, however, were not apparent to the Lenders at October 25, 2001. Furthermore, in a letter attached to the Notices of Borrowing, Enron's CEO Kenneth Lay made assurances that no events of default had occurred or would result from the drawdown of funds.[53] Enron's financial statements at June 30, 2001, and its third quarter earnings release likewise give no indication that Enron was in default on the Credit Agreements. For example, Enron's June 30 10-Q indicates a senior debt to capital ratio of 49.2%.[54] Also, even though Enron's third quarter earnings release did not provide balance sheet information, the $2.2 billion equity write-down would be insufficient in and of itself to move Enron's debt to capital ratio near the 65% threshold.[55]

---

[48] See deposition testimony of the Lenders, e.g.: the April 25, 2005, deposition of Kathryn Barrios, Banco Bilbao, at 72:5–73:3 and 76:18–79:17; the July 28, 2005, deposition of Kenneth Fatur, Bank One, at 104:19–105:19; and the January 27, 2005, deposition of John Hennessy, Banco Santander, at 36:16–38:9.

[49] Article VI of the Credit Agreements, "Events of Default," Bates # JPMUCI 0008469–71 and JPMUCI 0003199–201.

[50] Based on the June 1, 2006, expert report of Mr. Lawrence Field.

[51] Paragraph 6.01(b) of the Credit Agreements defines an event of default if "Any representation or warranty made by the Borrower (or any of its officers) . . . under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing." (Bates # JPMUCI 0008469 and JPMUCI 0003199).

[52] Paragraph 5.02(b) of the Credit Agreements defines a negative covenant in which Enron is prohibited from having " . . . a ratio of (i) Total Senior Debt to (ii) Total Capitalization greater than 65%," and paragraph 6.02(c) of the Credit Agreements defines an event of default if "The Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.02." (Bates # JPMUCI 0008469 and JPMUCI 0003198). See also pages 24 and 25 of this report, Section VII.D.2.

[53] October 25, 2001, Notices of Borrowing, Bates # CITINEWBY 00006460–62 and CITINEWBY 00006467–69.

[54] Enron's June 30, 2001, 10-Q indicates total debt of $12.812 billion (including $3.457 billion of short-term debt and $9.355 billion of long-term debt), COPS of $903 million, minority interests of $2.395 billion, and equity of $11.740 billion, amounting to total capitalization of $27.850 billion.

[55] Less $2.2 billion of equity and assuming a similar reported capital structure to June 30, 2001, Enron's total capitalization at September 30, 2001, would have been reported to be $25.650 billion, and its debt to capital ratio apparently would have been 53.5%.

## VII. Enron's Financial Statements, Adjusted for the False Accounting of the Defendants' Transactions With Enron, Show That the Defendants' Transactions with Enron Significantly Impacted the Appearance of Enron's Financial Condition

### A.    Information Relied Upon and Methods Used

I have been instructed to rely on the expert report of Mr. Lawrence Field, CPA, which sets forth his opinions on the misstatements of Enron's financial statements resulting from the Defendants' improper transactions with Enron. I rely on the Field Report for his restatements of the Enron financial statements for the effect of the Defendants' improper transactions with Enron.

Field analyzes 19 transactions that, in his view, were structured by the Defendants and Enron specifically to allow Enron to achieve certain improper financial reporting treatments. These transactions include 11 structured by the Citigroup Defendants and 8 structured by the Chase Defendants. Field opines on the proper accounting for those transactions in accordance with Generally Accepted Accounting Principles (or "GAAP") and sets forth adjusted balances for the affected accounts in the financial statements, including:

- Total debt;

- Minority interests;

- Retained earnings;

- Shareholders equity;

- Interest expense;

- Net income; and

- Cash flow from operations.

The Field Report presents adjusted Enron financial reporting but for the improper accounting for the Defendants' transactions for the years 1999 and 2000, and for the periods ended March 31, 2000; March 31, 2001; and June 30, 2001. In addition, the Field Report presents adjusted financial information as of October 25, 2001, based on:

- The June 30, 2001, adjusted financials;

- The third quarter earnings release, and

- The Defendants' transactions arranged after June 30, 2001.

Field includes three categories of transactions:

- Prepay transactions – Field details 15 transactions in which the Defendants provided loans to Enron through a structure involving a third-party special purpose entity, or SPE, and various forward sale and swap arrangements to give each loan the appearance of commodities transactions. Enron improperly reported the debt from each transaction as liabilities from price risk management activities, and improperly reported the loan proceeds as cash flow from operations rather than from financing activities.

- Minority Interest transactions – Field details three transactions in which Citigroup provided loans to Enron through a third-party minority interest investor in order to allow Enron to improperly report the proceeds as minority interest investments rather than debt.

- The Forest Products transaction – The Bacchus/Fishtail transaction involved the fictitious sale of Enron's pulp and paper trading business and allowed Enron to record proceeds from a $200 million loan as cash flow from operations and a gain from the purported sale.

Using the figures from the Field Report, I compared Enron's financial statements—adjusted for the improper treatment of the Defendants' transactions—to Enron's reported financial statements for the years 1999 and 2000 and the periods ended March 31, 2000, and March 31, 2001. I then compared Enron's adjusted financials to the financial results of those companies listed in the peer group for the years 1999 and 2000.

I also compared Enron's adjusted financial results for 1999 and 2000 to median credit ratios published in the Standard & Poor's 2002 publication "Corporate Ratings Criteria," and I contrasted Enron's reported financial information and adjusted financials to determine whether Enron's reported and adjusted financials aligned with the median scores of investment grade companies.

Finally, I compared Enron's financial information as adjusted by Field to the requirements set forth in the covenants in the Credit Agreements.

The results of my analysis are discussed below and are detailed in Exhibits 6, 7, and 8 to this report. Exhibits 6 and 7 are described in Section V., above. Exhibit 8 shows the comparison of Enron's financial ratios, based on both its reported financial statements and the adjustments in the Field Report, to the median scores of both investment grade and non-investment grade companies rated by Standard & Poor's for 1999 and 2000.

**B.    The Picture of Enron at the Time of the May 2000 Agreement, Given the Field Adjustments**

**1.    Enron's 1999 balance sheet omitted over $4 billion of debt arranged by the Defendants**

Enron's 1999 balance sheet showed $8.152 billion of debt, indicating it was under-leveraged relative to its peers. However, the Field Report states Enron should have reported an additional $3.06 billion of debt at December 31, 1999, related to transactions arranged by Citibank, and $1.08 billion of debt related to the Chase transactions. Had Enron properly accounted for this debt:

- Its debt to capital ratio would have been 55.0% rather than 43.3%;

- Its Debt to EBITDA ratio would have been 4.18 rather than 2.85; and

- Its 1999 balance sheet would have showed 51% more debt than was actually reported.

Furthermore, Enron's failure to correctly report the interest expense associated with the disguised debt resulted in overstating its interest coverage ratios, as discussed further below.

**2.    Enron's 1999 cash flow statement reported over $1 billion of loans as cash flow from operations**

The Field Report states that in 1999 Enron overstated its operating cash flows by $195 million stemming from Chase transactions, by $1.215 billion stemming from Citibank transactions, and by $1.410 billion in total. As a result, if Enron had properly reported its cash flow from operations related to the Defendants' improper transactions in 1999, its operating cash flows would have been negative $182 million, as opposed to the $1.228 billion reported.

Adjusting Enron's financial statements for the Defendants' transactions, Enron's funds from operations would have been $818 million, and its funds from operations interest coverage ratio would have been 1.99, the worst of its peer group. Enron instead showed a funds from operations interest coverage ratio of 4.40, appearing to have less credit risk than it did.

3.    **Enron's credit rating was not aligned with its financial results adjusted for the Defendants' improper transactions with Enron**

By hiding several billion dollars of debt from its 1999 balance sheet, Enron's financial statements indicated it was much less leveraged than it really was. This also had the effect of understating Enron's debt to capital and debt to earnings ratios and overstating its interest coverage.

By improperly reporting the proceeds of its loans from the Defendants as cash flows from operations, Enron falsely showed that it generated much more cash than did. This had the effect of significantly overstating funds from operations and cash coverage ratios.

Based on its reported 1999 financial statements and related credit ratios, Enron appeared to be well-positioned in relation to its peer group. Enron's debt to capital ratio was second lowest among its peer group; its debt to EBITDA, second best; funds from operations interest coverage, fourth; and retained cash flow to total debt, third. In contrast, adjusted for the Defendants' improper transactions, many of Enron's 1999 credit ratios ranked at or near the bottom of the range of its peer group, including: its funds from operations interest coverage (last); debt to EBITDA (seventh); and retained cash flow to total debt (last). Enron's debt to capital ratio dropped to 55.0% (fifth).

I also reviewed a study published in 2002, Standard & Poor's "Corporate Ratings Criteria," in which credit ratio medians from rated companies are presented, arranged by rating category, including non-investment grade categories. This study indicates that Enron's credit rating was not aligned with its financial results adjusted for the Defendants' transactions. The comparison, depicted in detail in Exhibit 8, shows that:

- For 1999 Enron's credit ratios based on its reported financial statements generally align with the median scores for companies rated as low investment grade (BBB) or the highest category of non-investment grade (BB). I calculated Enron's credit ratios based on its reported 1999 financial statements for each of the eight credit benchmarks presented in the "Adjusted Key Industrial Financial Ratios" table from the Standard & Poor's report,[56] and Enron scored at or above the median for the lowest-rated investment grade category (BBB) for two of the eight, including debt to capital and long-term debt to capital. Enron scored above the median for the highest-rated non-investment grade category (BB) for five of the eight credit ratios and below it for return on capital, operating income to sales, and free cash flow to total debt.

- By contrast, Enron's 1999 credit ratios, based on its financial statements adjusted for the effects of the Defendants' improper transactions, show that had the Defendants' transactions been properly accounted for, Enron would have scored below the median of the lowest investment grade category for all eight measures. Additionally, Enron's adjusted

---

[56] These include EBIT interest coverage, EBITDA interest coverage, free cash flow to total debt, funds from operations to total debt, return on capital, operating income to sales, long-term debt to capital, and total debt to capital. The formulas for these ratios are detailed in the footnotes to Exhibit 8.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

1999 ratios would score at or below the median score for companies rated BB for five of the eight credit ratios.[57]

**C.**   **The Picture of Enron at the Time of the May 2001 Agreement, Considering the GAAP Expert's Adjustments**

**1.**   **Enron's 2000 balance sheet omitted $5.74 billion of debt arranged by the Defendants**

Enron's December 31, 2000, balance sheet reported $10.229 billion of debt. The Field Report states that Enron omitted $5.738 billion of debt from its 2000 balance sheet, including $4.002 billion of loans structured by Citibank and $1.737 billion of Chase-structured loans. Had Enron properly accounted for the omitted debt, its 2000 debt to capital ratio would have been 56.1% rather than 44.5%, its debt to EBITDA ratio would have been 4.62 rather than 3.07, and its 2000 balance sheet would show 56% more debt than was actually reported.

**2.**   **Enron's 2000 cash flows statement overstated funds from operations by $1.39 billion**

Enron reported $3.01 billion of funds from operations in its 2000 annual report, and its resulting funds from operations coverage ratio was 4.59. Correcting for the improper reporting of the Defendants' transactions, Enron's funds from operations interest coverage ratio was roughly half of what was reported (at 2.38), placing it near the bottom of the range among its peer group.

**3.**   **Enron's credit rating was not aligned with its financial results adjusted for the Defendants' improper transactions with Enron**

By hiding several billions of dollars of debt from its balance sheet, Enron represented itself to be under-leveraged, and Enron's debt to capital and debt to EBITDA ratios were similarly misstated.

Likewise, by continuing to report proceeds from the Defendants' loans as cash flows from operations, Enron represented itself to be far more liquid than it really was, and Enron's funds from operations and related coverage ratios also conveyed that message.

Based on its reported financial statements and related credit ratios, Enron appeared to be well-positioned in relation to its peer group. Despite its low operating margin (tenth out of 11 companies), its debt to capital ratio was the best; its debt to EBITDA was fourth; funds from operations interest coverage, fourth; and retained cash flow to total debt, third. Adjusting for the Defendants' transactions, many of Enron's credit ratios ranked near the bottom, including its funds from operations interest coverage, ninth; debt to EBITDA, ninth; pretax interest coverage, ninth;

---

[57] Enron's adjusted ratios that exceeded the median for BB companies included total debt to capital, long-term debt to capital, and free cash flow to total debt.

retained cash flow to total debt, seventh; and its debt to capital ratio dropped to 56.1%, or fifth place.

The analysis of Enron's credit ratios for 2000 in comparison with the Standard & Poor's study, detailed in Exhibit 8, shows that:

- For 2000 Enron's credit ratios based on its reported financial statements generally align with the median scores for companies rated low investment grade (BBB) or the highest category of non-investment grade (BB). Enron scored at or above the median for the lowest rated investment grade category (BBB) for four of the eight measures, including debt to capital, long-term debt to capital, free cash flow to debt, and funds from operations to total debt; and Enron scored above the median for BB-rated companies for six of the eight.[58]

- In contrast, Enron's 2000 credit ratios based on the adjustments from the Field Report show that if the Defendants' transactions had been properly accounted for, then Enron would have scored below the median of the lowest investment grade category for all eight measures and below the median for BB-rated companies for four of the eight.

### D. The Picture of Enron as of the Draw Date

#### 1. Enron concealed over $7 billion of debt arranged by the Defendants

The Field Report states that as of June 30, 2001, Enron's balance sheet concealed $5.584 billion of debt structured by Citigroup and an additional $1.512 billion of debt structured in the Chase prepays. In the third quarter of 2001, Enron received another $350 million of loans through Chase that was not properly accounted for. The Field Report states that by the Draw Date, Enron's total debt, adjusted only for the Defendants' improper transactions, was $20.188 billion, including $7.377 billion of debt that had not been disclosed to the Lenders.

#### 2. Given the concealed debt and Enron's announcement of an equity write down, Enron was in violation of the senior debt to total capital covenant as of October 25, 2001

At June 30, 2001, Enron's 10-Q reported $12.812 billion of debt. The Field Report states that $551 million of the debt is subordinated debt. Enron also reported $903 million of Company Obligated Preferred Stock of Subsidiaries (or "COPS"), for a total of $13.164 billion of senior debt as defined by the Credit Agreements. The Field Report shows an additional $7.096 billion of debt outstanding at June 30, 2001, and at October 25, 2001, shows this additional debt to be $7.377 billion. Thus Enron's total senior debt immediately prior to the funding of the loans, adjusted for the Defendants' transactions, was $20.541 billion.

---

[58] Only Enron's operating income to sales and return on capital ratios lagged the median ratios for BB-rated companies.

Enron reported total equity of $11.740 billion on June 30, 2001.  The Field Report states that Enron's total equity was overstated $122 million at October 25, 2001, due to the Defendants' improper transactions.  On its third quarter earnings call Enron announced a $2.211 billion charge to equity.  As a result, Enron's total equity at October 25, 2001, was approximately $9.407 billion. Its capitalization at that date was $32.468 billion.

Section 5.02 of the Agreements, "Negative Covenants," states in paragraph (b) that Enron must not have a ratio of total senior debt to total capitalization greater than 65%.  Enron's senior debt, adjusted to include the effects of the Defendants' improper transactions with Enron, to total capitalization ratio immediately following the $3 billion draw-down stood at 66.4%,[59] in violation of the Credit Agreements.

---

[59] Enron's total senior debt adjusted for the Defendants' transactions was $23.541 billion, and its capitalization was $35.468 billion, after giving effect to the $3 billion draw-down on October 25, 2001.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

# VIII. Enron Was Unable to Repay the Lenders Under the Terms of the Credit Agreements When the Loans Were Made

On December 2, 2001, five weeks following the funding of the $3 billion Credit Facilities, Enron filed for Chapter 11 bankruptcy protection. One measure of Enron's insolvency is the payout to date plus the potential eventual payout from Enron's Chapter 11 estate. I understand that the payout to date on Enron's unsecured liabilities is about 16.2918%, and an additional 1.0612% may have been made in April 2006 or will be made soon.[60] In addition, I understand that Enron unsecured bonds are trading, as of May 24, 2006, at approximately $0.32125 per dollar of principal—or at 32.125%. The sum of these figures is 49.478%, indicating that the current payout plus the market expectation of the remaining value of the Enron estate is about 50% of the allowed claims resulting from Enron unsecured liabilities.

Another measure of Enron's insolvency is the Citibank analysis performed virtually coincident with the funding of the loans.[61] That analysis shows "Total Debt (including non recourse)":

- "Fully Loaded" to be $37.951 billion; and

- "GAAP," or as reported on Enron's books, to be $12.743 billion.

This document also shows that Enron's debt to capital ratio was 74% and that Enron would require an equity infusion of over $7 billion to reduce its debt to capital ratio to 65%. I cannot reconcile this calculation with my calculation of Enron's senior debt to total capitalization ratio.

Further, Deposition testimony from Anne Clarke-Wolff of Citibank indicates that on October 25, 2001, the Defendant banks themselves became aware of a $5 billion cash flow deficit forecast for the upcoming 12 months.[62] The cascade of further announcements from Enron, ratings downgrades, and the Chapter 11 filing followed.

These facts are only some of the most pertinent that show that Enron was deeply insolvent at the Draw Date.

---

[60] See Notices of Distributions dated June 24, 2005; October 31, 2005; and April 3, 2006, *In Re ENRON CORP., et al., Reorganized Debtors, Chapter 11 Case No. 01-16034 (AJG), United States Bankruptcy Court for the Southern District of New York*, and a related work paper produced separately from this report, titled "Bankruptcy Distributions Schedule," showing the specific sources and calculations of these percentages.

[61] October 26, 2001, e-mail with attached schedules, Exhibit 15729, 68–05, Bates # CITINEWBY 00441201-06. See in particular CITINEWBY 00441202. Note that the total debt reported on Enron's June 30, 2001, Balance Sheet was approximately $12.812 billion.

[62] June 8, 2005, deposition of Anne Clarke-Wolff, at 252:4–265:7.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

# IX.  Calculation of Damages

I calculated damages due to the Plaintiffs based on the outstanding principal amounts of the debt funded under each Credit Agreement currently held by the Plaintiffs using two methods:

- Out-of-pocket damages; and

- Benefit-of-the-bargain damages.

These calculations require a number of variables.  I have summarized these variables at Exhibit 9. Certain of the calculations are voluminous, and there is little or no value in printing each calculation. As a result, I show the calculations in Exhibit 10, which includes:

- The total principal held by the Plaintiffs under each Credit Agreement that is the starting point for the interest calculations;

- Examples of the Base Rate calculations;

- Examples of the compounded contract interest calculations using the Base Rate and the Default Rate as they relate to the benefit-of-the-bargain damages method;

- The quarterly Facility Fee calculations and related statutory interest that are included in benefit-of-the-bargain damages;

- The statutory interest calculations under the out-of-pocket and benefit-of-the-bargain damages methods; and

- A summary by Credit Agreement of the total contract interest, Facility Fees, and statutory interest under each damages method.

