UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
:
UNICREDITO ITALIANO SPA, et al.,                                  :
:
               Plaintiffs,           :   Civil Action No.
:   02 Civ. 5328 (LTS)
v.                                                                :
:
JPMORGAN CHASE BANK, et al.,                                      :
:
               Defendants.           :
------------------------------------------------------------------x
:
DK ACQUISITION PARTNERS, L.P., et al.,                            :
:
               Plaintiffs,           :   Civil Action No.
:   08 Civ. 0446 (LTS)
v.                                                                :
:
J.P. MORGAN CHASE & CO., et al.,                                  :
:
               Defendants.           :
------------------------------------------------------------------x
:
AVENUE CAPITAL MANAGEMENT II, L.P., et al.,                       :
:
               Plaintiffs,           :   Civil Action No.
:   08 Civ. 0447 (LTS)
v.                                                                :
:
J.P. MORGAN CHASE & CO., et al.,                                  :
:
               Defendants.           :
------------------------------------------------------------------x

**PLAINTIFFS' JOINT STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO BREACH OF CONTRACT CLAIMS**

Pursuant to Local Rule 56.1 of the Southern District of New York, and this Court's order

dated June 18, 2008, Plaintiffs UniCredito Italiano SpA, *et al.*, DK Acquisition Partners, L.P., *et*

*al.*, and Avenue Capital Management II, L.P., *et al.*, respectfully submit this Joint Statement of Material Facts Pursuant to Local Rule 56.1, in Support of Plaintiffs' Motion for Partial Summary Judgment concerning their claims for breach of contract, dated January 20, 2006.

<u>The Revolving Credit Agreements and Parties Thereto</u>

1. Defendants JP Morgan Chase Bank ("Chase") and Citibank (collectively, the "Defendant Banks") are parties to two syndicated revolving credit agreements. Affidavit of Jordan Siev ("Siev Aff."), dated January 20, 2006, Exs. A & B.[1]

2. The first agreement is the $1.25 Billion Long-Term Revolving Credit Agreement, dated May 18, 2000 (the "Long-Term Facility Agreement"). *Id.*, Ex. A.

3. The Long-Term Facility Agreement was entered into by Enron, the Defendant Banks, and a group of participating signatory banks (the "Lenders"). *Id.*

4. Chase and Citibank are designated as "Co-Administrative Agents" under the Long-Term Facility Agreement. *Id.*

5. Citibank also is designated as the "Paying Agent" under the Long-Term Facility Agreement. *Id.*

6. Enron is the "Borrower" under the Long-Term Facility Agreement. *Id.*

7. The second agreement is the $1.75 Billion 364-Day Facility Agreement, dated May 14, 2001 (the "364-Day Facility Agreement"). Siev Aff., Ex. B.

---

[1] Jordan Siev was counsel for certain plaintiff banks in an action captioned, *Bayerische Landesbank et al v. JPMorgan Chase & Co., et al.*, 1-04 Civ. 2259 (JSR) & Civ. Action No. H-04-2154 (S.D. Tex.) Counsel for the *Bayerische Landesbank* plaintiffs filed the papers in support of the instant motion for summary judgment, in which all of the plaintiffs in the three above-captioned actions joined. The motion was filed in 2006, when all four actions were pending in the United States District Court for the Southern District of Texas, prior to transfer and/or remand to this Court. The *Bayerische Landesbank* action has since settled.

8. Chase and Citibank are designated as "Co-Administrative Agents" under the 364-Day Facility Agreement. *Id.*

9. Citibank also is designated as the "Paying Agent" under the 364-Day Facility Agreement. *Id.*

10. Enron is the "Borrower" under the 364-Day Facility Agreement. *Id.*

11. The Defendant Banks are sophisticated financial institutions, with experience serving as agent banks on syndicated revolving lending facilities; in 2001, Chase and Citibank collectively syndicated or arranged 51.2% of all such loans in the United States. Siev Aff., Ex. F at p.1, Table R11.