### A.    Out-of-Pocket Damages and Statutory Interest Are Approximately $1.815 Billion.

Out-of-pocket damages are:

- The total amount of money that was lent to Enron by the Funding Banks with respect to the aggregate principal currently held by the Plaintiffs;

- Less the mitigation of the amount recovered from the Enron bankruptcy proceedings;

- Plus statutory interest.

- 27 -

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

Exhibit 11 shows a summary of out-of-pocket damages that consists of principal held by the Plaintiffs of $1,577,309,727; mitigation of $256,972,146; and statutory interest of $495,040,212. The total is $1,815,377,793.

### 1.    Mitigation

Notices of Distribution from the bankruptcy court indicate that a cumulative of approximately 17.3530% was distributed to the unsecured creditors of Enron. Of that percentage, 16.2918% was distributed in cash and stock in PGE and an additional 1.0612% will be eventually distributed in some combination of cash, PGE stock, and in Prisma stock—but has not been distributed yet. In my view, the latter 1.0612% is potential future mitigation until it is actually paid. As a result, I used a cumulative 16.2918% as the amount of mitigation to date. The incremental distributions are:

- 1.7901% on April 11, 2005;

- 0.7888% on October 3, 2005; and

- 13.7129% on April 3, 2006.[65]

Given the amount of debt held by the Plaintiffs, this 16.2918% equals $256,972,146.

These recoveries affect both the debt outstanding—or the out-of-pocket amount—and the statutory interest calculation. As a result, I calculated statutory interest on the outstanding principal up to the dates of the recovery. I then adjusted the principal amount as of the recovery dates, and calculated statutory interest after those dates on the outstanding principal balance held by the Plaintiffs net of the recoveries.

### 2.    The out-of-pocket method statutory interest calculation

I understand from counsel that the applicable law that defines the statutory interest rate in this case is the Texas Finance Code and that the applicable statutory interest rate for torts is prime as of the date of judgment.[64] I further understand that prejudgment interest accrues from the earlier of 180 days after notice or date of the filing of the complaint and that interest accrues to the date of judgment.

---

[65] See Notices of Distributions dated June 24, 2005; October 31, 2005; and April 3, 2006, *In Re ENRON CORP., et al., Reorganized Debtors, Chapter 11 Case No. 01-16034 (AJG), United States Bankruptcy Court for the Southern District of New York,* and a related work paper produced separately from this report, titled "Bankruptcy Distributions Schedule," showing the specific sources and calculations of these percentages.

[64] Texas Finance Code (TFC) § 304.003 and § 304.103.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

As a result, I calculated statutory interest at the current Federal Reserve Bank Prime Loan Rate[65] ("Prime Rate")—as a substitute for the Prime Rate that will be in effect as of the date of judgment—as simple interest from the date of the first complaint in this case, June 30, 2003,[66] through September 1, 2007. Exhibit 12 is a demonstrative exhibit that shows the out-of-pocket damages method statutory interest calculation.

Total statutory interest using the out-of-pocket damages method is $495,040,212.[67]

> **B.    Benefit-of-the-Bargain Damages and Statutory Interest Are Approximately $1.923 Billion.**

In addition to the amounts of the loans, benefit-of-the-bargain damages includes unpaid Facility Fees in accordance with the terms of the Agreements. As a result, total benefit-of-the-bargain damages and statutory interest include:

- On the principal of the debt:
    - The total amount of money that was lent to Enron by the Funding Banks with respect to the aggregate principal currently held by the Plaintiffs;
    - Plus contract interest as specified in the Agreements, including an additional 2% Default Rate;
    - Less any amount recovered from Enron's Chapter 11 proceedings;
    - Plus statutory interest after the termination of the Agreements;
- Plus the unpaid Facility Fees and related statutory interest.

Exhibit 13 is a summary of benefit-of-the-bargain damages and statutory interest that totals $1,922,831,094. Exhibit 14 is a demonstrative exhibit of the contract and statutory interest calculations that shows the calculations with respect to the timeline of events and relevant dates.

---

[65] For calculation purposes, I used the Federal Reserve Bank Prime Loan Rate as of May 26, 2006, as posted on the Federal Reserve website, www.federalreserve.gov. The posted Prime Rate on that date is 8.000%.
[66] Plaintiffs' Original Petition in this case.
[67] Exhibit 11.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

### 1.     The contract interest calculation

Contract interest is calculated in accordance with the terms of each of the two Credit Agreements from the Draw Date to each of the Credit Agreement Termination Dates.[68]

The type of advance that Enron requested under the Credit Agreements dictates the selection of the contract interest rate. Enron's two notices of borrowing sent to Citibank, N.A., as Paying Agent, on October 25, 2001, indicate that both borrowings were Base Rate Advances.[69] As a result, I have computed contract interest using the Base Rate as defined in the Credit Agreements.

Exhibit 15 presents a summary of the Base Rate definition, by Credit Agreement, that defines the Base Rate as the highest of these three rates:

- Citibank's Base Rate;

- The Federal Reserve Bank Federal Funds Rate ("Fed Funds Rate"), plus 0.5%; or

- A calculation that includes:

    o  Three-month CD rates,

    o  Citibank's daily maximum reserve requirement with respect to liabilities consisting of or including (among other liabilities) three-month dollar, non-personal time deposits in the U.S., and

    o  Citibank's three-week average of its annual assessment for FDIC insurance.

I understand that Citibank's Base Rate matches the Prime Rate. The Prime Rate, the Fed Funds Rate, and the three-month CD rate are available from the Federal Reserve website, www.federalreserve.gov.

I have no basis to determine Citibank's actual daily maximum reserve requirement or its annual assessment for FDIC insurance for the purpose of determining the calculated Base Rate. I understand from the Federal Reserve website that the daily maximum reserve requirement for non-personal time deposits in the U.S. is zero. For other transaction account liabilities, the reserve requirement is either 3% or 10% of the respective liabilities, depending on the total of those liabilities. If one were to assume the apparent maximum of 10%, in no period does the calculated Base Rate exceed the Prime Rate.

Similarly, I understand from the FDIC website, www.fdic.gov, that FDIC-insured institutions are charged a risk-based assessment for FDIC insurance that ranges from zero to 27 basis points based upon the risk classification of the institution. I understand from a FDIC representative that risk

---

[68] For the May 2000 Agreement, May 18, 2005, or five years from May 18, 2000; and for the May 2001 Agreement, May 13, 2002, or 364 days from May 14, 2001. See also Exhibit 9, Damage Calculation Variables.
[69] Bates # CITYNEWBY 00006460–6464 and CITINEWBY 00006467–6471.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

classifications for insured depository institutions are confidential and, therefore, not publicly available. If one were to assume, however, the apparent maximum assessment of 0.27%, in no period does the more complex method of determining the Base Rate exceed the Prime Rate.

Further, if I were to assume both the apparent maximum daily reserve requirement and the apparent maximum FDIC insurance assessment rate for Citibank, in no period does the more complex Base Rate calculation exceed the Prime Rate.

The maximum rate for determining the Base Rate is the Prime Rate for all time periods that I calculated contract interest. This interest is compounded daily.

§ 2.05(a) of each Credit Agreement[70] states that any amount of principal which is not paid when due shall bear interest at a rate of 2% per annum (the "Default Rate") plus the Base Rate. I understand that on December 2, 2001, when Enron declared bankruptcy, it became in default[71] under both Credit Agreements and the outstanding principal became due on that date. As a result, I calculated contract interest at the Base Rate plus 2%—the Default Rate—for all periods after December 2, 2001.

Total contract interest is $199,361,096.[72]


## 2.    The Facility Fee

§ 2.03 of the Credit Agreements[73] states that the Signatory Banks are to be paid a quarterly Facility Fee, computed as a percentage of the average daily amount of each bank's commitment, whether or not the commitment was used. I understand that no Facility Fee payments were made by Enron or by Citibank, as Paying Agent, after Enron declared bankruptcy on December 2, 2001. I understand that the right to receive Facility Fee payments under the Credit Agreements is a right that was transferred with the rights and obligations associated with the certain principal amounts that were transferred from the Signatory Banks and ultimately to the Plaintiffs. As a result, the Plaintiffs are due unpaid Facility Fees on the principal amounts that they currently hold, beginning with the quarterly payment due December 31, 2001, and continuing through the respective Termination Dates of the two Credit Agreements.

In the May 2000 Agreement, the Facility Fee is based upon the rating level of Enron's unsecured long-term debt as of the first day of the quarter. The lowest credit rating defined in Schedule I of the Agreement is BB+ or lower (or not rated) by S&P, and Ba1 or lower (or not rated) by Moody's. In my view, Enron's credit rating after the Draw Date could not have exceeded these ratings, such that the applicable Facility Fee rate defined in Schedule I of the May 2000 Agreement is 0.25% per annum.[74]

---

[70] Bates # JPMUCI 0008453–54 and JPMUCI 0003182.
[71] Default for the purpose of assessing interest at the Default Rate is notwithstanding any potential prior event of default by Enron discussed in this report.
[72] Exhibit 13.
[73] Bates # JPMUCI 0008453 and JPMUCI 0003181–3182.
[74] Bates # JPMUCI 0008547.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

In the May 2001 Agreement, the Facility Fee is a fixed 0.10% per annum.[75] The total Facility Fee payments due to the Plaintiffs are $6,356,336.[76] Exhibit 16 is a demonstrative exhibit that shows the Facility Fee calculation with respect to each of the two Credit Agreements.

### 3.    Mitigation

Notices of Distribution from the bankruptcy court indicate that a cumulative of approximately 17.3530% was distributed to the unsecured creditors of Enron; 16.2918% was distributed in cash and stock in PGE; and an additional 1.0612% will be eventually distributed in some combination of cash, PGE stock, and in Prisma stock—but has not been distributed yet. In my view, the latter 1.0612% is potential future mitigation until it is actually paid. As a result, I used a cumulative 16.2918% as the amount of mitigation to date. The incremental distributions are:

- 1.7901% on April 11, 2005;

- 0.7888% on October 3, 2005; and

- 13.7129% on April 3, 2006.[77]

Given the amount of debt held by the Plaintiffs, this 16.2918% equals $256,972,146.

These recoveries affect the debt outstanding and the statutory interest calculation for both Credit Agreements. In addition, the recoveries affect the contract interest calculation and the facility fee calculation for the May 2000 Agreement. I made the appropriate adjustments to the principal balances as of each of the recovery dates. As of this writing it is unclear whether or not the unpaid Facility Fees were included as basis for these payouts. As a result, I have not included a bankruptcy recovery credit against the sum of the Facility Fees.

For both Credit Agreements I calculated contract interest and Facility Fees through the term of the agreements, adjusting principal balances for each recovery. The first recovery adjustment on April 11, 2005, lowered the compounded outstanding principal balances under both Agreements. Given that the first recovery occurred before the Termination Date of the May 2000 Agreement, this had the additional effect of reducing the last Facility Fee for that Agreement.

---

[75] Bates # JPMUCI 0003181–3182.

[76] Exhibit 13.

[77] See Notices of Distributions dated June 24, 2005; October 31, 2005; and April 3, 2006, *In Re ENRON CORP., et al., Reorganized Debtors, Chapter 11 Case No. 01-16034 (AJG), United States Bankruptcy Court for the Southern District of New York,* and a related work paper produced separately from this report, titled "Bankruptcy Distributions Schedule," showing the specific sources and calculations of these percentages.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

### 4.    The benefit-of-the-bargain statutory interest calculation

The method for calculating statutory interest under the benefit-of-the-bargain damages method differs from calculating statutory interest in the out-of-pocket method in two ways.

- The start date for computing statutory interest under the benefit-of-the-bargain damages method is the Termination Date of each respective Credit Agreement.[78]

- The rate is 6%.[79]

Statutory interest is calculated under the benefit-of-the-bargain method on:

- The compounded principal and contract interest amount as of the Termination Dates of the Credit Agreements; and

- The cumulative balance of the unpaid facility fees.

I calculated statutory interest on the outstanding principal up to the dates of the bankruptcy recoveries. I then adjusted the principal amount as of the recovery dates, and calculated statutory interest after those dates on the outstanding principal balance held by the Plaintiffs net of the recoveries.

The statutory interest under the benefit-of-the-bargain damages method on the:

- Compounded principal and contract interest is $395,110,872; and on

- The unpaid facility fees is $1,665,209.

The total statutory interest under the benefit-of-the-bargain damages method is $396,776,081.[80]

---

[78] TFC § 302.002.
[79] Id.
[80] Exhibit 13.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

## X.    The Current Market Value of the Plaintiffs' Holdings as Potential Future Mitigation

The Plaintiffs' recoveries from the Enron Chapter 11 estate to date are not all the mitigation the Plaintiffs will receive from the estate.  As shown by the plans of distributions from the Enron Chapter 11 proceedings, distributions are expected to continue.  From the perspective of calculating damages, given that the amounts and timing of the prospective recoveries affect the amount of damages and the calculations of prejudgment interest, the questions regarding the recoveries are "how much?" and "when?"; as of this writing these questions are unanswered.

On the other hand, the market value of Enron debt serves as a useful proxy to estimate the value of the potential future mitigation from the Enron Chapter 11 estate.

In my view, it is most appropriate to use the market value of debt instruments not associated with this particular case because the market value of the debt in this case could very well be affected by the market's perception of the likelihood of the success of the Plaintiffs in this case.  In my view, the market value of the Plaintiffs' holdings of Enron debt that is part of this case has two components;

- Prospects of recovery from this litigation; and

- Prospects of further recovery from the Enron bankruptcy proceedings.

I understand that the current market value as of May 24, 2006, of Enron debt not associated with this case is $0.32125 per dollar of principal.  I have been instructed to use this to calculate the amount of potential future mitigation in this case.  Applied to the aggregate outstanding principal amount of debt under the Credit Agreements that the Plaintiffs currently hold, it results in an estimate of potential future mitigation stemming solely from the value of the Enron estate and excluding this litigation of $506,710,750.[81]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[81] Exhibits 11 and 13.

DK Acquisition Partners, L. P., et al. v. J. P. Morgan Chase & Co., et al.
Expert Report of William C. Carey, CPA
June 1, 2006

If you have any questions, or if I may be of further assistance, please call me at 303.265.7805.

Sincerely,

William C. Carey
CPA

# CONFIDENTIAL EXHIBIT

## Filed Under Seal Pursuant to Court Order

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORP. SECURITIES DERIVATIVE & "ERISA" LITIGATION | § § § | MDL No. 1446 Assigned to: Judge Melinda Harmon |
| MARK NEWBY, et al., individually and On Behalf of All Other Similarly Situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No. H-01-3624 (Consolidated) |
| v. | § § | |
| ENRON CORP., et al., | § § | <u>CLASS ACTION</u> |
| Defendants. | § § | |
| AVENUE CAPITAL MANAGEMENT II, L.P., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. H-05-3031 |
| JPMORGAN CHASE & CO., et al., | § § | |
| Defendants. | § § | |

**PRELIMINARY EXPERT REPORT OF
STEPHEN R. BRAUNSTEIN, CPA, CFE, CVA**

June 1, 2006

[CONFIDENTIAL INFORMATION CONTAINED IN DESIGNATED EXHIBITS]

# STEPHEN R. BRAUNSTEIN, CPA, CFE, CVA

100 Congress Ave.
Suite 2000
Austin, Texas 78701

(512) 473-3616
Fax (512) 847-7690
srbcpa@starband.net

June 1, 2006

## PRELIMINARY REPORT ON DAMAGES

**RE:** *Avenue Capital Management II, L.P., et al. v. J.P. Morgan-Chase & Co., et al.*

### Introduction

I have been retained as an independent expert, at my regular hourly billing rate of $240 per hour, to analyze and evaluate the economic damages claimed by Plaintiffs as a result of the alleged wrongful conduct of Defendants in connection with certain loans and commitments extended to Enron Corporation ("Enron"). My qualifications are summarized in an accompanying exhibit. A list of all publications I have authored within the preceding ten years and a listing of other cases in which I have testified as an expert at trial or by deposition within the preceding four years are also attached as exhibits.

### Background

In summary, I understand that the Defendants syndicated to participating lenders $3.5 billion in unsecured credit facilities for Enron comprised of the following:

(a) $1.25 billion Long-Term Revolving Credit Agreement dated May 18, 2000 (the "Long-Term Revolver");

(b) $1.75 billion 364-day Revolving Credit Agreement dated May 14, 2001 (the "Short-Term Revolver" and, together with the Long-Term Revolver, the "Revolvers"); and

(c) $500 million Letter of Credit Agreement dated May 14, 2001 (the "L/C" and collectively with the Revolvers, the "Credit Facilities")

Pursuant to Enron's Notices of Borrowing on October 25, 2001, Enron drew the full amount of the Revolvers. Enron filed for bankruptcy on December 2, 2001. Based on L/C related documents and the Proof of Claim filed in Enron's bankruptcy proceeding, payments aggregating $373,708,155 were ultimately made under eight letters of credit that had been issued under the L/C Agreement. I understand that the Plaintiffs in this matter are successors in interest and have acquired the economic interests (including claims) of certain participating lenders relating to these Credit Facilities.

### Scope of Work

I was asked to calculate the value of losses sustained as a result of loans and commitments extended to Enron pursuant to the above-referenced Credit Facilities. One method of calculating these losses is to ascertain (in addition to unpaid principal

amounts) the opportunity costs (i.e., unpaid interest and fees) related to the subject loans to Enron as opposed to making other loans. The losses as calculated would appropriately be reduced by the effect of any recoveries from the Enron bankruptcy proceedings that are attributable to these Facilities. I was also asked to calculate the amounts of such losses applicable to Plaintiffs' acquired interests in the Credit Facilities. I, and/or other professionals working under my direction and supervision, have reviewed various documents including pleadings, the Credit Facility Agreements and related documents, reports of Enron's bankruptcy examiner, Enron's Notices of Borrowings, L/C documents, historical financial data for certain participating banks, and other related research from publicly available sources. A list of documents provided or obtained and considered is attached as an exhibit.

### Opinions

Based on the procedures performed, as summarized above, I have concluded that the value as of May 31, 2006, of losses, including the principal amounts loaned under each of the three above-referenced Credit Facilities, together with related opportunity costs but excluding recoveries, if any, for each $1 of initial principal amount is as follows:

| Facility | Loss Per $1 Principal |
|---|---|
| Long-Term Revolver | $ 1.26693918 |
| Short-Term Revolver | $ 1.27213933 |
| L/C: | |
| Paid Letters of Credit | $ 1.27172566 |
| Facility Fees | $ 0.00108609 |
| Letter of Credit Fees | $ 0.00043318 |

The principal amounts included in the calculated losses applicable to the Revolvers and paid letters of credit are based on amounts drawn by Enron pursuant to Notices of Borrowing (applicable to the Revolvers) and issuance/reimbursement requests and/or related documents (applicable to letters of credit).