12. As agents, Chase and Citibank agreed to assume certain responsibilities and perform certain duties, as set forth in the Long-Term Facility Agreement and the 364-Day Facility Agreement (collectively, the "Revolving Credit Facility Agreements"), with respect to those two facilities (the "Facilities"). Siev Aff., Exs. A & B.

13. In consideration of the Defendant Banks' acceptance of such responsibilities and agreement to perform such duties, the Defendant Banks received fees from Enron, which the other Lenders did not receive. Siev Aff., Exs. A & B at Sec. 2.03; Exs. G & H.

14. The duties which the Defendant Banks are obligated to perform under the Revolving Credit Facility Agreements are administrative and mechanical in nature. Siev Aff., Exs. A & B at Sec. 7.02, 8.02.

The Notice of Borrowing

15. Under the Revolving Credit Facility Agreements, Enron is required to issue its requests to borrow funds through Notices of Borrowing. *Id.* at Sec. 2.02

16. A "Notice of Borrowing" is a defined term under the Revolving Credit Facility Agreements. Siev Aff., Exs. A & B, Sec. 1.01, 2.02.

17. The Revolving Credit Facility Agreements require each Notice of Borrowing to contain specific information, including, *inter alia,* "the date of such Borrowing," the "Type of Advances comprising such Borrowing," and the "aggregate amount of such Borrowing." *Id.* at Sec. 2.02(a).

18. The Revolving Credit Facility Agreements require each Notice of Borrowing to be prepared in a particular form, as set forth in an exhibit to the Revolving Credit Facility Agreements, and to be transmitted and confirmed in a particular manner. *Id.*

<u>The Conditions Precedent in the Revolving Credit Facility Agreements</u>

19. The Revolving Credit Facility Agreements set forth certain obligations of the Paying Agent and the Co-Administrative Agents in the event that the Borrower, Enron, sought to borrow funds under the Facilities. Siev Aff., Exs. A & B.

20. The Revolving Credit Facility Agreements set forth conditions precedent to the Lenders' obligation to disburse funds to the Borrower in response to the Notice of Borrowing. *Id.* at Article III.

21. Among these conditions precedent is one set forth in Section 3.01(b) in the respective Revolving Credit Facility Agreements. *Id.* at Sec. 3.01(b).

22. The Revolving Credit Facility Agreements provide that a condition precedent to the Lenders' obligation to make Advances, as defined, to Enron is that Citibank, as the Paying Agent, shall have received on or before the day of the initial Advance, certain documentation as set forth in Section 3.01, such documentation to be "in form and substance satisfactory to each Co-Administrative Agent." *Id.*

23. Section 3.01 identifies among the required documentation "certified copies of the resolutions of the Board of Directors of the Borrower approving . . . each Notice of Borrowing." *Id.*

24. Absent a resolution of Enron's Board of Directors that satisfies the terms of Section 3.01 of the Revolving Credit Facility Agreements, the Lenders have no obligation to disburse funds or make Advances to Enron. *Id.*

25. The condition precedent set forth in Section 3.01(b) could not be waived or amended without the written consent of all of the participating Lenders, and only then in the "specific instance and for the specific purpose for which given." *Id.* at Sec. 9.01.

26. The condition precedent in Section 3.01(b) was not amended or waived. Siev Aff., Ex. I at 80-81.

The October 25, 2001 Notices of Borrowing

27. On October 25, 2001, Enron sought to draw down the full amount of both the Long-Term Syndicated Facility and the 364-Day Syndicated Facility, totaling $3 billion. Siev Aff., Ex. C; Declaration of Luciano Cenedese ("Cenedese Dec."), dated March 15, 2006, ¶¶ 30, 43 & Exs. 3-6 thereto.

28. Enron transmitted two Notices of Borrowing (one Notice for each of the Revolving Credit Facilities) to Citibank, which then transmitted those Notices of Borrowing to the Lenders. *Id.*

29. Citibank's internal policies, as expressed in an email distributed less than one week before the October 25, 2001 drawdown, required the internal credit group to be "certain" that the "borrower has met all conditions precedent" upon the occurrence of a drawdown. Siev Aff., Ex. J.