Among possible alternative calculation methodologies, the opportunity costs included in these loss amounts have been calculated by reference to the stated terms for interest rates and fees contained in the related Agreements. As reflected in an accompanying exhibit, the yields based on these terms are generally comparable to or less than applicable historical returns as reported by certain U.S. participating banks during the relevant time period. The interest component was calculated by applying the Citibank Base and/or Chase Prime rate to all outstanding principal and unpaid fee amounts compounded quarterly. The fees component was calculated by compiling the unpaid fees applicable to the Revolvers (assuming Enron paid no fees subsequent to its bankruptcy

filing) and to the L/C Facility (assuming Enron paid no fees for the quarter ended September 30, 2001, as asserted in the First Amended Complaint, or thereafter).

The calculated loss amount applicable to the L/C Facility Fees is comprised of unpaid Facility Fees, as defined in the Agreement, to May 13, 2002, the "Final L/C Issuance Date," as defined in the Agreement, together with interest thereon to date. The Facility Fees and interest thereon applicable to paid letters of credit subsequent to May 13, 2002, are included in the loss amount calculated for the paid letters of credit. This amount also includes Letter of Credit Fees, as defined in the Agreement, and interest thereon to date. The calculated loss amount applicable to the L/C Letter of Credit Fees is comprised only of unpaid Letter of Credit Fees and interest thereon to date applicable to letters of credit that were issued and expired or canceled.

The calculated loss amounts applicable to funded loans and paid letters of credit apply to each participating lender's funding of each $1 principal amount, assuming participation rights and obligations (including assignments thereof, if any) were in effect from each funding and issuance date to the present. The calculated loss amount applicable to the L/C Facility Fees applies to each participant assuming its rights and obligations (including assignments thereof, if any) were in effect and consistent from July 1, 2001, to May 13, 2002. The calculated loss amount applicable to the L/C Letter of Credit Fees applies to each participant assuming its rights and obligations were in effect and consistent from the later of each issuance date or July 1, 2001, to the date of expiration or cancellation.

The calculations of these loss amounts and related work product prepared are included in the accompanying exhibits.

Based on the application of the calculated loss amounts to Plaintiffs' economic interests in each Credit Facility, as set forth in responses to interrogatories, the aggregate value of Plaintiffs' interests in the losses described above is **$702,129,174.** The calculations of this amount and the amounts applicable to each plaintiff are set forth in an accompanying confidential exhibit.

The opinions I have formed, as expressed herein, are based on my review and analysis of documents and information provided or obtained through this date. I may supplement my opinions and the related analyses set forth in the accompanying exhibits based on additional documents or information (including but not limited to the reports of other experts). For example, if provided pertinent information before trial, I expect to calculate damages giving effect to recoveries from the Enron bankruptcy proceedings. Furthermore, I am continuing to evaluate and consider alternative methodologies for the calculation of damages and may supplement my opinions and related analyses accordingly.

Submitted by: _____
Stephen R. Braunstein

# EXHIBIT 10

EXHIBIT F

ASSIGNMENT AND ACCEPTANCE

Dated _____, \_\_\_\_

Reference is made to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (such 364-Day Revolving Credit Agreement, as amended or otherwise modified from time to time, being herein referred to as the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), the Banks (as defined in the Credit Agreement), Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent. Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.    The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement. After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of the Advances owing to the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iv) attaches the Note held by the Assignor and requests that the Paying Agent exchange such Note for a new Note payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance or new Notes payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance and the Assignor in an amount equal to the Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

3.    The Assignee attaches the Note (if any) held by it and (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents, the Assignor or any other Bank and based on such documents and information

JPMUCI 0003291

as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, any of the other Loan Documents or any other instrument or document; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Paying Agent and the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent and the Co-Administrative Agents by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof.

4.      Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents. The effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto.

5.      Upon such acceptance and recording by the Paying Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement and under the other Loan Documents.

6.      Upon such acceptance and recording by the Paying Agent, from and after the Effective Date, the Paying Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and facility and utilization fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and the other Loan Documents shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

-2-

JPMUCI 0003292

Schedule 1
to
Assignment and Acceptance

**Section 1.**
    Percentage interest assigned:                                            _____%

**Section 2.**
    Assignee's Commitment before giving effect to this
        Assignment and Acceptance:                    $_____

    Assignee's outstanding principal of Advances before
        giving effect to this Assignment and Acceptance        $_____

    Aggregate outstanding principal of Advances assigned to
        the Assignee under this Assignment and Acceptance:    $_____

    Assignee's Commitment after giving effect to this
        Assignment and Acceptance:                    $_____

    Assignee's outstanding principal of Advances after
        giving effect to this Assignment and Acceptance:      $_____

    Assignor's remaining Commitment after
        giving effect to this Assignment and Acceptance:      $_____

    Assignor's remaining outstanding principal of Advances
        after giving effect to this Assignment and Acceptance:  $_____

    Principal amount of Note payable to the Assignee:      $_____

    Principal amount of Note payable to the Assignor:      $_____

**Section 3.**
    Effective Date**:                                    _____, 20__

[NAME OF ASSIGNOR], as Assignor

By: _____
Name: _____
Title: _____
Dated: _____, _____

[NAME OF ASSIGNEE], as Assignee

By: _____
Name: _____
Title: _____

---

    **    This date should be no earlier than the date five Business Days after the delivery of this Assignment and Acceptance to the Paying Agent.

Dated: _____, _____

Domestic Lending Office (and
address for notices):

[Address]

Eurodollar Lending Office:

[Address]

[Approved this ___ day of _____.

_____

ENRON CORP.

By: _____
Name: _____
Title: _____]***

Accepted [and Approved]*** this ___ day of
_____, _____

[NAME OF PAYING AGENT], as
        Paying Agent

By: _____
Name: _____
Title: _____

_____

***Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Credit Agreement.

-2-

JPMUCI 0003294

# EXHIBIT 11

EXECUTION
ENRON –BT to SPRINGFIELD
REV: $19,333,333.33

## PURCHASE AND SALE AGREEMENT
### (Secondary Assignment; Borrower in Bankruptcy)

This Purchase and Sale Agreement (Secondary Assignment) ("Agreement") is made by and between BANKERS TRUST COMPANY ("Seller") and SPRINGFIELD ASSOCIATES, L.L.C. ("Buyer") as of February __, 2002 ("Agreement Date") and contemplates the assignment of $19,333,333.33 of Commitment made to Enron Corp.

1.  **Definitions**

    1.1    In this Agreement:

    "**Affiliate**" means "affiliate" as defined in either (a) Bankruptcy Code § 101(2) or (b) Rule 144 of the Securities Act.

    "**Agent**" has the meaning given to it in Schedule 1.

    "**Agent Expenses**" means any costs, liabilities, losses, claims, damages, and expenses incurred by, and any indemnification claims of, the Agent, for which the Agent has recourse under the Credit Documents to Seller, but only to the extent attributable or allocable to the Transferred Rights.

    "**Assignment**" means the document (if any) in the form specified in the Credit Agreement for an assignment of the Loans.

    "**Assumed Obligations**" means Seller's obligations and liabilities with respect to, or in connection with, the Transferred Rights resulting from facts, events or circumstances arising or occurring on and after the Effective Date; excluding, however, the Retained Obligations.

    "**Bankruptcy Case**" has the meaning given to it in Schedule 1.

    "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, 11 U.S.C §§ 101 et seq., as amended.

    "**Bankruptcy Court**" has the meaning given to it in Schedule 1.

MAY 2001
Copyright © LSTA 2000. All rights reserved.

DK-KSF 000204

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any corresponding or other local rules of the Bankruptcy Court.

"**Bar Date**" means the last date fixed by the Bankruptcy Court pursuant to the Bankruptcy Code or the Bankruptcy Rules on which proofs of claim or interest may be filed in the Bankruptcy Case, as set forth on Schedule 1.

"**Benefit Plan**" means an "employee benefit plan" subject to Title I of ERISA, a "plan" subject to Section 4975 of the Code or any Entity whose assets include the assets of any such employee benefit plan or plan.

"**Borrower**" means the Borrower under the Credit Agreement, as defined in Schedule 1.

"**Business Day**" means any day that is not (a) a Saturday, (b) a Sunday, or (c) any other day on which commercial banks are authorized or required by law to be closed in the City of New York.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"**Collateral**" means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to or for the benefit of the Lenders under the Credit Documents.

"**Commitments**" has the meaning given to it in Schedule 1.

"**Credit Agreement**" has the meaning given to it in Schedule 1.

"**Credit Documents**" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers and amendments and all other documents and agreements executed and delivered in connection therewith.

"**Distribution**" means any payment or other distribution of cash (including interest), notes, securities, or other property (including Collateral) or proceeds under or in respect of the Transferred Rights including, but not limited to payments or distributions in respect of Pre-Closing Date Accruals.

"**Effective Date**" means the date on which Seller receives the Purchase Price.

"**Encumbrance**" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, or other encumbrance, security agreement, security arrangement or adverse claim against title of any kind; (b) purchase or option agreement or put arrangement; (c) subordination agreement or arrangement other than as specified in the Credit Documents; or (d) agreement to create or effect any of the foregoing.

DK-KSF 000205

"**Entity**" includes any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, and Governmental Authority.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it.

"**Federal Funds Rate**" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for (any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Parties from three federal funds brokers of recognized standing selected by the Parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"**Filing Date**" means December 2, 2001.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Guaranty**" means a guaranty of any of Borrower's obligations under the Credit Documents, including Borrower's obligations in connection with the Loan.

"**Immediate Prior Sellers**" means the Entity or Entities from which Seller acquired the Transferred Rights.

"**Impairment**" means any claim, counterclaim, setoff, defense, action, demand, litigation (including administrative proceedings or derivative actions), Encumbrance, right (including expungement, avoidance, reduction, contractual or equitable subordination, or otherwise) or defect, other than those created pursuant to the Credit Documents, the effect of which is, or would be, materially and adversely to affect the Transferred Rights, in whole or in part.

"**Lender**" means a lender under the Credit Agreement and its successors, transferees, and assigns.

"**Loans**" means the Loan(s) in the amount(s) specified in Schedule 1, and includes the note(s) (if any) evidencing such Loan(s) issued under the Credit Agreement.

"**Obligor**" means any Entity other than the Borrower and the Lenders that is obligated under the Credit Documents.

"**Operative Documents**" means (a) this Agreement, (b) the Assignment, (c) the Purchase Price Letter and (d) the Transfer Notice, if any.

DK-KSF 000206

"**Party**" means Buyer or Seller, as applicable.

"**Pre-Closing Date Accruals**" means all interest and commitment, facility, letter of credit and other fees payable under the Credit Documents in respect of the Loans and the Commitments, if any, that accrue during the period before the Effective Date.

"**Predecessor Transfer Agreements**" means the transfer agreements under which (a) the Seller and (b) the Prior Sellers acquired the rights and obligations underlying the Transferred Rights, which transfer agreements are identified on Schedule 2.

"**Prior Sellers**" means, collectively, (a) the Immediate Prior Sellers, and (b) any predecessor Entity or Entities that transferred the Transferred Rights, which Entities are identified on Schedule 2.

"**Proof of Claim**" has the meaning given to it in Schedule 1.

"**Purchase Price**" has the meaning given to it in the Purchase Price Letter.

"**Purchase Price Letter**" means the letter agreement between Buyer and Seller, dated as of the Agreement Date, that specifies the calculations for determining the Purchase Price.

"**Purchase Rate**" means the purchase rate stated in the Purchase Price Letter.

"**Required Consents**" means the consents required pursuant to the Transaction Documents to transfer the Transferred Rights from Seller to Buyer, which Required Consents are specified in Schedule 1.

"**Retained Obligations**" means all obligations and liabilities of Seller relating to the Transferred Rights that (a) result from facts, events or circumstances arising or occurring prior to the Effective Date, (b) result from Seller's breach of its representations, warranties, covenants, or agreements under this Agreement, the Credit Documents or the Predecessor Transfer Agreements, (c) result from Seller's bad faith, gross negligence, or willful misconduct or (d) are attributable to Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents.

"**Schedule 1**" means the document titled "Schedule 1 to Purchase and Sale Agreement (Secondary Assignment; Borrower in Bankruptcy)".

"**Schedule 2**" means the document titled "Schedule 2 to Purchase and Sale Agreement (Secondary Assignment; Borrower in Bankruptcy)".

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., as amended, and the rules and regulations promulgated under it.

"**Trade Date**" has the meaning given to it in Schedule 1.

"**Transaction Documents**" means the Credit Documents, the Operative Documents and the Predecessor Transfer Agreements.

DK-KSF 000207

**"Transfer Fee"** has the meaning given to it in Schedule 1.

**"Transferred Rights"** means any and all of Seller's right, title, and interest in, to and under the Loans and the Commitments (if any) and to the extent related thereto, the following:

    (a)    all other amounts funded by or payable to Seller under the Credit Documents, and all obligations owed to Seller in connection with the Loans and the Commitments;

    (b)    the Credit Documents;

    (c)    the Proof of Claim, if one has been filed;

    (d)    the Predecessor Transfer Agreements (but only to the extent related to the Loans and the Commitments, as specified on Schedule 2);

    (e)    all claims (including "claims" as defined in Bankruptcy Code § 101(5)), suits, causes of action, and any other right of Seller or Prior Sellers, whether known or unknown, against Borrower, any Obligor, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Seller or Prior Sellers against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Credit Documents;

    (f)    all Guarantees and all Collateral and security of any kind for or in respect of the foregoing;

    (g)    all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of Seller or Prior Sellers under the Loans and the Commitments, if any, and other extensions of credit under the Credit Documents (whether for principal, interest, fees, reimbursement obligations, or otherwise) after the Trade Date, including all distributions obtained by or through redemption, consummation of a plan of reorganization, restructuring, liquidation, or otherwise of Borrower, any Obligor or the Credit Documents, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

    (h)    the economic benefit of permanent commitment reductions, permanent repayments of principal and amendment, consent, waiver and other fees received by Seller from and after the Trade Date; and

DK-KSF 000208

(i)     all proceeds of the foregoing.

"**Unfunded Commitments**" has the meaning given to it in Schedule 1.

1.2    Terms that are defined in other provisions of this Agreement have the meanings given to them in those provisions.

1.3    Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meaning in this Agreement as in the Credit Agreement.

2.    **Assignment and Assumption**

In consideration of the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

(a)    subject to the satisfaction of the conditions in Section 3.2, Seller irrevocably sells, transfers, assigns, grants, and conveys the Transferred Rights to Buyer with effect on and after the Effective Date;

(b)    subject to the satisfaction of the conditions in Section 3.1, Buyer acquires the Transferred Rights, and assumes and agrees to perform and comply with the Assumed Obligations, with effect on and after the Effective Date; and

(c)    notwithstanding the foregoing, (i) Seller agrees to remain responsible for, and assumes and agrees to perform and comply with the Retained Obligations, and (ii) Buyer assumes no obligations other than the Assumed Obligations.

This Agreement is intended to, and upon execution hereof and satisfaction or waiver of the conditions precedent set forth in Section 3 shall, effect a true sale of the Transferred Rights.

3.    **Conditions Precedent**

3.1    Buyer's obligations to pay the Purchase Price to Seller, to acquire the Transferred Rights and to assume the Assumed Obligations shall be subject to the conditions that (a) Seller's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and the Effective Date, (b) Seller shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Effective Date and (c) Buyer shall have received (i) this Agreement and the Purchase Price Letter duly executed on behalf of Seller, (ii) the note or notes (if any) evidencing the Loans duly endorsed to Buyer or evidence reasonably satisfactory to Buyer that the note or notes have been surrendered to the Agent for reissuance to Buyer and (iii) the Assignment duly executed on behalf of Seller, Borrower (if required), the Agent and any other Entity whose consent is required by the terms of the Assignment.

3.2    Seller's obligation to sell, transfer, assign, grant, and convey the Transferred Rights to Buyer on the Effective Date shall be subject to the conditions that (a) Buyer's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and the Effective Date, (b) Buyer shall have complied in all material respects

DK-KSF 000209

with all covenants required by this Agreement to be complied with by it on or before the Effective Date, (c) Seller shall have received (i) this Agreement and the Purchase Price Letter duly executed on behalf of Buyer and (ii) the Assignment duly executed on behalf of Buyer, Borrower (if required), the Agent and any other Entity whose consent is required by the terms of the Assignment and (d) Seller shall have received payment of the Purchase Price from Buyer.

4.      **Seller's Representations and Warranties**

4.1     Seller represents and warrants to Buyer (as of the Agreement Date and as of the Effective Date) that:

(a)     Seller (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under the Transaction Documents to which it is or will become a party.

(b)     Seller's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted and will not result in a breach of any provision of (i) Seller's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Seller, (iii) any judgment, injunction, decree or determination applicable to Seller or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other instrument by which Seller may be bound or to which any of the assets of Seller are subject.

(c)     (i)     The Transaction Documents to which Seller is a party (A) have been duly and validly authorized, executed, and delivered by Seller and (B) are the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except that such enforceability against Seller may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by the court's discretion in relation to equitable remedies; and

(ii)     No notice to, registration with, consent or approval of, or any other action by, any relevant Governmental Authority or other Entity (other than the Required Consents) is or will be required for Seller to execute, deliver, and perform its obligations under, the Transaction Documents (other than the Transfer Notice, if any) to which Seller is or will become a party.

(d)     Seller is the sole legal and beneficial owner of and has good title to the Transferred Rights, free and clear of any Encumbrance, and the Transferred Rights are not subject to any prior sale, transfer, assignment or participation by Seller or any agreement to assign, convey, transfer or participate, in whole or in part.

(e)     Other than the Bankruptcy Case and the proceedings thereunder, no proceedings are (i) pending against Seller or (ii) to the best of Seller's knowledge, threatened against Seller before any relevant Governmental Authority that, in the aggregate,

DK-KSF 000210

will materially and adversely affect (A) the Transferred Rights or (B) any action taken or to be taken by Seller under this Agreement.

(f)    The principal amounts of the Loans outstanding and the Commitments, if any, as of the Effective Date, and all permanent commitment reductions, permanent repayments of principal and all amendment, consent, waiver and other fees received by Seller in connection with the Transferred Rights from and after the Trade Date and as of the Effective Date, are accurately stated in Schedule 1.

(g)    There is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full. The Unfunded Commitments, if any, as of the Effective Date are accurately stated in Schedule 1.

(h)    Seller has not engaged in any acts or conduct or made any omissions with respect to Borrower, any Obligor or Agent that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche as the Loans and Commitments.

(i)    Seller has performed, and has complied with, all obligations required to be performed or complied with by it under the Credit Documents and is not in breach of any provisions of the Credit Documents.

(j)    No broker, finder or other Entity acting under Seller's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which Buyer could be responsible.

(k)    Seller has not breached any of its representations, warranties, obligations, agreements, or covenants under the Predecessor Transfer Agreements.