30. From the time Enron made its decision to draw down the Revolving Credit Facilities and through October 25, 2001, Enron's Board of Directors did not pass any resolution authorizing the October 25, 2001 Notices of Borrowing. Siev Aff., Exs. D, M, OO (Citibank Response to Interrogatories 39 and 43), PP (Chase Response to Interrogatories 31 and 35) ; Affidavit of William J. Hayes, ¶ 27.

31. From the time the Long-Term Facility Agreement (including Section 3.01(b) set forth therein) came into existence on May 18, 2000 through October 25, 2001, Enron's Board of Directors did not pass any resolution approving the October 25, 2001 Notices of Borrowing. *Id.*

32. From the time the 364-Day Facility Agreement (including Section 3.01(b) set forth therein) came into existence on May 14, 2001 through October 25, 2001, Enron's Board of Directors did not pass any resolution approving the October 25, 2001 Notices of Borrowing. *Id.*

<u>Plaintiff UniCredito's Efforts To Obtain Confirmation from Citibank that the Conditions Precedent Had Been Satisfied</u>

33. On October 25, 2001 Luciano Cenedese was an officer at the New York branch of UniCredito Italiano SpA and the manager of UniCredito's account with Enron. Cenedese Dec., ¶ 3.

34. On October 25, 2001 Citibank sent UniCredito by facsimile notices that Enron would be drawing down the two Revolving Credit Facilities, and informing UniCredito of its pro rata share of the Advances under the Facilities. *Id.*, ¶ 30 & Exs. 3 & 4.

35. Citibank's notices informed UniCredito that it should contact Janet Wallace ("Wallace"), a Citibank employee, if it had questions concerning the demand notices. *Id.*, ¶ 32 & Exs. 3 and 4.

36. After receiving the notices in the early afternoon of October 25, 2001, Cenedese called Wallace at the telephone number provided, specifically to confirm that Citibank and Chase

had performed their duties under the Revolving Credit Facility Agreements and had determined as required that the conditions precedent had been satisfied. *Id.*, ¶¶ 32-37.

37. When Cenedese reached Wallace by telephone, she told him that she was just an administrative person and had no idea what Citibank had done before circulating the notices. She told him to contact Chris Lyons ("Lyons"), Citibank's account officer in Houston, or his deputy, a Mr. Manous ("Manous"). *Id.*, ¶¶ 38-39 & Ex. 4.

38. Cenedese attempted repeatedly to contact Lyons and Manous. *Id.*, ¶ 40.

39. Despite Cenedese's repeated attempts to contact them, neither Lyons nor Manous answered their telephones. Cenedese left voicemails for both of them, in which he stated that he needed to discuss issues related to the drawdown, that the matter was of great urgency, and that either Lyons or Manous should call him back immediately. *Id.*, ¶ 40.

40. Neither Lyons nor Manous, nor anyone else from Citibank, returned UniCredito's calls, on October 25, 2001, or thereafter. *Id.*, ¶ 41.

The Syndicated L/C Facility and Parties Thereto

41. Defendant Banks are parties to a syndicated letter of credit facility agreement, dated May 14, 2001 (the "Syndicated L/C Facility Agreement"). Siev Aff., Ex. N.

42. Also parties to the Syndicated L/C Facility were numerous banks which participated as lenders (the "Syndicated L/C Lenders"). *Id.*, Ex. N.

43. Under the Syndicated L/C Facility Agreement, Chase and Citibank are designated as the "Co-Administrative Agents." *Id.*

44. Under the Syndicated L/C Facility Agreement, Chase is designated as the "Paying Agent," as well as the "Issuing Bank." *Id.*

45. As Co-Administrative Agent, Paying Agent, and Issuing Bank, Chase agreed to assume certain responsibilities and perform certain duties, as set forth in the Syndicated L/C Facility Agreement. *Id.*

46. In consideration of its agreement to assume and carry out such duties under the Syndicated L/C Facility, Defendant Chase received fees that the other Syndicated L/C Lenders did not receive. Siev Aff., Ex. H.