(l)    Except as set forth in Schedule 1, Seller (i) is not and has never been (A) an "insider" of Borrower or any Obligor (as "insider" is defined in Bankruptcy Code § 101(31)) or (B) an Affiliate of Borrower or any Obligor, and (ii) is not, and has not been, a member of (1) any official or unofficial committee appointed or otherwise constituted in the Bankruptcy Case or (2) any committee relating to Borrower or any Obligor formed prior to the commencement of the Bankruptcy Case.

(m)    Seller does not and did not on the Filing Date hold any funds or property of or owe any amounts or property to the Borrower or any Obligor and has not effected or received the benefit of any setoff against the Borrower or any Obligor on account of the Transferred Rights.

DK-KSF 000211

(n)    Except as set forth in Schedule 1, Seller has not received any written notice other than those publicly available in the Bankruptcy Case or otherwise, that (i) any payment or other transfer made to or for the account of Seller from or on account of Borrower or any Obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment.

(o)    Seller acknowledges that the consideration paid under this Agreement for the purchase of the Transferred Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(p)    Seller (i) is a sophisticated seller with respect to the sale of the Transferred Rights and the retention of the Retained Obligations, (ii) has adequate information concerning the business and financial condition of Borrower or any Obligor and the status of the Bankruptcy Case to make an informed decision regarding the sale of the Transferred Rights and the retention of the Retained Obligations and (iii) has independently and without reliance upon Buyer, and based on such information as Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Seller has relied upon Buyer's express representations, warranties, covenants, and indemnities in this Agreement. Seller acknowledges that Buyer has not given Seller any investment advice, credit information, or opinion on whether the sale of the Transferred Rights or the retention of the Retained Obligations is prudent.

(q)    Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights, Borrower, any Obligor or any of their Affiliates that is not known to Seller and that may be material to a decision to sell the Transferred Rights and to retain the Retained Obligations ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights and to retain the Retained Obligations notwithstanding its lack of knowledge of the Seller Excluded Information and (iii) Buyer shall have no liability to Seller, and Seller waives and releases any claims that it might have against Buyer or any Buyer Indemnitee whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Seller Excluded Information in connection with the transactions contemplated hereby; provided, however, that the Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r)    Seller is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Seller has not made any offers to sell, or solicitations of offers to buy, any portion of the Transferred Rights in violation of any applicable securities laws.

(s)    Immediately prior to the sale of the Transferred Rights, either (a) no interest in the Transferred Rights is being sold by or on behalf of one or more Benefit Plans, or

DK-KSF 000212

(b) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Transferred Rights.

(t)     Seller has provided to Buyer (i) true, correct and complete copies of (a) each Predecessor Transfer Agreement to which Seller is a party and (b) the Proof of Claim, if filed by or on behalf of Seller, and (ii) to the extent and in the form received by Seller from Immediate Prior Sellers, (a) the Credit Documents, (b) the other Predecessor Transfer Agreements and (c) the Proof of Claim, if one has been filed by or on behalf of an Entity other than Seller. A true and complete list of such Credit Documents and Predecessor Transfer Agreements is set forth on Schedule 2.

(u)     Other than as set forth on Schedule 1, Seller has not received (by set-off or otherwise) or directed to others any payments or other transfers from or on account of Borrower or any Obligor in respect of the Transferred Rights on or after the 95th day preceding the Filing Date.

(v)     Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, Seller has not given its consent to change, nor has it waived, any term or provision of any Credit Document or the Predecessor Transfer Agreements, including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

(w)     Seller is not a party to any document, instrument or agreement (other than any Predecessor Transfer Agreements and the Credit Documents specified in Schedule 2) that could materially and adversely affect the Transferred Rights or Buyer's rights and remedies under this Agreement.

(x)     No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

4.2     Except as expressly stated in this Agreement and the Assignment, Seller makes no representations or warranties, express or implied, with respect to the transactions contemplated herein and therein.

4.3     Seller acknowledges that (a) its sale of the Transferred Rights to Buyer is irrevocable; (b) Seller shall have no recourse to the Transferred Rights; and (c) Seller shall have

DK-KSF 000213

no recourse to Buyer, except for (i) Buyer's breaches of its representations, warranties, or covenants, and (ii) Buyer's indemnities, in each case as expressly stated in this Agreement.

**5.    Buyer's Representations and Warranties**

    5.1    Buyer represents and warrants to Seller (as of the Agreement Date and as of the Effective Date) that:

    (a)    Buyer (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, the Transaction Documents to which it is or will become a party.

    (b)    Buyer's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted, and will not result, in a breach of any provision of (i) Buyer's organizational documents, (ii) any statute, law, writ, order, rule, or regulation of any Governmental Authority applicable to Buyer, (iii) any judgment, injunction, decree or determination applicable to Buyer, or (iv) any contract, indenture, mortgage, loan agreement, note, lease, or other instrument by which Buyer may be bound or to which any of the assets of Buyer are subject.

    (c)    (i)    The Transaction Documents to which Buyer is a party (A) have been duly and validly authorized, executed, and delivered by Buyer, and (B) are the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by the court's discretion in relation to equitable remedies; and

    (ii)    except as provided in the Credit Documents, no notice to, registration with, consent or approval of, or any other action by, any relevant Governmental Authority or other Entity is or will be required for Buyer to execute, deliver, and perform its obligations under the Transaction Documents (other than the Transfer Notice, if any) to which Buyer is or will become a party.

    (d)    Without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Buyer is not purchasing the Transferred Rights with a view towards the sale or distribution thereof in violation of the Securities Act; provided, however, that Buyer may resell the Transferred Rights if such resale is in accordance with the Securities Act and in compliance with Section 10 hereof.

    (e)    Buyer acknowledges that the consideration paid under this Agreement for the purchase of the Transferred Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

    (f)    Buyer (i) is a sophisticated Entity with respect to the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (ii) is able to bear the

DK-KSF 000214

economic risk associated with the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (iii) has adequate information concerning the business and financial condition of Borrower or any Obligor and the status of the Bankruptcy Case to make an informed decision regarding the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement and (v) has independently and without reliance upon Seller, and based on such information as Buyer has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Buyer has relied upon Seller's express representations, warranties, covenants, and indemnities in this Agreement. Buyer acknowledges that Seller has not given Buyer any investment advice, credit information or opinion on whether the purchase of the Transferred Rights or the assumption of the Assumed Obligations is prudent.

(g)   Except as otherwise provided in this Agreement, Buyer has not relied and will not rely on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition or business of Borrower or any Obligor, or any other matter concerning Borrower or any Obligor.

(h)   Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights, Borrower, any Obligor or any of their Affiliates that is not known to Buyer and that may be material to a decision to acquire the Transferred Rights and assume the Assumed Obligations ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights and assume the Assumed Obligations notwithstanding its lack of knowledge of the Buyer Excluded Information, and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller or any Seller Indemnitee, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the transactions contemplated hereby; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(i)   No broker, finder, or other Entity acting under Buyer's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which Seller could be responsible.

(j)   Immediately prior to the purchase of the Transferred Rights, either (a) no interest in the Transferred Rights is being purchased by or on behalf of one or more Benefit Plans, or (b) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1

DK-KSF 000215

(a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is available with respect to the purchase and holding of the Transferred Rights and the exercise of the Buyer's rights thereunder.

(k)    Buyer acknowledges that (i) it has received copies of the Credit Documents and the Predecessor Transfer Agreements specified in Schedule 2, and (ii) without in any way limiting the representations and warranties of the Seller contained in this Agreement, it is assuming all risk with respect to the accuracy or sufficiency of such documents and information other than any representations, warranties or covenants made by Seller in any Predecessor Transfer Agreements to which Seller is a party.

(l)    Buyer is an "accredited investor" as defined in Rule 501 under the Securities Act.

(m)    No proceedings are (i) pending against Buyer or (ii) to the best of Buyer's knowledge, threatened against Buyer before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect any action taken or to be taken by Buyer under this Agreement.

5.2    Except as expressly stated in this Agreement and the Assignment, Buyer makes no representations or warranties, express or implied, with respect to the transactions contemplated herein or therein.

5.3    Buyer acknowledges that (a) Seller's sale of the Transferred Rights to Buyer, and Buyer's assumption of the Assumed Obligations, are irrevocable, and (b) Buyer shall have no recourse to Seller except for (i) Seller's breaches of its representations, warranties, or covenants, and (ii) Seller's indemnities, in each case as expressly stated in this Agreement.

6.    Indemnification

6.1    Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that Buyer Indemnitees incur or suffer as a result of, or arising out of (a) Seller's breach of any of Seller's representations, warranties, covenants, or agreements in this Agreement or (b) any obligation of Buyer or Seller to disgorge, in whole or in part, or otherwise reimburse (by setoff or otherwise) Borrower, Agent or any other Entity for any payments, property (including Collateral), setoffs or recoupments received, applied or effected by or for the account of Seller under or in connection with the Transferred Rights or otherwise from, against or on account of Borrower.

6.2    Buyer shall indemnify, defend, and hold Seller and its officers, directors, agents, partners, members, controlling Entities, and employees (collectively, "Seller Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that Seller Indemnitees incur or suffer as a

MAY 2001                                     13

DK-KSF 000216

result of or arising out of (a) Buyer's breach of any of Buyer's representations, warranties, covenants, or agreements in this Agreement or (b) Seller acting or refraining to act, pursuant to any direction of (i) Buyer, or (ii) the Majority Holders (as defined in Section 11); provided, however, that Buyer's share of the indemnity under clause (b)(ii) shall be limited to a fraction, the numerator of which is (A) the outstanding principal amount of the Transferred Rights or (B) if Seller has consented to transfers of the Transferred Rights (or a portion thereof) pursuant to Section 10.1(b), the then outstanding principal amount of the claims beneficially held by Buyer in respect of which the action involved is taken by Seller, and the denominator of which is the then aggregate outstanding principal amount of all claims in respect of which the action involved is taken by Seller.

6.3     If a third party commences any action or makes any demand against either Party for which such Party ("Indemnified Party") is entitled to indemnification under this Agreement, such Indemnified Party will promptly notify the other Party ("Indemnifying Party") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Party that has assumed the defense of such action shall provide the other Party with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without the other Party's prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

6.4     Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Parties and survives termination of this Agreement, and it is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

7.     **Costs and Expenses**

7.1     Seller shall pay all bills for Agent Expenses incurred, arising, or otherwise chargeable to the period prior to but excluding the Effective Date and chargeable to Seller as a Lender under the Credit Documents. Buyer shall pay all other Agent Expenses. If either Seller or Buyer receives a bill for Agent Expenses, Seller shall pay to the Agent that portion of the bill for Agent Expenses incurred, arising, or otherwise chargeable to the period prior to but excluding the Effective Date and Buyer shall pay to the Agent the balance. If a Party pays any Agent Expenses for which the other Party is responsible pursuant to this Section 7.1, the other Party shall, promptly upon the written request of the Party paying such amounts, reimburse such paying Party for the full amount paid on such other Party's behalf.

MAY 2001                                    14

DK-KSF 000217

7.2     The Parties agree to bear their own respective legal and other costs and expenses for preparing, negotiating, executing, and implementing this Agreement and any related documents and consummating the transactions contemplated under this Agreement.

7.3     The Transfer Fee shall be paid on or before the Effective Date as provided in Schedule 1.

## 8.     Distributions; Interest and Fees; Payments

8.1     (a)  If at any time after the Effective Date, Seller receives a Distribution, Seller shall (i) accept and hold the Distribution for the account and sole benefit of Buyer, (ii) have no equitable or beneficial interest in the Distribution, and (iii) deliver the Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Distribution, in no event later than two (2) Business Days after the date on which Seller receives it) to Buyer in the same form received and, when necessary or appropriate, with Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule, or order. If Seller fails to pay any cash Distribution to Buyer within two (2) Business Days after receiving it, then Seller will pay interest on such payment for the period from the day on which such payment is actually received by Seller to (but excluding) the day such payment is actually paid to Buyer, in accordance with Section 8.4 hereof.

(b)     If a Distribution includes securities, Seller shall, to the extent permissible by law, endorse (without recourse) or use reasonable efforts to assist Buyer to cause to be registered in Buyer's name, or such name as Buyer may direct (at Buyer's sole expense) in writing and deliver such securities to Buyer or to such Entity as Buyer may direct as soon as practicable. Pending such transfer, Seller shall hold the same on behalf and for the sole benefit of Buyer and Seller shall have no legal, equitable or beneficial interest in any such Distribution. Subject to applicable law, Buyer is entitled to receive any Distribution to be remitted by Seller under this Agreement without the withholding of any tax. If Seller receives a Distribution which it is required to remit to Buyer, Buyer will furnish to Seller such forms, certifications, statements and other documents as Seller may reasonably request in writing to evidence Buyer's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable Seller to comply with any applicable laws or regulations relating thereto, and Seller may refrain from remitting such Distribution until such forms, certifications, statements, and other documents have been so furnished.

(c)     If a Distribution received by Seller and transferred to Buyer pursuant to this Section 8.1 has been made to Seller wrongfully or in error, and is required to be returned or disgorged by Seller, Buyer shall promptly return such Distribution to Seller together with all related interest and charges payable by Seller.

8.2     The treatment of Pre-Closing Date Accruals is set forth on Schedule 1. "Trades Flat" is specified, and Buyer and Seller have agreed that all Pre-Closing Date Accruals, if and when paid, shall be for the account of Buyer. For purposes of this Agreement the Transferred Rights shall include Pre-Closing Date Accruals.

DK-KSF 000218

8.3    Except as provided in Section 8.1, all payments made by Buyer to Seller or by Seller to Buyer under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller or Buyer, as applicable, in accordance with the wire instructions specified in Schedule 1.

8.4    With respect to the payment of any funds or other property under this Agreement (including the delivery of Distributions under Section 8.1), whether from Seller to Buyer or from Buyer to Seller, (a) the Party required to deliver a Distribution may withhold therefrom any tax required by law to be withheld, and (b) the Party failing to make full payment of any amount when due shall, upon demand by the other Party, pay such defaulted amount together with interest on it (for each day from (and including) the date when due to (but excluding) the date when actually paid) at a rate equal to the Federal Funds Rate.

## 9.    Notices

9.1    All communications between the Parties or notices or other information sent under this Agreement shall be in writing, hand delivered or sent by overnight courier or telecopier, addressed to the relevant Party at its address or facsimile number specified on Schedule 1 or at such other address or facsimile number as such Party may request in writing. All such communications and notices shall be effective upon receipt.

9.2    From the Effective Date through the 45th day after the Effective Date, if Seller receives any notices, correspondence or other documents in respect of the Transferred Rights or any Credit Document that, to the best of Seller's knowledge, were not sent to the Lenders generally, Seller shall promptly forward them to Buyer.

## 10.    Further Transfers

10.1    Buyer may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Transferred Rights, this Agreement, its rights under this Agreement and the Predecessor Transfer Agreements, or any interest in the Transferred Rights without Seller's prior consent; provided, however, that (a) such sale, assignment, participation, or transfer shall comply with any applicable requirements in the Transaction Documents and shall not violate any applicable laws, rules or regulations, including, without limitation, any applicable securities laws, rules or regulations; (b) notwithstanding any such sale, assignment, participation or transfer, unless Seller otherwise consents in writing (which consent Seller shall not unreasonably withhold or delay), (i) Buyer's obligations to Seller under this Agreement shall remain in full force and effect until fully paid, performed, and satisfied and (ii) Seller shall continue to deal solely and directly with Buyer in connection with Buyer's obligations under this Agreement; and (c) with respect to a transfer by Buyer of its rights against Seller under this Agreement and against Prior Sellers under the Predecessor Transfer Agreements (i) the transferee must represent and warrant that (A) no interest in the Transferred Rights is being acquired by the transferee by or on behalf of a person who is, or at any time while the Transferred Rights are held thereby will be, one or more Benefit Plans, (B) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company

DK-KSF 000219

general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the acquisition and holding of the Transferred Rights by the transferee and the exercise of the transferee's rights thereunder, or (C) the funds being used by the transferee to purchase all or any portion of the Transferred Rights are from a fund managed by a Qualified Professional Asset Manager (the "Manager") within the meaning of Part V of PTE 84-14, the Manager made the investment decision on behalf of the transferee to acquire the Transferred Rights from the transferor, the acquisition and holding of the Transferred Rights hereunder satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and the individual making the investment decision to purchase the Transferred Rights on behalf of the transferee has no actual knowledge (without duty of inquiry or investigation) that the requirements of subsection (a) of Part I of PTE 84-14 are not satisfied, and (ii) the transferee must agree that it will obtain from each of its direct transferees the representations, warranties and covenants contained in this clause (c) (including, without limitation, this subclause (ii)).

10.2    Seller may assign its rights under this Agreement without the prior written consent of Buyer; provided, however, that Seller may not delegate its obligations under this Agreement without the prior written consent of Buyer.

## 11. Voting

On and after the Effective Date, (a) Buyer shall have sole authority to exercise all voting and other rights and remedies with respect to the Transferred Rights (including, if permitted under the Credit Documents, the right to change or revoke the vote, consent or other similar action of Seller or any Prior Seller made or taken on or prior to the Effective Date), and (b) if for any reason Seller is entitled to exercise any such rights (including the right to vote) after the Effective Date, Seller (i) shall not take any action with respect to the Transferred Rights other than in accordance with the prior written instructions of Buyer and (ii) shall take (or refrain from taking) any action with respect to the Transferred Rights in accordance with the prior written instructions of Buyer except (A) as prohibited under applicable law, rule, order or the Credit Documents, or (B) if following such instructions might (in Seller's reasonable determination) expose Seller to any obligation, liability, or expense that in Seller's reasonable judgment is material and for which Seller has not been provided adequate indemnity; provided, however, that if the vote or other action involved is not divisible or may not be cast or taken separately in respect of the Transferred Rights (or the relevant portion thereof) and any other claim against the Borrower or any other Entity (whether or not included in the Transferred Rights), then Seller shall take or refrain from taking such action in accordance with instructions received by Seller and believed by Seller in good faith to have been given by the then current holders (including, as the case may be, Seller) of more than 50% of the aggregate principal amount of the claims then outstanding in respect of which such action is to be taken by Seller (the "Majority Holders"). For purposes of determining the Majority Holders pursuant to the preceding sentence, Seller shall only be required to obtain instructions relating to any action to be taken in respect of the Transferred Rights from (x) the Buyer or (y) if Seller has consented to transfers of the Transferred Rights (or a portion thereof) pursuant to Section 10.1(b), the then current holders of

MAY 2001                                        17

DK-KSF 000220

the aggregate principal amount of the claims outstanding in respect of which such action is to be taken by Seller.

## 12.    Exercise of Rights

12.1    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.2    No failure on the part of a Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver hereof by such Party, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights under any other related document against the other Party or any other Entity.

## 13.    Survival; Successors and Assigns

13.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall be true and correct as of the Agreement Date and the Effective Date, and shall survive the execution, delivery, and performance of this Agreement and the other Operative Documents.