<u>Chase's Issuance and/or Amendment of Letters of Credit Which Enron Had Requested Pursuant to a Bilateral Facility</u>

47. As Issuing Bank under the Syndicated L/C Facility Agreement, Chase was permitted to issue letters of credit only in accordance with the procedures and requirements set forth in the Syndicated L/C Facility Agreement, including Sections 2.01 and 2.02 thereof.

48. One procedure specified by the Syndicated L/C Facility Agreement is that Enron should submit a "properly completed" Letter of Credit Request to Chase, in a form provided in an exhibit to the Syndicated L/C Facility Agreement. Siev Aff., Ex. E at Section 2.01.

49. Under the Syndicated L/C Facility Agreement, the requirements of Sections 2.01 and 2.02 could not be altered without the consent of a majority vote of the participating Syndicated L/C Lenders, or the "Majority Banks" as defined. *Id.*, Section 10.1.

50. The Majority Banks did not consent to any change in the requirements of the Syndicated L/C Facility Agreement. Siev Aff., Ex. BB at 131-132.

51. On July 23, 2001 and August 23, 2001, Enron submitted forms to Chase which requested the issuance of four letters of credit under a different letter of credit facility, namely a bilateral facility entered into solely between Enron and Chase (the "Bilateral L/C Facility"). *Id.*, Exs. O, P, Q, & R.

52. The forms Enron submitted complied with the form required by the agreement governing the Bilateral L/C Facility and set forth certain representations and warranties pursuant to sections 6.1(a) through (c) thereof. *Id.,* Exs. N, O, P, Q & R.

53. Under the agreement governing the Bilateral L/C Facility between Enron and Chase, Chase was the only lending bank that bore a risk of loss. *Id.,* Ex. N.

54. Under both the Syndicated L/C Facility Agreement and the Bilateral L/C Facility agreement, it was Enron's right to determine under which facility a letter of credit would be issued. *Id.,* Ex. E at Sec. 2.01, Ex. N at Sec. 3.2, & Ex. S at 37-38.

55. With respect to each of the four requests received by Chase on July 23, 2001 and August 23, 2001, Chase issued letters of credit under the Syndicated L/C Facility Agreement, not the Bilateral L/C Facility. *Id.,* Exs. T, U, V & W.

56. These letters of credit are: P215878 (in the amount of $43,105,325, amended to $55,827,837); P215879 (in the amount of $30,205,724, amended to $43,443,098); P216985 (in an amount of $16,437,220), and P216987 (in the amount of $24,750,000). *Id.*

57. Each of these letters of credit was later drawn upon, and Chase issued notices demanding payment from the Syndicated L/C Lenders. *Id.,* Exs. X, Y, Z & AA.

Chase's Issuance and/or Amendment of Letters of Credit after an Event of Default

58. Pursuant to Section 2.06(c) of the Syndicated L/C Facility Agreement, Chase, as Paying Agent, was to receive, on behalf of the Syndicated L/C Lenders, certain letter of credit fees ("Letter of Credit Fees") from Enron on a quarterly basis. Siev Aff., Ex. E at Sec. 2.06(c).

59. Under Section 6.01 of the Syndicated L/C Facility Agreement, it was an Event of Default if Enron failed to pay any fee set forth in Section 2.06 of that Agreement, including the

Letter of Credit Fees, "for more than 15 days after such fee becomes due and payable." *Id.*, Ex. E at Sec. 6.01(a).

60. A quarterly installment of Letter of Credit Fees became due to Chase, for the benefit of the Syndicated L/C Lenders, on September 30, 2001. *Id.* at Sec. 2.06(c).

61. Enron did not pay the fees when due, nor during the 15-day period following the due date, which period expired on October 15, 2001. *Id.*, Exs. DD, EE & BB at p. 192.

62. As a result of Enron's failure to pay its fees due on September 30, 2001, an Event of Default occurred under the Syndicated L/C Facility Agreement as of October 15, 2001. *Id.*, Ex. BB at 195-198, Ex. CC at 794-795, 798.