13.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

## 14.    Further Assurances

Each Party agrees (i) to execute and deliver, or to cause to be executed and delivered, all such instruments and (ii) to take all such actions as the other Party may reasonably request to effectuate the intent and purposes, and to carry out the terms, of this Agreement, including the procurement of any third-party consents.

## 15.    Disclosure

15.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement or the Purchase Price Letter (including the Purchase Price and the Purchase Rate) to any Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, or regulation, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity, (e) to its affiliated entities, professional advisors and auditors, (f) to its lenders, or (g) as set forth in Section 15.2.

DK-KSF 000221

15.2    Buyer may disclose the contents of this Agreement (but not the contents of the Purchase Price Letter (including the Purchase Price and the Purchase Rate)) to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Buyer in respect of the Transferred Rights or any part of them.

15.3    Buyer agrees to comply with the requirements of the Credit Documents regarding confidentiality.

16.    **Intentionally Omitted**

17.    **Parties' Other Relationships**

Each Party and any of its Affiliates may engage in any kind of lawful business or relationship with Borrower, any Obligor or any of their Affiliates without liability to the other Party, or any obligation to disclose such business or relationship to the other Party.

18.    **Entire Agreement; Conflict**

18.1    This Agreement and the other Operative Documents constitute the entire agreement of the Parties with respect to the respective subject matters thereof, and supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and finally integrated into this Agreement and the other Operative Documents.

18.2    This Agreement supplements the Assignment. As between Seller and Buyer, if there is any inconsistency or conflict between this Agreement and any of the other Operative Documents, the provisions of this Agreement shall govern and control.

19.    **Counterparts; Telecopies**

This Agreement and the other Operative Documents may be executed by telecopy in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier of an executed counterpart of any Operative Document shall be deemed to constitute due and sufficient delivery of such counterpart. Each fully executed counterpart of this Agreement and any other Operative Document shall be deemed to be a duplicate original.

20.    **Relationship Between Buyer and Seller**

The relationship between Seller and Buyer shall be that of seller and buyer. Neither is a trustee or agent for the other, nor does either have fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

21.    **Severability**

DK-KSF 000222

The illegality, invalidity, or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

## 22.    Governing Law

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

## 23.    Waiver of Trial by Jury

THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 24.    Jurisdiction

24.1    The Parties irrevocably and unconditionally submit to and accept the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating to it, and waives any objection it may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over it.

24.2    The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each

DK-KSF 000223

Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**25.    Subrogation**

To the extent that Buyer enforces any claim for indemnification or other claim or remedy against Seller under this Agreement and receives payment or another remedy from Seller in respect of such claim or remedy, the Parties agree that to the extent permitted by law, the Credit Documents and the Predecessor Transfer Agreements, without the need for further action on the part of either Party, Seller shall be subrogated to the rights of Buyer against any other Entity, including any Prior Sellers, with respect to such claim or remedy to the extent of such payment or other remedy.

**26.    Interpretation**

26.1    This Agreement includes the Schedules and any documents attached as exhibits to the Agreement.

26.2    The Schedules may supplement, change, or supersede other provisions of this Agreement. If there is any inconsistency between the provisions of the Schedules and the other provisions of this Agreement, the Schedules will prevail.

26.3    Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive

26.4    Any reference to a Party includes the Party's successors and permitted assigns.

26.5    Unless otherwise indicated, any reference to:

(a)    this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may at any time before the Effective Date be, in effect as modified, amended, or supplemented as of the Effective Date; and

(b)    a statute, law, order, rule, or regulation shall be construed as a reference to such statute, law, order, rule, or regulation as it may have been, or may at any time before the Effective Date be, in effect as modified, amended, or supplemented as of the Effective Date.

26.6    Section, Schedule, and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provisions of this Agreement.

26.7    This Agreement shall be deemed to have been jointly drafted, and no provision of it shall be interpreted or construed for or against any Party because such Party purportedly prepared or requested such provision, any other provision, or the Agreement as a whole.

MAY 2001                            21

DK-KSF 000224

22

DK-KSF 000225

FEB 15 2002 10:33 FR DEUTSCHE BANK        TO 912129868866        P.03
FROM KLEINBERG KAPLAN          (THU) 2. 14' 02 14:25/ST. 14:24/NO. 4863909380 P 3

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers as of the date first set forth above.

BANKERS TRUST COMPANY
By: BTNY Services, Inc. as Attorney-in-Fact

By: _____
Name:
Title:

        John Pineiro
        Vice President


SPRINGFIELD ASSOCIATES, L.L.C.

By: ELLIOTT ASSOCIATES, L.P., as
managing member

By: Elliott Capital Advisors L.P., as
general partner

By: Braxton Associates, Inc., as
general partner

By: _____
Name:
Title:

    ELLIOT GREENBERG
    VICE PRESIDENT


MAY 2001

DK-KSF 000226

02/07/2002 15:07 FAX 212 974 6000    MICHAEL STEPHAN    ☐003/019

## <u>SCHEDULES</u>

**Schedule 1**

**Schedule 2**

DK-KSF 000227

## SCHEDULE 1 TO PURCHASE AND SALE AGREEMENT
### (Secondary Assignment; Borrower in Bankruptcy)

**Section 1 (Definitions)**

"Agent" means Citibank, N.A. as Paying Agent.

"Bankruptcy Case" means the case under the Bankruptcy Code pending before the Bankruptcy Court in which the Borrower is a debtor, In re Enron Corp. et al., Case no.s 01-16033 through 01-16048 (AJG).

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York (and, if appropriate, the United States District Court for that District).

"Bar Date" none has been set.

"Borrower" means Enron Corp.

"Commitments" means Commitments under the Credit Agreement in the outstanding principal amount of $19,333,333.33.

"Credit Agreement" means the $1,750,000,000 364-Day Revolving Credit Agreement dated as of May 14, 2001 among Enron Corp. as Borrower, the Banks named therein as Banks, Citibank, N.A. as Paying Agent, Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, Salomon Smith Barney Inc. and JP Morgan (a division of Chase Securities Inc.) as Co-Lead Arrangers, Barclays Bank PLC and The Royal Bank of Scotland PLC as Co-Syndication Agents, and ABN AMRO Bank N.V. as Documentation Agent.

"Loans" means Advances under the Credit Agreement in the outstanding principal amount of $19,333,333.33

"Proof of Claim" means any proof of claim to be filed with the Bankruptcy Court in respect of the Assigned Rights.

"Required Consents" means the consent of Agent.

"Trade Date" means December 3, 2001 with respect to $5,000,000.00 of Commitments, December 6, 2001 with respect to $5,333,333.33 of Commitments, and January 23, 2002 with respect to $9,000,000.00 of Commitment.

"Transfer Fee" means the $ 3,000.00 transfer fee payable to the Agent in connection with the transfer by Seller to Buyer of the Transferred Rights.

"Unfunded Commitments" means $0.00 of unfunded Commitments.

DK-KSF 000228

**Sections 4 (Seller's Representations and Warranties)**

Section 4.1(f).  The principal amount of each of the Loans outstanding, the Commitments and the Unfunded Commitments as of the Effective Date, specified in Sections 4.1(f) and 4.1(g)is: as stated above.

The following are (i) all permanent commitment reductions, permanent repayments of principal and all amendment, consent, waiver and other similar non-ordinary course fees received by Seller in connection with the Transferred Rights from and after the Trade Date and as of the Effective Date, and (ii) all payments or other transfers received by Seller (by set-off or otherwise) or directed to others from or on account of Borrower or any Obligor in respect of the Transferred Rights on or after the 95th day preceding the Filing Date: NONE

Section 4.1(l)  ("Insider" status; Affiliate status; committee membership) NONE

Section 4.1(n) (Notice of Impairment) NONE

**Section 7 (Costs and Expenses)**

The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to one-half thereof.

**Section 8 (Distributions; Interest and Fees; Payments)**

The treatment of Pre-Closing Date Accruals is Trades Flat.

**Section 9 (Notices)**

Buyer's Address for Notices and Delivery:

SPRINGFIELD ASSOCIATES, L.L.C.
712 Fifth Avenue
36th Floor
New York, New York 10019
Attention: Elliot Greenberg
Telephone:  (212) 974-6000
Facsimile:  (212) 974-2091

Buyer's Wire Instructions:

Chase Manhattan Bank
ABA #:  021-000-021
A/C Name:  Merrill Lynch
A/C #:  9304019012
Credit:  ELLIOTT ASSOCIATES, LP/SPRINGFIELD
A/C #:  329-89203

LSTA JUNE 2000

DK-KSF 000229

<u>Seller's Address for Notices and Delivery</u>:

Bankers Trust Company
130 Liberty Street, 14th Floor
New York, New York 10006
Attention: Annmarie Reilly
Telephone: (212)250-8283
Facsimile: (212)250-5256

<u>Seller's Wire Instructions</u>:

ABA No.:021-001-033
Acct.: Commercial Loan Division
Acct. No. 99 401 268
Attn.: Joseph Regan
Ref.: Enron/Elliott

DK-KSF 000230

## SCHEDULE 2 TO PURCHASE AND SALE AGREEMENT
### (Secondary Assignment; Borrower in Bankruptcy)

1.     List of Predecessor Transfer Agreements and principal amount of Loans and Commitments thereunder assigned hereby:

- Purchase and Sale Agreement between Bankers Trust Company ("BT"), as buyer and Bear, Stearns & Co., Inc. ("Bear"), as seller, dated as of January 29, 2002 and the related Assignment and Acceptance dated as of January 29, 2002 (to the extent of $5,000,000.00 of Commitments transferred hereunder).

- Purchase and Sale Agreement between BT, as buyer and Bank of Montreal ("BoMo"), as seller, dated as of January 30, 2002 and the related Assignment and Acceptance dated as of January 30, 2002 (to the extent of $5,333,333.33 of Commitments transferred hereunder).

- Purchase and Sale Agreement between BT, as buyer and Wachovia Bank, N.A. ("Wachovia"), as seller, dated as of February 5, 2002 and the related Assignment and Acceptance dated as of February 5, 2002 (to the extent of $9,000,000.00 of Commitments transferred hereunder).

2.     List of Credit Documents provided to Buyer:

- Credit Agreement and all schedules, exhibits thereto

3.     List of waivers, supplements, forbearances and amendments to the Credit Agreement to which Seller is a party that were executed from and after the time that Seller acquired the Transferred Rights from the Immediate Prior Sellers: NONE

DK-KSF 000231

EXHIBIT 12

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

EXHIBIT 13

JUN-24-02    06:09PM    FROM-Otterbourg, Steindler, Houston & Rosen    212 682 6104    T-109    P.002/016    F-149

[EXECUTION COPY]

[Lehman #1 and 2]

## ASSIGNMENT AND ACCEPTANCE

### Dated June 25, 2002

Reference is made to the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001 (such 364-Day Revolving Credit Agreement, as amended or otherwise modified from time to time, being herein referred to as the "Credit Agreement"), among Enron Corp., an Oregon corporation (the "Borrower"), the Banks (as defined in the Credit Agreement), Citibank, N.A. and The Chase Manhattan Bank as Co-Administrative Agents, and Citibank, N.A. as Paying Agent. Terms defined in the Credit Agreement are used herein with the same meaning.

THE BANK OF TOKYO - MITSUBISHI, LTD., HOUSTON AGENCY (the "Assignor") and LEHMAN COMMERCIAL PAPER INC. (the "Assignee") agree as follows:

1.      The Assignor hereby sells and assigns to the Assignee, without recourse, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement. After giving effect to such sale and assignment, the Assignee's and Assignor's respective Commitments and the respective amounts of the Advances owing to the Assignee and Assignor will be as set forth in Section 2 of Schedule 1.

2.      The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Person or the performance or observance by the Borrower or any other Person of any of its respective obligations under the Credit Agreement, any of the other Loan Documents or any other instrument or document furnished pursuant thereto or in connection therewith; and (iv) attaches the Note held by the Assignor and requests that the Paying Agent exchange such Note for a new Note payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance or new Notes payable to the order of the Assignee in an amount equal to the Commitment of the Assignee after giving effect to this Assignment and Acceptance and the Assignor in an amount equal to the Commitment retained by the Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

3.      The Assignee attaches the Note (if any) held by it and (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in Section 4.01(d) of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Paying Agent, the Co-Administrative Agents, the

DK-KSF 000730

JUN-24-02   08:10PM   FROM-Otterbourg, Steindler, Houston & Rosen    212 682 6104    T-108  P.003/018  F-149

Assignor or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement, any of the other Loan Documents or any other instrument or document; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Paying Agent and the Co-Administrative Agents to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Paying Agent and the Co-Administrative Agents by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (v) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Bank; and (vi) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof..

4.      Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, this Assignment and Acceptance will be delivered to the Paying Agent for acceptance and recording by the Paying Agent, and a copy of this Assignment and Acceptance shall be delivered to the Co-Administrative Agents. The effective date of this Assignment and Acceptance (the "Effective Date") shall be the date of acceptance thereof by the Paying Agent, unless otherwise specified on Schedule 1 hereto.

5.      Upon such acceptance and recording by the Paying Agent, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and under the other Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement and under the other Loan Documents.

6.      Upon such acceptance and recording by the Paying Agent, from and after the Effective Date, the Paying Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and facility and utilization fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

7.      This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be as effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written, such execution being made on Schedule 1 hereto.

816702M v3 - BTMA/Revolver Assignment/Assignt (Lehman #1 & 2)                    2

DK-KSF 000731

Schedule 1
to
Assignment and Acceptance

**Section 1.**

Percentage interest assigned:                                                    2.285714285%

**Section 2.**

Assignor's Commitment before giving effect to this
Assignment and Acceptance:                                                      $23,333,333.39

Assignor's outstanding principal of Advances before giving
effect to this Assignment and Acceptance:                                       $23,333,333.39

Aggregate outstanding principal of Advances assigned to the
Assignee under this Assignment and Acceptance:                                  $40,000,000.00

Assignor's Commitment after giving effect to this Assignment
and Acceptance:                                                                 $63,333,333.39

Assignor's outstanding principal of Advances after giving effect
to this Assignment and Acceptance:                                              $63,333,333.39

Assignor's remaining Commitment after giving effect to this
Assignment and Acceptance:                                                      $13,666,666.67

Assignor's remaining outstanding principal of Advances after
giving effect to this Assignment and Acceptance:                                $13,666,666.67

Principal amount of Note payable to the Assignee:      $63,333,333.39

Principal amount of Note payable to the Assignor:$13,666,666.67

**Section 3.**

Effective Date:**                                                                June 25, 2002

THE BANK OF TOKYO - MITSUBISHI, LTD.,
HOUSTON AGENCY, as Assignor

By: _____
Name:  John W. McGhee
Title:  Vice President & Manager
Dated:  June 25, 2002

---

** This date should be no earlier than the date five Business Days after the delivery of this Assignment
and Acceptance to the Paying Agent.

30968_DOC                                          1

DK-KSF 000732

Schedule 1
to
Assignment and Acceptance

## Section 1.

Percentage interest assigned:                                          2.285714285%

## Section 2.

Assignee's Commitment before giving effect to this
Assignment and Acceptance:                                             $23,888,888.89
Assignee's outstanding principal of Advances before giving
effect to this Assignment and Acceptance:                              $23,888,888.89

Aggregate outstanding principal of Advances assigned to the
Assignee under this Assignment and Acceptance:                         $40,000,000.00

Assignee's Commitment after giving effect to this Assignment
and Acceptance:                                                        $63,888,888.89
Assignee's outstanding principal of Advances after giving effect
to this Assignment and Acceptance:                                     $63,888,888.89

Assignor's remaining Commitment after giving effect to this
Assignment and Acceptance:                                             $13,666,666.67
Assignor's remaining outstanding principal of Advances after
giving effect to this Assignment and Acceptance:                       $13,666,666.67

Principal amount of Note payable to the Assignee:    $63,888,888.89

Principal amount of Note payable to the Assignor: $13,666,666.67

## Section 3.

Effective Date:**                                                     June ___, 2002

THE BANK OF TOKYO - MITSUBISHI, LTD.,
HOUSTON AGENCY, as Assignor

By: _John M. McGhee_
Name: _John W. McGhee_
Title: _Vice President & Manager_
Dated: June 25, 2002

_____
** This date should be no earlier than the date five Business Days after the delivery of this Assignment
and Acceptance to the Paying Agent.

53x95_DOC                              1

DK-KSF 000733

06/24/2002    23:09    LEHMAN BROTHERS → 95363131    NO.848    004

LEHMAN COMMERCIAL PAPER INC., as
Assignee

By: _____
Name: _____EDUARDO REYES_____
Title: ____AUTHORIZED SIGNATORY____
Dated: June 25, 2002

Domestic Lending Office (and
address for notices):
747 7th Avenue, 16th Floor
New York, New York 10019
Attention: Ed Reyes

Eurodollar Lending Office:
747 7th Avenue, 16th Floor
New York, New York 10019
Attention: Ed Reyes

Approved this ____ day of
June ___, 2002

ENRON CORP.

By: _____
Name: _____
Title: _____

Accepted [and Approved]*** this day of
June ___, 2002

CITIBANK, N.A., as Paying Agent

By: _____
Name: _____
Title: _____

_____
***    Required if the Assignee is an Eligible Assignee solely by reason of clause (b) of the
definition of Eligible Assignee in the Credit Agreement.

42568_000                                        2

DK-KSF 000734

[EXECUTION COPY]
[Lehman No. 1]

## PURCHASE AND SALE AGREEMENT

### (Original Assignment; Borrower in Bankruptcy)

This Purchase and Sale Agreement ("Agreement") is made by and between **THE BANK OF TOKYO - MITSUBISHI, LTD., HOUSTON AGENCY** ("Seller") and **LEHMAN COMMERCIAL PAPER INC.** ("Buyer") as of June 25, 2002 ("Agreement Date") and contemplates the assignment of $20,000,000 of Advances made by Seller to **ENRON CORP.**, an Oregon corporation.

## 1. Definitions

1.1 In this Agreement:

**"Affiliate"** means "affiliate" as defined in either (a) Bankruptcy Code § 101(2) or (b) Rule 144 of the Securities Act.

**"Agent"** has the meaning given to it in Schedule 1.

**"Agent Expenses"** means any costs, liabilities, losses, claims, damages, and expenses incurred by, and any indemnification claims of, the Agent, for which the Agent has recourse under the Credit Documents to Seller, but only to the extent attributable or allocable to the Assigned Rights.