63. Under the Syndicated L/C Facility Agreement, following an Event of Default, at the request of the Majority Banks or with their consent, Chase was required to "declare" to Enron and the Syndicated L/C Lenders that Chase's "obligation to issue or amend Letters of Credit" was "terminated." Siev Aff., Ex. E at Sec. 6.01.

64. Under the Syndicated L/C Facility Agreement, Chase could not waive or amend this requirement without the consent of all of the Syndicated L/C Lenders. *Id.*, at Sec. 10.01.

65. At no time on or after October 15, 2001 did Chase inform the Syndicated L/C Lenders that an Event of Default had occurred or seek their consent to waive the Event of Default provision in the Syndicated L/C Facility Agreement. *Id.*, Ex. BB at 195-196.

66. Following October 15, 2001 Chase continued to issue and/or amend letters of credit under the Syndicated L/C Facility in an aggregate amount of over $83 million. *Id.*, Exs. BB at 194-195, EE, FF, GG & HH.

67. In particular, Chase issued or amended the following letters of credit after October 15, 2001: Letter of Credit P217348 (in the amount of $41,250,000); Letter of Credit P218893 (in the amount of $27,000,000); and; Letter of Credit P218894 (in the amount of $15,000,000). *Id.*

68. On November 29-30, 2001, these letters of credit were drawn upon, and Chase thereafter issued notices demanding payment from the Syndicated L/C Lenders. Siev Aff., Exs. JJ, KK & LL.

Dated:  July 25, 2008

        Respectfully submitted,

        **ARNOLD & PORTER LLP**

        */s/ Charles G. Berry*
        Charles G. Berry
        Robert A. Goodman
        399 Park Avenue
        New York, New York  10022
        Tel:  (212) 715-1000
        Fax: (212) 715-1399
        *Attorneys for  Plaintiffs*
        *UniCredito Italiano SpA, et al.*


        **BARTLIT BECK HERMAN**
        **PALENCHAR & SCOTT LLP**

        Philip S. Beck
        James B. Heaton III
        Cindy L. Sobel
        Courthouse Place
        54 West Hubbard Street, 3rd Floor
        Chicago, Illinois  60610
        Tel:  (312) 494-4400
        Fax: (312) 494-4440

        Joseph C. Smith, Jr.
        1899 Wynkoop Street, 8th Floor
        Denver, Colorado 80202
        Tel:  (303) 592-3100
        Fax: (303) 592-3140

        **KLEINBERG, KAPLAN, WOLFF &**
        **COHEN, P.C.**

        */s/ David Parker*
        David Parker
        551 Fifth Avenue, 18th Floor
        New York, New York 10176
        Tel:  (212) 986-6000
        Fax: (212) 986-8866
        *Attorneys  for  Plaintiffs DK  Acquisition*
        *Partners L.P., et al.*

12

        *Avenue Capital Management II, L.P., et al.*
        *DK Acquisition Partners, L.P., et al.*

BOIES, SCHILLER & FLEXNER LLP

_(signed)_

David A. Barrett
Harlan A. Levy
Magda M. Jimenez
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Philip J. Iovieno
10 North Pearl Street
Albany, New York 12207
Tel: (518) 434-0600
Fax: (518) 434-0665

*Attorneys for Plaintiffs*
*Avenue Capital Management II, L.P., et al.*

**CERTIFICATE OF SERVICE**

I, Robert Goodman, hereby certify that on the 25th of July, 2008, I caused the annexed **PLAINTIFFS' JOINT STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO BREACH OF CONTRACT CLAIMS** to be served by electronic mail and First Class mail upon:

    David J. Woll, Esq.
    Simpson Thacher & Bartlett LLP
    425 Lexington Avenue
    New York, New York 10017

    Michael E. Gertzman, Esq.
    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    1285 Avenue of the Americas
    New York, New York 10019

                        /s/ Robert A. Goodman
                        Robert A. Goodman