**"Assigned Rights"** means any and all of Seller's right, title, and interest in, to and under the Loans and solely to the extent related thereto, the following:

    (a)    all other amounts funded by or payable to Seller under the Credit Documents, and all obligations owed to Seller in connection with the Loans and the Commitments, if any;

    (b)    the Credit Documents;

    (c)    the Proof of Claim, if one has been filed;

    (d)    all claims (including "claims" as defined in Bankruptcy Code § 101(5)), suits, causes of action (including without limitation, any claim or cause of action against any officers or directors of the Borrower, Vinson & Elkins, Arthur Andersen LLP or any other accountant or independent auditor of, or legal counsel for, the Borrower), and any other right of Seller, whether known or unknown, against Borrower, any Obligor, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any

4sR:04_DOC

**DK-KSF 000735**

of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Seller against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Credit Documents;

(e)     all Guarantees and all Collateral and security of any kind for or in respect of the foregoing;

(f)     all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of Seller under the Loans and the Commitments, if any, and other extensions of credit under the Credit Documents (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the Trade Date, including all distributions obtained by or through redemption, consummation of a plan of reorganization, restructuring, liquidation, or otherwise of Borrower, any Obligor or the Credit Documents, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(g)     the economic benefit of permanent commitment reductions, permanent repayments of principal and amendment, consent, waiver and other similar non-ordinary course fees received by Seller from and after the Trade Date; and

(h)     all proceeds of the foregoing.

"**Assignment**" means the document (if any) in the form specified in the Credit Agreement for an assignment of the Loans.

"**Assumed Obligations**" means Seller's obligations and liabilities with respect to, or in connection with, the Assigned Rights resulting from facts, events, or circumstances arising or occurring on and after the Closing Date; excluding, however, the Retained Obligations.

"**Bankruptcy Case**" has the meaning given to it in Schedule 1.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, 11 U.S.C §§ 101 <u>et</u> <u>seq.</u>, as amended.

"**Bankruptcy Court**" has the meaning given to it in Schedule 1.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any corresponding or other local rules of the Bankruptcy Court.

DK-KSF 000736

"**Bar Date**" means the last date fixed by the Bankruptcy Court pursuant to the Bankruptcy Code or the Bankruptcy Rules on which proofs of claim or interest may be filed in the Bankruptcy Case, as set forth on Schedule 1.

"**Benefit Plan**" means an "employee benefit plan" subject to Title I of ERISA, a "plan" subject to Section 4975 of the Code or any Entity whose assets include the assets of any such employee benefit plan or plan.

"**Borrower**" means the Borrower under the Credit Agreement, as defined in Schedule 1.

"**Business Day**" means any day that is not (a) a Saturday, (b) a Sunday, or (c) any other day on which commercial banks are authorized or required by law to be closed in the City of New York.

"**Closing Date**" means the date on which Seller receives the Purchase Price.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"**Collateral**" means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to or for the benefit of the Lenders under the Credit Documents.

"**Commitments**" has the meaning given to it in Schedule 1.

"**Credit Agreement**" has the meaning given to it in Schedule 1.

"**Credit Documents**" means the Credit Agreement and, if any, all guaranties, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, supplements, modifications, forbearances and amendments and all other documents and agreements executed and delivered in connection therewith.

"**Distribution**" means any payment or other distribution (whether by setoff or otherwise) of cash (including interest), notes, securities, or other property (including Collateral) or proceeds under or in respect of and allocable to the Assigned Rights.

"**Encumbrance**" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, or other encumbrance, security agreement, security arrangement or adverse claim against title of any kind; (b) purchase or option agreement or put arrangement; (c) subordination agreement or arrangement other than as specified in the Credit Documents; or (d) agreement to create or effect any of the foregoing.

"**Entity**" includes any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, and Governmental Authority.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it.

4q8c04_.DOC                                  3                              DK-KSF 000737

"**Federal Funds Rate**" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Parties from three federal funds brokers of recognized standing selected by the Parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"**Filing Date**" means December 2, 2001, the date of the filing of the petition commencing the Bankruptcy Case.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Guaranty**" means, if any, a guaranty of any of Borrower's obligations under the Credit Documents, including Borrower's obligations in connection with the Loan.

"**Impairment**" means any claim, counterclaim, setoff, defense, action, demand, litigation (including administrative proceedings or derivative actions), Encumbrance, right (including expungement, avoidance, reduction, contractual or equitable subordination, or otherwise) or defect, other than those created pursuant to the Credit Documents, the effect of which is, or would be, materially and adversely to affect the Assigned Rights in whole or in part.

"**JPMorgan**" means JPMorgan Chase Bank.

"**JPMorgan Purchase Price**" has the meaning given to it in the JPMorgan Purchase Price Letter.

"**JPMorgan Purchase Price Letter**" means the letter agreement between JPMorgan and Seller, dated as of the Agreement Date, that specifies the calculation for determining the JPMorgan Purchase Price.

"**JPMorgan Purchase Rate**" means the respective purchase rates stated in the JPMorgan Purchase Price Letter with respect to the portions of the Loans in the aggregate principal amounts of $5,000,000 and $15,000,000, respectively.

"**Lehman**" means Lehman Commercial Paper Inc.

"**Lehman Purchase Price**" has the meaning given to it in the Lehman Purchase Price Letter.

DK-KSF 000738

"**Lehman Purchase Price Letter**" means the letter agreement between JPMorgan and Lehman, dated on or about the Agreement Date, that specifies the calculations for determining the Lehman Purchase Price.

"**Lender**" means a lender under the Credit Agreement and its successors, transferees, and assigns.

"**Loans**" means the Loan(s) in the amount(s) specified in Schedule 1.

"**Multilateral Agreement**" means the Multilateral Letter Agreement, dated as of the Agreement Date, executed by and among Seller, JPMorgan and Buyer.

"**Obligor**" means any Entity, if any, other than the Borrower and the Lenders that is obligated under the Credit Documents.

"**Operative Documents**" means (a) this Agreement, (b) the Assignment, (c) the Multilateral Agreement, (d) the JPMorgan Purchase Price Letter and (e) the Lehman Purchase Price Letter.

"**Party**" means Buyer or Seller, as applicable.

"**Pre-Closing Date Accruals**" means all interest and commitment, facility, letter of credit and other similar ordinary course fees accruing prior to the Closing Date, whether accruing before, on or after the Trade Date, payable under the Credit Documents in respect of the Loans and the Commitments, if any.

"**Proof of Claim**" has the meaning given to it in Schedule 1.

"**Purchase Price**" has the meaning given to it in the Purchase Price Letter.

"**Required Consents**" means the consents required pursuant to the Transaction Documents to transfer the Assigned Rights from Seller to Buyer, which Required Consents are specified in Schedule 1.

"**Retained Obligations**" means all obligations and liabilities of Seller relating to the Assigned Rights that (a) result from facts, events, or circumstances arising or occurring prior to the Closing Date, (b) result from Seller's breach of its representations, warranties, covenants, or agreements under this Agreement or the Credit Documents, (c) result from Seller's bad faith, gross negligence, or willful misconduct or (d) are attributable to Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents.

"**Schedule 1**" means the document titled "Schedule 1 to Purchase and Sale Agreement (Original Assignment; Borrower in Bankruptcy)."

"**Schedule 2**" means the document titled "Schedule 2 to Purchase and Sale Agreement (Original Assignment; Borrower in Bankruptcy)."

DK-KSF 000739

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., as amended, and the rules and regulations promulgated under it.

"**Trade Date**" has the meaning given to it in Schedule 1.

"**Transaction Documents**" means the Credit Documents and the Operative Documents.

"**Transfer Fee**" has the meaning given to it in Schedule 1.

"**Unfunded Commitments**" has the meaning given to it in Schedule 1.

1.2 Terms that are defined in other provisions of this Agreement have the meanings given to them in those provisions.

1.3 Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meaning in this Agreement as in the Credit Agreement.

## 2. Assignment and Assumption

2.1 In consideration of the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

    (a)    subject to the satisfaction of the conditions in Section 3.2, Seller irrevocably sells, transfers, assigns, grants, and conveys the Assigned Rights to Buyer with effect on and after the Closing Date;

    (b)    subject to the satisfaction of the conditions in Section 3.1, Buyer acquires the Assigned Rights, and assumes and agrees to perform and comply with the Assumed Obligations, with effect on and after the Closing Date; and

    (c)    notwithstanding the foregoing, (i) Seller agrees to remain responsible for, and assumes and agrees to perform and comply with the Retained Obligations, and (ii) Buyer assumes no obligations other than the Assumed Obligations and its obligations under this Agreement.

This Agreement is intended to, and upon execution hereof and satisfaction or waiver of the conditions precedent set forth in Section 3 shall, effect a true sale of the Assigned Rights.

2.2 Notwithstanding anything to the contrary contained in this Agreement:

    (a)    the Loans and the Assigned Rights expressly exclude, and Seller is retaining all of its right, title and interest in and to, the balance of Seller's outstanding Advances made by Seller to Borrower pursuant to the Credit Agreement in the aggregate principal amount of $33,666,666.67; and

    (b)    notwithstanding any reference in this Agreement to "Collateral" or "Guaranty", (i) there does not exist any Collateral or Guaranty insofar as the Assigned Rights are concerned, (ii) the Assigned Rights do not consist of or include any Collateral

DK-KSF 000740

or Guaranty, and (iii) all references to the foregoing terms in this Agreement shall
be of no force and effect in construing this Agreement and the respective rights
and obligations of the parties hereto.

### 3. Conditions Precedent

3.1 Buyer's obligations to pay the Lehman Purchase Price to JPMorgan, to acquire the
Assigned Rights and to assume the Assumed Obligations shall be subject to the conditions that
(a) Seller's representations and warranties in this Agreement shall have been true and correct on
the Agreement Date and the Closing Date, (b) Seller shall have complied in all material respects
with all covenants required by this Agreement to be complied with by it on or before the Closing
Date and (c) Buyer shall have received (i) this Agreement duly executed on behalf of Seller, (ii)
the Multilateral Agreement duly executed on behalf of Seller and JPMorgan, (iii) evidence
reasonably satisfactory to Buyer that the note or notes have been surrendered to the Agent, and
(iv) the Assignment duly executed on behalf of Seller, Borrower (if required), the Agent and any
other Entity whose consent is required by the terms of the Assignment.

3.2 Seller's obligation to sell, transfer, assign, grant, and convey the Assigned Rights to
Buyer on the Closing Date shall be subject to the conditions that (a) Buyer's representations and
warranties in this Agreement shall have been true and correct on the Agreement Date and the
Closing Date, (b) Buyer shall have complied in all material respects with all covenants required
by this Agreement to be complied with by it on or before the Closing Date, (c) Seller shall have
received (i) this Agreement duly executed on behalf of Buyer, (ii) the Multilateral Agreement
duly executed on behalf of Buyer and JPMorgan, and (iii) the Assignment duly executed on
behalf of Buyer, Borrower (if required), the Agent and any other Entity whose consent is
required by the terms of the Assignment and (d) Seller shall have received payment of the
JPMorgan Purchase Price from JPMorgan.

### 4. Seller's Representations and Warranties

4.1 Seller represents and warrants to Buyer (as of the Agreement Date and as of the
Closing Date) that:

(a)    Seller (i) is duly organized and validly existing under the laws of its jurisdiction
of organization or incorporation, (ii) is in good standing under such laws and (iii)
has full power and authority to execute, deliver and perform its obligations under
the Transaction Documents to which it is or will become a party.

(b)    Seller's execution, delivery, and performance of the Transaction Documents to
which it is or will become a party has not resulted and will not result in a breach
of any provision of (i) Seller's organizational documents, (ii) any statute, law,
writ, order, rule or regulation of any Governmental Authority applicable to Seller,
(iii) any judgment, injunction, decree or determination applicable to Seller or (iv)
any contract, indenture, mortgage, loan agreement, note, lease or other instrument
by which Seller may be bound or to which any of the assets of Seller are subject.

(c)    (i)    The Transaction Documents to which Seller is a party (A) have been duly and validly authorized, executed, and delivered by Seller and (B) are the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except that such enforceability against Seller may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by the court's discretion in relation to equitable remedies; and

(ii)    No notice to, registration with, consent or approval of, or any other action by, any relevant Governmental Authority or other Entity (other than the Required Consents) is or will be required for Seller to execute, deliver, and perform its obligations under, the Transaction Documents (other than the Transfer Notice, if any) to which Seller is or will become a party.

(d)    Seller is the sole legal and beneficial owner of and has good title to the Assigned Rights, free and clear of any Encumbrance, and the Assigned Rights are not subject to any prior sale, transfer, assignment or participation by Seller or any agreement to assign, convey, transfer or participate, in whole or in part.

(e)    Other than the Bankruptcy Case and the proceedings thereunder, no proceedings are (i) pending against Seller or (ii) to the best of Seller's knowledge, threatened against Seller before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect (A) the Assigned Rights or (B) any action taken or to be taken by Seller under this Agreement.

(f)    The principal amounts of the Loans outstanding and the Commitments, if any, as of the Closing Date, and all permanent commitment reductions, permanent repayments of principal and all amendment, consent, waiver and other similar non-ordinary course fees received by Seller in connection with the Assigned Rights from and after the Trade Date and as of the Closing Date, are accurately stated in Schedule 1.

(g)    Except for the Commitments, if any, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Assigned Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full. The Unfunded Commitments, if any, as of the Closing Date are accurately stated in Schedule 1.

(h)    Seller has not engaged in any acts or conduct or made any omissions that will result in Buyer receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Assigned Rights than is received by other Lenders holding loans or commitments of the same tranche as the Loans and Commitments, if any.

4q8r04_.DOC                                      8                          **DK-KSF 000742**

(i)   Seller has performed, and has complied with, all obligations required to be performed or complied with by it under the Credit Documents and is not in breach of any provisions of the Credit Documents.

(j)   No broker, finder or other Entity acting under Seller's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which Buyer could be responsible.

(k)   Seller (i) is an original Lender under the Credit Agreement and (ii) originally made the Loans.

(l)   Except as set forth in Schedule 1, Seller (i) is not and has never been (A) an "insider" of Borrower or any Obligor (as "insider" is defined in Bankruptcy Code § 101(31)) or (B) an Affiliate of Borrower or any Obligor, and (ii) is not, and has not been, a member of (1) any official or unofficial committee appointed or otherwise constituted in the Bankruptcy Case or (2) any committee relating to the Borrower or any Obligor formed prior to the commencement of the Bankruptcy Case.

(m)   Seller does not and did not on the Filing Date hold any funds or property of or owe any amounts or property to the Borrower or any Obligor and has not effected or received the benefit of any setoff against the Borrower or any Obligor on account of the Assigned Rights.

(n)   Except as set forth in Schedule 1, Seller has not received any written notice other than those publicly available in the Bankruptcy Case or otherwise, that (i) any payment or other transfer made to or for the account of Seller from or on account of Borrower or any Obligor under the Assigned Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Assigned Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment.

(o)   Seller acknowledges that the consideration paid under this Agreement for the purchase of the Assigned Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(p)   Seller (i) is a sophisticated seller with respect to the sale of the Assigned Rights and the retention of the Retained Obligations, (ii) has made an informed decision regarding the sale of the Assigned Rights and the retention of the Retained Obligations and (iii) has independently and without reliance upon Buyer, and based on such information as Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Seller has relied upon Buyer's express representations, warranties, covenants, and indemnities in this Agreement.   Seller acknowledges that Buyer has not given Seller any investment advice, credit information, or opinion on whether the sale of the Assigned Rights or the retention of the Retained Obligations is prudent.

DK-KSF 000743

(q) Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Assigned Rights, Borrower, any Obligor or any of their Affiliates that is not known to Seller and that may be material to a decision to sell the Assigned Rights and to retain the Retained Obligations ("Seller Excluded Information"), (ii) Seller has determined to sell the Assigned Rights and to retain the Retained Obligations notwithstanding its lack of knowledge of the Seller Excluded Information and (iii) Buyer shall have no liability to Seller, and Seller waives and releases any claims that it might have against Buyer or any Buyer Indemnitee, in connection with the sale and assignment of the Assigned Rights contemplated by this Agreement, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Seller Excluded Information in connection with the sale and assignment of the Assigned Rights contemplated by this Agreement; provided, however, that the Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(r) Seller is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Assigned Rights as a "security" within the meaning of applicable securities laws, Seller has not made any offers to sell, or solicitations of offers to buy, any portion of the Assigned Rights in violation of any applicable securities laws.

(s) Either (a) no interest in the Assigned Rights is being sold by or on behalf of one or more Benefit Plans, or (b) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Assigned Rights.

(t) Seller has provided to Buyer a true, correct and complete copy of the Credit Agreement and all schedules and exhibits to the Credit Agreement.

(u) Other than as set forth on Schedule 1, Seller has not received (by set-off or otherwise) or directed to others any payments or other transfers from or on account of Borrower or any Obligor in respect of the Assigned Rights on or after the 95th day preceding the Filing Date.

(v) Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, Seller has not given its consent to change, nor has it waived, any term or provision of any Credit Document including, without limitation, with respect to the amount or time of any payment of principal or the rate or time of any payment of interest.

DK-KSF 000744

(w)     Seller is not a party to or bound by, any document, instrument or agreement (other than the Credit Documents specified in Schedule 2 that could materially and adversely affect the Assigned Rights or Buyer's rights and remedies under this Agreement.

(x)     No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

4.2 Except as expressly stated in this Agreement and the Assignment, Seller makes no representations or warranties, express or implied, with respect to the transactions contemplated herein and therein.

4.3 Seller acknowledges that (a) its sale of the Assigned Rights to Buyer is irrevocable; (b) Seller shall have no recourse to the Assigned Rights; and (c) Seller shall have no recourse to Buyer with respect to the sale of the Assigned Rights hereunder, except for (i) Buyer's breaches of its representations, warranties, or covenants, and (ii) Buyer's indemnities, in each case as expressly stated in this Agreement.

## 5.  Buyer's Representations and Warranties

5.1 Buyer represents and warrants to Seller (as of the Agreement Date and as of the Closing Date) that:

(a)     Buyer (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws, and (iii) has full power and authority to execute, deliver and perform its obligations under, the Transaction Documents to which it is or will become a party.

(b)     Buyer's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted, and will not result, in a breach of any provision of (i) Buyer's organizational documents, (ii) any statute, law, writ, order, rule, or regulation of any Governmental Authority applicable to Buyer, (iii) any judgment, injunction, decree or determination applicable to Buyer, or (iv) any contract, indenture, mortgage, loan agreement, note, lease, or other instrument by which Buyer may be bound or to which any of the assets of Buyer are subject.

(c)     (i)     The Transaction Documents to which Buyer is a party (A) have been duly and validly authorized, executed, and delivered by Buyer, and (B) are the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by the court's discretion in relation to equitable remedies; and

(ii)     except as provided in the Credit Documents, no notice to, registration with, consent or approval of, or any other action by, any relevant Governmental

Authority or other Entity is or will be required for Buyer to execute, deliver and perform its obligations under the Transaction Documents (other than the Transfer Notice, if any) to which Buyer is or will become a party.

(d)    Without characterizing the Assigned Rights as a "security" within the meaning of applicable securities laws, Buyer is not purchasing the Assigned Rights with a view towards the sale or distribution thereof in violation of the Securities Act; provided, however, that Buyer may resell the Assigned Rights if such resale is in accordance with the Securities Act and in compliance with Section 10 hereof.

(e)    Buyer acknowledges that the consideration paid under this Agreement for the purchase of the Assigned Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(f)    Buyer (i) is a sophisticated Entity with respect to the purchase of the Assigned Rights and the assumption of the Assumed Obligations, (ii) is able to bear the economic risk associated with the purchase of the Assigned Rights and the assumption of the Assumed Obligations, (iii) has made an informed decision regarding the purchase of the Assigned Rights and the assumption of the Assumed Obligations, (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement and (v) has independently and without reliance upon Seller, and based on such information as Buyer has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Buyer has relied upon Seller's express representations, warranties, covenants, and indemnities in this Agreement. Buyer acknowledges that Seller has not given Buyer any investment advice, credit information or opinion on whether the purchase of the Assigned Rights or the assumption of the Assumed Obligations is prudent.

(g)    Except as otherwise provided in this Agreement, Buyer has not relied and will not rely on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition or business of Borrower or any Obligor, or any other matter concerning Borrower or any Obligor.

(h)    Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Assigned Rights, Borrower, any Obligor or any of their Affiliates that is not known to Buyer and that may be material to a decision to acquire the Assigned Rights and assume the Assumed Obligations ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Assigned Rights and assume the Assumed Obligations notwithstanding its lack of knowledge of the Buyer Excluded Information, and (iii) Seller shall have no liability to Buyer, and Buyer waives and releases any claims that it might have against Seller or any Seller Indemnitee, in connection with the sale and assignment of the Assigned Rights contemplated by this Agreement, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with sale and

DK-KSF 000746

assignment of the Assigned Rights contemplated by this Agreement; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(i)     No broker, finder, or other Entity acting under Buyer's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which Seller could be responsible.

(j)     Either (a) no interest in the Assigned Rights is being acquired by or on behalf of a person who is, or at any time while the Assigned Rights are held thereby will be, one or more Benefit Plans, or (b) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the purchase and holding of the Assigned Rights and the exercise of the Buyer's rights thereunder.

(k)     Buyer acknowledges that (i) it has received a true, correct and complete copy of the Credit Agreement and all schedules and exhibits to the Credit Agreement and (ii) without in any way limiting the representations and warranties of Seller contained in this Agreement, Seller is assuming all risk with respect to the accuracy or sufficiency of such documents and information.

(l)     Buyer is an "accredited investor" as defined in Rule 501 under the Securities Act.

(m)    No proceedings are (i) pending against Buyer or (ii) to the best of Buyer's knowledge, threatened against Buyer before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect any action taken or to be taken by Buyer under this Agreement.

(n)     Buyer is an original Lender under the Credit Agreement.

5.2 Except as expressly stated in this Agreement and the Assignment, Buyer makes no representations or warranties, express or implied, with respect to the transactions contemplated herein or therein.

5.3 Buyer acknowledges that (a) Seller's sale of the Assigned Rights to Buyer, and Buyer's assumption of the Assumed Obligations, are irrevocable, and (b) Buyer shall have no recourse to Seller except for (i) Seller's breaches of its representations, warranties, or covenants, and (ii) Seller's indemnities, in each case as expressly stated in this Agreement.

DK-KSF 000747

## 6. Indemnification

6.1 Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that Buyer Indemnitees incur or suffer as a result of, or arising out of (a) Seller's breach of any of Seller's representations, warranties, covenants, or agreements in this Agreement or (b) any obligation of Buyer or Seller to disgorge, in whole or in part, or otherwise reimburse (by setoff or otherwise) Borrower, Agent or any other Entity for any payments, property (including Collateral), setoffs or recoupments received, applied or effected by or for the account of Seller under or in respect of the Assigned Rights, or otherwise from, against or on account of Borrower or any Obligor under or in respect of the Assigned Rights.

6.2 Buyer shall indemnify, defend, and hold Seller and its officers, directors, agents, partners, members, controlling Entities, and employees (collectively, "Seller Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, or expense (including reasonable attorneys' fees and expenses) that Seller Indemnitees incur or suffer as a result of or arising out of (a) Buyer's breach of any of Buyer's representations, warranties, covenants, or agreements in this Agreement or (b) Seller acting or refraining to act, pursuant to any direction of (i) Buyer, or (ii) the Majority Holders (as defined in Section 11); provided, however, that Buyer's share of the indemnity under clause (b)(ii) shall be limited to a fraction, the numerator of which is (A) the outstanding principal amount of the Assigned Rights or (B) if Seller has consented to transfers of the Assigned Rights (or a portion thereof) pursuant to Section 10.1(b), the then outstanding principal amount of the claims beneficially held by Buyer in respect of which the action involved is taken by Seller, and the denominator of which is the then aggregate outstanding principal amount of all claims in respect of which the action involved is taken by Seller.

6.3 If a third party commences any action or makes any demand against either Party for which such Party ("Indemnified Party") is entitled to indemnification under this Agreement, such Indemnified Party will promptly notify the other Party ("Indemnifying Party") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Party that has assumed the defense of such action shall provide the other Party with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without the other Party's prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of both the Indemnifying Party and the Indemnified Party, may be

DK-KSF 000748

withheld for any reason if the settlement or adjustment involves performance or admission by either of such Parties.

6.4 Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Parties and survives termination of this Agreement, and it is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

## 7. Costs and Expenses

7.1 Seller shall pay all bills not otherwise paid by Borrower for Agent Expenses incurred, arising, or otherwise chargeable to the period prior to, but excluding, the Closing Date and that are chargeable to Seller as a Lender under the Credit Documents. Buyer shall pay all other Agent Expenses. If either Seller or Buyer receives a bill for Agent Expenses, Seller shall pay to the Agent that portion of the bill for Agent Expenses incurred, arising, or otherwise chargeable to the period prior to, but excluding, the Closing Date and Buyer shall pay to the Agent the balance. If a Party pays any Agent Expenses for which the other Party is responsible pursuant to this Section 7.1, the other Party shall, promptly upon the written request of the Party paying such amounts, reimburse such paying Party for the full amount paid on such other Party's behalf.

7.2 The Parties agree to bear their own respective legal and other costs and expenses for preparing, negotiating, executing, and implementing this Agreement and any related documents and consummating the transactions contemplated under this Agreement.

7.3 The Transfer Fee shall be paid on or before the Closing Date as provided in Schedule 1.

## 8. Distributions; Interest and Fees; Payments

8.1     (a) If at any time after the Closing Date, Seller receives a Distribution (excluding, for the avoidance of doubt, a Retained Interest Distribution), Seller shall (i) accept and hold the Distribution for the account and sole benefit of Buyer, (ii) have no equitable or beneficial interest in the Distribution, and (iii) deliver the Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Distribution, in no event later than two (2) Business Days after the date on which Seller receives it) to Buyer in the same form received and, when necessary or appropriate, with Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule, or order. If Seller fails to pay any cash Distribution to Buyer within two (2) Business Days after receiving it, then Seller will pay interest on such payment for the period from the day on which such payment is actually received by Seller to (but excluding) the day such payment is actually paid to Buyer, in accordance with Section 8.5 hereof.

(b) If a Distribution includes securities, Seller shall, to the extent permissible by law, endorse (without recourse) or use reasonable efforts to assist Buyer to cause to be registered in Buyer's name, or such name as Buyer may direct (at Buyer's sole expense) in writing and deliver such securities to Buyer or to such Entity as Buyer may direct as soon as practicable.

4qtr04_.DOC                          15

DK-KSF 000749

Pending such transfer, Seller shall hold the same on behalf and for the sole benefit of Buyer and Seller shall have no legal, equitable or beneficial interest in any such Distribution. Subject to applicable law, Buyer is entitled to receive any Distribution to be remitted by Seller under this Agreement without the withholding of any tax. If Seller receives a Distribution which it is required to remit to Buyer, Buyer will furnish to Seller such forms, certifications, statements and other documents as Seller may reasonably request in writing to evidence Buyer's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable Seller to comply with any applicable laws or regulations relating thereto, and Seller may refrain from remitting such Distribution until such forms, certifications, statements, and other documents have been so furnished.

(c) If a Distribution received by Seller and transferred to Buyer pursuant to this Section 8.1 has been made to Seller wrongfully or in error, and is required to be returned or disgorged by Seller, Buyer shall promptly return such Distribution to Seller together with all related interest and charges payable by Seller.

8.2    [Intentionally Omitted].

8.3    The treatment of Pre-Closing Date Accruals is set forth on Schedule 1. "Trades Flat" is specified, which means, and Buyer and Seller have agreed, that all Pre-Closing Date Accruals, if and when paid, shall be for the account of Buyer. For purposes of this Agreement the Assigned Rights shall include all such Pre-Closing Date Accruals and Seller shall have no Retained Interest.

8.4    Except as provided in Section 8.1, all payments made by Buyer to Seller or by Seller to Buyer under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller or Buyer, as applicable, in accordance with the wire instructions specified in Schedule 1.

8.5    With respect to the payment of any funds or other property under this Agreement (including the delivery of Distributions under Section 8.1), whether from Seller to Buyer or from Buyer to Seller, (a) the Party required to deliver a Distribution may withhold therefrom any tax required by law to be withheld, and (b) the Party failing to make full payment of any amount when due shall, upon demand by the other Party, pay such defaulted amount together with interest on it (for each day from (and including) the date when due to (but excluding) the date when actually paid) at a rate equal to the Federal Funds Rate.

## 9. Notices

9.1 All communications between the Parties or notices or other information sent under this Agreement shall be in writing, hand-delivered or sent by overnight courier or telecopier, addressed to the relevant Party at its address or facsimile number specified on Schedule 1 or at such other address or facsimile number as such Party may request in writing. All such communications and notices shall be effective upon receipt.

9.2 From the Closing Date through the 45th day after the Closing Date, if Seller receives any notices, correspondence or other documents in respect of the Assigned Rights or any Credit

4q8r04_.DOC                                 16

DK-KSF 000750

Document that, to the best of Seller's knowledge, were not sent to the Lenders generally, Seller shall promptly forward them to Buyer.

## 10. Further Transfers

10.1   Buyer may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Assigned Rights, this Agreement, its rights under this Agreement, or any interest in the Assigned Rights without Seller's prior consent; provided, however, that (a) such sale, assignment, participation, or transfer shall comply with any applicable requirements in the Transaction Documents and shall not violate any applicable laws, rules or regulations, including, without limitation, any applicable securities laws, rules or regulations; (b) notwithstanding any such sale, assignment, participation or transfer, unless Seller otherwise consents in writing (which consent Seller shall not unreasonably withhold or delay), (i) Buyer's obligations to Seller under this Agreement shall remain in full force and effect until fully paid, performed, and satisfied and (ii) Seller shall continue to deal solely and directly with Buyer in connection with Buyer's obligations under this Agreement; and (c) with respect to a transfer by Buyer of its rights against Seller under this Agreement (i) the transferee must represent and warrant that (A) no interest in the Assigned Rights is being acquired by the transferee by or on behalf of a person who is, or at any time while the Assigned Rights are held thereby will be, one or more Benefit Plans, (B) the transaction exemption set forth in one or more prohibited transaction class exemptions ("PTEs") issued by the U.S. Department of Labor, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the acquisition and holding of the Assigned Rights by the transferee and the exercise of the transferee's rights thereunder, or (C) the funds being used by the transferee to purchase all or any portion of the Assigned Rights are from a fund managed by a Qualified Professional Asset Manager (the "Manager") within the meaning of Part V of PTE 84-14, the Manager made the investment decision on behalf of the transferee to acquire the Assigned Rights from the transferor, the acquisition and holding of the Assigned Rights hereunder satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and the individual making the investment decision to purchase the Assigned Rights on behalf of the transferee has no actual knowledge (without duty of inquiry or investigation) that the requirements of subsection (a) of Part I of PTE 84-14 are not satisfied, and (ii) the transferee must agree that it will obtain from each of its direct transferees the representations, warranties and covenants contained in this clause (c) (including, without limitation, this subclause (ii)).

10.2   Seller may assign its rights under this Agreement without the prior written consent of Buyer; provided, however, that Seller may not delegate its obligations under this Agreement without the prior written consent of Buyer.

4q8r04_.DOC

17

DK-KSF 000751

## 11. Voting

On and after the Closing Date, (a) Buyer shall have sole authority to exercise all voting and other rights and remedies with respect to the Assigned Rights and (b) if for any reason Seller is entitled to exercise any such rights (including the right to vote) after the Closing Date, Seller (i) shall not take any action with respect to the Assigned Rights other than in accordance with the prior written instructions of Buyer and (ii) shall take (or refrain from taking) any action with respect to the Assigned Rights in accordance with the prior written instructions of Buyer except (A) as prohibited under applicable law, rule, order or the Credit Documents, or (B) if following such instructions might (in Seller's reasonable determination) expose Seller to any obligation, liability, or expense that in Seller's reasonable judgment is material and for which Seller has not been provided adequate indemnity; provided, however, that if the vote or other action involved is not divisible or may not be cast or taken separately in respect of the Assigned Rights (or the relevant portion thereof) and any other claim against the Borrower or any other Entity (whether or not included in the Assigned Rights), then Seller shall take or refrain from taking such action in accordance with instructions received by Seller and believed by Seller in good faith to have been given by the then current holders (including, as the case may be, Seller) of more than 50% of the aggregate principal amount of the claims then outstanding in respect of which such action is to be taken by Seller (the "Majority Holders"). For purposes of determining the Majority Holders pursuant to the preceding sentence, Seller shall only be required to obtain instructions relating to any action to be taken in respect of the Assigned Rights from (x) the Buyer or (y) if Seller has consented to transfers of the Assigned Rights (or a portion thereof) pursuant to Section 10.1(b), the then current holders of the aggregate principal amount of the claims outstanding in respect of which such action is to be taken by Seller.

## 12. Exercise of Rights

12.1    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.2    No failure on the part of a Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver hereof by such Party, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights under any other related document against the other Party or any other Entity.

## 13. Survival; Successors and Assigns

13.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall be true and

4q&r04_.DOC                                    18

DK-KSF 000752

correct as of the Agreement Date and the Closing Date, and shall survive the execution, delivery, and performance of this Agreement and the other Operative Documents.

13.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

## 14. Further Assurances

Each Party agrees (i) to execute and deliver, or to cause to be executed and delivered, all such instruments and (ii) to take all such actions as the other Party may reasonably request to effectuate the intent and purposes, and to carry out the terms, of this Agreement, including the procurement of any third-party consents.

## 15. Disclosure

15.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement or the Multilateral Agreement, and without the prior written consent of JPMorgan it will not disclose the contents of the JPMorgan Purchase Price Letter or the Lehman Purchase Price Letter, respectively, (including the JPMorgan Purchase Price), the Lehman Purchase Price, the JPMorgan Purchase Rate and the Lehman Purchase Rate, respectively) to any Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, or regulation, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity, (e) to its professional advisors and auditors, (f) to its parent corporation and Affiliates, or (g) as set forth in Section 15.2.

15.2    Buyer may disclose the contents of this Agreement or the Multilateral Agreement (but not the contents of the Purchase Price Letter or the Lehman Purchase Price Letter (including the JPMorgan Purchase Price, the Lehman Purchase Price, the JPMorgan Purchase Rate and the Lehman Purchase Rate, respectively)) to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Buyer in respect of the Assigned Rights or any part of them.

15.3    Buyer agrees to comply with the requirements of the Credit Documents regarding confidentiality.

## 16. Parties' Other Relationships

Nothing contained in this Agreement shall limit, impair or otherwise affect the right(s) of each Party and any of its Affiliates (a) to engage in any kind of lawful business or relationship with Borrower, any Obligor or any of their Affiliates without liability to the other Party, or any obligation to disclose such business or relationship to the other Party, or (b) to sell and assign

4q8r04_.DOC

19

DK-KSF 000753

their respective interests in any other outstanding loans heretofore made by such party to Borrower and/or any of its Affiliates, whether under the Credit Agreement or otherwise.

### 17. Entire Agreement; Conflict; Other Transactions and Agreements

17.1    This Agreement and the other Operative Documents constitute the entire agreement of the Parties with respect to the respective subject matters thereof, and supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and finally integrated into this Agreement and the other Operative Documents.

17.2    This Agreement and the Multilateral Agreement supplements the Assignment. As between Seller and Buyer, if there is any inconsistency or conflict between this Agreement and any of the other Operative Documents other than the Multilateral Agreement, the provisions of this Agreement shall govern and control. As between Seller and Buyer, if there is any inconsistency or conflict between this Agreement and the Multilateral Agreement, the provisions of the Multilateral Agreement shall control.

17.3    This Agreement relates solely to the sale and assignment of the Assigned Rights by Seller to Buyer. Nothing contained in this Agreement (including, without limitation, any waiver, release or indemnity) shall be construed to waive, release, limit, impair or affect any other agreements, relationship, understanding, transaction or rights between Seller and Buyer, whether related to the Credit Agreement or otherwise, or any rights or remedies in connection therewith, all of which rights and remedies are expressly reserved.

### 18. Counterparts; Telecopies

This Agreement and the other Operative Documents may be executed by telecopy in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier of an executed counterpart of any Operative Document shall be deemed to constitute due and sufficient delivery of such counterpart. Each fully executed counterpart of this Agreement and any other Operative Document shall be deemed to be a duplicate original.

### 19. Relationship Between Buyer and Seller

The relationship between Seller and Buyer shall be that of seller and buyer in respect of the transaction contemplated under this Agreement. Insofar as the transaction contemplated under this Agreement is concerned, neither party is a trustee or agent for the other, nor does either have fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

## 20. Severability

The illegality, invalidity, or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

## 21. Governing Law

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

## 22. Waiver of Trial by Jury

THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 23. Jurisdiction

23.1    The Parties  irrevocably and unconditionally submit to and accept the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating to it, and waive any objection that they may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over it.

DK-KSF 000755

23.2 The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

## 24. Subrogation

To the extent that Buyer enforces any claim for indemnification or other claim or remedy against Seller under this Agreement and receives payment or another remedy from Seller in respect of such claim or remedy, the Parties agree that to the extent permitted by law and the Credit Documents, without the need for further action on the part of either Party, Seller shall be subrogated to the rights of Buyer against any other Entity with respect to such claim or remedy to the extent of such payment or other remedy.

## 25. Interpretation

25.1 This Agreement includes the Schedules and any documents attached as exhibits to the Agreement.

25.2 The Schedules may supplement, change, or supersede other provisions of this Agreement. If there is any inconsistency between the provisions of the Schedules and the other provisions of this Agreement, the Schedules will prevail.

25.3 Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

25.4 Any reference to a Party includes the Party's successors and permitted assigns.

25.5 Unless otherwise indicated, any reference to:

(a) this Agreement or any other agreement or document shall be construed as a reference to this Agreement or, as the case may be, such other agreement or document as the same may have been, or may at any time before the Closing Date be, in effect as modified, amended, or supplemented as of the Closing Date; and

(b) a statute, law, order, rule, or regulation shall be construed as a reference to such statute, law, order, rule, or regulation as it may have been, or may at any time before the Closing Date be, in effect as modified, amended, or supplemented as of the Closing Date.

25.6 Section, Schedule, and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provisions of this Agreement.

DK-KSF 000756

25.7     This Agreement shall be deemed to have been jointly drafted, and no provision of it shall be interpreted or construed for or against any Party because such Party purportedly prepared or requested such provision, any other provision, or the Agreement as a whole.

**[SIGNATURE PAGE FOLLOWS]**

DK-KSF 000757

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers as of the date first set forth above.

THE BANK OF TOKYO - MITSUBISHI, LTD.,
HOUSTON AGENCY

By: _____
   Name:
   Title:

LEHMAN COMMERCIAL PAPER INC.

By: _____
   Name:
   Title:   EDUARDO REYES
         AUTHORIZED SIGNATORY

44404_DOC                              24

DK-KSF 000758

JUN-25-02  01:11PM  FROM-Otterbourg, Steindler, Houston & Rosen   212 682 6104      T-135  P.002/010  F-200

Jun.20. 2002  4:26PM                                            No.0863  P. 4

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement by their duly authorized officers as of the date first set forth above.

THE BANK OF TOKYO - MITSUBISHI, LTD., HOUSTON AGENCY

By: _____

Name: John W. McGhee

Title: Vice President & Manager

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name:

Title:

-00177FA.DOC                    24

DK-KSF 000759

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Agreement by their duly authorized officers as of the date first set forth above.

THE BANK OF TOKYO - MITSUBISHI, LTD.,
HOUSTON AGENCY


By: _____
    Name:
    Title:


LEHMAN COMMERCIAL PAPER INC.


By: _____
    Name:
    Title:

DK-KSF 000760

# <u>SCHEDULES</u>

**Schedule 1**

**Schedule 2**

4g4404_DOC

DK-KSF 000761

**SCHEDULE 1 TO PURCHASE AND SALE AGREEMENT**
**(Original Assignment; Borrower in Bankruptcy)**

**Section 1 (Definitions)**

"Agent" means, individually and collectively, Citibank, N.A. ("Citibank") and JPMorgan Chase Bank, as Co-Administrative Agents, and Citibank, as Paying Agent.

"Bankruptcy Case" means the case under the Bankruptcy Code pending before the Bankruptcy Court in which the Borrower is a debtor, In re: Enron Corp., Et Al., No. 01-16034 (AJG) (Jointly Administered).

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York (and, if appropriate, the United States District Court for that District).

"Bar Date":  None has been set as of the Closing Date.

"Borrower" means Enron Corp., an Oregon corporation.

"Commitments" means Seller's Commitment in existence prior to the Filing Date to make Advances in the principal amount of $53,666,666.67, which Commitment was fully funded and, pursuant to Section 6.01 of the Credit Agreement, was automatically terminated, in each case as of the Filing Date.

"Credit Agreement" means the U.S. $1,750,000,000 364-Day Revolving Credit Agreement, dated as of May 14, 2001, executed by and among Borrower, Agent and the Lenders from time to time party thereto, as amended from time to time thereafter.

"Loans" means that portion of Advances made by Seller to Borrower pursuant to the Credit Agreement in the aggregate principal amount of $20,000,000, and expressly excludes from the definition thereof the remaining outstanding balance of such Advances made by Seller to Borrower in the aggregate amount of $33,666,666.67.

"Proof of Claim": None has been filed by Seller with respect to the Loans as of the Closing Date.

"Required Consents" means the written acceptance of the Assignment by Citibank, N.A., as Paying Agent.

"Trade Date" means (i) March 27, 2002 with respect to that portion of the Loans in the aggregate principal amount of $5,000,000 and (ii) April 12, 2002 with respect to that portion of Loans in the aggregate principal amount of $15,000,000.

"Transfer Fee" means the $3,000 transfer fee payable to the Paying Agent in connection with the transfer by Seller to Buyer of the Assigned Rights.

"Unfunded Commitments":  None exist.

**Sections 4 (Seller's Representations and Warranties)**

Sections 4.1(f) and 4.1(g).  The principal amount of the Loans outstanding, the Commitments and the Unfunded Commitments as of the Closing Date, specified in Sections 4.1(f) and 4.1(g) is as set forth in the respective definition of "Loans", "Commitments" and "Unfunded Commitments" above.

The following are (i) all permanent commitment reductions, permanent repayments of principal and all amendment, consent, waiver and other similar non-ordinary course fees received by Seller in connection with the Assigned Rights from and after the Trade Date and as of the Closing Date, and (ii) all payments or other transfers received by Seller (by set-off or otherwise) or directed to others from or on account of Borrower or any Obligor in respect of the Assigned Rights on or after the 95th day preceding the Filing Date:   Commitment fees in the aggregate amount of $4,410.96 received on September 28, 2001.

Section 4.1(l) ("Insider" status; Affiliate status; committee membership)":  **NONE**.

Section 4.1(n) (Notice of Impairment): **NONE**.

**Section 7 (Costs and Expenses)**

The Transfer Fee shall be paid by Seller to the Agent and the JPMorgan Purchase Price shall be increased by an amount equal to two-thirds thereof.

**Section 8 (Distributions; Interest and Fees Payments)**

The treatment of Pre-Closing Date Accruals is Trades Flat.

**Section 9 (Notices)**

Buyer's Address for Notices and Delivery:

**LEHMAN COMMERCIAL PAPER INC.**
747 7th Avenue – 16th Floor
New York, NY 10019
Attention:  Ed Reyes
Telephone: (212) 526-1048
Facsimile:  (646) 758-4993

Buyer's Wire Instructions:

Citibank
ABA No.:  021000089
Acct. No.:  30434133
Acct. Name:  LCPI Bank Loans
Attn.:  Loan Servicing Dept
Ref.:  Enron

4qko4_.DOC                                    2

DK-KSF 000763

Seller's Address for Notices and Delivery:

**THE BANK OF TOKYO-MITSUBISHI, LTD.,
HOUSTON AGENCY**
1100 Louisiana, Suite 2800
Houston, Texas 77002
Credit Information Contact:
John McGhee
Telephone: (713) 655-3811

Operations Contact:
Barrie Hogue
Telephone: (713) 655-3835

Seller's Wire Instructions:

**THE BANK OF TOKYO-MITSUBISHI, LTD., NYB**
ABA No.: 026009632
Acct.: Loan Operations Department
Acct. No.: 30001710
Attn: Barrie Hogue
Ref.: Enron 364-Day Proceeds from Chase

4q8r04_.DOC

3

DK-KSF 000764

**SCHEDULE 2 TO PURCHASE AND SALE AGREEMENT**
(Original Assignment; Borrower in Bankruptcy)

None

DK-KSF 000765

# EXHIBIT 14

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

# EXHIBIT 15

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

# EXHIBIT 16

P A U L ,   W E I S S ,   R I F K I N D ,   W H A R T O N   &   G A R R I S O N   LLP

1285 AVENUE OF THE AMERICAS, NEW YORK, N.Y. 10019-6064 (212) 373-3000

# FAX COVER SHEET

FROM:  Seiji Newman                    DATE:  February 8, 2006

RETURN FAX NUMBER:  212-492-0294        TOTAL NUMBER OF PAGES:    (Including Cover Sheet)

| NAME | FIRM/COMPANY | FAX NO. (LIST ALT. WHERE POSSIBLE) | TIME SENT |
|------|-------------|-----------------------------------|-----------|
| James Meadows, Esq. | Boies, Schiller & Flexner LLP | 212-446-2350 | |
| Alan C. Turner | Simpson, Thacher & Bartlett LLP | 212-455-2502 | |
| David J. Woll | Simpson, Thacher & Bartlett LLP | 212-455-2502 | |

*If transmission is incomplete, please call:* 212-373-3294          *Operator:* _____

RETURN ORIGINAL TO:  [X] SENDER    [ ] RECORDS

COMMENTS:

---

**IRS Circular 230 disclosure**: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter that is contained in this document.

---

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential.  If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.  If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

Doc #:NY7:134260.1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL    (1946-1956)
SIMON H. RIFKIND    (1950-1995)
LOUIS S. WEISS    (1927-1950)
JOHN F. WHARTON    (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212-373-3294

WRITER'S DIRECT FACSIMILE
212-492-0294

WRITER'S DIRECT E-MAIL ADDRESS
hnewman@paulweiss.com

1615 L STREET, NW
WASHINGTON, DC 20036-5694
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2536-9933
FACSIMILE (852) 2536-9622

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

MARK H. ALCOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
RICHARD S. BORISOFF
HENK BRANDS
JOHN F. BREGLIO
JAMES BROCHIN
RICHARD J. BRONSTEIN
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y.F. CHAN
DOUGLAS A. CIFU
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
JAMES M. DUBIN
LESLIE GORDON FAGEN
MARC FALCONE
PETER L. FELCHER
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
KENNETH A. GALLO*
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
JOYCE S. HUANG
JEH CHARLES JOHNSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
JOHN C. KENNEDY
ALAN W. KORNBERG

DANIEL J. KRAMER
DAVID K. LAKHDHIR
JOHN E. LANGE
DANIEL J. LEFFELL
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG K. OH
JOHN J. O'NEIL
KELLEY D. PARKER
ROBERT P. PARKER*
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
STEVEN B. ROSENFELD
PETER J. ROTHENBERG
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
MICHAEL J. SEGAL
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
JULIA L. TARVER
JUDITH R. THOYER
DANIEL J. TOAL
MARK A. UNDERBERG
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
LISA YANO
JORDAN E. YARETT
KAYE N. YOSHINO
ALFRED D. YOUNGWOOD
TONG YU

*NOT ADMITTED TO NEW YORK BAR.

February 8, 2006

## Via Facsimile & US Mail

James Meadows, Esq.
Boies, Schiller & Flexner, LLP
570 Lexington Avenue
16th Floor
New York, NY 10022

*Avenue Capital Management II, et al. v. J.P. Morgan-Chase & Co., et al.,*
No. H-05-3031 (S.D. Tex.)

Dear James:

　　　　　We write regarding plaintiffs' responses to the Citigroup Defendants' First Set of Interrogatories to Plaintiffs (the "Interrogatories"), and the documents produced by plaintiffs in response to the Citigroup Defendants' First Request for Production of Documents to Plaintiffs (the "Document Requests").

　　　　　First, upon review of plaintiffs' document production, we have determined that plaintiffs have failed to produce all documents reflecting the chain of title through which plaintiffs purportedly acquired interests in the Syndicated Credit Facilities. These documents are responsive to the Document Requests. (*See, e.g.,* Document Request Nos. 1, 2, 5, 6, 8, 10.) For example, Document Request No. 2 seeks "[a]ll documents concerning any actual . . . purchase (or other acquisition) . . . of any right or interest in . . . the Syndicated Credit Facilities, including . . . all documents concerning confirmation of each such transaction." Although the appendices that plaintiffs provided in response to Citigroup's Interrogatories identify over one hundred transactions by which plaintiffs purportedly acquired interests in the Syndicated Credit Facilities, the documents relating to a substantial number of those transactions are missing from plaintiffs' productions. Accordingly, we request that plaintiffs promptly produce all documents reflecting the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

James Meadows, Esq.                                                                    2

chain of title of any interest in the Syndicated Credit Facilities purportedly acquired by plaintiffs.

Second, we understand that certain plaintiffs have submitted documents to Enron concerning the chain of title of their purported claims under the Syndicated Credit Facilities. (*See, e.g.*, Stipulation and Order Partially Resolving Debtors' Omnibus Objection to Proofs of Claim Nos. 14179 and 14196 by Citibank, N.A., as Paying Agent, dated February 22, 2005; and Amended and Restated Stipulation and Order Resolving Reorganized Debtors' Objection and Request for Alternate Forms of Relief with Respect to Claims Based Upon the Long-Term Revolving Credit Agreement, Including, Without Limitation, Reclassification of Claims as General Unsecured Claims, dated August 9, 2005.) Any documentation submitted to Enron pursuant to these or other similar stipulations are responsive to Document Request No. 72, which seeks "[a]ll documents relating to any recovery or contemplated recovery by Lenders and/or Plaintiffs in the Enron bankruptcy, including all documents relating to any proof of claim filed or contemplated in the Enron bankruptcy, or any pleading or other filing in the Enron bankruptcy proceeding." Such documentation also is responsive to the other document requests seeking chain of title documents identified above. Accordingly, we request that plaintiffs promptly produce these documents.

Third, Interrogatory No. 10 expressly asked plaintiffs to identify "the Lender which *originally held the interest* [in the Syndicated Credit Facilities]." (Emphasis added.) For the many transactions where the Appendices list multiple predecessors-in-interest, however, plaintiffs fail to identify which is the original Lender. Accordingly, we request that plaintiffs clarify the chain of title for those transactions within 10 days.

Finally, inasmuch as plaintiffs purport to have acquired or sold any interests in any of the Syndicated Credit Facilities since plaintiffs responded to our discovery demands, or purport to do so in the future, we expect plaintiffs to supplement their document production and update their responses to our written discovery demands accordingly.

The deficiencies in plaintiffs' documents compound an already burdensome situation. Plaintiffs' documents were not produced until the tail end of the discovery period, and, in many cases, just a single day before plaintiffs' depositions. Accordingly, we request your prompt attention to these matters.

Very truly yours,

Seiji Newman

cc:     David J. Woll, Esq.
        Alan Turner, Esq

# EXHIBIT 17

BOIES, SCHILLER & FLEXNER LLP

570 LEXINGTON AVENUE • 16TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

March 15, 2006

**VIA HAND DELIVERY**

Seiji Newman, Esq.
Paul, Weiss, Rifkind, Wharton, & Garrison LLP
1265 Avenue of the Americas
New York, NY 10019 - 6064

Re:    Avenue Capital Management II L.P., et al. v. J.P. Morgan Chase & Co., et
al. (Case No. H-05-3031)

Dear Mr. Newman:

        This letter responds to your letter dated February 8, 2006 regarding Plaintiffs'
responses to Citigroup Defendants' First Set of Interrogatories to Plaintiffs (the
"Interrogatories") and the Citigroup Defendants' First Request for Production of
Documents (the "Document Requests").

        First, please find enclosed additional chain-of-title documents for each of the
transactions you identified in your e-mails to me on February 10 and 14, 2006. These are
included in the enclosed DVD, and bear the bates ranges AC-ACM 10000001 to AC-
ACM 10000037 (on behalf of Avenue Capital Management II, L.P.); AC-KCM
10000001 to AC-KCM 10000203 (on behalf of King Street Capital, L.P.); and AC-SVP
10000001 to AC-SVP-10000347 (on behalf of Strategic Value Master Fund, Ltd.,
Strategic Value Credit Opportunities Master Fund, L.P., and Man Mac 3 Limited )
(collectively, the "Strategic Value Plaintiffs").

        Second, with respect to your request for additional chain-of-title documents
submitted to Enron, our review of such documents has only turned up a small number of
documents that have not already been produced to Defendants. We have included such
documents in the enclosed DVD under the bates range AC-HAM 1000001 to AC-HAM
10000020 (on behalf of Halcyon Fund, L.P.). We believe that the following documents
already produced to Defendants are responsive to your request. On behalf of RCG
Carpathia Master Fund, we produced documents bearing the bates range AC-RCG
00000001 to AC-RCG 00000862. On behalf of the Strategic Value Plaintiffs, we
produced documents bearing the bates range AC-SVP 00026268 to AC-SVP 00027500.
On behalf of Halcyon Fund LLP, we produced documents bearing the bates range AC-
HAM 00010232 AC-HAM 00010553. Besides the Halcyon Fund, L.P. documents
referenced above, we do not believe any other documents were submitted to Enron that
were not already provided to Defendants.

BOIES,  SCHILLER & FLEXNER LLP

Seiji Newman, Esq.
March 15, 2006
Page 2

Third, in response to your request for additional clarification of Plaintiffs'
responses to the Interrogatories, please find enclosed a spreadsheet identifying the Lender
that originally held the interest in the Enron Bank Debt for each of the transactions listed
in Appendix A of Plaintiffs' responses to the Interrogatories.

Finally, to the extent that the amounts of Enron Bank Debt held by Plaintiffs have
changed since Plaintiffs' response to Defendants' discovery requests or change in the
future, Plaintiffs shall supplement their discovery responses as appropriate.  Please note
that Plaintiffs have provided or are now providing Defendants with documentation
regarding two such changes reflecting transactions in which Marathon Special
Opportunity Master Fund, Ltd. and SPCP Group, LLC (former Plaintiffs in this action)
sold their Enron Bank Debt interests to the Strategic Value Plaintiffs.  Documentation
regarding the SPCP Group, LLC transactions was previously produced as AC-SVP
00019923 to AC-SVP 00019924, and documentation regarding both these transactions is
included in the enclosed DVD bearing AC-SVP 10000001 to AC-SVP 10000347.

Sincerely,

James B. Meadows

cc:     Samantha Brantley, Esq.

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

EXHIBIT 18

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION

 3   In Re:  ENRON CORPORATION    *
     SECURITIES LITIGATION        * MDL-1446
 4   DERIVATIVE & "ERISA"         *
     LITIGATION                   *
 5                                * C.A. No. H-01-3624
     MARK NEWBY, ET AL.,          * CONSOLIDATED CASES
 6   INDIVIDUALLY AND ON BEHALF   *
     OF ALL OTHERS SIMILARLY      *
 7   SITUATED,                    *
                                  *
 8       PLAINTIFFS,              *
                                  *
 9   VS.                          *
                                  *
10   ENRON CORP., ET AL.,         *
                                  *
11       DEFENDANTS.              *
                                  *
12   DK ACQUISITION PARTNERS,     *
     L.P., ET AL.,                * C.A. No. H-03-3393
13                                *
         PLAINTIFFS,              *
14                                *
     VS.                          *
15                                *
     J.P. MORGAN CHASE & CO.,     *
16   ET AL.,                      *
                                  *
17       DEFENDANTS.              *

18

19

20       ---------------------------------------

21        ORAL AND VIDEOTAPED DEPOSITION OF
              WILLIAM C. CAREY, CPA
22               OCTOBER 5, 2006

23       ---------------------------------------

24

25
```

Page 2

1              ORAL AND VIDEOTAPED DEPOSITION OF WILLIAM

2     C. CAREY, CPA, produced as a witness at the

3     instance of J.P. Morgan Chase and Affiliated

4     Entities, and duly sworn, was taken in the

5     above-styled and -numbered cause on the 5th day of

6     October, 2006, from 9:16 a.m. to 5:14 p.m., before

7     Angela L. Mancuso, CSR in and for the State of

8     Texas, reported by machine shorthand, at Anderson

9     Kill & Olick, P.C., located at 1251 Avenue of the

10    Americas, in the City of New York, County of New

11    York, and State of New York, pursuant to the

12    Federal Rules of Civil Procedure and the provisions

13    stated on the record or attached hereto.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

# EXHIBIT 19

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

# EXHIBIT 20

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order

# EXHIBIT 21

CONFIDENTIAL EXHIBIT

Filed Under Seal Pursuant to Court Order